IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BARBARA J. WINGARD, individually** | : |
| **and as Administratrix of the Estate of** | : CIVIL ACTION NO.: |
| **TROY ROBERT LEE HOOFTALLEN,** | : |
| Plaintiff, | : JUDGE: |
| | : |
| v. | : CIVIL ACTION - LAW |
| | : JURY TRIAL DEMANDED |
| | : |
| **JOHN DOE 1; JOHN DOE 2;** | : |
| **PENNSYLVANIA STATE POLICE;** | : |
| **COMMONWEALTH OF** | : |
| **PENNSYLVANIA;** | : |
| **TASER® INTERNATIONAL, INC.,** | : |
| Defendants | : |

## COMPLAINT

**AND NOW** comes Plaintiff, Barbara J. Wingard, individually and as the Administratrix of the Estate of Troy Robert Lee Hooftallen, by and through her undersigned counsel, Dennis E. Boyle, Esquire, Devon M. Jacob, Esquire, and the law firm of Boyle, Autry & Murphy, and avers as follows:

## INTRODUCTION

This case involves 36 year old Troy Robert Lee Hooftallen who died at the hands of two Pennsylvania State Police troopers during a medical emergency. Mr. Hooftallen was forced into a prone position, handcuffed, shackled, shocked

1

repeatedly by a Taser, and asphyxiated, by having a knee pressed into his throat and his chest compressed.

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983.

2. Jurisdiction is founded upon 28 U.S.C. § § 1331 and 1343(1), (3), and (4).

3. Venue is proper in this Court, as all parties are located within the Western District of Pennsylvania, and the cause of action arose in the Western District of Pennsylvania.

## PARTIES

4. Plaintiff is Barbara J. Wingard, is an adult individual living in Punxsutawney, Jefferson County, Pennsylvania. Ms. Wingard is the natural parent of Mr. Hooftallen, and the Administratrix of the Estate of Troy Robert Lee Hooftallen.

5. Defendant John Doe 1 is an adult individual, who during all relevant times, was employed by the Pennsylvania State Police, as a trooper. Defendant John Doe 1 was stationed at the Punxsutawney Barracks, which is located at 485 North Findley Street, Punxsutawney, Pennsylvania 15767. All of Defendant John

Doe 1's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

6. Defendant John Doe 2 is an adult individual, who during all relevant times, was employed by the Pennsylvania State Police, as a trooper.  Defendant John Doe 2 was stationed at the Punxsutawney Barracks, which is located at 485 North Findley Street, Punxsutawney, Pennsylvania 15767.  All of Defendant John Doe 2's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

7. Defendant Pennsylvania State Police ("PSP") was created by an act of legislation, which was signed into law on May 2, 1905.  Defendant PSP has jurisdiction in all political subdivisions in the Commonwealth.  Defendant PSP is headquartered at 1800 Elmerton Avenue, Harrisburg, PA 17110.

8. Defendant Commonwealth of Pennsylvania created Defendant PSP by an act of legislation, which was signed into law on May 2, 1905.

9. Defendant, Taser® International, Inc. (hereinafter "Taser® International"), is a Delaware Corporation and licensed to do business in the Commonwealth of Pennsylvania. Taser® International's corporate office is located at 17800 North 85th Street, Scottsdale, Arizona 85255. Taser® International is the

manufacturer of an electrical control device ("ECD") commonly referred to as a Taser, which is used for the neuromuscular incapacitation of individuals.

## FACTUAL BACKGROUND

10. On October 18, 2010, Troy Hooftallen was at the home of his girlfriend, which is located on Charley Hill Lane, Gaskill Township, Jefferson County, PA 15767.

11. Mr. Hooftallen was suffering from complications related to ulcerative colitis and other bowel disorders.

12. One of the medications that he was taking was Mucinex DM.

13. Mucinex DM contains two powerful medications: guaifenesin and dextromethorphan.

14. Mucinex DM can cause serious and dangerous side effects that require immediate medical attention.

15. These side effects include difficulty breathing, severe dizziness, hives, anxiety, confusion, and hallucinations.

16. At around 10:30 PM, Mr. Hooftallen's girlfriend found him to be confused and disoriented.

17. Mr. Hooftallen's girlfriend and family members decided that he required emergency medical treatment.

18. A family member called 911 and advised the dispatcher that Mr. Hooftallen required emergency medical treatment because he was apparently experiencing a bad reaction to Mucinex DM.

19. 911 dispatched the state police and an ambulance.

20. About 15 minutes after the 911 call, Defendants John Doe 1 and 2 arrived but the ambulance did not.

21. Defendants John Doe 1 and 2 were advised that Mr. Hooftallen was kind of "messed up" from the Mucinex that he takes for his Crohn's Disease.

22. The family member advised Defendants John Doe 1 and 2 that Mr. Hooftallen was not violent but that he did not want to go to the hospital.

23. Despite the fact that the Individual Defendants were never presented with the threat of serious injury or death, Defendants John Doe 1 and 2 used deadly force against Mr. Hooftallen in the form of Taser strikes and the application of knee or other pressure to his neck, throat and back.

24. Specifically, when Defendants John Doe 1 and 2 entered the home, they located a confused and anxious Mr. Hooftallen sitting on a sofa smoking a cigarette and talking to his mother.

25. Defendants John Doe 1 and 2 decided to tease and taunt Mr. Hooftallen until he finally took a swing at one of the officers.

26. In response, Defendants John Doe 1 and 2 tackled Mr. Hooftallen onto a sofa pressing his face into the cushions.

27. During the course of being tackled, Mr. Hooftallen's forehead struck a counter hard.

28. Mr. Hooftallen continued to struggle, and in response, was Tasered several times.

29. Shortly after the struggle began, Mr. Hooftallen found himself on the floor, with one of the John Doe Defendants' left knee on his neck and throat and right knee in the middle of his back between his shoulder blades, and the other John Doe Defendant pressing on his back.

30. At that point in time, Mr. Hooftallen surrendered to the custody of the officers stating, "Ok, ok, I'm done – I'm done."

31. Defendants John Doe 1 and 2 handcuffed Mr. Hooftallen.

32. One of the John Doe Defendants, however, continued to kneel on Mr. Hooftallen's throat and back.

33. When one of the John Doe Defendants went to apply shackles to Mr. Hooftallen's ankles, Mr. Hooftallen's legs moved, so one of the John Doe Defendants Tasered him again.

34. At that point, Mr. Hooftallen became still and quiet.

35. During the incident, Mr. Hooftallen was Tasered in "probe mode" and "drive-stun mode" in several locations that included the left side of his mid back near his heart, the right side of his neck below his ear, and the right side near his hip and back.

36. Defendants John Doe 1 and 2 dragged Mr. Hooftallen into the middle of the floor, where he remained handcuffed, shackled, and on his stomach.

37. Once again, one of the John Doe Defendants placed his left knee on Mr. Hooftallen's neck and throat, cutting off his airway supply, and his right knee on his back.

38. One of the John Doe Defendants then acknowledged that Mr. Hooftallen was unconscious.

39. One of the family members present inquired as to why the John Doe Defendant had to keep his knees on Mr. Hooftallen's neck, throat, and back.

40. Defendant John Doe replied that when he regained consciousness, he would start resisting again.

41. A family member asked the John Doe Defendants to check Mr. Hooftallen's breathing, and it was discovered that he was in respiratory and cardiac arrest.

42. One of the John Doe Defendants called again for an ambulance, and then for approximately 10 minutes, Defendants John Doe 1 and 2 stood around and waited for the ambulance to arrive.

43. While waiting for medical personnel to arrive, Defendants John Doe 1 and 2 did not remove the handcuffs or shackles from Mr. Hooftallen, initiate CPR, or provide him with any other medical treatment.

44. When medical personnel arrived, they found Mr. Hooftallen handcuffed, shackled, and lying on the floor in respiratory and cardiac arrest.

45. The medical personnel requested that Defendants John Doe 1 and 2 remove the handcuffs and shackles and only then were they removed.

46. Medical personnel initiated CPR and transported Mr. Hooftallen to the hospital.

47. Upon arrival at the hospital, it was determined by doctors that Mr. Hooftallen was brain dead.

48. On October 19, 2010, Mr. Hooftallen was pronounced dead.

49. After an autopsy was performed, the Allegheny County Medical Examiner concluded that Mr. Hooftallen "died as a result of Atherosclerotic Cardiovascular Disease while being both physically and electrically (TASER) restrained during a physical confrontation with the Pennsylvania State Police.

Positional asphyxia may have also played a role in his demise given witness accounts of the police officers pinning him to the ground in a prone position with their body weight on top of his upper back/neck and thighs.  The acute intoxication of both Dextromethorphan and Guaifenesin (both found in Mucinex DM) played a role in his demise likely causing his acute state of agitation."

50. Defendant Taser® International is engaged in the business of manufacturing, distributing and selling electrical control devices ("ECDs") to law enforcement agencies throughout the United States and Canada, as well as replacement cartridges for the continuing use of said products.

51. In connection with the original sale, and to promote and encourage ongoing sales, Defendant Taser® International makes representations regarding the potential risks and medical safety of its ECDs, and provides training and training materials for law enforcement agencies to use in instructing their officers in the purported safe use of its products.

52. Defendant Taser® International sold ECDs and replacement cartridges to Defendant PSP, and has provided training materials to Defendant PSP from the date of the original sale until the present day, in connection with those sales.

53. Defendant Taser® International knows that law enforcement agencies such as the Defendant PSP do not independently research medical risks posed by

ECDs, but instead rely on medical, training, and safety information provided by Defendant Taser® International.

54. When Defendant Taser® International introduced its products into the market in 1999, Defendant Taser® International represented that its products did not affect heart rhythms in humans.

55. In 2006 to 2007, Defendant Taser® International became aware that its products could cause ventricular arrhythmias, including potentially lethal ventricular fibrillation in humans.

56. Defendant Taser® International, however, waited until September of 2009, before it even began to acknowledge the potential of its products to affect heart rhythms.

57. Up and until the date of the incident in question, Defendant Taser® International's training programs and literature failed to fully and properly incorporate or communicate the available medical studies regarding the dangers of their products.

58. To the contrary, Defendant Taser® International continued to represent to law enforcement and the public that its products were and are a less than lethal weapon.

59. Defendant Taser® International's products are no less lethal than a gun – if it is fired into the chest it can kill – if it is fired into the foot it does not kill.

## COUNT I

### Plaintiff v. Defendants John Doe 1 and 2
### Fourth Amendment – Excessive Force
### Pursuant to 42 U.S.C. § 1983

60. Paragraphs 1- 59 are stated herein by reference.

61. Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

62. Despite the fact that Defendants John Doe 1 and 2 were not presented with the threat of serious injury or death, they provoked the need to use force, and in fact used deadly force, against Mr. Hooftallen in the form of Taser strikes and the application of knee and other pressure to his neck, throat, and back.

63. The forced used by Defendants John Doe 1 and 2 to effect the arrest of Mr. Hooftallen was excessive and therefore unlawful.

64. The unlawful force used against Mr. Hooftallen was for the purpose of inflicting pain and physical injury, torture, and punishment.

65. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT II

### Plaintiff v. Defendants John Doe 1 & 2
### Fourteenth Amendment – Denial of Medical Care
### Pursuant to 42 U.S.C. § 1983

66.     Paragraphs 1-65 are stated herein by reference.

67.     Mr. Hooftallen was a pretrial detainee in the custody of Defendants John Doe 1 and 2.

68.     While a pretrial detainee, the aforementioned Defendants knew of but ignored Mr. Hooftallen's serious medical needs associated with his respiratory and cardiac arrest.

69.     A medical need is serious when it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir. 1987), *cert. denied,* 486 U.S. 1006 (1988).

70.     It was obvious to Defendants John Doe 1 and 2 that Mr. Hooftallen required emergency medical treatment because they called a second time for an ambulance.

71.     Despite knowing that Mr. Hooftallen was in respiratory and cardiac arrest, Defendants John Doe 1 and 2 failed to initiate CPR.

72.     Defendants John Doe 1 and 2 refused to initiate CPR for a non-medical

reason.

73. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT III

### Plaintiff v. Defendants Commonwealth of PA and PSP
### Title II of the Americans with Disabilities Act of 1990
### and Section 504 of the Rehabilitation Act of 1973

74. Paragraphs 1- 73 are stated herein by reference.

75. Defendants PSP and Commonwealth of Pennsylvania violated Mr. Hooftallen's right to be free from discrimination on the basis of his disability pursuant to Title II of the ADA and § 504 of the RA.

76. Specifically, Defendant PSP and Commonwealth of Pennsylvania failed to properly train troopers to have peaceful encounters with mentally and physically disabled persons, and failed to establish a proper policy for handling such encounters, which resulted in the discrimination against Mr. Hooftallen that caused him to suffer his injuries and death.

77. Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities by a

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

78. Similarly, pursuant to § 504 of the RA, "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.] 29 U.S.C. § 794.

79. In order to state a claim under either statute, a Plaintiff must prove that he (1) is disabled, (2) is otherwise qualified for the services, programs or activities sought or would be qualified if the defendant had made reasonable modifications to the services, programs or activities, and (3) was discriminated against solely on the basis of his disability. *See Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1009 (3d Cir.1995).

80. Defendant PSP is a public entity that receives federal funding.

81. Mr. Hooftallen suffered from qualifying disabilities of depression, ulcerative colitis, and other bowel disorders.

82. Moreover, Defendants John Doe 1 and 2 who were employed by Defendant PSP and Commonwealth of Pennsylvania, and who interacted with Mr.

Hooftallen, regarded him as being disabled.

83. Mr. Hooftallen was entitled to the same law enforcement services that Defendant PSP provides to other non disabled persons.

84. Specifically, Mr. Hooftallen was entitled to the benefit of a lawful exercise of police powers, including the right not to be subjected to an unlawful use of force and the right to emergency medical care.

85. Defendants PSP and Commonwealth of Pennsylvania discriminated against the Mr. Hooftallen solely because of his disabilities.

86. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT IV

### Plaintiff v. Taser® International, Inc.
### Strict Products Liability

87. Paragraphs 1- 86 are stated herein by reference.

88. To state a products liability cause of action under section 402A of the Restatement (Second) of Torts in Pennsylvania, a Plaintiff must prove two things: "(1) that the product was defective; and (2) that the defect was a substantial factor in causing the injury." *Hadar v. AVCO Corp.,* 886 A.2d 225, 228 (Pa. Super. Ct. 2005) (citing *Webb v. Zern,* 220 A.2d 853 (1966)).

89. Defendant Taser® International had an ongoing duty to use reasonable and ordinary care in providing truthful and up-to-date medical, training, and safety information in connection with the ongoing use of its products by various law enforcement agencies.

90. Defendant Taser® International had a further duty to provide sufficient warnings and instructions as were required to inform its user and consumers of the possible risks and inherent limitations of his product.

91. Defendant Taser® International's failure to provide sufficient warnings and instructions, resulted in its products being defective.

92. Defendant Taser® International failed to correct the known misconception that their products are less than lethal.

93. As a direct and proximate result of the foregoing malicious, wanton, reckless, and negligent conduct, Defendants John Doe 1 and 2 were not properly trained:

   a. To only use ECDs when deadly force would be lawful;

   b. On the proper locations on the human body to use ECDs.

   c. On the dangers associated with extending the duration of the pulsing electrical current beyond the pre-programmed setting.

    d. To recognize cardiac arrest or to properly respond to a cardiac arrest event.

94. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

95. Defendant Taser® International's conduct was motivated by a desire to increase profits with a complete disregard for the value of human life.

96. Accordingly, Plaintiffs seek punitive damages in the maximum amount allowed by law.

## COUNT V

### Plaintiff v. Defendants
### Wrongful Death

97. Paragraphs 1- 96 are stated herein by reference.

98. Defendants John Doe 1 and 2 caused the death of Mr. Hooftallen by shocking him repeatedly with a Taser, and by placing a knee on his neck and throat and other pressure on his back causing him to asphyxiate.

99. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

100. There were no actions brought by decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

101. Mr. Hooftallen died intestate and had no spouse or children.

102. The following persons are entitled to recover damages: Barbara J. Wingard (mother), 421 Seitz Lane, Box 149, Punxsutawney, PA 15767.

103. Plaintiff brings this action on behalf of Mr. Hooftallen's survivors and claims damages for pecuniary loss suffered by decedent's survivors by reason of his wrongful death, as well as for reimbursement for medical bills, funeral and burial expenses, administrative expenses, and other expenses incident to his death, as well as the loss of services and financial care that he would have provided to his survivors.

## COUNT VI

### Plaintiff v. Defendants
### Survival Action

104. Paragraphs 1- 103 are stated herein by reference.

105. Plaintiff claims on behalf of Mr. Hooftallen's Estate damages for the pain and suffering caused during the events in question until the time of his death.

**WHEREFORE**, the Plaintiff respectfully requests that judgment be entered in her favor as follows:

A. That this Court declare that the Defendants' actions violated his constitutional

and statutory rights;

B. Compensatory damages;

C. Punitive damages (except against Defendants PSP and Commonwealth of Pennsylvania);

D. Reasonable attorney's fees and costs;

E. A jury trial; and,

F. Such other financial or equitable relief as is reasonable and just.

**BOYLE, AUTRY & MURPHY**

Date: October 17, 2012

*/s/Devon M. Jacob*
**Dennis E. Boyle, Esquire**
Pa. Supreme Ct. I.D. 49618
**Devon M. Jacob, Esquire**
Pa. Supreme Ct. I.D. 89182
**Travis S. Weber, Esquire**
Pa. Supreme Ct. I.D. 309319
4660 Trindle Road, Suite 200
Camp Hill, PA 17011
Phone: (717) 737-2430
Fax: (717) 737-2452
Email: deboyle@dennisboylelaw.com
          dmjacob@dennisboylelaw.com
          tweber@dennisboylelaw.com

Counsel for Plaintiff