# EXHIBIT D-1

# Plaintiff's Amended Complaint

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BARBARA J. WINGARD, individually** : | |
| **and as Administratrix of the Estate of** : | **Civil Action No.: 2:12-cv-01500** |
| **TROY ROBERT LEE HOOFTALLEN,** : | |
| **Plaintiff,** : | **District Judge Cathy Bisson** |
| : | |
| **v.** : | **CIVIL ACTION - LAW** |
| : | |
| : | **JURY TRIAL DEMANDED** |
| **GUY A. BATTESTILLI;** : | |
| **STEVEN E. JOHNSON;** : | |
| **PENNSYLVANIA STATE POLICE;** : | |
| **COMMONWEALTH OF PA;** : | |
| **TASER® INTERNATIONAL, INC.;** : | |
| **Defendants** : | |

## COMPLAINT

**AND NOW** comes Plaintiff, Barbara J. Wingard, individually and as the Administratrix of the Estate of Troy Robert Lee Hooftallen, by and through her undersigned counsel, and the law firm of Boyle Litigation, and avers as follows:

## INTRODUCTION

This case involves 36 year old Troy Robert Lee Hooftallen who died at the hands of two Pennsylvania State Police troopers during a medical emergency. Mr. Hooftallen was forced into a prone position, handcuffed, shackled, shocked repeatedly by a Taser, and asphyxiated, by having a knee pressed into his throat and his chest compressed.

1

Case 2:12-cv-01500-CB-MPK Document 14-1 Filed 02/11/13 Page 2 of 684

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. § § 1331 and 1343(1), (3), and (4).

3.      Venue is proper in this Court, as all parties are located within the Western District of Pennsylvania, and the cause of action arose in the Western District of Pennsylvania.

## PARTIES

4.      Plaintiff is Barbara J. Wingard, is an adult individual living in Punxsutawney, Jefferson County, Pennsylvania.   Ms. Wingard is the natural parent of Mr. Hooftallen, and the Administratrix of the Estate of Troy Robert Lee Hooftallen.

5.      Defendant, Guy A. Battestilli, is an adult individual, who during all relevant times, was employed by the Pennsylvania State Police, as a trooper. Defendant Battestilli was stationed at the Punxsutawney Barracks, which is located at 485 North Findley Street, Punxsutawney, Pennsylvania 15767.   All of Defendant Battestilli's actions or inactions were taken under color of state law.   He is sued in his individual capacity.

6.      Defendant, Steven E. Johnson, is an adult individual, who during all relevant times, was employed by the Pennsylvania State Police, as a trooper. Defendant Johnson was stationed at the Punxsutawney Barracks, which is located at 485 North Findley Street, Punxsutawney, Pennsylvania 15767.   All of Defendant Johnson's actions or inactions were taken under color of state law.   He is sued in his individual capacity.

7.      Defendant Pennsylvania State Police ("PSP") was created by an act of legislation, which was signed into law on May 2, 1905.   Defendant PSP has jurisdiction in all political subdivisions in the Commonwealth.   Defendant PSP is headquartered at 1800 Elmerton Avenue, Harrisburg, PA 17110.

8.      Defendant Commonwealth of Pennsylvania created Defendant PSP by an act of legislation, which was signed into law on May 2, 1905.

9.      Defendant, Taser® International, Inc. (hereinafter "Taser® International"), is a Delaware Corporation and licensed to do business in the Commonwealth of Pennsylvania. Taser® International's corporate office is located at 17800 North 85th Street, Scottsdale, Arizona 85255. Taser® International is the manufacturer of an electrical control device ("ECD") commonly referred to as a Taser, which is used for the neuromuscular incapacitation of individuals.

## IDENTIFICATION OF JOHN DOE DEFENDANTS

10.    On October 17, 2012, Plaintiff filed a Complaint, pursuant to 42 U.S.C. § 1983, seeking damages.

11.    Prior to filing her Complaint, in response to an inquiry from Plaintiff's lawyer, Defendant PSP refused to identify the John Doe Defendants.

12.    On November 13, 2012, undersigned counsel sent a written request to Chief Counsel for Defendant PSP, Scott R. Ford, advising him of the filed Complaint and requesting documents necessary to identify the John Doe Defendants.

13.    On the same date, despite the fact that no attorney had entered their appearance and Attorney Ford is chief counsel for the agency, Attorney Ford advised undersigned counsel that his office is not the proper office for service of discovery requests and denied the request.

14.    On the same date, undersigned counsel forwarded the same request for documents to the Commonwealth of Pennsylvania, Office of Attorney General, who Attorney Ford advised would eventually be representing Defendant PSP.

15.    On November 16, 2012, counsel for Defendants Commonwealth of PA and PSP entered his appearance.

4

16.     On January 15, 2013, undersigned counsel forwarded the request to the head of the Civil Division for the Commonwealth of Pennsylvania, Office of Attorney General

17.     On January 23, 2013, undersigned counsel received PSP investigation report IAD 2010-0738 and identified the John Doe Defendants.

## FACTUAL BACKGROUND

18.     On October 18, 2010, Troy Hooftallen was at the home of his girlfriend, which is located on Charley Hill Lane, Gaskill Township, Jefferson County, PA 15767.

19.     Mr. Hooftallen was suffering from depression and complications related to ulcerative colitis and other bowel disorders.

20.     One of the medications that he was taking was Mucinex DM.

21.     Mucinex DM contains two powerful medications: guaifenesin and dextromethorphan.

22.     Mucinex DM can cause serious and dangerous side effects that require immediate medical attention.

23.     These side effects include difficulty breathing, severe dizziness, hives, anxiety, confusion, and hallucinations.

24.     At around 11:20 PM, Mr. Hooftallen's girlfriend found him to be confused and disoriented.

25.     Mr. Hooftallen's girlfriend and family members decided that he required emergency medical treatment.

26.     A family member called 911 and advised the dispatcher that Mr. Hooftallen required emergency medical treatment because he was apparently experiencing a bad reaction to Mucinex DM.

27.     911 dispatched the state police and an ambulance.

28.     About 15 minutes after the 911 call, Defendants Battestilli and Johnson arrived but the ambulance did not.

29.     Defendants Battestilli and Johnson were advised that Mr. Hooftallen was kind of "messed up" from the Mucinex that he takes for his Crohn's Disease.

30.     The family member advised Defendants Battestilli and Johnson that Mr. Hooftallen was not violent but that he did not want to go to the hospital.

31.     The family member further advised Defendants Battestilli and Johnson that Mr. Hooftallen had tried to commit suicide a few weeks earlier.

32.     Despite the fact that the Individual Defendants were never presented with the threat of serious injury or death, Defendants Battestilli and Johnson used

deadly force against Mr. Hooftallen in the form of Taser strikes and the application of knee or other pressure to his neck, throat and back.

33.     Specifically, when Defendants Battestilli and Johnson entered the home, they located a confused and anxious Mr. Hooftallen sitting on a sofa smoking a cigarette and talking to his mother.

34.     Defendants Battestilli and Johnson teased and taunted Mr. Hooftallen until he finally took a swing at one of the troopers.

35.     In response, Defendants Battestilli and Johnson tackled Mr. Hooftallen onto a sofa pressing his face into the cushions.

36.     During the course of being tackled, Mr. Hooftallen's forehead struck a counter hard.

37.     Mr. Hooftallen was Tasered in "probe mode" in the upper back, near his heart, by Defendant Battestilli, with a model X26 TASER that had been manufactured by Defendant Taser® International and issued to Defendant Battestilli by Defendant PSP.

38.     Shortly after the struggle began, Mr. Hooftallen found himself on the floor, with either Defendants Battestilli's or Johnson's left knee on his neck and throat and right knee in the middle of his back between his shoulder blades, and either Defendants Battestilli or Johnson pressing on his back.

7

39.    At that point in time, Mr. Hooftallen surrendered to the custody of the officers stating, "Ok, ok, I'm done – I'm done."

40.    Defendants Battestilli and/or Johnson handcuffed Mr. Hooftallen.

41.    Either Defendants Battestilli or Johnson, however, continued to kneel on Mr. Hooftallen's throat and back.

42.    After being handcuffed and before shackles were applied to Mr. Hooftallen's ankles, Defendant Battestilli, with Defendant Johnson watching and having sufficient time to intervene to stop him, Tasered Mr. Hooftallen at least three more times in "drive stun" mode.

43.    At that point, Mr. Hooftallen became still and quiet.

44.    During the incident, Mr. Hooftallen was Tasered in "probe mode" and "drive-stun mode" at least four times, possibly more.

45.    Specifically, Defendant PSP's records indicate that Defendant Battestilli Tasered Mr. Hooftallen as follows: (1) 11:45:45 PM by a probe shot for seven seconds in the upper back, (2) 11:47:12 PM by drive stun for four seconds in the right leg, (3) 11:47:19 PM by drive stun for six seconds in the right side waist area, and (4) 11:47:26 PM by drive stun for five seconds in the right side waist area.

46.    Defendants Battestilli and Johnson dragged Mr. Hooftallen into the middle of the floor, where he remained handcuffed, shackled, and on his stomach.

47. Once again, either Defendants Battestilli or Johnson placed his left knee on Mr. Hooftallen's neck and throat, cutting off his airway supply, and his right knee on his back.

48. Defendants Battestilli or Johnson then acknowledged that Mr. Hooftallen was unconscious.

49. One of the family members present inquired as to why Defendants Battestilli or Johnson had to keep his knees on Mr. Hooftallen's neck, throat, and back.

50. Defendants Battestilli or Johnson replied that when he regained consciousness, he would start resisting again.

51. A family member asked Defendants Battestilli or Johnson to check Mr. Hooftallen's breathing, and it was discovered that he was in respiratory and cardiac arrest.

52. Defendants Battestilli or Johnson called again for an ambulance, and then for approximately 10 minutes, Defendants Battestilli or Johnson stood around and waited for the ambulance to arrive.

53. While waiting for medical personnel to arrive, Defendants Battestilli or Johnson did not remove the handcuffs or shackles from Mr. Hooftallen, initiate CPR, or provide him with any other medical treatment.

9

54.     When medical personnel arrived, they found Mr. Hooftallen handcuffed, shackled, and lying on the floor in respiratory and cardiac arrest.

55.     The medical personnel requested that Defendants Battestilli or Johnson remove the handcuffs and shackles and only then were they removed.

56.     Medical personnel initiated CPR and transported Mr. Hooftallen to the hospital.

57.     Upon arrival at the hospital, it was determined by doctors that Mr. Hooftallen was brain dead.

58.     On October 19, 2010, Mr. Hooftallen was pronounced dead.

59.     After an autopsy was performed, the Allegheny County Medical Examiner concluded that Mr. Hooftallen "died as a result of Atherosclerotic Cardiovascular Disease while being both physically and electrically (TASER) restrained during a physical confrontation with the Pennsylvania State Police. Positional asphyxia may have also played a role in his demise given witness accounts of the police officers pinning him to the ground in a prone position with their body weight on top of his upper back/neck and thighs.   The acute intoxication of both Dextromethorphan and Guaifenesin (both found in Mucinex DM) played a role in his demise likely causing his acute state of agitation."

60.     Defendant Taser® International is engaged in the business of

10

manufacturing, distributing and selling electrical control devices ("ECDs") to law enforcement agencies throughout the United States and Canada, as well as replacement cartridges for the continuing use of said products.

61.     In connection with the original sale, and to promote and encourage ongoing sales, Defendant Taser® International makes representations regarding the potential risks and medical safety of its ECDs, including the model X26 TASER, and provides training and training materials for law enforcement agencies to use in instructing their officers in the purported safe use of its products.

62.     Defendant Taser® International sold ECDs, including the model X26 TASER in question, and replacement cartridges, to Defendant PSP, and has provided training materials to Defendant PSP from the date of the original sale until the present day, in connection with those sales.

63.     Defendant Taser® International knows that law enforcement agencies such as the Defendant PSP do not independently research medical risks posed by ECDs like the model X26 TASER but instead rely on medical, training, and safety information provided by Defendant Taser® International.

64.     When Defendant Taser® International introduced its products like the model X26 TASER into the market in 1999, Defendant Taser® International represented that its products did not affect heart rhythms in humans.

65.     In 2006 to 2007, Defendant Taser® International became aware that its products like the model X26 TASER could cause ventricular arrhythmias, including potentially lethal ventricular fibrillation in humans.

66.     Defendant Taser® International, however, waited until September of 2009, before it even began to acknowledge the potential of its products to affect heart rhythms.

67.     Up and until the date of the incident in question, Defendant Taser® International's training programs and literature failed to fully and properly incorporate or communicate the available medical studies regarding the dangers of their products.

68.     To the contrary, Defendant Taser® International continued to represent to law enforcement and the public that its products were and are a less than lethal weapon.

69.     Defendant Taser® International knows that the model X26 TASER causes stress on the body, which can result in physical injury or death.

70.     The model X26 TASER is designed to shut off after a preprogrammed amount of time.

71.     Despite knowing the substantial risks in doing so, Defendant Taser® International designed the model X26 TASER so that the preprogrammed amount of cycle time can easily be overridden by the user (which occurred in this incident).

72.     Defendant Taser® International continues to ignore the related dangers of designing its products like the model X26 TASER to permit the user to override the preset cycle time while knowing that its products are being regularly misused in the field by law enforcement personnel.

73.     Defendant Taser® International's model X26 TASER is no less lethal than a gun – if it is fired into the chest it can kill – if it is fired into the foot it does not kill.

# COUNT I

### Plaintiff v. Defendants Battestilli and Johnson
### Fourth Amendment – Excessive Force
### Pursuant to 42 U.S.C. § 1983

74.     Paragraphs 1- 73 are stated herein by reference.

75.     Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

76.     Despite the fact that Defendants Battestilli and Johnson were not presented with the threat of serious injury or death, they provoked the need to use force, and in fact used deadly force, against Mr. Hooftallen in the form of Taser strikes and the application of knee and other pressure to his neck, throat, and back.

77.     The forced used by Defendants Battestilli and Johnson to effect the arrest of Mr. Hooftallen was excessive and therefore unlawful.

78.     The unlawful force used against Mr. Hooftallen was for the purpose of inflicting pain and physical injury, torture, and punishment.

79.     As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT II

### Plaintiff v. Defendants Battestilli and Johnson
### Fourteenth Amendment – Denial of Medical Care
### Pursuant to 42 U.S.C. § 1983

80.     Paragraphs 1-79 are stated herein by reference.

81.     Mr. Hooftallen was a pretrial detainee in the custody of Defendants Battestilli and Johnson.

82.     While a pretrial detainee, the aforementioned Defendants knew of but ignored Mr. Hooftallen's serious medical needs associated with his respiratory and cardiac arrest.

83.     A medical need is serious when it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir. 1987), *cert. denied,* 486 U.S. 1006 (1988).

84.     It was obvious to Defendants Battestilli and Johnson that Mr. Hooftallen required emergency medical treatment because they called a second time for an ambulance.

85.     Despite knowing that Mr. Hooftallen was in respiratory and cardiac arrest, Defendants Battestilli and Johnson failed to initiate CPR.

86.     Defendants Battestilli and Johnson refused to initiate CPR for a

15

non-medical reason.

87.     As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT III

### Plaintiff v. Defendants Commonwealth of PA and PSP
### Title II of the Americans with Disabilities Act of 1990
### and Section 504 of the Rehabilitation Act of 1973

88.     Paragraphs 1- 87 are stated herein by reference.

89.     Defendants PSP and Commonwealth of Pennsylvania violated Mr. Hooftallen's right to be free from discrimination on the basis of his disability pursuant to Title II of the ADA and § 504 of the RA.

90.     Specifically, Defendant PSP and Commonwealth of Pennsylvania failed to properly train troopers to have peaceful encounters with mentally and physically disabled persons, and failed to establish a proper policy for handling such encounters, which resulted in the discrimination against Mr. Hooftallen that caused him to suffer his injuries and death.

91.     Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities by a

16

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

92.    Similarly, pursuant to § 504 of the RA, "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.] 29 U.S.C. § 794.

93.    In order to state a claim under either statute, a Plaintiff must prove that he (1) is disabled, (2) is otherwise qualified for the services, programs or activities sought or would be qualified if the defendant had made reasonable modifications to the services, programs or activities, and (3) was discriminated against solely on the basis of his disability. *See Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1009 (3d Cir.1995).

94.    Defendant PSP is a public entity that receives federal funding.

95.    Mr. Hooftallen suffered from qualifying disabilities of depression, ulcerative colitis, and other bowel disorders.

96.    Moreover, Defendants Battestilli and Johnson who were employed by Defendant PSP and Commonwealth of Pennsylvania, and who interacted with Mr.

17

Hooftallen, regarded him as being disabled.

97.     Mr. Hooftallen was entitled to the same law enforcement services that Defendant PSP provides to other non disabled persons.

98.     Specifically, Mr. Hooftallen was entitled to the benefit of a lawful exercise of police powers, including the right not to be subjected to an unlawful use of force and the right to emergency medical care.

99.     Defendants PSP and Commonwealth of Pennsylvania discriminated against the Mr. Hooftallen solely because of his disabilities.

100.    As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT IV

### Plaintiff v. Taser® International, Inc.
### Strict Products Liability

101.    Paragraphs 1- 100 are stated herein by reference.

102.    To state a products liability cause of action under section 402A of the Restatement (Second) of Torts in Pennsylvania, a Plaintiff must prove two things: "(1) that the product was defective; and (2) that the defect was a substantial factor in causing the injury." *Hadar v. AVCO Corp.,* 886 A.2d 225, 228 (Pa. Super. Ct. 2005) (citing *Webb v. Zern,* 220 A.2d 853 (1966)).

103. Defendant Taser® International had an ongoing duty to use reasonable and ordinary care in providing truthful and up-to-date medical, training, and safety information in connection with the ongoing use of its products by various law enforcement agencies.

104. Defendant Taser® International had a duty to manufacture safe products, which included the duty to design its products, like the model X26 TASER, so that the cycle settings could not be easily overridden by the user.

105. Defendant Taser® International had a duty to stop selling its products or to manufacture safer products after it discovered that its products were being used improperly by law enforcement.

106. Defendant Taser® International had a further duty to provide sufficient warnings and instructions as were required to inform its user and consumers of the possible risks and inherent limitations of his product.

107. Defendant Taser® International's failure to provide sufficient warnings and instructions, resulted in its products being defective.

108. Defendant Taser® International failed to correct the known misconception that their products are less than lethal.

19

109.   As a direct and proximate result of the foregoing malicious, wanton, reckless, and negligent conduct, Defendants Battestilli and Johnson were not properly trained:

    a.  To only use ECDs when deadly force would be lawful;

    b.  On the proper locations on the human body to use ECDs.

    c.  On the dangers associated with extending the duration of the pulsing electrical current beyond the pre-programmed setting.

    d.  To recognize cardiac arrest or to properly respond to a cardiac arrest event.

110.   As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

111.   Defendant Taser® International's conduct was motivated by a desire to increase profits with a complete disregard for the value of human life.

112.   Accordingly, Plaintiffs seek punitive damages in the maximum amount allowed by law.

## <u>COUNT V</u>

### Plaintiff v. Defendants
### Wrongful Death

113.   Paragraphs 1- 112 are stated herein by reference.

114. Defendants Battestilli and Johnson caused the death of Mr. Hooftallen by shocking him repeatedly with a Taser, and by placing a knee on his neck and throat and other pressure on his back causing him to asphyxiate.

115. As a direct and proximate cause of the Defendants' actions, Mr. Hooftallen suffered immense physical pain, humiliation, fear, physical injuries, and death.

116. There were no actions brought by decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

117. Mr. Hooftallen died intestate and had no spouse or children.

118. The following persons are entitled to recover damages: Barbara J. Wingard (mother), 421 Seitz Lane, Box 149, Punxsutawney, PA 15767, and Perry Hooftallen (father), 3 Railroad Avenue, Roulette, PA 16746.

119. Plaintiff brings this action on behalf of Mr. Hooftallen's survivors and claims damages for pecuniary loss suffered by decedent's survivors by reason of his wrongful death, as well as for reimbursement for medical bills, funeral and burial expenses, administrative expenses, and other expenses incident to his death, as well as the loss of services and financial care that he would have provided to his survivors.

## COUNT VI

### Plaintiff v. Defendants
### Survival Action

120.   Paragraphs 1- 119 are stated herein by reference.

121.   Plaintiff claims on behalf of Mr. Hooftallen's Estate damages for the pain and suffering caused during the events in question until the time of his death.

   **WHEREFORE**, the Plaintiff respectfully requests that judgment be entered in her favor as follows:

A. That this Court declare that the Defendants' actions violated his constitutional and statutory rights;

B. Compensatory damages;

C. Punitive damages (except against Defendants PSP and Commonwealth of Pennsylvania);

D. Reasonable attorney's fees and costs;

E. A jury trial; and,

F. Such other financial or equitable relief as is reasonable and just.

RESPECTFULLY SUBMITTED,

BOYLE LITIGATION

**Dennis E. Boyle, Esquire**
PA Supreme Court I.D. No. 49618
Email: deboyle@boylelitigation.com

_s/Devon M. Jacob_
**Devon M. Jacob, Esquire**
PA Supreme Court I.D. No. 89182
Email: dmjacob@boylelitigation.com

**Travis S. Weber, Esquire**
PA Supreme Court I.D. No. 309319
Email: tweber@boylelitigation.com

4660 Trindle Road, Suite 200
Camp Hill, PA 17011
Phone: (717) 737-2430
Fax: (717) 737-2452

Dated:   February 11, 2013          Counsel for Plaintiff

# EXHIBIT D-2

# Deposition of Barbara Wingard

1

1

2        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3
                    - - - - -
4
    BARBARA J. WINGARD,      )
5   individually and as      )
    Administratrix of the    )
6   Estate of TROY ROBERT    )
    LEE HOOFTALLEN,          )
7                             )
            Plaintiff,       )
8                             )
            vs.              ) Civil Action
9                             ) No. 2:12-cv-01500
    GUY A. BATTESTILLI;      )
10  STEVEN E. JOHNSON;       )
    PENNSYLVANIA STATE       )
11  POLICE; COMMONWEALTH     )
    OF PENNSYLVANIA; TASER   )
12  INTERNATIONAL, INC.,     )
                             )
13          Defendants.      )

14                  - - - - -

15      DEPOSITION OF BARBARA JEAN WINGARD

16                  - - - - -

17              December 5, 2013

18                  - - - - -

19

20

21

22

23  REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
    WITHOUT AUTHORIZATION FROM THE CERTIFYING
24  AGENCY

25                  - - - - -

2

1

2          <u>DEPOSITION OF BARBARA JEAN WINGARD</u>,

3     the Plaintiff herein, called by the Defendant,

4     TASER International, Inc., for examination,

5     taken pursuant to Rule 30 of the Federal

6     Rules of Civil Procedure, by and before

7     Lina G. Hershberger, a Professional Court

8     Reporter and Notary Public in and for the

9     Commonwealth of Pennsylvania, at the Office of

10    the Attorney General, Sixth Floor, Manor

11    Complex, 564 Forbes Avenue, Pittsburgh,

12    Pennsylvania, on Thursday, December 5, 2013, at

13    9:39 a.m.

14                    - - - - -

15    <u>COUNSEL PRESENT</u>:

16    For the Plaintiff:

17         Travis S. Weber, Esq.
           Boyle Litigation
18         4660 Trindle Road, Suite 102
           Camp Hill, PA  17011
19

20    For the Defendant TASER International, Inc.:

21         Isaiah Fields, Esq.
           TASER International, Inc.
22         17800 North 85th Street
           Scottsdale, AZ  85255
23

24

25

3

1

2      For the Defendants Pennsylvania State Police
       and Commonwealth of Pennsylvania:

3

           Thomas L. Donahoe, SDAG
4          Office of the Attorney General
           Sixth Floor, Manor Complex
5          564 Forbes Avenue
           Pittsburgh, PA  15219
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

I N D E X

- - - - -

WITNESS:   BARBARA J. WINGARD

E X A M I N A T I O N:                      PAGE

BY MR. FIELDS                                5

BY MR. DONAHOE                             185

BY MR. WEBER                               253

BY MR. FIELDS                              267

BY MR. DONAHOE                             270

BY MR. WEBER                               271


E X H I B I T S:


DEFENSE EXHIBIT NO. 1                       46

DEFENSE EXHIBIT NO. 2                       56

DEFENSE EXHIBIT NO. 3                       80

DEFENSE EXHIBIT NO. 4                      232

5

1

2                          P R O C E E D I N G S

3                              - - - - -

4                  BARBARA JEAN WINGARD,

5       the Plaintiff herein, having been first duly

6       sworn, was examined and testified as follows:

7                              - - - - -

8                          EXAMINATION

9       BY MR. FIELDS:

10           Q.      Good morning.   Please state your

11      full legal name for the record, ma'am.

12           A.      Barbara Jean Wingard.

13           Q.      Can you spell Jean, please?

14           A.      J-E-A-N.

15           Q.      Have you ever gone by any other

16      name?

17           A.      I was married, and it was Barbara

18      Jean Hooftallen.

19           Q.      How long were you married?

20           A.      Almost 20 years.

21           Q.      What was your former husband's name?

22           A.      Perry Hooftallen.

23           Q.      Is that the only time you have been

24      married?

25           A.      Yes.

6

1           B. Wingard - by Mr. Fields

2           Q.     Is Perry Hooftallen still alive or

3      is he deceased now?

4           A.     He's alive.

5           Q.     Do you know where he resides?

6           A.     Yeah.  In Roulette, Pennsylvania.

7           Q.     When was the last time you spoke

8      with Perry Hooftallen?

9           A.     It's been just a couple weeks.

10          Q.     Let me back up a little bit.  Have

11     you ever been deposed before?

12          A.     I don't understand the question.

13          Q.     Have you ever had your deposition

14     taken before?

15          A.     No.

16          Q.     Have you ever testified in court?

17          A.     Yes.

18          Q.     When did you do that?

19          A.     Back in 2002.  And I might have had

20     a deposition done then, but it was nothing like

21     this.  They were typing it and stuff, but that

22     was it.

23          Q.     What did your testimony relate to

24     back in 2002?

25          A.     I had a work-related injury.

7

1          B. Wingard - by Mr. Fields

2     Q.     Was it a workers' compensation

3  hearing?

4     A.     Yes.

5     Q.     Are you currently receiving workers'

6  compensation?

7     A.     No.

8     Q.     Have you ever received any workers'

9  compensation?

10     A.     Yes.

11     Q.     I'm sure your attorney has talked to

12  you a little bit about the process, but let me

13  just cover what I like to call the ground rules

14  for a deposition so that you and I understand

15  each other so there's no confusion and so that

16  we make it easier on Lina.

17          We're here today just as if we're in

18  open court.  You're giving sworn testimony, and

19  you have taken an oath to tell the truth under

20  penalty of perjury.  Do you understand that?

21     A.     Yes.

22     Q.     Because the setting is a little more

23  informal, it sometimes gets easy to be

24  conversational or to talk over each other in a

25  way that we probably wouldn't do if we were in

8

1             B. Wingard - by Mr. Fields

2    court.  Does that make sense?

3         A.    Yes.

4         Q.    So to try to avoid that, I just ask

5    that we both try to keep a few things in mind.

6    Probably one of the most important things is

7    that I'm not always the most articulate in how

8    I ask my questions.  So if I ask you something

9    and you don't understand what you're being

10   asked, I want you to let me know.  Is that fair?

11        A.    Yes.

12        Q.    But if I ask you a question and you

13   answer it, I'm going to assume that you

14   understood what you were asked.  Is that fair?

15        A.    Yes.

16        Q.    So far you're doing a fantastic job

17   of the next rule which is, again, because we

18   have a court reporter taking everything down,

19   you need to answer orally as opposed to

20   nonverbally with nods of the head.

21        A.    Right.

22        Q.    And you're doing a great job so far.

23   It's important we not talk over each other, and

24   I'm sure some of the other attorneys will jump

25   in and let us know if we are doing that, or

9

1                    B. Wingard - by Mr. Fields

2        Lina will.

3                    How are you feeling this morning?

4             A.    Okay.

5             Q.    Is there any reason that you can't,

6        as we sit here this morning, recall facts and

7        testify truthfully as to what you remember?

8             A.    No.

9             Q.    Are you under the influence of any

10       intoxicating drugs or alcohol?

11            A.    No.

12            Q.    I forgot the most important rule.

13       This is not an endurance contest.  If you want

14       to take a break at any point in time, just let

15       me know.

16            A.    Okay.

17            Q.    The only thing I ask is that if

18       there's a question pending from one of the

19       attorneys, that you answer that question before

20       we break.  Is that fair?

21            A.    Yes.

22            Q.    Then occasionally one of the

23       attorneys may have an objection to another

24       attorney's question.  Generally the way that

25       plays out is the objecting attorney will just

10

1               B. Wingard - by Mr. Fields

2      say "form," F-O-R-M.  So it's a little

3      disconcerting.  You might hear somebody say

4      "form" after a question, and they are just

5      preserving their evidentiary objection for down

6      the road with the Judge.  Does that make sense?

7           A.    Yes.

8           Q.    We talked a little bit about your

9      prior testimony in the workers' comp case.

10     Let's start with your current employment.  Are

11     you currently employed?

12          A.    No.

13          Q.    When was the last time you were

14     employed?

15          A.    2002.

16          Q.    Where were you working at the time?

17          A.    Mercy Hospital in Scranton,

18     Pennsylvania.

19          Q.    How long did you work for Mercy

20     Hospital?

21          A.    Probably about nine years.

22          Q.    So approximately 1994 to 2002, '93

23     to 2002?

24          A.    No.  I started there in 1995, I

25     think it was.  So maybe it was seven years.

11

1          B. Wingard - by Mr. Fields

2    I'm not sure.

3          Q.     We don't need to go into a whole lot

4    of detail, but can you just walk me through the

5    position or positions that you held while you

6    were with Mercy, starting with the first

7    position held?

8          A.     I only had one.  It was in

9    environmental services.  I was in housekeeping.

10         Q.     Did you feel that you injured

11    yourself on the job?

12         A.     Yes.

13         Q.     Just a thumbnail sketch of what that

14    incident involved.

15         A.     Okay.  We were shorthanded that day,

16    and I was doing a different area than what I

17    usually do.  I went into an office, and it had

18    a really large garbage can.  It looked like it

19    had just regular papers in it.  I was hurrying,

20    and I just pulled it out real quick, and I felt

21    two, like, pains in my shoulders.

22         Q.     Then you filed a workers' comp claim

23    after that?

24         A.     Yes.  I tried working, but I

25    couldn't.

12

1                    B. Wingard - by Mr. Fields

2         Q.     Was the workers' comp claim denied

3    by the workers' comp insurer or was it approved?

4         A.     It was approved.

5         Q.     Did you start receiving workers'

6    compensation at some point?

7         A.     Yes.

8         Q.     For how long did you receive

9    workers' compensation or are you still

10   receiving it?

11        A.     No.  I'm not receiving it.  It was

12   probably about 2010.

13        Q.     Do you currently consider yourself

14   retired?

15        A.     Yes.  I'm on Social Security

16   Disability.

17        Q.     When did you start I'll call it SSDI

18   for short?

19        A.     I was approved for 2002, but I

20   didn't start receiving it probably until 2010,

21   whenever I went off of the workers' comp.

22        Q.     Ma'am, starting with high school,

23   would you just give me a thumbnail sketch of

24   your educational experience.

25        A.     Right.  I went from 1st grade to

13

1                   B. Wingard - by Mr. Fields

2        11th, moved to Scranton, and then I received my

3        GED.

4            Q.      What year did you receive your GED?

5            A.      1997 I'm thinking.

6            Q.      Do you have any what I'll call post-

7        high school education or training?

8            A.      Well, I went to the University of

9        Marywood for the GED, and I also went to

10       computer classes.

11           Q.      Did you receive any type of degree

12       or certificate?

13           A.      No.

14           Q.      Any medical training?

15           A.      No.

16           Q.      All right.  Prior to your work with

17       Mercy in 1995, where were you employed?

18           A.      I wasn't.  I was married.

19           Q.      Did you have any full-time

20       employment prior to 1995 starting let's go from

21       age 20 forward?  I'm not interested in any high

22       school jobs.

23           A.      Right.  I was employed at a small

24       factory in Austin, Pennsylvania.

25           Q.      What years did you work there?

14

1            B. Wingard - by Mr. Fields

2        A.    Probably 1992 to '94 probably, or

3    '91.  Something like that.

4        Q.    What did you do for that factory?

5        A.    I was in janitorial.

6        Q.    Any other jobs during your adult

7    life other than the one for Mercy and the one

8    for that factory?

9        A.    No.

10       Q.    What was the name of that factory?

11       A.    Emporium Specialties.

12       Q.    Where do you currently reside?

13       A.    211 Park Avenue, Punxsutawney,

14   Pennsylvania.

15       Q.    How long have you been living at

16   that address?

17       A.    Probably about nine months.

18       Q.    Does anybody live there with you?

19       A.    Yes.  My grandson.

20       Q.    What is your grandson's name?

21       A.    Matthew Eric Hooftallen.

22       Q.    How old is Matthew?

23       A.    He just turned 13.

24       Q.    I'm going to jump ahead a little

25   bit.  Did Matthew Hooftallen spend some time

15

1               B. Wingard - by Mr. Fields

2       with your son, Troy Hooftallen, on the day of

3       the incident that gives rise to this case?

4               A.      Yes.  I think he did.  Yeah, I'm

5       sure that he did.

6               Q.      Where did you reside prior to the

7       211 Park Avenue address?

8               A.      I forgot the number, but it was on

9       Seitz Street.  It was 421 Seitz Street.

10              Q.      Spell Seitz, please.

11              A.      S-E-I-T-Z.  It was the -- Seitz is

12      the name of the guy who owned the whole farm.

13      It was in Punxsutawney too, but it was like in

14      a rural area outside of town.

15              Q.      How long did you live at that

16      address?

17              A.      About three years.

18              Q.      I'm going to refer to "the incident"

19      during this deposition.  By "the incident," I

20      mean the incident involving Troy Hooftallen and

21      the Pennsylvania State Police that gives rise

22      to this incident.  Do you understand that?

23              A.      Yes.

24              Q.      So you'll understand when I say "the

25      incident," you will know what I'm referring to?

16

1              B. Wingard - by Mr. Fields

2        A.      Yes.

3        Q.      With respect to your son, Troy

4    Hooftallen, are you comfortable with me calling

5    him Troy?

6        A.      Yes.

7        Q.      Ordinarily I would call him

8    Mr. Hooftallen, but there were a few

9    Mr. Hooftallens we'll be talking about.

10       A.      Right.

11       Q.      I mean no disrespect by that.

12       A.      Right.

13       Q.      So you were at the 421 Seitz Street

14   address -- I'm sorry -- you were residing there

15   back at the time of the incident; correct?

16       A.      Yes.

17       Q.      Was anybody residing there with you?

18       A.      Yes.

19       Q.      Who?

20       A.      My son, Tim; and Matthew.

21       Q.      Who is Matthew's father?

22       A.      Tim.

23       Q.      Does Matthew have any siblings?

24       A.      Yes, he does.  He has a half-brother

25   and half-sister.

17

1           B. Wingard - by Mr. Fields

2       Q.      What are their names?

3       A.      Christopher Enslin, E-N-S-L-I-N; and

4   Ashley Jenkins, J-E-N-K-I-N-S.

5       Q.      Do they live with their mother?

6       A.      Yes.

7       Q.      Have they ever lived with you?

8       A.      No.

9       Q.      Do you know if they were present at

10  any point in time on the day of the incident?

11      A.      No.  They don't even live near here.

12      Q.      Where was Troy residing, if you

13  know, on the date of the incident?

14      A.      27 Charley Hill Lane.

15      Q.      Is that Kim Hall's house?

16      A.      Yes.

17      Q.      Do you know if she owns that house

18  or does she rent it?

19      A.      No.  She was renting it.

20      Q.      That's Charley Hill Lane?

21      A.      Yes.

22      Q.      How far is that from your property

23  on Seitz Street?

24      A.      Probably from here to the university

25  right there (indicating).  Well, sort of.  It

18

1              B. Wingard - by Mr. Fields

2    was, like, two yards away.  I'm not good at

3    estimating the exact feet.

4                   MR. DONAHOE:  You know that's

5    Duquesne anyway.

6                   THE WITNESS:  Yes.  I seen the

7    sign down there.

8         Q.    So within walking distance.  Is that

9    fair?

10        A.    Yes.

11        Q.    Do you know how long Troy lived at

12   the Charley Hill Lane address prior to the

13   incident?

14        A.    He lived there a year longer than I

15   did, so a year before the incident.

16        Q.    Had you moved into the Seitz Street

17   address fairly shortly before the incident?

18        A.    Yes.  It was the same year.

19        Q.    Was there any reason that you chose

20   to move there at that time?

21        A.    Yeah.  I wanted to just live closer

22   to Troy.

23        Q.    Were you concerned about Troy at

24   that time?

25        A.    No.

19

1          B. Wingard - by Mr. Fields

2          Q.     Had Troy attempted suicide prior to

3     you moving to that address or did that occur

4     after?

5          A.     No.   That occurred after.

6          Q.     Where did you reside prior to the

7     Seitz Street address?

8          A.     1609 Sprinkle Mills Road, and that

9     was in Punxsutawney too.

10         Q.     How long did you live there, ma'am?

11         A.     About three years.

12         Q.     Did Troy ever live with you at that

13    address?

14         A.     No.

15         Q.     When was the last time that you and

16    Troy had lived together prior to the incident?

17         A.     Approximately 1995-'96.   Those

18    two years.

19         Q.     My math isn't great, but that would

20    be around the time he was maybe 18 to 20 years

21    old; is that correct?

22         A.     Oh, do you know what?   I'm saying 19.

23    I'm sorry.   It's 20.   I'm sorry.

24         Q.     So you two were living together back

25    around 2005?

20

1              B. Wingard - by Mr. Fields

2         A.    Yes.

3         Q.    And then he moved out; correct?

4         A.    Yes.

5         Q.    Would that put him at about 30 years

6    old?

7         A.    Yeah.

8         Q.    Had he lived with you the entire

9    time up until then?

10        A.    Yes.

11        Q.    Then why did he move out in 2005?

12        A.    I moved from Scranton to here.  He

13   stayed back in Scranton.

14        Q.    When you say "here," do you mean

15   Punxsutawney?

16        A.    Yes.

17        Q.    But prior to him moving out in 2005,

18   he continued to live with you; correct?

19        A.    Yes.

20        Q.    And did he pay rent at any point in

21   time?

22        A.    Yes.

23        Q.    All right.  When did he start paying

24   rent?  Do you recall?

25        A.    Yeah.  The whole time he was living

21

1                    B. Wingard - by Mr. Fields

2       with me, for two years anyway.

3            Q.     Let me back up a little bit.

4       Starting with high school, can you walk me

5       through Troy's educational background.

6            A.     Sure.  He graduated high school from

7       1993.  He went to Williamsport College, but

8       then he quit.  So he really didn't even stay

9       there very long, maybe a semester.  Then he

10      moved back to Austin, PA, where he lived all of

11      his life up until he moved to Scranton.

12           Q.     Austin, PA, is that A-U-S-T-I-N?

13           A.     Yes.

14           Q.     Did he graduate high school in

15      four years?

16           A.     Yes.

17           Q.     So was he about approximately 18

18      when he graduated?

19           A.     Yes.

20           Q.     Then did he ever tell you why he

21      quit Williamsport College?

22           A.     Well, he didn't really say the exact

23      words, but I knew he just missed his friends

24      and his family.

25           Q.     Okay.  So he never told you that,

22

1                B. Wingard - by Mr. Fields
2       but that was your speculation; correct?
3             A.    Yes.
4             Q.    Would you agree with me, though,
5       because you didn't talk with him about it, you
6       have no personal knowledge as to why he quit?
7       Would you agree with that?
8             A.    Yeah.  I guess you could say that.
9             Q.    The reason I ask that is as
10      attorneys, it's important for us to know when
11      you're testifying about personal knowledge --
12            A.    Yes.
13            Q.    -- as opposed to when you might be
14      speculating or guessing about something.
15            A.    Right.
16            Q.    Do you understand that?
17            A.    Yes.
18            Q.    So I periodically may ask you
19      whether you're testifying to personal
20      knowledge, and, if so, what the basis is for
21      that or whether you're speculating.
22            A.    Okay.
23            Q.    So do you have any personal
24      knowledge as to why Troy quit Williamsport
25      College?

23

1                  B. Wingard - by Mr. Fields

2          A.     Well, can I say the same thing?  He

3     just -- whenever he would come home, he didn't

4     want to go back, so I knew it was because he

5     missed home.

6          Q.     Did you ever talk to him about it?

7          A.     Yes.

8          Q.     What did he say?

9          A.     Well, I told him that he should

10    continue, and he said, okay, Mom, I'll try, and

11    then he would go back.

12         Q.     Did he ever personally tell you why

13    he didn't want to go back?

14         A.     He just didn't like it he said.

15         Q.     Do you know how his grades were

16    while he was there?

17         A.     No, I don't.

18         Q.     How were his grades in high school?

19         A.     Really good.

20         Q.     What's your definition of really good?

21         A.     He had mostly Bs.  Sometimes a

22    couple As and some Cs, but mostly Bs.

23         Q.     Do you know where he was in his

24    class rank at graduation?

25         A.     Val -- whatever that word is.

24

1                    B. Wingard - by Mr. Fields

2          Q.       Valedictorian?

3          A.       Yes.

4          Q.       So he graduated top of his class?

5          A.       Yes.

6                         MR. DONAHOE:  Let me

7       interrupt.  Did you say he was the class

8       valedictorian?

9                         THE WITNESS:  Yes.

10         Q.       Were you proud of him?

11         A.       Yes.

12         Q.       During high school, did he ever

13      receive any other honors or awards that you

14      recall?

15         A.       In sports he did.  He played

16      baseball every year.  He played basketball

17      every year.

18         Q.       Other than high school and his time

19      at Williamsport College, did he have any other

20      post-high school, meaning after high school,

21      education or training?

22         A.       No, he didn't.

23         Q.       Do you recall where he was living in

24      Austin before he moved back to Punxsutawney?

25         A.       Yes.

25

1                    B. Wingard - by Mr. Fields

2          Q.      Where was he living?

3          A.      Scovell Street, but I don't know the

4    number.

5          Q.      Would you please spell that.

6          A.      S-C-O-V-E-L-L.

7          Q.      Do you know how long he was living

8    at that Scovell Street address?

9          A.      Probably a year.

10         Q.      What year was that?

11         A.      Probably 1994 to 1995.

12         Q.      Then from '95 to 2005 he moved back

13   in with you?

14         A.      Yes.  Down in Scranton.

15         Q.      All right.  From '95 to 2005, where

16   did the two of you live?

17         A.      1609 Sanderson Avenue, Scranton, PA.

18   And we did move once from there.

19         Q.      Where did you move to?

20         A.      647 Monroe Avenue, Scranton.

21         Q.      Approximately what years did you

22   live at the 1609 Sanderson Avenue address?

23         A.      1995 to 1996.  And then Monroe?

24         Q.      Yes, ma'am.

25         A.      Monroe was 1996 to 2005.

26

1                   B. Wingard - by Mr. Fields

2         Q.      During the time that you two lived

3    together, did you ever have to call 911 for any

4    reason?

5         A.      Never.

6         Q.      Were the police ever called to your

7    house when Troy lived with you?

8         A.      Never.

9         Q.      Do you recall the police ever

10   visiting the house with questions about Troy or

11   his activities?

12        A.      One time.

13        Q.      When was that?

14        A.      Whenever we lived at Sanderson

15   Avenue.  They came for Troy because he was

16   supposed to turn in his license, but he had to

17   tell them he never had a license.  I guess they

18   just didn't get the information or something.

19        Q.      Do you know why they were asking for

20   him to turn in his license?

21        A.      He had one charge on him back in

22   Austin, and it was underage drinking.

23        Q.      Do you know, did he have a trial for

24   that underage drinking charge?  Did he plead

25   guilty?  Was it dismissed?

27

1                    B. Wingard - by Mr. Fields

2          A.     Yes.  He pled guilty.

3          Q.     Did he serve any kind of time in a

4    correctional facility?

5          A.     No.  He just had to do community

6    service.

7          Q.     Are you aware of any other charges

8    that Troy ever had brought against him during

9    his lifetime?

10         A.     Yeah.  Back whenever he was young,

11   him and a few kids broke into some camps up

12   there.  That was right around the same time

13   that he was underage drinking.

14         Q.     I'm sorry.  I'm getting myself a

15   little bit confused.  Was that Austin?

16         A.     Yes.  He was still in school.

17         Q.     Any other interactions with law

18   enforcement for any reason?  Good, bad?

19         A.     None.

20         Q.     All right.  It's 2005, and then you

21   moved to Punxsutawney; correct?

22         A.     Yes.

23         Q.     Between 2005 and 2010, if you could

24   just run me through, to some degree I think we

25   have done this, but run me through where Troy

28

1                    B. Wingard - by Mr. Fields
2        resided.
3                A.      He lived in Scranton from 2005 to
4        2006.
5                Q.      Where did he live, ma'am?
6                A.      647 Monroe Avenue, Scranton.
7                Q.      Then from 2006?
8                A.      He moved to 24 or 26 Charley Hill
9        Lane.
10               Q.      How long did he live there?
11               A.      Up until his death.
12               Q.      In 2010?
13               A.      Uh-huh.
14               Q.      Did he and Kim Hall live together
15       that entire time from 2006 to 2010?
16               A.      Yes.
17               Q.      Did he ever come the night and stay
18       at your house during those years?
19               A.      No.
20               Q.      From 2005 until 2010, did he ever
21       contribute to your rent?
22               A.      What's the dates again now?
23               Q.      After he moved out in 2005 through
24       2010.  Once he moved out.
25               A.      No.

29

1                   B. Wingard - by Mr. Fields

2         Q.      He never contributed to your rent?

3         A.      Not to my rent, no.

4         Q.      Did he ever provide you with any

5   money for any reason?

6         A.      Well, if I needed some, I would

7   borrow some off of him.

8         Q.      But would you pay him back?

9         A.      Yes.

10         Q.      Did you ever help him financially

11   from 2005 to 2010?

12         A.      Yes.

13         Q.      Describe that for me, please.

14         A.      It was after he got sick with the

15   Crohn's disease, and he couldn't work, and if

16   he needed money for cigarettes or I helped him

17   with his rent.

18         Q.      Do you recall approximately when he

19   got sick with Crohn's disease?

20         A.      I'm thinking it was approximately

21   2008.

22         Q.      Was that around the time he lost his

23   job?

24         A.      Yes.   That was the time.

25         Q.      Do you know whether -- was he

30

1               B. Wingard - by Mr. Fields

2      terminated from that job or did he quit that job?

3          A.    No.  He quit that job.

4          Q.    How do you know that, ma'am?

5          A.    Because he told me that he quit.  He

6      was too embarrassed because he had accidents

7      there trying to get to the bathroom in time.

8          Q.    Where was he working at that time?

9          A.    It's called Stello's, and it's a

10     warehouse that makes spaghetti sauce and

11     different things like that.  He was a packer.

12         Q.    Do you know how long he worked

13     there?

14         A.    I'm going to say approximately

15     two years.

16               MR. DONAHOE:  What town was

17     that in again, Stello's?

18               THE WITNESS:  Punxsutawney.

19               MR. DONAHOE:  Sorry.

20         Q.    Now, I do want to talk about his

21     employment history, but let me go back to the

22     financial support you were providing him from

23     you said it was 2008 to the time of his death;

24     is that correct?

25         A.    Yes.

31

1              B. Wingard - by Mr. Fields

2        Q.     You testified that you would

3   occasionally help him with his rent; is that

4   correct?

5        A.     Yes.

6        Q.     You would occasionally give him some

7   money to buy cigarettes; is that correct?

8        A.     Yes.

9        Q.     Did you ever give him money for any

10  other reasons?

11       A.     Mickey D's.  That's about it.

12       Q.     Occasionally you gave him money for

13  food?

14       A.     Yes.

15       Q.     Was he struggling financially after

16  he quit his job with Stello's in 2008?

17       A.     Yes, he was.

18       Q.     Was he receiving any kind of

19  benefits from any type of source?

20       A.     No.

21       Q.     Did he hold any other jobs full time

22  or part time between the time that he quit

23  Stello's and the date of his death?

24       A.     No.

25       Q.     Did he have any source of income

32

1          B. Wingard - by Mr. Fields

2    during those years?

3          A.    No.   The household income was Kim's,

4    though.   She was able to keep it mostly caught

5    up, but Troy just wasn't able to provide to her.

6          Q.    Do you know if he was looking for

7    work during those years?

8          A.    No.   He wasn't looking.

9          Q.    Do you know if he applied for any

10   kind of disability or unemployment?

11         A.    He applied for assistance, welfare

12   assistance, to get the medical card.

13         Q.    Did he receive that?

14         A.    Yes.

15         Q.    Is that the ACCESS program?

16         A.    Yes.

17         Q.    So any money that Troy had between

18   2008 and the time of his death either would

19   have been from you or from Kim or from a family

20   member or friend; is that correct?

21         A.    Correct.

22         Q.    Do you know if anybody else was

23   helping him financially during those years?

24         A.    Probably my mother --

25         Q.    What's her name?

33

1                   B. Wingard - by Mr. Fields

2          A.      -- his grandmother.  Veronica May,

3     M-A-Y.

4          Q.      Is Ms. May still alive?

5          A.      Yes.

6          Q.      Where does she live?

7          A.      Home, PA.

8          Q.      How close to that -- you have to

9     forgive me.  I'm from Arizona.  Is that near

10    Punxsutawney?

11         A.      It's probably about maybe a half

12    hour away.

13         Q.      Do you know if she saw or spoke to

14    Troy in the 48 hours before the incident?

15         A.      No, she didn't.

16         Q.      In terms of Troy's cigarette habit,

17    do you know how long he had been smoking or

18    when he started smoking?

19         A.      Probably in high school.

20         Q.      Then was he a smoker when he started

21    in high school until the time of his death?

22         A.      Yes.

23         Q.      At the time of his death, do you

24    know approximately how much he smoked on

25    average?  Either by the day or week, whatever

34

1                    B. Wingard - by Mr. Fields

2       is easiest for you to kind of estimate.

3             A.     Okay.   Maybe -- can I go by packs of

4       cigarettes?

5             Q.     Yes, ma'am.

6             A.     Okay.   He would probably buy a pack

7       of cigarettes every three days.

8             Q.     So he had about a third-a-pack-a-day

9       habit?

10            A.     Right.

11            Q.     What type of cigarettes did he smoke?

12            A.     Marlboro filters.

13            Q.     Let's go back to Troy's employment

14      history.   Was he employed prior to his position

15      with Stello's?

16            A.     Not here in Punxsutawney.

17            Q.     Do you know where he was employed?

18            A.     In Scranton.

19            Q.     Do you know where he worked in

20      Scranton?

21            A.     Yes.

22            Q.     Where, ma'am?

23            A.     Price Chopper, and it's a grocery

24      chain, and it was on Monroe Avenue.

25            Q.     Do you know how long he worked

35

1                    B. Wingard - by Mr. Fields
2       there?
3               A.      About ten years.
4               Q.      Then did he hold that job right up
5       until he took the position with Stello's?  Do
6       you know?
7               A.      Just about -- I think there was a
8       lapse between it whenever he was moving and
9       getting settled in here to Punxsutawney.
10              Q.      Do you know whether he quit the
11      position with Price Chopper or was he
12      terminated from that position?
13              A.      He quit.
14              Q.      How do you know that, ma'am?
15              A.      He told me.
16              Q.      Do you know whether he was a good
17      employee, a bad employee?
18              A.      He was very good.  He was an
19      assistant manager.  He never missed work.  I
20      don't think he missed even one day.  And he
21      liked his job.
22              Q.      So he held that position maybe
23      around 1995 to 2005, 2006?
24              A.      Yes.
25              Q.      Did he hold any jobs, any full-time

36

1              B. Wingard - by Mr. Fields

2    adult jobs, prior to that?

3         A.    Yes.

4         Q.    Where, ma'am?

5         A.    Tafts.  It was just the

6    abbreviation, T-A-F-T-S.  I don't know what it

7    stands for.  It's something about floor

8    cleaning, and that's what he did.

9         Q.    Do you know where that business is

10   located?

11        A.    It's not there anymore.  They just

12   went out of business.  But it was in Scranton.

13        Q.    Do you know how long he worked

14   there?

15        A.    Probably about six months.  Right

16   whenever we moved to Scranton.

17        Q.    Any other adult full-time employment

18   positions?

19        A.    No.

20        Q.    Do you know if at any time in Troy's

21   life he was ever fired from a job?

22        A.    No.

23        Q.    Other than speaking with your

24   attorneys, did you do anything to prepare for

25   today's deposition?

37

1              B. Wingard - by Mr. Fields

2        A.     No.

3        Q.     Did you review any documents before

4    you came here today?

5        A.     Just glanced over one.  That was so

6    quick, and it was, like, the first page.

7        Q.     What was that, ma'am?

8        A.     My Affidavit I think it's called.

9        Q.     A statement that you prepared that

10   you had notarized; correct?

11       A.     Yes.  But I didn't even look at the

12   rest of it, just the beginning.

13       Q.     Prior to glancing at the first page,

14   when was the last time you had looked at that

15   document?

16       A.     Probably 2012 I'm assuming.

17       Q.     Did you talk with anybody about your

18   deposition other than your attorneys?

19       A.     No.

20       Q.     Did you have any meetings with your

21   attorneys about this case at any point in time

22   where there was anybody else present?  A family

23   member or a friend?

24       A.     No.

25       Q.     Have you ever met with, for

38

1                    B. Wingard - by Mr. Fields

2          instance, your attorneys with Kim Hall present?

3               A.    No.

4               Q.    How about with Tim present?

5               A.    Yes.

6               Q.    On how many occasions?

7               A.    That I met with my attorneys?

8               Q.    When Tim was present.

9               A.    Once.

10              Q.    When approximately was that?

11              A.    2010.

12              Q.    Which attorneys did you meet with at

13         that time?

14              A.    Dennis Boyle.

15              Q.    What did you all talk about, ma'am?

16                    MR. WEBER:   Objection.  We're

17         not going to get into discussions with

18         attorneys and what she was saying.

19                    MR. FIELDS:   Tim is not a

20         party to the action, and so my position would

21         be that by having him present, there is no

22         attorney-client privilege.

23                    MR. WEBER:   Well, I'm going to

24         object to any conversation that took place when

25         Dennis and her spoke, regardless of when Tim

39

1          B. Wingard - by Mr. Fields

2     was present and they were going to be speaking

3     about privileged matters.

4               MR. FIELDS:  Let me just

5     clarify the question, and then you can make

6     your objection.

7     BY MR. FIELDS:

8          Q.    When you met with Mr. Boyle when Tim

9     was present, ma'am, I'm interested in knowing

10    what was discussed.  I don't want to know

11    anything about any conversations where your

12    son, Tim Hooftallen, was not present.

13              MR. FIELDS:  Do you want to

14    make an objection?

15              MR. WEBER:  I'm going to

16    object.  I mean, regardless of whether he's

17    present, there's privileged information that I

18    don't want her talking about when they are with

19    Attorney Dennis.  If we want to take this up

20    with the Court, that's fine, but I'm not going

21    to have her answer anything about what she

22    discussed with Dennis while Tim was present.

23              MR. FIELDS:  So I just want to

24    make sure the record is clear, are you

25    instructing her not to answer that question on

40

1           B. Wingard - by Mr. Fields

2     grounds of privilege?

3                 MR. WEBER:  Can you restate

4     the question again so I can hear it?

5                 MR. FIELDS:  Sure.

6     BY MR. FIELDS:

7         Q.    Ma'am, what was discussed during the

8     meeting with you, your attorney, and Tim

9     Hooftallen?

10                MR. WEBER:  Yes.  I'm going to

11     object to that.

12                MR. DONAHOE:  Let me just say

13     on the record that there's really no

14     attorney-client privilege if a nonparty is

15     present.  When the attorney is talking to

16     another person, it's waived.  I don't think it

17     could be clearer.

18                MR. WEBER:  Perhaps we can

19     have her answer what was discussed between her

20     and Tim.  I don't want her answering what

21     Dennis may have told her about the case at all

22     during that time.

23                MR. FIELDS:  I think our point

24     is, I don't want to speak for Mr. Donahoe, but

25     if Tim Hooftallen was present, there's no

41

1              B. Wingard - by Mr. Fields

2     privilege because he's a nonparty.  So what I

3     need to know for the record is --

4              I'm not waiving any right.  In fact,

5     what I want to do is preserve my right to go to

6     the Court and to get an order to redepose

7     Ms. Wingard about any conversations she has had

8     where there's a nonparty present.  We are

9     entitled to that.

10             So I just need to know if you're

11    instructing her not to answer that question,

12    and then I'll make it clear for the record that

13    I'm not waiving my right to go out and do

14    that -- to go ahead and do that.

15             MR. WEBER:  So you're trying

16    to get at what was discussed with her, Dennis,

17    and Tim present?

18             MR. FIELDS:  Correct.

19             MR. WEBER:  You can answer that.

20    BY MR. FIELDS:

21        Q.   Ma'am, tell us everything you recall

22    discussing during that meeting with Mr. Boyle,

23    only during the time that Tim Hooftallen was

24    present.

25        A.   He asked me questions about what

42

1          B. Wingard - by Mr. Fields

2     happened with Troy, who all was there.  I

3     explained, you know, what I seen; Tim explained

4     what he seen; and then he said he would be in

5     touch.  That's about it.

6          Q.     Did Tim provide him with any

7     documents or information, written information,

8     at that time?

9          A.     No.  Not at that time.

10          Q.     Do you remember specifically what

11     Tim told Mr. Boyle that he had seen?

12          A.     Yes, I remember.

13          Q.     Tell me everything you recall about

14     that.

15          A.     Tim said that he's the one that

16     called 911.  He didn't ask for the police.  He

17     just wanted an ambulance.  I didn't know he was

18     making the call.  I was inside with Troy, and

19     Troy agreed to go to the ER with me.  We just

20     sat there talking and waiting for Tim to come

21     in.

22               But to get back to Dennis.  He

23     explained that, what happened and what he seen,

24     and that was about it.  Dennis said he would be

25     in touch with me.

43

1                   B. Wingard - by Mr. Fields

2          Q.      Did you have any other meetings with

3    Mr. Boyle or anybody from his office where

4    there was a nonattorney present?

5          A.      Yes.

6          Q.      How many?

7          A.      Two.

8          Q.      All right.  Those two other

9    meetings, let's talk about the first one.  Who

10   was there?

11         A.      David Crill I think his name is.

12         Q.      Do you know how to spell Crill?

13         A.      C-R-I-L-L I think his name is.

14         Q.      Who is David Crill?

15         A.      He's a private investigator.

16                 MR. DONAHOE:  I don't know if

17   there's a privilege for that one or not.

18                 MR. WEBER:  I wasn't going to

19   say anything yet, but Dave Crill is our

20   investigator.  I was going to object to

21   anything that was discussed when he was present

22   which would be aimed towards advising her on

23   legal rights and preparing the case.

24   BY MR. FIELDS:

25         Q.      And then the second meeting, who was

44

1          B. Wingard - by Mr. Fields

2     present?

3          A.    Dave, me, Kim Hall, and I don't

4     recall if Tim was there or not.

5          Q.    But you do remember Kim was there?

6          A.    Yes.

7          Q.    When did that meeting occur?

8          A.    2010.

9          Q.    Was that meeting with when you say

10    Dave, is that David Crill?

11         A.    Yes.

12         Q.    Were any attorneys present at that

13    meeting?

14         A.    No.

15         Q.    What did you all discuss at that

16    meeting?

17         A.    What Kim observed during the

18    incident.

19         Q.    Did she provide any kind of written

20    statement or any kind of documents to David at

21    that time?

22         A.    I don't recall.

23         Q.    Tell me everything you remember her

24    telling David during that meeting.

25         A.    You mean during the whole incident,

45

1                 B. Wingard - by Mr. Fields

2       what happened during the incident?  That's all

3       she --

4            Q.    No.  Let me rephrase.  Tell me

5       everything that you remember Kim telling, that

6       you specifically remember Kim telling, David

7       during that meeting.

8            A.    Well, she was telling him where --

9       because we was at Kim's house, and she was

10      explaining where the incident took place and

11      her view of the incident.

12           Q.    Do you know if that conversation was

13      recorded?

14           A.    I don't recall, but I think she did

15      an affidavit.  I'm almost positive.

16           Q.    Do you know whether anybody, though,

17      was recording or typing up that conversation or

18      interview that took place during the meeting?

19           A.    No.

20           Q.    You don't know, or it wasn't?

21           A.    There wasn't any.

22           Q.    No one was taking notes?

23           A.    Just Dave.

24           Q.    So David was taking notes

25      contemporaneous with Kim telling him what she

46

1          B. Wingard - by Mr. Fields

2   remembered?

3        A.    Yes.

4        Q.    I think you already said that you

5   don't recall her bringing any documents and

6   giving those to him at the time?

7        A.    Not at the time.  I don't recall

8   anything like that.

9        Q.    Did you ever remember Kim gathering

10  up any documents or materials and providing

11  them to you or your attorneys?

12       A.    She gave us her statement.

13       Q.    Is that it?

14       A.    Yes.  She had to have it documented --

15  I mean, notarized.

16       Q.    Ma'am, I'm going to mark this is as

17  Defense Exhibit 1.

18              (Defense Exhibit No. 1 was

19  marked for identification.)

20              (Discussion held off the

21  record.)

22       Q.    Ma'am, I'm going to hand you what's

23  been marked as Defense Exhibit 1.  Do you

24  recognize that document?

25       A.    Yes, I do.

47

1                B. Wingard - by Mr. Fields

2        Q.      Have you seen that before?

3        A.      Yes.

4        Q.      Would you please identify it for the

5   record.

6        A.      Civil action lawsuit.

7        Q.      Is that your Complaint in this

8   lawsuit?

9        A.      Yes.

10       Q.      Have you ever read that document?

11       A.      Yes, I have.

12       Q.      Do you agree with everything that's

13   stated in that document?

14       A.      Well, I don't recall the whole

15   document, but I'm assuming I did or else I

16   would have said something to my attorney.

17       Q.      Do you recall whether you reviewed

18   that document prior to this lawsuit actually

19   getting filed?

20       A.      Yes.

21       Q.      And you gave it your blessing at

22   that time?

23       A.      Yes.

24       Q.      Was Troy ever married?

25       A.      No.

48

1                    B. Wingard - by Mr. Fields

2          Q.      Did Troy ever have any children?

3          A.      No.

4          Q.      How many children have you had

5     during your life, ma'am?

6          A.      Three.

7          Q.      And what's the name and date of

8     birth for your first child?

9          A.      Terry Eugene Hooftallen.

10         Q.      What's his date of birth?

11         A.      11/11/72.

12         Q.      Is Terry still alive?

13         A.      Yes.

14         Q.      And where does he live?

15         A.      Austin, Pennsylvania.

16         Q.      And he's married and has kids?

17         A.      Yes.

18         Q.      Do you know if he or his wife or any

19    of his children spoke with Troy in the 48 hours

20    before the incident?

21         A.      No, he didn't.

22         Q.      None of them did, to your knowledge?

23         A.      None.

24         Q.      Who was your second child?

25         A.      Troy.

49

1              B. Wingard - by Mr. Fields

2      Q.    What was Troy's date of birth?

3      A.    7/6/74.

4      Q.    Then who was your third child, ma'am?

5      A.    Tim Eric Hooftallen.

6      Q.    What was Tim's date of birth?

7      A.    December 8, 1976.

8      Q.    He passed away on September 2 -- I'm

9   sorry.  Ma'am, when did he pass away?

10     A.    February 1, 2013.

11     Q.    I'll tell you, ma'am, I'm sorry for

12  your loss.

13     A.    Thank you.

14     Q.    Troy's father, Perry Hooftallen,

15  remind me what year you divorced.

16     A.    1995 is on the -- yeah, 1995.

17     Q.    Do you know if Troy maintained a

18  relationship with him after that?

19     A.    Troy did not.

20     Q.    Do you know why?

21     A.    Troy did not like his father.

22     Q.    Do you know why Troy didn't like his

23  father?

24     A.    His father didn't treat him very good.

25     Q.    Did his father abuse him?

50

1                 B. Wingard - by Mr. Fields

2          A.      Probably verbally.

3          Q.      So after the divorce, Troy and Perry

4    no longer maintained a relationship?

5          A.      Never talked even once.

6          Q.      All the way up until the time of --

7          A.      His death.

8          Q.      -- Troy's death?

9          A.      Uh-huh.

10         Q.      You mentioned you spoke with Perry a

11   few weeks back?

12         A.      Yes.  He wanted me to keep him

13   updated on the case, and he wanted to know

14   since it was canceled once coming down here, to

15   know when I was coming down.

16         Q.      Do you know if he's seeking any

17   damages for this case?

18         A.      Well, since he's my ex-husband then,

19   from what I was told, he would get half if

20   there was any kind of damages paid out or

21   anything.

22         Q.      Does that seem fair to you?

23         A.      No.  Because him and Troy was not

24   friends at all.  They did not speak.  It wasn't --

25   well, Perry could have tried to talk to Troy.

51

1              B. Wingard - by Mr. Fields
2     He never talked to any of them after the divorce.
3          Q.     So Perry Hooftallen and Troy don't
4     have a relationship from 1995 through the date
5     of his death in 2010?
6          A.     Right.
7          Q.     But now Perry Hooftallen is seeking
8     half of whatever damages, if any, coming from
9     this lawsuit?
10         A.     Right.
11         Q.     Perry in fact has told you I want
12    half of whatever comes out of this?
13         A.     No.  He didn't tell me that.
14         Q.     I don't want you to tell me anything
15    your lawyers told you.
16         A.     That's what I was going to say.
17         Q.     Have you talked to Perry about this
18    lawsuit?
19         A.     A little bit, not a lot.  Because I
20    think he calls the office quite a bit.
21         Q.     When you decided to file a lawsuit,
22    did you contact Perry at that time?
23         A.     No.
24         Q.     Did you have any communication with
25    Perry between '95 and 2010?

52

1                  B. Wingard - by Mr. Fields

2          A.      No.

3          Q.      So once that divorce took place, you

4     and Troy both were, for all intents and

5     purposes, pretty much done with Perry?

6          A.      Right.

7          Q.      Then the incident occurs in 2010?

8          A.      Right.

9          Q.      At some point after that, you happen

10    to have occasion to start communicating with

11    Perry again; correct?

12         A.      Correct.

13         Q.      Is that because of this lawsuit?

14         A.      No.   It's because of Troy's death.

15         Q.      Okay.   Did you two, when you started

16    talking again because of the death, did you

17    become friends again or is it just more for

18    purposes of the funeral and the lawsuit?

19         A.      Yes.

20         Q.      From the time of Troy's death until

21    the present, how often do you speak with Perry?

22         A.      Could be once a month, could be once

23    every three or four months.   It's not on a

24    regular basis.

25         Q.      After you got past Troy's funeral

53

1           B. Wingard - by Mr. Fields

2     and all those arrangements were over with, have

3     all the conversations or communications been

4     just in terms of this lawsuit or have you been

5     talking for any other reason?

6           A.     Yeah.  We talk for different reasons.

7           Q.     But do you keep him updated on the

8     lawsuit?

9           A.     Somewhat.  Not on a regular basis,

10    though.

11          Q.     Anyone in your family ever die of a

12    sudden cardiac arrest or heart attack?

13          A.     Well, Tim's death certificate, it

14    says that he had cardiac arrest, sudden cardiac

15    arrest.

16          Q.     Ma'am, I do want to talk a little

17    bit about Tim's death.  And one of the things

18    that I forgot to mention this morning is I

19    understand that this is a difficult experience

20    for you, and so it's not my intent to be

21    insensitive.  In fact, it's my intent to treat

22    you with respect and to be sensitive to that.

23    So as we go forward, if you want to take a

24    break, just let me know.  But there's going to

25    be some things I'm going to want to ask you

54

1                     B. Wingard - by Mr. Fields

2          about.  I just wanted to let you know that.

3                A.     Okay.

4                Q.     Anyone other than Tim on your side

5          of the family ever die of a heart attack or

6          sudden cardiac arrest?

7                A.     No.  Not that I recall.

8                Q.     Anybody ever have any heart

9          conditions ranging from something as common as

10         high blood pressure or high cholesterol all the

11         way through a bypass or pacemaker?

12               A.     Right, yes.

13               Q.     Who, ma'am?

14               A.     Well, I have high blood pressure.

15               Q.     Do you know if Troy had high blood

16         pressure?

17               A.     No, he didn't.

18               Q.     Anyone else on your side of the

19         family that you know of?

20               A.     Yes.  My mother, Veronica May.

21               Q.     What does she have?

22               A.     She had some blockage, and she had a

23         stent put in.

24               Q.     Anyone else on your side, ma'am?

25               A.     No.  Not that I recall.

55

1          B. Wingard - by Mr. Fields

2      Q.     Do you know if anybody on Troy's

3  father's side of the family has ever had any

4  heart issues of any kind?

5      A.     Yes.

6      Q.     Who, ma'am?

7      A.     Perry's brother, Chuck.  Charles.

8      Q.     That would be Troy's uncle?

9      A.     Yes.

10     Q.     What conditions did Chuck have?

11     A.     I don't know.

12     Q.     Do you know if he passed away from a

13 heart condition?

14     A.     No.  He's still alive.

15     Q.     What do you know generally just

16 about his --

17     A.     I think he had a bypass done.

18     Q.     Anybody else on Troy's father's side

19 of the family either had a heart attack, a

20 sudden cardiac arrest, or any other kind of

21 heart condition?

22     A.     No.  Not that I know of.

23     Q.     Terry, your eldest son, has he ever

24 had any cardiac conditions?

25     A.     No.

56

1                  B. Wingard - by Mr. Fields

2                       MR. FIELDS:  I'm going to mark

3        as Defense Exhibit 2 a photograph.

4                       (Defense Exhibit No. 2 was

5        marked for identification.)

6            Q.     Ma'am, do you recognize that

7        photograph?

8            A.     Yes, I do.

9            Q.     On the left side there's a gentleman

10       in a white tank top.  Do you see that?

11           A.     Uh-huh.

12           Q.     Can you identify that individual for

13       the record?

14           A.     That's my eldest son, Terry

15       Hooftallen.

16           Q.     In the middle of the picture,

17       there's a gentleman with I believe a hat and a

18       black shirt.  Would you identify that

19       individual, please?

20           A.     That's my youngest son, Tim.

21           Q.     And then on the right side of the

22       picture, there's a gentleman with a hat and a

23       gray sleeveless shirt.  Would you identify that

24       individual, please?

25           A.     That's my son, Troy Robert Lee

57

1                B. Wingard - by Mr. Fields

2       Hooftallen.

3            Q.     Thank you, ma'am.  Ma'am, have you

4       ever been charged with a crime?

5            A.     No.

6            Q.     Going back to high school -- I'm

7       doing a little housekeeping here as I go back

8       through my notes.  Going back to Troy's time in

9       high school, did he have any behavioral issues?

10           A.     Any what?

11           Q.     Any behavioral issues while at high

12      school.

13           A.     No.  None.

14           Q.     Do you know if Troy was ever a party

15      to a civil lawsuit?  And by civil lawsuit, I

16      mean not criminal charges, but one that

17      involves money damages.

18           A.     No.

19           Q.     In the couple, let's say the two years

20      leading up to Troy's death, do you know, was he

21      physically active at all?

22           A.     Yes.

23           Q.     How so?

24           A.     Well, he would be outside playing

25      baseball with Matthew.  When Matthew was

58

1           B. Wingard - by Mr. Fields

2    smaller, he would pick him up, swing him around

3    by his arm and ankle; pushed him on the swings.

4    He played softball himself on a softball team.

5    And going down to where he lived at, we had --

6    they had basketball hoops and stuff there, and

7    he enjoyed going down there and doing that.

8           Q.    So in the couple of years leading up

9    to his death, he played softball and he played

10   basketball and he would play with his nephew.

11          A.    Uh-huh.

12          Q.    Did he have a gym membership?

13          A.    No.

14          Q.    Do you know, was he a jogger?  Would

15   he go out and jog in the mornings or the

16   afternoons?

17          A.    No.  He usually lifted weights.

18          Q.    Where did he lift weights?

19          A.    Where?

20          Q.    Yes, ma'am.

21          A.    In the basement.  Or do you mean the

22   residence?

23          Q.    There's gyms, there's friends who

24   sometimes have weights; so --

25          A.    I see.  Yeah, it was at home.

59

1          B. Wingard - by Mr. Fields

2          Q.     So he had some weights at home that

3     he lifted?

4          A.     Yes.

5          Q.     Did he ever complain to you -- and

6     let's frame this with the five years leading up

7     to his death, other than the colitis, did he

8     ever complain to you about any physical

9     conditions or problems?

10         A.     No, no.

11         Q.     Did he ever complain to you about

12    any chest pains?

13         A.     No.

14         Q.     If there's a medical record where

15    he's complaining about chest pains during

16    exertion, that's nothing that he ever mentioned

17    to you?

18         A.     No.

19         Q.     So the only physical complaint he

20    had about his health or his physical well-being

21    in the five years before his death was the

22    colitis?

23         A.     Yes.

24         Q.     When did that start?  I know in 2008

25    he quit his job because of it.

60

1                  B. Wingard - by Mr. Fields
2          A.      Right.
3          Q.      But did it start before that, or is
4    that about the time it started?
5          A.      A little before that because he
6    tried working.
7          Q.      So maybe around 2007 all of a sudden
8    he starts having these stomach problems?
9          A.      Uh-huh.
10         Q.      Now, have you seen the autopsy
11   report from Troy?
12         A.      Yes.
13         Q.      Are you aware that he had severe
14   heart disease?
15         A.      Yes.
16         Q.      Is that the first that you ever came
17   to learn of that?
18         A.      Yes.
19         Q.      Are you aware that the medical
20   examiner attributes his death to severe heart
21   disease?
22         A.      Yes.
23         Q.      Do you have any reason to disagree
24   with the medical examiner?
25         A.      No.

61

1              B. Wingard - by Mr. Fields

2        Q.     Now, I got in some what we call

3    discovery responses.  We sent your attorney

4    some questions, and we got answers back to some

5    of them that Troy treated with Dr. Martin

6    Chambers, Shirish Amin, and Satish Amerneni.

7        A.     Right.

8        Q.     I'm not talking about hospitals or

9    practices, I'm just talking about the

10   individuals.  Do you remember the names of any

11   other individuals he treated with at any time

12   during his adult life other than those three?

13       A.     No.

14       Q.     No other general practitioners or

15   internal medicine doctors?

16       A.     No.

17       Q.     We have for hospitals that he went

18   to Allegheny General, Punxsutawney Area, and

19   DRMC Adult Behavioral Health Center.

20       A.     Yes.

21       Q.     Any others that you recall him going

22   to during his adult life for any reason?

23       A.     No.  None.

24       Q.     Who was Troy's pediatrician growing up?

25       A.     Dr. George Mosch from Coudersport,

62

1          B. Wingard - by Mr. Fields

2     Pennsylvania.

3          Q.     What's his last name, ma'am?

4          A.     Mosch, M-O-S-C-H.

5          Q.     Do you recall the name of that

6     practice?

7          A.     It was a family practice.

8          Q.     Do you remember the name of his

9     practice?

10         A.     It was just Dr. George Mosch.

11         Q.     It wasn't like something something

12    health center or anything?

13         A.     No.

14         Q.     Was that Troy's pediatrician right

15    up until when he graduated high school?

16         A.     Yes.

17         Q.     Troy ever in the military?

18         A.     No.

19         Q.     In terms of Troy's colitis, tell me

20    what you remember, in terms of him talking to

21    you, if he did, about the problems he was

22    having.

23         A.     Mostly if he would eat or drink

24    certain things, like milk or salads, greasy

25    foods, he would start getting a bad stomachache

63

1          B. Wingard - by Mr. Fields

2    and then have to go to the bathroom.

3          Q.    Was he able to control it if he

4    stayed away from those foods?

5          A.    No.  He still had it.  Those things

6    made it worse, but he still had it.

7          Q.    Do you recall what medications,

8    whether prescription or nonprescription, he was

9    taking to treat that?

10         A.    I don't recall it.  I know that I

11   gave it to my attorney, the names, and I might

12   have even wrote it down on this discovery paper.

13         Q.    In the five years before his death,

14   did Troy ever talk to you about any mental or

15   emotional problems that he was having?

16         A.    No.

17         Q.    Did you have any concerns about his

18   emotional or mental health?

19         A.    No.

20         Q.    All the way up until the incident in

21   October of 2010?

22         A.    Well, a month before is whenever he

23   tried to commit suicide.  I think yesterday you

24   said a whole year.  It was not a whole year.

25         Q.    You're right, ma'am, and I

64

1              B. Wingard - by Mr. Fields

2      apologize.  All right.  Troy's attempted

3      suicide was on September 2, 2010; correct?

4            A.    Yes.

5            Q.    Prior to September 2, 2010, did you

6      ever have reason to believe that he was

7      suffering from any kind of mental or emotional

8      issues?

9            A.    Sometimes him and his girlfriend

10     would have an argument or something, but that

11     would be it, and then they would always make

12     up.  It was never anything -- they were just

13     like a small argument they would have.

14           Q.    So right up until September 2, 2010,

15     you thought everything was going okay for Troy,

16     other than this colitis issue?

17           A.    Right.  I knew he had, like,

18     emotional -- Troy always worked.  He never

19     missed work.  He enjoyed working, bringing

20     money into the house.  I know that would be a

21     stress on him.

22           Q.    Did he ever tell you, I'm stressed

23     out because I can't work?

24           A.    Oh, yes.

25           Q.    Well, do you know if Troy had

65

1               B. Wingard - by Mr. Fields

2        applied for disability at any time during 2008

3        to 2010?

4               A.     I do not recall, but I don't think

5        he did.

6               Q.     He's got colitis, he's telling you

7        that he can't work because of this colitis, did

8        you or anybody else say, why don't you go and

9        apply for disability then?

10              A.     I'm the one that told him to apply

11       for assistance, at least get assistance first,

12       and then I was telling him that we should apply

13       for disability.

14              Q.     Was he resistant to that, or was he

15       open to that?

16              A.     At first he didn't like the idea of

17       applying for assistance.  He didn't like doing

18       anything with welfare.  He preferred to work,

19       but he knew he couldn't.

20              Q.     To your knowledge, prior to

21       October 2010, he never actually went in and put

22       in any forms for any kind of, separate from

23       ACCESS, any kind of Social Security Disability

24       or other type of --

25              A.     No.  None.

66

1                    B. Wingard - by Mr. Fields

2          Q.      When he attempted suicide on

3    September 2, 2010, were you surprised that he

4    did that?

5          A.      Yes.

6          Q.      Was that the first indication that

7    maybe something was going wrong with Troy?

8          A.      Yes.

9          Q.      Other than just the fact that he had

10   colitis and wasn't able to work?

11         A.      Yes.

12         Q.      Did you ever know Troy to use

13   illegal drugs prior to his death?

14         A.      No.   Back in Scranton once in a

15   while he would smoke some pot, but never

16   anything else.

17         Q.      Other than smoking a little pot back

18   in Scranton, you never came to learn that he

19   was using any other drugs?

20         A.      Never.

21         Q.      Did you ever come to learn that he

22   smoked marijuana in Punxsutawney?

23         A.      No.

24         Q.      How about alcohol, did you ever know

25   Troy to use alcohol?

67

                    B. Wingard - by Mr. Fields

1

2        A.      Maybe he would have a drink for New

3    Years.

4        Q.      Wasn't a regular drinker?

5        A.      No, no.

6        Q.      So on a social occasion he might a

7    drink, but that was about it, to your knowledge?

8        A.      Yes.

9        Q.      Did you ever know Troy to abuse

10   Mucinex?

11       A.      No.

12       Q.      You understand that he had Mucinex

13   in his system on the night of the incident?

14       A.      Yes.

15       Q.      Did you ever tell anybody that you

16   were concerned that he was acting erratically

17   at any time because of his consumption of

18   Mucinex?

19       A.      At that time or before or --

20       Q.      Any time?

21       A.      At that time I told him that I

22   thought he took too much Mucinex.

23       Q.      Why did you tell him that, ma'am?

24       A.      Because he was -- his behavior.  I

25   could tell that he wasn't -- he just was -- he

68

1             B. Wingard - by Mr. Fields

2       looked like he was high, and he was acting kind

3       of -- he wasn't acting normal.

4             Q.    Was he acting erratically?

5             A.    Yes.

6             Q.    Why did you think it was too much

7       Mucinex as opposed to something else?

8             A.    Because he told me he took some

9       before.  He said that it had helped his

10      colitis.  And, also, the night that he was in

11      the hospital for the suicide attempt, the ER

12      doctor was right there, and he did tell me

13      himself, as close as me and you, he told me

14      that there is an ingredient in Mucinex that

15      does help Crohn's disease and colitis.

16            Q.    So it's your testimony that prior to

17      the October 18 incident, you never knew Troy to

18      take too much Mucinex?

19            A.    No, no.

20            Q.    You never knew Troy to take Mucinex

21      to get some kind of a buzz?

22            A.    No.

23            Q.    Did you ever hear anybody else with

24      concerns that Troy might be doing that, taking

25      too much Mucinex?

69

1          B. Wingard - by Mr. Fields

2      A.    No.

3      Q.    Tim never came to you and said, hey,

4  Ma, Troy is taking Mucinex more than he should

5  to try and get a buzz?

6      A.    No.

7      Q.    So when you went there on

8  October 18, 2010, and he's acting erratically,

9  you immediately thought, oh, maybe he took too

10 much Mucinex?

11     A.    Yeah.  Because that's the only thing

12 I knew that he was taking.  I didn't know if it

13 would do anything, and I never knew it up until

14 his death that something like that could affect

15 you, you know?

16           He was out of medicine too, so I

17 knew he didn't take an overdose or anything

18 extra of the medicine that he was on for his

19 colitis.  He was out of it.

20     Q.    Did somebody that night, October 18,

21 2010, say to you, oh, hey, Troy took a whole

22 box of Mucinex?

23     A.    No.

24     Q.    You have seen the police report in

25 this case; correct?

70

1          B. Wingard - by Mr. Fields

2     A.    Yes.

3     Q.    You have seen the references in

4 there --

5     A.    I didn't see the police report.  I'm

6 sorry.  I didn't see that at all.

7     Q.    Are you aware that there's a number

8 of references of people telling the law

9 enforcement and medical responders that they

10 were concerned because Troy took a whole box of

11 Mucinex?

12    A.    No.  I do not recall that.

13    Q.    So prior to October 18, 2010, you

14 had no concerns about Troy abusing any drug

15 whatsoever, prescription or nonprescription?

16    A.    No.

17    Q.    Well, then would it be your

18 understanding that Troy was not an experienced

19 abuser of Mucinex, if that makes sense?

20    A.    Yes, it makes sense.

21    Q.    Would you agree, then, to your

22 knowledge, he was not an experienced abuser of

23 Mucinex?

24    A.    That's correct.

25    Q.    Let's back up a little bit.  Are you

1              B. Wingard - by Mr. Fields

2     doing okay?  Do you want to take a break?

3          A.     No.  I'm fine.

4          Q.     We usually break every hour, but

5     you're a trooper.  So if you want to break, we

6     can break or we can just keep plugging along.

7          A.     I would prefer to keep ongoing.

8          Q.     Let's talk about the September 2,

9     2010, suicide attempt.  Were you present with

10    Troy at any time prior to his arriving at the

11    hospital?

12         A.     Yes.

13         Q.     All right.  When during that

14    incident?

15         A.     I'm not sure about the time, but he

16    came to my house.  I was in the bedroom, in

17    Tim's bedroom, talking to Tim.  And the door's,

18    like, almost even with his bedroom, but the

19    door is different.  I heard him come in.  And

20    then from Tim's room I can look straight into

21    my bedroom, and I seen him go back to the

22    bathroom.  I just thought maybe on the way he

23    had to hurry up and go to the bathroom because

24    he didn't say anything to me, he just walked in

25    and went straight to the bathroom.  That was

72

1           B. Wingard - by Mr. Fields
2      the only time I seen him prior to his attempted
3      suicide.
4           Q.    Do you know what he was doing at the
5      time?
6           A.    At the time I didn't know.
7           Q.    Did you come to learn after the fact
8      what he was doing?
9           A.    Yes.
10          Q.    What was he doing?
11          A.    He took a box of Tylenol PMs that I
12     had a bottle of.
13          Q.    So he actually walked from his house
14     over to your house, he came in and went into
15     the bathroom, he found the box of Tylenol PMs,
16     took them and returned to his house; correct?
17          A.    Yes.
18          Q.    It was after that he consumed the
19     Tylenol PMs?
20          A.    Yes.
21          Q.    Do you know if he took any Mucinex
22     that day?
23          A.    I don't know anything else he could
24     have taken or would have taken.
25          Q.    Did you ever talk with him about

73

1                    B. Wingard - by Mr. Fields

2       that suicide attempt?

3               A.      I did after he come home from the

4       hospital.

5               Q.      What did you two discuss?

6               A.      I asked him why he would do such a

7       thing.

8               Q.      What did he say, ma'am?

9               A.      He told me he felt like his life was

10      all messed up.

11              Q.      Did he tell you why?

12              A.      Because he was -- he couldn't get a

13      job, he couldn't keep a job, he was sick all

14      the time.  He was depressed because he just --

15      sometimes he couldn't even make it to the

16      bathroom, or else if he drove someplace, he

17      couldn't get to a bathroom.

18              Q.      So at that time he's upset because

19      he hasn't worked for a year and a half; correct?

20              A.      Yes.

21              Q.      He's got no money coming in except

22      support from friends and family; correct?

23              A.      Right.

24              Q.      He's not feeling good because of the

25      colitis?

74

1                    B. Wingard - by Mr. Fields

2          A.      Correct.

3          Q.      You mentioned he said that he

4     couldn't get a job.  Was that because nobody

5     would hire him or because he felt he could not

6     work?

7          A.      He felt he could not work.

8          Q.      That was because he couldn't manage

9     his colitis at that point?

10         A.      Right.

11         Q.      What did you tell him after he told

12    you that, if you recall?

13         A.      I really don't recall right now.  I

14    can't remember.

15         Q.      Did you have just that one

16    conversation, or did you have more than one?

17         A.      No.  I had more with him, but it was

18    always about the colitis, how depressed he was.

19    But I would tell him that we all loved him and

20    stuff, you know, and I would help out as much

21    as I could.

22         Q.      Was he in a pretty dark place after

23    that suicide attempt?

24         A.      He was for about a week or two later

25    I think.

75

1              B. Wingard - by Mr. Fields

2          Q.    Would you agree with me that he

3    certainly was in a pretty dark place at the

4    time he tried to commit suicide?

5          A.    I would agree with that, but I

6    didn't notice it.

7          Q.    Well, that was my next question that

8    you anticipated, that he must have been in a

9    pretty dark place if he was trying to commit

10   suicide, but somehow he managed to keep that

11   from you; correct?

12         A.    Exactly.

13         Q.    This was a big surprise to you;

14   correct?

15         A.    Yes.

16         Q.    It was not something where Troy had

17   come to you before September 2, 2010, and said,

18   hey, Mom, I need to talk to you.  I have got

19   some stuff going on.

20         A.    He never did.

21         Q.    Then after the suicide attempt, he

22   was going for some sessions of behavioral

23   health; correct?

24         A.    Yes.

25         Q.    Counseling?

1                    B. Wingard - by Mr. Fields

2          A.     Yes.

3          Q.     Some psychotherapy?

4          A.     Yes.

5          Q.     Did he talk to you about that?

6          A.     A little bit.  Also, he was in the

7    hospital at DuBois, and we would go visit him.

8          Q.     You mean DuBois Hospital?

9          A.     It was DuBois -- they kept him after

10   that.  They transferred him from Punxsutawney

11   to the hospital, or whatever it was, and they

12   kept him in there.  They wouldn't release him

13   for 72 hours I think it was.

14         Q.     Do you know if he was upset that

15   they wouldn't release him?  Did he want to get

16   out of there, or was he okay there?

17         A.     He was okay there, but I know he

18   wanted to go home too.

19         Q.     You mentioned that Troy was always,

20   at least to you, he seemed like he was doing

21   okay except he would occasionally fight with

22   Kim Hall; correct?

23         A.     Yes.

24         Q.     How often would he and Kim fight in

25   the years leading up to his death?

77

1              B. Wingard - by Mr. Fields

2         A.    I think I recall two times.  That's

3    all I know of.

4         Q.    Why do those two times stand out in

5    your mind?  Anything significant?  Not

6    significant, but anything that stands out?

7         A.    Right.  Troy told me that -- back in

8    Scranton or everything for Christmas and his

9    birthday, he liked the Broncos, so I would buy

10   plates.  He had a collection of those.  One

11   incident when Kim and Troy was fighting, Kim

12   picked up a plate or two and smashed them.  And

13   I knew they were fighting then because he

14   mentioned it to me.

15        Q.    And then the other incident, ma'am,

16   that you remember?

17        A.    It was -- I found out later that

18   that's why he committed suicide, they were

19   arguing.

20        Q.    Do you know what they were arguing

21   over?

22        A.    Probably money, I'm assuming.

23        Q.    Was money a source of stress in that

24   relationship, do you know?

25        A.    Yes.

78

1                      B. Wingard - by Mr. Fields

2          Q.      That's because Troy told you?

3          A.      Yes.

4          Q.      Did Kim ever come to you about

5    concerns about the money situation or Troy

6    prior to the suicide attempt?

7          A.      No.  I don't recall.  I don't think

8    she did.

9          Q.      Do you know if their arguments ever

10   got physical?

11         A.      No.  They never did.

12         Q.      So I believe you testified Troy was

13   kind of in a dark place for a couple weeks

14   after the suicide attempt but then seemed to be

15   getting better?

16         A.      (Witness nodding.)

17         Q.      So the first incident was September 2,

18   2010, and the next incident was October 18,

19   2010; correct?

20         A.      Right.

21         Q.      So you got about six weeks in there.

22   About four weeks you felt like he was doing

23   better?

24         A.      Right.

25         Q.      Anything happen in those four weeks

79

1              B. Wingard - by Mr. Fields
2      leading up to the October 18 incident that gave
3      you any concerns or caused you to talk with him
4      about any problems he might be having?
5           A.    No.   None.
6           Q.    So when Tim told you on October 18,
7      2010, hey, Ma, there's something going on with
8      Troy, can you come over to Kim's house, was
9      that a surprise to you?
10          A.    Yes, yes.
11                (Short recess taken.)
12                MR. FIELDS:  I just want to
13     put a request on the record that if there are
14     any photographs that were taken of the incident
15     scene, that they be disclosed pursuant to
16     Rule 26.
17                MR. DONAHOE:  Sure.
18     BY MR. FIELDS:
19          Q.    All right, ma'am.  I want to talk
20     about the incident on October 18, 2010.  Let me
21     just tell you how I think -- well, let me just
22     tell you how I would like to go about it.  I'm
23     going to ask you a general question, walk me
24     through everything that you recall about the
25     incident.  And I may periodically stop you to

80

1          B. Wingard - by Mr. Fields

2     ask questions to clarify.

3               MR. FIELDS:  I'm going to

4     encourage my colleagues here, just for the sake

5     of expediency, Mr. Weber and Mr. Donahoe, if

6     you have questions, jump in as we go through.

7     I would encourage that.

8          Q.     But before we do that, I'm going to

9     ask you to draw the inside of Kim Hall's living

10    room and kitchen, if part of the incident takes

11    place in there, so that as we talk about this,

12    you can identify, you know, where people are

13    standing and where things are located.  Is that

14    fair?

15         A.     Uh-huh.

16         Q.     So let me hand you -- we have plenty

17    of paper if you need to start over -- a pen and

18    paper.

19         A.     Should I explain it while I'm

20    drawing it or just draw it now and then we'll

21    talk?

22               (Discussion held off the

23    record.)

24               (Defense Exhibit No. 3 was

25    marked for identification.)

81

1          B. Wingard - by Mr. Fields

2          Q.     Ma'am, I'm going to hand you what's

3     been marked as Defense Exhibit 3.  To identify

4     that for the record, is that a drawing that you

5     just prepared while we were off the record of

6     the incident scene?

7          A.     Yes.

8          Q.     Is that Kim Hall's house?

9          A.     Yes.

10         Q.     Just to orient everybody, as you

11    look at it and we go through the incident, is

12    this (indicating) how you want to look at it,

13    or do you want to turn it a different way?

14    Like this (indicating)?

15         A.     This (indicating) is good.  Or else

16    I'll turn it this (indicating) way.

17         Q.     All right.  So you have it right now

18    where the exhibit sticker is in the upper

19    right-hand corner; correct?

20         A.     Correct.

21         Q.     The kitchen is on the left side of

22    the paper, and the living room is on the right?

23         A.     Uh-huh.

24         Q.     To orient us to the scene, can you

25    tell me what's at the bottom of the picture

82

1               B. Wingard - by Mr. Fields

2      here?

3          A.    On the left-hand side, that's where

4      you come into the house.  There's a doorway

5      here (indicating).

6          Q.    Would you mind just maybe writing

7      "door"?

8          A.    Okay.  I'll put the "outside door."

9      And then it's a hallway.  And actually it

10     should extend down because the hallway goes

11     straight into the thing.  You don't turn.

12         Q.    So can we draw this (indicating) and

13     kind of scribble out that (indicating)?

14         A.    Yeah.

15         Q.    If you would like to do that?

16         A.    (Witness complying.)

17         Q.    Okay.  Great.

18         A.    And then come down the hallway.

19     You're in the living room, unless you turn

20     right, and then you're going down the hallway

21     to the bedrooms (indicating).

22         Q.    And the hallway at sort of the

23     bottom of the page is the hallway to the

24     bedrooms; correct?

25         A.    Yes.

83

1                B. Wingard - by Mr. Fields

2          Q.      Then the hallway opens into the

3      living room, and then there's an entry into the

4      kitchen; correct?

5          A.      There's an entry into the kitchen --

6      I'm sorry -- in this (indicating) hallway, just

7      a few feet from the front door.

8          Q.      Okay.  Let's back up a little bit.

9      Did you ever hear Troy use the term that he

10     felt like he was in a "black hole" with you?

11         A.      A black hole, no.  Not that I recall.

12         Q.      In the week leading up to the

13     incident, did he ever tell you he was feeling

14     agitated or anxious?

15         A.      No.

16         Q.      Did you see anything that caused you

17     to feel maybe he was agitated or anxious that

18     week prior to the incident?  I'm now talking

19     about October 18, 2010.  We're past the suicide

20     attempt.

21         A.      Okay.  That would have been

22     September, not October.  No.  I don't recall.

23         Q.      The day before the incident,

24     October 17, 2010, do you know how Troy spent

25     that day?

84

1                B. Wingard - by Mr. Fields

2        A.      It would have been a Monday.  Well,

3    usually every morning about nine he come over

4    to my house.  They didn't have cable, so he

5    would come over to my house to watch TV.  He

6    liked a certain show.

7        Q.      Which show was that, ma'am?

8        A.      I don't know the name.  I know it's

9    something about two guys.  Paranormal Behavior

10   or something.  It's just -- I think there was a

11   show about ghosts or something.  I'm not really

12   sure.

13       Q.      Now, you said usually he comes over

14   in the morning and watches TV at your house

15   because you have cable.  Do you specifically

16   remember if he did that or not on October 17?

17       A.      Yes.  He did that.

18       Q.      So he came over to the house around

19   9:00 a.m.

20       A.      Uh-huh.

21       Q.      What happened next?

22       A.      He stayed there and he watched TV

23   for a few hours or else asks me if I needed

24   anything done.  And then sometimes he would go

25   back home.  If any of the kids was home from

B. Wingard - by Mr. Fields

1   school, he wanted to come over, but that day

2   there was nobody home from school.

3

4           His usual routine for each day when

5   he was home was he made sure the dishes was

6   done, redd up some, and he would come over and

7   watch TV for a few hours.

8           He would leave and go back home.  I

9   don't know what he did.  Maybe he waited about

10  an hour, then he would come back and watch TV,

11  ask me if I needed anything done.  He would

12  take the garbage down for me, things like that.

13  You know, if I needed something done around the

14  house he would, or else he would hang around

15  with Tim a lot.

16      Q.    Was Tim working at that time?

17      A.    No, he wasn't.

18      Q.    How long had it been since Tim had

19  been employed?

20      A.    Tim had trouble holding down jobs.

21  He was opposite of Troy.  I think maybe

22  six months maybe.

23      Q.    So Tim had been unemployed for about

24  six months?

25      A.    Right.

86

1              B. Wingard - by Mr. Fields

2         Q.    So he's around the house; correct?

3         A.    Yes.

4         Q.    Did Tim do things for you around the

5    house?

6         A.    Oh, yes.

7         Q.    He was living with you at that time;

8    correct?

9         A.    Yes.

10         Q.    Was Tim paying rent in those

11   six months?

12         A.    If he was working, yes.

13         Q.    If he wasn't working, he wasn't?

14         A.    He would pay me some because I think

15   at the time he was on partial disability, and

16   he got, like, $200 a month from welfare.

17         Q.    What was his partial disability?

18         A.    He had trouble with his neck and his

19   shoulder.  Because back in Scranton whenever he

20   worked, he was doing some tree trimming, and he

21   fell out of a tree and had to be LifeFlighted.

22   So he still had problems with his neck and his

23   shoulder and his right leg.

24         Q.    So was Tim around that day on the

25   17th, do you recall?

87

1          B. Wingard - by Mr. Fields

2     A.     Yes.

3     Q.     So basically Troy comes over in the

4  morning, watches some TV, asks you if you need

5  anything done, goes back to his house for a

6  little bit, then comes back in the afternoon.

7  Did he do anything for you around the house

8  that day specifically that you recall?

9     A.     I don't recall at all what he could

10  have did.  He might not have even been there

11  the whole time.  Him and Tim could have taken

12  the Jeep and maybe went to the store for me or

13  something.  I just don't recall.

14     Q.     Tim is living with you at that time

15  and had been living with you for a while;

16  correct?

17     A.     Yes.

18     Q.     And Tim did things around the house

19  for you; correct?

20     A.     Yes.

21     Q.     Was there much that you needed Troy

22  to do given that you had Tim living with you?

23     A.     No.  Troy was taller, so he did

24  things like change the light bulb more and

25  stuff like that.

88

1              B. Wingard - by Mr. Fields

2          Q.      Did you have a lawn that needed

3    mowing?

4          A.      Yes.

5          Q.      Who did that?

6          A.      Mostly Tim.  And Troy would mow his

7    own yard with our mower.

8          Q.      Was there any kind of like a weekly

9    chore or responsibility that Troy always did

10   for you or was it just if you happen to need

11   something and Tim wasn't available, you would

12   said, hey, Troy, can you do this?

13         A.      Just occasionally I would have

14   things for him to do.

15         Q.      All right.  Anything stand out in

16   your mind about Troy's behavior the day before

17   the incident on October 17, 2010?

18         A.      No.  Nothing.

19         Q.      Did Troy sleep at his house that

20   night, or did he sleep at your house on the

21   night of the 17th going into the morning of the

22   18th?

23         A.      He slept at Kim's house.

24         Q.      Did he ever come over and stay the

25   night at your house?

89

1          B. Wingard - by Mr. Fields

2          A.    He did one -- a couple nights he

3    stayed whenever I lived at Sprinkle Mills, but

4    that wasn't in that same year at all.

5          Q.    All right.  It is now the morning of

6    the 18th, the day of the incident.  Was that a

7    repeat of the prior morning?

8                (Discussion held off the

9    record.)

10         Q.    I'm going to strike the last

11   question and ask a different question.

12               What do you remember on the morning

13   of the 18th in terms of when you saw Troy and

14   what he was doing that morning?

15         A.    As I recall, he came over to watch

16   TV like he usually does, that hour-long show.

17   I don't remember too much about that day.  But

18   he would go back and forth like he always did

19   since we lived so close.  Sometimes he would go

20   home and take a nap or something, sometimes he

21   would fall asleep on the couch.

22               I do remember -- I do remember him

23   going out the door, and he gave me one big

24   smile.  He was in a good mood.  He gave me a

25   big smile.

1                    B. Wingard - by Mr. Fields

2          Q.     Was that in the morning, ma'am, or

3     the afternoon?

4          A.     It was in the afternoon.

5          Q.     Do you know if he spent some time

6     with Matthew, his nephew, that day?

7          A.     Oh, yeah.  For sure he did.  He

8     always come over and seen Matthew.

9          Q.     I have seen something in the record

10    that indicates that he and Matthew spent some

11    time together that day.  I'm just wondering as

12    to what they did that day or if Matthew ever

13    talked to you about that?

14         A.     Oh, they probably played catch or

15    else sat out on the porch.  Troy always was

16    there for Matthew, teach him with baseball and

17    stuff.  So Troy always -- they were like

18    buddies.

19         Q.     Matthew ever say anything to you

20    like, oh, Grandma, I remember Troy was acting

21    funny that day, or anything like that?

22         A.     No.

23         Q.     Prior to that evening, when you got

24    a call from Kim that something was going on

25    with Troy, anything out of the ordinary that

91

1                    B. Wingard - by Mr. Fields

2      day that you recall?

3            A.      No.   Nothing.

4            Q.      All right.   So it's that evening,

5      and at some point you get a call from Kim Hall;

6      correct?

7            A.      Well, I didn't get the call, Tim

8      did.   Because I think I might have answered it

9      and she asked for Tim, and then Tim got on the

10     phone and talked to her.

11           Q.      Tell me, and this is where we're

12     going to start walking through the incident,

13     and I'm just going to ask you that big general

14     question.   Walk me through everything that you

15     remember about the incident starting with that

16     call.

17           A.      Okay.   The first call I'm pretty

18     sure I answered the phone, and she asked for

19     him.   Tim got off the phone and said, Mom, I'm

20     going over to Troy and Kim's, because I think

21     he said they were arguing or Troy was yelling

22     or something.   So he went over --

23           Q.      I apologize.   Remember we're going

24     to --

25           A.      Right.   That's okay.

92

B. Wingard - by Mr. Fields

1

2      Q.      Was this the first time Tim had ever

3      been called over --

4      A.      Uh-huh.

5      Q.      -- for something like this?

6      A.      Yes.

7      Q.      Were you a little -- so this was a

8      surprise to you?

9      A.      Well, I mean, they would call and

10     talk to Tim on the phone, so the call wasn't

11     surprising.  It was surprising that they asked

12     him to come over because Troy was yelling, and

13     he was upset, or just yelling.  Tim went over.

14     Q.      Approximately what time is this?

15     A.      I think it was approximately around

16     10:30 as I recall.  I'm not positive.  But I do

17     know I was straightening up the kitchen, things

18     like that:  putting things away or getting

19     things ready for Matthew for breakfast.  I was

20     in the kitchen, that's why I answered the phone.

21     Q.      Go on, ma'am.

22     A.      Tim went over, and Tim didn't say

23     anything.  I don't know what he said or what

24     they did, but he come back, and he said, Troy

25     is okay.  There's nothing going on over there.

93

1    B. Wingard - by Mr. Fields

2         And then no sooner he sat down,

3    probably like it could have been about

4    five minutes later, Kim called again. I didn't

5    answer this time. Maybe I did. I just don't

6    recall who answered the phone. But Tim goes,

7    come on, Mom, we'll go over. You go over with

8    me. Instead of walking, we both got in the

9    Jeep and rode over.

10        Q.    Let me stop you there, ma'am. When

11   Kim called again, do you remember anything?

12   Did Tim speak with her, or did you speak with

13   her?

14        A.    Oh, with Kim? I didn't speak with

15   her. Tim did say that he thought Troy took too

16   many Mucinex, because he probably knew that --

17   well, we all knew that Troy was out of

18   medicine. He had to go back to the doctor's to

19   get a refill. It's not like I could give him

20   money for him to go down and refill it. I know

21   that he had to go back to the doctor's in

22   Indiana to get it refilled. He just kept on

23   putting it off.

24        Q.    You say the doctor's in Indiana.

25   Which doctor was that? Do you recall?

94

1              B. Wingard - by Mr. Fields

2          A.    It was one of the ones with the

3      strange names.  I'm not sure which one.

4          Q.    Did you usually give him a little

5      money to fill his prescriptions?

6                    MR. WEBER:  Just to clarify,

7      is that Indiana, Pennsylvania?

8                    THE WITNESS:  Indiana,

9      Pennsylvania.

10                   MR. FIELDS:  Thank you,

11     Travis.  That's why I was confused.

12         Q.    Again, you have to bear with me.

13     I'm not as familiar with the local geography.

14         A.    Right.  I'm sorry.

15         Q.    No, no.  It's on me.  Okay, ma'am.

16     Do you remember anything else that Kim might

17     have said to Tim or Tim might have said to Kim

18     during that second phone call?

19         A.    No.  Just that Tim said, come on,

20     Mom.  Come over and talk to Troy.

21         Q.    Is that because Troy had gotten

22     upset again?

23         A.    I guess, yeah.  I think so.

24         Q.    But you're not 100 percent certain.

25     It's kind of your understanding from the

95

         B. Wingard - by Mr. Fields

1    circumstances?

2        A.    Yeah.   Understanding from Tim why he

3    would even ask me to go over, so that's why I

4    say it.

5        Q.    I see.   It's late, and it's dark, so

6    you jump into the Jeep and drive over?

7        A.    Yes.

8        Q.    What happens next, ma'am?

9        A.    I stayed in the Jeep and Tim went

10   inside.   I don't know, I'm assuming -- I think

11   that he talked to Troy.   I know he did.   And

12   then he come out on the porch and motioned for

13   me to come in.

14            So I went in.   Tim stayed outside.

15   I just assumed he was smoking a cigarette.   I

16   went in.   I didn't know that he called 911.   So

17   he already knew that Troy needed help.

18            I went in and Troy was just setting

19   there smoking a cigarette and watching TV, but

20   I sat down next to him.   He looked over like if

21   he was kind of surprised:   Mom, what's going

22   on?   Because I don't usually go over there a

23   lot.   Maybe during the day or something, but

24   just to pop in, I usually don't, not at night,

96

1          B. Wingard - by Mr. Fields
2     unless it was like New Years Eve or a holiday
3     or something.
4          Q.    If it's okay, let me stop you there,
5     ma'am.  Looking at Exhibit 3 that you drew,
6     where was Tim sitting when you came in -- I'm
7     sorry -- Troy sitting when you came in?
8          A.    He was on the couch in the living
9     room.
10         Q.    Where did you sit?
11         A.    He sat towards the right, I sat on
12    the left of him.  Or rather it would be facing
13    the other way.  I sat on the right of him.
14         Q.    He's on your left, you're on his
15    right?
16         A.    Right.
17         Q.    That's a coffee table in front of
18    the couch?
19         A.    Yes.
20         Q.    Is the TV on?  Do you recall?
21         A.    Yes.  It was on because he was
22    watching TV.
23         Q.    Tim is outside; correct?
24         A.    Yes.
25         Q.    You didn't know at the time what he

1              B. Wingard - by Mr. Fields
2       was doing, but you have since found out he was
3       on the phone with 911?
4              A.    Yes.
5              Q.    Anybody else in the room with you?
6              A.    Yes.  Whenever I walked into the
7       house from the front porch, Kim was in the
8       kitchen.  She might have been drying dishes or
9       something.  I don't know.
10             Q.    Does Kim have children?
11             A.    Yes.
12             Q.    How many?
13             A.    Four.
14             Q.    Do you know if they were all in the
15      house that night?
16             A.    They were, but they were in their
17      bedrooms.
18             Q.    Do you know how many bedrooms in
19      that house?
20             A.    Three.
21             Q.    Do you know how big that house is,
22      approximately?  Square footage?
23             A.    No.  I don't know that.
24             Q.    Closer to 1,500 or closer to
25      5,000 square feet?

98

1                    B. Wingard - by Mr. Fields

2            A.      Probably closer to 1,500.  It's a

3      two-bedroom modular home; so --

4            Q.      Two story, one story?

5            A.      One story.

6            Q.      That (indicating) hall goes to the

7      bedrooms; correct?

8            A.      Yes.  And the bathroom.

9            Q.      Any point during the incident, did

10     any of the children -- did you see any of the

11     children before Tim was taken away by the

12     ambulance?

13           A.      It was Troy.

14           Q.      Troy.  I'm sorry.

15           A.      No.  Not before.

16           Q.      So you sit on the couch next to

17     Troy, Kim is in the kitchen; correct?

18           A.      Uh-huh.

19           Q.      And what happens next, ma'am?

20           A.      Whenever I went into the living

21     room, I crossed the living room, sat down next

22     to Troy.  I don't know if Kim was still there

23     or -- I know at one point she did go out on the

24     porch with Tim, but I don't know when.  I just

25     know I was setting on the couch with Troy.  He

99

1              B. Wingard - by Mr. Fields

2        was smoking a cigarette, watching TV.

3                  I sat down, and he goes, Mom, what

4        are you doing here?  I said, oh, Tim wanted to

5        come over and see you.  And I also told him --

6        I could tell that he just looked like if he was

7        messed up or something, and I said, Troy, I

8        think you took -- I didn't -- I knew that he

9        took the Mucinex.  That's the only thing he had

10       to take, like I said, about the prescriptions.

11                 And I go -- and, plus, Tim told me

12       he was messed up on that.  I told him, Troy, I

13       think you need to go to the ER because you took

14       too many of those pills.  And he goes, okay.

15       I'll go to the ER.

16                 Now, whenever Tim was there -- I

17       remembered this now, that Tim did tell me

18       something.  He said that he wanted to take Troy

19       to the ER, but Troy would not go with him.  He

20       also tried tricking Troy.  He said, Troy, I

21       need cigarettes, let's go down and get

22       cigarettes.  Troy told him, no, I'm not going

23       anywhere.  But whenever I come in and asked

24       him, and I told him, Troy, you need to get to

25       the ER, and he said, okay, Mom.

100

1          B. Wingard - by Mr. Fields

2          And I sat there waiting.  I thought

3   Tim was outside having a cigarette or

4   something.  I was waiting for him to come in,

5   and I was going to say, let's go.  Troy is

6   going to go to the ER, but he didn't come in at

7   all.

8          Me and Troy sat there talking.  He

9   gave me a lot of hugs that night while we was

10  setting there.  We --

11       Q.    Is it okay if I interrupt for a

12  minute?

13       A.    Uh-huh.

14       Q.    You said he's sitting there and he's

15  smoking a cigarette.  Could you tell something

16  was going on with him?  If you hadn't known

17  anything from Tim prior to walking in --

18       A.    Right.

19       Q.    -- if you had just surprised him,

20  was there anything going on that you observed?

21       A.    No.

22       Q.    So he seemed fine?

23       A.    Yes.

24       Q.    As you're sitting there, you said

25  you're talking and he's giving you a lot of

101

1                 B. Wingard - by Mr. Fields

2      hugs; correct?

3             A.      Uh-huh.

4             Q.      Let me back up a little bit.  Did

5      you at one point tell him that you thought he

6      took too many Mucinex?

7             A.      Right.

8             Q.      What did he say to you when you

9      asked him?

10            A.      That's whenever I said, you took too

11     many Mucinex, and I think you need to go to the

12     ER, and he answered, okay.

13            Q.      He didn't say, oh, no, I didn't, or

14     anything like that?

15            A.      Nope.  I don't remember him saying

16     that.  I don't recall it.

17            Q.      But then he's giving you lots of

18     hugs as you two were talking?

19            A.      Yeah.

20            Q.      Was that normal behavior for him?

21            A.      No.

22            Q.      Then did you think, okay, something

23     is definitely wrong here?

24            A.      I could tell that maybe a few

25     minutes before, as soon as I started talking to

102

1              B. Wingard - by Mr. Fields

2    him.

3         Q.    What was it about your conversation

4    that caused you to feel something was wrong?

5         A.    Maybe the slurred words or

6    something.  I really, really don't recall.  And

7    also his eyes.

8         Q.    So he was slurring his words, he was

9    giving you lots of hugs, and what was going on

10   with his eyes?

11        A.    They were, like, glassy.

12        Q.    Anything else you recall about his

13   appearance or behavior at that time?

14        A.    No.

15        Q.    Okay, ma'am.  What happened next?

16        A.    I don't recall the whole

17   conversation, but there would be times where we

18   would just be talking.  I don't remember what

19   we was saying, though.  I don't recall it.  And

20   then there would be times where -- that's

21   whenever he turned around and said, I love you,

22   Mom.  I said, I love you too, Troy.

23              And then he seemed okay.  So I said,

24   Troy, I have to go to the bathroom.  I will be

25   right back.  He said, okay, and he just sat

103

1              B. Wingard - by Mr. Fields

2      there.  He wasn't smoking a cigarette, he was

3      watching TV then.

4              I went down this (indicating)

5      hallway to the bathroom and then came back out.

6      Whenever you come down this (indicating)

7      hallway, you can see straight into the living

8      room.  And I can see him on the couch.  And he

9      was like this setting -- he wasn't laying down,

10     but yet he was setting.  He turned and he had

11     his face in the sofa, and he was crying so

12     hard.  It just wasn't a little cry, it was,

13     like, from the heart.  He was really crying

14     hard.

15             I do remember Kim was in the kitchen

16     at the time because I was thinking, well, if

17     she loves him, why isn't she over there with

18     that kind of crying?  I come over to him, and I

19     kind of put my hand on his shoulder.  He sat

20     up.  I said, Troy, what's wrong?  Why are you

21     crying?  He goes, Mom, because my life is so

22     messed up.  And then I knew he meant the

23     colitis, you know, and not being able to work

24     and support, and he felt bad.  I know he felt

25     really bad about that.

104

1              B. Wingard - by Mr. Fields

2              And he says, my life is so messed

3       up.  And I said, I know, Troy.  We're just

4       going to have to get you back on that medicine,

5       and just do what -- maybe change doctors or

6       something.  I can't really remember what we

7       said, but I know it was about his help that he

8       needs with his medical issues and stuff.

9              I was still waiting for Tim to come

10      up.  I was assuming that he would be coming in.

11      But while I was setting there then, a few

12      minutes later we were setting there talking, I

13      think he was smoking another cigarette then.

14      Like, then we'd talk, and then he would turn

15      and watch TV, you know, or just be looking at

16      it, and then we would talk some more.

17             The next thing I know, I was looking

18      at Troy, he was kind of like tapping a

19      cigarette, and then he stopped and he just

20      looked up.  I turned to look to see what he was

21      looking at, and it was the two police officers

22      in the room.

23         Q.    Let me stop you there and go back a

24      little bit.

25         A.    Okay.

105

B. Wingard - by Mr. Fields

1

2        Q.      From the time that you sat down with

3    Troy to the time that I believe they are

4    Pennsylvania State Troopers; correct?

5        A.      Yes.

6        Q.      I'm going to call them the Troopers.

7        A.      Okay.

8        Q.      From the time you sat down on the

9    couch with Troy to the time the Pennsylvania

10   State Troopers arrived, was he ever pounding

11   his fists?

12       A.      Yes, he did.  I just remembered

13   that.  Not both of them.  He just slammed his

14   fist down.  This was before the crying

15   incident, okay?  Before I went to the bathroom.

16   Just out of the blue he would hit his fist

17   down, and he would start yelling.  I can't

18   recall what he was saying.  Maybe he just,

19   like, swore a little bit, like damn it.

20   Something.  One-word thing.  And I said, Troy,

21   the girls are sleeping.

22            Then he might have yelled that or

23   something because I know that he was a little

24   bit loud, especially with the hitting on the

25   table, and that's why I told him the girls were

106

                    B. Wingard - by Mr. Fields

1

2       sleeping.  He quieted right down.  He didn't

3       hit the table anymore.  And then we talked some

4       more.  And maybe a couple minutes later he did

5       it again, and I said, Troy, the girls are

6       sleeping.  I said, you got to stop making

7       noise.  And then that's whenever he said, well,

8       Mom, where are the girls at?  That's when I

9       said, they are in their bedroom sleeping.  He

10      goes, oh, okay.  That's whenever he started

11      crying.

12                  No, he didn't start crying until

13      after I come -- I mean, he already started when

14      I went to the bathroom.  But whenever I came

15      back, he said he was worried about Tim, and I

16      said, why?  What do you mean you're worried

17      about Tim?  He goes, well, where is Tim?  I

18      said, I think he's outside on the porch having

19      a cigarette.  Then that's whenever I went to

20      the bathroom, sometime around approximately

21      that time.  I came back in, and he was crying.

22                  Whenever he sat up, he was still

23      crying to me.  That's whenever I asked him what

24      was wrong, and he told me his life was messed

25      up.  I knew that he meant that he couldn't --

107

1              B. Wingard - by Mr. Fields

2      because I was helping pay his rent.  I was

3      paying my rent and also helped pay his rent and

4      things.  And my Mom would chip in for the fuel,

5      because they got out of fuel one time, and that

6      made him stressed out too.

7              Like I said, the next thing I knew,

8      the police was in the room.

9         Q.    So prior to those State Troopers

10     arriving, at first he seemed calm, but then you

11     noticed after talking to him for a little bit

12     that he seemed a little confused?

13        A.    Right.

14        Q.    Then at one point he started

15     pounding the table, and you had to tell him to

16     quiet down, then he was calm again?

17        A.    Yes.

18        Q.    Then he seemed confused?  He didn't

19     know where the girls were; right?

20        A.    Yes.

21        Q.    Did he ask you at one point what's

22     going on, Mom?  Do you remember that?

23        A.    I think he asked me that right in

24     the beginning.

25        Q.    Then he again was pounding the

108

1              B. Wingard - by Mr. Fields

2       table?

3              A.     Just twice.

4              Q.     So he did that twice before the

5       State Troopers arrived?

6              A.     Right.

7              Q.     You again had to ask him to calm down?

8              A.     Right.

9              Q.     So he's showing a range of behavior,

10      from calm to agitated to confused; correct?

11             A.     Right.  But he was calm, and he

12      seemed okay whenever the State Troopers -- I

13      don't know how long they were there.  Probably

14      not very long.  I mean, the living room is not

15      really big.  It kind of looks big here

16      (indicating), but it's not.  It's really

17      smaller.

18             Q.     So at some point you realize the

19      State Troopers are in the room?

20             A.     Uh-huh.

21             Q.     How are they dressed?

22             A.     In their uniforms.

23             Q.     All right.  That's the typical

24      Pennsylvania State Trooper uniform that you see?

25             A.     Yes.

109

1             B. Wingard - by Mr. Fields

2        Q.     Did they have hats on?  Do you

3    recall?

4        A.     No.

5        Q.     Describe that uniform for me.

6        A.     It was blue and gray I believe.

7    They had their badges on.

8        Q.     Clearly identifiable as State

9    Troopers?  Would you agree with that?

10       A.     Yes.

11       Q.     In their State Trooper uniforms;

12   correct?

13       A.     Yes.

14       Q.     All right.  So you notice that the

15   State Troopers are in the room.  What happens

16   next, ma'am, that you recall?

17       A.     At the time I didn't know, you know,

18   what their names was or anything.  One goes to

19   Troy, what's going on, Troy?  And --

20       Q.     Let me stop you there actually,

21   ma'am.  I apologize.

22       A.     Okay.

23       Q.     I appreciate your patience with me.

24   You're sitting on the couch with Troy, where

25   are they standing in the room?

110

1              B. Wingard - by Mr. Fields

2         A.    They are standing in front of the TV

3    facing the couch.

4         Q.    The table is between you and the

5    Troopers?

6         A.    Yes.

7         Q.    Do you recall what they looked like?

8    Do you have a memory of what each of them

9    physically looked like in terms of maybe age

10   and physical appearance?

11        A.    One, to me, seemed a little bit

12   stockier than the other one, and one was

13   younger.  That's all I really remember.

14        Q.    So there's an older Trooper and a

15   younger Trooper?

16        A.    Yeah.  He's not real old, but yet

17   you could tell there was an age difference.

18        Q.    Who was the stockier one?

19        A.    The younger one.

20        Q.    How tall was Troy?

21        A.    Troy was 6'4".

22        Q.    Did Troy have any experience with

23   martial arts or fighting training?

24        A.    A little bit.  He took some classes

25   back in Scranton, but he never received any

                    B. Wingard - by Mr. Fields

1

2      certificates or anything.  Then he stopped

3      going.  He only went maybe, like, three weeks,

4      and maybe one day a week.  Three or four.

5      Because at the time he didn't have a vehicle,

6      so he was walking there.  It started getting

7      cold, so he just stopped.

8          Q.    He's 6'4", he has had some fighting

9      training; correct?

10         A.    I guess, yeah.

11         Q.    Have you read the 911 call from Tim

12     to the police?

13         A.    No.

14         Q.    Are you aware that Tim told the 911

15     operator that Troy was tough and scrappy and

16     one hell of a scrapper?

17         A.    No.

18         Q.    Did you think Troy was a tough guy?

19         A.    No.  Troy wasn't.

20         Q.    Did he and Tim ever fight?

21         A.    Maybe growing up.  Maybe once or

22     twice.  Troy was pretty mellow.  He always had

23     lots of friends come to the house, and he would

24     go to their place.  He never had any fights.

25     No problems with anybody.

112

1          B. Wingard - by Mr. Fields

2          Q.      At least none that you're aware of;

3     correct?

4          A.      Right.

5          Q.      So when he and Tim, whenever they

6     would fight, who got the better of that?  Tim

7     or Troy?

8          A.      It was never physical.  They never

9     fought physical.  They would yell at each other

10    and stuff.  Geez, I don't know who would get

11    the better.  I think they would both say they

12    got the better of each one.  Because they would

13    just plain stop because I would tell them to

14    knock it off.

15         Q.      Was Tim a big guy?

16         A.      He was stocky, yeah.  He was big.

17         Q.      How tall was he?

18         A.      He was only I think 5'8" or 5'9".

19    He wasn't just stocky, he was heavy.

20         Q.      So before I interrupted you, ma'am,

21    Troopers came in, they are in the room, and one

22    of them says, what's going on, Troy?  What

23    happens next, ma'am?

24         A.      I can't exactly remember.  I can't

25    recall what Troy answered them then.  But they

1              B. Wingard - by Mr. Fields

2    asked that a couple times.  It wasn't just

3    once.  Maybe Troy said nothing or -- because

4    they had to ask it more than once.  I know they

5    asked different things too.

6              But I think he said the first time,

7    like, maybe nothing much or something like

8    that.  And then they would ask him something

9    like -- well, it was always, like, the same

10   thing:  What's going on?  Or, yeah, mostly

11   what's going on?  But it wasn't just a

12   plain-asked question like that, it was an

13   attitude they had with it.  You can tell in

14   your voice:  Well, what's going on now, Troy?

15   They would put that word "now" in the same

16   sentence a couple times, you know?

17             The one time Troy goes, I got it all

18   figured out.  That was in the beginning, yeah.

19   One of them said, what do you got figured out?

20   And you could tell in the tone of their voice

21   it was not a regular -- it was like aggravating

22   like or something.  Trying to -- like an

23   incident, like try to start something.  Troy

24   goes, I got it all figured out.  He goes, what

25   do you got figured out?  And he goes, life.

114

1               B. Wingard - by Mr. Fields

2      The one cop laughed.  He goes, I would like to

3      hear about that.

4               And Troy stood up, and he goes --

5      well, I don't think he wanted to argue with

6      them or anything, especially in front of me,

7      but he goes, let's go outside.  The one cop

8      said, no, I'm not going outside.  And Troy,

9      like, touched his arm and said, come on and

10     let's go outside.  And he goes, no, and don't

11     touch me.  So Troy stopped touching him, and --

12     wait a minute.  I got to back up.

13          Q.    That's fine, ma'am.  By all means.

14     Take as much time as you need.

15          A.    I remembered -- I don't know if it

16     was before -- I don't recall if it was before

17     that he said that he got it figured out or

18     after about the life.  But he goes, Troy

19     goes -- because they asked him again, what's

20     going on, Troy?  And Troy goes, I'll show you.

21     I think it was after that.  I'm almost positive

22     now.  He said, I'll show you.  And there was a

23     half-full bottle, about this (indicating) size,

24     of Pepsi, and it had a lid on it, and it was

25     half full.  Troy picked it up and started

                    B. Wingard - by Mr. Fields

1

2    twisting it.  I don't know why he did that.

3    Maybe because he was messed up or something.  I

4    don't know.

5                    But I go, Troy, put that down.

6    You're going to break it, and it's going to

7    make a mess.  He instantly put it down and

8    listened to me.  So he just stopped that.

9    That's whenever -- yeah, he was standing up,

10   and I think I stood up then too because he was

11   doing that.  And I said, Troy put that down and

12   leave it alone.

13                   Then the same question:  Now, Troy,

14   what are you going to do this time?  Or

15   something like that.  It was just their tone

16   and stuff, where they were trying to get to

17   him, trying to make him mad.  Just like they --

18   well, I can't say what they were doing.  It's

19   my opinion now.

20                   That's whenever I think Troy had

21   enough of their same question over and over.

22   Then he took a step, and he didn't go like this

23   (indicating), like he was purposely going to

24   punch him, he put his arm back and then just

25   slowly swang around like if he was going to hit

116

1          B. Wingard - by Mr. Fields

2    him that way.  I mean, usually someone doesn't

3    fight like that, you know, but that's what he

4    did.  At that time, whenever he swung, the one

5    cop jumped back like, stepped back.  He didn't

6    have to jump back, all he had to do was move

7    back a little bit.  And instantly they both

8    tackled him then.

9          Q.    Let's stop there for a moment and go

10   back through some of the testimony here.  When

11   the Troopers are asking Troy questions and

12   before he twists the bottle, you and Troy are

13   still sitting on the couch; correct?

14         A.    Uh-huh.

15         Q.    It's some kind of 16 ounce Pepsi

16   bottle or something like this (indicating)

17   water?

18         A.    Yes.

19         Q.    There was some soda in it?

20         A.    Yeah.  It was probably about half

21   full.

22         Q.    All right.  So then Troy, did he

23   stand up or was he sitting when he was doing

24   this?

25         A.    He was standing up.

117

1              B. Wingard - by Mr. Fields
2        Q.    So he stands up.  Did he stand up to
3   do that or was he already standing up?
4        A.    He stood up to do that, yes.
5        Q.    He started twisting it?
6        A.    Yeah.
7        Q.    Did you think he might rip it in
8   half?
9        A.    Yes.
10       Q.    You told him to stop?
11       A.    Yes.
12       Q.    Did you have any idea why he was
13  doing that?
14       A.    I think he was getting a little bit
15  angry with them two.
16       Q.    Was he acting angry?  Troy, was he
17  acting angry?
18       A.    Just -- that's unusual for him to
19  display any kind of anger really.  I didn't see
20  him ever display much anger.  But to pick that
21  up and pretend he's twisting it, that would
22  show me that he was angry.
23       Q.    Where were the officers standing
24  when that happens?  Are they in the same spot?
25       A.    Yeah, the same spot.  About the

118

1              B. Wingard - by Mr. Fields
2    middle of the room.
3         Q.    Do you recall the approximate
4    distance from where you and Troy were on the
5    couch to where the State Troopers are standing?
6         A.    I would say approximately, as I
7    recall, five or six feet.
8         Q.    You didn't hear any of the 911 call,
9    so you don't know what information they had
10   walking into that house; correct?
11        A.    Correct.
12        Q.    There were four children somewhere
13   in that house at that time; correct?
14        A.    Yes.  I don't know if they knew that
15   or not, but yes.
16        Q.    Prior to the physical contact
17   between the Troopers and Troy, where was Kim
18   during all of this?
19        A.    Like I said, I seen her in the
20   kitchen.  That was whenever Troy was crying.
21   That was the last time I seen her, in the
22   kitchen, until after the incident.  I'm
23   assuming that she was out on the porch with
24   Tim.
25        Q.    Okay.  But would you agree with me

1              B. Wingard - by Mr. Fields

2    that you don't know, you weren't focused on her

3    whereabouts during the incident; is that

4    correct?

5         A.    That's correct.

6         Q.    So you don't know where she was

7    while all of this was happening; correct?  When

8    I say that, from the time the Troopers arrived

9    until the time things got physical, you didn't

10   see her, did you?

11        A.    I think I seen her maybe standing

12   back here (indicating) towards the hallway.

13   Because right through here (indicating), where

14   I put these (indicating) marks at, is a big

15   window with shutters so you can see into the

16   kitchen.

17        Q.    From where the loveseat is, you

18   can't walk from the kitchen into the living

19   room there?

20        A.    No.  You go this (indicating) way.

21   They have it blocked off.  But over here

22   (indicating) is the dining room and that big

23   doorway.

24        Q.    Again, with the sticker on the top

25   right-hand corner at the top of the page, you

120

1                    B. Wingard - by Mr. Fields

2      can go back through the living room and come

3      into the kitchen from there?

4           A.     Yes.

5           Q.     Did you see Tim during any of this

6      time, from when the Troopers arrived to when

7      things got physical?

8           A.     No.

9           Q.     Troy, at some point, gets up and he

10     walks toward the officers; correct?

11          A.     Yes.

12          Q.     Did he have to walk around the table

13     or was that a smaller table where he could just

14     get up and walk straight towards them?

15          A.     That part I don't remember.  I know

16     at one point whenever I was setting on the

17     couch, I was to his left.  Yes.  And then

18     whenever he stood up, I was to his right, so he

19     must have walked around in front of me and came

20     over here (indicating) beside the table and

21     stood.

22          Q.     When you were facing the Troopers,

23     where was the older Trooper and where was the

24     younger Trooper?  Do you recall?

25          A.     Yeah.  The older one was to the --

121

1              B. Wingard - by Mr. Fields
2     he was to the right, like closer to this
3     (indicating) doorway; and then the younger one,
4     yeah, the younger one was here (indicating).
5     That was before any of the physical things
6     happened.
7          Q.    Okay.  So you're sitting on the
8     couch looking towards the TV; correct?
9          A.    Uh-huh.
10         Q.    On your left is the older Trooper?
11         A.    Uh-huh.
12         Q.    On your right is the younger
13    Trooper?
14         A.    Right.
15         Q.    As Troy gets up and walks towards
16    them, did he come up to the younger Trooper,
17    the older Trooper, or both of them?  Do you
18    recall?
19         A.    The younger one I think, yeah.
20         Q.    Then he reaches back, and he takes a
21    swing; correct?
22         A.    Right.
23         Q.    That was a punch; correct?
24         A.    Correct.
25         Q.    Did he try to punch the younger

122

1              B. Wingard - by Mr. Fields

2     Trooper or the older Trooper?

3         A.    I am assuming it was the younger one

4     because he was the one with all the sarcastic

5     questions and remarks that he made to Troy.

6         Q.    This is one of those things where

7     I'm interested in what you know versus what you

8     might be speculating about.  So as you sit

9     here, do you know that it was the younger one,

10    or can you not remember, but you think it was

11    the younger one?

12        A.    I'll give a percentage.  I think

13    it's, like, 90 percent sure that it was the

14    younger one.

15        Q.    Was this upsetting to you?

16        A.    Yes.

17        Q.    So you know something is going on

18    with Troy; correct?

19        A.    Right.

20        Q.    And you're concerned about him;

21    correct?

22        A.    Correct.

23        Q.    Now, some State Troopers come in;

24    correct?

25        A.    Uh-huh.

123

1              B. Wingard - by Mr. Fields

2         Q.    He's acting erratically and twisting

3    the bottle, and he goes over and he tries to

4    punch one of the State Troopers; correct?

5         A.    Right.

6         Q.    So --

7         A.    Can I interrupt you, please?

8         Q.    Yes, ma'am.

9         A.    At that time when he went over to

10   punch him, I mean, this took a few minutes.  Up

11   to that point, Troy was very calm.  Whenever

12   they walked in, they seen him that he had to be

13   very calm because we was setting there for

14   about ten minutes just talking, and I know

15   nothing was going on the last ten minutes

16   before they showed up.  So they knew he was

17   okay.

18             I mean, what I don't understand is

19   why didn't they call and okay the ambulance at

20   that time because that's whenever they started

21   with the arrogant questions.  I mean, I'm just

22   saying one or two questions, but it was their

23   tone in their voice, how they kept on asking

24   it.  That was almost the same question, and

25   that's what got Troy angry.

124

1          B. Wingard - by Mr. Fields

2          Q.    Now, during the incident, you agree

3     with me that the first thing that Troy did that

4     was aggressive was trying to twist the soda

5     bottle and rip it in half; correct?

6          A.    Yes.

7          Q.    Did he do that before or after he

8     put his hands on the officers and said, let's

9     go outside, if you recall?

10         A.    I don't recall.  I can't recall if

11    it was before or after.

12         Q.    At some point during this, though,

13    we know he's twisted the soda bottle; he's put

14    his hand on the officers to try to get them

15    outside; and he's taken a swing at the

16    officers, the State Troopers.  Correct?

17         A.    Right.  I think that when he twisted

18    the bottle -- I lost my train of thought why I

19    was thinking that.  I think that he did that

20    after that, he touched his arm and said come

21    out.  I'm sure of it because that's whenever

22    they still asked him the same questions.

23         Q.    Are you still sitting on the couch?

24         A.    Whatever he twisted the bottle I

25    stood up.

125

1          B. Wingard - by Mr. Fields

2          Q.     When he goes over and tries to punch

3     one of the officers, are you standing or sitting?

4          A.     I'm standing.  I moved over here

5     (indicating) toward the end of the room.  Not

6     completely in the room but to the right, right

7     side of the room, right side of the table.

8                    MR. FIELDS:  It's not going to

9     be true north, east, south, west.  Can we just

10    label it just like that to help orient

11    ourselves?

12                    MR. DONAHOE:  Yes.  Whatever

13    you want.  What I'm understanding is you're

14    saying you moved over to where you have marked

15    "window"?

16                    THE WITNESS:  Yes.  Towards

17    the window.

18         Q.     Do you mind if I make a little key

19    just for purposes of the record that says

20    north, south?

21         A.     Yeah, yeah.  But I was right next to

22    the table there too.

23         Q.     So I have done north, south, east,

24    and west.

25         A.     Okay.

126

1              B. Wingard - by Mr. Fields

2        Q.      Hopefully I did that right.  Does

3    that look reasonable to you?

4        A.      Yes.

5        Q.      So you moved sort of to the

6    northeast corner of the living room?

7        A.      Right.  I was right next to the

8    table, in between the table and the wall.

9        Q.      And where at this time is Troy as

10   he's trying to punch the Trooper?

11       A.      He was, like, near the table, but he

12   stepped away from the couch.  They were, like,

13   in the middle of the room, and he was -- I

14   mean, the living room is small.  I left a big

15   space, and it isn't that much space.  The TV

16   should have been a lot closer.  And so they

17   were -- Troy was about at the end of the table

18   standing there (indicating), to the west of the

19   table like.

20       Q.      Do you want to, if you wouldn't

21   mind, put a "P" for where the punch occurred

22   approximately.

23       A.      (Witness complying.)

24       Q.      So you believe it was the younger

25   Trooper.  Where is the older Trooper when this

127

1          B. Wingard - by Mr. Fields
2    happens?
3          A.    He was, like, on this (indicating)
4    side of the Trooper.  He was facing this
5    (indicating) way.  This (indicating) one was
6    over here facing Troy too, but not -- this
7    (indicating) was facing him more like.  He was
8    off to the side.
9          Q.    So you have drawn two Xs.  The X
10   closer to the table, is that the older Trooper?
11         A.    Yes.
12         Q.    Then the X further away is the
13   younger Trooper?
14         A.    Yes.
15         Q.    You are, again, in the northeast
16   corner; correct?
17         A.    Yes.  Right about here (indicating).
18         Q.    You have drawn a third X.  Do you
19   mind if I just circle it so it -- the X with
20   the circle is you.
21         A.    Okay.
22         Q.    So is this a fairly small space you
23   said?
24         A.    Yeah.  I mean, it only has maybe the
25   couch and the tables close, and then the TV is

128

1              B. Wingard - by Mr. Fields

2      maybe about four feet from the table.

3          Q.    Would you agree with me that the

4      older Trooper is between you and the younger

5      Trooper?

6          A.    Yes.

7          Q.    Are you looking at the side of him

8      or the back of his head?  How was he positioned

9      when Troy tries to punch the younger Trooper?

10          A.    I don't recall the older Trooper at

11      all in my mind.

12          Q.    But he's there?

13          A.    Yes, he's there.

14          Q.    He's standing between you and the

15      younger Trooper; correct?

16          A.    Yes.  Might not be directly between

17      us because I did see Troy, but I kind of like

18      blocked him out or something.  I just don't

19      remember seeing him.

20          Q.    That's fair.  So you don't recall

21      exactly 100 percent where the older Trooper,

22      the younger Trooper, and Troy was when the

23      punch occurred?

24          A.    Right.  I'm sure they were close

25      together.  I'm 100 percent sure they were both

1              B. Wingard - by Mr. Fields
2    close together.  I mean, they were both in the
3    same area.  I mean, it's not like one was -- he
4    might have been -- like I had the X a little
5    bit behind him, but not much.  But he was
6    really off to the side.
7         Q.    So the younger Trooper steps back
8    when Troy tries to punch him; correct?
9         A.    Uh-huh.
10        Q.    He put his arm up to block the
11   punch?
12        A.    No.  I didn't see that.  I just seen
13   him lean back, and that was it.
14        Q.    Is it possible the older Trooper and
15   the younger Trooper -- was it Troy's right arm
16   or left arm that he swung with?
17        A.    His right.
18        Q.    Do you know what a roundhouse punch
19   is?
20        A.    That's the kind that he threw.
21        Q.    A roundhouse comes around like this
22   (indicating)?
23        A.    Yes.
24        Q.    Would you agree with me it's
25   possible that the younger Trooper brought his

130

1          B. Wingard - by Mr. Fields

2    arm up to block it, but you couldn't see that

3    because you have got the older Trooper in front

4    of you (indicating), the younger Trooper

5    (indicating), and it would have been the left

6    arm that would have blocked it?

7          A.    He didn't block it.  I know he

8    didn't.  He just leaned back.  Just like

9    everything was, like, in slow motion for me as

10   I remember it.  But I can picture it perfectly,

11   where he just either leaned back or took a step

12   back.

13         Q.    You say it was slow motion as you

14   remember it, how did it feel like at the time

15   of the incident?  Did it seem like things were

16   happening very quickly at that point?

17         A.    Yes.

18         Q.    Was your heart pounding, if you

19   recall?

20         A.    I never thought about it, but I

21   assume that it probably was.

22         Q.    I mean, this is not typical?

23         A.    Right.  It wasn't -- things happened

24   so fast.  I mean, if it was, it was maybe a

25   little bit.  Not until afterwards whenever

131

1          B. Wingard - by Mr. Fields

2    things really got heated up it really got going.

3          Q.    Okay.  So what happens after Troy

4    takes a swing at the younger Trooper?

5          A.    Like I said, he took a step

6    backwards and leaned backwards, and they

7    instantly both at the same time tackled Troy.

8    And then this was in front of the -- so maybe

9    Troy was over here (indicating) a little bit

10   further because it happened --

11              The loveseat is not as big as the

12   couch, but they both tackled him and pushed him

13   onto the loveseat.  He smacked his forehead on

14   that counter that's up on top where the window

15   is.  Part of it got chipped and fell off.  I

16   know that happened, but not the time.

17              Troy screamed, ow, and they both --

18   that's whenever he smacked his face real hard,

19   his forehead real hard.  And then they both

20   held him down onto the loveseat.  Troy was,

21   like, face down, and he ended up with his face,

22   you know, pushed against the back of the

23   loveseat.

24              They were trying to get his arms to

25   handcuff him.  Troy never fought back except

132

1             B. Wingard - by Mr. Fields

2    for that one swing.  After that, what he did

3    was he would break their grip, and then while

4    he was laying there, he would put his hands

5    underneath his stomach, and he kept on putting

6    his hands underneath his stomach.  He did not

7    want to be cuffed.

8        Q.    Are you familiar with the term

9    "turtling"?

10       A.    No.

11       Q.    Do you know how a turtle can go

12   inside its shell?

13       A.    Yeah.

14       Q.    Was Troy kind of like a turtle,

15   putting his arms in and covering up so that the

16   officers wouldn't be able to have that?

17       A.    Yes.

18       Q.    He's breaking their grip to do that?

19       A.    Yes.

20       Q.    Would you agree with me that that's

21   resisting their efforts?

22       A.    Yes.

23       Q.    I'm sorry, ma'am.  Go on.

24       A.    That kept up for a little while,

25   where they tried to grab him and then grab his

133

1          B. Wingard - by Mr. Fields

2      wrists.  That happened a few times where they

3      tried to.  Then the next thing I knew, I seen

4      the younger cop pull out I didn't know what it

5      was at that time.  I never thought about that

6      they would use the stun gun.  It just never

7      crossed my mind.  But he never said anything to

8      Troy.

9              I remember one time he said, Troy,

10     stop resisting, but that wasn't in the

11     beginning.  And they never said, Troy, stop it

12     or else I'm going to tase you.  The officer

13     just pulled it out.

14             They keep their heat on real, real

15     low, so he wore a number of shirts.  Probably a

16     T-shirt; long-sleeved shirt, maybe a few of

17     them; the outside was a heavy sweatshirt.  I

18     remember them putting the taser against his

19     right side where his stomach was, or rib cage

20     or something.  Nothing would happen.

21             So at first I didn't know what it

22     is.  But that cop, the younger cop, said, pull

23     up his shirt, and the other cop pulled it, and

24     then he tased him.  He held the gun against

25     there and then pulled it away, and that's

134

1              B. Wingard - by Mr. Fields

2    whenever Troy screamed.

3                    MR. DONAHOE:  Ma'am, can I

4    stop you for one second?  Did you say the

5    younger cop is the one who tased him?

6                    THE WITNESS:  Yeah.

7                    MR. DONAHOE:  And he's the

8    same one who got punched at?

9                    THE WITNESS:  Yes.

10                   MR. DONAHOE:  Sorry.

11                   THE WITNESS:  I'm quite sure

12   about that.

13                   MR. DONAHOE:  I couldn't hear

14   because of the siren.

15                   THE WITNESS:  Right.  As I

16   recall, that's who I'm thinking those two were.

17   I mean, it wasn't two, but I'm assuming that it

18   was the young guy that he was swung at and also

19   he's the one that used the taser.

20                   MR. DONAHOE:  Okay.

21       A.    Troy screamed, slid off of the

22   loveseat, and was on the floor.  That cop was

23   down, like, on his knees, but he put his knee

24   on Troy's side of his neck.  And then right

25   then he pulled out the barbs.  Troy was laying

135

1            B. Wingard - by Mr. Fields

2       on the floor.  I don't remember him even moving

3       much.  But he must have still been, you know,

4       not letting him handcuff him because the next

5       thing I knew, he put that stun gun up against

6       his neck once.  I remember seeing that because

7       I remember the bolts of lightening.  Not

8       lightening, but you know what the gun does.

9       BY MR. FIELDS:

10           Q.     Electricity?

11           A.     Yeah.  I can see them.  And it was

12      up against his neck.  Troy, I don't know if he

13      screamed at that or moaned or something.  I

14      know he screamed real loud when he first got

15      tasered with the barbs, and then they also

16      tasered him not with any more barbs.  It was

17      just that one time with the barbs, the first

18      time, and after that was where they put it

19      against his skin.

20              They did that two more times.  It

21      was on his back, in the middle of his back, but

22      a little to the left side I'm pretty sure, as I

23      recall.  Then I don't recall where the last one

24      was.  I just know for sure those three

25      positively for sure.

136

1               B. Wingard - by Mr. Fields

2               Then he was probably still moving

3       around, maybe struggling some, I'm not sure.

4       But they did get the handcuffs.  One hand went

5       back and then the other hand, and they

6       handcuffed him.

7               Actually they handcuffed him after

8       the first time because after they handcuffed

9       him, he was still moving.  I mean, he couldn't

10      move his arms because he was in handcuffs, but

11      he was still I would say struggling.  He was

12      still moving.  He was trying to get up.  That's

13      whenever they tasered him two times, but I

14      found out that it was four times all together.

15      I don't remember the time on the thigh, on his

16      leg, at all.  I just remember the three times

17      on his neck, back, and side.

18              They tasered him, and then he

19      stopped moving.  He was, like, moving his legs

20      some, and that was the only part I could see

21      moving because the cop had his knee in the

22      middle of his back and on the side of his

23      throat holding him down.  That guy was the

24      younger guy, and he goes to the other cop, he

25      goes, go out and get the shackles.  So he did

137

1                B. Wingard - by Mr. Fields

2      and come back in.

3           Q.     Do you mind if I just stop you

4      there, ma'am?  Because that's a good point to

5      stop because we know the one Trooper is leaving

6      to get the shackles.  We got quite a bit of

7      information there that I kind of want to walk

8      back through.

9                So is it your testimony that after

10     Troy took the swing at the younger Trooper,

11     that they both moved in on him and they all

12     went down onto the loveseat?

13          A.     Yes.

14          Q.     Was Troy on top of one of the

15     Troopers at that point?

16          A.     No.  He was on the bottom.

17          Q.     Are you still standing in the same

18     spot where the X and circle are?

19          A.     Yeah.  I might have moved a little

20     bit closer because I remember how close they

21     were.  Because I remember looking at Troy.  I

22     could see his face and all of him at one point.

23     At other points I couldn't see his face, I can

24     just see maybe his legs.

25          Q.     Now, it's your belief that Troy is

138

1                   B. Wingard - by Mr. Fields

2       not trying to punch anybody anymore, but he is

3       resisting; correct?

4               A.      Correct.

5               Q.      The Troopers are struggling with

6       him; correct?

7               A.      Correct.

8               Q.      Troy is pulling out of their grips

9       and keeping his arms under him?

10              A.      Yeah.  He did that a few more times

11      after that, but then they was able to pull one

12      hand back.

13              Q.      Do you recall how many times he was

14      able to do that?

15              A.      I am thinking maybe three times.

16              Q.      Now, you said that one of the

17      officers brought the TASER weapon out and

18      brought it up through his clothes.  Did you

19      actually see any electricity during any of that?

20              A.      No.  I didn't see electricity then.

21              Q.      At one point, one of the Troopers

22      says to the other one, pull up Troy's shirt;

23      correct?

24              A.      Uh-huh.

25              Q.      Where are the Troopers and Troy

139

1           B. Wingard - by Mr. Fields

2    right now when one of the Troopers says that?

3    Do you recall?

4        A.    The older one was down by his legs

5    and probably between his knees or something, or

6    else on the other side of him.  No, he can't

7    have been on the other side because the couch,

8    loveseat, was there.  The other one was holding

9    him.  Like I said, it would be his left knee on

10   Troy's neck, his right knee down on the floor.

11       Q.    I'm sorry.  Is Troy on part of the

12   loveseat at this point, if you recall?

13       A.    Before they tased him, he was on the

14   loveseat, and they didn't have his knee on his

15   neck.  He had his I think it was like this

16   (indicating) in his back.  Probably this

17   (indicating) arm because they were pulling at

18   an arm.  Each of them was pulling at an arm,

19   you know?

20            And then he brought out the taser

21   with this (indicating) hand, though.  I

22   remember it was the right hand.  So he must

23   have switched things; put that arm down.  Then

24   when he went to put the gun against his

25   clothes, it didn't work.

140

1          B. Wingard - by Mr. Fields

2              And the other Trooper was down

3    further, but he was on the loveseat.  Once he

4    got shocked, then he slid off of it.  You know,

5    he screamed and slid off of the loveseat and

6    went on the floor.

7          Q.    I apologize.  Which Trooper was it,

8    the older or the younger one, that you believe

9    took the TASER weapon out?

10         A.    The younger one.

11         Q.    Okay.  So which of the Troopers

12   pulled Troy's shirt up?

13         A.    The other one.

14         Q.    The older one?

15         A.    Right.  Maybe -- I mean, to me he

16   looked older.  Maybe he's not.  Maybe I got --

17   well, I could tell you who the younger one was.

18   It was Battestilli.  That's the one I'm saying

19   is the younger one.

20         Q.    How do you know that it is

21   Battestilli?

22         A.    I have seen him before.  The other

23   one, I don't know.  I just seen him before and

24   knew his name afterwards.  Actually I also

25   looked it up on Facebook, and I seen his

141

1          B. Wingard - by Mr. Fields

2    picture there, and I knew it was him.

3              MR. DONAHOE:  Ma'am, he was

4    the one who was the one who Troy took the

5    roundhouse at, and he was the one who had been,

6    as you said, aggravating Troy with his

7    questions before?

8              THE WITNESS:  Yes.

9         Q.    At some point during this, are you

10   yelling at Troy to stop resisting?

11        A.    Yes.  I did yell at him and told him

12   that exact words:  Troy, please stop resisting.

13   I'm not sure if I used the word "please," but I

14   did tell him to stop resisting.  He was on the

15   floor at the time, after they used the taser.

16   Because that just scared me so much and --

17        Q.    So were you telling him to stop

18   resisting before they used the TASER weapon?

19        A.    No.  I don't think so.

20        Q.    Did you say anything that you recall

21   when things got physical before the TASER

22   weapon was used?

23        A.    I might have said it before,

24   because, as I recall, I was in so disbelief

25   about the taser being used.  I just -- I don't

142

1          B. Wingard - by Mr. Fields

2    know.  I didn't know at that time what a taser

3    was.  I never seen anything about it.  I heard

4    the word "taser," and I heard the police use

5    it, but I just never even seen a picture of it

6    at that time.  I think it was before that, but

7    I could be wrong, as I recall.  I'm just not

8    positive.

9          Q.    That's fine.  This is a very

10   emotional situation both at the time and now as

11   you relive it; correct?

12         A.    Correct.

13         Q.    There's a lot going on, would you

14   agree with that?

15         A.    Yes.

16         Q.    You haven't been exposed to a lot of

17   physical altercations like this in your life,

18   have you?

19         A.    No.

20         Q.    Do you think you yelled that more

21   than one time at Troy or -- strike that.  How

22   many times did you yell at Troy to stop

23   resisting and to let the Troopers cuff him?

24         A.    Just once.

25         Q.    That was after the TASER weapon was

143

1              B. Wingard - by Mr. Fields

2    deployed?

3         A.    I'm not positive about that.  I

4    can't recall.

5         Q.    Then you recall what we call a drive

6    stun; right?  Where it's pressed against the

7    body?

8         A.    Yes.  Once on his neck, and once on

9    his back that I recall, that I know of.

10         Q.    You know now that you believe there

11    were three, but you only specifically recall

12    the two; correct?

13         A.    No.  I know there was four, but I

14    only recall three.

15         Q.    I'm sorry.  I was talking about the

16    three drive stuns.  I'm sorry.

17         A.    Oh, yeah.

18         Q.    So you know there was the probe

19    mode, where the darts are shot; correct?

20         A.    Right.

21         Q.    Those were removed?

22         A.    Yes.  Then he screamed then again

23    whenever they pulled it out of his skin.

24         Q.    Then there were drive stuns;

25    correct?

144

1              B. Wingard - by Mr. Fields

2         A.      Correct.

3         Q.      You recall two of the three drive

4    stuns; correct?

5         A.      Correct.

6         Q.      Those two drive stuns that you saw,

7    they occurred before the Trooper went to get

8    the shackles for the legs; correct?

9         A.      I know one did, and that was behind

10   his neck, on the side of his neck.  And then

11   they were able to --

12              No.  As soon as they shot the barbs

13   into Troy, that's whenever it's like Troy got

14   really -- I mean, he tried it once, but he

15   wasn't so strong and resisting so much.

16              So they did get to put his arms back

17   there, but he was still like if he's trying to

18   get up, you know?  And I think, as I believe

19   now, my opinion, I know whenever someone is on

20   you, you can't breathe.  I think at the time he

21   was trying to get up, and he was moving his

22   feet, you know, just to get leverage maybe to

23   push himself and try to get up because maybe he

24   couldn't breathe.  I didn't hear him say

25   anything after that.  No, I did hear him say

145

1              B. Wingard - by Mr. Fields

2    something.  I'm sorry.

3              But whenever he said, go out and get

4    the shackles, Troy was just moving his legs.

5    Right before he went out to get the shackles,

6    before the cop told him to, he goes, okay, I

7    give, I give, meaning he was going to quit, and

8    he did.  He didn't move again, except for his

9    legs, and they were just, like, moving very

10   slowly.  To me it was like if he was getting

11   leverage on the floor or something, trying to

12   push himself up.

13       Q.    When he says I give, I give, that

14   was after the two drive stuns?

15       A.    No.  It was before the drive stuns.

16   It was after he got shot with the barbs.

17       Q.    Okay.  But he is still moving his

18   legs, and is he twisting and turning?

19       A.    Yeah.  A little bit.  Like right

20   after that, they pulled them out, and he

21   screamed, and then they were able to handcuff

22   him.  But he was still kind of like trying to

23   get up is what it is.  That's whenever they

24   stunned him one more time.  He was still moving

25   a little bit more.  But he said, I give, I

146

1              B. Wingard - by Mr. Fields

2    give, and then they stunned him again.   And

3    then he was quiet, and he did not move again.

4         Q.    Well, he then is on the ground, they

5    have got his arms cuffed, and one of the

6    Troopers goes to get shackles; correct?

7         A.    Right.

8         Q.    How long did it take?  How long was

9    that Trooper gone to go get those shackles?  Do

10   you recall?

11        A.    I don't recall.  It seemed like a

12   long time, but I really honestly don't recall.

13        Q.    Then when he gets back in with the

14   leg shackles, is Tim at that point holding down

15   Troy's legs?

16        A.    I don't remember seeing Tim at all.

17   He stood behind the couch, and I do not

18   remember him holding his legs down at all.

19        Q.    When you say the couch, do you mean

20   the loveseat or the couch?

21        A.    No, no.  The couch.  He was behind

22   here (indicating) the whole time.  Kim was in

23   the kitchen because I could see her, and she

24   was upset and crying.  Tim was back here

25   (indicating).

147

1          B. Wingard - by Mr. Fields

2                    MR. DONAHOE:  Where is here,

3      ma'am?

4                    THE WITNESS:  Back behind the

5      couch (indicating).  I'm sorry.

6                    MR. DONAHOE:  In the living

7      room?

8                    THE WITNESS:  In the living

9      room, but it was behind the couch.  The living

10     room is like a long one, and it's L-shaped into

11     the dining room and then into the kitchen.

12     BY MR. FIELDS:

13          Q.    Where are you when the shackles are

14     being placed on him?

15          A.    I was between the table and the couch.

16          Q.    Did you touch Troy at any point

17     during this time?

18          A.    No.

19          Q.    Did you check for a pulse at any

20     point during this time?

21          A.    No.

22          Q.    Did you check his breathing at any

23     point during this time?

24          A.    No.  I just assumed they were

25     professionals.

148

1        B. Wingard - by Mr. Fields

2        Q.     My question, ma'am, is the only

3    individuals that were in physical contact with

4    Troy, to your knowledge, were the two Troopers

5    during this time?

6        A.     That's correct.

7        Q.     You don't have a recollection of Tim

8    holding down Troy's legs?

9        A.     No, no.

10        Q.     Is it possible that happened and you

11    just don't remember it or didn't see it?

12        A.     I remember Tim telling somebody

13    that.  But, to be honest with you, Tim likes to

14    make things up just to look good, you know?  To

15    be like the important one or something.  But I

16    do not recall him holding his legs down.  I

17    recall Tim behind the couch the whole time.

18        Q.     So after Troy groaned, I'm done, I'm

19    done, that was when they were finally able to

20    get his other arm and get him cuffed; correct?

21        A.     Right.

22        Q.     When you say Troy stopped moving,

23    you agree with me he stopped resisting?

24        A.     Right.  And moving.  He didn't move

25    again after that.

149

1            B. Wingard - by Mr. Fields

2        Q.    How do you know he didn't move

3    again, ma'am?

4        A.    Because he was still, and I was

5    looking at him.  The only thing that moved on

6    him -- okay.  Right after that, the upper part

7    of him stopped because he was underneath that

8    cop, the police officer.  His knee was on his

9    neck holding him.  He had all of his weight on

10   Troy.  His right knee was in the middle of his

11   back, and the left knee was in the side of his

12   throat, the side of his neck, and one hand was,

13   like, on Troy's head smashing it down.

14            I didn't see him move again after

15   the third, second or third, I am not positive.

16   But whenever he went out to get the shackles

17   and he come back in with them, he was still

18   moving his legs, but they were, like, very

19   slow.  He must have grabbed his leg is what I'm

20   thinking to put the shackle on him.  And then

21   whenever Troy felt that, maybe that's whenever

22   he started moving his legs.  But they were so

23   slow and weak.  It wasn't really kicking or

24   nothing.  It wasn't kicking at all.

25       Q.    It wasn't the type of resisting that

150

1              B. Wingard - by Mr. Fields

2    he had exhibited earlier?

3         A.    Exactly.

4         Q.    But he was moving his legs?

5         A.    Right.

6         Q.    This is after the officer comes back

7    with the shackles; correct?

8         A.    Yes.

9              MR. FIELDS:  This is probably

10   a good time to take a break.

11             MR. DONAHOE:  Before we do,

12   can I just clarify a couple of things because

13   I'm going to get lost if we don't.  Was it

14   Trooper Battestilli or the other one that went

15   out for the shackles?

16             THE WITNESS:  The other one.

17             MR. DONAHOE:  Was Battestilli

18   the one you said was kneeling on Troy's neck

19   and back?

20             THE WITNESS:  Yes.

21             MR. DONAHOE:  Those are the

22   two.  I needed to get the lineup correct.

23   Thanks.

24             MR. WEBER:  I have some

25   follow-up, but I'll ask it later.

151

1              B. Wingard - by Mr. Fields

2                    MR. FIELDS:  Sure.  Let's take

3       a break.

4                    (Lunch recess taken.)

5       MR. FIELDS:

6            Q.    Ma'am, you understand you are still

7       under oath?

8            A.    Yes.

9            Q.    Before we went off the record, we

10      had you walk through the incident up until the

11      point in time where the Trooper had gone out to

12      get the leg shackles.  Do you recall that?

13           A.    Yes.

14           Q.    You said that he went out there for

15      a while, and it felt like a long time to you

16      before he came back?

17           A.    Yeah.  Things are going on, so I

18      don't recall how long or anything.

19           Q.    Are you able to estimate

20      approximately how long?  And if not, that's

21      perfectly okay.  You just need to let me know.

22           A.    I really don't.

23           Q.    Okay.  When he comes back with the

24      shackles, does he place them on Troy?

25           A.    Yes.  Troy's legs.  First one, and

152

1              B. Wingard - by Mr. Fields

2      that's whenever Troy moved a little bit of

3      Troy's legs, and he was able to put the other

4      one on very quickly.

5          Q.    How was Troy positioned on the

6      ground with respect to the living room?

7          A.    He was laying on the side facing

8      this (indicating) way, towards the inside of

9      the room, but he was laying down here

10     (indicating), towards the edge.  And the one

11     cop that put the shackles on was right here

12     (indicating), and the other one was on top of

13     him.

14         Q.    So to orient everybody, he was lying

15     sort of adjacent to the loveseat; is that

16     correct?

17         A.    Uh-huh.

18         Q.    Or parallel to the loveseat?

19         A.    Uh-huh.

20         Q.    Then you did an arrow from the

21     loveseat.  So was he facing out, or was he

22     looking down?

23         A.    He was facing out.  He was, like, on

24     his side.

25         Q.    His feet --

153

1          B. Wingard - by Mr. Fields

2                MR. DONAHOE:  I'm sorry.  Out

3      towards where the window and door were?

4                THE WITNESS:  Yes.

5                MR. DONAHOE:  With his head at

6      the top and his legs near the couch?

7                THE WITNESS:  Yes.

8                MR. DONAHOE:  So he's on his

9      right side?

10               THE WITNESS:  Yes.

11               MR. DONAHOE:  Okay.

12     BY MR. FIELDS:

13         Q.    So the officer's putting the

14     shackles on; correct?

15         A.    Uh-huh.

16         Q.    Then what happens next, ma'am?

17         A.    They pulled him into the middle of

18     the floor.  One of the officers pulled him into

19     the middle of the floor.  It was about -- I

20     mean, it looks like a long ways, but it was

21     just pulled up here (indicating).  He was

22     laying this (indicating) way.  The officer that

23     was on top of him before was still on him.

24     This time they had him on his stomach, and the

25     officer had still his knee --

154

1       B. Wingard - by Mr. Fields

2              Let me see which way that would be.

3    I think Troy's face was still facing the same

4    way, and then he had his knee into his throat

5    and into his back.  And the other officer was

6    down at the bottom by Troy's feet, but he was

7    already shackled.  But they had him there.

8              That's when Tim spoke up.  Well, Tim

9    was still behind the couch when this was going

10   on, and Tim spoke up and said, is he breathing?

11   It doesn't even look like he's breathing.  The

12   older one said, yes, he's breathing -- no, I

13   got that wrong.  I'm sorry.

14             First Tim goes, well, if he's

15   handcuffed and shackled, why do you still have

16   to be on him on top of him.  He goes, whenever

17   he wakes up, he's going to be resisting again,

18   and I need to keep control of him.  Tim goes,

19   well, is he breathing?  It doesn't even look

20   like he's breathing.

21             The officer down by his feet said,

22   yes, he is.  And he pulled up his shirt to look

23   at his chest to see if it was moving.  He goes,

24   yes, he is.  And the other one reached over --

25   he was off of him at the time whenever the

155

1          B. Wingard - by Mr. Fields

2    other one lifted up his shirt and stuff.  He

3    was, like, both knees were on the floor -- and

4    he felt Troy's pulse on his neck, and he goes,

5    no, he's not.

6          I'm not quite sure who got up and

7    went out the door, but the door, Troy's storm

8    door, was broken.  So it would open, but you

9    had to push it shut.  It wouldn't automatically

10   shut.  So the door stayed open.  And we could

11   hear the officer making the call.  He goes --

12   his exact words was, where's the ambulance?  We

13   need the ambulance now.  He's not breathing.

14   That's what he told them.

15          Then he came back in and he told us

16   that the ambulance is on the way.  I was still

17   in the living room, still back here (indicating).

18   Q.     When you say back here, you mean by

19   the X and the table?

20   A.     Yeah.  By the table and the couch.

21   I might have moved back and forth during the

22   incident, but I was still closest to the table.

23   I looked into the kitchen and seen Kim upset,

24   so I went around the couch and came in, and me

25   and her was hugging and crying.  Tim was

156

1              B. Wingard - by Mr. Fields

2      crying.  He was standing behind the couch

3      crying.  And the two officers just stood there

4      by Troy.  Troy was laying on the floor, but

5      they just stood there.

6           Q.     Do you recall which of the Troopers,

7      and I know you know one by the name

8      Battestilli, and do you know the other one's

9      name?

10          A.     Johnson I think.

11          Q.     Do you know which Trooper -- I think

12     you answered this, so I apologize -- went out

13     to get the shackles?

14          A.     Yeah.  It would have been Johnson.

15          Q.     Do you know which Trooper went out

16     to make that call?

17          A.     No.  I don't remember.

18          Q.     Did Johnson put the shackles on

19     Troy's feet?

20          A.     Yes.

21          Q.     After Troy's moving of his legs,

22     which you described as not resisting, more of --

23          A.     Right.  Trying to move himself or

24     trying to --

25          Q.     Did you see any other movements by

157

1               B. Wingard - by Mr. Fields

2       Troy after that?

3           A.      Nothing.   Whenever they moved him

4       over there, I don't know if it was right after

5       they moved him, I heard him gurgling.   I think

6       maybe they were switching positions whenever

7       they were checking for a pulse.

8           Q.      At any point in time during this

9       incident, were you ever able to touch Troy?

10          A.      No.   I wish I would have.   I figured

11      they were professionals, that they were going

12      to handle everything.

13          Q.      Now, you go into the kitchen after

14      you hear the telephone call; correct?   To

15      comfort Kim, or was that --

16          A.      I'm not sure.   I don't recall if it

17      was before the phone call or after.   I just

18      remember being in there.

19          Q.      When this phone call takes place,

20      can you see the Trooper that's talking on the

21      phone or can you just hear?

22          A.      No.   I could just hear.

23          Q.      Was there any other noise?   Was

24      anybody talking?   Was it just silent in the

25      house?

158

1          B. Wingard - by Mr. Fields
2          A.    It was silent for maybe -- no,
3    because we all could hear him talking, so
4    everything was quiet.
5          Q.    Did you hear the entire conversation?
6          A.    Yes.
7          Q.    Where were the kids during all of
8    this?
9          A.    In their bedrooms.
10         Q.    How do you know that?
11         A.    Because I went back to check on them
12   then.
13         Q.    Were they sleeping?
14         A.    No, they weren't sleeping.  They
15   were awake.  The girls was crying.  They could
16   hear things going on.
17         Q.    Kim is in the kitchen crying?
18         A.    Uh-huh.
19         Q.    Is Tim asking questions or yelling
20   or talking or crying?  What's Tim doing?
21         A.    At the time of the phone call?
22         Q.    Yes, ma'am.
23         A.    At the time of the phone call, me
24   and Kim was both in the kitchen, Tim was by the
25   couch, and one officer was by Troy, and the

159

1                B. Wingard - by Mr. Fields

2      other one was right outside this (indicating)

3      hall.  The kitchen, it might look like it's

4      big, but it's not.  He went out this

5      (indicating) -- well, he came around and went

6      out through from the living room, out the back

7      door to the porch.

8           Q.    So out of the living room, through

9      the hall, past the kitchen door, out to the

10     back porch?

11          A.    Right.  Like I said, it's a short

12     distance.  The door stayed open, and we could

13     hear his conversation completely.

14          Q.    You say we?

15          A.    Me, Tim, and Kim.

16          Q.    How do you know that Kim heard?

17          A.    She told me.

18          Q.    I am as guilty as you are, we're

19     both getting into that kind of conversational

20     thing.  I apologize.  I'm going to try and let

21     you finish.

22          A.    Right.  Okay.

23          Q.    We're going to be in big trouble.

24                You're in the kitchen comforting

25     Kim.  What happens next?

160

1          B. Wingard - by Mr. Fields

2          A.    I was crying too.  We was both

3    crying.  I remember after he made the phone

4    call, he came back in and stood over top of

5    Troy with the other officer.  They just stood

6    there.  The one that came back in, he said the

7    ambulance is on the way.  We didn't know what

8    to do or anything.

9                Then the ambulance did come, and the

10   paramedics came in.  The one officer, I don't

11   know who it is, said, he is not moving.  The

12   paramedics said, can you remove the handcuffs?

13   And he did.  Then they started working on him,

14   doing CPR and asked me if I had given my

15   permission to work on him.  I said, yeah, do

16   anything you have to do.  And he said, okay.

17               Then I know they put a tube down his

18   throat, got him ready, and took him in the

19   ambulance.

20         Q.    Was Tim crying at some point during

21   all of this?

22         A.    Uh-huh.

23         Q.    Was anybody yelling or anything?

24         A.    No.  No yelling.

25         Q.    What happened after the ambulance

161

B. Wingard - by Mr. Fields

1
2    took Troy away?  What was the next thing that
3    you did?
4         A.    Me and Tim got in the car.  Kim
5    stayed there; took the boys and the girls over
6    to my place to stay.  They wanted out of that
7    area, out of the room, of the house.  Her and
8    the kids stayed there with Matthew, and me and
9    Tim followed the ambulance down.  Kim stayed at
10   my house.  We followed the ambulance down to
11   Punxsutawney Area Hospital, and we was there
12   for a few hours.  I'm not sure --
13        And there was a lot of police
14   officers around.  One came out to talk to me; I
15   think he was a corporal or a captain.  He
16   started asking me some questions.  I can't
17   remember what the questions were.  I think he
18   asked me two questions, and I cannot remember
19   what they are.  That's whenever Tim spoke up,
20   do you think maybe we should get an attorney?
21   And the police officer just kind of yelled and
22   said, you don't need an attorney, that guy in
23   there, laying there in that bed needs an
24   attorney.  Then we didn't talk anymore.  He got
25   up and left.

162

B. Wingard - by Mr. Fields

1

2      Q.     Then at some point the medical staff

3   told you that Troy was brain dead; correct?

4      A.     No.   They told me to come -- they

5   couldn't LifeFlight him because it was too

6   foggy.   They had to take him by ambulance down

7   here to Allegheny Hospital here in Pittsburgh.

8   We followed them down.

9           We arrived here probably I'm

10  thinking maybe two, but I can't really recall

11  the exact time.   I know I think we left around

12  five or something, but I'm not real sure.

13  While we was down here, they did more tests on

14  him, and then they told us he was brain dead.

15     Q.     Did somebody tell the EMS that you

16  overheard that it was possible that Troy had

17  smoked marijuana that day?

18     A.     No.

19     Q.     You don't recall that?

20     A.     No.

21     Q.     Do you recall somebody telling the

22  EMS that Troy had taken a bunch of Mucinex once

23  before like this?

24     A.     No.   I just remember them asking me

25  if I knew he took any Mucinex, and I said, I

163

1              B. Wingard - by Mr. Fields

2    think he did, but I don't know how much.

3         Q.    You're not aware -- I think we

4    talked about this so I apologize if I'm

5    replowing the ground -- but you're not aware of

6    any other instances where he took too much

7    Mucinex?

8         A.    No.

9         Q.    When did you first consult with a

10   lawyer following the incident?

11        A.    I don't recall the exact date, but I

12   called one in Scranton.

13        Q.    I'm not going to ask you about your

14   conversations, but I am entitled to know who

15   you called.

16        A.    I called Dennis, Lenahan & Dempsey.

17   They were my worker's comp, and I didn't know

18   what to do.  I was friends with Terry, and I

19   felt comfortable talking to Terry Dempsey.  So

20   I called him and asked him what I should do.

21        Q.    Was this within days of the incident

22   or weeks of the incident or months of the

23   incident?

24        A.    I was thinking it was a few days,

25   but it could be close to a week.

164

1                 B. Wingard - by Mr. Fields

2          Q.    When you say you didn't know what to

3    do, what do you mean by that?

4          A.    Well, I felt the police was in the

5    wrong with not treating him properly.  I

6    figured -- I was thinking that was their

7    training, that they were supposed to be able to

8    resuscitate him, things like that.  I thought

9    they were in the wrong, and I didn't know what

10   else to do.  I didn't know who else could have

11   been in the wrong or anything.  I just -- I was

12   at a loss.  I didn't know what to do.

13         Q.    You would agree with me that Troy

14   was acting erratically that evening; correct?

15         A.    Yes.   Sometimes.

16         Q.    And would you agree with me that he

17   did attempt to punch a uniformed State Trooper

18   that evening; correct?

19         A.    Correct.

20         Q.    As we sit here today, do you think

21   that his ingestion of Mucinex played some role

22   in his behavior?

23         A.    It could.  I don't know about

24   Mucinex much.

25         Q.    I'm not asking you as an expert on

165

1              B. Wingard - by Mr. Fields

2     Mucinex or its properties or effects.

3          A.     Right.

4          Q.     Do you just have a personal belief

5     one way or the other whether that Mucinex

6     somehow influenced his behavior that night?

7          A.     Yes.

8          Q.     Do you think that that drug, that

9     Mucinex, bears any responsibility for what

10    happened?

11         A.     I'm not sure.  I still believe that

12    there should have been more things done with

13    the police standing over him and stuff.  So I

14    think it could have been resolved a different

15    way.  Not just that it was, you know, the pills

16    itself, I think them irritating him and egging

17    him on and stuff, that's -- his mood just

18    changed then.

19         Q.     Do you think that Troy bears any

20    responsibility at all for what happened that

21    night?

22         A.     I'm not sure.  I'm not sure.

23         Q.     Let me ask the question about

24    Mucinex a little differently:  Do you think

25    that the drug Mucinex and its effects bear any

166

1              B. Wingard - by Mr. Fields

2      responsibility for the events that happened

3      that night?

4              A.    I guess.  I just really don't know.

5              Q.    Do you think that Troy's behavior

6      was appropriate that evening?

7              A.    No.  He should have -- whenever they

8      were being so arrogant and stuff, he should

9      have been more under control and just ignored

10     them.

11             Q.    Now, one of the parties that you

12     have sued in this case is the company TASER

13     International.  Are you aware of that?

14             A.    Yes.

15             Q.    Why are you suing TASER, ma'am?

16             A.    Well, it was the taser gun that I

17     believe that hit close to his -- in the back

18     towards his heart, so maybe something caused

19     his heart palpations or his heart not to be

20     quite correct, the beats and stuff.

21             And also how many seconds they did

22     it and stuff.  I know that there was -- it's

23     supposed to be only certain seconds, and I know

24     the police know how to override those, what I

25     read about.

167

1                B. Wingard - by Mr. Fields

2          Q.     So you think that the TASER weapon

3     somehow reached his heart and affected it?

4          A.     Oh, yes.

5          Q.     You think the electricity from the

6     TASER weapon reached his heart?

7          A.     Yes.

8          Q.     Have you seen the report that your

9     attorneys produced by a Dr. Cyril Wecht?

10         A.     No.

11         Q.     You have not seen that?

12         A.     No.

13         Q.     So you're not aware that your

14    attorneys have produced on your behalf a report

15    from this Dr. Wecht?  Have you ever heard of

16    Dr. Wecht?

17         A.     Yes.

18         Q.     They produced this report from

19    Dr. Wecht that gives his opinion as to the

20    cause of Troy's death, or the mechanism.

21    You're not aware of that?

22         A.     No.

23         Q.     If Dr. Wecht opines that the

24    electricity didn't actually reach his heart,

25    thus causing him to go into cardiac arrest, do

168

1              B. Wingard - by Mr. Fields

2      you have any reason to disagree with him?

3          A.    No.

4                  MR. WEBER:  Objection.  You're

5      asking her about opinions that are the realm of

6      experts.  We know she's here as a fact witness.

7      I have let you ask a few questions, but steer

8      clear of this.  I don't think it's relevant to

9      this today.

10                 MR. FIELDS:  I think it's

11     certainly -- I don't think it's privileged or

12     confidential, so I'm going to ask the

13     questions.  If you instruct her not to answer

14     them --

15                 MR. WEBER:  I'm not going to

16     do that.  I'm only objecting to direct it back

17     to the factual, the facts that she's presented

18     here to testify to.

19                 MR. FIELDS:  Okay.

20     BY MR. FIELDS:

21         Q.    So, ma'am, if Dr. Wecht does not

22     opine that the electricity from the taser

23     reached Troy's heart, do you have any reason to

24     disagree with me?

25         A.    No.

169

1                B. Wingard - by Mr. Fields
2          Q.     If that's true, do you still think
3     that TASER International bears some fault or
4     responsibility for what happened?
5          A.     Yes, I do.  Because he could be
6     wrong.  I mean, he's only human too.  So I
7     would still believe that they should be held
8     responsible.
9          Q.     What if pepper spray had been used
10    instead of the TASER weapon, but everything
11    else happened the same way, including Troy's
12    death, would you think that the pepper spray
13    manufacturer was responsible?
14         A.     No.
15         Q.     That's because you think that tasers
16    can reach the heart and cause cardiac arrest?
17         A.     Exactly.
18         Q.     What do you hope to get from this
19    lawsuit?  Some people file lawsuits because
20    they want money, some people want an apology,
21    some people want something else altogether.
22    What do you hope to accomplish with this lawsuit?
23         A.     I would like an apology from the
24    police officers for sure.  I would like some
25    money.  I would like to be able to move from

170

1              B. Wingard - by Mr. Fields
2    this area, away from these cops, and go back
3    home and put Troy and Tim together in the
4    cemetery up there.  I can't afford to do that.
5    You know, I would like to have something, a
6    memorial, near my house.
7         Q.    It wouldn't be enough for you to
8    dismiss this case if you received an apology,
9    you would want some money as well; correct?
10        A.    Yes.
11        Q.    How much money are you hoping to get?
12        A.    I don't know that.
13        Q.    You have not thought about that?
14        A.    No.
15        Q.    If I ask you to sit here and think
16   about it for a few moments now, are you able to
17   tell me?
18        A.    No.  I don't know.  I leave it up to
19   my attorneys.  I don't even know where to start
20   for putting a price.
21        Q.    Going back to the effects of the
22   TASER weapon --
23        A.    Uh-huh.
24        Q.    -- if I sat down and presented you
25   with the report of Dr. Wecht and all of the

171

1          B. Wingard - by Mr. Fields

2     studies, and there have been hundreds and

3     hundreds and hundreds, on the effects of the

4     TASER weapon, and experts that were hired by

5     TASER and their reports, and they all agreed

6     that under the circumstances in this case, it

7     was impossible for the electricity from that

8     device to reach Troy's heart, would that still

9     not be enough to convince you?

10         A.     No.   The certain reason is that I

11    read a report that it does from the doctor.

12         Q.     Do you remember the name of that

13    doctor?

14         A.     I can't remember him.   I did give

15    you -- I think I sent it to Devon.

16         Q.     Was it a Dr. Zipes?

17         A.     It might have been, but I'm not -- I

18    can't really recall.

19         Q.     Are you aware that, setting aside

20    that Dr. Zipes' opinion is very controversial,

21    he says it is only possible when the taser

22    probes are directly over the heart in a very

23    small area of the chest (indicating)?

24         A.     No.   I didn't know that.   I didn't

25    notice that in the report.

172

1          B. Wingard - by Mr. Fields

2     Q.    Even if I presented you with

3  testimony from Dr. Zipes who says it's

4  impossible for the electricity to reach the

5  heart when a taser is used in the neck or the

6  thigh or the back --

7     A.    I understand about the neck and the

8  thigh.  The back I disagree.

9     Q.    So it doesn't matter what

10 information, you have a firm belief that you're

11 not going to be swayed from that the

12 electricity can reach the heart under the

13 circumstances at issue in this case?

14    A.    From just one report, no.  I would

15 need more.

16    Q.    What was Troy wearing that evening

17 during the incident?

18    A.    Blue jeans, a T-shirt, a long-

19 sleeved shirt, and a sweat shirt.

20    Q.    So do you recall what kind of

21 T-shirt he had?  Was it like a really thin

22 material or thick material?

23    A.    A T-shirt was probably thin.

24    Q.    A white T-shirt?

25    A.    Yes.

173

1           B. Wingard - by Mr. Fields

2      Q.     A Hanes undershirt type of thing?

3      A.     Uh-huh.

4      Q.     What's the long shirt?  Do you

5  recall?

6      A.     It was a heavier -- it was a jersey.

7  It didn't have a hood on it, but it was a

8  sweatshirt.

9      Q.     I thought -- but did he have

10 three shirts or two shirts?

11     A.     Probably three:  a T-shirt; a

12 long-sleeved shirt that wasn't all that heavy,

13 but it did have long sleeves; and then a

14 sweatshirt over top.

15     Q.     Was the long-sleeved shirt like a

16 T-shirt material maybe?

17     A.     Yes.

18     Q.     Was it a waffle shirt or --

19     A.     No.  It was just a regular cotton

20 shirt.

21     Q.     And a regular sweatshirt?

22     A.     Yes.

23     Q.     Did you maintain or preserve any of

24 those clothes?

25     A.     No.  The hospital took them off of

174

1                B. Wingard - by Mr. Fields

2       him.

3            Q.      Do you recall Tim apologizing for

4       Troy's behavior to law enforcement during the

5       incident?

6            A.      No.  That was the first I heard

7       anything about that.

8            Q.      Did Troy owe you any money at the

9       time of his death?

10           A.      No.  I don't think so.  There's a

11      lot of times where I didn't expect it back, and

12      I told him not to worry about it.

13           Q.      Did you incur any expenses arising

14      from Troy's death in terms of funeral or the

15      burial or anything like that?

16           A.      Yes.

17           Q.      Do you recall approximately how much?

18           A.      Probably about $4,000.

19           Q.      How often in the year leading up to

20      his death would you and Troy spend time

21      together?

22           A.      How often?

23           Q.      Yes, ma'am.

24           A.      Every single day.  Except whenever I

25      lived over Sprinkle Mills.  I lived on the

175

1                    B. Wingard - by Mr. Fields

2       other side of town, and he lived on the other

3       side of town, so he had to drive to come and

4       visit me.  There was maybe, like, two or

5       three days that we would go without seeing each

6       other, but that would be the longest.

7            Q.    Prior to his death, you had the

8       conversations with him about getting onto

9       disability; correct?

10           A.    Right.

11           Q.    Do you know, was he taking any steps

12      towards doing that at the time?

13           A.    No.  I know he didn't because Troy

14      didn't like doing things like that by himself,

15      any paperwork or anything.  So he always left

16      it to me.

17           Q.    Were you planning on gathering that

18      material together for him?

19           A.    Yes.

20           Q.    If he hadn't passed away, you would

21      have gone ahead and done that?

22           A.    Oh, yes.

23           Q.    I want to just talk a little bit

24      about Tim.  I know this isn't easy either.  Tim

25      passed away on February 1, 2013; correct?

176

1              B. Wingard - by Mr. Fields

2        A.     Yes.

3        Q.     Was that as a result of a suicide?

4        A.     No, no.  He was a diabetic, and he

5    didn't have it under control.  And even toward

6    the end he said he wasn't a diabetic, and he

7    didn't care.  He quit taking his insulin,

8    everything.  He just didn't care he said.

9              Whenever the paramedics came, they

10   tried to get a reading, and it was so high they

11   couldn't even read it.  So they were also

12   saying that he went into diabetic shock.

13       Q.     I have seen something in the

14   material that indicated Tim died of an apparent

15   drug overdose?

16       A.     Right.  He did overdose.

17       Q.     What did he overdose on?

18       A.     Mucinex.

19       Q.     Did Tim blame Mucinex for Troy's

20   death after Troy's death?

21       A.     Yes.

22       Q.     Did you talk with him about that?

23       A.     I probably did, but I can't really

24   recall what was said and when it was.  But I

25   know he did blame it.

177

1          B. Wingard - by Mr. Fields

2          Q.      Do you recall an incident at a

3    Wal-Mart I believe where Troy was arrested --

4    Tim was arrested?

5          A.      Tim was arrested, uh-huh.

6          Q.      Have you seen any police report or

7    the video from that?

8          A.      No.

9          Q.      Did he talk to you about this

10   incident?

11         A.      Yes.  He said that he was taking it

12   off the shelf and smashing it all up.

13         Q.      Did you ever see Tim abusing Mucinex

14   prior to his death on February 1, 2013?

15         A.      Yes.

16         Q.      When did he start abusing Mucinex?

17         A.      It was in 2010, but I'm not sure --

18   maybe like January, February, March.  Something

19   like that.

20         Q.      This was before Troy's death?

21         A.      Yes.

22         Q.      Did Troy know that Tim was abusing

23   Mucinex?

24         A.      I don't know that.  He could have

25   known.  He had never mentioned it to me.

178

1          B. Wingard - by Mr. Fields

2      Q.    You and Troy never discussed that

3   issue?

4      A.    No.

5      Q.    Then on February 1, 2013, Tim had an

6   overdose of Mucinex; correct?

7      A.    When was it now?

8      Q.    February 1, 2013, Tim overdosed on

9   Mucinex?

10     A.    Yeah.  That's what they are saying.

11     Q.    Did he have any other drug or

12  anything in his system that you know of?

13     A.    No.

14     Q.    So did you find him, or did somebody

15  else find him?

16     A.    I was in the home at the time.  He

17  acted confused, and he fell down.  Then he got

18  back up and went into the bathroom, and he fell

19  in there.  That's where I tried to get him out,

20  and I couldn't get him out.  Finally he crawled

21  towards the bedroom, but he couldn't make it

22  any further.

23          He complained of his arm hurting.

24  He was very, very thirsty.  He just kept on

25  wanting glasses of water.  He peed on the

179

1          B. Wingard - by Mr. Fields

2    floor, so I went in and scrubbed it in the

3    bathroom.  I come back and looked at him, and

4    he looked like he wasn't breathing.

5              Matthew was in the next room.  He

6    could hear me, see me, but he couldn't see his

7    dad because he was laying on the hallway floor.

8    I yelled, Tim, and I think I was shaking him,

9    trying to wake him up.  I think when Matthew

10   heard from the tone of my voice he came in.

11             I go, come on, Matthew, we got to

12   turn him over.  So we tried to turn him over,

13   got him mostly turned over, almost clear on his

14   back.  That's whenever I started CPR.  I said,

15   you get that phone and call 911.  I tried doing

16   CPR to him.  I talked to the 911 operator.  He

17   was telling me everything what to do.  It was

18   just so hard.  He said even have Matthew help

19   me, and he did.

20             Matthew afterwards just held his

21   hand.  We couldn't revive him.  The paramedics

22   came, and they couldn't revive him.

23        Q.    Was an autopsy done, ma'am?

24        A.    No.

25        Q.    Did anybody make a determination as

180

1              B. Wingard - by Mr. Fields
2      to cause of death?
3          A.    Yeah.   The coroner that came.
4          Q.    So with no autopsy there was no
5      analysis of his heart; correct?
6          A.    No.   That's correct.
7          Q.    But the coroner did tell you that he
8      believed that the mechanism of death was sudden
9      cardiac arrest due to an apparent drug
10     overdose; correct?
11         A.    Right.
12         Q.    But you believe that diabetes -- I'm
13     sorry -- shock?
14         A.    Shock.
15         Q.    Played some type of role in that?
16         A.    Yes.
17         Q.    Do you believe that the Mucinex
18     played any role in Tim's death?
19         A.    I don't know.  I just know that if
20     you're a diabetic, you are more likely to have
21     a heart attack than a normal person.  I mean,
22     it could have, but I don't know.
23         Q.    Do you know if Troy ever read the
24     warnings that came with Mucinex?
25         A.    I don't know.

181

1              B. Wingard - by Mr. Fields

2          Q.      Have you ever read the warnings that

3      come with Mucinex?

4          A.      No.  I think I looked it up online,

5      and I think it said something about respiratory

6      problems.

7          Q.      Would you agree with me, though,

8      that both with Tim and with Troy, both of those

9      gentlemen, unfortunately, took a large enough

10     dose of Mucinex to affect their behavior, both

11     in the incident involving Troy which gives rise

12     to this case and the incident leading to Tim's

13     death?

14         A.      I believe -- no.  I'm going to

15     disagree with that because I believe Tim

16     enjoyed getting high.  He would do whatever he

17     needed to do.  I mean, you have his report.

18     You know that he was arrested for stealing the

19     Mucinex.  So I know that, and we had talked

20     about it.

21              I never had any problem with Troy.

22     Troy never came to me for money for it like Tim

23     did.  If I did have the money, I would actually

24     lie to him and say, no, I don't have any money.

25     That's whenever he would go and steal it.  So

B. Wingard - by Mr. Fields

1
2      most of the time I would just give him money to
3      buy it.
4            Q.    This began happening in early 2010
5      with Tim?
6            A.    Yes.
7            Q.    Troy was aware of this issue with
8      Tim?
9            A.    Oh, yes.  Because he was at the
10     Wal-Mart one time whenever Tim didn't come back
11     out and he seen the cops go in.
12            Q.    Your ex-husband, Perry Hooftallen,
13     one of the measures of damages in a wrongful
14     death case is quality of the relationship.
15     Just your personal opinion, do you think Perry
16     Hooftallen is entitled to any damages for loss
17     of the relationship?
18            A.    Well, legally I would say yes
19     because I know that he's supposed to, but, in
20     my opinion, since Troy did not like him, did
21     not get along with him, I would say no.  But
22     I'm okay with him getting anything that would
23     happen.
24            Q.    Ma'am, this is the last question
25     I'll ask you before I turn this over to the

1                   B. Wingard - by Mr. Fields

2       other attorneys, although I may have a few

3       follow-ups when they're done.  It's a difficult

4       question which is one of the reasons I save it

5       for last.

6                   Your attorneys may ask you at trial

7       how Troy's death has affected your life.  So

8       this is my opportunity to fully go down the

9       road to hear from you.  So with that, I'll ask

10      you how has Troy's death affected your life?

11          A.    Well, I know you're not supposed to

12      have favorites with your kids.  It's hard not

13      to with certain kids, you know?  Troy was my

14      favorite.  I love my other two as much, but

15      Troy was my favorite.  Troy would do anything

16      for me.  He helped me all the time.  He was

17      there for me whenever I had problems with my

18      workers' comp and whenever I had surgery done

19      and stuff.

20                  Whenever he was working, he worked

21      constantly.  He wasn't hurting for money

22      because he would leave his checks go without

23      cashing them.  If I needed money, he was always

24      there for me.  It didn't matter how much.

25                  He was also there for Kim.  Whenever

184

1                B. Wingard - by Mr. Fields

2       her gas got shut off at the house, he gladly

3       paid it to get it turned back on, whenever he

4       lived in Scranton.  He wasn't living with her,

5       he was still living at my place, but he still

6       helped her.

7                    To me, he was a very bright young

8       man, and I think he had a very good future.

9            Q.    Actually I do apologize, I do have

10      one or two follow-up questions.  Have you been

11      doing anything to try and either come to terms

12      or heal following Troy's death, whether through

13      church or therapy or friends?

14           A.    I thought about going to counseling.

15      There's a church counseling, but I haven't made

16      it there.  See, I never got my license.  I just

17      got my permit.  Whenever I was young, my dad

18      died.  I was next in line to get my license,

19      and it was just kind of pushed aside.

20                   For years and years I always had

21      Troy to take me places, so I just put it off.

22      So I just didn't go places that I should have

23      went, you know?

24           Q.    In the two, two-and-a-half years

25      following Troy's death before Tim's death, were

185

1                    B. Wingard - by Mr. Donahoe

2       you starting to feel like you were coming to

3       terms at all with it or were you making any

4       improvements?

5            A.     I was.  Yes, I was.  But Tim wasn't.

6            Q.     Then with Tim's death, was that a

7       new injury?

8            A.     Yes.

9            Q.     All right.  Now you're having to

10      heal from that; correct?

11           A.     Right.  I wasn't even over the first

12      one, so it's hard.

13                    MR. FIELDS:  With that, thank,

14      you, ma'am.

15                         - - - - -

16                       EXAMINATION

17      BY MR. DONAHOE:

18           Q.     Ma'am, my name is Tom Donahoe.  I

19      represent the State Troopers in this case.  I'm

20      a Deputy Attorney General, and we represent the

21      State agencies when they get sued.  I'm going

22      to ask you a few questions about the incident

23      and what you know and a few things about your

24      son, Troy.

25           A.     Okay.

186

1              B. Wingard - by Mr. Donahoe

2        Q.     First of all, let me ask you, did

3    you ever talk to the coroner about this case?

4        A.     On the phone.

5        Q.     Okay.  Do you remember, first of

6    all, when you spoke to the coroner?

7        A.     It was probably March 2011.

8        Q.     That would be a full year after the

9    incident?

10       A.     No.  It was from October 2010 to

11   March.

12       Q.     Five months afterwards?

13       A.     Yeah, yeah.

14       Q.     At the time that Troy died and this

15   incident occurred, you did not speak to anybody

16   from the coroner's office in that immediate

17   time period?

18       A.     No.

19       Q.     What was the occasion that caused

20   you to speak to the coroner in March of 2011?

21       A.     I don't know if he called me or if I

22   called him, but it was something about the

23   results of the autopsy.

24       Q.     What did the coroner tell you?

25       A.     That he was going to put it down as

187

1              B. Wingard - by Mr. Donahoe
2    accidental death.  He told me on the phone that
3    he believed that positional asphyxiation had a
4    part of it, Troy's death.  He also told me that
5    he believes that the taser did.  He told me
6    that Troy had a blockage of 70 percent, but he
7    did not believe that that caused the death.
8         Q.    Where did you have the conversation
9    over the phone?  Were you in your home?
10        A.    Yes.
11        Q.    Was it just you on the phone, or
12   were you on a speakerphone?
13        A.    It was just me.
14        Q.    Do you recall anything further about
15   the circumstances that caused you to have that
16   conversation?  In other words, were you calling
17   there at the behest of somebody else?
18        A.    No.  It would have been just for
19   myself, and for me and Tim to find things out.
20        Q.    Do you recall what person you spoke
21   to from the coroner's office?
22        A.    He had a really strange last name.
23   Maybe it was Polish or something.  I'm not sure.
24        Q.    Was it Dr. Luckasevic?
25        A.    Yeah.

188

1              B. Wingard - by Mr. Donahoe

2        Q.     Did Dr. Luckasevic tell you anything

3    further about why he thought that positional

4    asphyxia had something to do with the death of

5    Troy?

6        A.     Because I explained to him what I

7    seen at the incident.

8        Q.     When did you explain that to him?

9        A.     Probably earlier, right whenever he

10   was starting to do the deposition or whatever.

11   Whenever he was going to write down his report.

12   But also he told me that oxygen to his brain

13   was very low or something.

14       Q.     By the way, it is Todd Luckasevic.

15       A.     Yes.

16       Q.     That's L-U-C-K-A-S-E-V-I-C.  So

17   there was a time earlier when you spoke to the

18   coroner, Dr. Luckasevic?

19       A.     Yes.  Probably maybe a couple times,

20   just to call and see if he had the results.

21       Q.     Was it at that earlier time that you

22   explained to him what you had seen?

23       A.     It might have been, but I'm not real

24   sure.  I really can't recall.

25       Q.     Did you tell the doctor that the

189

1          B. Wingard - by Mr. Donahoe

2     Troopers had placed a knee on Troy's neck?

3          A.     Yes.

4          Q.     Did you tell them that they had

5     placed their knee on his upper back?

6          A.     Yes.

7          Q.     Do you recall how long you told them

8     that the Trooper's knee was on his neck, Troy's

9     neck?

10         A.     No.  I don't recall how long.

11         Q.     Did he ask?

12         A.     I don't think so.  He might have.  I

13    just don't recall.

14         Q.     That's fine.  How about how long

15    that the knee placed on Troy's back?

16         A.     I don't recall that either.

17         Q.     Did the doctor describe for you why

18    he felt that there were other indications that

19    Troy did not have enough oxygen?

20         A.     I don't think he did, but I really

21    can't recall.

22         Q.     Now, you indicated that you had told

23    the coroner, Dr. Luckasevic, about what you had

24    observed about the struggle that Troy had.  Do

25    you know if, first of all, your son, Tim, spoke

190

1              B. Wingard - by Mr. Donahoe

2     to the coroner and related to the coroner what

3     Tim had seen?

4          A.    I don't think he did.  I'm not real

5     sure.

6          Q.    What about Kimberly?

7          A.    No.  She never talked to the

8     coroner.

9          Q.    Do you know if any other persons

10    besides yourself spoke to the coroner and

11    advised the coroner what they had seen about

12    this struggle?

13         A.    No, I don't know.

14         Q.    That's fine.  I need a few items of

15    background information about Troy.  Did he have

16    hobbies?

17         A.    Yeah.  He liked collecting anything

18    with Broncos.

19         Q.    Okay.  How about hunting?

20         A.    No.  He didn't like hunting.  He

21    didn't like killing animals.

22         Q.    Did he fish?

23         A.    He did some.  He would take Matthew

24    fishing.

25         Q.    Did he own any firearms?

191

1                    B. Wingard - by Mr. Donahoe

2           A.     No.

3           Q.     Were there firearms -- this occurred

4      in Kimberly's house; correct?

5           A.     Yes.

6           Q.     Do you know if there were any guns

7      in Kimberly's house?

8           A.     Definitely not.  No guns.

9           Q.     Do you know whether or not Troy had

10     a bank that he went to?

11          A.     A bank?

12          Q.     Yes.  Where he kept his accounts or

13     his money.

14          A.     First Commonwealth I believe, but

15     I'm not positive.

16          Q.     Did they have a branch in this area

17     where the incident happened?

18          A.     Yes.  In Punxsutawney.

19          Q.     Did he have an ATM card, for

20     example, that he used?

21          A.     I think he did, but I'm not positive.

22          Q.     Did Troy have a car?

23          A.     Yes, he did.

24          Q.     What kind of car did he have?

25          A.     It was a Chevy.

192

1          B. Wingard - by Mr. Donahoe

2     Q.     Any idea what year?

3     A.     It was probably in the, like, 1997

4  or something.  I'm not sure.

5     Q.     When Troy died and you became the

6  administratrix of the estate, I take it he did

7  not have a Will; correct?

8     A.     That's correct.

9     Q.     So you became the administratrix of

10 the estate?

11    A.     Yes.

12    Q.     Where did you take out the estate?

13 What county?  Do you recall?

14    A.     Jefferson.

15    Q.     Very good.  When you took out the

16 estate, did you fill out something called a

17 Petition for Probate, if you recall?  If you

18 don't, that's okay.

19    A.     I don't remember.  Dennis had the

20 papers and talked to me, and I talked to him

21 and signed some papers.

22    Q.     Did you actually go to the

23 courthouse and swear before the Register of

24 Wills?

25    A.     Yes.

193

1           B. Wingard - by Mr. Donahoe

2       Q.      You went there with Dennis Boyle?

3       A.      Yes.

4       Q.      So if there's an inventory of Troy's

5   property and the Petition, it would be in the

6   Jefferson County Courthouse or the attorneys

7   would have it?

8       A.      Yes.

9       Q.      You did not know or did you say that

10  Troy had not been awarded Social Security

11  Disability when this incident had happened?

12      A.      He never filed for it.

13      Q.      He did not file at all?

14      A.      Right.  If he did, it was at the

15  very early stages of filing.  But I don't

16  remember doing it for him.  I remember talking

17  to him about it.

18      Q.      You had mentioned his doctors, and

19  you have given us authorizations for his

20  doctors.  But where would he go for primary

21  treatment of his Crohn's disease?

22      A.      He went to Dr. Martin, and then he

23  went to a doctor in Indiana.

24      Q.      Where is Dr. Martin?

25      A.      In Punxsutawney.

194

1              B. Wingard - by Mr. Donahoe

2       Q.     Who is the doctor in Indiana?

3       A.     I don't know.  It was one of the

4   two doctors that I gave -- the other two doctors.

5   One of them.  Now, one of them is going to say

6   it was a psychiatrist or something from the

7   DuBois branch.  That wasn't the doctor he seen,

8   it was the other one.  But they are both kind

9   of foreign names.

10      Q.     Do you recall what prescription

11  medication he was taking, Troy was taking?

12      A.     I don't.  I have it written down at

13  home.

14      Q.     Do you know if his Crohn's disease

15  was controlled with his medication?

16      A.     It wasn't working.

17      Q.     Did he have an appointment scheduled

18  for a different medication?

19      A.     No.  He was looking for a different

20  doctor.  We were.

21      Q.     Had you been recommended any

22  experts, anybody who specializes in that area?

23      A.     The one that we seen in Indiana did.

24      Q.     But he did not prescribe a

25  medication that controlled Troy's condition?

195

1          B. Wingard - by Mr. Donahoe

2          A.    He prescribed medicine.  He said it

3    should be working, but Troy didn't make it back

4    to do any follow-ups with him.

5          Q.    Did Troy belong to any clubs or

6    groups or associations?

7          A.    No.

8          Q.    Other than Tim and Matt, did he have

9    any other close friends that he socialized with

10   regularly?

11         A.    In the Punxsutawney area?

12         Q.    Yes.

13         A.    My nephew, Donald Dies.

14         Q.    What's Donald's last name?

15         A.    Dies, D-I-E-S.

16         Q.    Then where else did he have close

17   friends?  In the Scranton area?

18         A.    Yes.

19         Q.    How long had he been out of Scranton

20   before this incident?

21         A.    He lived there for about ten years.

22         Q.    How long had he been gone from there?

23         A.    2006 he moved; so --

24         Q.    Four years approximately?

25         A.    Right.  Yeah.

196

B. Wingard - by Mr. Donahoe

1

2      Q.      So during the four years that he was

3   in Punxsutawney, there wasn't a group of social

4   friends that he became close with?

5      A.      No.

6      Q.      Was there any location where he

7   would go?  Did he go to a bar, for example, or

8   a club or anything like that?

9      A.      No.  He never went to bars.  He just

10  mostly stayed at home.  He didn't like

11  traveling anywhere.  He just wanted to know --

12  if he did, he wanted to know where he could go

13  to the bathroom at if he had to stop.

14     Q.      Between '06 and '08 he was employed

15  in the Punxsutawney area?

16     A.      Yes.

17     Q.      At the Stello's warehouse?

18     A.      Right.

19     Q.      Is it your testimony that he simply

20  quit there because of the problems that he had

21  with Crohn's disease?

22     A.      Yes.

23     Q.      He got along well there otherwise as

24  an employee?

25     A.      Yes.  I think he even had some

197

1          B. Wingard - by Mr. Donahoe

2     friends, but I don't know their names.

3          Q.    Fine.  Since this incident occurred

4     and after the death of your son, Troy, have you

5     spoken to anybody from the Pennsylvania State

6     Police about the incident?

7          A.    Yes.  His name was Neal.  I don't

8     know his last name.

9          Q.    Did he call you?

10         A.    I think so, yeah.  I didn't call him

11    at all ever.  He called.  And I didn't even --

12    I didn't even talk to him I don't think.  I

13    think Tim talked to him at the time.

14         Q.    Was that that evening when you said

15    that maybe we need a lawyer?

16         A.    No.  That was in the hospital.

17         Q.    How much longer after that did you

18    speak to this other person from the State

19    Police named Neal?

20         A.    Maybe two weeks approximately.  I'm

21    not real sure.

22         Q.    Do you know, did Neal identify the

23    purpose for his call?

24         A.    No, I don't recall.  Because I don't

25    think I ever talked to him.

198

1              B. Wingard - by Mr. Donahoe

2         Q.    Do you know if his name is Captain

3    Scott A. Neal?

4         A.    Maybe that was it, yes.

5         Q.    Did you speak to Captain Neal?

6         A.    I can't recall if I answered the

7    phone and then Tim got on.  I just can't recall.

8         Q.    Do you remember anything that

9    Captain Neal may have said to you?

10        A.    No.  I just know he called the

11   house, but I can't remember if I had a

12   conversation with him or not.

13        Q.    That's fine.  Do you know what Tim

14   may have heard or said?

15        A.    I know Tim asked him what the police

16   officers' names were.  I know that he asked him

17   if there was any disciplinary action taken.

18        Q.    What answers did Tim receive?

19        A.    He said that he couldn't give the

20   names of the officers.  And I do remember some

21   of the conversation.  I did talk to him.

22        Q.    Okay.  Tell us what you recall.

23        A.    I recall I'm the one that asked him

24   if there was any disciplinary actions.  He

25   said, no, he didn't -- they didn't shoot

199

1              B. Wingard - by Mr. Donahoe
2       anybody, so there was no disciplinary actions.
3              Q.    Anything else you recall Captain
4       Neal saying?
5              A.    No.  I just remember his tone was
6       kind of nasty.
7              Q.    Why do you say that?
8              A.    Because the way he said it.  He was,
9       like, arrogant.  No, they didn't kill anybody,
10      so why should they be taken off of their
11      duties.
12             Q.    Anything else you can recall Captain
13      Neal saying to him or to you?
14             A.    I don't recall anything else.
15             Q.    Have you since the date of the
16      incident spoken to anybody from the paramedics
17      or the emergency medical services, the
18      ambulance crew?
19             A.    No.
20             Q.    Have you spoken, other than to
21      Dr. Luckasevic, to any other physicians about
22      this incident?
23             A.    Well, whenever I was in the
24      Pittsburgh hospital, I mean, not in it, but, I
25      mean, I was there for whenever they took Troy

200

1              B. Wingard - by Mr. Donahoe

2    down there, the one doctor came out.  I don't

3    know his name.  He did come out and talk to me

4    and Tim.

5              He told us that Troy was brain dead,

6    there was nothing they could do.  I asked him

7    what caused the brain damage.  He said -- how

8    did he put that?  Brain damage and brain.  He

9    said there was two things, but I can't remember

10   the second one.  He said one he will have just

11   it's a brain damage, but it wasn't completely

12   that he would, you know, be dead and stuff.  I

13   can't remember exact words he used.  But he

14   said that's whenever he had loss of oxygen for

15   a few minutes.

16             He said in Troy's case, he had

17   complete brain damage, and it could have been

18   caused whenever he hit his head on the counter.

19   It also could have been caused from the police

20   putting his knee on there, shutting off the

21   oxygen, but it had to have been more than,

22   like, ten minutes.

23        Q.    That his brain was deprived of

24   oxygen?

25        A.    Yes.

201

1              B. Wingard - by Mr. Donahoe

2       Q.      That occurred at Allegheny General

3    Hospital?

4       A.      Yes.

5       Q.      In the evening or the early morning

6    after this incident?

7       A.      Right.  Yes.

8       Q.      Have you spoken to any people -- by

9    the way, I take it was your son laid out at a

10   funeral home?

11      A.      Yes.

12      Q.      Did you speak to the funeral

13   directors about his condition or what may have

14   occurred to him?

15      A.      She asked.  Yes, I told her.

16      Q.      What did she tell you, if anything?

17      A.      She didn't tell me anything related

18   to his death, just explained what was going to

19   happen with the funeral.  That's all we talked

20   about.

21      Q.      During the course of the incident

22   where Troy was -- where the struggle occurred

23   in Kim's house, since the date of the incident,

24   has Kim related to you what she saw that evening?

25      A.      Yes.

202

1                B. Wingard - by Mr. Donahoe

2          Q.      What has she told you?

3          A.      Well, she was in the kitchen, so I

4     suppose she couldn't see everything because the

5     loveseat and a few things was in the way.

6          Q.      By the way, that's one of the things

7     that I was going to ask you with respect to the

8     drawing that you made.  Can you see through an

9     opening in the wall of the kitchen into the

10    living room?

11         A.      Yes.

12         Q.      On the exhibit that you have, which

13    you have marked as D3, the kitchen is adjacent

14    to the living room where the loveseat is

15    located.  Am I correct about that?

16         A.      Yes.

17         Q.      Is there what would be like an

18    opening in the wall above the loveseat?

19         A.      Yes.  There's a counter and a window

20    with shutters.

21         Q.      Were the shutters open that evening?

22         A.      Yes.

23         Q.      How big is the area approximately?

24    How high?  High wide?

25         A.      Right.  Approximately it would

203

1                 B. Wingard - by Mr. Donahoe

2       probably be about maybe four feet wide and

3       maybe about three feet high.

4            Q.    What portion of that three-by-four foot

5       area is obscured by the shutters when they are

6       open?

7            A.    Maybe about four inches on each side.

8            Q.    How high up is the opening from

9       floor in the kitchen?

10           A.    I don't know that.

11           Q.    Would it be approximately your waist

12      level, for example?  So that when you stood

13      there, the opening would begin at approximately

14      your waist?

15           A.    No.  It would be higher than that.

16      Probably like about lower than my shoulders;

17      maybe about elbow high.

18           Q.    Very good.  Is it an opening that's

19      used to allow food to be moved from the kitchen?

20           A.    Yes.

21           Q.    So it's a service-type opening?

22           A.    Yes.

23           Q.    Is there a window sill there at the

24      bottom of this opening?

25           A.    Yes.  Like a shelf.  And then on the

204

1                    B. Wingard - by Mr. Donahoe

2       kitchen side there's stools that could be slid

3       underneath.

4              Q.      Do the children sometimes eat there?

5              A.      Yes.

6              Q.      I take it, though, one can't eat

7       from the loveseat side of this?

8              A.      Right.   No.

9              Q.      What is the sill or the bottom of

10      that window made of?   Is it wood, marble?

11             A.      Wood.

12             Q.      Did you indicate that Troy struck

13      his forehead on that wood?

14             A.      Yes.

15             Q.      Did Troy bleed when that occurred?

16             A.      No.

17             Q.      Did he mark or break the wood?

18             A.      Yes.

19             Q.      What was the nature of the damage to

20      the wood that occurred from his head striking it?

21             A.      Probably about a piece maybe about

22      four inches long; maybe about an inch wide;

23      and, you know, like an inch thick, an inch wide.

24             Q.      But that did not cause a cut to his

25      forehead or a bruise?

205

1                   B. Wingard - by Mr. Donahoe

2          A.       No.   But as soon as he got up, you

3     could see a deep mark in his forehead, like an

4     impression.

5          Q.       Was it four inches wide?  Long I

6     mean -- sorry -- not wide.

7          A.       I'm not sure.  I can't recall, but I

8     know that it wasn't there before.

9          Q.       I'm talking about its location in

10    length.  Would it be approximately the length

11    of the area that was knocked out of the sill?

12         A.       Approximately.

13         Q.       It was in the forehead, so above the

14    eyebrows but below his hairline?

15         A.       Yes.

16         Q.       That's fine.  I'll get back to that.

17    I won't be that long.  It's not like I'm going

18    to make a career out of this.

19                  So getting back to you were

20    explaining to me what Kim had observed.  Is it

21    your testimony, then, that throughout the

22    incident Kim was located in the kitchen?

23         A.       Yes.

24         Q.       How close to the opening would she

25    have been in the wall?

206

1              B. Wingard - by Mr. Donahoe

2        A.      Probably about two feet.

3        Q.      There's no other way that she would

4    have seen into the living room other than

5    through that opening; is that correct?

6        A.      If she would have walked in the

7    dining room and then came around into the

8    living room, but I can't recall her doing that.

9        Q.      Is the dining room on the other side

10   of what you have marked as the hall?

11       A.      No.  It's on this (indicating) side

12   of the kitchen.

13       Q.      I see.  It's on the other side of

14   the area where the couch was located?

15       A.      Yes.

16       Q.      I see.  What about Tim, has he ever --

17   then tell me what did Kim tell you that she

18   saw?

19       A.      She seen Troy took a swing.  They

20   both tackled him.  They both held him down,

21   shackled him.  She seen the one police officer,

22   after they dragged him into the middle of the

23   floor, she would be able to see everything a

24   lot better.  She seen the one officer with his

25   knee on his neck and throat and the other one

207

1                 B. Wingard - by Mr. Donahoe

2       with his knee in the back and the other officer

3       probably standing like I said.

4                 Me and her disagreed on one thing,

5       and that was whenever the paramedics asked --

6       no -- yeah -- the paramedics asked the officers

7       to remove the handcuffs, she said that she

8       doesn't believe they did.  But me and Tim both

9       talked about it later, and we both said yeah.

10          Q.      Who removed the handcuffs?

11          A.      One of the officers.  I don't recall

12      which one.

13          Q.      When they removed the handcuffs, if

14      you can think back to that time, do you recall

15      whether Troy was handcuffed behind his back at

16      that point or in front of himself?

17          A.      Behind his back the whole time.

18          Q.      When they removed the cuffs at that

19      point, had Troy lost consciousness, to your

20      observation?

21          A.      He was already unconscious.

22          Q.      They then did not rehandcuff him in

23      the front, or did they?

24          A.      No.

25          Q.      They did not?

208

1              B. Wingard - by Mr. Donahoe

2        A.     No.   That's correct, they did not.

3        Q.     Did you discuss with Kim what her

4    thoughts were about how the incident was

5    handled and whether she thought anything was

6    done improperly or recklessly or whatever?

7        A.     Right.   Yeah.   She was upset about

8    it.  She was very mad at the State Police.  She

9    believed that, like I believed, it was a big

10   role in their part where they didn't even try

11   to bring him back or anything.

12       Q.     Did she know either of the Troopers?

13       A.     No.   Except that she heard about

14   Batt --

15       Q.     Battestilli?

16       A.     Yes.   He has a reputation.   She

17   heard of him from her work.

18       Q.     Where does she work?

19       A.     Stello's.   And also she heard from

20   the furnace man, talking to him and that.   They

21   heard rumors and stuff in town.

22       Q.     In Punxsutawney?

23       A.     Yes.

24       Q.     What reputation did she hear that

25   Trooper Battestilli had?

209

1                  B. Wingard - by Mr. Donahoe

2          A.      That he was a dirty police officer.

3          Q.      Could you be more specific?  When

4    you say dirty, I don't know whether you mean

5    corrupt, took bribes, beat up people, whatever.

6          A.      Well, I'm not really sure.  But I do

7    know an incident that did happen, and it was in

8    the paper of what happened, what he did.  So I

9    don't know.

10         Q.      Before I get to that, I will ask you

11   about that, but Kim had related to you that she

12   had heard at work, first, that Trooper

13   Battestilli's reputation was that of being --

14         A.      That he got in trouble before, put

15   it that way.  She didn't say what.  He wasn't --

16   he didn't act really professional and stuff.  I

17   guess he didn't follow the rules and stuff.

18         Q.      Can you be more specific as to how

19   he did not act professionally or failed to

20   follow the rules?

21         A.      The only way I can is if I explain

22   about the newspaper article.

23         Q.      Is there anything other than the

24   newspaper article incident that you're aware of

25   that would reflect on him?

210

1          B. Wingard - by Mr. Donahoe

2          A.     No.

3          Q.     What about the heater, the service

4     man who was in air conditioning?

5          A.     Yeah.  The heater man.  He was there

6     for the furnace, and he's the one that really

7     told Kim mostly.  Kim didn't explain

8     everything, but I guess that guy told Kim quite

9     a few stories about Battestilli, or whatever

10    his name is.

11         Q.     What stories, if you know of any of

12    the particulars, did Kim learn from the heater

13    guy?

14         A.     I don't recall what she said.  I

15    just know of two that was in the paper.

16         Q.     Can you describe those two incidents?

17         A.     Yeah.  The one -- you know, I can't

18    really remember about it.  Let's forget about

19    that one.  The first one that I seen in the

20    paper, I read about it, is where a young woman

21    owned a tavern in Austin, in Punxsutawney, and

22    she left the residence about 2:00 in the

23    morning, and he started following her home.

24    Maybe he assumed that she was drinking or

25    something.  He probably didn't even know who it

1          B. Wingard - by Mr. Donahoe

2     was.

3               He did put on his lights.  It was a

4     back road, and it said in the paper that there

5     was no place to pull off, so she kept on going.

6     She did blink her lights so that he would know

7     she understood that he wanted her to pull over.

8               I guess he didn't wait.  He did the

9     maneuver where he tapped the back of the Jeep,

10    whatever she was driving -- I think it was a

11    Jeep -- and it rolled over.  I don't think she

12    was hurt bad, but that just came.

13         Q.    Was that after this incident with

14    your son?

15         A.    No.  This was years ago.

16         Q.    I see.  Anything else in particular

17    that you learned about Trooper Battestilli?

18         A.    No.

19         Q.    Now, the other Trooper's name as we

20    indicated was Trooper Johnson.

21         A.    Right.

22         Q.    Have you heard anything about

23    Trooper Johnson?

24         A.    No.  Nothing.

25         Q.    Tim also was present on the evening

212

1              B. Wingard - by Mr. Donahoe

2      when this occurred in the house, and you had

3      indicated that as far as you know, he was

4      located --

5          A.      Behind the couch (indicating).

6          Q.      Behind the couch.  Was he in the

7      dining room?

8          A.      There was like a dining room

9      (indicating), couch (indicating).  In the

10     beginning when the police came in, he was

11     behind the police officers.  And then I think

12     he went through the kitchen and went behind the

13     couch.

14         Q.      Is the dining room separated from

15     the living room from by walls or just by this

16     couch?

17         A.      Just by the couch.

18         Q.      I see.  He was in the dining area

19     from the time that he came into the area and

20     was there until the end of this incident?

21         A.      Yes.

22         Q.      What did he say that he observed

23     during the incident in your discussions with

24     him about it?

25         A.      We talked about it.  We both seen

213

                B. Wingard - by Mr. Donahoe

1    about the same thing, where Troy did take a

2    swing, the officers jumped him he said.  Those

3    were his words, the officer jumped right on

4    him.  He even said that what he thought was

5    they were just waiting for Troy to do something

6    and then they instantly just jumped on him.  He

7    did tell me that.

8            He says he doesn't believe they

9    should have held him down that long, as long as

10   they did, his knee in the throat and stuff, his

11   neck.

12       Q.    Did he relate to you that he saw any

13   of the particular types of means by which they

14   held him down?  In other words, did he relate

15   to you that he saw them with their knee in his

16   neck or on his neck?

17       A.    Oh, yes.

18       Q.    What did he say about -- by the way,

19   it was Trooper Battestilli that you had

20   indicated was the person who had his knee by

21   Troy's neck and back?

22       A.    Yes.

23       Q.    What, if anything, did Tim say that

24   he observed about Trooper Battestilli's

214

1                    B. Wingard - by Mr. Donahoe

2       actions?

3               A.      Well, he said the same thing.  He

4       was more against the Troopers the way they were

5       talking to Troy, in their tone of voice.  He

6       didn't like that at all.  He said it was

7       inappropriate.

8               Q.      Were these the discussions that the

9       Troopers had with Troy prior to the time that

10      he took that swing at Trooper Battestilli?

11              A.      Uh-huh.

12              Q.      Correct?

13              A.      Yes.

14              Q.      You have described that they asked

15      him a number of times "now what"?

16              A.      Correct.

17              Q.      Quote, now what, Troy?

18              A.      They would use his name and change

19      the wording around:  Now what, Troy?  What are

20      you going to do now, Troy?

21              Q.      Do you recall anything else that

22      they said to Troy?

23              A.      Just whenever they talked, they said

24      what's going on, Troy?

25              Q.      How long did the discussions back

215

1              B. Wingard - by Mr. Donahoe

2      and forth with Troy last, if you can estimate,

3      between the time they first entered the living

4      room area and the time that Troy swung at

5      Trooper Battestilli?

6          A.    I can't recall.  I don't know or I

7      just don't remember.

8          Q.    Fine.  Was it Trooper Battestilli

9      that was the one speaking to Troy or was it

10     both of the Troopers?

11         A.    No.  Just Battestilli.

12         Q.    It was your testimony and perhaps

13     also that of Tim's that it was the tone of the

14     questions that Trooper Battestilli was asking

15     that caused Troy to become agitated enough to

16     swing at him?

17         A.    Yes.  It was what was that word?

18     Scar --

19         Q.    Sarcastic?

20         A.    Yes.

21         Q.    I see.  Now, had you ever known in

22     the past that Troy would hit somebody for being

23     sarcastic to him?

24         A.    No.

25         Q.    Had he ever gotten into fights with

216

1          B. Wingard - by Mr. Donahoe

2     people because he didn't like what they said?

3          A.     He got in one incident, and only one

4     incident I know of.  He was in high school.  He

5     was at a Christmas basketball tournament, and

6     he was standing around with a bunch of the boys

7     on the team.  They were outside this fast food

8     place, and they were laughing and talking.

9     Another member of another team on the Christmas

10    tournament, a different team, walked by while

11    they were laughing.

12              Well, Troy was the biggest one, and

13    Troy said he figured that's why he come up to

14    him.  He grabbed him real quick and head-butted

15    him right in the face, so he punched the kid.

16    And he goes to me, Mom, I didn't start it, and

17    we wasn't laughing about the kid at all.  They

18    both got removed from the tournament.

19              But that's the only incident I ever

20    heard of Troy getting in a fight, and he didn't

21    even start it.

22         Q.     In that incident, he was physically

23    assaulted.  Here there was somebody whose tone

24    of voice he didn't particularly care for.

25         A.     Right.

217

1                   B. Wingard - by Mr. Donahoe

2          Q.      So the question I have is why on

3      this occasion would he perceive someone not to

4      be talking in a way he wanted them to talk to

5      him he decided to punch them?  Do you have any

6      idea?

7          A.      I do not.

8          Q.      Did you and Tim and Kim discuss that

9      at all with anybody?

10         A.      No.

11         Q.      Then the punch occurred, and the

12     two Troopers came in contact with Troy, and he

13     wound up, as you testified, up on the loveseat,

14     and he wound up with his face to the right into

15     the side of the loveseat?

16         A.      Whenever they tackled him, he ended

17     up face down.

18         Q.      On the cushion, the seat part or the

19     side part?  The back of the loveseat?

20         A.      His face was on the side.

21         Q.      The back of it?

22         A.      Yeah.  His arm was partways on the

23     back, his feet was on the floor.

24         Q.      We don't have the loveseat anymore I

25     take it; correct?

218

1                B. Wingard - by Mr. Donahoe

2          A.     No.

3          Q.     Can you just describe it a little

4     bit.  I know it's a long time ago.  Just

5     ballparking it.

6          A.     It was just a regular couch like,

7     only smaller size, upholstered.  It was kind of

8     worn out from having four kids jumping on it

9     and stuff.

10         Q.     Sure.

11         A.     That's all I know.

12         Q.     He lands initially with his face on

13    the loveseat, feet on the ground, and then you

14    had indicated that he had his hands in front of

15    him?

16         A.     Right.  His knees was actually on

17    the ground too, on the floor.

18         Q.     Very good.  So his knees are on the

19    floor.  Is it Trooper Battestilli that's up by

20    his head portion of the loveseat?

21         A.     Right.

22         Q.     Was his head towards the TV area, or

23    was it towards the -- in other words, there's

24    (indicating) the couch?

25         A.     Right.

219

1                    B. Wingard - by Mr. Donahoe

2          Q.      And then there's (indicating) the

3     TV?

4          A.      Troy's face was smashed into the

5     couch.

6          Q.      Was his head up by the TV and his

7     feet in the back pointed towards the couch?

8          A.      No.  His head was, like, up towards

9     this (indicating) shelf at the top of the back

10    of the couch.

11         Q.      Sure.

12         A.      His face was smashed right into it.

13         Q.      Was he just kneeling directly --

14         A.      Yes.

15         Q.      I see.  So he wasn't pointed

16    parallel to the kitchen?

17         A.      No.

18         Q.      He was perpendicular to the kitchen?

19         A.      Right.

20         Q.      At that point, then, his knees are

21    on the ground, his feet are out, where was --

22    I'll tell you his name is Johnson, and he's not

23    Battestilli, so that would be an easy way for

24    you to understand -- Trooper Johnson at that

25    time?

220

1          B. Wingard - by Mr. Donahoe

2          A.    He was more like -- he was back

3    some.  He left Battestilli do everything, and

4    he was, like, more in the background.

5          Q.    Was he standing, Trooper Johnson?

6          A.    Yes.

7          Q.    He was in the area that's closer to

8    where the window and door are, away from the

9    loveseat?

10         A.    Once they tackled him, they both

11   tackled him, got him down.  Whenever Troy's

12   face was shoved into the loveseat, Battestilli

13   had his arm behind his neck, and I don't know

14   where his legs was at the time.  The other one,

15   Johnson, was trying to pull Troy's one arm out

16   to handcuff him.

17         Q.    Do you know if it was his left or

18   his right arm?

19         A.    It would have been his left arm that

20   Johnson would have been working on -- no, his

21   right.  I'm sorry.

22         Q.    That's okay.  And Battestilli had

23   his right arm on him trying to get his left arm

24   out?

25         A.    Right.

221

1              B. Wingard - by Mr. Donahoe

2         Q.     Did either one of them have their

3    taser drawn from his holster at that point?

4         A.     No.

5         Q.     Did Trooper Johnson ever remove his

6    taser from the holster?

7         A.     No.

8         Q.     I see.  No other implements were

9    drawn I take it that evening?  In other words,

10   I don't know what all was on the belts of

11   Troopers Johnson and Battestilli, but did you

12   see them take out, other than handcuffs at some

13   point, a baton or a billy club or an asp or

14   pepper spray?

15        A.     No.

16        Q.     And not a pistol?

17        A.     No.

18        Q.     Then did you see them remove the

19   handcuffs, or did they have their handcuffs in

20   their hand when they entered the house?

21        A.     No.  They didn't have them in their

22   hand.  I don't recall seeing them pulling the

23   handcuffs out.

24        Q.     Do you know whose handcuffs were

25   used to secure Troy's hands?

222

1          B. Wingard - by Mr. Donahoe

2      A.    No.  I don't know that.

3      Q.    That's fine.  During the initial

4  taking Troy onto that loveseat after the swing

5  occurred, do you recall anything that the

6  Troopers then said to Troy?

7      A.    Repeat that.

8      Q.    After Troy was knocked to his knees,

9  or brought down on his knees, and he had his

10  face into the loveseat, do you recall anything

11  the Troopers then said?

12      A.    They didn't talk after they tackled

13  him.

14      Q.    I see.

15      A.    They didn't even warn him about the

16  taser or nothing.  The one time somebody said,

17  Troy, quit resisting.  That was the only -- and

18  then the next thing I heard was go out and get

19  the shackles.

20      Q.    From the time that Troy was tackled,

21  as you say, to the time that you heard them,

22  one of the Troopers, and I take it -- who went

23  out for the shackles?

24      A.    Johnson.

25      Q.    Okay.  So it would have been

223

1           B. Wingard - by Mr. Donahoe

2    Battestilli who said go out and get the

3    shackles?

4           A.    Exactly right.

5           Q.    From the time that Troy was tackled

6    to the time when Trooper Battestilli said to

7    Trooper Johnson go and get the shackles, I know

8    it's a lot going on, do you have any idea how

9    much time elapsed?

10          A.    No.  Not at all.  Sorry.

11          Q.    During that time, up until the time

12   that Trooper Johnson was told to go to get the

13   shackles, do you know where you were standing?

14   Was it always within the living room area?

15          A.    Yes.

16          Q.    Then after Trooper Johnson left to

17   get the shackles, did he come back with them?

18          A.    Yes.

19          Q.    Do you know how long Trooper Johnson

20   was gone?

21          A.    No.

22          Q.    Did you overhear him say anything

23   when he was outside?

24          A.    No.

25          Q.    When was it that you then left the

224

1              B. Wingard - by Mr. Donahoe
2     living room area and went into the kitchen?
3         A.    It was after they dragged him into
4     the middle of the floor.  And that's when Tim
5     asked him why he had to still stay on him with
6     his knee on his neck and throat area and his
7     back.  He kept on saying, why are you holding
8     him down?  Battestilli said that when he's
9     coming around, he will be resisting again.
10             Then I walked around, because I
11    looked up at Kim, and I walked around, and me
12    and Kim stood in the kitchen.
13        Q.    Did Troy have the shackles placed on
14    his legs by that time?
15        A.    Oh, yes.
16        Q.    Did you go into the kitchen via the
17    dining room area?
18        A.    Yes.
19        Q.    I see.  Again, any idea how long it
20    took from the time that Trooper Johnson came
21    back into the living room with the shackles
22    until the time that they actually applied them
23    and you went into the kitchen?
24        A.    I don't recall that.  I don't recall
25    the time at all.

225

1          B. Wingard - by Mr. Donahoe

2          Q.     I'm going through my notes because

3     they are not all in order.

4          A.     Right.

5          Q.     The one thing I was going to ask you

6     about, as you had indicated in your testimony,

7     when Troy initially swung, I take it he did

8     that with his right hand at Trooper Battestilli;

9     is that correct?

10         A.     Yes.

11         Q.     Trooper Battestilli, as you recall,

12    did not block this punch?

13         A.     No, he did not.

14         Q.     Sometimes when people throw a punch,

15    they fall down if it doesn't connect.  Did the

16    punch connect with anything?

17         A.     No.

18         Q.     Did Troy remain on his feet?

19         A.     Yes.  But he kind of like swung

20    around, and that's whenever they tackled him.

21    He was half around, and I think that's why he

22    ended up face down.

23         Q.     I see.  I'm going to go back to the

24    time immediately when they tackled Troy and he

25    was on the loveseat face down.  His hands were

226

1              B. Wingard - by Mr. Donahoe

2      in front of him --

3              A.    Yes.

4              Q.    -- in an effort to avoid being

5      handcuffed?

6              A.    Yes.  His hands were right in the

7      front of his stomach.

8              Q.    It being a loveseat, I guess it

9      looks kind of like a small couch?

10             A.    Yes.

11             Q.    If your face is on the side of the

12     cushion where a person sits, the arms would be

13     in front of the person who is trying to keep

14     them away from a police officer, and they would

15     not be on the couch then I take it?  They would

16     be between his chest and the side of the

17     loveseat?

18             A.    First of all, Troy's face was not in

19     the cushion where you said.  It was on the back

20     part of the couch.

21             Q.    Okay.

22             A.    Half his body was, like, on the

23     couch, and his legs and knee and feet was down

24     on the floor.

25             Q.    I see.

1              B. Wingard - by Mr. Donahoe

2         A.    Officer Battestilli was on this

3    (indicating) side of him.

4         Q.    When you say "this side," you mean

5    the side closest to the TV?

6         A.    Yes.

7         Q.    In the hall?

8         A.    Yes.

9         Q.    Where were Troy's arms?  Were they

10   on the couch, or were they in front of the

11   couch -- I mean, the loveseat?  In other words,

12   he had them in front of him?  Are they on the

13   loveseat portion of the piece of furniture, or

14   are they on the front portion of the piece of

15   furniture?  Are they against the front portion?

16              In other words, if this table in

17   front of me is the loveseat, and the front of

18   the table would be underneath the table.  His

19   body would be kind of angled on it.  Where were

20   his arms?  Were they in front of him here

21   (indicating) or below him on the couch seat?

22   Were they beneath him on the loveseat cushion?

23        A.    Yes.

24        Q.    I see.  Then it was this effort to

25   try to remove those arms that the Troopers were

228

1              B. Wingard - by Mr. Donahoe

2       engaged in?

3              A.    Yeah.   They were trying to force his

4       wrists out, his arms out.

5              Q.    Eventually there was an application

6       of the taser in its barb mode we have called

7       it, and the drive stun mode is the other mode,

8       but the barbs is when the two prongs are shot

9       into the person.

10             A.    Right.

11             Q.    Was the initial contact with Troy by

12      way of the two-barb mode?

13             A.    Yes.

14             Q.    The initial contact with Troy, was

15      he still in a struggle to prevent his arms from

16      being handcuffed?  At that point when those

17      barbs went into him, was he trying to not get

18      handcuffed?

19             A.    Whenever they were trying to reach

20      for his hand, his arms, then he would resist.

21      At the time whenever -- Battestilli had his arm

22      I'm thinking it was behind his head.  He wasn't

23      struggling too much because his hands was

24      there.  He had no reason to keep on struggling.

25      His hands was free and in front of him.

229

1          B. Wingard - by Mr. Donahoe

2               That's whenever Battestilli was

3     kneeling and he had his arm on the back of his

4     neck and getting his taser out and then trying

5     to shoot him, but they couldn't get through the

6     clothing.

7          Q.    I see.  Now, at this point, was

8     Johnson standing, the other Trooper, the older

9     Trooper?

10         A.    I can't remember if he was on the

11    loveseat, you know, trying get Troy's arm out

12    or not.  It's just like he's away or something.

13    I just don't picture him.

14         Q.    They had a difficult time with

15    applying the taser to Troy, so Trooper Johnson

16    lifted up his shirt?

17         A.    He slid it up.

18         Q.    He slid it up and shot the taser?

19         A.    Yes.

20         Q.    Did they try to discharge that taser

21    into Troy's clothing prior to that?

22         A.    (Witness nodding.)

23         Q.    Did you see the barbs land on his

24    clothing?

25         A.    No.

230

1          B. Wingard - by Mr. Donahoe

2      Q.    How is it that you know they

3  discharged it if it shoots out two metal barbs?

4      A.    Because I'm pretty sure he said

5  something about -- I just seen him pushing it

6  against his clothes.

7      Q.    Again, this is Trooper Battestilli?

8      A.    Yeah.  And then he goes, pull up his

9  shirt.  So I'm just thinking then that it

10 didn't work.  But he's pushing, trying to get

11 it through his clothes.

12     Q.    But you didn't see any wires come out?

13     A.    No.  I did -- whenever they pulled

14 up his shirt I did see that then.

15     Q.    Did you hear any electric

16 crackling --

17     A.    Yes.

18     Q.    -- prior to the time they pulled up

19 his shirt?

20     A.    That I can't recall.  I don't know

21 for sure.

22     Q.    But at the time the barbs entered

23 Troy, you heard an electrical crackling-type

24 sound?  If you don't, that's fine.  I'm just

25 asking.

231

1              B. Wingard - by Mr. Donahoe

2         A.    I just remember hearing it, but I'm

3    not sure where they placed it at.  It was just

4    whenever they did it without barbs or with the

5    barbs, I just can't recall.

6         Q.    Initially you saw them push their

7    TASER weapon into his shirt?

8         A.    Right.

9         Q.    And it apparently was not effective,

10   so someone --

11        A.    Right.

12        Q.    When they applied the taser to his

13   shirt initially, was it the back?

14        A.    Yeah, it was his back.  In the

15   middle of his back, but to the side.

16        Q.    When the actual barbs contacted his

17   skin, it was in the upper right-hand back area

18   or was it the mid-back?

19        A.    Mid-back on the side.  Exact same

20   place.

21        Q.    On his left side or right side?

22        A.    His left I'm pretty sure.

23        Q.    At that point, did Troy stand up?

24   If you recall.

25        A.    I recall him standing up, but I know

232

1              B. Wingard - by Mr. Donahoe

2     he screamed.  So I think he stood up -- he

3     screamed and stood up, and they knocked him

4     down, and then jerked out the barbs, and then

5     he screamed again.

6                   (Defense Exhibit No. 4 was

7     marked for identification.)

8         Q.    I have your statement in front here.

9     We have marked it as D4.  If you go to the

10    third page it says BOYLELIT00016 on the bottom.

11        A.    Okay.

12        Q.    Well, actually 15 at the very

13    bottom.  If you go four lines up from the very

14    bottom, you wrote -- I take it this is you who

15    wrote this; correct?

16        A.    Uh-huh.

17        Q.    The date of the Affidavit was

18    June 2, 2011, so, like, eight months after the

19    incident.  Is that when you prepared this

20    statement?

21        A.    Well, I know that it might have been

22    a little bit before that, but I knew that they

23    were going to need it, but I just didn't know

24    when they was going to come out.

25        Q.    It's typed.  Did you type it?

233

1          B. Wingard - by Mr. Donahoe

2     A.    Is this the one that was certified?

3     Q.    Yes.  In the very back.  There's a

4  notary from Jefferson.  The notary's name is

5  Jeanette Ruth Bish.  She's down in Punxsutawney.

6     A.    No.  I didn't type this.

7     Q.    Do you know who did type it?

8     A.    No.

9     Q.    You signed it; correct?

10    A.    Yes.  I read it over, and then I

11 signed it.

12    Q.    Did you dictate it, or did you give

13 a written statement that was reduced to typing,

14 or do you know how it became this?

15    A.    I e-mailed my statement.

16    Q.    I see.  And then it was reduced to a

17 written statement?

18    A.    Yes.

19    Q.    You typed out the e-mailed statement?

20    A.    Yes.

21    Q.    Well, I guess in this modern day and

22 age one of the things that we ask for is the

23 metadata they call it.  So the question, first

24 of all I guess, do you still have a copy of the

25 e-mail that you sent?  If you know.  Here's

234

1              B. Wingard - by Mr. Donahoe

2      what I'm going to say, would you go back to

3      your computer -- do you still have the same

4      computer?

5              A.    Yes.

6              Q.    Take a look to see if you have kept

7      the copy of the e-mail you sent and preserve it.

8              A.    Right.  I could check.

9              Q.    Great.  Thank you.  Let me go to the

10     one that was typed out.  If we go to the bottom

11     of the second page, which is 15, do you see

12     that?  Four lines up you write, "the younger

13     cop said, 'well, Troy what's next'?  Troy said

14     'I'll show ya.'"  Do you remember that?

15             A.    Uh-huh.

16             Q.    Then you wrote, and he took a step

17     toward them and took a swing at one of the cops

18     but missed?

19             A.    Right.

20             Q.    "The cop took a step back and then

21     they both tackled Troy onto one of the

22     two couches."  The one you're talking about is

23     the loveseat?

24             A.    Yes.

25             Q.    Troy hit his head really hard on the

235

1          B. Wingard - by Mr. Donahoe

2     counter that was above the couch and that

3     separates the kitchen and living room.

4          A.    Right.

5          Q.    You heard a loud thump, and Troy

6     yelled ow.  Both cops, each had one of Troy's

7     arms and were trying to twist them behind

8     Troy's back.

9          A.    Right.

10          Q.    "Troy was face down with his face

11     smashed into the back of the couch.  The cop on

12     the left put his knee into the back of Troy's

13     neck to hold him down."  Do you recall that

14     occurring?

15          A.    Yes.

16          Q.    "Troy was still struggling so the

17     same cop pulled out his taser gun and tried to

18     tase Troy through his clothes (he tried three

19     or four times) but it didn't work so he told

20     the other cop to pull up Troy's shirt and then

21     he tased Troy on his bare back (left side about

22     in the middle.)"

23          A.    Right.

24          Q.    That's Battestilli who tased him?

25          A.    Yes.

236

1          B. Wingard - by Mr. Donahoe

2          Q.     "Troy was half-standing & then when

3     he was tased" -- that's what I'm getting to.

4     So Troy was half standing.  Did the tasering

5     make Troy stand up, or did they raise him up?

6     Do you know how that occurred, that he went

7     from having his knees on the ground to half

8     standing?  Or when you say half standing, do

9     you mean knees on the ground?

10         A.     No.  He was half standing with his

11    feet.

12         Q.     I see.

13         A.     I just can't really exactly recall --

14         Q.     That's fine.

15         A.     -- what happened.  I know he ended

16    up screaming.

17         Q.     You wrote and he fell back down on

18    the couch.

19         A.     Yeah.  He fell back down on the

20    couch and then, like, kind of fell down onto

21    the floor then.

22         Q.     You said, "I yelled to Troy to stop

23    resisting and to just let them cuff him."

24         A.     Uh-huh.

25         Q.     Did Troy respond when you told him

237

1          B. Wingard - by Mr. Donahoe

2      that?

3          A.    No.

4          Q.    The same cop put his knee, that's

5      Battestilli, back onto Troy's neck; correct?

6          A.    Yes.

7          Q.    "This time Troy had his head turned

8      to the right and the cop's knee was on the side

9      of Troy's neck into his throat area."

10         A.    Right.

11         Q.    So Troy's back on the couch, and was

12     he kneeling at this point again, Troy?

13         A.    He was laying flat on the couch this

14     time.

15         Q.    This time Battestilli put a knee in

16     the side of Troy's neck in the throat area?

17         A.    Yes.

18         Q.    Then the cop, again Battestilli I

19     take it; correct?

20         A.    Uh-huh.

21         Q.    "Pulled out the wires from the taser

22     gun and then started pulling them out of Troy's

23     back."

24         A.    Right.

25         Q.    Did he keep his knee on Troy's neck

1              B. Wingard - by Mr. Donahoe

2    while he did this?

3         A.    I think he did for the purpose that

4    Troy never got back up.  So I am assuming that

5    he did, but I can't really recall.

6         Q.    When he pulled these taser wires out

7    of Troy's back, Troy screamed again.  It says,

8    and he started struggling again.  So the cop

9    jerked the wires out of Troy's back and then

10   pulled Troy's left arm up behind his back and

11   cuffed that arm.

12        A.    Right.

13        Q.    Was that the first time a cuff got

14   onto Troy?

15        A.    Yes.

16        Q.    "While he was pulling on Troy's arm

17   to cuff him -- Troy was able to stand up on one

18   leg and the other leg was bent at the knee and

19   was on the couch."

20             Now, at this point I take it, the

21   Trooper was unable to have his knee on Troy's

22   throat?

23        A.    Right, that's correct.  I think it

24   was like whenever he pulled his arm back, he

25   was able to sort of like lift him up a little

239

1          B. Wingard - by Mr. Donahoe

2     bit, and he was able to stand up.

3          Q.    When this incident happened to this

4     point, any idea how many seconds or minutes

5     Trooper Battestilli had his knee on Troy's neck?

6          A.    I don't.

7          Q.    That's fine.  I'm just asking.  If

8     you don't have any idea, that's fine.  Then the

9     same cop, Battestilli, tased Troy again with a

10    prong stun gun.  We have called it the drive

11    stun mode?

12         A.    Yep.

13         Q.    Shocked Troy on the bare neck in the

14    right side below his ear.  Is that the course

15    of the events as you recall?

16         A.    Yeah.  It was more like in the

17    middle of the neck.

18         Q.    Again, Troy falls onto the couch and

19    then slid right down onto the floor.  Did he go

20    right from couch to floor?

21         A.    Yes.

22         Q.    As soon as Troy landed on the floor,

23    the same cop, Battestilli, put his left knee

24    back onto Troy's neck and throat area and his

25    right knee in Troy's back, in the middle

240

1               B. Wingard - by Mr. Donahoe

2      between his shoulder plates.

3            A.      Right.

4            Q.      I take it that means a little bit

5      below his neck?

6            A.      Right.  He had all of his weight on

7      him.

8            Q.      At this point is Troy laying face up

9      or face down?

10           A.      Face down.

11           Q.      He has one handcuff on?

12           A.      Yes.

13           Q.      You said, Troy groaned and said,

14     okay, I'm done, I'm done.

15           A.      I'm wrong then about that because

16     before he said that, I know he was handcuffed,

17     both hands.  So probably some point before the

18     floor he was handcuffed, and I think it was

19     before the floor where he landed completely.

20           Q.      If you look at the bottom of 16 at

21     those last three lines, it looked to me like he

22     had all his weight on Troy, Troy groaned and

23     said, okay, I'm done, I'm done, but the cop who

24     had Troy pinned down did not get off of Troy.

25     He just stayed on him, and they were able to

241

1              B. Wingard - by Mr. Donahoe

2      put the other cuff on his right arm then.

3                Then do you have a clear

4      recollection or is it kind of not clear at this

5      point?

6          A.    Well, I wrote this right after this,

7      so I would say this would be correct.  It's

8      just, you know, hard to remember everything.

9          Q.    The next page is 17 has Paragraph 8.

10     The next paragraph you said, "the cop that had

11     Troy pinned down told the other cop to go out

12     and get the leg braces."

13         A.    Right.

14         Q.    Do you know why he said that?

15         A.    I don't know.

16         Q.    Again, that's Battestilli?

17         A.    Troy was handcuffed.

18         Q.    Battestilli is telling Johnson?

19         A.    Yes.

20         Q.    "The cop went out and got them.  But

21     before they could put them on, Troy started

22     moving his legs because I believe he couldn't

23     breathe."

24                Any reason why you say that you feel

25     that his leg movement was because he couldn't

242

                    B. Wingard - by Mr. Donahoe

1

2    breathe?

3         A.      Because he wasn't really kicking

4    like if he was aiming at anybody.  I know if it

5    was my position, if I couldn't breathe, I would

6    really be flipping out because I don't -- I

7    would be trying to get up.  But I think Troy's

8    legs were just moving so slow and like his feet

9    dragging on the floor, it was like he was

10   trying to get leverage and trying to get up.

11        Q.      You said, "but when he started

12   moving again, the cop shocked him a third time

13   with the prong stun gun on the right side in

14   the waist area, toward Troy's back."  Is that

15   what you recall actually happening?  If you

16   recall.  If you don't know at this time, that's

17   fine.

18        A.      Right.  I don't really recall

19   where -- I mean, like I said, this was written

20   afterwards, so, I mean, it could have been, but

21   I don't recall it right now.

22        Q.      Do you recall seeing the police

23   officer, the Trooper, actually at that point,

24   again when Troy's legs were moving, apply the

25   taser to Troy?  Do you recall that?

243

1          B. Wingard - by Mr. Donahoe

2       A.     Yes.

3       Q.     Now, to do that, he had to take the

4   taser in his hand?

5       A.     Right.

6       Q.     And apply it somewhere to Troy's

7   back?

8       A.     Right.

9       Q.     At that point, was he putting any

10  part of his body on Troy's throat or neck or

11  back?

12      A.     I can't really recall.

13      Q.     That's fine.  The next line says,

14  "Troy stopped struggling completely and didn't

15  say anything else and didn't move at all."  So

16  that third application, as you indicated, of

17  the drive stun mode, Troy stopped doing anything?

18      A.     Yes.

19      Q.     Then you say they put the leg braces

20  on.  So was the other Trooper, Johnson, who

21  went for the leg braces, standing there when

22  the third drive stun application to Troy's back

23  occurred?

24      A.     I really can't recall.  I don't know

25  if he was in the house or outside.

244

1          B. Wingard - by Mr. Donahoe

2      Q.    Was it Trooper Johnson who put the

3   leg braces on Troy?

4      A.    Yes.

5      Q.    Did anyone help him?

6      A.    No.

7      Q.    Do you know where Tim was at that

8   point?

9      A.    Tim was behind the couch.  Most of

10  the time he had his hands on the couch.  He was

11  standing behind it.

12     Q.    Standing in the dining room area?

13     A.    Yes.

14     Q.    "They" you say.  "They put the leg

15  braces on and then the cop got off of Troy, and

16  they both dragged him into the middle of the

17  floor stomach down and face to the right."

18  Again, the same cop, Battestilli, put his left

19  knee back onto Troy's neck and throat area.

20  His right knee was on the middle of Troy's back?

21     A.    Right.  Correct.

22     Q.    Then you went in to help Kim who was

23  crying?

24     A.    Yes.

25     Q.    "The cop with his knee on Troy said,

245

1              B. Wingard - by Mr. Donahoe

2     'he's out cold.'"  That would be Battestilli?

3          A.    Right.

4          Q.    Do you know how much time elapsed

5     between the time that you write here that both

6     Troopers dragged Troy into the middle of the

7     floor and then Trooper Battestilli again put

8     his knee on Troy's neck and throat area and

9     right knee in the middle of his back?  Do you

10    know how much time elapsed between the time

11    Trooper Battestilli did that and the time that

12    you heard someone, again Battestilli, say he's

13    out cold?

14         A.    I don't recall.

15         Q.    Were you in the kitchen when he said

16    that, or were you still in the living room?

17         A.    I was in the kitchen part.

18         Q.    Then you heard Tim say, again from

19    the dining room area, if he's out cold, then

20    why do you need to keep your knee on.

21    Battestilli said, when he comes to, he's going

22    to start resisting again.

23         A.    Right.

24         Q.    Then Tim asked are you sure he's

25    breathing?  It doesn't look like it.  Then

246

1          B. Wingard - by Mr. Donahoe

2     Battestilli removed his knee and turned Troy

3     over onto his right side.

4          A.    Uh-huh.

5          Q.    You heard a gurgling noise from Troy.

6          A.    Yes.

7          Q.    Did you see Troy's face at that

8     point?

9          A.    Yes.

10         Q.    What did that look like?  I know

11    it's difficult to recall, but if you can.

12         A.    He just had his eyes closed.  His

13    face looked kind of grayish.

14         Q.    Anything else you recall unusual?

15         A.    No.

16         Q.    Then the one cop lifted Troy's shirt

17    and said, yes, he's breathing.  Was that

18    Johnson or Battestilli?

19         A.    I think that was -- that was

20    Johnson.

21         Q.    And the other cop, Battestilli,

22    checked for a pulse and said -- it says

23    "pause," but it means "pulse."  Am I right

24    about that?

25         A.    Yes.

247

1          B. Wingard - by Mr. Donahoe

2      Q.     He said, no, he's not.  No pulse.

3  He got up and walked to the back door.  So we

4  heard him ask where the ambulance was and that

5  they needed it now.  Was he yelling to someone

6  out in the driveway or something?

7      A.     No.  He was on the phone because he

8  pulled out his cell phone or whatever he was

9  using.

10     Q.     Did you know where at that point the

11 ambulance was staged?

12     A.     No.

13     Q.     Had you understood that an ambulance

14 had previously been called?

15     A.     Yes.  Tim told me that.

16     Q.     Did Tim tell you where they were

17 parked?

18     A.     No.

19     Q.     Do you know if they were waiting for

20 the okay to come down?

21     A.     We didn't know that at all at the

22 time.

23     Q.     Then Trooper Battestilli came back

24 inside -- was that Johnson or Battestilli who

25 made that call out there?  If you remember.  If

248

1              B. Wingard - by Mr. Donahoe
2      you don't, that's okay.
3              A.    I'm not sure.  But reading this, it
4      might have been Battestilli.  I'm not really
5      positive.
6              Q.    Then they are both in the living
7      room with Troy, and he's on his side?
8              A.    Yes.
9              Q.    He is handcuffed?
10             A.    Yes.  And shackled.
11             Q.    And shackled.  Handcuffed in the
12     back?
13             A.    Yes.
14             Q.    They are waiting for the ambulance
15     to arrive?
16             A.    Right.
17             Q.    Do you have a time estimate, how
18     long from that point to the time -- and if you
19     don't, again I'm asking only because I don't
20     know if you might know.
21             A.    No.  I don't recall it.
22             Q.    Did anybody indicate to you that
23     they calculated the time from the ambulance
24     trip sheet?
25             A.    Nope.

249

1              B. Wingard - by Mr. Donahoe
2         Q.     Had you ever seen the ambulance trip
3    sheet?
4         A.     No.
5         Q.     Do you know what ambulance company
6    it was?
7         A.     It was out of Brookville -- Big Run
8    I'm pretty sure.
9         Q.     I think it said in there Big Run.
10   Are they called Big Run Ambulance or EMS?
11        A.     Yeah.  Big Run probably volunteer.
12        Q.     Is their headquarters in Brookville?
13        A.     No.  Jefferson County.  Brookville
14   is in Jefferson County.  Their headquarters is
15   on Pine Street, Punxsutawney.
16        Q.     Okay.  So they are close to where
17   this residence was, Kim's residence?
18        A.     Big Run is closer, only four miles
19   away, and that's why they get there, not
20   Punxsutawney ambulance, even though they work --
21   even though it is in Punxsutawney.
22        Q.     Did you know any of the EMS folks
23   who arrived?
24        A.     No.
25        Q.     Did Tim or Kim?

250

1              B. Wingard - by Mr. Donahoe

2         A.     No.

3         Q.     Until the EMS folks arrived, was

4    Troy moved at all?

5         A.     No.

6         Q.     What did Battestilli do during this

7    period of time?  Did he stand there as you said?

8         A.     Yeah.  Him and Johnson just stood

9    over him, and I was next to them.

10        Q.     Did you hear them discuss anything

11   between them?

12        A.     No.

13        Q.     Did you hear them get on their

14   walkie-talkie, their radio, or their phone?

15        A.     No.  Not at all.

16        Q.     Did you have discussions amongst

17   yourself, either you, Kim, and Tim or you and

18   the Troopers?

19        A.     No.  We was just crying.  Me and Kim

20   was crying, holding each other.  Tim was over

21   there behind the couch crying.

22        Q.     You were in the kitchen?

23        A.     Yes.  With Kim.

24        Q.     What happened then when the EMS

25   folks arrived?

251

1                   B. Wingard - by Mr. Donahoe

2            A.     They came in through the back door,

3       like the door that everybody usually comes in.

4            Q.     How many, if you recall?  If you

5       don't --

6            A.     There was at least four there.

7       Yeah, I'm pretty sure there was four.  At least

8       three or four.

9            Q.     With equipment?

10           A.     Yes.

11           Q.     What did they do, if you remember?

12           A.     First of all, they asked -- well,

13      one of the police officers, I don't recall who

14      it was, told him he wasn't breathing.  And then

15      they got down, and they were assessing him.

16           Q.     Did you see that they were trying to

17      apply some sort of first aid, resuscitation?

18           A.     Right.  They were checking for a

19      pulse and things.  Then they asked the State

20      Police to remove the handcuffs, which they did;

21      and then they applied oxygen, an oxygen mask.

22           Q.     A mask?

23           A.     Maybe they were pumping that thing.

24      That's probably what it was.  Then they started

25      CPR, and it didn't work.  So they put a neck

252

1              B. Wingard - by Mr. Donahoe

2      brace on him, put him on the gurney, and took

3      him out to the ambulance.

4           Q.    How long, if you recall --

5           A.    (Witness indicating.)

6           Q.    Again, you're indicating you didn't

7      really have a recollection.  That's fine.

8           A.    I don't know the times.

9           Q.    In your statement it says, Paragraph 10

10     on Page 17, towards the bottom of Paragraph 10,

11     "he came back in and they both just stood there

12     looking down at Troy."  11, "Kim and I were

13     crying.  I didn't know what to do.  Tim was

14     across the room crying."  12, "a few minutes

15     later (about 10 minutes) the ambulance got

16     there."

17          A.    Okay.  Maybe it was about ten minutes

18     the ambulance got there.

19          Q.    Do you happen to have a recollection

20     now or is that just probably what you

21     remembered then?

22          A.    That's probably what I remembered.

23          Q.    Fine.

24                (Short recess taken.)

25                MR. DONAHOE:  I think those

253

1          B. Wingard - by Mr. Weber

2     are all the questions I have right now,

3     Ms. Wingard.  Thank you.

4                    - - - - -

5                  EXAMINATION

6     BY MR. WEBER:

7          Q.    I just have a few follow-up

8     questions for you about what we discussed

9     today.

10              Earlier in the testimony we talked

11    about Mucinex and Troy's use of that.  Did Troy

12    take Mucinex to treat his medical conditions?

13         A.    He took it before whenever he first

14    had a cold, a chest cold.  Then whenever he had

15    that cold, he was taking Mucinex, and he told

16    me that it seemed like it helped his Crohn's

17    symptoms.

18         Q.    Okay.  Any other medical conditions,

19    to your knowledge, that he used it to treat?

20         A.    No.

21         Q.    We also earlier talked about the

22    role Troy played in your life and other family

23    members' lives.  I just wanted to clarify a few

24    things about that.  Did you enjoy Troy's

25    companionship?

254

1               B. Wingard - by Mr. Weber

2          A.     Oh, yes.  A lot.

3          Q.     How significant would you say Troy's

4     place in your life was compared to that of

5     other friends and family?

6          A.     Me and Troy was always close.

7          Q.     Would you say very close, somewhat

8     close?

9          A.     Very close.

10          Q.     How involved in your life was Troy?

11     You can just qualify that as very, somewhat, a

12     little bit.

13          A.     Very.

14          Q.     Compared to other family members'

15     lives or friends' lives, how involved was he in

16     your life?

17          A.     Very involved.  Me and Troy talked

18     about everything.  We was open to each other,

19     and he was the one I would mostly turn to.

20     Terry was further away; and Tim was sometimes,

21     he would be going on trips, something away back

22     home and stuff, Potter County and stuff.

23          Q.     Would you say that Troy was the most

24     significant relationship you had in your life

25     at that time?

255

1           B. Wingard - by Mr. Weber

2       A.    Yes.

3       Q.    At the time that he passed away?

4       A.    Yes.

5       Q.    Would you say you depended on Troy

6    at all?

7       A.    Yes, I did.

8       Q.    How did you depend on him?

9       A.    Tim didn't have his license, I

10   didn't have a license, so he was there for me.

11   Also, if I had any problems or me and Tim had

12   any arguments, because me and him got into a

13   few arguments, I would always talk about it

14   with Troy.  So he was there for me.  He was

15   like a rock for me.

16       Q.    Okay.  There was also testimony

17   about the interaction between the two police

18   officers and Troy, and when they entered I

19   believe there was testimony that Troy became

20   agitated?

21       A.    Not at first.  It was just like all

22   they said was, well, what's going on, Troy?

23   And I don't think -- Troy just said not too

24   much or something like that.  Whenever they

25   kept asking him different questions, well,

256

1           B. Wingard - by Mr. Weber

2    almost the same question:  What's going on?

3    What's up, Troy?

4              Then he told them I got it all

5    figured out, there was the one cop, Battestilli

6    I think it was, asked him what he had figured

7    out, and he told him life.  And that's whenever

8    Battestilli laughed at him, and that's whenever

9    Troy started getting aggravated.

10       Q.    Now, there's a lot of testimony

11   about the word "punch" being used regarding

12   Troy's physical interaction with the officers.

13       A.    Right.

14       Q.    The word "punch," as it's been

15   described, can you describe what happened?

16   What you call a punch and what's been referred

17   to as a punch, can you describe that a bit for me?

18       A.    I think "punch" is the wrong word.

19   Punch sounds like it's already done; it

20   connected.  I would say a swing, you know, now.

21   Whenever I am thinking about it, a punch would

22   seem like it would -- I mean, he swung at him,

23   and he did not connect.

24       Q.    How hard did he swing?

25       A.    I don't think he swung that hard.

257

                    B. Wingard - by Mr. Weber

1

2       Because I was next to him, and it was just, I

3       don't know, it just didn't seem like it was

4       very hard.  It just looked like I could have

5       reached out and grabbed his arm is how easy it

6       seems like he swung.

7              Q.     Do you know if it was an open or

8       closed fist that Troy had?

9              A.     It was a closed fist.

10             Q.     What do you think Troy was

11      attempting to do by swinging at the officer

12      like that?

13             A.     He was probably trying to hit him.

14             Q.     Okay.  How hard would you say in

15      terms of describing how hard the punch or arm

16      motion was?  What would it have done?  Would it

17      have knocked over a person, a small person?

18      Can you describe how hard it was in that sense

19      at all?

20             A.     It would never have knocked over

21      either one of them.  And the one guy was

22      smaller, Johnson was smaller, and it wouldn't

23      have knocked him over.

24             Q.     Now, I think there was testimony

25      that the Trooper did not try to block it?

1              B. Wingard - by Mr. Weber

2         A.     No, he did not.

3         Q.     Do you know why?

4         A.     No.  He just took a step backwards

5    because I think that it was just such a slow

6    kind of punch.  I don't think he really thought

7    it was threatening to him or else he knew that

8    he could get out of the way.

9         Q.     So the bottle twisting as described

10   earlier, when Troy was twisting the soda

11   bottle, was that directed at anyone?  I mean,

12   was Troy looking at someone while he was doing

13   that?

14        A.     No.  He was looking at the bottle.

15   And I really don't know -- I mean, I could

16   maybe take a guess at why he was doing it, but

17   I really don't --

18        Q.     I don't want you to guess.  I'm just

19   wondering if it was directed at anyone.  Was he

20   looking at anyone while he was doing that?

21        A.     No.

22        Q.     There was also testimony later about

23   the physical interaction between the officers

24   and Troy where Troy ended up down on the

25   loveseat.  Regarding that interaction, did the

259

1          B. Wingard - by Mr. Weber

2     officers push Troy onto the loveseat in a way

3     that Troy left contact with them and fell into

4     the seat or did they tackle Troy and fall into

5     the seat while maintaining contact with him?

6          A.    The last one:  They tackled him,

7     knocked him to the -- maintained contact with

8     him.

9          Q.    So they maintained contact with him?

10         A.    Yes.

11         Q.    Were they both on the same -- Troy

12    was between both of them and the loveseat; is

13    that correct?  Or would you say --

14         A.    Yeah, yeah.  That's correct.

15         Q.    At one point I think there was

16    testimony that someone said, Troy, quit

17    resisting.

18         A.    That was me.

19         Q.    You said that?

20         A.    Yes.  And also one of the officers

21    said that to him.

22         Q.    One of the officers said that?

23         A.    Yes.

24         Q.    How many times did the officers --

25         A.    Just once.

260

1          B. Wingard - by Mr. Weber

2      Q.      Do you remember which officer said

3   that?

4      A.      I'm thinking it's Battestilli, but

5   I'm not positive.

6      Q.      Okay.  Now, there was discussion

7   about handcuffs being put on Troy and officers

8   kneeling on Troy's back and neck.  When they

9   were kneeling on his back and neck, did you see

10  one or more of the officers putting full weight

11  on Troy?

12     A.      Just the one.  His had his knee in

13  Troy's side, his neck and throat area, and his

14  knee in the middle of his back.

15     Q.      Did the officer have any contact

16  with the ground or any other object?

17     A.      Just his toes was touching the

18  ground, and his toes was, like, bent.  You

19  could tell all of his weight was on Troy.

20     Q.      Was his body mass completely over

21  Troy?

22     A.      Yes.

23     Q.      Troy was exactly between the floor

24  and the surface?

25     A.      The floor.  It was a hard floor.

261

1          B. Wingard - by Mr. Weber

2          Q.     So Troy was between the floor and

3      the officer's body mass?

4          A.     Yes.

5          Q.     I think there has been testimony at

6      various points referring to a younger cop.  Now

7      you know that to be Battestilli?

8          A.     Yes.

9          Q.     I think you testified that you were

10     in disbelief about the taser being used?

11         A.     Right.

12         Q.     Why is that?

13         A.     Because I thought they had to warn

14     him and say, stop struggling or else I'm going

15     to use the taser.  Maybe I seen it on TV, I

16     don't know.  But I just was not expecting that

17     at all for anything.  I don't know.  I just

18     wasn't expecting something like that.

19         Q.     Okay.  I think there was testimony,

20     I believe this was your testimony, you said

21     Troy was resisting three times for sure.  Can

22     you describe that again, the three times that

23     you thought he was resisting?

24         A.     Well, the first time was whenever he

25     was leaning on the couch and the recliner; and

262

1           B. Wingard - by Mr. Weber

2   he has, I think it was Battestilli, his arm in

3   the back of his neck and pushing his face into

4   the thing; and then he tried pulling out his

5   arm, so Troy was resisting then, pulling both

6   arms back.

7       Q.    Were there other times that you

8   thought Troy was resisting being handcuffed or

9   resisting the officers?

10      A.    Probably again on the floor.  He was

11  doing the same thing before he got tasered.

12  And then he was moving his feet and struggling

13  trying to get up.  I guess that's one time.

14      Q.    The moving of the feet, is that when

15  you believed he was trying to breathe?

16      A.    Right.  Then he stopped.  There was

17  no movement.

18      Q.    Later, there was testimony about

19  seeing Troy laying still and not breathing and

20  not having a pulse.  At one point, you saw Troy

21  not breathing; is that correct?

22      A.     I didn't see him not breathing.  I

23  wasn't close enough to see his chest.  But at

24  the time whenever the officer was on top of

25  him, whenever he stopped moving, he just

1           B. Wingard - by Mr. Weber
2    stopped.  It was just like he was completely
3    still.  And then he got, the officer, got off
4    of him, and that's when they pulled him across.
5    I thought Troy was still breathing, but it was
6    afterwards whenever Tim said, is he breathing?
7         Q.    At some point, you noticed him
8    laying there completely still and not moving?
9         A.    Yes.
10        Q.    Now, at some point there was
11   testimony about Troy being referred to as when
12   he wakes up.  Do you know about that?
13        A.    Yeah.  Because he said that he was
14   out cold.  So I'm just saying whenever -- he
15   probably -- he said when he regains consciousness,
16   that's what his words were, then he would be
17   resisting him.
18        Q.    Those were Battestilli's words?
19        A.    Yes.
20        Q.    So you think Battestilli believed
21   that he was unconscious at this point?
22        A.    Yes.  He said he's out cold.
23        Q.    Okay.  Now, at one point after that,
24   an officer checked Troy's pulse?
25        A.    Yes.

264

1              B. Wingard - by Mr. Weber

2        Q.     And checked his breathing?

3        A.     Yes.

4        Q.     That was Battestilli?

5        A.     Well, both of them.  Johnson lifted

6    up the shirt and looked at his chest to see if

7    it was moving.

8        Q.     Did one or the other do anything

9    else besides that?

10       A.     Yeah.  He felt for a pulse in his

11   neck.

12       Q.     Did they do anything else when he

13   was in this state of being out cold?

14       A.     No.

15       Q.     So they just stood there?

16       A.     Uh-huh.

17       Q.     Did they administer CPR at all?

18       A.     No.

19       Q.     Is it at this point that one of them

20   tried to contact the ambulance?

21       A.     Yes.

22       Q.     What did the other one do while the

23   one was trying to contact the ambulance?

24       A.     He just stood inside the kitchen.

25       Q.     That was Johnson --

265

1          B.  Wingard - by Mr.  Weber

2     A.     I mean, in the living room.

3     Q.     That was Johnson?

4     A.     Yes.

5     Q.     From the point at which the officer

6  said Troy was out cold to when the ambulance

7  arrived, do you know how long that approximately

8  was?

9     A.     No.  I don't recall.

10     Q.     Was it in the course of minutes,

11  over ten minutes, or you're just not sure?

12     A.     I don't know.

13     Q.     There was testimony referring to a

14  gurgling noise that Troy made.  How many times

15  did he make the gurgling noise?

16     A.     Just once.

17     Q.     That was when he was being pulled

18  across the floor to the middle of the room?

19     A.     That was whenever he was in the

20  middle of the floor and they turned him over to

21  check for a pulse or check his shirt.  They

22  were moving him I know that, but it wasn't like

23  dragging him or anything.

24     Q.     Okay.  When the officers just stood

25  around before the paramedics arrived on the

266

1              B. Wingard - by Mr. Weber
2    scene, did they do anything at all with Troy's
3    handcuffs or situation in how he was laying on
4    the floor?
5         A.    No.  They just left him lay on his
6    back, or side.  I can't really remember.  I
7    know he was still in the handcuffs.
8         Q.    He was handcuffed behind his back?
9         A.    Yes.
10        Q.    And shackled?
11        A.    Yes.  So he probably was on his
12   right side facing the kitchen is what I am
13   thinking.
14        Q.    Did anyone ever ask the officers
15   whether the cuffs should be removed?
16        A.    Yes.  The paramedics did.
17        Q.    They weren't before that point?
18        A.    No.
19        Q.    Did anyone ever ask the officers to
20   do anything, you or anyone else?
21        A.    No.  I just assumed they were
22   trained to do things.
23        Q.    Lastly, in Paragraph 10, we were
24   reviewing this in the last bit of questioning,
25   the last sentence of that paragraph, "he came

267

1              B. Wingard - by Mr. Fields
2     back in and they both just stood there looking
3     down at Troy," who is the "he" referring to there?
4          A.    Battestilli.   He came back in from
5     using his phone that he had.
6          Q.    "They both" in that sentence refers
7     to Battestilli and Johnson?
8          A.    Yes.
9          Q.    So Battestilli and Johnson both just
10    stood there looking down at Troy?
11         A.    Yes.
12              MR. WEBER:   I don't think I
13    have anything else.
14                   - - - - -
15                 EXAMINATION
16    BY MR. FIELDS:
17         Q.    I got a couple of quick follow-up
18    questions, ma'am.
19              I'm a little confused about the
20    three drive stun applications and the timing of
21    those.   Are you aware that the TASER weapon
22    records every trigger pull?
23         A.    I heard that afterwards.   I mean, at
24    the time I didn't know that.
25         Q.    So there's a record that's been

268

1                    B. Wingard - by Mr. Fields

2          produced in this case that shows when the

3          trigger was pulled and how long those exposures

4          lasted.

5               A.    Right.

6               Q.    The probe mode, first one, showed

7          for a period of seven seconds.

8               A.    Okay.

9               Q.    And then there's a little less than

10         about a minute and a half before you see

11         another trigger pull.  Is that roughly

12         consistent with your recollection of the timing?

13              A.    Yes.  In fact, I think maybe it

14         might have been a little longer because it was

15         like sometimes they were trying to get Troy's

16         arm up.  And it wasn't exactly boom, boom,

17         boom, give him three shots.  That didn't happen.

18              Q.    So there's the probe mode, and then

19         there's some time that passes, and then there's

20         the first drive stun that you remember seeing;

21         correct?  The probe mode shoots the probes.

22              A.    Right.  That came first.

23              Q.    Then they pressed it against him in

24         the prong mode, there's a gap of time in there;

25         correct?

269

1                    B. Wingard - by Mr. Fields

2          A.     Yes.

3          Q.     The download from the device shows

4    that the prong mode was used three times in

5    less than, well, in about 30 seconds.

6          A.     What was prong mode?  No wires?

7          Q.     Correct.

8          A.     Yes.

9          Q.     But I'm confused because I thought

10   earlier you testified that there was no more

11   use of the taser after that one officer,

12   Trooper, went out to get the shackles and then

13   came back in.

14         A.     What I said was I remembered three

15   of them, but I don't remember the fourth one.

16   I do not remember them using it on his leg at

17   all.  So maybe that's --

18         Q.     But the printout -- I'm sorry -- the

19   device shows that all four were used in about a

20   two-and-a-half minute period with the

21   three prong modes --

22         A.     Right.

23         Q.     -- all occurring in about 30 seconds.

24   So would you agree with me that would not be

25   enough time to go out and get the shackles and

270

1              B. Wingard - by Mr. Donahoe

2    then come back in for that fourth and final

3    exposure?

4         A.    Right.  I guess.

5         Q.    So I guess what I'm asking is how

6    certain are you that there was another exposure

7    after the Trooper went out to get the shackles

8    and when they put the shackles on?

9         A.    I'm not really, really certain.  I

10   just know that he was tasered three times that

11   I seen.  One was with the probes and two were

12   the other ones.  I really can't remember.  I

13   can't recall.

14             MR. FIELDS:  Do you have any

15   further questions, Mr. Donahoe?

16                 - - - - -

17             <u>EXAMINATION</u>

18   <u>BY MR. DONAHOE</u>:

19        Q.    Two things I know already you

20   answered.  Where did Troy go to high school?

21        A.    Austin Area High School in Austin,

22   Pennsylvania.

23        Q.    Up in Potter County?

24        A.    Yeah, up in Potter County.

25        Q.    How big of a high school is that?

271

1          B. Wingard - by Mr. Weber

2          A.     Very, very small.  It's one of the

3     smallest ones in Pennsylvania.

4          Q.     What do they have in the senior

5     class?

6          A.     Whenever he graduated, I think there

7     was, like, 14 kids.  I think.

8                 MR. DONAHOE:  I see.  That's it.

9                 MR. WEBER:  I just have one

10    more.

11                    - - - - -

12                 EXAMINATION

13    BY MR. WEBER:

14         Q.     We just spoke a few minutes ago

15    about that statement in Paragraph 10, he came

16    back in and stood there just looking down at

17    Troy.  I believe you said you don't remember

18    how long they were standing there?

19         A.     Right.

20         Q.     Do you remember what was occurring

21    at that time?

22         A.     I know they didn't just stand there

23    staring down.  I remember them looking at each

24    other, maybe whispering to each other, but I

25    didn't hear any words.  But they did just stand

272

1                B. Wingard - by Mr. Weber

2       there.  It's not like they kneeled down to

3       check him again or anything like that.  They

4       just stood there.

5            Q.    You couldn't hear what they were

6       whispering?

7            A.    No.

8            Q.    Were they whispering multiple

9       sentences to each other?

10           A.    They could have been.

11           Q.    A few words or more than that?

12           A.    A few words probably.

13           Q.    Were they doing anything else

14      besides whispering?

15           A.    No.

16           Q.    Was there anything else going on at

17      that point?

18           A.    No.

19                MR. WEBER:  Okay.  I have no

20      further questions.

21                MR. DONAHOE:  I have no

22      further questions.

23                MR. FIELDS:  Is she going to

24      read and sign?

25                MR. WEBER:  Yes.

273

1                  - - - - -

2                  MR. FIELDS:  She'll read and

3      sign.

4                  Ma'am, I want to thank you for your

5      time today.  This was a difficult experience,

6      and it was my intention to treat you with

7      respect.  I hope I did.

8                  THE WITNESS:  You did.

9                  (Signature not waived.)

10                 (Whereupon, the above-entitled

11     matter was concluded at 3:33 p.m.)

12                 - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

274

1

2   COMMONWEALTH OF PENNSYLVANIA    )   E R R A T A
    COUNTY OF JEFFERSON              )   S H E E T
3

4   BARBARA J. WINGARD
    vs.
5   GUY A. BATTESTILLI; STEVEN E. JOHNSON; et. al.

6
          I, BARBARA JEAN WINGARD, have read the
7   foregoing pages of my deposition given on
    Thursday, December 5, 2013, and wish to make
8   the following, if any, amendments, additions,
    deletions or corrections:
9
    Pg. No.  Line No. Change and reason for change:
10

11

12

13

14

15

16

17

18

19
    In all other respects the transcript is true
20  and correct.

21                     _____
                       BARBARA JEAN WINGARD
22
    Subscribed and sworn to before me this
23  _____ day of _____, 2013.

24  _____
          Notary Public                   (LGH)
25

275

1

2    COMMONWEALTH OF PENNSYLVANIA)
     COUNTY OF ALLEGHENY          )
3

4           I, Lina G. Hershberger, a notary
     public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the
     witness, BARBARA JEAN WINGARD, was by me first
6    duly sworn to testify the truth, the whole
     truth, and nothing but the truth; that the
7    foregoing deposition was taken at the time and
     place stated herein; and that the said
8    deposition was recorded stenographically by me
     and then reduced to typewriting under my
9    direction, and constitutes a true record of the
     testimony given by said witness, all to the
10   best of my skill and ability.

11          I further certify that the inspection,
     reading and signing of said deposition were not
12   waived by counsel for the respective parties
     and by the witness and if after 30 days the
13   transcript has not been signed by said witness
     that the witness received notification and has
14   failed to respond and the deposition may then
     be used as though signed.
15
            I further certify that I am not a
16   relative, or employee of either counsel, and
     that I am in no way interested, directly or
17   indirectly, in this action.

18          IN WITNESS WHEREOF, I have hereunto
     set my hand and affixed my seal of office this
19   12th day of December, 2013.

20

21

22                    S/Lina G. Hershberger
                      ----------------------------
23

24                    ----------------------------

25

## $

**$200** [1] - 86:16
**$4,000** [1] - 174:18

## '

**'06** [1] - 196:14
**'08** [1] - 196:14
**'91** [1] - 14:3
**'93** [1] - 10:22
**'94** [1] - 14:2
**'95** [3] - 25:12, 25:15, 51:25
**'I'll** [1] - 234:14
**'well** [1] - 234:13

## 1

**1** [9] - 4:17, 46:17, 46:18, 46:23, 49:10, 175:25, 177:14, 178:5, 178:8
**1,500** [2] - 97:24, 98:2
**10** [5] - 252:9, 252:10, 252:15, 266:23, 271:15
**100** [3] - 94:24, 128:21, 128:25
**102** [1] - 2:18
**10:30** [1] - 92:16
**11** [1] - 252:12
**11/11/72** [1] - 48:11
**11th** [1] - 13:2
**12** [1] - 252:14
**12th** [1] - 275:19
**13** [1] - 14:23
**14** [1] - 271:7
**15** [2] - 232:12, 234:11
**15219** [1] - 3:5
**16** [2] - 116:15, 240:20
**1609** [3] - 19:8, 25:17, 25:22
**17** [5] - 83:24, 84:16, 88:17, 241:9, 252:10
**17011** [1] - 2:18
**17800** [1] - 2:22
**17th** [2] - 86:25, 88:21
**18** [11] - 19:20, 21:17, 68:17, 69:8, 69:20, 70:13, 78:18, 79:2, 79:6, 79:20, 83:19
**185** [1] - 4:9
**18th** [3] - 88:22, 89:6, 89:13
**19** [1] - 19:22
**1976** [1] - 49:7
**1992** [1] - 14:2
**1993** [1] - 21:7
**1994** [2] - 10:22, 25:11
**1995** [9] - 10:24, 13:17, 13:20, 25:11, 25:23, 35:23, 49:16,

51:4
**1995-'96** [1] - 19:17
**1996** [2] - 25:23, 25:25
**1997** [2] - 13:5, 192:3
**1st** [1] - 12:25

## 2

**2** [12] - 4:18, 49:8, 56:3, 56:4, 64:3, 64:5, 64:14, 66:3, 71:8, 75:17, 78:17, 232:18
**20** [4] - 5:20, 13:21, 19:20, 19:23
**2002** [6] - 6:19, 6:24, 10:15, 10:22, 10:23, 12:19
**2005** [13] - 19:25, 20:11, 20:17, 25:12, 25:15, 25:25, 27:20, 27:23, 28:3, 28:20, 28:23, 29:11, 35:23
**2006** [5] - 28:4, 28:7, 28:15, 35:23, 195:23
**2007** [1] - 60:7
**2008** [6] - 29:21, 30:23, 31:16, 32:18, 59:24, 65:2
**2010** [35] - 12:12, 12:20, 27:23, 28:12, 28:15, 28:20, 28:24, 29:11, 38:11, 44:8, 51:5, 51:25, 52:7, 63:21, 64:3, 64:5, 64:14, 65:3, 65:21, 66:3, 69:8, 69:21, 70:13, 71:9, 75:17, 78:18, 78:19, 79:7, 79:20, 83:19, 83:24, 88:17, 177:17, 182:4, 186:10
**2011** [3] - 186:7, 186:20, 232:18
**2012** [1] - 37:16
**2013** [10] - 1:17, 2:12, 49:10, 175:25, 177:14, 178:5, 178:8, 274:7, 274:23, 275:19
**211** [2] - 14:13, 15:7
**232** [1] - 4:20
**24** [1] - 28:8
**253** [1] - 4:10
**26** [2] - 28:8, 79:16
**267** [1] - 4:11
**27** [1] - 17:14
**270** [1] - 4:12
**271** [1] - 4:13
**2:00** [1] - 210:22
**2:12-cv-01500** [1] - 1:9

## 3

**3** [4] - 4:19, 80:24, 81:3, 96:5
**30** [5] - 2:5, 20:5, 269:5, 269:23, 275:12
**3:33** [1] - 273:11

## 4

**4** [2] - 4:20, 232:6
**421** [2] - 15:9, 16:13
**46** [1] - 4:17
**4660** [1] - 2:18
**48** [2] - 33:14, 48:19

## 5

**5** [4] - 1:17, 2:12, 4:8, 274:7
**5'8** [1] - 112:18
**5'9"** [1] - 112:18
**5,000** [1] - 97:25
**56** [1] - 4:18
**564** [2] - 2:11, 3:5

## 6

**6'4** [1] - 111:8
**6'4"** [1] - 110:21
**647** [2] - 25:20, 28:6

## 7

**7/6/74** [1] - 49:3
**70** [1] - 187:6
**72** [1] - 76:13

## 8

**8** [2] - 49:7, 241:9
**80** [1] - 4:19
**85255** [1] - 2:22
**85th** [1] - 2:22

## 9

**90** [1] - 122:13
**911** [9] - 26:3, 42:16, 95:17, 97:3, 111:11, 111:14, 118:8, 179:15, 179:16
**9:00** [1] - 84:19
**9:39** [1] - 2:13

## A

**a.m** [2] - 2:13, 84:19
**abbreviation** [1] - 36:6

**ability** [1] - 275:10
**able** [22] - 32:4, 32:5, 63:3, 66:10, 103:23, 132:16, 138:11, 138:14, 144:11, 145:21, 148:19, 151:19, 152:3, 157:9, 164:7, 169:25, 170:16, 206:23, 238:17, 238:25, 239:2, 240:25
**above-entitled** [1] - 273:10
**abuse** [2] - 49:25, 67:9
**abuser** [2] - 70:19, 70:22
**abusing** [4] - 70:14, 177:13, 177:16, 177:22
**ACCESS** [2] - 32:15, 65:23
**accidental** [1] - 187:2
**accidents** [1] - 30:6
**accomplish** [1] - 169:22
**accounts** [1] - 191:12
**act** [2] - 209:16, 209:19
**acted** [1] - 178:17
**acting** [10] - 67:16, 68:2, 68:3, 68:4, 69:8, 90:20, 117:16, 117:17, 123:2, 164:14
**action** [4] - 38:20, 47:6, 198:17, 275:17
**Action** [1] - 1:8
**actions** [3] - 198:24, 199:2, 214:2
**active** [1] - 57:21
**activities** [1] - 26:11
**actual** [1] - 231:16
**additions** [1] - 274:8
**address** [11] - 14:16, 15:7, 15:16, 16:14, 18:12, 18:17, 19:3, 19:7, 19:13, 25:8, 25:22
**adjacent** [2] - 152:15, 202:13
**administer** [1] - 264:17
**Administratrix** [1] - 1:5
**administratrix** [2] - 192:6, 192:9
**Adult** [1] - 61:19
**adult** [5] - 14:6, 36:2, 36:17, 61:12, 61:22
**advised** [1] - 190:11
**advising** [1] - 43:22
**affect** [2] - 69:14, 181:10
**affected** [3] - 167:3, 183:7, 183:10

**Affidavit** [2] - 37:8, 232:17
**affidavit** [1] - 45:15
**affixed** [1] - 275:18
**afford** [1] - 170:4
**afternoon** [3] - 87:6, 90:3, 90:4
**afternoons** [1] - 58:16
**afterwards** [7] - 130:25, 140:24, 179:20, 186:12, 242:20, 263:6, 267:23
**age** [4] - 13:21, 110:9, 110:17, 233:22
**agencies** [1] - 185:21
**AGENCY** [1] - 1:24
**aggravated** [2] - 256:9
**aggravating** [2] - 113:21, 141:6
**aggressive** [1] - 124:4
**agitated** [5] - 83:14, 83:17, 108:10, 215:15, 255:20
**ago** [3] - 211:15, 218:4, 271:14
**agree** [18] - 22:4, 22:7, 47:12, 70:21, 75:2, 75:5, 109:9, 118:25, 124:2, 128:3, 129:24, 132:20, 142:14, 148:23, 164:13, 164:16, 181:7, 269:24
**agreed** [2] - 42:19, 171:5
**ahead** [3] - 14:24, 41:14, 175:21
**aid** [1] - 251:17
**aimed** [1] - 43:22
**aiming** [1] - 242:4
**air** [1] - 210:4
**al** [1] - 274:5
**alcohol** [3] - 9:10, 66:24, 66:25
**alive** [5] - 6:2, 6:4, 33:4, 48:12, 55:14
**ALLEGHENY** [1] - 275:2
**Allegheny** [3] - 61:18, 162:7, 201:2
**allow** [1] - 203:19
**almost** [7] - 5:20, 45:15, 71:18, 114:21, 123:24, 179:13, 256:2
**alone** [1] - 115:12
**altercations** [1] - 142:17
**altogether** [1] - 169:21
**ambulance** [28] - 42:17, 98:12, 123:19, 155:12, 155:13, 155:16, 160:7, 160:9, 160:19, 160:25,

1

161:9, 161:10, 162:6, 199:18, 247:4, 247:11, 247:13, 248:14, 248:23, 249:2, 249:5, 249:20, 252:3, 252:15, 252:18, 264:20, 264:23, 265:6
**Ambulance** [1] - 249:10
**amendments** [1] - 274:8
**Amerneni** [1] - 61:6
**Amin** [1] - 61:6
**analysis** [1] - 180:5
**anger** [2] - 117:19, 117:20
**angled** [1] - 227:19
**angry** [5] - 117:15, 117:16, 117:17, 117:22, 123:25
**animals** [1] - 190:21
**ankle** [1] - 58:3
**answer** [8] - 8:13, 8:19, 9:19, 39:21, 39:25, 40:19, 41:11, 41:19, 93:5, 168:13
**answered** [9] - 91:8, 91:18, 92:20, 93:6, 101:12, 112:25, 156:12, 198:6, 270:20
**answering** [1] - 40:20
**answers** [2] - 61:4, 198:18
**anticipated** [1] - 75:8
**anxious** [2] - 83:14, 83:17
**anyway** [2] - 18:5, 21:2
**apologize** [8] - 64:2, 91:23, 109:21, 140:7, 156:12, 159:20, 163:4, 184:9
**apologizing** [1] - 174:3
**apology** [3] - 169:20, 169:23, 170:8
**apparent** [2] - 176:14, 180:9
**appearance** [2] - 102:13, 110:10
**application** [3] - 228:5, 243:16, 243:22
**applications** [1] - 267:20
**applied** [6] - 32:9, 32:11, 65:2, 224:22, 231:12, 251:21
**apply** [6] - 65:9, 65:10, 65:12, 242:24, 243:6, 251:17
**applying** [2] - 65:17, 229:15

**appointment** [1] - 194:17
**appreciate** [1] - 109:23
**appropriate** [1] - 166:6
**approved** [3] - 12:3, 12:4, 12:19
**approximate** [1] - 118:3
**area** [34] - 11:16, 15:14, 129:3, 161:7, 170:2, 171:23, 191:16, 194:22, 195:11, 195:17, 196:15, 202:23, 203:5, 205:11, 206:14, 212:18, 212:19, 215:4, 218:22, 220:7, 223:14, 224:2, 224:6, 224:17, 231:17, 237:9, 237:16, 239:24, 242:14, 244:12, 244:19, 245:8, 245:19, 260:13
**Area** [3] - 61:18, 161:11, 270:21
**argue** [1] - 114:5
**arguing** [3] - 77:19, 77:20, 91:21
**argument** [2] - 64:10, 64:13
**arguments** [2] - 78:9, 255:12, 255:13
**arising** [1] - 174:13
**Arizona** [1] - 33:9
**arm** [35] - 58:3, 114:9, 115:24, 124:20, 129:10, 129:15, 129:16, 130:2, 130:6, 139:17, 139:18, 139:23, 148:20, 178:23, 217:22, 220:13, 220:15, 220:18, 220:19, 220:23, 228:21, 229:3, 229:11, 238:10, 238:11, 238:16, 238:24, 241:7, 257:5, 257:15, 262:2, 262:5, 268:16
**arms** [15] - 131:24, 132:15, 136:10, 138:9, 144:16, 146:5, 226:12, 227:9, 227:20, 227:25, 228:4, 228:15, 228:20, 235:7, 262:6
**arrangements** [1] - 53:2
**arrest** [8] - 53:12, 53:14, 53:15, 54:6,

55:20, 167:25, 169:16, 180:9
**arrested** [4] - 177:3, 177:4, 177:5, 181:18
**arrive** [1] - 248:15
**arrived** [10] - 105:10, 108:5, 119:8, 120:6, 162:9, 249:23, 250:3, 250:25, 265:7, 265:25
**arriving** [2] - 71:10, 107:10
**arrogant** [3] - 123:21, 166:8, 199:9
**arrow** [1] - 152:20
**article** [2] - 209:22, 209:24
**articulate** [1] - 8:7
**arts** [1] - 110:23
**Ashley** [1] - 17:4
**aside** [2] - 171:19, 184:19
**asleep** [1] - 89:21
**asp** [1] - 221:13
**asphyxia** [1] - 188:4
**asphyxiation** [1] - 187:3
**assaulted** [1] - 216:23
**assessing** [1] - 251:15
**assistance** [5] - 32:11, 32:12, 65:11, 65:17
**assistant** [1] - 35:19
**associations** [1] - 195:6
**assume** [2] - 8:13, 130:21
**assumed** [4] - 95:16, 147:24, 210:24, 266:21
**assuming** [9] - 37:16, 47:15, 77:22, 95:11, 104:10, 118:23, 122:3, 134:17, 238:4
**ATM** [1] - 191:19
**attack** [4] - 53:12, 54:5, 55:19, 180:21
**attempt** [9] - 68:11, 71:9, 73:2, 74:23, 75:21, 78:6, 78:14, 83:20, 164:17
**attempted** [4] - 19:2, 64:2, 66:2, 72:2
**attempting** [1] - 257:11
**attitude** [1] - 113:13
**attorney** [12] - 7:11, 9:25, 38:22, 40:8, 40:14, 40:15, 47:16, 61:3, 63:11, 161:20, 161:22, 161:24
**Attorney** [4] - 2:10, 3:4, 39:19, 185:20
**attorney's** [1] - 9:24
**attorney-client** [2] - 38:22, 40:14
**attorneys** [19] - 8:24,

9:19, 9:23, 22:10, 36:24, 37:18, 37:21, 38:2, 38:7, 38:12, 38:18, 44:12, 46:11, 167:9, 167:14, 170:19, 183:2, 183:6, 193:6
**attributes** [1] - 60:20
**AUSTIN** [1] - 21:12
**Austin** [10] - 13:24, 21:10, 21:12, 24:24, 26:22, 27:15, 48:15, 210:21, 270:21
**AUTHORIZATION** [1] - 1:23
**authorizations** [1] - 193:19
**automatically** [1] - 155:9
**autopsy** [4] - 60:10, 179:23, 180:4, 186:23
**available** [1] - 88:11
**Avenue** [10] - 2:11, 3:5, 14:13, 15:7, 25:17, 25:20, 25:22, 26:15, 28:6, 34:24
**average** [1] - 33:25
**avoid** [2] - 8:4, 226:4
**awake** [1] - 158:15
**awarded** [1] - 193:10
**awards** [1] - 24:13
**aware** [27] - 27:7, 60:13, 60:19, 70:7, 111:14, 112:2, 163:3, 163:5, 166:13, 167:13, 167:21, 171:19, 182:7, 209:24, 267:21
**AZ** [1] - 2:22

## B

**background** [3] - 21:5, 190:15, 220:4
**backwards** [3] - 131:6, 258:4
**bad** [6] - 27:18, 35:17, 62:25, 103:24, 103:25, 211:12
**badges** [1] - 109:7
**ballparking** [1] - 218:5
**bank** [2] - 191:10, 191:11
**bar** [1] - 196:7
**barb** [2] - 228:6, 228:12
**BARBARA** [9] - 1:4, 1:15, 2:2, 4:4, 5:4, 274:4, 274:6, 274:21, 275:5
**Barbara** [2] - 5:12, 5:17
**barbs** [15] - 134:25,

135:15, 135:16, 135:17, 144:12, 145:16, 228:8, 228:17, 229:23, 230:3, 230:22, 231:4, 231:5, 231:16, 232:4
**bare** [2] - 235:21, 239:13
**bars** [1] - 196:9
**baseball** [3] - 24:16, 57:25, 90:16
**basement** [1] - 58:21
**basis** [3] - 22:20, 52:24, 53:9
**basketball** [4] - 24:16, 58:6, 58:10, 216:5
**bathroom** [17] - 30:7, 63:2, 71:22, 71:23, 71:25, 72:15, 73:16, 73:17, 98:8, 102:24, 103:5, 105:15, 106:14, 106:20, 178:18, 179:3, 196:13
**baton** [1] - 221:13
**Batt** [1] - 208:14
**battestilli** [1] - 245:21
**Battestilli** [61] - 140:18, 140:21, 150:14, 150:17, 156:8, 208:15, 208:25, 210:9, 211:17, 213:20, 214:10, 215:5, 215:8, 215:11, 215:14, 218:19, 219:23, 220:3, 220:12, 220:22, 221:11, 223:2, 223:6, 224:8, 225:8, 225:11, 227:2, 228:21, 229:2, 230:7, 235:24, 237:5, 237:15, 237:18, 239:5, 239:9, 239:23, 241:16, 241:18, 244:18, 245:2, 245:7, 245:11, 245:12, 246:2, 246:18, 246:21, 247:23, 247:24, 248:4, 250:6, 256:5, 256:8, 260:4, 261:7, 262:2, 263:20, 264:4, 264:7, 267:7, 267:9
**BATTESTILLI** [2] - 1:9, 274:5
**Battestilli's** [3] - 209:13, 213:25, 263:18
**bear** [2] - 94:12, 165:25
**bears** [3] - 165:9,

165:19, 169:3
**beat** [1] - 209:5
**beats** [1] - 166:20
**became** [5] - 192:5,
192:9, 196:4,
233:14, 255:19
**become** [2] - 52:17,
215:15
**bed** [1] - 161:23
**bedroom** [7] - 71:16,
71:17, 71:18, 71:21,
98:3, 106:9, 178:21
**bedrooms** [6] - 82:21,
82:24, 97:17, 97:18,
98:7, 158:9
**began** [1] - 182:4
**begin** [1] - 203:13
**beginning** [5] - 37:12,
107:24, 113:18,
133:11, 212:10
**behalf** [1] - 167:14
**Behavior** [1] - 84:9
**behavior** [10] - 67:24,
88:16, 101:20,
102:13, 108:9,
164:22, 165:6,
166:5, 174:4, 181:10
**Behavioral** [1] - 61:19
**behavioral** [3] - 57:9,
57:11, 75:22
**behest** [1] - 187:17
**behind** [23] - 129:5,
144:9, 146:17,
146:21, 147:4,
147:9, 148:17,
154:9, 156:2,
207:15, 207:17,
212:5, 212:6,
212:11, 212:12,
220:13, 228:22,
235:7, 238:10,
244:9, 244:11,
250:21, 266:8
**belief** [3] - 137:25,
165:4, 172:10
**believes** [1] - 187:5
**belong** [1] - 195:5
**below** [4] - 205:14,
227:21, 239:14,
240:5
**belts** [1] - 221:10
**beneath** [1] - 227:22
**benefits** [1] - 31:19
**bent** [2] - 238:18,
260:18
**beside** [1] - 120:20
**best** [1] - 275:10
**better** [6] - 78:15,
78:23, 112:6,
112:11, 112:12,
206:24
**between** [26] - 27:23,
31:22, 32:17, 35:8,
40:19, 51:25, 110:4,
118:17, 126:8,
128:4, 128:14,

128:16, 139:5,
147:15, 196:14,
215:3, 226:16,
240:2, 245:5,
245:10, 250:11,
255:17, 258:23,
259:12, 260:23,
261:2
**Big** [3] - 249:7, 249:9,
249:10
**big** [20] - 75:13, 89:23,
89:25, 91:13, 97:21,
108:15, 112:15,
112:16, 119:14,
119:22, 126:14,
131:11, 159:4,
159:23, 202:23,
208:9, 249:11,
249:18, 270:25
**biggest** [1] - 216:12
**billy** [1] - 221:13
**birth** [4] - 48:8, 48:10,
49:2, 49:6
**birthday** [1] - 77:9
**Bish** [1] - 233:5
**bit** [38] - 6:10, 7:12,
10:8, 14:25, 21:3,
27:15, 51:19, 51:20,
53:17, 70:25, 76:6,
83:8, 87:6, 101:4,
104:24, 105:19,
105:24, 107:11,
110:11, 110:24,
116:7, 117:14,
129:5, 130:25,
131:9, 137:6,
137:20, 145:19,
145:25, 152:2,
175:23, 218:4,
232:22, 239:2,
240:4, 254:12,
256:17, 266:24
**black** [3] - 56:18,
83:10, 83:11
**blame** [2] - 176:19,
176:25
**bleed** [1] - 204:15
**blessing** [1] - 47:21
**blink** [1] - 211:6
**block** [5] - 129:10,
130:2, 130:7,
225:12, 257:25
**blockage** [2] - 54:22,
187:6
**blocked** [3] - 119:21,
128:18, 130:6
**blood** [3] - 54:10,
54:14, 54:15
**blue** [3] - 105:16,
109:6, 172:18
**body** [6] - 143:7,
226:22, 227:19,
243:10, 260:20,
261:3
**bolts** [1] - 135:7
**boom** [3] - 268:16,

268:17
**borrow** [1] - 29:7
**bottle** [12] - 72:12,
114:23, 116:12,
116:16, 123:3,
124:5, 124:13,
124:18, 124:24,
258:9, 258:11,
258:14
**bottom** [12] - 81:25,
82:23, 137:16,
154:6, 203:24,
204:9, 232:10,
232:13, 232:14,
234:10, 240:20,
252:10
**box** [4] - 69:22, 70:10,
72:11, 72:15
**Boyle** [7] - 2:17,
38:14, 39:8, 41:22,
42:11, 43:3, 193:2
**BOYLELIT00016** [1] -
232:10
**boys** [2] - 161:5, 216:6
**brace** [1] - 252:2
**braces** [5] - 241:12,
243:19, 243:21,
244:3, 244:15
**brain** [10] - 162:3,
162:14, 188:12,
200:5, 200:7, 200:8,
200:11, 200:17,
200:23
**branch** [2] - 191:16,
194:7
**break** [12] - 9:14, 9:20,
53:24, 71:2, 71:4,
71:5, 71:6, 115:6,
132:3, 150:10,
151:3, 204:17
**breakfast** [1] - 92:19
**breaking** [1] - 132:18
**breathe** [1] - 144:20,
144:24, 241:23,
242:2, 242:5, 262:15
**breathing** [17] -
147:22, 154:10,
154:11, 154:12,
154:19, 154:20,
155:13, 179:4,
245:25, 246:17,
251:14, 262:19,
262:21, 262:22,
263:5, 263:6, 264:2
**bribes** [1] - 209:5
**bright** [1] - 184:7
**bring** [1] - 208:11
**bringing** [2] - 46:5,
64:19
**broke** [1] - 27:11
**broken** [1] - 155:8
**Broncos** [2] - 77:9,
190:18
**Brookville** [2] - 249:7,
249:12
**brookville** [1] - 249:13

**brother** [2] - 16:24,
55:7
**brought** [6] - 27:8,
129:25, 138:17,
138:18, 139:20,
222:9
**bruise** [1] - 204:25
**Bs** [2] - 23:21, 23:22
**buddies** [1] - 90:18
**bulb** [1] - 87:24
**bunch** [2] - 162:22,
216:6
**burial** [1] - 174:15
**business** [2] - 36:9,
36:12
**butted** [1] - 216:14
**buy** [4] - 31:7, 34:6,
77:9, 182:3
**buzz** [2] - 68:21, 69:5
**BY** [21] - 4:8, 4:9, 4:10,
4:11, 4:12, 4:13, 5:9,
39:7, 40:6, 41:20,
43:24, 79:18, 135:9,
147:12, 153:12,
168:20, 185:17,
253:6, 267:16,
270:18, 271:13
**bypass** [2] - 54:11,
55:17

# C

**cable** [2] - 84:4, 84:15
**cage** [1] - 133:19
**calculated** [1] -
248:23
**calm** [7] - 107:10,
107:16, 108:7,
108:10, 108:11,
123:11, 123:13
**Camp** [1] - 2:18
**camps** [1] - 27:11
**canceled** [1] - 50:14
**cannot** [1] - 161:18
**Captain** [5] - 198:2,
198:5, 198:9, 199:3,
199:12
**captain** [1] - 161:15
**car** [3] - 161:4, 191:22,
191:24
**card** [2] - 32:12,
191:19
**cardiac** [9] - 53:12,
53:14, 54:6, 55:20,
55:24, 167:25,
169:16, 180:9
**care** [3] - 176:7, 176:8,
216:24
**career** [1] - 205:18
**case** [18] - 10:9, 15:3,
37:21, 40:21, 43:23,
50:13, 50:17, 69:25,
166:12, 170:8,
171:6, 172:13,
181:12, 182:14,

185:19, 186:3,
200:16, 268:2
**cashing** [1] - 183:23
**catch** [1] - 90:14
**caught** [1] - 32:4
**caused** [11] - 79:3,
83:16, 102:4,
166:18, 186:19,
187:7, 187:15,
200:7, 200:18,
200:19, 215:15
**causing** [1] - 167:25
**cell** [1] - 247:8
**cemetery** [1] - 170:4
**Center** [1] - 61:19
**center** [1] - 62:12
**certain** [8] - 62:24,
84:6, 94:24, 166:23,
171:10, 183:13,
270:6, 270:9
**certainly** [2] - 75:3,
168:11
**certificate** [2] - 13:12,
53:13
**certificates** [1] - 111:2
**certified** [1] - 233:2
**certify** [3] - 275:5,
275:11, 275:15
**CERTIFYING** [1] -
1:23
**chain** [1] - 34:24
**Chambers** [1] - 61:6
**change** [4] - 87:24,
104:5, 214:18, 274:9
**Change** [1] - 274:9
**changed** [1] - 165:18
**charge** [2] - 26:21,
26:24
**charged** [1] - 57:4
**charges** [2] - 27:7,
57:16
**Charles** [1] - 55:7
**Charley** [4] - 17:14,
17:20, 18:12, 28:8
**check** [7] - 147:19,
147:22, 158:11,
234:8, 265:21, 272:3
**checked** [3] - 246:22,
263:24, 264:2
**checking** [2] - 157:7,
251:18
**checks** [1] - 183:22
**chest** [8] - 59:12,
59:15, 154:23,
171:23, 226:16,
253:14, 262:23,
264:6
**Chevy** [1] - 191:25
**child** [3] - 48:8, 48:24,
49:4
**children** [8] - 48:2,
48:4, 48:19, 97:10,
98:10, 98:11,
118:12, 204:4
**chip** [1] - 107:4
**chipped** [1] - 131:15

3

4

cholesterol [1] - 54:10
Chopper [2] - 34:23, 35:11
chore [1] - 88:9
chose [1] - 18:19
Christmas [3] - 77:8, 216:5, 216:9
Christopher [1] - 17:3
Chuck [2] - 55:7, 55:10
church [2] - 184:13, 184:15
cigarette [10] - 33:16, 95:16, 95:20, 99:2, 100:3, 100:15, 103:2, 104:13, 104:19, 106:19
cigarettes [7] - 29:16, 31:7, 34:4, 34:7, 34:11, 99:21, 99:22
circle [3] - 127:19, 127:20, 137:18
circumstances [4] - 95:2, 171:6, 172:13, 187:15
Civil [2] - 1:8, 2:6
civil [3] - 47:6, 57:15
claim [2] - 11:22, 12:2
clarify [5] - 39:5, 80:2, 94:6, 150:12, 253:23
class [4] - 23:24, 24:4, 24:7, 271:5
classes [2] - 13:10, 110:24
cleaning [1] - 36:8
clear [6] - 39:24, 41:12, 168:8, 179:13, 241:3, 241:4
clearer [1] - 40:17
clearly [1] - 109:8
client [2] - 38:22, 40:14
close [19] - 33:8, 68:13, 89:19, 127:25, 128:24, 129:2, 137:20, 163:25, 166:17, 195:9, 195:16, 196:4, 205:24, 249:16, 254:6, 254:7, 254:8, 254:9, 262:23
closed [3] - 246:12, 257:8, 257:9
closer [10] - 18:21, 97:24, 98:2, 121:2, 126:16, 127:10, 137:20, 220:7, 249:18
closest [2] - 155:22, 227:5
clothes [6] - 138:18, 139:25, 173:24, 230:6, 230:11, 235:18
clothing [3] - 229:6,

229:21, 229:24
club [2] - 196:8, 221:13
clubs [1] - 195:5
coffee [1] - 96:17
cold [1] - 111:7, 245:2, 245:13, 245:19, 253:14, 253:15, 263:14, 263:22, 264:13, 265:6
colitis [14] - 59:7, 59:22, 62:19, 64:16, 65:6, 65:7, 66:10, 68:10, 68:15, 69:19, 73:25, 74:9, 74:18, 103:23
colleagues [1] - 80:4
collecting [1] - 190:17
collection [1] - 77:10
College [4] - 21:7, 21:21, 22:25, 24:19
comfort [1] - 157:15
comfortable [2] - 16:4, 163:19
comforting [1] - 159:24
coming [7] - 50:14, 50:15, 51:8, 73:21, 104:10, 185:2, 224:9
commit [3] - 63:23, 75:4, 75:9
committed [1] - 77:18
common [1] - 54:9
COMMONWEALTH [3] - 1:11, 274:2, 275:2
Commonwealth [4] - 2:9, 3:2, 191:14, 275:4
communicating [1] - 52:10
communication [1] - 51:24
communications [1] - 53:3
community [1] - 27:5
comp [7] - 10:9, 11:22, 12:2, 12:3, 12:21, 163:17, 183:18
companionship [1] - 253:25
company [2] - 166:12, 249:5
compared [2] - 254:4, 254:14
compensation [5] - 7:2, 7:6, 7:9, 12:6, 12:9
complain [3] - 59:5, 59:8, 59:11
complained [1] - 178:23
complaining [1] - 59:15

Complaint [1] - 47:7
complaint [1] - 59:19
complete [1] - 200:17
completely [8] - 125:6, 159:13, 200:11, 240:19, 243:14, 260:20, 263:2, 263:8
Complex [2] - 2:11, 3:4
complying [2] - 82:16, 126:23
computer [3] - 13:10, 234:3, 234:4
concerned [4] - 18:23, 67:16, 70:10, 122:20
concerns [5] - 63:17, 68:24, 70:14, 78:5, 79:3
concluded [1] - 273:11
condition [4] - 55:13, 55:21, 194:25, 201:13
conditioning [1] - 210:4
conditions [6] - 54:9, 55:10, 55:24, 59:9, 253:12, 253:18
confidential [1] - 168:12
confused [8] - 27:15, 94:11, 107:12, 107:18, 108:10, 178:17, 267:19, 269:9
confusion [1] - 7:15
connect [3] - 225:15, 225:16, 256:23
connected [1] - 256:20
consciousness [2] - 207:19, 263:15
consider [1] - 12:13
consistent [1] - 268:12
constantly [1] - 183:21
constitutes [1] - 275:9
consult [1] - 163:9
consumed [1] - 72:18
consumption [1] - 67:17
contact [13] - 51:22, 118:16, 148:3, 217:12, 228:11, 228:14, 259:3, 259:5, 259:7, 259:9, 260:15, 264:20, 264:23
contacted [1] - 231:16
contemporaneous [1] - 45:25
contest [1] - 9:13
continue [1] - 23:10
continued [1] - 20:18

contribute [1] - 28:21
contributed [1] - 29:2
control [4] - 63:3, 154:18, 166:9, 176:5
controlled [2] - 194:15, 194:25
controversial [1] - 171:20
conversation [12] - 38:24, 45:12, 45:17, 74:16, 102:3, 102:17, 158:5, 159:13, 187:8, 187:16, 198:12, 198:21
conversational [2] - 7:24, 159:19
conversations [5] - 39:11, 41:7, 53:3, 163:14, 175:8
convince [1] - 171:9
cop [36] - 114:2, 114:7, 116:5, 133:4, 133:22, 133:23, 134:5, 134:22, 136:21, 136:24, 145:6, 149:8, 152:11, 234:13, 234:20, 235:11, 235:17, 235:20, 237:4, 237:18, 238:8, 239:9, 239:23, 240:23, 241:10, 241:11, 241:20, 242:12, 244:15, 244:18, 244:25, 246:16, 246:21, 246:25, 261:6
cop's [1] - 237:8
cops [4] - 170:2, 182:11, 234:17, 235:6
copy [2] - 233:24, 234:7
corner [4] - 81:19, 119:25, 126:6, 127:16
coroner [13] - 180:3, 180:7, 186:3, 186:6, 186:20, 186:24, 188:18, 189:23, 190:2, 190:8, 190:10, 190:11
coroner's [2] - 186:16, 187:21
corporal [1] - 161:15
correct [126] - 16:15, 19:21, 20:3, 20:18, 22:2, 27:21, 30:24, 31:4, 31:7, 32:20, 32:21, 37:10, 41:18, 52:11, 52:12, 64:3, 69:25, 70:24, 72:16, 73:19, 73:22, 74:2, 75:11, 75:14, 75:23, 76:22, 78:19, 81:19,

81:20, 82:24, 83:4, 86:2, 86:8, 87:16, 87:19, 91:6, 96:23, 98:7, 98:17, 101:2, 105:4, 108:10, 109:12, 111:9, 112:3, 116:13, 118:10, 118:11, 118:13, 119:4, 119:5, 119:7, 120:10, 121:8, 121:21, 121:23, 121:24, 122:18, 122:21, 122:22, 122:24, 123:4, 124:5, 124:16, 127:16, 128:15, 129:8, 138:3, 138:4, 138:6, 138:7, 138:23, 142:11, 142:12, 143:12, 143:19, 143:25, 144:2, 144:4, 144:5, 144:8, 146:6, 148:6, 148:20, 150:7, 150:22, 152:16, 153:14, 157:14, 162:3, 164:14, 164:18, 164:19, 166:20, 170:9, 175:9, 175:25, 178:6, 180:5, 180:6, 180:10, 185:10, 191:4, 192:7, 192:8, 202:15, 206:5, 208:2, 214:12, 214:16, 217:25, 225:9, 232:15, 233:9, 237:5, 237:19, 238:23, 241:7, 244:21, 259:13, 259:14, 262:21, 268:21, 268:25, 269:7, 274:20
correctional [1] - 27:4
corrections [1] - 274:8
corrupt [1] - 209:5
cotton [1] - 173:19
couch [64] - 89:21, 96:8, 96:18, 98:16, 98:25, 103:8, 105:9, 109:24, 110:3, 116:13, 118:5, 120:17, 121:8, 124:23, 126:12, 127:25, 131:12, 139:7, 146:17, 146:19, 146:20, 146:21, 147:5, 147:9, 147:15, 148:17, 153:6, 154:9, 155:20, 155:24, 156:2, 158:25, 206:14, 212:5, 212:6, 212:9,

212:13, 212:16, 212:17, 218:6, 218:24, 219:5, 219:7, 219:10, 226:9, 226:15, 226:20, 226:23, 227:10, 227:11, 227:21, 235:2, 235:11, 236:18, 236:20, 237:11, 237:13, 238:19, 239:18, 239:20, 244:9, 244:10, 250:21, 261:25

**couches** [1] - 234:22

**Coudersport** [1] - 61:25

**COUNSEL** [1] - 2:15

**counsel** [2] - 275:12, 275:16

**counseling** [3] - 75:25, 184:14, 184:15

**counter** [4] - 131:14, 200:18, 202:19, 235:2

**COUNTY** [2] - 274:2, 275:2

**county** [1] - 192:13

**County** [6] - 193:6, 249:13, 249:14, 254:22, 270:23, 270:24

**couple** [12] - 6:9, 23:22, 57:19, 58:8, 78:13, 89:2, 106:4, 113:2, 113:16, 150:12, 188:19, 267:17

**course** [3] - 201:21, 239:14, 265:10

**court** [4] - 6:16, 7:18, 8:2, 8:18

**COURT** [1] - 1:2

**Court** [3] - 2:7, 39:20, 41:6

**courthouse** [1] - 192:23

**Courthouse** [1] - 193:6

**cover** [1] - 7:13

**covering** [1] - 132:15

**CPR** [5] - 160:14, 179:14, 179:16, 251:25, 264:17

**crackling** [2] - 230:16, 230:23

**crackling-type** [1] - 230:23

**crawled** [1] - 178:20

**crew** [1] - 199:18

**Crill** [5] - 43:11, 43:12, 43:14, 43:19, 44:10

**CRILL** [1] - 43:13

**crime** [1] - 57:4

**criminal** [1] - 57:16

**Crohn's** [7] - 29:15, 29:19, 68:15, 193:21, 194:14, 196:21, 253:16

**crossed** [2] - 98:21, 133:7

**cry** [1] - 103:12

**crying** [26] - 103:11, 103:13, 103:18, 103:21, 105:14, 106:11, 106:12, 106:21, 106:23, 118:20, 146:24, 155:25, 156:2, 156:3, 158:15, 158:17, 158:20, 160:2, 160:3, 160:20, 244:23, 250:19, 250:20, 250:21, 252:13, 252:14

**Cs** [1] - 23:22

**cuff** [5] - 142:23, 236:23, 238:13, 238:17, 241:2

**cuffed** [4] - 132:7, 146:5, 148:20, 238:11

**cuffs** [2] - 207:18, 266:15

**current** [1] - 10:10

**cushion** [4] - 217:18, 226:12, 226:19, 227:22

**cut** [1] - 204:24

**Cyril** [1] - 167:9

## D

**D's** [1] - 31:11

**D-I-E-S** [1] - 195:15

**D3** [1] - 202:13

**D4** [1] - 232:9

**dad** [2] - 179:7, 184:17

**damage** [5] - 200:7, 200:8, 200:11, 200:17, 204:19

**damages** [6] - 50:17, 50:20, 51:8, 57:17, 182:13, 182:16

**damn** [1] - 105:19

**dark** [5] - 74:22, 75:3, 75:9, 78:13, 95:6

**darts** [1] - 143:19

**date** [11] - 17:13, 31:23, 48:7, 48:10, 49:2, 49:6, 51:4, 163:11, 199:15, 201:23, 232:17

**dates** [1] - 28:22

**Dave** [4] - 43:19, 44:3, 44:10, 45:23

**David** [7] - 43:11, 43:14, 44:10, 44:20, 44:24, 45:6, 45:24

**days** [5] - 34:7, 163:21, 163:24, 175:5, 275:12

**dead** [4] - 162:3, 162:14, 200:5, 200:12

**death** [50] - 28:11, 30:23, 31:23, 32:18, 33:21, 33:23, 50:7, 50:8, 51:5, 52:14, 52:16, 52:20, 53:13, 53:17, 57:20, 58:9, 59:7, 59:21, 60:20, 63:13, 66:13, 69:14, 76:25, 167:20, 169:12, 174:9, 174:14, 174:20, 175:7, 176:20, 177:14, 177:20, 180:2, 180:8, 180:18, 181:13, 182:14, 183:7, 183:10, 184:12, 184:25, 185:6, 187:2, 187:4, 187:7, 188:4, 197:4, 201:18

**deceased** [1] - 6:3

**December** [5] - 1:17, 2:12, 49:7, 274:7, 275:19

**decided** [2] - 51:21, 217:5

**deep** [1] - 205:3

**Defendant** [2] - 2:3, 2:20

**Defendants** [2] - 1:13, 3:2

**Defense** [5] - 46:17, 46:18, 46:23, 56:3, 81:3

**DEFENSE** [4] - 4:17, 4:18, 4:19, 4:20

**defense** [3] - 56:4, 80:24, 232:6

**definitely** [2] - 101:23, 191:8

**definition** [1] - 23:20

**degree** [2] - 13:11, 27:24

**deletions** [1] - 274:8

**Dempsey** [2] - 163:16, 163:19

**denied** [1] - 12:2

**Dennis** [11] - 38:14, 38:25, 39:19, 39:22, 40:21, 41:16, 42:22, 42:24, 163:16, 192:19, 193:2

**depended** [1] - 255:5

**deployed** [1] - 143:2

**deposed** [1] - 6:11

**DEPOSITION** [2] - 1:15, 2:2

**deposition** [12] - 6:13, 6:20, 7:14, 15:19, 36:25, 37:18,

188:10, 274:7, 275:7, 275:8, 275:11, 275:14

**depressed** [2] - 73:14, 74:18

**deprived** [1] - 200:23

**Deputy** [1] - 185:20

**describe** [9] - 29:13, 109:5, 189:17, 210:16, 218:3, 256:15, 256:17, 257:18, 261:22

**described** [4] - 156:22, 214:14, 256:15, 258:9

**describing** [1] - 257:15

**detail** [1] - 11:4

**determination** [1] - 179:25

**device** [3] - 171:8, 269:3, 269:19

**Devon** [1] - 171:15

**diabetes** [1] - 180:12

**diabetic** [4] - 176:4, 176:6, 176:12, 180:20

**dictate** [1] - 233:12

**die** [2] - 53:11, 54:5

**died** [4] - 176:14, 184:18, 186:14, 192:5

**Dies** [2] - 195:13, 195:15

**difference** [1] - 110:17

**different** [12] - 11:16, 30:11, 53:6, 71:19, 81:13, 89:11, 113:5, 165:14, 194:18, 194:19, 216:10, 255:25

**differently** [1] - 165:24

**difficult** [5] - 53:19, 183:3, 229:14, 246:11, 273:5

**dining** [11] - 119:22, 147:11, 206:7, 206:9, 212:7, 212:8, 212:14, 212:18, 224:17, 244:12, 245:19

**direct** [1] - 168:16

**directed** [2] - 258:11, 258:19

**direction** [1] - 275:9

**directly** [4] - 128:16, 171:22, 219:13, 275:16

**directors** [1] - 201:13

**dirty** [2] - 209:2, 209:4

**disability** [7] - 32:10, 65:2, 65:9, 65:13, 86:15, 86:17, 175:9

**Disability** [3] - 12:16, 65:23, 193:11

**disagree** [5] - 60:23,

188:10, 274:7, 275:7, 275:8, 275:11, 275:14

**disagreed** [1] - 207:4

**disbelief** [2] - 141:24, 261:10

**discharge** [1] - 229:20

**discharged** [1] - 230:3

**disciplinary** [3] - 198:17, 198:24, 199:2

**disclosed** [1] - 79:15

**disconcerting** [1] - 10:3

**discovery** [2] - 61:3, 63:12

**discuss** [5] - 44:15, 73:5, 208:3, 217:8, 250:10

**discussed** [8] - 39:10, 39:22, 40:7, 40:19, 41:16, 43:21, 178:2, 253:8

**discussing** [1] - 41:22

**discussion** [1] - 260:6

**Discussion** [3] - 46:20, 80:22, 89:8

**discussions** [5] - 38:17, 212:23, 214:8, 214:25, 250:16

**disease** [8] - 29:15, 29:19, 60:14, 60:21, 68:15, 193:21, 194:14, 196:21

**dishes** [2] - 85:5, 97:8

**dismiss** [1] - 170:8

**dismissed** [1] - 26:25

**display** [2] - 117:19, 117:20

**disrespect** [1] - 16:11

**distance** [3] - 18:8, 118:4, 159:12

**DISTRICT** [2] - 1:2, 1:2

**divorce** [3] - 50:3, 51:2, 52:3

**divorced** [1] - 49:15

**doctor** [11] - 68:12, 93:25, 171:11, 171:13, 188:25, 189:17, 193:23, 194:2, 194:7, 194:20, 200:2

**doctor's** [3] - 93:18, 93:21, 93:24

**doctors** [6] - 61:15, 104:5, 193:18, 193:20, 194:4

**document** [6] - 37:15, 46:24, 47:10, 47:13, 47:15, 47:18

**documented** [1] - 46:14

**documents** [5] - 37:3, 42:7, 44:20, 46:5, 46:10

**Donahoe** [4] - 3:3,

168:2, 168:24, 172:8, 181:15

40:24, 185:18, 270:15

**donahoe** [1] - 80:5

**DONAHOE** [30] - 4:9, 4:12, 18:4, 24:6, 30:16, 30:19, 40:12, 43:16, 79:17, 125:12, 134:3, 134:7, 134:10, 134:13, 134:20, 141:3, 147:2, 147:6, 150:11, 150:17, 150:21, 153:2, 153:5, 153:8, 153:11, 185:17, 252:25, 270:18, 271:8, 272:21

**Donald** [1] - 195:13

**Donald's** [1] - 195:14

**done** [24] - 6:20, 27:25, 52:5, 55:17, 84:24, 85:6, 85:11, 85:13, 87:5, 125:23, 148:18, 148:19, 165:12, 175:21, 179:23, 183:3, 183:18, 208:6, 240:14, 240:23, 256:19, 257:16

**door** [17] - 71:19, 82:7, 82:8, 83:7, 89:23, 153:3, 155:7, 155:8, 155:10, 159:7, 159:9, 159:12, 220:8, 247:3, 251:2, 251:3

**door's** [1] - 71:17

**doorway** [3] - 82:4, 119:23, 121:3

**dose** [1] - 181:10

**down** [97] - 8:18, 10:5, 18:7, 25:14, 50:14, 50:15, 58:5, 58:7, 63:12, 82:10, 82:18, 82:20, 85:12, 85:20, 93:2, 93:20, 95:21, 98:21, 99:3, 99:21, 103:4, 103:6, 103:9, 105:2, 105:8, 105:14, 105:17, 106:2, 107:16, 108:7, 115:5, 115:7, 115:11, 131:20, 131:21, 134:23, 136:23, 137:12, 139:4, 139:10, 139:23, 140:2, 146:14, 146:18, 148:8, 148:16, 149:13, 152:9, 152:22, 154:6, 154:21, 160:17, 161:9, 161:10, 162:6, 162:8, 162:13, 170:24, 178:17, 183:8,

186:25, 188:11, 194:12, 200:2, 206:20, 213:10, 213:15, 217:17, 220:11, 222:9, 224:8, 225:15, 225:22, 225:25, 226:23, 232:4, 233:5, 235:10, 235:13, 236:17, 236:19, 236:20, 239:19, 240:9, 240:10, 240:24, 241:11, 244:17, 247:20, 251:15, 252:12, 258:24, 267:3, 267:10, 271:16, 271:23, 272:2

**download** [1] - 269:3

**Dr** [19] - 61:5, 62:10, 167:9, 167:15, 167:16, 167:19, 167:23, 168:21, 170:25, 171:16, 171:20, 172:3, 187:24, 188:2, 188:18, 189:23, 193:22, 193:24, 199:21

**dr** [1] - 61:25

**dragged** [4] - 206:22, 224:3, 244:16, 245:6

**dragging** [2] - 242:9, 265:23

**draw** [3] - 80:9, 80:20, 82:12

**drawing** [3] - 80:20, 81:4, 202:8

**drawn** [4] - 127:9, 127:18, 221:3, 221:9

**dressed** [1] - 108:21

**drew** [1] - 96:5

**drink** [3] - 62:23, 67:2, 67:7

**drinker** [1] - 67:4

**drinking** [4] - 26:22, 26:24, 27:13, 210:24

**drive** [15] - 95:7, 143:5, 143:16, 143:24, 144:3, 144:6, 145:14, 145:15, 175:3, 228:7, 239:10, 243:17, 243:22, 267:20, 268:20

**driveway** [1] - 247:6

**driving** [1] - 211:10

**DRMC** [1] - 61:19

**drove** [1] - 73:16

**drug** [6] - 70:14, 165:8, 165:25, 176:15, 178:11, 180:9

**drugs** [3] - 9:10, 66:13, 66:19

**drying** [1] - 97:8

**DuBois** [4] - 76:7, 76:8, 76:9, 194:7

**due** [1] - 180:9

**duly** [2] - 5:5, 275:6

**Duquesne** [1] - 18:5

**during** [51] - 14:6, 15:19, 24:12, 26:2, 27:8, 28:18, 32:2, 32:7, 32:23, 40:7, 40:22, 41:22, 41:23, 44:17, 44:24, 44:25, 45:2, 45:7, 45:18, 48:5, 59:15, 61:12, 61:22, 65:2, 71:13, 94:18, 95:24, 98:9, 118:18, 119:3, 120:5, 124:2, 124:12, 138:19, 141:9, 147:17, 147:20, 147:23, 148:5, 155:21, 157:8, 158:7, 160:20, 172:17, 174:4, 196:2, 201:21, 212:23, 222:3, 223:11, 250:6

**duties** [1] - 199:11

---

# E

**e-mail** [2] - 233:25, 234:7

**e-mailed** [2] - 233:15, 233:19

**ear** [1] - 239:14

**early** [3] - 182:4, 193:15, 201:5

**easier** [1] - 7:16

**easiest** [1] - 34:2

**east** [2] - 125:9, 125:23

**easy** [4] - 7:23, 175:24, 219:23, 257:5

**eat** [3] - 62:23, 204:4, 204:6

**edge** [1] - 152:10

**education** [2] - 13:7, 24:21

**educational** [2] - 12:24, 21:5

**effective** [1] - 231:9

**effects** [4] - 165:2, 165:25, 170:21, 171:3

**effort** [2] - 226:4, 227:24

**efforts** [1] - 132:21

**egging** [1] - 165:16

**eight** [1] - 232:18

**either** [12] - 32:18, 33:25, 55:19, 130:11, 175:24, 184:11, 189:16,

208:12, 221:2, 250:17, 257:21, 275:16

**elapsed** [3] - 223:9, 245:4, 245:10

**elbow** [1] - 203:17

**eldest** [2] - 55:23, 56:14

**electric** [1] - 230:15

**electrical** [1] - 230:23

**electricity** [9] - 135:10, 138:19, 138:20, 167:5, 167:24, 168:22, 171:7, 172:4, 172:12

**embarrassed** [1] - 30:6

**emergency** [1] - 199:17

**emotional** [6] - 63:15, 63:18, 64:7, 64:18, 142:10

**employed** [8] - 10:11, 10:14, 13:17, 13:23, 34:14, 34:17, 85:19, 196:14

**employee** [4] - 35:17, 196:24, 275:16

**employment** [5] - 10:10, 13:20, 30:21, 34:13, 36:17

**emporium** [1] - 14:11

**EMS** [6] - 162:15, 162:22, 249:10, 249:22, 250:3, 250:24

**encourage** [2] - 80:4, 80:7

**end** [4] - 125:5, 126:17, 176:6, 212:20

**ended** [5] - 131:21, 217:16, 222:22, 236:15, 258:24

**endurance** [1] - 9:13

**enforcement** [1] - 27:18, 70:9, 174:4

**engaged** [1] - 228:2

**enjoy** [1] - 253:24

**enjoyed** [3] - 58:7, 64:19, 181:16

**Enslin** [1] - 17:3

**ENSLIN** [1] - 17:3

**entered** [4] - 215:3, 221:20, 230:22, 255:18

**entire** [3] - 20:8, 28:15, 158:5

**entitled** [4] - 41:9, 163:14, 182:16, 273:10

**entry** [2] - 83:3, 83:5

**environmental** [1] - 11:9

**equipment** [2] - 251:9

**ER** [8] - 42:19, 68:11,

99:13, 99:15, 99:19, 99:25, 100:6, 101:12

**Eric** [2] - 14:21, 49:5

**erratically** [5] - 67:16, 68:4, 69:8, 123:2, 164:14

**especially** [2] - 105:24, 114:6

**Esq** [2] - 2:17, 2:21

**Estate** [1] - 1:6

**estate** [4] - 192:6, 192:10, 192:12, 192:16

**estimate** [4] - 34:2, 151:19, 215:2, 248:17

**estimating** [1] - 18:3

**et** [1] - 274:5

**Eugene** [1] - 48:9

**Eve** [1] - 96:2

**evening** [12] - 90:23, 91:4, 164:14, 164:18, 166:6, 172:16, 197:14, 201:5, 201:24, 202:21, 211:25, 221:9

**events** [2] - 166:2, 239:15

**eventually** [1] - 228:5

**evidentiary** [1] - 10:5

**ex** [2] - 50:18, 182:12

**ex-husband** [2] - 50:18, 182:12

**exact** [8] - 18:3, 21:22, 141:12, 155:12, 162:11, 163:11, 200:13, 231:19

**exactly** [9] - 75:12, 112:24, 128:21, 150:3, 169:17, 223:4, 236:13, 260:23, 268:16

**examination** [1] - 2:4

**EXAMINATION** [6] - 5:8, 185:16, 253:5, 267:15, 270:17, 271:12

**examined** [1] - 5:6

**examiner** [2] - 60:20, 60:24

**example** [3] - 191:20, 196:7, 203:12

**except** [6] - 73:21, 76:21, 131:25, 145:8, 174:24, 208:13

**exertion** [1] - 59:16

**Exhibit** [9] - 46:17, 46:18, 46:23, 56:3, 56:4, 80:24, 81:3, 96:5, 232:6

**EXHIBIT** [4] - 4:17, 4:18, 4:19, 4:20

**exhibit** [2] - 81:18, 202:12

6

**exhibited** [1] - 150:2
**expect** [1] - 174:11
**expecting** [2] - 261:16, 261:18
**expediency** [1] - 80:5
**expenses** [1] - 174:13
**experience** [4] - 12:24, 53:19, 110:22, 273:5
**experienced** [2] - 70:18, 70:22
**expert** [1] - 164:25
**experts** [3] - 168:6, 171:4, 194:22
**explain** [4] - 80:19, 188:8, 209:21, 210:7
**explained** [6] - 42:3, 42:23, 188:6, 188:22, 201:18
**explaining** [2] - 45:10, 205:20
**exposed** [1] - 142:16
**exposure** [2] - 270:3, 270:6
**exposures** [1] - 268:3
**extend** [1] - 82:10
**extra** [1] - 69:18
**eyebrows** [1] - 205:14
**eyes** [3] - 102:7, 102:10, 246:12

## F

**F-O-R-M** [1] - 10:2
**face** [29] - 103:11, 131:18, 131:21, 137:22, 137:23, 154:3, 216:15, 217:14, 217:17, 217:20, 218:12, 219:4, 219:12, 220:12, 222:10, 225:22, 225:25, 226:11, 226:18, 235:10, 240:8, 240:9, 240:10, 244:17, 246:7, 246:13, 262:3
**Facebook** [1] - 140:25
**facility** [1] - 27:4
**facing** [11] - 96:12, 110:3, 120:22, 127:4, 127:6, 127:7, 152:7, 152:21, 152:23, 154:3, 266:12
**fact** [7] - 41:4, 51:11, 53:21, 66:9, 72:7, 168:6, 268:13
**factory** [4] - 13:24, 14:4, 14:8, 14:10
**facts** [2] - 9:6, 168:17
**factual** [1] - 168:17
**failed** [2] - 209:19, 275:14

**fair** [7] - 8:10, 8:14, 9:20, 18:9, 50:22, 80:14, 128:20
**fairly** [2] - 18:17, 127:22
**fall** [3] - 89:21, 225:15, 259:4
**falls** [1] - 239:18
**familiar** [2] - 94:13, 132:8
**family** [13] - 21:24, 32:19, 37:22, 53:11, 54:5, 54:19, 55:3, 55:19, 62:7, 73:22, 253:22, 254:5, 254:14
**fantastic** [1] - 8:16
**far** [4] - 8:16, 8:22, 17:22, 212:3
**farm** [1] - 15:12
**fast** [2] - 130:24, 216:7
**father** [6] - 16:21, 49:14, 49:21, 49:23, 49:24, 49:25
**father's** [2] - 55:3, 55:18
**fault** [1] - 169:3
**favorite** [2] - 183:14, 183:15
**favorites** [1] - 183:12
**February** [6] - 49:10, 175:25, 177:14, 177:18, 178:5, 178:8
**Federal** [1] - 2:5
**feet** [23] - 18:3, 83:7, 97:25, 118:7, 128:2, 144:22, 152:25, 154:6, 154:21, 156:19, 203:2, 203:3, 206:2, 217:23, 218:13, 219:7, 219:21, 225:18, 226:23, 236:11, 242:8, 262:12, 262:14
**fell** [8] - 86:21, 131:15, 178:17, 178:18, 236:17, 236:19, 236:20, 259:3
**felt** [15] - 11:20, 73:9, 74:5, 74:7, 78:22, 83:10, 103:24, 149:21, 151:15, 155:4, 163:19, 164:4, 189:18, 264:10
**few** [31] - 8:5, 16:8, 27:11, 50:11, 83:7, 84:23, 85:7, 101:24, 104:11, 123:10, 133:2, 133:16, 138:10, 161:12, 163:24, 168:7, 170:16, 183:2, 185:22, 185:23, 190:14, 200:15,

202:5, 210:9, 252:14, 253:7, 253:23, 255:13, 271:14, 272:11, 272:12
**Fields** [1] - 2:21
**flELDS** [1] - 4:8
**FIELDS** [33] - 4:11, 5:9, 38:19, 39:4, 39:7, 39:13, 39:23, 40:5, 40:6, 40:23, 41:18, 41:20, 43:24, 56:2, 79:12, 79:18, 80:3, 94:10, 125:8, 135:9, 147:12, 150:9, 151:2, 151:5, 153:12, 168:10, 168:19, 168:20, 185:13, 267:16, 270:14, 272:23, 273:2
**fight** [6] - 76:21, 76:24, 111:20, 112:6, 116:3, 216:20
**fighting** [4] - 77:11, 77:13, 110:23, 111:8
**fights** [2] - 111:24, 215:25
**figured** [10] - 113:18, 113:19, 113:24, 113:25, 114:17, 157:10, 164:6, 216:13, 256:5, 256:6
**file** [3] - 51:21, 169:19, 193:13
**filed** [3] - 11:22, 47:19, 193:12
**filing** [1] - 193:15
**fill** [2] - 94:5, 192:16
**filters** [1] - 34:12
**final** [1] - 270:2
**finally** [2] - 148:19, 178:20
**financial** [1] - 30:22
**financially** [3] - 29:10, 31:15, 32:23
**fine** [20] - 39:20, 71:3, 100:22, 114:13, 142:9, 189:14, 190:14, 197:3, 198:13, 205:16, 215:8, 222:3, 230:24, 236:14, 239:7, 239:8, 242:17, 243:13, 252:7, 252:23
**finish** [1] - 159:21
**firearms** [2] - 190:25, 191:3
**fired** [1] - 36:21
**firm** [1] - 172:10
**first** [44] - 5:5, 11:6, 37:6, 37:13, 43:9, 48:8, 60:16, 65:11, 65:16, 66:6, 78:17, 91:17, 92:2, 107:10,

113:6, 124:3, 133:21, 135:14, 135:17, 136:8, 151:25, 154:14, 163:9, 174:6, 185:11, 186:2, 186:5, 189:25, 191:14, 209:12, 210:19, 215:3, 226:18, 233:23, 238:13, 251:12, 251:17, 253:13, 255:21, 261:24, 268:6, 268:20, 268:22, 275:5
**fish** [1] - 190:22
**fishing** [1] - 190:24
**fist** [4] - 105:14, 105:16, 257:8, 257:9
**fists** [1] - 105:11
**five** [7] - 59:6, 59:21, 63:13, 93:4, 118:7, 162:12, 186:12
**flat** [1] - 237:13
**flipping** [1] - 242:6
**Floor** [2] - 2:10, 3:4
**floor** [37] - 36:7, 134:22, 135:2, 139:10, 140:6, 141:15, 145:11, 153:18, 153:19, 155:3, 156:4, 179:2, 179:7, 203:9, 206:23, 217:23, 218:17, 218:19, 224:4, 226:24, 236:21, 239:19, 239:20, 239:22, 240:18, 240:19, 242:9, 244:17, 245:7, 260:23, 260:25, 261:2, 262:10, 265:18, 265:20, 266:4
**focused** [1] - 119:2
**foggy** [1] - 162:6
**folks** [3] - 249:22, 250:3, 250:25
**follow** [3] - 150:25, 183:3, 184:10, 195:4, 209:17, 209:20, 253:7, 267:17
**follow-up** [4] - 150:25, 184:10, 253:7, 267:17
**follow-ups** [2] - 183:3, 195:4
**followed** [3] - 161:9, 161:10, 162:8
**following** [5] - 163:10, 184:12, 184:25, 210:23, 274:8
**follows** [1] - 5:6
**food** [3] - 31:13, 203:19, 216:7

**foods** [2] - 62:25, 63:4
**foot** [1] - 203:4
**footage** [1] - 97:22
**FOR** [1] - 1:2
**Forbes** [2] - 2:11, 3:5
**force** [1] - 228:3
**foregoing** [2] - 274:7, 275:7
**forehead** [6] - 131:13, 131:19, 204:13, 204:25, 205:3, 205:13
**foreign** [1] - 194:9
**forget** [1] - 210:18
**forgive** [1] - 33:9
**forgot** [3] - 9:12, 15:8, 53:18
**form** [2] - 10:2, 10:4
**former** [1] - 5:21
**forms** [1] - 65:22
**forth** [3] - 89:18, 155:21, 215:2
**forward** [2] - 13:21, 53:23
**fought** [2] - 112:9, 131:25
**four** [26] - 21:15, 52:23, 78:22, 78:25, 97:13, 111:4, 118:12, 128:2, 136:14, 143:13, 195:24, 196:2, 203:2, 203:4, 203:7, 204:22, 205:5, 218:8, 232:13, 234:12, 235:19, 249:18, 251:6, 251:7, 251:8, 269:19
**fourth** [2] - 269:15, 270:2
**frame** [1] - 59:6
**free** [1] - 228:25
**friend** [2] - 32:20, 37:23
**friends** [13] - 21:23, 50:24, 52:17, 58:23, 73:22, 111:23, 163:18, 184:13, 195:9, 195:17, 196:4, 197:2, 254:5
**friends'** [1] - 254:15
**FROM** [1] - 1:23
**front** [23] - 83:7, 96:17, 97:7, 110:2, 114:6, 120:19, 130:3, 131:8, 207:16, 207:23, 218:14, 226:2, 226:7, 226:13, 227:10, 227:12, 227:14, 227:15, 227:17, 227:20, 228:25, 232:8
**fuel** [2] - 107:4, 107:5
**full** [10] - 5:11, 13:19, 31:21, 35:25, 36:17,

8

114:23, 114:25, 116:21, 186:8, 260:10
**full-time** [3] - 13:19, 35:25, 36:17
**fully** [1] - 183:8
**funeral** [6] - 52:18, 52:25, 174:14, 201:10, 201:12, 201:19
**funny** [1] - 90:21
**furnace** [2] - 208:20, 210:6
**furniture** [2] - 227:13, 227:15
**future** [1] - 184:8

**G**

**gap** [1] - 268:24
**garbage** [2] - 11:18, 85:12
**gas** [1] - 184:2
**gathering** [2] - 46:9, 175:17
**GED** [3] - 13:3, 13:4, 13:9
**Geez** [1] - 112:10
**general** [3] - 61:14, 79:23, 91:13
**General** [5] - 2:10, 3:4, 61:18, 185:20, 201:2
**generally** [2] - 9:24, 55:15
**gentleman** [3] - 56:9, 56:17, 56:22
**gentlemen** [1] - 181:9
**geography** [1] - 94:13
**George** [2] - 61:25, 62:10
**ghosts** [1] - 84:11
**girlfriend** [1] - 64:9
**girls** [7] - 105:21, 105:25, 106:5, 106:8, 107:19, 158:15, 161:5
**given** [5] - 87:22, 160:14, 193:19, 274:7, 275:9
**gladly** [1] - 184:2
**glanced** [1] - 37:5
**glancing** [1] - 37:13
**glasses** [1] - 178:25
**glassy** [1] - 102:11
**grab** [2] - 132:25
**grabbed** [3] - 149:19, 216:14, 257:5
**grade** [1] - 12:25
**grades** [2] - 23:15, 23:18
**graduate** [1] - 21:14
**graduated** [5] - 21:6, 21:18, 24:4, 62:15, 271:6
**graduation** [1] - 23:24

**Grandma** [1] - 90:20
**grandmother** [1] - 33:2
**grandson** [1] - 14:19
**grandson's** [1] - 14:20
**gray** [2] - 56:23, 109:6
**grayish** [1] - 246:13
**greasy** [1] - 62:24
**great** [4] - 8:22, 19:19, 82:17, 234:9
**grip** [2] - 132:3, 132:18
**grips** [1] - 138:8
**groaned** [2] - 148:18, 240:13, 240:22
**grocery** [1] - 34:23
**ground** [11] - 7:13, 146:4, 152:6, 163:5, 218:13, 218:17, 219:21, 236:7, 236:9, 260:16, 260:18
**grounds** [1] - 40:2
**group** [1] - 196:3
**groups** [1] - 195:6
**growing** [2] - 61:24, 111:21
**guess** [16] - 22:8, 26:17, 94:23, 111:10, 166:4, 209:17, 210:8, 211:8, 226:8, 233:21, 233:24, 258:16, 258:18, 262:13, 270:4, 270:5
**guessing** [1] - 22:14
**guilty** [3] - 26:25, 27:2, 159:18
**gun** [10] - 133:6, 133:24, 135:5, 135:8, 139:24, 166:16, 235:17, 237:22, 239:10, 242:13
**guns** [2] - 191:6, 191:8
**gurgling** [4] - 157:5, 246:5, 265:14, 265:15
**gurney** [1] - 252:2
**GUY** [2] - 1:9, 274:5
**guy** [10] - 15:12, 111:18, 112:15, 134:18, 136:23, 136:24, 161:22, 210:8, 210:13, 257:21
**guys** [1] - 84:9
**gym** [1] - 58:12
**gyms** [1] - 58:23

**H**

**habit** [2] - 33:16, 34:9
**hairline** [1] - 205:14

**half** [22] - 16:24, 16:25, 33:11, 50:19, 51:8, 51:12, 73:19, 114:23, 114:25, 116:20, 117:8, 124:5, 184:24, 225:21, 226:22, 236:2, 236:4, 236:7, 236:8, 236:10, 268:10, 269:20
**half-brother** [1] - 16:24
**half-full** [1] - 114:23
**half-sister** [1] - 16:25
**half-standing** [1] - 236:2
**hall** [5] - 98:6, 159:3, 159:9, 206:10, 227:7
**Hall** [5] - 28:14, 38:2, 44:3, 76:22, 91:5
**Hall's** [3] - 17:15, 80:9, 81:8
**hallway** [12] - 82:9, 82:10, 82:18, 82:20, 82:22, 82:23, 83:2, 83:6, 103:5, 103:7, 119:12, 179:7
**hand** [22] - 46:22, 80:16, 81:2, 81:19, 82:3, 103:19, 119:25, 124:14, 136:4, 136:5, 138:12, 139:21, 139:22, 149:12, 179:21, 221:20, 221:22, 225:8, 228:20, 231:17, 243:4, 275:18
**handcuff** [2] - 131:25, 135:4, 145:21, 220:16, 240:11
**handcuffed** [15] - 136:6, 136:7, 136:8, 154:15, 207:15, 226:5, 228:16, 228:18, 240:16, 240:18, 241:17, 248:9, 248:11, 262:8, 266:8
**handcuffs** [15] - 136:4, 136:10, 160:12, 207:7, 207:10, 207:13, 221:12, 221:19, 221:23, 221:24, 251:20, 260:7, 266:3, 266:7
**handle** [1] - 157:12
**handled** [1] - 208:5
**hands** [11] - 124:8, 132:4, 132:6, 218:14, 221:25, 225:25, 226:6, 228:23, 228:25, 240:17, 244:10
**Hanes** [1] - 173:2

**hang** [1] - 85:14
**hard** [16] - 103:12, 103:14, 131:18, 131:19, 179:18, 183:12, 185:12, 234:25, 241:8, 256:24, 256:25, 257:4, 257:14, 257:15, 257:18, 260:25
**hat** [2] - 56:17, 56:22
**hats** [1] - 109:2
**head** [14] - 8:20, 128:8, 149:13, 153:5, 200:18, 204:20, 216:14, 218:20, 218:22, 219:6, 219:8, 228:22, 234:25, 237:7
**head-butted** [1] - 216:14
**headquarters** [2] - 249:12, 249:14
**heal** [2] - 184:12, 185:10
**health** [4] - 59:20, 62:12, 63:18, 75:23
**Health** [1] - 61:19
**hear** [25] - 10:3, 40:4, 68:23, 83:9, 114:3, 118:8, 134:13, 144:24, 144:25, 155:11, 157:14, 157:21, 157:22, 158:3, 158:5, 158:16, 159:13, 179:6, 183:9, 208:24, 230:15, 250:10, 250:13, 271:25, 272:5
**heard** [25] - 71:19, 142:3, 142:4, 157:5, 159:16, 167:15, 174:6, 179:10, 198:14, 208:13, 208:17, 208:19, 208:21, 209:12, 211:22, 216:20, 222:18, 222:21, 230:23, 235:5, 245:12, 245:18, 246:5, 247:4, 267:23
**hearing** [2] - 7:3, 231:2
**heart** [25] - 53:12, 54:5, 54:8, 55:4, 55:13, 55:19, 55:21, 60:14, 60:20, 103:13, 130:18, 166:18, 166:19, 167:3, 167:6, 167:24, 168:23, 169:16, 171:8, 171:22, 172:5, 172:12, 180:5,

180:21
**heat** [1] - 133:14
**heated** [1] - 131:2
**heater** [3] - 210:3, 210:5, 210:12
**heavier** [1] - 173:6
**heavy** [3] - 112:19, 133:17, 173:12
**held** [13] - 11:5, 11:7, 35:22, 46:20, 80:22, 89:8, 131:20, 133:24, 169:7, 179:20, 206:20, 213:10, 213:15
**hell** [1] - 111:16
**help** [10] - 29:10, 31:3, 68:15, 74:20, 95:18, 104:7, 125:10, 179:18, 244:5, 244:22
**helped** [6] - 29:16, 68:9, 107:3, 183:16, 184:6, 253:16
**helping** [2] - 32:23, 107:2
**hereby** [1] - 275:5
**herein** [3] - 2:3, 5:5, 275:7
**hereunto** [1] - 275:18
**Hershberger** [3] - 2:7, 275:4, 275:22
**high** [32] - 12:22, 13:7, 13:21, 21:4, 21:6, 21:14, 23:18, 24:12, 24:18, 24:20, 33:19, 33:21, 54:10, 54:14, 54:15, 57:6, 57:9, 57:11, 62:15, 68:2, 176:10, 181:16, 202:24, 203:3, 203:8, 203:17, 216:4, 270:20, 270:25
**High** [1] - 270:21
**higher** [1] - 203:15
**Hill** [5] - 2:18, 17:14, 17:20, 18:12, 28:8
**himself** [7] - 58:4, 68:13, 144:23, 145:12, 156:23, 175:14, 207:16
**hire** [1] - 74:5
**hired** [1] - 171:4
**history** [2] - 30:21, 34:14
**hit** [8] - 105:16, 106:3, 115:25, 166:17, 200:18, 215:22, 234:25, 257:13
**hitting** [1] - 105:24
**hobbies** [1] - 190:16
**hold** [4] - 31:21, 35:4, 35:25, 235:13
**holding** [10] - 85:20, 136:23, 139:8, 146:14, 146:18,

148:8, 148:16, 149:9, 224:7, 250:20
**hole** [2] - 83:10, 83:11
**holiday** [1] - 96:2
**holster** - 221:3, 221:6
**home** [22] - 23:3, 23:5, 33:7, 58:25, 59:2, 73:3, 76:18, 84:25, 85:3, 85:5, 85:8, 89:20, 98:3, 170:3, 178:16, 187:9, 194:13, 196:10, 201:10, 210:23, 254:22
**honest** [1] - 148:13
**honestly** [1] - 146:12
**honors** [1] - 24:13
**hood** [1] - 173:7
**HOOFTALLEN** [1] - 1:6
**Hooftallen** [23] - 5:18, 5:22, 6:2, 6:8, 14:21, 14:25, 15:2, 15:20, 16:4, 16:8, 39:12, 40:9, 40:25, 41:23, 48:9, 49:5, 49:14, 51:3, 51:7, 56:15, 57:2, 182:12, 182:16
**Hooftallens** [1] - 16:9
**hoops** [1] - 58:6
**hope** [3] - 169:18, 169:22, 273:7
**hopefully** [1] - 126:2
**hoping** [1] - 170:11
**Hospital** [6] - 10:17, 10:20, 76:8, 161:11, 162:7, 201:3
**hospital** [8] - 68:11, 71:11, 73:4, 76:7, 76:11, 173:25, 197:16, 199:24
**hospitals** [2] - 61:8, 61:17
**hour** [4] - 33:12, 71:4, 85:10, 89:16
**hour-long** [1] - 89:16
**hours** [6] - 33:14, 48:19, 76:13, 84:23, 85:7, 161:12
**house** [47] - 17:15, 17:17, 26:7, 26:10, 28:18, 45:9, 64:20, 71:16, 72:13, 72:14, 72:16, 79:8, 81:8, 82:4, 84:4, 84:5, 84:14, 84:18, 85:14, 86:2, 86:5, 87:5, 87:7, 87:18, 88:19, 88:20, 88:23, 88:25, 97:7, 97:15, 97:19, 97:21, 111:23, 118:10, 118:13, 157:25, 161:7, 161:10, 170:6, 184:2, 191:4, 191:7,

198:11, 201:23, 212:2, 221:20, 243:25
**household** [1] - 32:3
**housekeeping** [2] - 11:9, 57:7
**hugging** [1] - 155:25
**hugs** [4] - 100:9, 101:2, 101:18, 102:9
**human** [1] - 169:6
**hundreds** [3] - 171:2, 171:3
**hunting** [1] - 190:19, 190:20
**hurry** [1] - 71:23
**hurrying** [1] - 11:19
**hurt** [1] - 211:12
**hurting** [2] - 178:23, 183:21
**husband** [2] - 50:18, 182:12
**husband's** [1] - 5:21

---

**I**

**idea** [8] - 65:16, 117:12, 192:2, 217:6, 223:8, 224:19, 239:4, 239:8
**identifiable** [1] - 109:8
**identification** [4] - 46:19, 56:5, 80:25, 232:7
**identify** [7] - 47:4, 56:12, 56:18, 56:23, 80:12, 81:3, 197:22
**ignored** [1] - 166:9
**illegal** [1] - 66:13
**immediate** [1] - 186:16
**immediately** [2] - 69:9, 225:24
**implements** [1] - 221:8
**important** [5] - 8:6, 8:23, 9:12, 22:10, 148:15
**impossible** [2] - 171:7, 172:4
**impression** [1] - 205:4
**improperly** [1] - 208:6
**improvements** [1] - 185:4
**IN** [2] - 1:2, 275:18
**inappropriate** [1] - 214:7
**INC** [1] - 1:12
**Inc** [3] - 2:4, 2:20, 2:21
**inch** [2] - 204:22, 204:23
**inches** [3] - 203:7, 204:22, 205:5
**incident** [91] - 11:14, 15:3, 15:18, 15:19, 15:20, 15:22, 15:25,

16:15, 17:10, 17:13, 18:13, 18:15, 18:17, 19:16, 33:14, 44:18, 44:25, 45:2, 45:10, 45:11, 48:20, 52:7, 63:20, 67:13, 68:17, 71:14, 77:11, 77:15, 78:17, 78:18, 79:2, 79:14, 79:20, 79:25, 80:10, 81:6, 81:11, 83:13, 83:18, 83:23, 88:17, 89:6, 91:12, 91:15, 98:9, 105:15, 113:23, 118:22, 119:3, 124:2, 130:15, 151:10, 155:22, 157:9, 163:10, 163:21, 163:22, 163:23, 172:17, 174:5, 177:2, 177:10, 181:11, 181:12, 185:22, 186:9, 186:15, 188:7, 191:17, 193:11, 195:20, 197:3, 197:6, 199:16, 199:22, 201:6, 201:21, 201:23, 205:22, 208:4, 209:7, 209:24, 211:13, 212:20, 212:23, 216:3, 216:4, 216:19, 216:22, 232:19, 239:3
**incidents** [1] - 210:16
**including** [1] - 169:11
**income** [2] - 31:25, 32:3
**incur** [1] - 174:13
**Indiana** [6] - 93:22, 93:24, 94:7, 193:23, 194:2, 194:23
**indiana** [1] - 94:8
**indicate** [2] - 204:12, 248:22
**indicated** [8] - 176:14, 189:22, 211:20, 212:3, 213:21, 218:14, 225:6, 243:16
**indicates** [1] - 90:10
**indicating** [51] - 81:12, 81:14, 81:15, 81:16, 82:12, 82:13, 83:6, 98:6, 103:4, 103:6, 108:16, 114:23, 115:23, 116:16, 119:12, 119:13, 119:14, 119:20, 119:22, 120:20, 121:3, 125:5, 126:18, 127:3, 127:5, 127:7, 129:22, 130:4,

130:5, 131:9, 139:16, 139:17, 139:21, 146:22, 152:8, 152:10, 152:12, 153:22, 159:2, 159:5, 171:23, 206:11, 212:9, 218:24, 219:2, 219:9, 227:3, 227:21, 252:5, 252:6
**indicating** [11] - 17:25, 82:5, 82:21, 121:4, 127:17, 146:25, 147:5, 153:21, 155:17, 212:5, 212:9
**indication** [1] - 66:6
**indications** [1] - 189:18
**indirectly** [1] - 275:17
**individual** [3] - 56:12, 56:19, 56:24
**individually** [1] - 1:5
**individuals** [3] - 61:10, 61:11, 148:3
**influence** [1] - 9:9
**influenced** [1] - 165:6
**informal** [1] - 7:23
**information** [8] - 26:18, 39:17, 42:7, 118:9, 137:7, 172:10, 190:15
**ingestion** [1] - 164:21
**ingredient** [1] - 68:14
**initial** [3] - 222:3, 228:11, 228:14
**injured** [1] - 11:10
**injury** [2] - 6:25, 185:7
**insensitive** [1] - 53:21
**inside** [7] - 42:18, 80:9, 95:11, 132:12, 152:8, 247:24, 264:24
**inspection** [1] - 275:11
**instance** [1] - 38:2
**instances** [1] - 163:6
**instantly** [4] - 115:7, 116:7, 131:7, 213:7
**instead** [2] - 93:8, 169:10
**instruct** [1] - 168:13
**instructing** [2] - 39:25, 41:11
**insulin** [1] - 176:7
**insurer** [1] - 12:3
**intent** [2] - 53:20, 53:21
**intention** [1] - 273:6
**intents** [1] - 52:4
**interaction** [2] - 255:17, 256:12, 258:23, 258:25
**interactions** [1] - 27:17
**interested** [4] - 13:21,

39:9, 122:7, 275:16
**internal** [1] - 61:15
**INTERNATIONAL** [1] - 1:12
**International** [5] - 2:4, 2:20, 2:21, 166:13, 169:3
**interrupt** [3] - 24:7, 100:11, 123:7
**interrupted** [1] - 112:20
**interview** [1] - 45:18
**intoxicating** [1] - 9:10
**inventory** [1] - 193:4
**investigator** [2] - 43:15, 43:20
**involved** [4] - 11:14, 254:10, 254:15, 254:17
**involves** [1] - 57:17
**involving** [2] - 15:20, 181:11
**irritating** [1] - 165:16
**IS** [1] - 1:23
**Isaiah** [1] - 2:21
**issue** [4] - 64:16, 172:13, 178:3, 182:7
**issues** [5] - 55:4, 57:9, 57:11, 64:8, 104:8
**items** [1] - 190:14
**itself** [1] - 165:16

---

**J**

**J-E-A-N** [1] - 5:14
**J-E-N-K-I-N-S** [1] - 17:4
**janitorial** [1] - 14:5
**January** [1] - 177:18
**JEAN** [6] - 1:15, 2:2, 5:4, 274:6, 274:21, 275:5
**Jean** [3] - 5:12, 5:13, 5:18
**Jeanette** [1] - 233:5
**jeans** [1] - 172:18
**Jeep** [6] - 87:12, 93:9, 95:7, 95:10, 211:9, 211:11
**jefferson** [1] - 249:13
**Jefferson** [4] - 192:14, 193:6, 233:4, 249:14
**JEFFERSON** [1] - 274:2
**Jenkins** [1] - 17:4
**jerked** [2] - 232:4, 238:9
**jersey** [1] - 173:6
**job** [15] - 8:16, 8:22, 11:11, 29:23, 30:2, 30:3, 31:16, 35:4, 35:21, 36:21, 59:25, 73:13, 74:4
**jobs** [6] - 13:22, 14:6, 31:21, 35:25, 36:2,

85:20
**jog** [1] - 58:15
**jogger** [1] - 58:14
**johnson** [1] - 222:24
**Johnson** [32] - 156:10, 156:14, 156:18, 211:20, 211:23, 219:22, 219:24, 220:5, 220:15, 220:20, 221:5, 221:11, 223:7, 223:12, 223:16, 223:19, 224:20, 229:8, 229:15, 241:18, 243:20, 244:2, 246:18, 246:20, 247:24, 250:8, 257:22, 264:5, 264:25, 265:3, 267:7, 267:9
**JOHNSON** [2] - 1:10, 274:5
**Judge** [1] - 10:6
**jump** [5] - 8:24, 14:24, 80:6, 95:7, 116:9
**jumped** [4] - 116:5, 213:3, 213:4, 213:7
**jumping** [1] - 218:8
**June** [1] - 232:18

## K

**keep** [14] - 8:5, 32:4, 50:12, 53:7, 71:6, 71:7, 73:13, 75:10, 133:14, 154:18, 226:13, 228:24, 237:25, 245:20
**keeping** [1] - 138:9
**kept** [12] - 76:9, 76:12, 93:22, 123:23, 132:5, 132:24, 178:24, 191:12, 211:5, 224:7, 234:6, 255:25
**key** [1] - 125:18
**kicking** [3] - 149:23, 149:24, 242:3
**kid** [2] - 216:15, 216:17
**kids** [9] - 27:11, 48:16, 84:25, 158:7, 161:8, 183:12, 183:13, 218:8, 271:7
**kill** [1] - 199:9
**killing** [1] - 190:21
**Kim** [60] - 17:15, 28:14, 32:19, 38:2, 44:3, 44:5, 44:17, 45:5, 45:6, 45:25, 46:9, 76:22, 76:24, 77:11, 78:4, 80:9, 81:8, 90:24, 91:5, 93:4, 93:11, 93:14, 94:16, 94:17, 97:7,

97:10, 98:17, 98:22, 103:15, 118:17, 146:22, 155:23, 157:15, 158:17, 158:24, 159:15, 159:16, 159:25, 161:9, 183:25, 201:24, 205:20, 205:22, 206:17, 208:3, 209:11, 210:7, 210:8, 210:12, 217:8, 224:11, 224:12, 244:22, 249:25, 250:17, 250:19, 250:23, 252:12
**kim** [1] - 161:4
**Kim's** [7] - 32:3, 45:9, 79:8, 88:23, 91:20, 201:23, 249:17
**Kimberly** [1] - 190:6
**Kimberly's** [2] - 191:4, 191:7
**kind** [45] - 27:3, 31:18, 32:10, 34:2, 44:19, 44:20, 50:20, 55:4, 55:20, 64:7, 65:22, 65:23, 68:2, 68:21, 78:13, 82:13, 88:8, 94:25, 95:22, 103:18, 103:19, 104:18, 108:15, 116:15, 117:19, 128:17, 129:20, 132:14, 137:7, 145:22, 159:19, 161:21, 172:20, 184:19, 191:24, 194:8, 199:6, 218:7, 225:19, 226:9, 227:19, 236:20, 241:4, 246:13, 258:6
**kitchen** [44] - 80:10, 81:21, 83:4, 83:5, 92:17, 92:20, 97:8, 98:17, 103:15, 118:20, 118:22, 119:16, 119:18, 120:3, 146:23, 147:11, 155:23, 157:13, 158:17, 158:24, 159:3, 159:9, 159:24, 202:3, 202:9, 202:13, 203:9, 203:19, 204:2, 205:22, 206:12, 212:12, 219:16, 219:18, 224:2, 224:12, 224:16, 224:23, 235:3, 245:15, 245:17, 250:22, 264:24, 266:2
**knee** [41] - 134:23, 136:21, 139:9,

139:10, 139:14, 149:8, 149:10, 149:11, 153:25, 154:4, 189:2, 189:5, 189:8, 189:15, 200:20, 206:25, 207:2, 213:11, 213:16, 213:21, 224:6, 226:23, 235:12, 237:4, 237:8, 237:15, 237:25, 238:18, 238:21, 239:5, 239:23, 239:25, 244:19, 244:20, 244:25, 245:8, 245:9, 245:20, 246:2, 260:12, 260:14
**kneeled** [1] - 272:2
**kneeling** [6] - 150:18, 219:13, 229:3, 237:12, 260:8, 260:9
**knees** [10] - 134:23, 139:5, 155:3, 218:16, 218:18, 219:20, 222:8, 222:9, 236:7, 236:9
**knock** [1] - 112:14
**knocked** [7] - 205:11, 222:8, 232:3, 257:17, 257:20, 257:23, 259:7
**knowing** [1] - 39:9
**knowledge** [10] - 22:6, 22:11, 22:20, 22:24, 48:22, 65:20, 67:7, 70:22, 148:4, 253:19
**known** [3] - 100:16, 177:25, 215:21

## L

**L-shaped** [1] - 147:10
**L-U-C-K-A-S-E-V-I-C** [1] - 188:16
**label** [1] - 125:10
**laid** [1] - 201:9
**land** [1] - 229:23
**landed** [2] - 239:22, 240:19
**lands** [1] - 218:12
**Lane** [4] - 17:14, 17:20, 18:12, 28:9
**lapse** [1] - 35:8
**large** [2] - 11:18, 181:9
**last** [19] - 6:7, 10:13, 19:15, 37:14, 62:3, 89:10, 118:21, 123:15, 135:23, 182:24, 183:5, 187:22, 195:14, 197:8, 215:2, 240:21, 259:6,

266:24, 266:25
**lasted** [1] - 268:4
**lastly** [1] - 266:23
**late** [1] - 95:6
**laughed** [2] - 114:2, 256:8
**laughing** [3] - 216:8, 216:11, 216:17
**law** [3] - 27:17, 70:8, 174:4
**lawn** [1] - 88:2
**lawsuit** [14] - 47:6, 47:8, 47:18, 51:9, 51:18, 51:21, 52:13, 52:18, 53:4, 53:8, 57:15, 169:19, 169:22
**lawsuits** [1] - 169:19
**lawyer** [2] - 163:10, 197:15
**lawyers** [1] - 51:15
**lay** [1] - 266:5
**laying** [14] - 103:9, 132:4, 134:25, 152:7, 152:9, 153:22, 156:4, 161:23, 179:7, 237:13, 240:8, 262:19, 263:8, 266:3
**leading** [8] - 57:20, 58:8, 59:6, 76:25, 79:2, 83:12, 174:19, 181:12
**lean** [1] - 129:13
**leaned** [3] - 130:8, 130:11, 131:6
**leaning** [1] - 261:25
**learn** [5] - 60:17, 66:18, 66:21, 72:7, 210:12
**learned** [1] - 211:17
**least** [5] - 65:11, 76:20, 112:2, 251:6, 251:7
**leave** [4] - 85:8, 115:12, 170:18, 183:22
**leaving** [1] - 137:5
**LEE** [1] - 1:6
**Lee** [1] - 56:25
**left** [32] - 56:9, 81:21, 82:3, 96:12, 96:14, 120:17, 121:10, 126:14, 129:16, 130:5, 135:22, 139:9, 149:11, 161:25, 162:11, 175:15, 210:22, 220:3, 220:17, 220:19, 220:23, 223:16, 223:25, 231:21, 231:22, 235:12, 235:21, 238:10, 239:23, 244:18, 259:3, 266:5
**left-hand** [1] - 82:3

**leg** [14] - 86:23, 136:16, 146:14, 149:19, 151:12, 238:18, 241:12, 241:25, 243:19, 243:21, 244:3, 244:14, 269:16
**legal** [2] - 5:11, 43:23
**legally** [1] - 182:18
**legs** [24] - 136:19, 137:24, 139:4, 144:8, 145:4, 145:9, 145:18, 146:15, 146:18, 148:8, 148:16, 149:18, 149:22, 150:4, 151:25, 152:3, 153:6, 156:21, 220:14, 224:14, 226:23, 241:22, 242:8, 242:24
**Lenahan** [1] - 163:16
**length** [2] - 205:10
**less** [2] - 268:9, 269:5
**letting** [1] - 135:4
**level** [1] - 203:12
**leverage** [3] - 144:22, 145:11, 242:10
**LGH** [1] - 274:24
**license** [8] - 26:16, 26:17, 26:20, 184:16, 184:18, 255:9, 255:10
**lid** [1] - 114:24
**lie** [1] - 181:24
**life** [21] - 14:7, 21:11, 36:21, 48:5, 61:12, 61:22, 73:9, 103:21, 104:2, 106:24, 113:25, 114:18, 142:17, 183:7, 183:10, 253:22, 254:4, 254:10, 254:16, 254:24, 256:7
**LifeFlight** [1] - 162:5
**LifeFlighted** [1] - 86:21
**lifetime** [1] - 27:9
**lift** [2] - 58:18, 238:25
**lifted** [6] - 58:17, 59:3, 155:2, 229:16, 246:16, 264:5
**light** [1] - 87:24
**lightening** [2] - 135:7, 135:8
**lights** [2] - 211:3, 211:6
**likely** [1] - 180:20
**Lina** [4] - 2:7, 7:16, 9:2, 275:4
**Line** [1] - 274:9
**line** [2] - 184:18, 243:13
**lines** [3] - 232:13, 234:12, 240:21

**lineup** [1] - 150:22
**listened** [1] - 115:8
**Litigation** [1] - 2:17
**live** [15] - 14:18, 15:15, 17:5, 17:11, 18:21, 19:10, 19:12, 20:18, 25:16, 25:22, 28:5, 28:10, 28:14, 33:6, 48:14
**lived** [18] - 17:7, 18:11, 18:14, 19:16, 20:8, 21:10, 26:2, 26:7, 26:14, 28:3, 58:5, 89:3, 89:19, 174:25, 175:2, 184:4, 195:21
**lives** [3] - 253:23, 254:15
**living** [45] - 14:15, 19:24, 20:25, 24:23, 25:2, 25:7, 80:9, 81:22, 82:19, 83:3, 86:7, 87:14, 87:15, 87:22, 96:8, 98:20, 98:21, 103:7, 108:14, 119:18, 120:2, 126:6, 126:14, 147:6, 147:8, 147:9, 152:6, 155:17, 159:6, 159:8, 184:4, 184:5, 202:10, 202:14, 206:4, 206:8, 212:15, 215:3, 223:14, 224:2, 224:21, 235:3, 245:16, 248:6, 265:2
**local** [1] - 94:13
**located** [6] - 36:10, 80:13, 202:15, 205:22, 206:14, 212:4
**location** [2] - 196:6, 205:9
**long-sleeved** [3] - 133:16, 173:12, 173:15
**longest** [1] - 175:6
**look** [15] - 37:11, 71:20, 81:11, 81:12, 104:20, 126:3, 148:14, 154:11, 154:19, 154:22, 159:3, 234:6, 240:20, 245:25, 246:10
**looked** [19] - 11:18, 37:14, 68:2, 95:21, 99:6, 104:20, 110:7, 110:9, 140:16, 140:25, 155:23, 179:3, 179:4, 181:4, 224:11, 240:21, 246:13, 257:4, 264:6
**looking** [20] - 32:6, 32:8, 96:5, 104:15,

104:17, 104:21, 121:8, 128:7, 137:21, 149:5, 152:22, 194:19, 252:12, 258:12, 258:14, 258:20, 267:2, 267:10, 271:16, 271:23
**looks** [3] - 108:15, 153:20, 226:9
**loss** [4] - 49:12, 164:12, 182:16, 200:14
**lost** [4] - 29:22, 124:18, 150:13, 207:19
**loud** [3] - 105:24, 135:14, 235:5
**love** [3] - 102:21, 102:22, 183:14
**loved** [1] - 74:19
**loves** [1] - 103:17
**loveseat** [42] - 119:17, 131:11, 131:13, 131:20, 131:23, 134:22, 137:12, 139:8, 139:12, 139:14, 140:3, 140:5, 146:20, 152:15, 152:18, 152:21, 202:5, 202:14, 202:18, 204:7, 217:13, 217:15, 217:19, 217:24, 218:13, 218:20, 220:9, 220:12, 222:4, 222:10, 225:25, 226:8, 226:17, 227:11, 227:13, 227:17, 227:22, 229:11, 234:23, 258:25, 259:2, 259:12
**low** [2] - 133:15, 188:13
**lower** [1] - 203:16
**Luckasevic** [6] - 187:24, 188:2, 188:14, 188:18, 189:23, 199:21
**Lunch** [1] - 151:4
**lying** [1] - 152:14

# M

**M-A-Y** [1] - 33:3
**M-O-S-C-H** [1] - 62:4
**ma'am** [70] - 5:11, 12:22, 19:10, 25:24, 28:5, 30:4, 34:5, 34:22, 35:14, 36:4, 37:7, 38:15, 39:9, 40:7, 41:21, 46:16, 46:22, 48:5, 49:4,

49:9, 49:11, 53:16, 54:13, 54:24, 55:6, 56:6, 57:3, 58:20, 62:3, 63:25, 67:23, 73:8, 77:15, 79:19, 81:2, 84:7, 90:2, 92:21, 93:10, 94:15, 95:9, 96:5, 98:19, 102:15, 109:16, 109:21, 112:20, 112:23, 114:13, 123:8, 132:23, 134:3, 137:4, 141:3, 147:3, 148:2, 149:3, 151:6, 153:16, 158:22, 166:15, 168:21, 174:23, 179:23, 182:24, 185:14, 185:18, 267:18, 273:4
**mad** [2] - 115:17, 208:8
**mail** [2] - 233:25, 234:7
**mailed** [2] - 233:15, 233:19
**maintain** [1] - 173:23
**maintained** [4] - 49:17, 50:4, 259:7, 259:9
**maintaining** [1] - 259:5
**man** [4] - 184:8, 208:20, 210:4, 210:5
**manage** [1] - 74:8
**managed** [1] - 75:10
**manager** [1] - 35:19
**maneuver** [1] - 211:9
**Manor** [2] - 2:10, 3:4
**manufacturer** [1] - 169:13
**marble** [1] - 204:10
**March** [4] - 177:18, 186:7, 186:11, 186:20
**marijuana** [2] - 66:22, 162:17
**mark** [4] - 46:16, 56:2, 204:17, 205:3
**marked** [10] - 46:19, 46:23, 56:5, 80:25, 81:3, 125:14, 202:13, 206:10, 232:7, 232:9
**marks** [1] - 119:14
**marlboro** [1] - 34:12
**married** [6] - 5:17, 5:19, 5:24, 13:18, 47:24, 48:16
**Mart** [2] - 177:3, 182:10
**martial** [1] - 110:23
**Martin** [3] - 61:5, 193:22, 193:24
**Marywood** [1] - 13:9
**mask** [2] - 251:21,

251:22
**mass** [2] - 260:20, 261:3
**material** [5] - 172:22, 173:16, 175:18, 176:14
**materials** [1] - 46:10
**math** [1] - 19:19
**Matt** [1] - 195:8
**matter** [3] - 172:9, 183:24, 273:11
**matters** [1] - 39:3
**matthew** [1] - 14:21, 90:19
**Matthew** [19] - 14:22, 14:25, 16:20, 16:23, 57:25, 90:6, 90:8, 90:10, 90:12, 90:16, 92:19, 161:8, 179:5, 179:9, 179:11, 179:18, 179:20, 190:23
**Matthew's** [1] - 16:21
**mean** [48] - 15:20, 16:11, 20:14, 39:16, 44:25, 46:15, 57:16, 58:21, 76:8, 92:9, 106:13, 106:16, 108:14, 116:2, 123:10, 123:18, 123:21, 126:14, 127:24, 129:2, 129:3, 130:22, 130:24, 134:17, 136:9, 140:15, 144:14, 146:19, 153:20, 155:18, 164:3, 169:6, 180:21, 181:17, 199:24, 199:25, 205:6, 209:4, 227:4, 227:11, 236:9, 242:19, 242:20, 256:22, 258:11, 258:15, 265:2, 267:23
**meaning** [2] - 24:20, 145:7
**means** [4] - 114:13, 213:14, 240:4, 246:23
**meant** [2] - 103:22, 106:25
**measures** [1] - 182:13
**mechanism** [2] - 167:20, 180:8
**medical** [13] - 14:14, 32:12, 59:14, 60:19, 60:24, 70:9, 104:8, 162:2, 199:17, 253:12, 253:18
**medication** [4] - 194:11, 194:15, 194:18, 194:25
**medications** [1] - 63:7
**medicine** [6] - 61:15,

69:16, 69:18, 93:18, 104:4, 195:2
**meet** [1] - 38:12
**meeting** [10] - 40:8, 41:22, 43:25, 44:7, 44:9, 44:13, 44:16, 44:24, 45:7, 45:18
**meetings** [3] - 37:20, 43:2, 43:9
**mellow** [1] - 111:22
**member** [3] - 32:20, 37:23, 216:9
**members'** [2] - 253:23, 254:14
**membership** [1] - 58:12
**memorial** [1] - 170:6
**memory** [1] - 110:8
**mental** [3] - 63:14, 63:18, 64:7
**mention** [1] - 53:18
**mentioned** [7] - 50:10, 59:16, 74:3, 76:19, 77:14, 177:25, 193:18
**Mercy** [5] - 10:17, 10:19, 11:6, 13:17, 14:7
**mess** [1] - 115:7
**messed** [7] - 73:10, 99:7, 99:12, 103:22, 104:2, 106:24, 115:3
**met** [3] - 37:25, 38:7, 39:8
**metadata** [1] - 233:23
**metal** [1] - 230:3
**Mickey** [1] - 31:11
**mid** [2] - 231:18, 231:19
**mid-back** [2] - 231:18, 231:19
**middle** [21] - 56:16, 118:2, 126:13, 135:21, 136:22, 149:10, 153:17, 153:19, 206:22, 224:4, 231:15, 235:22, 239:17, 239:25, 244:16, 244:20, 245:6, 245:9, 260:14, 265:18, 265:20
**might** [28] - 6:19, 10:3, 22:13, 63:11, 67:6, 68:24, 79:4, 87:10, 91:8, 94:16, 94:17, 97:8, 105:22, 117:7, 122:8, 128:16, 129:4, 137:19, 141:23, 155:21, 159:3, 171:17, 188:23, 189:12, 232:21, 248:4, 248:20, 268:14
**miles** [1] - 249:18
**military** [1] - 62:17

**milk** [1] - 62:24

**Mills** [3] - 19:8, 89:3, 174:25

**mind** [10] - 8:5, 77:5, 82:6, 88:16, 125:18, 126:21, 127:19, 128:11, 133:7, 137:3

**minute** [4] - 100:12, 114:12, 268:10, 269:20

**minutes** [16] - 93:4, 101:25, 104:12, 106:4, 123:10, 123:14, 123:15, 200:15, 200:22, 239:4, 252:14, 252:15, 252:17, 265:10, 265:11, 271:14

**missed** [6] - 21:23, 23:5, 35:19, 35:20, 64:19, 234:18

**moaned** [1] - 135:13

**mode** [13] - 143:19, 228:6, 228:7, 228:12, 239:11, 243:17, 268:6, 268:18, 268:21, 268:24, 269:4, 269:6

**modern** [1] - 233:21

**modes** [1] - 269:21

**modular** [1] - 98:3

**Mom** [14] - 23:10, 75:18, 91:19, 93:7, 94:20, 95:22, 99:3, 99:25, 102:22, 103:21, 106:8, 107:4, 107:22, 216:16

**moment** [1] - 116:9

**moments** [1] - 170:16

**Monday** [1] - 84:2

**money** [26] - 29:5, 29:16, 31:7, 31:9, 31:12, 32:17, 57:17, 64:20, 73:21, 77:22, 77:23, 78:5, 93:20, 94:5, 169:20, 169:25, 170:9, 170:11, 174:8, 181:22, 181:23, 181:24, 182:2, 183:21, 183:23, 191:13

**Monroe** [5] - 25:20, 25:23, 25:25, 28:6, 34:24

**month** [3] - 52:22, 63:22, 86:16

**months** [9] - 14:17, 36:15, 52:23, 85:22, 85:24, 86:11, 163:22, 186:12, 232:18

**mood** [2] - 89:24, 165:17

**morning** [15] - 5:10, 9:3, 9:6, 53:18, 84:3, 84:14, 87:4, 88:21, 89:5, 89:7, 89:12, 89:14, 90:2, 201:5, 210:23

**mornings** [1] - 58:15

**Mosch** [3] - 61:25, 62:4, 62:10

**most** [6] - 8:6, 8:7, 9:12, 182:2, 244:9, 254:23

**mostly** [10] - 23:21, 23:22, 32:4, 62:23, 88:6, 113:10, 179:13, 196:10, 210:7, 254:19

**mother** [3] - 17:5, 32:24, 54:20

**motion** [3] - 130:9, 130:13, 257:16

**motioned** [1] - 95:13

**move** [14] - 18:20, 20:11, 25:18, 25:19, 116:6, 136:10, 145:8, 146:3, 148:24, 149:2, 149:14, 156:23, 169:25, 243:15

**moved** [26] - 13:2, 18:16, 20:3, 20:12, 21:10, 21:11, 24:24, 25:12, 27:21, 28:8, 28:23, 28:24, 36:16, 125:4, 125:14, 126:5, 137:11, 137:19, 149:5, 152:2, 155:21, 157:3, 157:5, 195:23, 203:19, 250:4

**movement** [2] - 241:25, 262:17

**movements** [1] - 156:25

**moving** [33] - 19:3, 20:17, 35:8, 135:2, 136:2, 136:9, 136:12, 136:19, 136:21, 144:21, 145:4, 145:9, 145:17, 145:24, 148:22, 148:24, 149:18, 149:22, 150:4, 154:23, 156:21, 160:11, 241:22, 242:8, 242:12, 242:24, 262:12, 262:14, 262:25, 263:8, 264:7, 265:22

**mow** [1] - 88:6

**mower** [1] - 88:7

**mowing** [1] - 88:3

**MR** [85] - 4:8, 4:9, 4:10, 4:11, 4:12,

4:13, 5:9, 18:4, 24:6, 30:16, 30:19, 38:16, 38:19, 38:23, 39:4, 39:7, 39:13, 39:15, 39:23, 40:3, 40:5, 40:6, 40:10, 40:12, 40:18, 40:23, 41:15, 41:18, 41:19, 41:20, 43:16, 43:18, 43:24, 56:2, 79:12, 79:17, 79:18, 80:3, 94:6, 94:10, 125:8, 125:12, 134:3, 134:7, 134:10, 134:13, 134:20, 135:9, 141:3, 147:2, 147:6, 147:12, 150:9, 150:11, 150:17, 150:21, 150:24, 151:2, 151:5, 153:2, 153:5, 153:8, 153:11, 153:12, 168:4, 168:10, 168:15, 168:19, 168:20, 185:13, 185:17, 252:25, 253:6, 267:12, 267:16, 270:14, 270:18, 271:8, 271:9, 271:13, 272:19, 272:21, 272:23, 272:25, 273:2

**Mucinex** [45] - 67:10, 67:12, 67:18, 67:22, 68:7, 68:14, 68:18, 68:20, 68:25, 69:4, 69:10, 69:22, 70:11, 70:19, 70:23, 72:21, 93:16, 99:9, 101:6, 101:11, 162:22, 162:25, 163:7, 164:21, 164:24, 165:2, 165:5, 165:9, 165:24, 165:25, 176:18, 176:19, 177:13, 177:16, 177:23, 178:6, 178:9, 180:17, 180:24, 181:3, 181:10, 181:19, 253:11, 253:12, 253:15

**multiple** [1] - 272:8

**must** [5] - 75:8, 120:19, 135:3, 139:22, 149:19

---

# N

**name** [30] - 5:11, 5:16, 5:21, 14:10, 14:20, 15:12, 32:25, 43:11, 43:13, 48:7, 62:3, 62:5, 62:8, 84:8, 140:24, 156:7,

156:9, 171:12, 185:18, 187:22, 195:14, 197:7, 197:8, 198:2, 200:3, 210:10, 211:19, 214:18, 219:22, 233:4

**named** [1] - 197:19

**names** [9] - 17:2, 61:10, 63:11, 94:3, 109:18, 194:9, 197:2, 198:16, 198:20

**nap** [1] - 89:20

**nasty** [1] - 199:6

**nature** [1] - 204:19

**Neal** [8] - 197:7, 197:19, 197:22, 198:3, 198:5, 198:9, 199:4, 199:13

**near** [5] - 17:11, 33:9, 126:11, 153:6, 170:6

**neck** [47] - 86:18, 86:22, 134:24, 135:6, 135:12, 136:17, 139:10, 139:15, 143:8, 144:10, 149:9, 149:12, 150:18, 155:4, 172:5, 172:7, 189:2, 189:8, 189:9, 206:25, 213:12, 213:17, 213:22, 220:13, 224:6, 229:4, 235:13, 237:5, 237:9, 237:16, 237:25, 239:5, 239:13, 239:17, 239:24, 240:5, 243:10, 244:19, 245:8, 251:25, 260:8, 260:9, 260:13, 262:3, 264:11

**need** [22] - 8:19, 11:3, 41:3, 41:10, 75:18, 80:17, 87:4, 88:10, 99:13, 99:21, 99:24, 101:11, 114:14, 151:21, 154:18, 155:13, 161:22, 172:15, 190:14, 197:15, 232:23, 245:20

**needed** [12] - 29:6, 29:16, 84:23, 85:11, 85:13, 87:21, 88:2, 95:18, 150:22, 181:17, 183:23, 247:5

**needs** [2] - 104:8, 161:23

**nephew** [3] - 58:10, 90:6, 195:13

**never** [42] - 21:25, 26:5, 26:8, 26:17,

156:9, 171:12, 185:18, 187:22, 195:14, 197:7, 197:8, 198:2, 200:3, 210:10, 211:19, 214:18, 219:22, 233:4

29:2, 35:19, 50:5, 51:2, 64:12, 64:18, 65:21, 66:15, 66:18, 12 66:20, 68:17, 68:20, 69:3, 69:13, 75:20, 78:11, 110:25, 111:24, 112:8, 130:20, 131:25, 133:5, 133:6, 133:7, 133:11, 142:3, 142:5, 177:25, 178:2, 181:21, 181:22, 184:16, 190:7, 193:12, 196:9, 238:4, 257:20

**New** [2] - 67:2, 96:2

**new** [1] - 185:7

**newspaper** [2] - 209:22, 209:24

**next** [29] - 8:17, 75:7, 78:18, 84:21, 95:9, 95:21, 98:16, 98:19, 98:21, 102:15, 104:17, 107:7, 109:16, 112:23, 125:21, 126:7, 133:3, 135:4, 153:16, 159:25, 161:2, 179:5, 184:18, 222:18, 241:9, 241:10, 243:13, 250:9, 257:2

**next'** [1] - 234:13

**night** [13] - 28:17, 67:13, 68:10, 69:20, 88:20, 88:21, 88:25, 95:25, 97:15, 100:9, 165:6, 165:21, 166:3

**nights** [1] - 89:2

**nine** [3] - 10:21, 14:17, 84:3

**NO** [4] - 4:17, 4:18, 4:19, 4:20

**nobody** [2] - 74:4, 85:3

**noise** [5] - 106:7, 157:23, 246:5, 265:14, 265:15

**nonattorney** [1] - 43:4

**none** [8] - 27:19, 48:22, 48:23, 57:13, 61:23, 65:25, 79:5, 112:2

**nonparty** [3] - 40:14, 41:2, 41:8

**nonprescription** [2] - 63:8, 70:15

**nonverbally** [1] - 8:20

**normal** [3] - 68:3, 101:20, 180:21

**North** [1] - 2:22

**north** [3] - 125:9, 125:20, 125:23

**northeast** [2] - 126:6, 127:15

**notarized** [2] - 37:10,

46:15
**notary** [2] - 233:4, 275:4
**Notary** - 2:8, 274:24
**notary's** [1] - 233:4
**notes** [4] - 45:22, 45:24, 57:8, 225:2
**nothing** [15] - 6:20, 59:16, 88:18, 91:3, 92:25, 113:3, 113:7, 123:15, 133:20, 149:24, 157:3, 200:6, 211:24, 222:16, 275:6
**notice** [3] - 75:6, 109:14, 171:25
**noticed** [2] - 107:11, 263:7
**notification** [1] - 275:13
**number** [5] - 15:8, 25:4, 70:7, 133:15, 214:15

# O

**oath** [2] - 7:19, 151:7
**object** [5] - 38:24, 39:16, 40:11, 43:20, 260:16
**objecting** [2] - 9:25, 168:16
**objection** [6] - 9:23, 10:5, 38:16, 39:6, 39:14, 168:4
**obscured** [1] - 203:5
**observation** [1] - 207:20
**observed** [6] - 44:17, 100:20, 189:24, 205:20, 212:22, 213:25
**occasion** [4] - 52:10, 67:6, 186:19, 217:3
**occasionally** [6] - 9:22, 31:3, 31:6, 31:12, 76:21, 88:13
**occasions** [1] - 38:6
**occur** [2] - 19:3, 44:7
**occurred** [17] - 19:5, 126:21, 128:23, 144:7, 186:15, 191:3, 197:3, 201:2, 201:14, 201:22, 204:15, 204:20, 212:2, 217:11, 222:5, 236:6, 243:23
**occurring** [3] - 235:14, 269:23, 271:20
**occurs** [1] - 52:7
**October** [16] - 63:21, 65:21, 68:17, 69:8, 69:20, 70:13, 78:18,

79:2, 79:6, 79:20, 83:19, 83:22, 83:24, 84:16, 88:17, 186:10
**OF** [9] - 1:2, 1:11, 1:15, 1:23, 2:2, 274:2, 274:2, 275:2, 275:2
**Office** [2] - 2:9, 3:4
**office** [6] - 11:17, 43:3, 51:20, 186:16, 187:21, 275:18
**officer** [28] - 133:12, 149:8, 150:6, 153:22, 153:25, 154:5, 154:21, 155:11, 158:25, 160:5, 160:10, 161:21, 206:21, 206:24, 207:2, 209:2, 213:4, 226:14, 227:2, 242:23, 257:11, 260:2, 260:15, 262:24, 263:3, 263:24, 265:5, 269:11
**officer's** [2] - 153:13, 261:3
**officers** [32] - 104:21, 117:23, 120:10, 124:8, 124:14, 124:16, 125:3, 132:16, 138:17, 153:18, 156:3, 161:14, 169:24, 198:20, 207:6, 207:11, 212:11, 213:3, 251:13, 255:18, 256:12, 258:23, 259:2, 259:20, 259:22, 259:24, 260:7, 260:10, 262:9, 265:24, 266:14, 266:19
**officers'** [1] - 198:16
**often** [4] - 52:21, 76:24, 174:19, 174:22
**old** [4] - 14:22, 19:21, 20:6, 110:16
**older** [10] - 110:14, 120:23, 120:25, 121:10, 121:17, 122:2, 126:25, 127:10, 128:4, 128:10, 128:21, 129:14, 130:3, 139:4, 140:8, 140:14, 140:16, 154:12, 229:8
**once** [22] - 25:18, 28:24, 38:9, 50:5, 50:14, 52:3, 52:22, 66:14, 111:21, 113:3, 113:4, 135:6,

140:3, 142:24, 143:8, 144:14, 162:22, 220:10, 259:25, 265:16
**one** [192] - 8:6, 9:18, 9:22, 11:8, 14:7, 26:12, 26:21, 35:20, 37:5, 42:15, 43:9, 43:17, 45:22, 53:17, 57:16, 65:10, 74:15, 74:16, 77:10, 89:2, 89:23, 94:2, 94:3, 98:4, 98:5, 98:23, 101:5, 105:20, 107:5, 107:14, 107:21, 109:18, 110:11, 110:12, 110:18, 110:19, 111:4, 111:16, 112:12, 112:21, 113:17, 113:19, 114:2, 114:7, 116:4, 120:16, 120:25, 121:3, 121:4, 121:19, 122:3, 122:4, 122:6, 122:9, 122:11, 122:14, 123:4, 123:22, 125:3, 127:5, 129:3, 132:2, 133:9, 134:4, 134:5, 134:8, 134:19, 135:17, 135:23, 136:4, 137:5, 137:14, 137:22, 138:11, 138:16, 138:21, 138:22, 139:2, 139:4, 139:8, 140:8, 140:10, 140:13, 140:14, 140:17, 140:18, 140:19, 140:23, 141:4, 141:5, 142:21, 144:9, 145:24, 146:5, 147:10, 148:15, 149:12, 150:14, 150:16, 150:18, 151:25, 152:4, 152:10, 152:12, 153:18, 154:12, 154:24, 155:2, 156:7, 158:25, 159:2, 160:6, 160:10, 161:14, 163:12, 165:5, 166:11, 172:14, 182:10, 182:13, 183:4, 184:10, 185:12, 194:3, 194:5, 194:8, 194:23, 198:23, 200:2, 200:10, 202:6, 204:6, 206:21, 206:24, 206:25, 207:4, 207:11, 207:12, 210:6, 210:17,

210:19, 215:9, 216:3, 216:12, 220:14, 220:15, 221:2, 222:16, 222:22, 225:5, 233:2, 233:22, 234:10, 234:17, 234:21, 234:22, 235:6, 238:17, 240:11, 246:16, 251:13, 254:19, 256:5, 257:21, 259:6, 259:15, 259:20, 259:22, 260:10, 260:12, 262:13, 262:20, 263:23, 264:8, 264:19, 264:22, 264:23, 268:6, 269:11, 269:15, 270:11, 271:2, 271:9
**one's** [1] - 156:8
**one-word** [1] - 105:20
**ones** [3] - 94:2, 270:12, 271:3
**ongoing** [1] - 71:7
**online** [1] - 181:4
**open** [9] - 7:18, 65:15, 155:8, 155:10, 159:12, 202:21, 203:6, 254:18, 257:7
**opening** [9] - 202:9, 202:18, 203:8, 203:13, 203:18, 203:21, 203:24, 205:24, 206:5
**opens** [1] - 83:2
**operator** [2] - 111:15, 179:16
**opine** [1] - 168:22
**opines** [1] - 167:23
**opinion** [6] - 115:19, 144:19, 167:19, 171:20, 182:15, 182:20
**opinions** [1] - 168:5
**opportunity** [1] - 183:8
**opposed** [3] - 8:19, 22:13, 68:7
**opposite** [1] - 85:21
**orally** [1] - 8:19
**order** [2] - 41:6, 225:3
**ordinarily** [1] - 16:7
**ordinary** [1] - 90:25
**orient** [4] - 81:10, 81:24, 125:10, 152:14
**otherwise** [1] - 196:23
**ounce** [1] - 116:15
**ourselves** [1] - 125:11
**outside** [17] - 15:14, 57:24, 82:8, 95:15, 96:23, 100:3, 106:18, 114:7, 114:8, 114:10,

124:9, 124:15, 133:17, 159:2, 216:7, 223:23, 243:25
**overdose** [6] - 69:17, 176:15, 176:16, 176:17, 178:6, 180:10
**overdosed** [1] - 178:8
**overhear** [1] - 223:22
**overheard** [1] - 162:16
**override** [1] - 166:24
**owe** [1] - 174:8
**own** [2] - 88:7, 190:25
**owned** [2] - 15:12, 210:21
**owns** [1] - 17:17
**oxygen** [7] - 188:12, 189:19, 200:14, 200:21, 200:24, 251:21

# P

**p.m** [1] - 273:11
**PA** [6] - 2:18, 3:5, 21:10, 21:12, 25:17, 33:7
**pacemaker** [1] - 54:11
**pack** [2] - 34:6, 34:8
**packer** [1] - 30:11
**packs** [1] - 34:3
**Page** [1] - 252:10
**PAGE** [1] - 4:6
**page** [7] - 37:6, 37:13, 82:23, 119:25, 232:10, 234:11, 241:9
**pages** [1] - 274:7
**paid** [2] - 50:20, 184:3
**pains** [3] - 11:21, 59:12, 59:15
**palpations** [1] - 166:19
**paper** [8] - 63:12, 80:17, 80:18, 81:22, 209:8, 210:15, 210:20, 211:4
**papers** [3] - 11:19, 192:20, 192:21
**paperwork** [1] - 175:15
**paragraph** [2] - 241:10, 266:25
**Paragraph** [5] - 241:9, 252:9, 252:10, 266:23, 271:15
**parallel** [2] - 152:18, 219:16
**paramedics** [9] - 160:10, 160:12, 176:9, 179:21, 199:16, 207:5, 207:6, 265:25, 266:16

13

14

**paranormal** [1] - 84:9
**Park** [2] - 14:13, 15:7
**parked** [1] - 247:17
**part** [14] - 31:22, 80:10, 120:15, 131:15, 136:20, 139:11, 149:6, 187:4, 208:10, 217:18, 217:19, 226:20, 243:10, 245:17
**partial** [2] - 86:15, 86:17
**particular** [2] - 211:16, 213:14
**particularly** [1] - 216:24
**particulars** [1] - 210:12
**parties** [2] - 166:11, 275:12
**partways** [1] - 217:22
**party** [2] - 38:20, 57:14
**pass** [1] - 49:9
**passed** [5] - 49:8, 55:12, 175:20, 175:25, 255:3
**passes** [1] - 268:19
**past** [4] - 52:25, 83:19, 159:9, 215:22
**patience** [1] - 109:23
**pause** [1] - 246:23
**pay** [5] - 20:20, 29:8, 86:14, 107:2, 107:3
**paying** [3] - 20:23, 86:10, 107:3
**pediatrician** [2] - 61:24, 62:14
**peed** [1] - 178:25
**pen** [1] - 80:17
**penalty** [1] - 7:20
**pending** [1] - 9:18
**Pennsylvania** [20] - 2:9, 2:12, 3:2, 3:2, 6:6, 10:18, 13:24, 14:14, 15:21, 48:15, 62:2, 94:7, 94:9, 105:4, 105:9, 108:24, 197:5, 270:22, 271:3, 275:5
**PENNSYLVANIA** [5] - 1:2, 1:10, 1:11, 274:2, 275:2
**people** [9] - 70:8, 80:12, 169:19, 169:20, 169:21, 201:8, 209:5, 216:2, 225:14
**pepper** [3] - 169:9, 169:12, 221:14
**Pepsi** [2] - 114:24, 116:15
**perceive** [1] - 217:3
**percent** [5] - 94:24, 122:13, 128:21,
128:25, 187:6
**percentage** [1] - 122:12
**perfectly** [2] - 130:10, 151:21
**perhaps** [2] - 40:18, 215:12
**period** [4] - 186:17, 250:7, 268:7, 269:20
**periodically** [2] - 22:18, 79:25
**perjury** [1] - 7:20
**permission** [1] - 160:15
**permit** [1] - 184:17
**perpendicular** [1] - 219:18
**Perry** [18] - 5:22, 6:2, 6:8, 49:14, 50:3, 50:10, 50:25, 51:3, 51:7, 51:11, 51:17, 51:22, 51:25, 52:5, 52:11, 52:21, 182:12, 182:15
**Perry's** [1] - 55:7
**person** [10] - 40:16, 180:21, 187:20, 197:18, 213:21, 226:12, 226:13, 228:9, 257:17
**personal** [6] - 22:6, 22:11, 22:19, 22:23, 165:4, 182:15
**personally** [1] - 23:12
**persons** [1] - 190:9
**Petition** [2] - 192:17, 193:5
**Pg** [1] - 274:9
**phone** [24] - 91:10, 91:18, 91:19, 92:10, 92:20, 93:6, 94:18, 97:3, 157:17, 157:19, 157:21, 158:21, 158:23, 160:3, 179:15, 186:4, 187:2, 187:9, 187:11, 198:7, 247:7, 247:8, 250:14, 267:5
**photograph** [2] - 56:3, 56:7
**photographs** [1] - 79:14
**physical** [16] - 59:8, 59:19, 59:20, 78:10, 110:10, 112:8, 112:9, 118:16, 119:9, 120:7, 121:5, 141:21, 142:17, 148:3, 256:12, 258:23
**physically** [3] - 57:21, 110:9, 216:22
**physicians** [1] - 199:21
**pick** [2] - 58:2, 117:20
**picked** [2] - 77:12, 114:25
**picture** [7] - 56:16, 56:22, 81:25, 130:10, 141:2, 142:5, 229:13
**piece** [3] - 204:21, 227:13, 227:14
**pills** [2] - 99:14, 165:15
**Pine** [1] - 249:15
**pinned** [2] - 240:24, 241:11
**pistol** [1] - 221:16
**Pittsburgh** [4] - 2:11, 3:5, 162:7, 199:24
**place** [19] - 38:24, 45:10, 45:18, 52:3, 74:22, 75:3, 75:9, 78:13, 80:11, 111:24, 151:24, 157:19, 161:6, 184:5, 211:5, 216:8, 231:20, 254:4, 275:7
**placed** [6] - 147:14, 189:2, 189:5, 189:15, 224:13, 231:3
**places** [2] - 184:21, 184:22
**plain** [2] - 112:13, 113:12
**plain-asked** [1] - 113:12
**Plaintiff** [4] - 1:7, 2:3, 2:16, 5:5
**planning** [1] - 175:17
**plate** [1] - 77:12
**plates** [2] - 77:10, 240:2
**play** [1] - 58:10
**played** [10] - 24:15, 24:16, 58:4, 58:9, 90:14, 164:21, 180:15, 180:18, 253:22
**playing** [1] - 57:24
**plays** [1] - 9:25
**plead** [1] - 26:24
**pled** [1] - 27:2
**plenty** [1] - 80:16
**plugging** [1] - 71:6
**plus** [1] - 99:11
**PMs** [3] - 72:11, 72:15, 72:19
**point** [64] - 9:14, 12:6, 17:10, 20:20, 37:21, 40:23, 52:9, 74:9, 91:5, 98:9, 98:23, 101:5, 107:14, 107:21, 108:18, 120:9, 120:16, 123:11, 124:12, 130:16, 137:4, 137:15, 137:22, 138:21, 139:12,
141:9, 146:14, 147:16, 147:20, 147:23, 151:11, 157:8, 160:20, 162:2, 207:16, 207:19, 219:20, 221:3, 221:13, 228:16, 229:7, 231:23, 237:12, 238:20, 239:4, 240:8, 240:17, 241:5, 242:23, 243:9, 244:8, 246:8, 247:10, 248:18, 259:15, 262:20, 263:7, 263:10, 263:21, 263:23, 264:19, 265:5, 266:17, 272:17
**pointed** [2] - 219:7, 219:15
**points** [2] - 137:23, 261:6
**police** [27] - 26:6, 26:9, 42:16, 69:24, 70:5, 104:21, 107:8, 111:12, 142:4, 149:8, 161:13, 161:21, 164:4, 165:13, 166:24, 169:24, 177:6, 198:15, 200:19, 206:21, 209:2, 212:10, 212:11, 226:14, 242:22, 251:13, 255:17
**Police** [6] - 3:2, 15:21, 197:6, 197:19, 208:8, 251:20
**POLICE** [1] - 1:11
**Polish** [1] - 187:23
**pop** [1] - 95:25
**porch** [8] - 90:15, 95:13, 97:7, 98:24, 106:18, 118:23, 159:7, 159:10
**portion** [5] - 203:4, 218:20, 227:13, 227:14, 227:15
**position** [9] - 11:5, 11:7, 34:14, 35:5, 35:11, 35:12, 35:22, 38:20, 242:5
**positional** [2] - 187:3, 188:3
**positioned** [2] - 128:8, 152:5
**positions** [3] - 11:5, 36:18, 157:6
**positive** [10] - 45:15, 92:16, 114:21, 142:8, 143:3, 149:15, 191:15, 191:21, 248:5, 260:5
**positively** [1] - 135:25
**possible** [5] - 129:14,
129:25, 148:10, 162:16, 171:21
**post** [2] - 13:6, 24:20
**post-high** [1] - 24:20
**pot** [2] - 66:15, 66:17
**Potter** [3] - 254:22, 270:23, 270:24
**pounding** [4] - 105:10, 107:15, 107:25, 130:18
**practice** [3] - 62:6, 62:7, 62:9
**practices** [1] - 61:9
**practitioners** [1] - 61:14
**prefer** [1] - 71:7
**preferred** [1] - 65:18
**prepare** [1] - 36:24
**prepared** [2] - 37:9, 81:5, 232:19
**preparing** [1] - 43:23
**prescribe** [1] - 194:24
**prescribed** [1] - 195:2
**prescription** [3] - 63:8, 70:15, 194:10
**prescriptions** [2] - 94:5, 99:10
**present** [23] - 17:9, 37:22, 38:2, 38:4, 38:8, 38:21, 39:2, 39:9, 39:12, 39:17, 39:22, 40:15, 40:25, 41:8, 41:17, 41:24, 43:4, 43:21, 44:2, 44:12, 52:21, 71:9, 211:25
**PRESENT** [1] - 2:15
**presented** [3] - 168:17, 170:24, 172:2
**preserve** [3] - 41:5, 173:23, 234:7
**preserving** [1] - 10:5
**pressed** [2] - 143:6, 268:23
**pressure** [3] - 54:10, 54:14, 54:16
**pretend** [1] - 117:21
**pretty** [11] - 52:5, 74:22, 75:3, 75:9, 91:17, 111:22, 135:22, 230:4, 231:22, 249:8, 251:7
**prevent** [1] - 228:15
**previously** [1] - 247:14
**Price** [2] - 34:23, 35:11
**price** [1] - 170:20
**primary** [1] - 193:20
**printout** [1] - 269:18
**private** [1] - 43:15
**privilege** [5] - 38:22, 40:2, 40:14, 41:2, 43:17
**privileged** [3] - 39:3,

39:17, 168:11
**Probate** [1] - 192:17
**probe** [4] - 143:18, 268:6, 268:18, 268:21
**probes** [3] - 171:22, 268:21, 270:11
**problem** [1] - 181:21
**problems** [11] - 59:9, 60:8, 62:21, 63:15, 79:4, 86:22, 111:25, 181:6, 183:17, 196:20, 255:11
**Procedure** [1] - 2:6
**process** [1] - 7:12
**produced** [4] - 167:9, 167:14, 167:18, 268:2
**professional** [1] - 209:16
**Professional** [1] - 2:7
**professionally** [1] - 209:19
**professionals** [2] - 147:25, 157:11
**program** [1] - 32:15
**PROHIBITED** [1] - 1:23
**prong** [6] - 239:10, 242:13, 268:24, 269:4, 269:6, 269:21
**prongs** [1] - 228:8
**properly** [1] - 164:5
**properties** [1] - 165:2
**property** [2] - 17:22, 193:5
**proud** [1] - 24:10
**provide** [4] - 29:4, 32:5, 42:6, 44:19
**providing** [2] - 30:22, 46:10
**psychiatrist** [1] - 194:6
**psychotherapy** [1] - 76:3
**public** [1] - 275:4
**Public** [2] - 2:8, 274:24
**pull** [11] - 133:4, 133:22, 138:11, 138:22, 211:5, 211:7, 220:15, 230:8, 235:20, 267:22, 268:11
**pulled** [23] - 11:20, 133:13, 133:23, 133:25, 134:25, 140:12, 143:23, 145:20, 153:17, 153:18, 153:21, 154:22, 230:13, 230:18, 235:17, 237:21, 238:6, 238:10, 238:24, 247:8, 263:4, 265:17, 268:3

**pulling** [8] - 138:8, 139:17, 139:18, 221:22, 237:22, 238:16, 262:4, 262:5
**pulse** [11] - 147:19, 155:4, 157:7, 246:22, 246:23, 247:2, 251:19, 262:20, 263:24, 264:10, 265:21
**pumping** [1] - 251:23
**punch** [29] - 115:24, 121:23, 121:25, 123:4, 123:10, 125:2, 126:10, 126:21, 128:9, 128:23, 129:8, 129:11, 129:18, 138:2, 164:17, 217:5, 217:11, 225:12, 225:14, 225:16, 256:11, 256:14, 256:16, 256:17, 256:18, 256:19, 256:21, 257:15, 258:6
**punched** [2] - 134:8, 216:15
**Punxsutawney** [25] - 14:13, 15:13, 19:9, 20:15, 24:24, 27:21, 30:18, 33:10, 34:16, 35:9, 61:18, 66:22, 76:10, 161:11, 191:18, 193:25, 195:11, 196:3, 196:15, 208:22, 210:21, 233:5, 249:15, 249:20, 249:21
**purpose** [2] - 197:23, 238:3
**purposely** [1] - 115:23
**purposes** [3] - 52:5, 52:18, 125:19
**pursuant** [2] - 2:5, 79:15
**push** [5] - 144:23, 145:12, 155:9, 231:6, 259:2
**pushed** [4] - 58:3, 131:12, 131:22, 184:19
**pushing** [3] - 230:5, 230:10, 262:3
**put** [49] - 20:5, 54:23, 65:21, 79:13, 82:8, 103:19, 113:15, 115:5, 115:7, 115:11, 115:24, 119:14, 124:8, 124:13, 126:21, 129:10, 132:4, 134:23, 135:5, 135:18, 139:23, 139:24, 144:16,

149:20, 152:3, 152:11, 156:18, 160:17, 170:3, 184:21, 186:25, 200:8, 209:14, 211:3, 235:12, 237:4, 237:15, 239:23, 241:2, 241:21, 243:19, 244:2, 244:14, 244:18, 245:7, 251:25, 252:2, 260:7, 270:8
**putting** [10] - 92:18, 93:23, 132:5, 132:15, 133:18, 153:13, 170:20, 200:20, 243:9, 260:10

---

## Q

**qualify** [1] - 254:11
**quality** [1] - 182:14
**questioning** [1] - 266:24
**questions** [28] - 8:8, 26:10, 41:25, 61:4, 80:2, 80:6, 116:11, 122:5, 123:21, 123:22, 124:22, 141:7, 158:19, 161:16, 161:17, 161:18, 168:7, 168:13, 184:10, 185:22, 215:14, 253:2, 253:8, 255:25, 267:18, 270:15, 272:20, 272:22
**quick** [4] - 11:20, 37:6, 216:14, 267:17
**quickly** [2] - 130:16, 152:4
**quiet** [3] - 107:16, 146:3, 158:4
**quieted** [1] - 106:2
**quit** [17] - 21:8, 21:21, 22:6, 22:24, 30:2, 30:3, 30:5, 31:16, 31:22, 35:10, 35:13, 59:25, 145:7, 176:7, 196:20, 222:17, 259:16
**quite** [6] - 51:20, 134:11, 137:6, 155:6, 166:20, 210:8
**quote** [1] - 214:17

---

## R

**radio** [1] - 250:14
**raise** [1] - 236:5
**range** [1] - 108:9
**ranging** [1] - 54:9

**rank** [1] - 23:24
**rather** [1] - 96:12
**reach** [6] - 167:24, 169:16, 171:8, 172:4, 172:12, 228:19
**reached** [5] - 154:24, 167:3, 167:6, 168:23, 257:5
**reaches** [1] - 121:20
**read** [12] - 47:10, 111:11, 166:25, 171:11, 176:11, 180:23, 181:2, 210:20, 233:10, 272:24, 273:2, 274:6
**reading** [3] - 176:10, 248:3, 275:11
**ready** [2] - 92:19, 160:18
**real** [12] - 11:20, 110:16, 131:18, 131:19, 133:14, 135:14, 162:12, 188:23, 190:4, 197:21, 216:14
**realize** [1] - 108:18
**really** [53] - 11:18, 21:8, 21:22, 23:19, 23:20, 40:13, 74:13, 84:11, 102:6, 103:13, 103:25, 104:6, 108:15, 108:16, 110:13, 117:19, 129:6, 131:2, 144:14, 146:12, 149:23, 151:22, 162:10, 166:4, 171:18, 172:21, 176:23, 187:22, 188:24, 189:20, 209:6, 209:16, 210:6, 210:18, 234:25, 236:13, 238:5, 242:3, 242:6, 242:18, 243:12, 243:24, 248:4, 252:7, 258:6, 258:15, 258:17, 266:6, 270:9, 270:12
**realm** [1] - 168:5
**reason** [16] - 9:5, 18:19, 22:9, 26:4, 27:18, 29:5, 53:5, 60:23, 61:22, 64:6, 168:2, 168:23, 171:10, 228:24, 241:24, 274:9
**reasonable** [1] - 126:3
**reasons** [3] - 31:10, 53:6, 183:4
**receive** [6] - 12:8, 13:4, 13:11, 24:13, 32:13, 198:18
**received** [5] - 7:8,

13:2, 110:25, 170:8, 275:13
**receiving** [6] - 7:5, 12:5, 12:10, 12:11, 12:20, 31:18
**recess** [3] - 79:11, 151:4, 252:24
**recklessly** [1] - 208:6
**recliner** [1] - 261:25
**recognize** [2] - 46:24, 56:6
**recollection** [5] - 148:7, 241:4, 252:7, 252:19, 268:12
**recommended** [1] - 194:21
**record** [19] - 5:11, 39:24, 40:13, 41:3, 41:12, 46:21, 47:5, 56:13, 59:14, 79:13, 80:23, 81:4, 81:5, 89:9, 90:9, 125:19, 151:9, 267:25, 275:9
**recorded** [2] - 45:13, 275:8
**recording** [1] - 45:17
**records** [1] - 267:22
**redd** [1] - 85:6
**redepose** [1] - 41:6
**reduced** [3] - 233:13, 233:16, 275:8
**refer** [1] - 15:18
**references** [2] - 70:3, 70:8
**referred** [2] - 256:16, 263:11
**referring** [4] - 15:25, 261:6, 265:13, 267:3
**refers** [1] - 267:6
**refill** [2] - 93:19, 93:20
**refilled** [1] - 93:22
**reflect** [1] - 209:25
**regains** [1] - 263:15
**regarding** [2] - 256:11, 258:25
**regardless** [2] - 38:25, 39:16
**Register** [1] - 192:23
**regular** [8] - 11:19, 52:24, 53:9, 67:4, 113:21, 173:19, 173:21, 218:6
**regularly** [1] - 195:10
**rehandcuff** [1] - 207:22
**relate** [3] - 6:23, 213:13, 213:15
**related** [5] - 6:25, 190:2, 201:17, 201:24, 209:11
**relationship** [7] - 49:18, 50:4, 51:4, 77:24, 182:14, 182:17, 254:24
**relative** [1] - 275:16
**release** [2] - 76:12,

76:15
**relevant** [1] - 168:8
**relive** [1] - 142:11
**remain** [1] - 225:18
**remarks** [1] - 122:5
**remember** [84] - 9:7, 42:10, 42:12, 44:5, 44:23, 45:5, 45:6, 46:9, 61:10, 62:8, 62:20, 74:14, 77:16, 84:16, 89:12, 89:17, 89:22, 90:20, 91:15, 91:23, 93:11, 94:16, 101:15, 102:18, 103:15, 104:6, 107:22, 110:13, 112:24, 120:15, 122:10, 128:19, 130:10, 130:14, 133:9, 133:18, 135:2, 135:6, 135:7, 136:15, 136:16, 137:20, 137:21, 139:22, 146:16, 146:18, 148:11, 148:12, 156:17, 157:18, 160:3, 161:17, 161:18, 162:24, 171:12, 171:14, 186:5, 192:19, 193:16, 198:8, 198:11, 198:20, 199:5, 200:9, 200:13, 210:18, 215:7, 229:10, 231:2, 234:14, 241:8, 247:25, 251:11, 260:2, 266:6, 268:20, 269:15, 269:16, 270:12, 271:17, 271:20, 271:23
**remembered** [7] - 46:2, 99:17, 105:12, 114:15, 252:21, 252:22, 269:14
**remind** [1] - 49:15
**remove** [6] - 160:12, 207:7, 221:5, 221:18, 227:25, 251:20
**removed** [7] - 143:21, 207:10, 207:13, 207:18, 216:18, 246:2, 266:15
**rent** [12] - 17:18, 20:20, 20:24, 28:21, 29:2, 29:3, 29:17, 31:3, 86:10, 107:2, 107:3
**renting** [1] - 17:19
**repeat** [2] - 89:7, 222:7
**rephrase** [1] - 45:4
**replowing** [1] - 163:5

**report** [13] - 60:11, 69:24, 70:5, 167:8, 167:14, 167:18, 170:25, 171:11, 171:25, 172:14, 177:6, 181:17, 188:11
**Reporter** [1] - 2:8
**reporter** [1] - 8:18
**reports** [1] - 171:5
**represent** [2] - 185:19, 185:20
**REPRODUCTION** [1] - 1:23
**reputation** [3] - 208:16, 208:24, 209:13
**request** [1] - 79:13
**reside** [3] - 14:12, 15:6, 19:6
**resided** [1] - 28:2
**residence** [4] - 58:22, 210:22, 249:17
**resides** [1] - 6:5
**residing** [3] - 16:14, 16:17, 17:12
**resist** [1] - 228:20
**resistant** [1] - 65:14
**resisting** [24] - 132:21, 133:10, 138:3, 141:10, 141:12, 141:14, 141:18, 142:23, 144:15, 148:23, 149:25, 154:17, 156:22, 222:17, 224:9, 236:23, 245:22, 259:17, 261:21, 261:23, 262:5, 262:8, 262:9, 263:17
**resolved** [1] - 165:14
**respect** [5] - 16:3, 53:22, 152:6, 202:7, 273:7
**respective** [1] - 275:12
**respects** [1] - 274:19
**respiratory** [1] - 181:5
**respond** [2] - 236:25, 275:14
**responders** [1] - 70:9
**responses** [1] - 61:3
**responsibility** [5] - 88:9, 165:9, 165:20, 166:2, 169:4
**responsible** [2] - 169:8, 169:13
**rest** [1] - 37:12
**restate** [1] - 40:3
**result** [1] - 176:3
**results** [2] - 186:23, 188:20
**resuscitate** [1] - 164:8
**resuscitation** [1] - 251:17
**retired** [1] - 12:14

**returned** [1] - 72:16
**review** [1] - 37:3
**reviewed** [1] - 47:17
**reviewing** [1] - 266:24
**revive** [2] - 179:21, 179:22
**rib** [1] - 133:19
**right-hand** [3] - 81:19, 119:25, 231:17
**rights** [1] - 43:23
**rip** [2] - 117:7, 124:5
**rise** [3] - 15:3, 15:21, 181:11
**Road** [2] - 2:18, 19:8
**road** [3] - 10:6, 183:9, 211:4
**ROBERT** [1] - 1:6
**Robert** [1] - 56:25
**rock** [1] - 255:15
**rode** [1] - 93:9
**role** [5] - 164:21, 180:15, 180:18, 208:10, 253:22
**rolled** [1] - 211:11
**room** [61] - 71:20, 80:10, 81:22, 82:19, 83:3, 96:9, 97:5, 98:21, 103:8, 104:22, 107:8, 108:14, 108:19, 109:15, 109:25, 112:21, 118:2, 119:19, 119:22, 120:2, 125:5, 125:6, 125:7, 126:6, 126:13, 126:14, 147:7, 147:9, 147:10, 147:11, 152:6, 152:9, 155:17, 159:6, 159:8, 161:7, 179:5, 202:10, 202:14, 206:4, 206:7, 206:8, 206:9, 212:7, 212:8, 212:14, 212:15, 215:4, 223:14, 224:2, 224:17, 224:21, 235:3, 244:12, 245:16, 245:19, 248:7, 252:14, 265:2, 265:18
**roughly** [1] - 268:11
**Roulette** [1] - 6:6
**roundhouse** [3] - 129:18, 129:21, 141:5
**routine** [1] - 85:4
**Rule** [2] - 2:5, 79:16
**rule** [2] - 8:17, 9:12
**Rules** [1] - 2:6
**rules** [3] - 7:13, 209:17, 209:20
**rumors** [1] - 208:21
**Run** [5] - 249:7, 249:9, 249:10, 249:11,

249:18
**run** [2] - 27:24, 27:25
**rural** [1] - 15:14
**Ruth** [1] - 233:5

## S

**S-C-O-V-E-L-L** [1] - 25:6
**S-E-I-T-Z** [1] - 15:11
**S/Lina** [1] - 275:22
**sake** [1] - 80:4
**salads** [1] - 62:24
**Sanderson** [3] - 25:17, 25:22, 26:14
**sarcastic** [3] - 122:4, 215:19, 215:23
**sat** [17] - 42:20, 90:15, 93:2, 95:21, 96:11, 96:13, 98:21, 99:3, 100:2, 100:8, 102:25, 103:19, 105:2, 105:8, 106:22, 170:24
**Satish** [1] - 61:6
**sauce** [1] - 30:10
**save** [1] - 183:4
**saw** [9] - 33:13, 89:13, 144:6, 201:24, 206:18, 213:13, 213:16, 231:6, 262:20
**scar** [1] - 215:18
**scared** [1] - 141:16
**scene** [4] - 79:15, 81:6, 81:24, 266:2
**scheduled** [1] - 194:17
**school** [23] - 12:22, 13:7, 13:22, 21:4, 21:6, 21:14, 23:18, 24:12, 24:18, 24:20, 27:16, 33:19, 33:21, 57:6, 57:9, 57:12, 62:15, 85:2, 85:3, 216:4, 270:20, 270:25
**School** [1] - 270:21
**Scott** [1] - 198:3
**Scottsdale** [1] - 2:22
**Scovell** [2] - 25:3, 25:8
**Scranton** [23] - 10:17, 13:2, 20:12, 20:13, 21:11, 25:14, 25:17, 25:20, 28:3, 28:6, 34:18, 34:20, 36:12, 36:16, 66:14, 66:18, 77:8, 86:19, 110:25, 163:12, 184:4, 195:17, 195:19
**scrapper** [1] - 111:16
**scrappy** [1] - 111:15
**screamed** [2] - 131:17, 134:2,

134:21, 135:13, 135:14, 140:5, 143:22, 145:21, 232:2, 232:3, 232:5, 238:7
**screaming** [1] - 236:16
**scribble** [1] - 82:13
**scrubbed** [1] - 179:2
**SDAG** [1] - 3:3
**seal** [1] - 275:18
**seat** [4] - 217:18, 227:21, 259:4, 259:5
**second** [7] - 43:25, 48:24, 94:18, 134:4, 149:15, 200:10, 234:11
**seconds** [6] - 166:21, 166:23, 239:4, 268:7, 269:5, 269:23
**secure** [1] - 221:25
**Security** [3] - 12:15, 65:23, 193:10
**see** [72] - 56:10, 58:25, 70:5, 70:6, 83:16, 95:6, 98:10, 99:5, 103:7, 103:8, 104:20, 108:24, 117:19, 119:10, 119:15, 120:5, 128:17, 129:12, 130:2, 135:11, 136:20, 137:22, 137:23, 137:24, 138:19, 138:20, 146:23, 148:11, 149:14, 154:2, 154:23, 156:25, 157:20, 177:13, 179:6, 184:16, 188:20, 202:4, 202:8, 205:3, 206:13, 206:16, 206:23, 211:16, 212:18, 215:21, 219:15, 221:8, 221:12, 221:18, 222:14, 224:19, 225:23, 226:25, 227:24, 229:7, 229:23, 230:12, 230:14, 233:16, 234:6, 234:11, 236:12, 246:7, 251:16, 260:9, 262:22, 262:23, 264:6, 268:10, 271:8
**seeing** [8] - 128:19, 135:6, 146:16, 175:5, 221:22, 242:22, 262:19, 268:20
**seeking** [2] - 50:16, 51:7
**seem** [4] - 50:22, 130:15, 256:22,

16

257:3
**Seitz** [8] - 15:9, 15:10, 15:11, 16:13, 17:23, 18:16, 19:7
**semester** [1] - 21:9
**senior** [1] - 271:4
**sense** [5] - 8:2, 10:6, 70:19, 70:20, 257:18
**sensitive** [1] - 53:22
**sent** [4] - 61:3, 171:15, 233:25, 234:7
**sentence** [3] - 113:16, 266:25, 267:6
**sentences** [1] - 272:9
**separate** [1] - 65:22
**separated** [1] - 212:14
**separates** [1] - 235:3
**September** [9] - 49:8, 64:3, 64:5, 64:14, 66:3, 71:8, 75:17, 78:17, 83:22
**serve** [1] - 27:3
**service** [3] - 27:6, 203:21, 210:3
**service-type** [1] - 203:21
**services** [2] - 11:9, 199:17
**sessions** [1] - 75:22
**set** [1] - 275:18
**setting** [11] - 7:22, 95:19, 98:25, 100:10, 103:9, 103:10, 104:11, 104:12, 120:16, 123:13, 171:19
**settled** [1] - 35:9
**seven** [2] - 10:25, 268:7
**severe** [2] - 60:13, 60:20
**shackle** [1] - 149:20
**shackled** [6] - 154:7, 154:15, 206:21, 248:10, 248:11, 266:10
**shackles** [30] - 136:25, 137:6, 144:8, 145:4, 145:5, 146:6, 146:9, 146:14, 147:13, 149:16, 150:7, 150:15, 151:12, 151:24, 152:11, 153:14, 156:13, 156:18, 222:19, 222:23, 223:3, 223:7, 223:13, 223:17, 224:13, 224:21, 269:12, 269:25, 270:7, 270:8
**shaking** [1] - 179:8
**shaped** [1] - 147:10
**sheet** [2] - 248:24, 249:3
**shelf** [3] - 177:12,

203:25, 219:9
**shell** [1] - 132:12
**Shirish** [1] - 61:6
**shirt** [32] - 56:18, 56:23, 133:16, 133:23, 138:22, 140:12, 154:22, 155:2, 172:18, 172:19, 172:21, 172:23, 172:24, 173:4, 173:11, 173:12, 173:15, 173:16, 173:18, 173:20, 229:16, 230:9, 230:14, 230:19, 231:7, 231:13, 235:20, 246:16, 264:6, 265:21
**shirts** [3] - 133:15, 173:10
**shock** [3] - 176:12, 180:13, 180:14
**shocked** [3] - 140:4, 239:13, 242:12
**shoot** [2] - 198:25, 229:5
**shoots** [2] - 230:3, 268:21
**short** [4] - 12:18, 79:11, 159:11, 252:24
**shorthanded** [1] - 11:15
**shortly** [1] - 18:17
**shot** [5] - 143:19, 144:12, 145:16, 228:8, 229:18
**shots** [1] - 268:17
**shoulder** [4] - 86:19, 86:23, 103:19, 240:2
**shoulders** [2] - 11:21, 203:16
**shoved** [1] - 220:12
**show** [8] - 84:6, 84:7, 84:11, 89:16, 114:20, 114:22, 117:22, 234:14
**showed** [2] - 123:16, 268:6
**showing** [1] - 108:9
**shows** [3] - 268:2, 269:3, 269:19
**shut** [3] - 155:9, 155:10, 184:2
**shutters** [4] - 119:15, 202:20, 202:21, 203:5
**shutting** [1] - 200:20
**siblings** [1] - 16:23
**sick** [3] - 29:14, 29:19, 73:13
**side** [58] - 54:4, 54:18, 54:24, 55:3, 55:18, 56:9, 56:21, 81:21, 82:3, 125:7, 127:4,

127:8, 128:7, 129:6, 133:19, 134:24, 135:22, 136:17, 136:22, 139:6, 139:7, 144:10, 149:11, 149:12, 152:7, 152:24, 153:9, 175:2, 175:3, 203:7, 204:2, 204:7, 206:9, 206:11, 206:13, 217:15, 217:19, 217:20, 226:11, 226:16, 227:3, 227:4, 227:5, 231:15, 231:19, 231:21, 235:21, 237:8, 237:16, 239:14, 242:13, 246:3, 248:7, 260:13, 266:6, 266:12
**sign** [3] - 18:7, 272:24, 273:3
**Signature** [1] - 273:9
**signed** [5] - 192:21, 233:9, 233:11, 275:13, 275:14
**significant** [4] - 77:5, 77:6, 254:3, 254:24
**signing** [1] - 275:11
**silent** [2] - 157:24, 158:2
**sill** [3] - 203:23, 204:9, 205:11
**simply** [1] - 196:19
**single** [1] - 174:24
**siren** [1] - 134:14
**sister** [1] - 16:25
**sit** [6] - 9:6, 96:10, 98:16, 122:8, 164:20, 170:15
**sits** [1] - 226:12
**sitting** [10] - 96:6, 96:7, 100:14, 100:24, 109:24, 116:13, 116:23, 121:7, 124:23, 125:3
**situation** [3] - 78:5, 142:10, 266:3
**six** [6] - 36:15, 78:21, 85:22, 85:24, 86:11, 118:7
**Sixth** [2] - 2:10, 3:4
**size** [2] - 114:23, 218:7
**sketch** [2] - 11:13, 12:23
**skill** [1] - 275:10
**skin** [3] - 135:19, 143:23, 231:17
**slammed** [1] - 105:13
**sleep** [2] - 88:19, 88:20
**sleeping** [6] - 105:21, 106:2, 106:6, 106:9, 158:13, 158:14

**sleeved** [4] - 133:16, 172:19, 173:12, 173:15
**sleeveless** [1] - 56:23
**sleeves** [1] - 173:13
**slept** [1] - 88:23
**slid** [7] - 134:21, 140:4, 140:5, 204:2, 229:17, 229:18, 239:19
**slow** [6] - 130:9, 130:13, 149:19, 149:23, 242:8, 258:5
**slowly** [2] - 115:25, 145:10
**slurred** [1] - 102:5
**slurring** [1] - 102:8
**smacked** [2] - 131:13, 131:18
**small** [8] - 13:23, 64:13, 126:14, 127:22, 171:23, 226:9, 257:17, 271:2
**smaller** [6] - 58:2, 108:17, 120:13, 218:7, 257:22
**smallest** [1] - 271:3
**smashed** [4] - 77:12, 219:4, 219:12, 235:11
**smashing** [2] - 149:13, 177:12
**smile** [2] - 89:24, 89:25
**smoke** [2] - 34:11, 66:15
**smoked** [3] - 33:24, 66:22, 162:17
**smoker** [1] - 33:20
**smoking** [9] - 33:17, 33:18, 66:17, 95:16, 95:20, 99:2, 100:15, 103:2, 104:13
**Social** [3] - 12:15, 65:23, 193:10
**social** [2] - 67:6, 196:3
**socialized** [1] - 195:9
**soda** [4] - 116:19, 124:4, 124:13, 258:10
**sofa** [1] - 103:11
**softball** [3] - 58:4, 58:9
**someone** [8] - 116:2, 144:19, 217:3, 231:10, 245:12, 247:5, 258:12, 259:16
**someplace** [1] - 73:16
**sometime** [1] - 16:3
**sometimes** [13] - 7:23, 23:21, 58:24, 64:9, 73:15, 84:24, 89:19, 89:20, 164:15, 204:4, 225:14, 254:20, 268:15

**somewhat** [3] - 53:9, 254:7, 254:11
**somewhere** [2] - 118:12, 243:6
**son** [13] - 15:2, 16:3, 16:20, 39:12, 55:23, 56:14, 56:20, 56:25, 185:24, 189:25, 197:4, 201:9, 211:14
**soon** [4] - 101:25, 144:12, 205:2, 239:22
**sooner** [1] - 93:2
**sorry** [26] - 16:14, 19:23, 27:14, 30:19, 49:9, 49:11, 70:6, 83:6, 94:14, 96:7, 98:14, 132:23, 134:10, 139:11, 143:15, 143:16, 145:2, 147:5, 153:2, 154:13, 180:13, 205:6, 220:21, 223:10, 269:18
**sort** [6] - 17:25, 82:22, 126:5, 152:15, 238:25, 251:17
**sound** [1] - 230:24
**sounds** [1] - 256:19
**source** [3] - 31:19, 31:25, 77:23
**south** [3] - 125:9, 125:20, 125:23
**space** [3] - 126:15, 127:22
**spaghetti** [1] - 30:10
**speakerphone** [1] - 187:12
**speaking** [3] - 36:23, 39:2, 215:9
**specializes** [1] - 194:22
**Specialties** [1] - 14:11
**specific** [2] - 209:3, 209:18
**specifically** [5] - 42:10, 45:6, 84:15, 87:8, 143:11
**speculating** [3] - 22:14, 22:21, 122:8
**speculation** [1] - 22:2
**spell** [3] - 5:13, 25:5, 43:12
**Spell** [1] - 15:10
**spend** [2] - 14:25, 174:20
**spent** [3] - 83:24, 90:5, 90:10
**spoken** [4] - 197:5, 199:16, 199:20, 201:8
**sports** [1] - 24:15
**spot** [3] - 117:24, 117:25, 137:18
**spray** [3] - 169:9, 169:12, 221:14

**Sprinkle** [3] - 19:8, 89:3, 174:25
**square** [2] - 97:22, 97:25
**SSDI** [1] - 12:17
**staff** [1] - 162:2
**staged** [1] - 247:11
**stages** [1] - 193:15
**stand** [11] - 77:4, 88:15, 116:23, 117:2, 231:23, 236:5, 238:17, 239:2, 250:7, 271:22, 271:25
**standing** [31] - 80:13, 109:25, 110:2, 115:9, 116:25, 117:3, 117:23, 118:5, 119:11, 125:3, 125:4, 126:18, 128:14, 137:17, 156:2, 165:13, 207:3, 216:6, 220:5, 223:13, 229:8, 231:25, 236:2, 236:4, 236:8, 236:10, 243:21, 244:11, 244:12, 271:18
**stands** [3] - 36:7, 77:6, 117:2
**staring** [1] - 271:23
**start** [19] - 10:10, 12:5, 12:17, 12:20, 20:23, 52:10, 59:24, 60:3, 62:25, 80:17, 91:12, 105:17, 106:12, 113:23, 170:19, 177:16, 216:16, 216:21, 245:22
**started** [24] - 10:24, 33:18, 33:20, 52:15, 60:4, 101:25, 106:10, 106:13, 107:14, 111:6, 114:25, 117:5, 123:20, 149:22, 160:13, 161:16, 179:14, 210:23, 237:22, 238:8, 241:21, 242:11, 251:24, 256:9
**starting** [7] - 11:6, 12:22, 13:20, 21:4, 91:15, 185:2, 188:10
**starts** [1] - 60:8
**State** [23] - 3:2, 15:21, 105:4, 105:10, 107:9, 108:5, 108:12, 108:19, 108:24, 109:8, 109:11, 109:15, 118:5, 122:23, 123:4, 124:16, 164:17, 185:19,

185:21, 197:5, 197:18, 208:8, 251:19
**STATE** [1] - 1:10
**state** [2] - 5:10, 264:13
**statement** [1] - 37:9, 44:20, 46:12, 232:8, 232:20, 233:13, 233:15, 233:17, 233:19, 252:9, 271:15
**STATES** [1] - 1:2
**stay** [5] - 21:8, 28:17, 88:24, 161:6, 224:5
**stayed** [13] - 20:13, 63:4, 84:22, 89:3, 95:10, 95:15, 155:10, 159:12, 161:5, 161:8, 161:9, 196:10, 240:25
**steal** [1] - 181:25
**stealing** [1] - 181:18
**steer** [1] - 168:7
**Stello's** [8] - 30:9, 30:17, 31:16, 31:23, 34:15, 35:5, 196:17, 208:19
**stenographically** [1] - 275:8
**stent** [1] - 54:23
**step** [6] - 115:22, 130:11, 131:5, 234:16, 234:20, 258:4
**stepped** [2] - 116:5, 126:12
**steps** [2] - 129:7, 175:11
**STEVEN** [2] - 1:10, 274:5
**sticker** [2] - 81:18, 119:24
**still** [53] - 6:2, 12:9, 27:16, 33:4, 48:12, 55:14, 63:5, 63:6, 86:22, 98:22, 104:9, 106:22, 116:13, 124:22, 124:23, 135:3, 136:2, 136:9, 136:11, 136:12, 137:17, 144:17, 145:17, 145:22, 145:24, 149:4, 149:17, 151:6, 153:23, 153:25, 154:3, 154:9, 154:15, 155:16, 155:17, 155:22, 165:11, 169:2, 169:7, 171:8, 184:5, 224:5, 228:15, 233:24, 234:3, 235:16, 245:16, 262:19, 263:3, 263:5, 263:8, 266:7
**stockier** [2] - 110:12,

110:18
**stocky** [2] - 112:16, 112:19
**stomach** [7] - 60:8, 132:5, 132:6, 133:19, 153:24, 226:7, 244:17
**stomachache** [1] - 62:25
**stood** [24] - 114:4, 115:10, 117:4, 120:18, 120:21, 124:25, 146:17, 156:3, 156:5, 160:4, 160:5, 203:12, 224:12, 232:2, 232:3, 250:8, 252:11, 264:15, 264:24, 265:24, 267:2, 267:10, 271:16, 272:4
**stools** [1] - 204:2
**stop** [22] - 79:25, 93:10, 96:4, 104:23, 106:6, 109:20, 112:13, 116:9, 117:10, 133:10, 133:11, 134:4, 137:3, 137:5, 141:10, 141:12, 141:14, 141:17, 142:22, 196:13, 236:22, 261:14
**stopped** [14] - 104:19, 111:2, 111:7, 114:11, 115:8, 136:19, 148:22, 148:23, 149:7, 243:14, 243:17, 262:16, 262:25, 263:2
**store** [1] - 87:12
**stories** [2] - 210:9, 210:11
**storm** [1] - 155:7
**story** [3] - 98:4, 98:5
**straight** [5] - 71:20, 71:25, 82:11, 103:7, 120:14
**straightening** [1] - 92:17
**strange** [2] - 94:3, 187:22
**Street** [10] - 2:22, 15:9, 16:13, 17:23, 18:16, 19:7, 25:3, 25:8, 249:15
**stress** [2] - 64:21, 77:23
**stressed** [2] - 64:22, 107:6
**strike** [2] - 89:10, 142:21
**striking** [1] - 204:20
**strong** [1] - 144:15
**struck** [1] - 204:12

**struggle** [4] - 189:24, 190:12, 201:22, 228:15
**struggling** [11] - 31:15, 136:3, 136:11, 138:5, 228:23, 228:24, 235:16, 238:8, 243:14, 261:14, 262:12
**studies** [1] - 171:2
**stuff** [24] - 6:21, 58:6, 74:20, 75:19, 87:25, 90:17, 104:8, 112:10, 115:16, 155:2, 165:13, 165:17, 166:8, 166:20, 166:22, 183:19, 200:12, 208:21, 209:16, 209:17, 213:11, 218:9, 254:22
**stun** [11] - 133:6, 135:5, 143:6, 228:7, 239:10, 239:11, 242:13, 243:17, 243:22, 267:20, 268:20
**stunned** [2] - 145:24, 146:2
**stuns** [3] - 143:16, 143:24, 144:4, 144:6, 145:14, 145:15
**Subscribed** [1] - 274:22
**sudden** [6] - 53:12, 53:14, 54:6, 55:20, 60:7, 180:8
**sued** [2] - 166:12, 185:21
**suffering** [1] - 64:7
**suicide** [17] - 19:2, 63:23, 64:3, 66:2, 68:11, 71:9, 72:3, 73:2, 74:23, 75:4, 75:10, 75:21, 77:18, 78:6, 78:14, 83:19, 176:3
**suing** [1] - 166:15
**Suite** [1] - 2:18
**support** [3] - 30:22, 73:22, 103:24
**suppose** [1] - 202:4
**supposed** [5] - 26:16, 164:7, 166:23, 182:19, 183:11
**surface** [1] - 260:24
**surgery** [1] - 183:18
**surprise** [3] - 75:13, 79:9, 92:8
**surprised** [3] - 66:3, 95:22, 100:19
**surprising** [2] - 92:11
**swang** [1] - 115:25
**swayed** [1] - 172:11

**swear** [1] - 192:23
**sweat** [1] - 172:19
**sweatshirt** [4] - 133:17, 173:8, 173:14, 173:21
**swing** [14] - 58:2, 121:21, 124:15, 131:4, 132:2, 137:10, 206:19, 213:3, 214:10, 215:16, 222:4, 234:17, 256:20, 256:24
**swinging** [1] - 257:11
**swings** [1] - 58:3
**switched** [1] - 139:23
**switching** [1] - 157:6
**swore** [1] - 105:19
**sworn** [4] - 5:6, 7:18, 274:22, 275:6
**swung** [9] - 116:4, 129:16, 134:18, 215:4, 225:7, 225:19, 256:22, 256:25, 257:6
**symptoms** [1] - 253:17
**system** [2] - 67:13, 178:12

## T

**T-A-F-T-S** [1] - 36:6
**T-shirt** [7] - 133:16, 172:18, 172:21, 172:23, 172:24, 173:11, 173:16
**table** [25] - 96:17, 105:25, 106:3, 107:15, 108:2, 110:4, 120:12, 120:13, 120:20, 125:7, 125:22, 126:8, 126:11, 126:17, 126:19, 127:10, 128:2, 147:15, 155:19, 155:20, 155:22, 227:16, 227:18
**tables** [1] - 127:25
**tackle** [1] - 259:4
**tackled** [14] - 116:8, 131:7, 131:12, 206:20, 217:16, 220:10, 220:11, 222:12, 222:20, 223:5, 225:20, 225:24, 234:21, 259:6
**Tafts** [1] - 36:5
**talkie** [1] - 250:14
**tall** [2] - 110:20, 112:17
**taller** [1] - 87:23
**tank** [1] - 56:10

**tapped** [1] - 211:9
**tapping** [1] - 104:18
**tase** [2] - 133:12, 235:18
**tased** [7] - 133:24, 134:5, 139:13, 235:21, 235:24, 236:3, 239:9
**TASER** [20] - 1:11, 2:4, 2:20, 2:21, 138:17, 140:9, 141:18, 141:21, 142:25, 166:12, 166:15, 167:2, 167:6, 169:3, 169:10, 170:22, 171:4, 171:5, 231:7, 267:21
**taser** [29] - 133:18, 134:19, 139:20, 141:15, 141:25, 142:2, 142:4, 166:16, 168:22, 171:21, 172:5, 187:5, 221:3, 221:6, 222:16, 228:6, 229:4, 229:15, 229:18, 229:20, 231:12, 235:17, 237:21, 238:6, 242:25, 243:4, 261:10, 261:15, 269:11
**tasered** [6] - 135:15, 135:16, 136:13, 136:18, 262:11, 270:10
**tasering** [1] - 236:4
**tasers** [1] - 169:15
**tavern** [1] - 210:21
**teach** [1] - 90:16
**team** [4] - 58:4, 216:7, 216:9, 216:10
**telephone** [1] - 157:14
**ten** [7] - 35:3, 123:14, 123:15, 195:21, 200:22, 252:17, 265:11
**term** [2] - 83:9, 132:8
**terminated** [2] - 30:2, 35:12
**terms** [10] - 33:16, 53:4, 62:19, 62:20, 89:13, 110:9, 174:14, 184:11, 185:3, 257:15
**Terry** [7] - 48:9, 48:12, 55:23, 56:14, 163:18, 163:19, 254:20
**testified** [7] - 5:6, 6:16, 31:2, 78:12, 217:13, 261:9, 269:10
**testify** [3] - 9:7, 168:18, 275:6

**testifying** [2] - 22:11, 22:19
**testimony** [25] - 6:23, 7:18, 10:9, 68:16, 116:10, 137:9, 172:3, 196:19, 205:21, 215:12, 225:6, 253:10, 255:16, 255:19, 256:10, 257:24, 258:22, 259:16, 261:5, 261:19, 261:20, 262:18, 263:11, 265:13, 275:9
**tests** [1] - 162:13
**THE** [21] - 1:2, 1:2, 1:23, 18:6, 24:9, 30:18, 94:8, 125:16, 134:6, 134:9, 134:11, 134:15, 141:8, 147:4, 147:8, 150:16, 150:20, 153:4, 153:7, 153:10, 273:8
**therapy** [1] - 184:13
**thick** [2] - 172:22, 204:23
**thigh** [3] - 136:15, 172:6, 172:8
**thin** [2] - 172:21, 172:23
**thinking** [15] - 13:5, 29:20, 103:16, 124:19, 134:16, 138:15, 149:20, 162:10, 163:24, 164:6, 228:22, 230:9, 256:21, 260:4, 266:13
**third** [9] - 34:8, 49:4, 127:18, 149:15, 232:10, 242:12, 243:16, 243:22
**third-a-pack-a-day** [1] - 34:8
**thirsty** [1] - 178:24
**THIS** [1] - 1:23
**Thomas** [1] - 3:3
**thoughts** [1] - 208:4
**threatening** [1] - 258:7
**three** [32] - 15:17, 19:11, 34:7, 48:6, 52:23, 61:12, 97:20, 111:3, 111:4, 135:24, 136:16, 138:15, 143:11, 143:14, 143:16, 144:3, 173:10, 173:11, 175:5, 203:3, 203:4, 235:18, 240:21, 251:8, 261:21, 261:22, 267:20, 268:17, 269:4,

269:14, 269:21, 270:10
**three-by-four** [1] - 203:4
**threw** [1] - 129:20
**throat** [15] - 136:23, 149:12, 154:4, 160:18, 206:25, 213:11, 224:6, 237:9, 237:16, 238:22, 239:24, 243:10, 244:19, 245:8, 260:13
**throughout** [1] - 205:21
**throw** [1] - 225:14
**thumbnail** [2] - 11:13, 12:23
**thump** [1] - 235:5
**Thursday** [2] - 2:12, 274:7
**Tim** [146] - 16:20, 16:22, 38:4, 38:8, 38:19, 38:25, 39:8, 39:12, 39:22, 40:8, 40:20, 40:25, 41:17, 41:23, 42:3, 42:6, 42:11, 42:15, 42:20, 44:4, 49:5, 54:4, 56:20, 69:3, 71:17, 79:6, 85:15, 85:16, 85:18, 85:20, 85:23, 86:4, 86:10, 86:24, 87:11, 87:18, 87:22, 88:6, 88:11, 91:7, 91:9, 92:2, 92:10, 92:13, 92:22, 93:6, 93:12, 93:15, 94:17, 94:19, 95:3, 95:10, 95:15, 96:6, 96:23, 98:11, 98:24, 99:4, 99:11, 99:16, 99:17, 100:3, 100:17, 104:9, 106:15, 106:17, 111:11, 111:14, 111:20, 112:5, 112:15, 118:24, 120:5, 146:14, 146:16, 146:24, 148:7, 148:12, 148:13, 148:17, 154:8, 154:10, 154:14, 154:18, 155:25, 158:19, 158:20, 158:24, 159:15, 160:20, 161:4, 161:9, 161:19, 170:3, 174:3, 175:24, 176:14, 176:19, 177:4, 177:5, 177:13, 177:22, 178:5, 178:8, 179:8, 181:8, 181:15, 181:22, 182:5, 182:8,

182:10, 185:5, 187:19, 189:25, 190:3, 195:8, 197:13, 198:7, 198:13, 198:15, 198:18, 200:4, 206:16, 207:8, 213:24, 217:8, 224:4, 244:7, 245:18, 245:24, 247:15, 247:16, 249:25, 250:17, 250:20, 252:13, 254:20, 255:9, 255:11, 263:6
**tim** [5] - 87:14, 91:19, 112:6, 211:25, 244:9
**Tim's** [10] - 49:6, 53:13, 53:17, 71:17, 71:20, 180:18, 181:12, 184:25, 185:6, 215:13
**timing** [2] - 267:20, 268:12
**today** [6] - 7:17, 37:4, 164:20, 168:9, 253:9, 273:5
**today's** [1] - 36:25
**Todd** [1] - 188:14
**toes** [2] - 260:17, 260:18
**together** [11] - 19:16, 19:24, 26:3, 28:14, 90:11, 128:25, 129:2, 136:14, 170:3, 174:21, 175:18
**Tom** [1] - 185:18
**tone** [8] - 113:20, 115:15, 123:23, 179:10, 199:5, 214:5, 215:13, 216:23
**took** [46] - 35:5, 38:24, 45:10, 45:18, 52:3, 67:22, 68:8, 69:9, 69:21, 70:10, 72:11, 72:16, 72:21, 93:15, 99:8, 99:9, 99:13, 101:6, 101:10, 110:24, 115:22, 123:10, 130:11, 131:5, 137:10, 140:9, 141:4, 160:18, 161:2, 161:5, 162:25, 163:6, 173:25, 181:9, 192:15, 199:25, 206:19, 209:5, 214:10, 224:20, 234:16, 234:17, 234:20, 252:2, 253:13, 258:4
**top** [14] - 24:4, 56:10, 119:24, 119:25, 131:14, 137:14,

152:12, 153:6, 153:23, 154:16, 160:4, 173:14, 219:9, 262:24
**touch** [5] - 42:5, 42:25, 114:11, 147:16, 157:9
**touched** [2] - 114:9, 124:20
**touching** [2] - 114:11, 260:17
**tough** [2] - 111:15, 111:18
**tournament** [3] - 216:5, 216:10, 216:18
**toward** [5] - 120:10, 125:5, 176:5, 234:17, 242:14
**towards** [18] - 43:22, 96:11, 119:12, 120:14, 121:8, 121:15, 125:16, 152:8, 152:10, 153:3, 166:18, 175:12, 178:21, 218:22, 218:23, 219:7, 219:8, 252:10
**town** [5] - 15:14, 30:16, 175:2, 175:3, 208:21
**train** [1] - 124:18
**trained** [1] - 266:22
**training** [6] - 13:7, 13:14, 24:21, 110:23, 111:9, 164:7
**TRANSCRIPT** [1] - 1:23
**transcript** [2] - 274:19, 275:13
**transferred** [1] - 76:10
**traveling** [1] - 196:11
**Travis** [2] - 2:17, 94:11
**treat** [6] - 49:24, 53:21, 63:9, 253:12, 253:19, 273:6
**treated** [2] - 61:5, 61:11
**treating** [1] - 164:5
**treatment** [1] - 193:21
**tree** [2] - 86:20, 86:21
**trial** [2] - 26:23, 183:6
**tricking** [1] - 99:20
**tried** [17] - 11:24, 50:25, 60:6, 63:23, 75:4, 99:20, 132:25, 133:3, 144:14, 176:10, 178:19, 179:12, 179:15, 235:17, 235:18, 262:4, 264:20
**tries** [4] - 123:3, 125:2, 128:9, 129:8
**trigger** [3] - 267:22, 268:3, 268:11
**trimming** [1] - 86:20

**Trindle** [1] - 2:18
**trip** [2] - 248:24, 249:2
**trips** [1] - 254:21
**trooper** [1] - 71:5
**Trooper** [82] - 108:24,
109:11, 110:14,
110:15, 120:23,
120:24, 121:10,
121:13, 121:16,
121:17, 122:2,
126:10, 126:25,
127:4, 127:10,
127:13, 128:4,
128:5, 128:9,
128:10, 128:15,
128:21, 128:22,
129:7, 129:14,
129:15, 129:25,
130:3, 130:4, 131:4,
137:5, 137:10,
140:2, 140:7, 144:7,
146:9, 150:14,
151:11, 156:11,
156:15, 157:20,
164:17, 208:25,
209:12, 211:17,
211:20, 211:23,
213:20, 213:25,
214:10, 215:5,
215:8, 215:14,
218:19, 219:24,
220:5, 221:5, 223:6,
223:7, 223:12,
223:16, 223:19,
224:20, 225:8,
225:11, 229:8,
229:9, 229:15,
230:7, 238:21,
239:5, 242:23,
243:20, 244:2,
245:7, 245:11,
247:23, 257:25,
269:12, 270:7
**Trooper's** [2] - 189:8,
211:19
**Troopers** [44] - 105:4,
105:6, 105:10,
107:9, 108:5,
108:12, 108:19,
109:9, 109:15,
110:5, 112:21,
116:11, 118:5,
118:17, 119:8,
120:6, 120:22,
122:23, 123:4,
124:16, 137:15,
138:5, 138:21,
138:25, 139:2,
140:11, 142:23,
146:6, 148:4, 156:6,
185:19, 189:2,
208:12, 214:4,
214:9, 215:10,
217:12, 221:11,
222:6, 222:11,
222:22, 227:25,

245:6, 250:18
**trouble** [4] - 85:20,
86:18, 159:23,
209:14
**Troy** [382] - 15:2,
15:20, 16:3, 16:5,
17:12, 18:11, 18:22,
18:23, 19:2, 19:12,
19:16, 22:24, 26:7,
26:10, 26:15, 27:8,
27:25, 32:5, 32:17,
33:14, 42:2, 42:18,
42:19, 47:24, 48:2,
48:19, 48:25, 49:17,
49:19, 49:21, 49:22,
50:3, 50:23, 50:25,
51:3, 52:4, 54:15,
56:25, 57:14, 60:11,
61:5, 62:17, 63:14,
64:15, 64:18, 64:25,
66:7, 66:12, 66:25,
67:9, 68:17, 68:20,
68:24, 69:4, 69:21,
70:10, 70:14, 70:18,
71:10, 75:16, 76:19,
77:7, 77:11, 78:2,
78:5, 78:12, 79:8,
83:9, 83:24, 85:21,
87:3, 87:21, 87:23,
88:6, 88:9, 88:12,
88:19, 89:13, 90:15,
90:17, 90:20, 90:25,
91:20, 91:21, 92:12,
92:24, 93:15, 93:17,
94:20, 94:21, 95:12,
95:18, 95:19, 96:7,
98:13, 98:14, 98:17,
98:22, 98:25, 99:7,
99:12, 99:18, 99:19,
99:20, 99:22, 99:24,
100:5, 100:8,
102:22, 102:24,
103:20, 104:3,
104:18, 105:3,
105:9, 105:20,
106:5, 109:19,
109:24, 110:20,
110:21, 110:22,
111:15, 111:18,
111:19, 111:22,
112:7, 112:22,
112:25, 113:3,
113:14, 113:17,
113:23, 114:4,
114:8, 114:11,
114:18, 114:20,
114:25, 115:5,
115:11, 115:13,
115:20, 116:11,
116:12, 116:22,
117:16, 118:4,
118:17, 118:20,
120:9, 121:15,
122:5, 122:18,
123:11, 123:25,
124:3, 126:9,

126:17, 127:6,
128:9, 128:17,
128:22, 129:8,
131:3, 131:7, 131:9,
131:17, 131:20,
131:25, 132:14,
133:8, 133:9,
133:11, 134:2,
134:21, 134:25,
135:12, 137:10,
137:14, 137:21,
137:25, 138:8,
138:25, 139:11,
141:4, 141:6,
141:10, 141:12,
142:21, 142:22,
144:13, 145:4,
147:16, 148:4,
148:18, 148:22,
149:10, 149:21,
151:24, 152:2,
152:5, 156:4, 157:2,
157:9, 158:25,
160:5, 161:2, 162:3,
162:16, 162:22,
164:13, 165:19,
170:3, 172:16,
174:8, 174:20,
175:13, 177:3,
177:22, 178:2,
180:23, 181:8,
181:11, 181:21,
181:22, 182:7,
182:20, 183:13,
183:15, 184:21,
185:24, 186:14,
187:6, 188:5,
189:19, 189:24,
190:15, 191:9,
191:22, 192:5,
193:10, 194:11,
195:3, 195:5, 197:4,
199:25, 200:5,
201:22, 204:12,
204:15, 206:19,
207:15, 207:19,
213:2, 213:6, 214:5,
214:9, 214:17,
214:19, 214:20,
214:22, 214:24,
215:2, 215:4, 215:9,
215:15, 215:22,
216:12, 216:13,
216:20, 217:12,
222:4, 222:6, 222:8,
222:17, 222:20,
223:5, 224:13,
225:7, 225:18,
225:24, 228:11,
228:14, 229:15,
230:23, 231:23,
234:13, 234:21,
234:25, 235:5,
235:10, 235:16,
235:18, 235:21,
236:2, 236:4, 236:5,
236:22, 236:25,

237:7, 237:12,
238:4, 238:7,
238:14, 238:17,
239:9, 239:13,
239:18, 239:22,
240:8, 240:13,
240:22, 240:24,
241:11, 241:17,
241:21, 242:25,
243:14, 243:17,
244:3, 244:15,
244:25, 245:6,
246:2, 246:5, 248:7,
250:4, 252:12,
253:11, 253:22,
254:6, 254:10,
254:17, 254:23,
255:5, 255:14,
255:18, 255:19,
255:22, 255:23,
256:3, 256:9, 257:8,
257:10, 258:10,
258:12, 258:24,
259:2, 259:3, 259:4,
259:11, 259:16,
260:7, 260:11,
260:19, 260:21,
260:23, 261:2,
261:21, 262:5,
262:8, 262:19,
262:20, 263:5,
263:11, 265:6,
265:14, 267:3,
267:10, 270:20,
271:17
**TROY** [1] - 1:6
**Troy's** [104] - 21:5,
33:16, 34:13, 36:20,
49:2, 49:14, 50:8,
52:14, 52:20, 52:25,
55:2, 55:8, 55:18,
57:8, 57:20, 61:24,
62:14, 62:19, 64:2,
88:16, 129:15,
134:24, 138:22,
139:10, 140:12,
146:15, 148:8,
149:13, 150:18,
151:25, 152:3,
154:3, 154:6, 155:4,
155:7, 156:19,
156:21, 166:5,
167:20, 168:23,
169:11, 171:8,
174:4, 174:14,
176:19, 176:20,
177:20, 183:7,
183:10, 184:12,
184:25, 187:4,
189:2, 189:8,
189:15, 193:4,
194:25, 200:16,
213:22, 220:11,
220:15, 221:25,
226:18, 227:9,
229:11, 229:21,

235:6, 235:8,
235:12, 235:20,
237:5, 237:9,
237:11, 237:16,
237:22, 237:25,
238:7, 238:9,
238:10, 238:16,
238:21, 239:5,
239:24, 239:25,
242:7, 242:14,
242:24, 243:6,
243:10, 243:22,
244:19, 244:20,
245:8, 246:7,
246:16, 253:11,
253:24, 254:3,
256:12, 260:8,
260:13, 263:24,
266:2, 268:15
**troy's** [1] - 219:4
**true** [4] - 125:9, 169:2,
274:19, 275:9
**truth** [4] - 7:19, 275:6,
275:6
**truthfully** [1] - 9:7
**try** [14] - 8:4, 8:5,
23:10, 69:5, 113:23,
121:25, 124:14,
144:23, 159:20,
184:11, 208:10,
227:25, 229:20,
257:25
**trying** [37] - 30:7,
41:15, 75:9, 113:22,
115:16, 115:17,
124:4, 126:10,
131:24, 136:12,
138:2, 144:17,
144:21, 145:11,
145:22, 156:23,
156:24, 179:9,
220:15, 220:23,
226:13, 228:3,
228:17, 228:19,
229:4, 229:11,
230:10, 235:7,
242:7, 242:10,
251:16, 257:13,
262:13, 262:15,
264:23, 268:15
**tube** [1] - 160:17
**turn** [11] - 26:16,
26:20, 81:13, 81:16,
82:11, 82:19,
104:14, 179:12,
182:25, 254:19
**turned** [9] - 14:23,
102:21, 103:10,
104:20, 179:13,
184:3, 237:7, 246:2,
265:20
**turning** [1] - 145:18
**turtle** [2] - 132:11,
132:14
**turtling** [1] - 132:9
**TV** [22] - 84:5, 84:14,

84:22, 85:7, 85:10,
87:4, 89:16, 95:20,
96:20, 96:22, 99:2,
103:3, 104:15,
110:2, 121:8,
126:15, 127:25,
218:22, 219:3,
219:6, 227:5, 261:15

**twice** [3] - 108:3,
108:4, 111:22

**twist** [2] - 124:4, 235:7

**twisted** [3] - 124:13,
124:17, 124:24

**twisting** [7] - 115:2,
117:5, 117:21,
123:2, 145:18,
258:9, 258:10

**twists** [1] - 116:12

**two** [60] - 11:21, 18:2,
19:18, 19:24, 21:2,
25:16, 26:2, 30:15,
43:7, 43:8, 52:15,
57:19, 73:5, 74:24,
77:2, 77:4, 77:12,
84:9, 98:3, 98:4,
101:18, 104:21,
117:15, 123:22,
127:9, 134:16,
134:17, 135:20,
136:13, 143:12,
144:3, 144:6,
145:14, 148:4,
150:22, 156:3,
161:18, 162:10,
173:10, 175:4,
183:14, 184:10,
184:24, 194:4,
197:20, 200:9,
206:2, 210:15,
210:16, 217:12,
228:8, 228:12,
230:3, 234:22,
255:17, 269:20,
270:11, 270:19

**two-and-a-half** [2] -
184:24, 269:20

**two-barb** [1] - 228:12

**two-bedroom** [1] -
98:3

**Tylenol** [3] - 72:11,
72:15, 72:19

**type** [12] - 13:11,
31:19, 34:11, 65:24,
149:25, 173:2,
180:15, 203:21,
230:23, 232:25,
233:6, 233:7

**typed** [3] - 232:25,
233:19, 234:10

**types** [1] - 213:14

**typewriting** [1] - 275:8

**typical** [2] - 108:23,
130:22

**typing** [3] - 6:21,
45:17, 233:13

## U

**unable** [1] - 238:21

**uncle** [1] - 55:8

**unconscious** [2] -
207:21, 263:21

**under** [9] - 7:19, 9:9,
138:9, 151:7, 166:9,
171:6, 172:12,
176:5, 275:8

**underage** [3] - 26:22,
26:24, 27:13

**underneath** [5] -
132:5, 132:6, 149:7,
204:3, 227:18

**undershirt** [1] - 173:2

**understood** [3] - 8:14,
211:7, 247:13

**unemployed** [1] -
85:23

**unemployment** [1] -
32:10

**unfortunately** [1] -
181:9

**uniform** [2] - 108:24,
109:5

**uniformed** [1] -
164:17

**uniforms** [2] - 108:22,
109:11

**UNITED** [1] - 1:2

**University** [1] - 13:8

**university** [1] - 17:24

**unless** [2] - 82:19,
96:2

**unusual** [2] - 117:18,
246:14

**up** [153] - 6:10, 20:9,
21:3, 21:11, 27:11,
28:11, 32:5, 35:4,
39:19, 45:17, 46:10,
50:6, 57:20, 58:2,
58:8, 59:6, 61:24,
62:15, 63:20, 64:12,
64:14, 69:13, 70:25,
71:23, 73:10, 76:25,
77:12, 79:2, 83:8,
83:12, 85:6, 92:17,
99:7, 99:12, 101:4,
103:20, 103:22,
104:3, 104:10,
104:20, 106:22,
106:25, 111:21,
114:4, 114:12,
114:25, 115:3,
115:9, 115:10,
116:23, 116:25,
117:2, 117:3, 117:4,
117:21, 120:9,
120:14, 120:18,
121:15, 121:16,
123:10, 123:16,
124:25, 129:10,
130:2, 131:2,
131:14, 131:21,

132:15, 132:24,
133:23, 135:5,
135:12, 136:12,
138:18, 138:22,
140:12, 140:25,
144:18, 144:21,
144:23, 145:12,
145:23, 148:14,
150:25, 151:10,
153:21, 154:8,
154:10, 154:17,
154:22, 155:2,
155:6, 161:19,
161:25, 170:4,
170:18, 174:19,
177:12, 178:18,
179:9, 181:4,
184:10, 203:8,
205:2, 209:5,
216:13, 217:13,
217:14, 217:17,
218:19, 219:6,
219:8, 223:11,
224:11, 225:22,
229:16, 229:17,
229:18, 230:8,
230:14, 230:18,
231:23, 231:25,
232:2, 232:3,
232:13, 234:12,
235:20, 236:5,
236:16, 238:4,
238:10, 238:17,
238:25, 239:2,
240:8, 242:7,
242:10, 247:3,
253:7, 256:3,
258:24, 262:13,
263:12, 264:6,
267:17, 268:16,
270:23, 270:24

**updated** [2] - 50:13,
53:7

**upholstered** [1] -
218:7

**upper** [4] - 81:18,
149:6, 189:5, 231:17

**ups** [2] - 183:3, 195:4

**upset** [7] - 73:18,
76:14, 92:13, 94:22,
146:24, 155:23,
208:7

**upsetting** [1] - 122:15

**usual** [1] - 85:4

## V

**val** [1] - 23:25

**valedictorian** [2] -
24:2, 24:8

**various** [1] - 261:6

**vehicle** [1] - 111:5

**verbally** [1] - 50:2

**Veronica** [2] - 33:2,
54:20

**versus** [1] - 122:7

**via** [1] - 224:16

**video** [1] - 177:7

**view** [1] - 45:11

**visit** [2] - 76:7, 175:4

**visiting** [1] - 26:10

**voice** [6] - 113:14,
113:20, 123:23,
179:10, 214:5,
216:24

**volunteer** [1] - 249:11

**vs** [2] - 1:8, 274:4

## W

**waffle** [1] - 173:18

**waist** [3] - 203:11,
203:14, 242:14

**wait** [2] - 114:12,
211:8

**waited** [1] - 85:9

**waiting** [7] - 42:20,
100:2, 100:4, 104:9,
213:6, 247:19,
248:14

**waived** [3] - 40:16,
273:9, 275:12

**waiving** [2] - 41:4,
41:13

**wake** [1] - 179:9

**wakes** [2] - 154:17,
263:12

**Wal** [2] - 177:3, 182:10

**Wal-Mart** [2] - 177:3,
182:10

**walk** [9] - 11:4, 21:4,
79:23, 91:14,
119:18, 120:12,
120:14, 137:7,
151:10

**walked** [10] - 71:24,
72:13, 97:6, 120:19,
123:12, 206:6,
216:10, 224:10,
224:11, 247:3

**walkie** [1] - 250:14

**walkie-talkie** [1] -
250:14

**walking** [6] - 18:8,
91:12, 93:8, 100:17,
111:6, 118:10

**walks** [2] - 120:10,
121:15

**wall** [4] - 126:8, 202:9,
202:18, 205:25

**walls** [1] - 212:15

**warehouse** [2] -
30:10, 196:17

**warn** [2] - 222:15,
261:13

**warnings** [2] - 180:24,
181:2

**watch** [5] - 84:5, 85:7,
85:10, 89:15, 104:15

**watched** [1] - 84:22

**watches** [2] - 84:14,
87:4

**watching** [4] - 95:20,
96:22, 99:2, 103:3

**water** [2] - 116:17,
178:25

**ways** [1] - 153:20

**weak** [1] - 149:23

**weapon** [12] - 138:17,
140:9, 141:18,
141:22, 142:25,
167:2, 167:6,
169:10, 170:22,
171:4, 231:7, 267:21

**wearing** [1] - 172:16

**Weber** [2] - 2:17, 80:5

**WEBER** [21] - 4:10,
4:13, 38:16, 38:23,
39:15, 40:3, 40:10,
40:18, 41:15, 41:19,
43:18, 94:6, 150:24,
168:4, 168:15,
253:6, 267:12,
271:9, 271:13,
272:19, 272:25

**Wecht** [7] - 167:9,
167:15, 167:16,
167:19, 167:23,
168:21, 170:25

**week** [6] - 33:25,
74:24, 83:12, 83:18,
111:4, 163:25

**weekly** [1] - 88:8

**weeks** [9] - 6:9, 50:11,
78:13, 78:21, 78:22,
78:25, 111:3,
163:22, 197:20

**weight** [5] - 149:9,
240:6, 240:22,
260:10, 260:19

**weights** [4] - 58:17,
58:18, 58:24, 59:2

**welfare** [3] - 32:11,
65:18, 86:16

**well-being** [1] - 59:20

**west** [3] - 125:9,
125:24, 126:18

**WESTERN** [1] - 1:2

**whatsoever** [1] -
70:15

**whereabouts** [1] -
119:3

**WHEREOF** [1] -
275:18

**whispering** [4] -
271:24, 272:6,
272:8, 272:14

**white** [2] - 56:10,
172:24

**whole** [15] - 11:3,
15:12, 20:25, 44:25,
47:14, 63:24, 69:21,
70:10, 87:11,
102:16, 146:22,
148:17, 207:17,
275:6

**wide** [6] - 202:24, 203:2, 204:22, 204:23, 205:5, 205:6
**wife** [1] - 48:18
**Williamsport** [4] - 21:7, 21:21, 22:24, 24:19
**Wills** [1] - 192:24
**window** [9] - 119:15, 125:15, 125:17, 131:14, 153:3, 202:19, 203:23, 204:10, 220:8
**Wingard** [2] - 5:12, 253:3
**WINGARD** [9] - 1:4, 1:15, 2:2, 4:4, 5:4, 274:4, 274:6, 274:21, 275:5
**wingard** [1] - 41:7
**wires** [5] - 230:12, 237:21, 238:6, 238:9, 269:6
**wish** [2] - 157:10, 274:7
**WITHOUT** [1] - 1:23
**WITNESS** [20] - 4:4, 18:6, 24:9, 30:18, 94:8, 125:16, 134:6, 134:9, 134:11, 134:15, 141:8, 147:4, 147:8, 150:16, 150:20, 153:4, 153:7, 153:10, 273:8, 275:18
**witness** [11] - 78:16, 82:16, 126:23, 168:6, 229:22, 252:5, 275:5, 275:9, 275:12, 275:13, 275:13
**woman** [1] - 210:20
**wondering** [2] - 90:11, 258:19
**wood** [5] - 204:10, 204:11, 204:13, 204:17, 204:20
**word** [9] - 23:25, 105:20, 113:15, 141:13, 142:4, 215:17, 256:11, 256:14, 256:18
**wording** [1] - 214:19
**words** [18] - 21:23, 102:5, 102:8, 141:12, 155:12, 187:16, 200:13, 213:4, 213:15, 218:23, 221:9, 227:11, 227:16, 263:16, 263:18, 271:25, 272:11, 272:12
**wore** [1] - 133:15
**work-related** [1] - 6:25

**worker's** [1] - 163:17
**workers'** [11] - 7:2, 7:5, 7:8, 10:9, 11:22, 12:2, 12:3, 12:5, 12:9, 12:21, 183:18
**worn** [1] - 218:8
**worried** [2] - 106:15, 106:16
**worry** [1] - 174:12
**worse** [1] - 63:6
**wound** [2] - 217:13, 217:14
**wrists** [2] - 133:2, 228:4
**write** [3] - 188:11, 234:12, 245:5
**writing** [1] - 82:6
**written** [6] - 42:7, 44:19, 194:12, 233:13, 233:17, 242:19
**wrongful** [1] - 182:13
**wrote** [6] - 63:12, 232:14, 232:15, 234:16, 236:17, 241:6

## X

**Xs** [1] - 127:9

## Y

**yard** [1] - 88:7
**yards** [1] - 18:2
**year** [16] - 13:4, 18:14, 18:15, 18:18, 24:16, 24:17, 25:9, 25:10, 49:15, 63:24, 73:19, 89:4, 174:19, 186:8, 192:2
**years** [31] - 5:20, 10:21, 10:25, 13:25, 15:17, 19:11, 19:18, 19:20, 20:5, 21:2, 21:15, 25:21, 28:18, 30:15, 32:2, 32:7, 32:23, 35:3, 57:19, 58:8, 59:6, 59:21, 63:13, 76:25, 184:20, 184:24, 195:21, 195:24, 196:2, 211:15
**Years** [2] - 67:3, 96:2
**yell** [3] - 112:9, 141:11, 142:22
**yelled** [6] - 105:22, 142:20, 161:21, 179:8, 235:6, 236:22
**yelling** [9] - 91:21, 92:12, 92:13, 105:17, 141:10, 158:19, 160:23, 160:24, 247:5
**yesterday** [1] - 63:23

**young** [5] - 27:10, 134:18, 184:7, 184:17, 210:20
**younger** [36] - 110:13, 110:15, 110:19, 120:24, 121:3, 121:4, 121:12, 121:16, 121:19, 121:25, 122:3, 122:9, 122:11, 122:14, 126:24, 127:13, 128:4, 128:9, 128:15, 128:22, 129:7, 129:15, 129:25, 130:4, 131:4, 133:4, 133:22, 134:5, 136:24, 137:10, 140:8, 140:10, 140:17, 140:19, 234:12, 261:6
**youngest** [1] - 56:20
**yourself** [4] - 11:11, 12:13, 190:10, 250:17

## Z

**Zipes** [2] - 171:16, 172:3
**Zipes'** [1] - 171:20

# EXHIBIT D-3

# Deposition of Kimberly Hall

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

BARBARA J. WINGARD,  *

individually and as  *

Administratrix of    *

the Estate of TROY   *

ROBERT LEE           *

HOOFTALLEN,          *

    Plaintiff      * Case No.

    vs.            * 2:12-cv-01500

GUY A. BATTLESTILLI;* District Judge

STEVEN E. JOHNSON;   * Cathy Bisson

PENNSYLVANIA STATE   * JURY TRIAL

POLICE; COMMONWEALTH* DEMANDED

OF PA; TASER®        *

INTERNATIONAL, INC.;*

    Defendants      *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

KIMBERLY HALL

May 5, 2014

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

2

1               V I D E O T A P E D   D E P O S I T I O N

2                                O F

3       KIMBERLY HALL, taken on behalf of the

4       Defendants herein, pursuant to the

5       Rules of Civil Procedure, taken

6       before me, the undersigned, Rhonda K.

7       Thorpe, a Court Reporter and Notary

8       Public in and for the Commonwealth of

9       Pennsylvania, at the offices of

10      Jefferson County Commissioners'

11      Office, 155 Main Street, #202, Second

12      Floor, Brookville, Pennsylvania, on

13      Monday, May 5, 2014, beginning at

14      11:21 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

1                    A  P  P  E  A  R  A  N  C  E  S

2

3    TAMARA  J.  HAKEN,  ESQUIRE

4    SUSAN  A.  CORRADO,  ESQUIRE

5    Boyle  Litigation

6    4660  Trindle  Road

7    Camp  Hill,  PA   17011

8         COUNSELS  FOR  PLAINTIFF

9

10   THOMAS  L.  DONAHOE,  ESQUIRE

11   Office  of  Attorney  General

12   6th  Floor,  Manor  Complex

13   564  Forbes  Avenue

14   Pittsburgh,  PA   15219

15        COUNSEL  FOR  DEFENDANTS

16

17

18

19

20

21

22

23

24

25

4

1                    I   N   D   E   X

2

3   DISCUSSION AMONG PARTIES          7  -  8

4   WITNESS: KIMBERLY HALL

5   EXAMINATION

6       By Attorney Donahoe        8  -  122

7   CERTIFICATE                        123

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          E X H I B I T   P A G E

2

3                                              P A G E

4    N U M B E R      D E S C R I P T I O N          I D E N T I F I E D

5    O n e      A f f i d a v i t                       5 2

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

OBJECTION PAGE

| ATTORNEY | PAGE |
|---|---|
| Corrado | 32, 45 |
| Haken | 106 |

7

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3              V I D E O G R A P H E R :

4              My name is Sarah Dick.

5         I am an employee of Boyle

6         Litigation which is located

7         4650 Trindle Road, Suite 102,

8         Camp Hill, Pennsylvania,

9         17011.  This deposition is

10        being recorded on Monday, May

11        5th, 2014, at 11:21 a.m., in

12        the small conference room of

13        the Jefferson County

14        Commissioners' Office located

15        at 155 Main Street,

16        Brookville, PA, 15825.  This

17        deposition is being filmed in

18        connection with the case of

19        Barbara Wingard, et al., v.

20        Pennsylvania State Police, et

21        al., U.S. District Court for

22        the Western District of

23        Pennsylvania, Docket Number

24        12-cv-01500.  The witness in

25        this deposition is Kimberly

8

1          Hall.  This deposition is
2          being videotaped on behalf of
3          the Plaintiff.
4                ATTORNEY DONAHOE:
5                Okay.  Did you swear
6          the witness?
7                COURT REPORTER:
8                Would you raise your
9          right hand, please?
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
11   KIMBERLY HALL, HAVING FIRST BEEN DULY
12   SWORN, TESTIFIED AS FOLLOWS:
13   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
14   EXAMINATION
15   BY ATTORNEY DONAHOE:
16   Q.     Ma'am, my name is Tom Donahoe.
17   I'm a Deputy Attorney General.  I
18   represent state agencies when they
19   get sued.  Today I'm representing the
20   Pennsylvania State Police and two of
21   the troopers that work for them,
22   Troopers Battestilli and Johnson.
23   I'm asking you today questions about
24   an incident that occurred back on
25   October 18, 2010, that ultimately

9

1   involved also a death of Troy

2   Hooftallen.  And first of all, am I

3   saying his last name correctly?

4   A.      It's Hooftallen (corrects

5   pronunciation).

6   Q.      Okay.  I thought I might have

7   that wrong.  Could you tell me your

8   name?

9   A.      Kimberly Hall.

10   Q.      Where do you live?

11   A.      30 West Main Street,

12   Brookville, Pennsylvania, 15825.

13   Q.      How long have you lived there?

14   A.      Two years.

15   Q.      Where did you live before

16   that?

17   A.      27 Charley Hill Lane,

18   Punxsutawney, PA, 15767.

19   Q.      How long did you live there?

20   A.      Approximately eight years.

21   Q.      How old are you, ma'am?

22   A.      Forty-two (42).

23   Q.      Are you married?

24   A.      No.

25   Q.      Do you have children?

10

1    A.       Yes.

2    Q.       How many?

3    A.       Four.

4    Q.       What are their ages?

5    A.       Twenty-one (21), 20, 19, and

6    14.

7    Q.       And having the preliminaries

8    out of the way here, I'm going to ask

9    you a few other questions that I ask

10   everybody who I take a deposition

11   from.  One, are you able to hear and

12   understand my questions?

13   A.       Yes.

14   Q.       Have you taken any medications

15   today that might impair your ability

16   to understand my questions?

17   A.       No.

18   Q.       Fine.  If you need to take a

19   break, will you tell me?

20   A.       Yes.

21   Q.       And if you need me to clarify

22   the question, will you tell me?

23   A.       Yes.

24   Q.       And if you want to talk to

25   these other attorneys in the room,

11

1   would you let me know?

2   A.      Yes.

3   Q.      Fine.  Are you employed?

4   A.      Yes.

5   Q.      Where do you work?

6   A.      McDonald's, Allegheny

7   Boulevard in Brookville.

8   Q.      How long have you worked

9   there?

10  A.      Two and a half years.

11  Q.      Where did you work before

12  that?

13  A.      Stella Foods in Punxsutawney.

14  Q.      What is that?

15  A.      They make spaghetti sauces and

16  barbecue sauces.

17  Q.      How long did you work there?

18  A.      Almost five years.

19  Q.      Why did you leave there?

20  A.      They laid me off.  The

21  business was getting slow.

22  Q.      Have they subsequently closed

23  or are they still around?

24  A.      As far as I know, they're

25  still around.

12

1    Q.       Did Troy work there also?

2    A.       At one point, yes.

3    Q.       All right.  Prior to Stella

4    Foods, where did you work?

5    A.       Gerrity's in Scranton, PA.

6    Q.       All right.  So Scranton, PA,

7    where did you grow up?

8    A.       I grew up in Binghamton, New

9    York.

10   Q.       Did you go to high school

11   there?

12   A.       In Johnson City, New York,

13   yes.

14   Q.       And after high school, where

15   did you go?  Did you go to college?

16   A.       No.

17   Q.       Okay.  Did you move away from

18   New York?

19   A.       Yes.

20   Q.       Did you move down to the

21   Scranton area?

22   A.       Yes, I did.

23   Q.       All right.  How long did you

24   remain in the Scranton area?

25   A.       Five years.

13

1    Q.      And where did you move from
2    the Scranton to?  Did you move from
3    Scranton to this
4    Brookville/Punxsutawney area?
5    A.      Yes, to Punxsutawney.
6    Q.      What brought you to
7    Punxsutawney, this area?
8    A.      Troy and I moved out here to
9    be closer to his family.
10   Q.      When did you meet Troy?
11   A.      My daughter was two, so she's
12   14 now.  I'm sorry.  2001.
13   Q.      When you met Troy, you had one
14   child?
15   A.      No, I had the four.
16   Q.      All right.  You already had
17   the four.  Had you ever been married?
18   A.      Yes.
19   Q.      All right.  And had you been
20   married one time or more than once?
21   A.      Just once.
22   Q.      Once.  Did that marriage end
23   in divorce?
24   A.      Yes.
25   Q.      Who was your husband?

14

```
 1   A.       Seth Palaschak.
 2   Q.       And did you have four children
 3   with Seth Palaschak?
 4   A.       No, I had just two.
 5   Q.       Two.  Is Seth Palaschak ---
 6   where does he live now?
 7   A.       Arizona.
 8   Q.       All right.  Is he the father
 9   of the older two?
10   A.       Yes.
11   Q.       Does he contribute to their
12   --- to them at all financially?
13   A.       Not anymore, no.
14   Q.       All right.  And the one is 14
15   and how old's the other?
16   A.       Nineteen (19).
17   Q.       Nineteen (19).
18   A.       My two girls.
19   Q.       All right.  Then you have two
20   other children.  Are they boys or
21   girls?
22   A.       Two boys, two girls.
23   Q.       Who is their father?
24   A.       Mike Visakay.
25   Q.       Is he in this area?
```

15

1    A.        No.

2    Q.        And what are their ages?

3    A.        Fourteen (14) and 19.

4    Q.        Okay.  The two boys are also

5    14 and 19?

6    A.        No, I'm sorry.  The boys are

7    21 --- I'm sorry.  Twenty-two (22)

8    and 20.

9    Q.        All right.  So you were not

10   married to Mike Visakay?

11   A.        No.

12   Q.        Where's he live now?

13   A.        Last I heard, North Carolina.

14   Q.        All right.  And he's not

15   contributing to the kids?

16   A.        No.

17   Q.        All right.  So you had no

18   children with Troy?

19   A.        No.

20   Q.        And you met him in 2001.  At

21   that time, what were the

22   circumstances under which you met

23   Troy?

24   A.        We worked at the same grocery

25   store.

16

1    Q.       Was that in Scranton?

2    A.       Yes.

3    Q.       Which one was that?

4    A.       Price Chopper.

5    Q.       What did Troy do there?  What

6    kind of job?

7    A.       He was the assistant night

8    manager.

9    Q.       And if Troy were alive today,

10   how old would he be?  Was he the same

11   age as you?

12   A.       No, he's two years younger.

13   Q.       Okay.  So he would be 40?

14   You're 42?

15   A.       Yes.

16   Q.       When you met Troy, did he have

17   any children?

18   A.       No.

19   Q.       And he had never had any

20   children?

21   A.       No.

22   Q.       So how long did you and he

23   work together at Price Chopper?

24   A.       I was there for five years, so

25   yeah, five years.

17

1    Q.      Was he the night manager the
2    whole time?
3    A.      Yes.
4    Q.      And did you work the
5    nightshift also?
6    A.      No, I was the assistant deli
7    manager.
8    Q.      All right.  And the reason
9    that you both moved back to ---?  And
10   your place was --- where was it
11   located?  What township?  When this
12   incident occurred.
13   A.      Gaskill Township.
14   Q.      Gaskill.  How close is that to
15   Punxsutawney?
16   A.      Maybe a five-minute drive.
17   Q.      Okay.  So when you moved here,
18   did you go right to Gaskill Township?
19   A.      Yes.
20   Q.      The reason you moved was so
21   that Troy could be close to his
22   family?
23   A.      Yes.
24   Q.      What did his family consist of
25   back at that time?

18

1  A.      His mother, his nephew

2  Matthew, his brother Tim.

3  Q.      Okay.  And you brought the

4  four children with you?

5  A.      Yes.

6  Q.      So you moved to Gaskill.  Did

7  you buy a home?

8  A.      No, we rented.

9  Q.      And I'm sorry for losing the

10  track of these dates, but do you

11  recall the date when you got back to

12  Gaskill Township from Scranton, what

13  year that was?

14  A.      I can't even think.

15  Q.      Okay.  That's fine.  How long

16  did you live at that address?

17  A.      Almost ten years.

18  Q.      Almost ten.  And then you've

19  been out two, so it's 2014.  Did you

20  come back around 2002 or so?

21  A.      Roughly, yes.

22  Q.      All right.  At that point, all

23  the kids are still at home; right?

24  A.      Yes.

25  Q.      All right.  And did Troy live

19

1    with you full time?

2    A.      Yes.

3    Q.      Where did you and he both

4    start working when you came here?

5    A.      I started working at Stella

6    Foods.

7    Q.      And where did Troy start?

8    A.      I don't remember.

9    Q.      Okay.  You know him.  You knew

10   him well, lived with him all those

11   years.  I want to get a little bit of

12   background from you.  And we got a

13   lot from his mom, so I'm not going to

14   belabor the point, but you knew he

15   went to high school in North Central

16   PA somewhere?  Did you know where he

17   went to high school?

18   A.      He went to Austin High School.

19   Q.      Where's that?

20   A.      Potter County.

21   Q.      Potter, okay.  And he

22   graduated from Austin.  And what did

23   he do after high school?  Did he go

24   to further education or to the

25   military or ---?

20

1  A.       No.

2  Q.       Okay.  Did he just begin

3  working?

4  A.       Yes.

5  Q.       And did he start working up in

6  Potter County somewhere?

7  A.       I don't know.

8  Q.       All right.  Do you know up

9  until the time you met Troy if he

10 ever had any further training in any

11 trade or in any specialty or went to

12 school anywhere?

13 A.       Not to my knowledge.

14 Q.       What was his training to be a

15 night manager at the supermarket in

16 Scranton?

17 A.       I really don't know.  He was

18 already the assistant manager before

19 I met him.

20 Q.       When he came back to Gaskill

21 Township, how was Troy's health?

22 A.       To our knowledge, he was

23 healthy.

24 Q.       Fine.  And at that point, if

25 it was 12 years ago and Troy would

21

1    today be 40, he was somewhere near 30

2    at that point, am I right about that,

3    when you moved back here?  Maybe 29,

4    30 years old; is that right?

5    A.      Yes.

6    Q.      When he moved back to this

7    area, this isn't the area where he

8    grew up?  This was just an area where

9    his mom and brother were; am I

10   correct?

11   A.      Yes.

12   Q.      Do you know why his mom and

13   brother were down here or at this

14   location in Punxsutawney and Gaskill

15   Township?

16   A.      As far as I know, Barbara had

17   moved down here to be closer to her

18   mom and her stepfather.

19   Q.      I see.  And Barbara was not

20   --- was she a widow or divorced at

21   the time?

22   A.      Divorced.

23   Q.      Divorced.  Did you ever get to

24   know Troy's father?

25   A.      I only met him at the funeral

22

1    one time.

2    Q.      Okay.  So he was never close

3    to the family down here in Gaskill?

4    A.      No.

5    Q.      All right.  When you moved in,

6    there were the four children, you,

7    and Troy.  Anybody else live there

8    besides the six of you?

9    A.      No.

10   Q.      Were you working full time?

11   A.      Yes, I was.

12   Q.      What school district did the

13   children attend?

14   A.      Punxsutawney Area.

15   Q.      I take it Troy never legally

16   adopted any of the children; ---

17   A.      No.

18   Q.      --- am I correct?  Did Troy

19   eventually begin working here in

20   Gaskill Township?

21   A.      Yes.

22   Q.      And where did he start

23   working?

24   A.      As far as I remember, he

25   worked at Stella Foods for a brief

23

1  period before he went to Jefferson

2  Wholesale --- or Jefferson Grocery.

3  Sorry.

4  Q.     What did he do there at

5  Jefferson Grocery?

6  A.     As far as I know, he stocked

7  shelves.

8  Q.     Was that a full-time job for

9  him?

10  A.     Yes.

11  Q.     Now, at the time this incident

12  occurred on October 18th of 2010, was

13  Troy working anywhere?

14  A.     No.

15  Q.     And for how long had he been

16  out of work prior to this incident?

17  A.     I can't recall, but I believe

18  it was a little over a year.

19  Q.     Over a year.  Up until the

20  time that he was out of work, was it

21  first Stella Foods and then this

22  company, Jefferson Grocery, where he

23  worked?

24  A.     Yes.

25  Q.     Did he have any income other

24

1    than from his jobs, if you know?

2    A.      Not to my knowledge, no.

3    Q.      How were the finances of the

4    family handled while you were living

5    with Troy here in Gaskill Township?

6    In other words, what did you earn?

7    Do you recall?

8    A.      I worked anywhere from 30 to

9    35 hours a week.

10   Q.      Any idea what the hourly rate

11   was?

12   A.      $7.25 an hour, I believe.

13   Q.      And did you get benefits with

14   that as well?

15   A.      No.

16   Q.      No benefits.  And how about

17   Troy?  What was he earning, if you

18   recall, before he went out of work?

19   A.      I don't recall.

20   Q.      Was he 40 hours a week?

21   A.      Yes, he was full time, 40

22   hours.

23   Q.      Did he get benefits?

24   A.      No.

25   Q.      Okay.  So he did not have

25

1   health coverage from his employer?

2   A.      No.

3   Q.      Okay.  And any other benefits

4   that he had that you are aware?

5   A.      I know he applied for the

6   Access.

7   Q.      Access medical coverage?

8   A.      Yes.

9   Q.      Did he apply for that and get

10  it, do you know?

11  A.      I'm not sure.

12  Q.      All right.  Did you have

13  Access medical coverage?

14  A.      Yes.

15  Q.      And how were your children

16  covered?

17  A.      With the Access.

18  Q.      With Access.  All right.  So

19  Troy's employment never provided

20  insurance, health insurance, for the

21  kids or yourself; am I correct?

22  A.      No.

23  Q.      Did you have a bank account

24  separate from Troy?

25  A.      Yes.

26

1    Q.       Where did you bank?

2    A.       I had First Commonwealth.

3    Q.       Do you know where Troy banked?

4    A.       I believe he had the same.

5    Q.       Did you two have a joint

6    account?

7    A.       No.

8    Q.       All right.  Whose name was on

9    the lease of the home, the residence?

10   A.       Both of ours.

11   Q.       Both, all right.  Was it

12   always both for the time you lived in

13   Gaskill?

14   A.       Yes.

15   Q.       Did Troy and you contribute

16   equally to the rent?

17   A.       When he was working, yes.

18   Q.       All right.  During the last

19   year, did the burden of paying the

20   rent fall to your salary?

21   A.       Yes.

22   Q.       What about utilities?  Was

23   that also true, that it was equally

24   shared up until the time he became

25   unemployed?

27

1    A.      Yes.

2    Q.      All right.  Were there any

3    other costs besides rent and

4    utilities that you both shared?  Let

5    me ask you this.  Did you have a car

6    together?

7    A.      No.

8    Q.      Did you pay for your own car?

9    A.      Yes.

10   Q.      Did he pay for his?

11   A.      Yes.

12   Q.      All right.  Any other costs or

13   expenses that you both shared?

14   A.      Besides food, that was it.

15   Q.      Okay.  Did you buy that

16   together?

17   A.      Yes.

18   Q.      And would that be food that

19   was also obviously for the kids;

20   right?

21   A.      Yes.

22   Q.      And so while he was paying

23   part of your expenses, that meant

24   that he was paying part for the

25   children ---

28

1   A.        Right.

2   Q.        --- in terms of utilities,

3   rent and food?

4   A.        Yes.

5   Q.        All right.  Was that the case

6   all the time that you two had lived

7   together?

8   A.        Yes.

9   Q.        All right.  Did any of your

10  children pursue higher education

11  beyond high school?

12  A.        No.

13  Q.        All right.  Did Troy ever

14  contribute to any tuition costs for

15  them in any way?

16  A.        No.

17  Q.        All right.  Any other expenses

18  of your children that you can think

19  of that Troy contributed to?

20  A.        No.

21  Q.        All right.  During the time

22  that you knew Troy, had he ever been

23  arrested or charged with any crimes?

24  A.        No.

25  Q.        All right.  Do you know if he

29

1    ever had been prior to the time you

2    knew him?

3    A.      No.

4    Q.      All right.  No problem with

5    his driver's license ever being

6    suspended or anything like that?

7    A.      No.

8    Q.      And none for you either, I

9    would take it?

10   A.      No.

11   Q.      These are all questions that I

12   ask everybody when I take their

13   deposition, so I don't mean to be

14   offensive.  What was the cause of

15   Troy not working for the year or so

16   prior to the incident in 2010?

17   A.      He had health problems.

18   Q.      All right.  Do you know the

19   nature of them generally ---?

20   A.      Yes.  He had ulcerative

21   colitis.

22   Q.      Did he have any other problems

23   that go along with ulcerative colitis

24   you were aware of?

25   A.      No.

30

1   Q.      All right.  Did he go to a

2   doctor for treatment?

3   A.      Yes.

4   Q.      Who was his doctor?

5   A.      I believe it was Doctor

6   Chambers in Punxsutawney.

7   Q.      Was Chambers a specialist?

8   A.      I'm not sure.

9   Q.      Okay.  Do you know for how

10  long Troy suffered with ulcerative

11  colitis that you were aware of prior

12  to his death?

13  A.      It was a little over a year.

14  Q.      Was he ever hospitalized for

15  that condition?

16  A.      Other than going in for a

17  colonoscopy, no.

18  Q.      Where did he have the

19  colonoscopy?

20  A.      He had one done in Indiana and

21  he had one done in Punxsutawney.

22  Q.      Other than it being ulcerative

23  colitis, did you learn anything more

24  about the condition?

25  A.      No.

31

1    Q.      All right.  Prior to the time

2    that Troy was diagnosed with

3    ulcerative colitis, did he take any

4    medications that you're aware of?

5    A.      Just the ones from the doctor

6    to help him.

7    Q.      No, I mean even before, before

8    the time he learned he had this

9    disease.

10   A.      Oh, no.  Not to my knowledge.

11   Q.      And do you know what the

12   doctor prescribed for Troy with

13   respect to his ulcerative colitis?

14   A.      I really don't know.

15   Q.      Okay.  Do you know if it was

16   prescription medication?

17   A.      Yes.

18   Q.      Would you know where he bought

19   it?

20   A.      At the time it was Rite Aid, I

21   believe.

22   Q.      Is that in ---

23   A.      Punxsutawney.

24   Q.      --- Punxsutawney?  Okay.  And

25   it would have been on Doctor

32

1  Chambers' prescription?

2  A.     Yes.

3  Q.     And do you know his first

4  name?

5  A.     No, I don't.

6  Q.     And he's in Punxsutawney.  Do

7  you know if he's an internist or

8  gastroenterologist?

9                  ATTORNEY CORRADO:

10                 Objection.  She already

11        said she didn't know if he was

12        a specialist.

13 BY ATTORNEY DONAHOE:

14 Q.     Okay.  You don't know what

15 kind of ---?

16 A.     No.

17 Q.     Okay.  Other than Doctor

18 Chambers, did he treat with anybody

19 else that you knew of?

20 A.     Not to my knowledge.

21 Q.     Did you observe how ulcerative

22 colitis affected Troy in his daily

23 activities?

24 A.     Yes.

25 Q.     Can you describe what you

33

1   observed?

2   A.      He had a lot of stomach pains,

3   continuously going to the bathroom.

4   Q.      Did they affect him

5   differently at various times of the

6   day?

7   A.      No.

8   Q.      Did it affect his diet?

9   A.      No.

10  Q.      Did he gain weight, lose

11  weight, anything that you noticed

12  about his physical appearance during

13  the year or so that he was

14  unemployed?

15  A.      No.

16  Q.      All right.  And when he became

17  ---?  Was it his condition that made

18  him no longer able to work?

19  A.      Yes.

20  Q.      And what did he say about what

21  his condition did that made him

22  unable to work?

23  A.      It was just very hard for him

24  to work because he was always running

25  to the bathroom.

34

1   Q.      And I forgot to ask you this,

2   but do you know, did he contribute

3   any of his salary when he was working

4   to his mother?

5   A.      Not to my knowledge.

6   Q.      All right.  Do you know if he

7   contributed it to anyone else?

8   A.      No.

9   Q.      And he did own a car?

10  A.      Yes.

11  Q.      Correct?  Did he own anything

12  else you're aware of other than a

13  car, because you didn't have the

14  house, you rented the house?  But did

15  he own like a hunting camp, any

16  camper, motorcycle, anything like

17  that?

18  A.      No.

19  Q.      All right.  When Troy became

20  unable to work, do you know if he

21  applied for any kind of disability

22  benefits?

23  A.      Not to my knowledge.

24  Q.      Okay.  Not Social Security?

25  A.      No.

35

1   Q.      Do you know when he applied

2   for Medicaid Access?

3   A.      I don't remember.

4   Q.      Okay.  Prior to the date

5   October 18th of 2010, do you know

6   whether or not Troy had ever taken

7   any drugs not for medical purposes

8   but to get high?

9   A.      No.

10  Q.      Is that no, I don't know, or

11  he did not?

12  A.      To my knowledge.  You know, I

13  don't know.

14  Q.      Okay.

15  A.      I didn't see him take

16  anything.

17  Q.      Did you ever see him take ---?

18  Well, first of all, with respect to

19  Mucinex, do you know whether or not

20  he was ever taking Mucinex?

21  A.      I've never seen him take it.

22  Q.      Okay.  Do you know if it was

23  in the house or not?

24  A.      Not to my knowledge.

25  Q.      All right.  And do you and

36

1   Troy share a bathroom?

2   A.      Yes.

3   Q.      Did it have a medicine

4   cabinet?

5   A.      Yes.

6   Q.      Did you ever see Mucinex in

7   the bathroom medicine cabinet or

8   anywhere else in the house?

9   A.      No.

10  Q.      Do you even know what a box of

11  it looks like?

12  A.      Yes.

13  Q.      Okay.  And you had never seen

14  it in the home before?

15  A.      No.

16  Q.      And you have no knowledge or

17  understanding that Troy had ever

18  abused it before?

19  A.      No.

20  Q.      Did his mom ever tell you that

21  he did ---

22  A.      No.

23  Q.      --- prior to the date of this

24  incident?

25  A.      No.

37

1  Q.     Did his brother Tim ever tell
2  you that he had done it before?
3  A.     No.
4  Q.     Did he ever smoke marijuana
5  that you know of?
6  A.     In the past, yes.
7  Q.     How about in the year before
8  the incident in October of 2010?
9  A.     No.
10 Q.     All right.  Did he drink
11 alcohol?
12 A.     Occasionally.
13 Q.     Okay.  But never abused it if
14 you know?
15 A.     No.
16 Q.     All right.  And he lived with
17 you, you know, all the time?  It
18 wasn't like he moved in and out or
19 anything?
20 A.     No.
21 Q.     All right.  Did you ever have
22 occasion to have to get the police
23 called to your home for any
24 threatened violence by Mr. Hooftallen
25 against either you or anybody else in

38

1   the home?

2   A.      No.

3   Q.      All right.  There was an

4   incident of an attempted suicide a

5   couple weeks before his demise; am I

6   correct about that?

7   A.      Yes.

8   Q.      All right.  Other than that

9   incident, did you ever have to call

10  the police with respect to Troy's

11  behavior?

12  A.      No.

13  Q.      Do you know if his family ever

14  had to?

15  A.      Not to my knowledge.

16  Q.      All right.  Did you ever

17  observe his behavior to be erratic or

18  violent in a way that caused you to

19  have concern prior to the date of

20  this incident or the suicide?

21  A.      No.

22  Q.      All right.  Were you present

23  when he became --- when his behavior

24  was such that he was treated for

25  suicidal thoughts?  Were you there?

39

1   A.      I was at work that day.

2   Q.      All right.  Can you tell me

3   what you recall about that incident?

4   A.      I had come home from work and

5   I went in the bedroom to go change,

6   and he was sleeping.  And there was a

7   note on the nightstand.  And I read

8   it and I took it over to Barbara.

9   Q.      All right.  What shift were

10  you working that day?

11  A.      I believe I was working either

12  5:00 a.m. or 6:00 a.m. in the morning

13  until 2:00, 3:00 in the afternoon.

14  Q.      All right.  So you came home

15  in the afternoon and there was a note

16  on the nightstand?

17  A.      Yes.

18  Q.      All right.  What did it say?

19  A.      He just said he was sorry and

20  he loved everybody.

21  Q.      It was Troy's note?

22  A.      Yes.

23  Q.      All right.  And was it signed

24  by him?

25  A.      I don't remember.

40

1   Q.      Other than I'm sorry and he

2   loved everyone, anything else he

3   indicated in that note?

4   A.      I don't remember.

5   Q.      All right.  So you took it to

6   Barbara.  Did she live nearby?

7   A.      Yes, she lived on the

8   property.

9   Q.      Fine.  Who owned the property?

10  A.      Charles Seitz.

11  Q.      All right.  So how many

12  residences besides the --- besides

13  yours and Barbara's were on the

14  property?

15  A.      I want to say there was seven.

16  Q.      Fine.  Seitz is S-E-I-T-Z?

17  A.      Yes.

18  Q.      Did he own then a number of

19  residences that he rented out to

20  people?

21  A.      Yes.  It was called Hillcrest

22  Farm.

23  Q.      Very good.  Okay.  Could you

24  walk over to Barbara's home?

25  A.      Yes.

41

1   Q.      You took it over there.  Who

2   was there when Barbara was there?

3   A.      It was Barbara and Tim.

4   Q.      Did Tim live with Barbara?

5   A.      Yes.

6   Q.      Was he younger than Troy?

7   A.      Yes.

8   Q.      Did he work?

9   A.      Back in Scranton he did, but

10  when we moved to Punxsy, he didn't.

11  Q.      How come he didn't work?

12  A.      I guess he had hurt himself

13  when he was working for a tree guy.

14  Q.      Okay.  So was he getting any

15  kind of disability benefits?

16  A.      Not to my knowledge.

17  Q.      All right.  And did Barbara

18  work, the mom?

19  A.      No.

20  Q.      All right.  Did either Barbara

21  or Tim contribute any money to your

22  household?

23  A.      No.

24  Q.      What did you say to Barb and

25  what did you and she do?

42

1    A.        I told her I think he's trying

2    to kill himself, and I gave her the

3    note.  And she called 911, and Tim

4    ran over.

5    Q.        All right.  Tim ran to your

6    home?

7    A.        Yes.

8    Q.        And did you go back to the

9    home?

10   A.        No.

11   Q.        Where did you stay?

12   A.        I didn't go right away.  I

13   stayed with Barbara.

14   Q.        All right.  And what happened?

15   How did that incident then play out?

16   What happened?

17   A.        Tim had gotten Troy up and

18   woke him up and the ambulance had

19   come and they had taken him to the

20   hospital to pump his stomach.

21   Q.        What hospital?

22   A.        Punxsutawney.

23   Q.        All right.  Now, when you saw

24   Troy and read the note, was there any

25   indication as to what, if anything,

43

1    he had ingested?

2    A.      There was a pill bottle on the

3    table.   I don't remember what it was.

4    Q.      Did you ever know what it was?

5    A.      No.

6    Q.      Do you know whose pills they

7    were?

8    A.      No.

9    Q.      How long did they keep Troy at

10   the hospital?

11   A.      A couple of days, I believe.

12   Q.      Was he involuntarily committed

13   to the hospital for a psychiatric

14   evaluation, if you know?

15   A.      Yes.

16   Q.      And it was the Punxsutawney

17   Hospital?

18   A.      Yes.

19                   ATTORNEY DONAHOE:

20             All right.   I believe I

21        have those records provided to

22        me on a CD, but if I don't,

23        would you be willing to

24        provide authorization for

25        those?

44

1          ATTORNEY CORRADO:

2               Yes.

3     BY ATTORNEY DONAHOE:

4     Q.      Did you go into the hospital

5     and visit with Troy and his doctors

6     while he was in there?

7     A.      I visited with Troy, yes.

8     Q.      Okay.  Did you ever talk to

9     his doctors?

10    A.      No.

11    Q.      What did Troy say about why he

12    was taking an overdose?  What did he

13    say about his incident?

14    A.      He was just tired of being in

15    pain from the colitis.

16    Q.      Did he complain of pain often

17    in the year that he was diagnosed

18    with colitis?

19    A.      Yes.

20    Q.      What type of complaints would

21    he make?

22    A.      Just that his stomach hurt.

23    Q.      Okay.  Anything else?

24    A.      No.

25    Q.      Now, prior to this year, had

45

1    he ever exhibited any indication that

2    he was suicidal?

3    A.       No.

4    Q.       All right.  What else did he

5    say about I'm tired of being in pain

6    and that was my reason for trying to

7    kill myself?  What else did he say?

8    Do you remember?

9    A.       No, I don't.

10   Q.       All right.  Did you talk to

11   him and try to elicit any kind of

12   positive response from him?

13                    ATTORNEY CORRADO:

14                    That's vague.

15                    ATTORNEY DONAHOE:

16                    Yeah, you're right.

17   BY ATTORNEY DONAHOE:

18   Q.       Did he ever indicate that he

19   was no longer suicidal?

20   A.       Yes.

21   Q.       What did he say?

22   A.       He said he was happy that it

23   didn't go through.

24   Q.       All right.  Did he express any

25   plans for dealing with his colitis?

46

1    A.       Yes, he was going to go to ---
2    make sure he got another doctor
3    because the prescriptions they were
4    giving him wasn't working.
5    Q.       So did he have some --- did he
6    indicate anything that would indicate
7    to you that he was hopeful for the
8    future or he had any goals for his
9    future health?
10   A.       Yes.
11   Q.       And what did he say in that
12   regard?
13   A.       He just wanted to find a good
14   doctor to help him get better.
15   Q.       Okay.  Then did he return
16   home?
17   A.       Yes.
18   Q.       This incident, how many weeks
19   before his death did that incident
20   happen?
21   A.       Just a few weeks, I believe.
22   Q.       What was his demeanor during
23   the few weeks he was home before
24   October 18th, 2010?
25   A.       He was his same, happy self.

47

1    Q.        All right.  What would he do

2    during the day?

3    A.        Nothing really.  Just hang out

4    at home while the kids and I were

5    out.

6    Q.        All right.  Did he have a

7    routine that he followed, if you

8    know?

9    A.        Yes.  He would get up and eat

10   something and then he'd go over and

11   see his mom for a while.

12   Q.        Okay.  Anything else?

13   A.        Not to my knowledge.

14   Q.        Was he a smoker?

15   A.        Yes.

16   Q.        How many packs a day?  Do you

17   know?

18   A.        Maybe a half a pack.

19   Q.        Any other activities he had as

20   hobbies or ---?

21   A.        He played videogames.

22   Q.        All right.  Your house or her

23   house?

24   A.        Both.

25   Q.        Did he have any sports or

48

1    anything that he engaged in?

2    A.      He liked playing basketball.

3    Q.      All right.  Was he able to do

4    that during the year he had Crohn's

5    --- or I mean, ulcerative colitis?

6    A.      Not really, no.

7    Q.      All right.  Was he a hunter?

8    A.      No.

9    Q.      Fisherman?

10   A.      No.

11   Q.      Any other activities you can

12   think of?

13   A.      No.

14   Q.      All right.  Who did he

15   socialize with besides Tim and his

16   mom?

17   A.      Just me and my children, and

18   that's it.

19   Q.      Did you belong to any clubs or

20   organizations that you went to on a

21   regular basis?

22   A.      No.

23   Q.      I'm sure you recall the day

24   when the state police and the EMS

25   were called to your residence and

49

1    Troy ultimately died that night.  Do

2    you recall it was October 18th, 2010?

3    A.      Yes.

4                    ATTORNEY CORRADO:

5                    I just want to offer a

6           break if she wants one.

7                    ATTORNEY DONAHOE:

8                    Yeah, I'm going to get

9           a break too and get a glass of

10          water if you don't mind.  Take

11          a minute.

12                   VIDEOGRAPHER:

13                   This deposition has

14          paused.

15   OFF VIDEO

16   SHORT BREAK TAKEN

17   ON VIDEO

18                   VIDEOGRAPHER:

19                   Are you ready?

20   BY ATTORNEY DONAHOE:

21   Q.      Oh, I had asked you about that

22   day of October 18, 2010.  And

23   whatever I asked you the last time,

24   let me just start.  Let me ask you,

25   how did that day go for you?  Were

50

1    you working?

2    A.      I can't remember what day of

3    the week it was.  I think it was a

4    Sunday.

5    Q.      October 18th?

6    A.      Uh-huh (yes).

7    Q.      Okay.  It will be on the

8    report somewhere, but ---?

9    A.      If it was a weekday, I was

10   working.

11   Q.      Okay.  The incident occurred

12   late in the evening, it began; right?

13   After ten o'clock p.m.?

14   A.      Yes.

15   Q.      So where were you initially

16   when the incident began?  Were you

17   sleeping?

18   A.      Yes.

19   Q.      All right.  And you don't know

20   if you had worked that day or not?

21   A.      That day, no.  I had work the

22   next day.

23   Q.      When you have work the next

24   day, what time are you required to be

25   at your employment?

51

1   A.      5:00 or 6:00 in the morning.

2   Q.      All right.  So that's early?

3   A.      Yes.

4   Q.      What time did you have to get

5   up?

6   A.      Usually I usually got up about

7   an hour before.

8   Q.      So you could have been getting

9   up as early as 4:00 or 5:00 in the

10  morning?

11  A.      Yes.

12  Q.      You're in bed.  And were the

13  other kids all in bed too?

14  A.      My three younger ones were,

15  yes.

16  Q.      All right.  And I read your

17  statement.  One of the kids was still

18  up with Troy?

19  A.      Yes, my son Joshua.

20  Q.      How old was Josh?  How old is

21  he now?

22  A.      He's going to be 23 this year,

23  I think.

24  Q.      So he would have been what,

25  19, 20 at the time?

52

1    A.       Yeah, he had already

2    graduated.

3                    (Hall Deposition

4                    Exhibit One marked for

5                    identification.)

6    BY ATTORNEY DONAHOE:

7    Q.       All right.  And I have a copy

8    of your statement.  And I marked it

9    as Hall Exhibit Number One and I

10   provided a copy to your attorney, and

11   I'm going to give a copy to you.  And

12   take as long as you want to and look

13   at that.  And you let me know when

14   you're ready.  Okay?

15   WITNESS COMPLIES

16   A.       Okay.

17   BY ATTORNEY DONAHOE:

18   Q.       All right.  The last page says

19   June 4th, 2011 on it.

20   OFF RECORD DISCUSSION

21   BY ATTORNEY DONAHOE:

22   Q.       The last page of this exhibit

23   says sworn to and subscribed June 4,

24   2011.  Is that pretty much your

25   recollection of when you gave the

53

1   statement?

2   A.      Yes.

3   Q.      Do you know who typed up your

4   statement?

5   A.      No, I don't.

6   Q.      Did you write out a statement

7   or did you get interviewed and

8   someone recorded you?

9   A.      I wrote out a statement and I

10  also got interviewed.

11  Q.      All right.  At the same

12  meeting?

13  A.      No.

14  Q.      When did you write out the

15  statement?  Was it earlier than this

16  statement is dated?

17  A.      Yes.

18  Q.      Where were you when you wrote

19  your statement out?

20  A.      I was at home.

21  Q.      Did you write it out in the

22  presence of anybody else?

23  A.      No.

24  Q.      Who requested that you write

25  out a statement?

54

1   A.      I believe it was the lawyers

2   in the case.

3   Q.      Who did you send this

4   statement to?

5   A.      I had given it to Barbara

6   Wingard, and she had given it to her

7   lawyers.

8                   ATTORNEY DONAHOE:

9                   And I don't think I

10              have a copy of the written

11              statement, so I would request

12              it that if Counsel has it,

13              they send me a copy of the

14              written statement.

15                  ATTORNEY HAKEN:

16                  I will look for it.

17                  ATTORNEY DONAHOE:

18                  You don't know if you

19              have it or not?

20                  ATTORNEY HAKEN:

21                  I do not.

22                  ATTORNEY DONAHOE:

23                  Is it possible it was

24              with the Lanahan firm that was

25              previously ---?

55

1           ATTORNEY HAKEN:

2                That is a possibility.

3           ATTORNEY DONAHOE:

4                Okay.  Could you see if

5       you do?

6           ATTORNEY HAKEN:

7                Yes, I'll look at that.

8           ATTORNEY DONAHOE:

9                Thanks.

10   BY ATTORNEY DONAHOE:

11   Q.      And then you did a written

12   statement and then you also did a

13   recording --- a recorded statement;

14   is that correct?

15   A.      As far as I know, yes.

16   Q.      Now, did someone come and

17   interview you to get that statement?

18   A.      Yes.

19   Q.      And was that approximately on

20   June 4th of 2011?

21   A.      I really don't remember.

22   Q.      Okay.  Where did it happen?

23   A.      At my residence.

24   Q.      Who was present for that

25   statement?

56

1    A.       It was myself, Barbara, and I

2    can't remember who the guy was.

3    Q.       Did you understand he was an

4    investigator for somebody?

5    A.       Yes.

6    Q.       Was it for her, Barbara?

7    A.       Yes, it was.

8    Q.       Fine.  Is that statement what

9    generated this Affidavit?

10   A.       Yes.

11   Q.       All right.  And you signed the

12   Affidavit?

13   A.       Yes.

14   Q.       Did you sign it in front of

15   this notary here or did you send ---?

16   I don't really care.  I mean, do you

17   know if the notary was there?

18   A.       I don't remember.

19                     ATTORNEY HAKEN:

20                     I'm sorry.  Are you

21           asking if the notary was there

22           for the recorded?

23                     ATTORNEY DONAHOE:

24                     No, just for ---.

25                     ATTORNEY HAKEN:

57

1          Oh, okay.

2    BY ATTORNEY DONAHOE:

3    Q.       But anyway, I'm going to go

4    through the statement a little bit

5    because it seems to be in

6    chronological order.  So going to the

7    first page of it, it said at number

8    four, the purpose of my declaration

9    is to recall my observations of the

10   incident that led to the death of

11   Troy Hooftallen in October 2010.

12   Number five, Troy had been depressed

13   over his ulcerative colitis and bowel

14   disorder issues.  Troy had been

15   taking Mucinex as he felt it provided

16   relief for his health problems.  Do

17   you know how you became aware he had

18   been taking Mucinex?

19   A.       I had heard him say it at one

20   time.

21   Q.       And you previously had said, I

22   assume this doesn't refresh your

23   recollection, that you don't know if

24   it was over the counter or

25   prescription?

58

1   A.      I don't know.

2   Q.      Number seven, you said I had

3   gone to bed.  Troy and my older son

4   Josh were in the living room watching

5   TV.  About 10:30 p.m., I heard Troy

6   scream out my name.  Josh told me

7   that Troy just stood up and screamed.

8   I came out to the living room and

9   asked what was going on.  Troy seemed

10  very confused.  Was your home a one-

11  floor?

12  A.      Yes.

13  Q.      So you just came down the

14  hallway?

15  A.      Yes.

16  Q.      And encountered both of the

17  --- both gentlemen?

18  A.      Yes.

19  Q.      Number nine, I called Tim

20  Hooftallen, Troy's brother, to come

21  over and talk to Troy.  Tim did.  He

22  asked Troy if he had been taking

23  pills, Mucinex.  Troy said he hadn't,

24  that he was done with them.  Did you

25  overhear that conversation?

59

1    A.      Yes.

2    Q.      Did that take place in the

3    living room?

4    A.      Yes.

5    Q.      Now, at one point in the

6    Affidavit, you indicated that you do

7    have a photograph of the mark on the

8    wall that was created by Troy's

9    hitting the wall with his head?

10   A.      The bar.

11   Q.      The bar.  Do you have that

12   photograph anywhere?

13   A.      I had given that to Barbara.

14   Q.      All right.

15                  ATTORNEY DONAHOE:

16                  Does Counsel have a

17          copy of that photograph?

18                  ATTORNEY HAKEN:

19                  We at this point have

20          not located it.

21                  ATTORNEY DONAHOE:

22                  Fine.  All right.

23                  ATTORNEY HAKEN:

24                  I can look into it

25          further and see if we can ---.

60

ATTORNEY DONAHOE:

Just that it would give a little bit of a diagram, an understanding of the house.

BY ATTORNEY DONAHOE:

Q.      And you don't live there anymore?

A.      No.

Q.      Do you have any photographs of that living room?

A.      I believe I do at home somewhere.

Q.      All right.  And I'm going to ask your lawyer if you could ask to get --- if you can locate them to provide a copy because it will --- you know, a picture's worth a lot of words.  So at this point, we don't have a picture of the living room. I'm going to page two.  And you said I sat with Troy for a while.  I intended to walk him over to his mom's place and I helped Troy start to get his shoes and sweatshirt on. After a brief amount of time passed,

61

1    Troy seemed to completely forget what

2    was going on.

3           So on the prior page, you

4    indicated that when you went into the

5    room, into the living room, he seemed

6    confused, and here Troy forgot what

7    was going on.  Had you ever observed

8    this type of demeanor with Troy

9    previous to this evening?

10   A.     No.

11   Q.     And what more can you say

12   about your observations of his

13   demeanor other than what you wrote?

14   A.     Nothing really.  I mean, he

15   just didn't know what was going on.

16   Q.     Did you have any understanding

17   as to ---?  I mean, ordinarily Troy,

18   if he was awake, would know what was

19   going on; am I correct?

20   A.     Right.

21   Q.     Did you have any understanding

22   about what was the cause of Troy

23   seeming to be confused and not

24   knowing what was going on?

25   A.     No, I didn't.

62

1    Q.       Okay.  At that point, Troy,

2    after you noticed that he seemed to

3    have forgotten what was going on, you

4    called Barbara, his mom, and Tim.

5    They both came over, but only Tim

6    came into your home at first, and

7    Barb remained in their car.  They

8    were going to try to get Troy to the

9    hospital.  And would this have been

10   Punxsutawney Hospital?

11   A.       Yes.

12   Q.       All right.  The same place

13   where he went the last time that he

14   had his episode of depression?

15   A.       Yes.

16   Q.       And how did you know that they

17   were going to try to get him to the

18   hospital?  Did Tim tell you that?

19   A.       Yes.

20   Q.       Troy went from being happy to

21   sad to mad.  Is this during the time

22   you were sitting there with him after

23   he had forgotten what was going on

24   and while Tim was in the room with

25   him?

63

1    A.        Yes.

2    Q.        It said he began to throw

3    small items.  He wasn't throwing them

4    at anyone, just tossing them in the

5    room.  During this period, was Troy

6    standing up and walking around or was

7    he sitting?

8    A.        In the beginning he was

9    sitting on the couch next to me.  And

10   then he had gotten up.

11   Q.        And what kind of items was he

12   throwing?

13   A.        An empty soda bottle.  Just

14   minor things that wouldn't even hurt

15   anybody if they got hit.

16   Q.        What was he saying when he was

17   throwing these items?

18   A.        He didn't know what was going

19   on.  He didn't want to go to the

20   hospital.  At first he didn't know

21   that he was going to the hospital.

22   Tim tried telling him let's go get a

23   pack of cigarettes, let's go down to

24   the store.  Anything to get him in

25   the vehicle.

1    Q.      Did Troy seem in physical

2    distress at all that you could

3    observe?

4    A.      No.

5    Q.      He was not overtly sweating or

6    red or anything like that?

7    A.      No.

8    Q.      Was he ever out of breath?

9    A.      No.

10   Q.      And prior to this date, did

11   you know whether or not Troy, other

12   than having ulcerative colitis, had

13   any other health problems?

14   A.      Not to my knowledge.

15   Q.      Tim went outside and called

16   911 on your cell phone and asked for

17   an ambulance, and you said I heard

18   Tim tell the operator that Troy knew

19   Tae Kwan Do?

20   A.      Yes.

21   Q.      Okay.  Did you know that Troy

22   knew these things?

23   A.      Yes.

24   Q.      Were they hobbies of his?

25   A.      Yes.

65

1    Q.        Besides Tae Kwan Do, did he

2    have as a hobby any other marshal art

3    techniques?

4    A.        No.  He did all that before we

5    got together.

6    Q.        All right.  Did he ever

7    practice them afterwards?

8    A.        No.

9    Q.        Did he have any other kind of

10   hobby in terms of boxing or sparring

11   with other folks who studied these

12   marshal arts?

13   A.        No.

14   Q.        All right.  And then going to

15   paragraph 14, you said instead of an

16   ambulance coming, a state police car

17   arrived with two troopers, a younger

18   guy, really tall and stocky, and an

19   older 40s, I take offense at that.

20   A.        Sorry.

21   Q.        Smaller guy.  And they came

22   into my house.  Now, number 14, did

23   you understand that there was no

24   request by Tim for police, that he

25   only had requested an ambulance?

66

1    A.       Yes, that's all I knew.

2    Q.       Do you know whether Barbara or

3    Tim wanted the police to come?

4    A.       No.

5    Q.       In the prior incident, was

6    Troy taken by ambulance to the

7    Punxsutawney Hospital?

8    A.       Yes.

9    Q.       Did the police assist with

10   that call?

11   A.       Yes.

12   Q.       Which police assisted with

13   that?  Was it local or was it the

14   state police?

15   A.       I believe it was the state.

16   Q.       But were you surprised that

17   state police showed up for this call?

18   A.       Yes.

19   Q.       Why were you surprised?

20   A.       I was surprised because they

21   came before the ambulance.

22   Q.       In the prior call, did they

23   come after the ambulance?

24   A.       Yes.

25   Q.       All right.  In the prior call,

67

1   was Troy combative in any way?

2   A.      I don't know.  He was just

3   very calm.

4   Q.      I'm not talking about this

5   incident, October 18th.

6   A.      Right, no.

7   Q.      It's the prior?

8   A.      Yeah, yeah.

9   Q.      Okay.  So he was calm on that

10  one.  Number 15 says Troy was pissed

11  that the cops were there.  The cops

12  kept asking what is wrong.  Troy

13  responded I understand now.  The

14  younger cop said understand what.

15  Troy responded life.  They did not

16  seem at all interested in trying to

17  calm Troy down.  The younger cop,

18  Battestilli, had a major attitude and

19  acted like he wanted to kick Troy's

20  ass.  He kept saying, hey, Troy, what

21  are we doing here and what are you

22  going to do next.

23          Now, from the time the police

24  entered your residence until the time

25  they actually started to get into a

68

1  physical scuffle with Troy, do you

2  know how long they were there talking

3  to him?

4  A.      I don't recall.

5  Q.      Are you able to put any time

6  estimate on that period at all?

7  A.      I want to say maybe about 15

8  minutes, 20 minutes.

9  Q.      During that period of time,

10  where were you located within the

11  residence?

12  A.      In the living room with them.

13  Q.      All right.  Have they entered

14  from the rear of the residence?

15  A.      Yes.

16  Q.      All right.  Is there a front

17  door?

18  A.      Yes.

19  Q.      Does the front door enter

20  directly into the living room?

21  A.      Yes.

22  Q.      All right.  Then your mother-

23  in-law drew a diagram of the living

24  room/kitchen area.  And it was not

25  easy for her and I'm sure if we had a

69

1    photograph it would be a lot easier,

2    but would your Counsel be willing to

3    let you make an attempt at drawing a

4    diagram here, just like a very rough

5    outline of the kitchen/living

6    room/hallway?

7                      ATTORNEY HAKEN:

8                      Okay.  That's fine.

9    BY ATTORNEY DONAHOE:

10   Q.      Make it big because I have

11   lousy eyes.

12   WITNESS COMPLIES

13   BY ATTORNEY DONAHOE:

14   Q.      Thank you.

15   A.      You're welcome.

16   Q.      I'm looking at this diagram,

17   and it looks like as you walk in the

18   front door of your old residence

19   you'd walk right into the living

20   room?

21   A.      Yes.

22   Q.      And then to the right of the

23   living room is a dining room?

24   A.      Yes.

25   Q.      Is the dining room separated

70

1   by a wall from the living room?

2   A.      No.

3   Q.      All right.  And then it says

4   bar, which is kind of like an opening

5   in the wall from the kitchen to the

6   living room?

7   A.      Right.

8   Q.      How big's the opening?  Does

9   it run the whole distance of the

10  width of the living room or was it a

11  square kind of ---?

12  A.      It was just a square.

13  Q.      Any idea how big, like three

14  feet by four or anything?

15  A.      No, I don't know.

16  Q.      All right.  Would it be

17  something that people would pass food

18  from the kitchen ---

19  A.      Yes.

20  Q.      --- into the dining room area

21  with?

22  A.      The kitchen to the living

23  room.  We just had a counter from the

24  kitchen to the ---

25  Q.      To the dining room?

71

1    A.       --- dining room.

2    Q.       I see.  And then as you walked

3    in the front door, if you didn't kind

4    of bear to the right and went

5    straight, you'd go down a hallway

6    that would lead to the bedrooms; am I

7    correct about that?

8    A.       You'd go straight and then

9    you'd have to take a left to go to

10   the hallway to the bedrooms.

11   Q.       Very good.  And so was there a

12   door that led from the hallway or did

13   it just open into ---?

14   A.       It was just open.

15   Q.       There was --- I understood,

16   was also a loveseat, a couch, and a

17   television, and a coffee table.  And

18   would you be ready to try to draw

19   this in?  It's not to scale and it's

20   your best efforts, but it does kind

21   of help a little bit in

22   understanding.

23   WITNESS COMPLIES

24   BY ATTORNEY DONAHOE:

25   Q.       Great.  And it was a big

72

1    television across from the couch?

2    A.      Yes.  It was an entertainment

3    center with a TV inside of it.

4    Q.      Great.  Coffee table, was that

5    wooden or glass?

6    A.      Wooden.

7    Q.      So going back to that

8    paragraph 15 on there, how did you

9    know that Troy was pissed that the

10   cops were there?

11   A.      Because he kept telling them

12   to get out of his house.

13   Q.      Other than just saying get out

14   of my house, did he say anything

15   else?

16   A.      I believe he said you don't

17   belong here and this is my house.

18   Q.      At any point did he ever say

19   that he was tough or bad and he was

20   going to kick ass?

21   A.      No.

22   Q.      Okay.  Never heard that at

23   all?

24   A.      No.

25   Q.      All right.  Other than him

73

1    telling the police to get out of his

2    house, did he engage in any other

3    discussion with them?

4    A.      Not to my knowledge, no.

5    Q.      And at this point in time, he

6    was seated on the couch?

7    A.      No, they were standing in

8    front of the entertainment center.

9    Q.      And where was Troy?  Was he on

10   the couch or was he standing?

11   A.      He was standing in front of

12   the entertainment center with them.

13   Q.      Okay.  He was standing there?

14   A.      Yes.

15   Q.      Initially when they came in,

16   was he seated at the couch?

17   A.      Yes.

18   Q.      And was his mom there?

19   A.      I believe she was standing in

20   the kitchen.

21   Q.      Were you standing in the

22   kitchen?

23   A.      At first I was standing in the

24   living room.

25   Q.      All right.  So she was in the

74

1  kitchen.  You're in the living room.

2  Where was Tim?

3  A.     I believe he was behind the

4  couch.

5  Q.     In the dining room area?

6  A.     Yeah.

7  Q.     So there's no break and you

8  could look right from behind the

9  couch?

10  A.     Yeah, the dining room actually

11  is over in the corner.  That's why I

12  put that there.

13  Q.     Got you.

14  A.     But it's like this whole area

15  was opened up.

16  Q.     Got you.  So Tim's sitting on

17  the couch and he was mad that the

18  police were there?

19                ATTORNEY HAKEN:

20                Sorry.  You said Tim.

21  BY ATTORNEY DONAHOE:

22  Q.     Or, I'm sorry.  Troy.  I

23  apologize.  Troy's sitting on the

24  couch.  His mom's in the kitchen.  He

25  expresses that he's not happy that

CASE 2:12-cv-01500-CB   Document 64-1   Filed 10/10/14   Page 398 of 684

1    the police are there.  And they kept

2    asking him what's wrong and he said I

3    understand now.  Did he say I

4    understand now?

5    A.    Yes.

6    Q.    And was he standing up when

7    that happened ---

8    A.    Yes.

9    Q.    --- or sitting down?  And do

10   you know who he said that to?

11   A.    He had said it --- he was

12   standing here and the police were

13   standing in front of him.  I'm

14   assuming he said it to them.

15   Q.    How long was it that they were

16   discussing or talking to each other

17   before Troy said that?

18   A.    I don't know.  Maybe ten

19   minutes.

20   Q.    Do you recall what other ---

21   what else the troopers may have said

22   to Troy during this time prior to the

23   time that Troy said I understand now?

24   A.    They really didn't say

25   anything.

76

1    Q.      Did they ever talk to you?

2    A.      No.

3    Q.      Did they talk to Tim?

4    A.      Not to my knowledge.

5    Q.      And did they talk to Barbara?

6    A.      Not to my knowledge.

7    Q.      All right.  When you say they

8    did not seem at all interested in

9    trying to calm Troy down, the younger

10   cop, Battestilli, had a major

11   attitude and acted like he wanted to

12   kick Troy's ass, he kept saying, hey,

13   Troy, what are we doing here and what

14   are you going to do next, was there

15   any other behavior on Trooper

16   Battestilli's part that exhibited

17   that he was uninterested in trying to

18   calm Troy down and had a major

19   attitude?

20   A.      He was egging him on.  He just

21   kept asking him what are you going to

22   do, what are you going to do now.

23   That's all he kept saying.  And he

24   just kept getting more aggressive as

25   he said it.

77

1    Q.      What do you mean more

2    aggressive?  If you can describe it

3    in more detail.

4    A.      He just acted like he was a

5    bad ass.  Like if you're going to

6    mess with me, you know, something's

7    going to happen.

8    Q.      And how did he act that way?

9    A.      I don't know.  He just kept

10   saying what are you going to do now.

11   Q.      And what would Troy respond?

12   A.      He said he wasn't going to do

13   anything and he was telling them to

14   leave.

15   Q.      All right.  So had Troy

16   regained his sense of where he was

17   and became aware of everything and

18   not confused or unaware of where he

19   was?

20   A.      No, he wasn't confused

21   anymore.  He knew what was going on.

22   Q.      Okay.  And then he said I

23   understand now, and they asked him

24   what, and he said the meaning of

25   life?

78

1    A.        Uh-huh (yes).

2    Q.        Did that cause you to think

3    either, A, he does know what's going

4    on or, B, he doesn't know what's

5    going on or ---?

6    A.        I knew he knew what was going

7    on.

8    Q.        All right.  Now, had he ever

9    expressed that knowledge about the

10   meaning of life before?

11   A.        Yeah.  I mean, we've talked

12   about it.

13   Q.        Why did he say that to the

14   troopers, if you know?

15   A.        I don't know.

16   Q.        All right.  And what did they

17   say in response?

18   A.        They just kept saying what are

19   you going to do now.

20   Q.        All right.  Did both troopers

21   say that or just Trooper Battestilli?

22   A.        To my knowledge, it was just

23   Battestilli.

24   Q.        Okay.  And he was the ---?

25   Can you describe him, because you say

79

1   here he --- was he the younger guy?

2   A.      That's a hard ---.

3   Q.      Well, it just says 14, instead

4   of an ambulance coming, a state

5   police car arrived with two troopers,

6   a younger guy really tall and stocky

7   and an older 40s smaller guy.  Who

8   was doing the --- who had the major

9   attitude, the bigger or the smaller?

10  A.      I want to say it was the

11  bigger guy.  I can't remember.

12  Q.      Okay.  And was the smaller guy

13  saying anything that you overheard?

14  A.      I don't remember.

15  Q.      Do you recall how they were

16  dressed?

17  A.      In uniform.

18  Q.      Do you recall what they looked

19  like?

20  A.      I just remember dark hair,

21  short.

22  Q.      One short?

23  A.      Yeah.

24  Q.      One had dark hair?

25  A.      No, they both had dark hair,

80

1   but their hair was short.

2   Q.      Oh, I see.  Short, dark hair.

3   A.      And I know one of them --- one

4   was tall and one was short.

5   Q.      Okay.  And this back and forth

6   where they said what are you going to

7   do now, what are you going to do next

8   went on for --- you don't know, but

9   you said maybe up to ten minutes?

10  A.      Right.

11  Q.      All right.  And during that

12  time, Troy said I understand now,

13  they said what, he said the meaning

14  of life.  Do you know what they said

15  in response?

16  A.      I don't remember.

17  Q.      All right.  At that point,

18  were you still in the living room?

19  A.      Yes.

20  Q.      All right.  And at that point,

21  was Troy still sitting down?

22  A.      No, he was standing up talking

23  to them.

24  Q.      Okay.  Where was his mother?

25  A.      In the kitchen.

81

Q.    With you.  So was she ever on the couch with him?

A.    Yeah, that was before the police had shown up.

Q.    I see.  But by the time they got there, she was in the kitchen?

A.    Yes.

Q.    And Tim was also in the kitchen?

A.    He was behind the --- standing behind the couch.

Q.    Yeah, oh, I'm sorry.  Yeah, yeah.  So we go to 16 that says Troy put his hands on the cops' arms and said let's go outside and talk.  Was that one hand on each cop's arm?

A.    No, it was Battestilli's arm. He just put it right here as if to come on, let's go outside.

Q.    Okay.  Do you remember if it was Battestilli's left or right arm?

A.    It was this arm, and he was facing this way, so yeah, it was his left arm.

Q.    Okay.  And was Troy facing

82

1    Trooper Battestilli?

2    A.      Yes.

3    Q.      And was it his right arm that

4    he put on him?

5    A.      Yes.

6    Q.      All right.  And what did he do

7    then?  What did he say to him and

8    what physically did Troy do?

9    A.      He just put his hand on his

10   arm and said, come on, let's go

11   outside and discuss this.

12   Q.      And you said he did this in a

13   nice way?

14   A.      Yes.

15   Q.      It seemed like he just wanted

16   to talk to the police away from

17   everyone.  Battestilli said no, we're

18   going to talk right here and took

19   Troy's hand off of him?

20   A.      Yes.

21   Q.      All right.  Do you recall them

22   saying anything else at that point?

23   A.      No.

24   Q.      Then you say Troy then took a

25   swing at the officers.  They stepped

83

1   back and there was no contact.  So

2   did Troy immediately take a swing

3   when Battestilli took his arm off of

4   --- took his hand off of --- Troy's

5   hand off his arm?

6   A.      Yes.

7   Q.      Did Troy swing with his right

8   arm or left, if you remember?

9   A.      His right arm.

10  Q.      Okay.  And at this point,

11  you're in the living room?

12  A.      At that point I was in the

13  kitchen.

14  Q.      All right.  How close to the

15  two of them were you?

16  A.      We had the wall between us

17  because I was looking through the

18  bar.

19  Q.      So ten feet or so?

20  A.      Yeah.

21  Q.      And was Troy's mother also

22  there in the kitchen?

23  A.      She was standing right next to

24  me to my left.

25  Q.      All right.  Tim's still in the

84

1    dining room?

2    A.      Yeah.

3    Q.      All right.  Then number 18

4    says the cop then jumped on and

5    tackled Troy.  So prior to the --- or

6    after the swing, there was no contact

7    between the police and ---

8    A.      No.

9    Q.      --- Troy?  Had you ever seen

10   Troy punch anybody before?

11   A.      No.

12   Q.      All right.  Was this a total

13   surprise to you that he swung at

14   them?

15   A.      Yes.

16   Q.      All right.  He swings, and

17   then did both troopers jump on him

18   and tackle him?

19   A.      I know Battestilli did.  I'm

20   assuming the other guy did too.  I

21   don't recall.

22   Q.      Okay.  And what did you

23   observe the three of them do?  What

24   happened?

25   A.      They tackled him towards the

85

1  loveseat, and that's when he hit his

2  head on the bar itself.

3  Q.      And when you say bar, do you

4  mean the opening between the kitchen

5  and the ---?

6  A.      Yeah, there was a little table

7  kind of thing there where you could

8  sit up there and eat.

9  Q.      Oh, okay.  Were there stools

10  on the other side ---

11  A.      Yes.

12  Q.      --- of that table?  And the

13  stools were in the kitchen obviously?

14  A.      Yes.

15  Q.      And then the loveseat was

16  pushed right up to the wall?

17  A.      Yes.

18  Q.      And the loveseat obviously

19  didn't come all the way up to the

20  bar?

21  A.      Right.

22  Q.      So he hit his head on that

23  kind of corner?

24  A.      Yeah, right on the edge of it.

25  Q.      Front of his head or back?

86

1   A.      Right here on his forehead.

2   Q.      Okay.  You're saying right at

3   the top of his forehead?

4   A.      Yes.

5   Q.      And did you see that impact

6   occur?

7   A.      Yes, I did.  I was right there

8   in front of it.

9   Q.      And then what did you observe

10  after he hit his head?

11  A.      His head bounced off and that

12  was when Battestilli was on him, and

13  the other cop must have jumped on him

14  or something because he had bounced

15  his head another time off of it.

16  Q.      Okay.

17  A.      And that's when they slid down

18  onto the couch.

19  Q.      All right.  And did you see

20  them slide onto the couch?

21  A.      Yes.

22  Q.      Where were each one of them,

23  if you recall?  I know it's probably

24  a --- was it a chaotic scene?

25  A.      Yes.

87

1    Q.      All right.  What do you recall
2    about the three bodies there?  Who
3    was where?
4    A.      Troy was on the bottom.
5    Battestilli was on him, and the other
6    cop was on him.
7    Q.      Okay.  So Battestilli's on
8    Troy.  Is Troy facedown on the
9    loveseat?
10   A.      Yes.
11   Q.      And Battestilli's on top of
12   him?
13   A.      Yes.
14   Q.      And then Johnson is the other
15   trooper.  Did you remember that name
16   or am I just injecting that into your
17   memory?
18   A.      I didn't remember the name.
19   Q.      Okay.  Assuming his name's
20   Johnson, he would be the third guy,
21   and he's on the top of them?
22   A.      Yes.
23   Q.      All right.  So it's kind of
24   like a --- three layers of people?
25   A.      Yes.

88

1  Q.      Were all of them on the

2  loveseat?

3  A.      Their upper body was on the

4  loveseat and their lower part was on

5  the floor.

6  Q.      Okay.  So the loveseat's

7  pretty --- probably only about two

8  feet deep; correct?

9  A.      Yes.

10 Q.      So he's kind of like got his

11 --- where's Troy's head?  Up against

12 the back of the loveseat or is it

13 right on the cushion of the loveseat?

14 A.      It was on the cushion.

15 Q.      All right.  So his body's

16 sticking out kind of like in a --- in

17 a perpendicular or corner-type thing.

18 And the other two are right on top of

19 him?

20 A.      Yes.

21 Q.      And what did you hear them

22 say?

23 A.      I heard Battestilli tell the

24 other police officer to tase him.

25 Q.      Okay.  And did they do any

89

1   damage to the couch that's next to

2   them, or did they knock it over or

3   anything?

4   A.      No, no.

5   Q.      How about the coffee table?

6   Did they knock that over?

7   A.      It didn't get knocked over.

8   It got pushed aside.

9   Q.      Okay.  And how long were they

10   struggling before you heard him say

11   get the Taser or Taser him?

12   A.      It was just a couple of

13   minutes.

14   Q.      All right.  And what did you

15   observe about the Taser then?  What

16   happened after Battestilli said Taser

17   him?

18   A.      He tried tasering him through

19   his clothes.

20   Q.      All right.  Now, how did he

21   try to taser him?

22   A.      He had held it up around his

23   back area when he was trying to ---.

24   Q.      Have you ever seen a Taser

25   before this?

90

1    A.       On TV, yes.

2    Q.       Okay.  On TV.  In real life,

3    as we say, had you ever seen one

4    before?

5    A.       No.

6    Q.       All right.  What do you recall

7    about the trooper's use of this

8    particular Taser?

9    A.       He just said taser him, and it

10   wasn't going through his clothes to

11   his skin.

12   Q.       Was he holding it right to his

13   clothes?

14   A.       I don't recall that.

15   Q.       All right.  How do you know it

16   wasn't going through his clothes to

17   his skin?

18   A.       Because Battestilli told him.

19   Q.       Okay.  What did he say?

20   A.       He said it's not hitting skin.

21   It's not hitting, you know,

22   contacting any skin.

23   Q.       All right.  So then what did

24   the trooper do?

25   A.       He told the other guy to pull

91

1    up his shirt.

2    Q.      And what did you observe?

3    A.      He pulled up his sweatshirt,

4    tried tasering him again to go

5    through the tee-shirt he was wearing,

6    and he said it's still not working.

7    And he said pull up his other shirt,

8    and that's when he tasered him two

9    more times.

10   Q.      All right.  Now, where's

11   Battestilli at this point?

12   A.      He was holding Troy down.

13   Q.      All right.  Was he still on

14   top of him?

15   A.      Yes.

16   Q.      And then the other guy, was he

17   still on top of Battestilli?

18   A.      No.

19   Q.      All right.  Did he stand up?

20   A.      Yes.

21   Q.      Okay.  So he stood up.  Did

22   you see him --- did you see where he

23   got the Taser from?

24   A.      No, I didn't.

25   Q.      All right.  Do you recall

92

1    anything about how the Taser looked?

2    A.      No.   Just afterwards.

3    Q.      Did you see him initially try

4    to taser the --- try to taser Troy?

5    A.      No.

6    Q.      All right.  Was it your

7    observation that these --- that this

8    trooper, and this would have been

9    Johnson, not Battestilli; right?

10   That Johnson was applying the Taser

11   right to Troy's body, to his skin?

12   A.      The last two times, yes.

13   Q.      Before that, it was going ---

14   applied directly to his shirt?

15   A.      Yes.

16   Q.      And it wasn't going through?

17   A.      Right.

18   Q.      All right.  And at this point,

19   Battestilli is holding Troy down?

20   A.      Yes.

21   Q.      What did you observe about

22   Battestilli?  Where were his hands

23   and body?

24   A.      He was kneeling on the floor

25   and he had --- he was trying to get

93

1   Troy's hands behind his back.

2   Q.      Okay.

3   A.      And when he did get his hands

4   behind his back, that's when he had

5   told him to taser him.

6   Q.      Okay.  How was he able to hold

7   Troy's hands behind Troy's back?  How

8   was Battestilli able to do that?

9   A.      He just had both of his hands

10  on his hands.

11  Q.      And with his own physical

12  strength, he was able to hold his ---

13  A.      Yes.

14  Q.      --- hands back there?

15  Apparently when the shirt came all

16  the way up, there were one or two

17  applications of the Taser to his

18  body.  Where on his body?  Do you

19  know?

20  A.      I believe one of them was his

21  back and I didn't observe it, but I

22  heard it.  The other was his thigh.

23  Q.      Then did you observe the

24  struggle continue or this

25  altercation?

94

1    A.        Yes.

2    Q.        What did you observe then

3    after the last tasering?

4    A.        After the last tasering, Troy

5    said I'm done.  And he says I'm not

6    going to fight anymore, and that's

7    when they handcuffed him.

8    Q.        All right.  Now, was he still

9    on the loveseat?

10   A.        Yes, when they got the cuffs

11   on him.

12   Q.        All right.  And so they

13   handcuffed him.  And then what did

14   they do with him?

15   A.        They jerked him off the couch

16   and put him on his back on the floor

17   and shackled his feet.

18   Q.        Okay.  Now, he was on his

19   back.  Were his hands behind his

20   back?

21   A.        Yes.

22   Q.        All right.  Was he saying

23   anything?

24   A.        No.

25   Q.        All right.  And then they

95

```
1   shackled his feet together?
2   A.      Yes.
3   Q.      Who did that?
4   A.      I don't recall.
5   Q.      Do you know where the shackles
6   came from?
7   A.      No.
8   Q.      All right.  How long did it
9   take after Troy said, okay, I'm not
10  going to fight anymore?  Was that
11  right after the last taser?
12  A.      Yes.
13  Q.      Then he said, okay, I'm not
14  going to fight anymore.  And then did
15  they immediately handcuff him behind
16  his back?
17  A.      Yes.
18  Q.      And then they immediately
19  rolled him onto his back onto the
20  floor?
21  A.      Yes.
22  Q.      Were the shackles there at
23  that point?
24  A.      I didn't see them.
25  Q.      All right.  How long did it
```

96

1    take for them to shackle his feet?

2    A.      I didn't even see.  I don't

3    know.

4    Q.      Did you hear Tim say anything

5    to the troopers at that point?

6    A.      At that point, no.

7    Q.      All right.  Did you observe

8    Tim help the troopers at all hold

9    Troy's feet?

10   A.      No.

11   Q.      All right.  And then they

12   shackled his feet.  And then what

13   happened?

14   A.      I can't remember which officer

15   it was, but he put his knee on his

16   chest to hold him down.

17   Q.      All right.  He put his knee on

18   the top of his chest as he was lying

19   on his back?

20   A.      Yes.

21   Q.      All right.  So did he kneel

22   next to him?

23   A.      He had one knee on his chest

24   and one on the floor, yes.

25   Q.      Okay.  And you don't know

97

1   which trooper that was?

2   A.      I want to say it was the

3   younger one, the Johnson because I

4   believe Battestilli went outside to

5   call to ask where the ambulance was.

6   Q.      I see.  And Johnson had his

7   knee on his chest.  And how long did

8   he keep his knee on his chest?

9   A.      Until the paramedics arrived.

10  Q.      How long do you think that

11  was?

12  A.      I don't know.  Ten (10), 15

13  minutes maybe.

14  Q.      Okay.  During that period of

15  time, where were you?

16  A.      I was in the kitchen with

17  Barbara.

18  Q.      All right.  Where was Tim?

19  A.      Standing behind the couch.

20  Q.      All right.  And was there any

21  conversation going on between anyone

22  at that time?

23  A.      Yes.  All three of us had said

24  that it looked like he wasn't

25  breathing.

98

1    Q.       All right.  How long was it
2    that Johnson had his knee on Troy's
3    chest before someone said he's not
4    breathing?
5    A.       It wasn't very long.
6    Q.       Okay.  More than a minute?
7    A.       Probably about two, three
8    minutes.
9    Q.       All right.  And someone said
10   he's not breathing.  Who said that?
11   A.       Tim.  Tim stated it and we
12   both observed that he wasn't.
13   Q.       All right.  And when you said
14   that, what happened?  When you
15   observed that and Tim said that, what
16   happened?
17   A.       The cop had said yes, he is
18   breathing.
19   Q.       All right.
20   A.       And that's when I had come
21   around from the kitchen into the
22   living room area right where the
23   hallway is to go down to the
24   bedrooms.  And I stood right there
25   and watched, and he wasn't breathing.

99

1   Q.      All right.  Now, did the cop

2   still have his knee on Troy's chest

3   at that time?

4   A.      At that point when I came

5   around, his knee was actually on his

6   neck.

7   Q.      Okay.  So did you observe him

8   move his knee from his chest to his

9   neck?

10  A.      No.

11  Q.      All right.  So you came around

12  and now the trooper is kneeling there

13  with his knee on Troy's neck.  And

14  what did you say at that point?

15  A.      I said to him he's not

16  breathing.  Are you going to do CPR?

17  Q.      And then what happened?

18  A.      He just said he's breathing.

19  And then, like I said, I heard

20  Battestilli out on the porch.  He

21  says where's the F-ing ambulance,

22  he's not breathing.

23  Q.      Okay.  And the other trooper

24  kept his knee on the neck during that

25  period of time?

100

1   A.      (Indicates yes.)

2   Q.      How long did that last where

3   he had his knee on the neck?

4   A.      Until the ambulance came.

5   Q.      How many minutes?

6   A.      I don't know.

7   Q.      Okay.  You don't care to put

8   any time frame on it at all?

9   A.      No.

10   Q.      All right.  The ambulance

11   arrived.  What did you observe about

12   their arrival?

13   A.      They came in and said that

14   he's not resisting, you can uncuff

15   him, and they said no, he resisted.

16   Q.      Where was Johnson's knee at

17   this point?

18   A.      When they had come in, he had

19   taken --- he was completely away from

20   Troy.  He was actually standing up.

21   Q.      How long before they arrived

22   did he get up?

23   A.      As soon as they were walking

24   in the door.

25   Q.      All right.  So they did not

101

1   remove the cuffs.  And did they move
2   the cuffs from behind his back to his
3   front?
4   A.      No.
5   Q.      All right.  They kept the
6   cuffs behind his back?
7   A.      Yes.
8   Q.      What did the EMS folks do?
9   A.      They tried getting him to
10  breathe.  They did CPR.  They kept
11  telling the cops that they can take
12  the cuffs off, he's not resisting,
13  he's not even conscious.
14  Q.      And how long did the CPR
15  efforts continue?
16  A.      Probably about 10, 15 minutes
17  before they hauled him away.
18  Q.      How did they get him out of
19  the house?  On a board?
20  A.      On a board, yeah.
21  Q.      All right.  At that point,
22  were his hands behind his back or in
23  front?
24  A.      No, they're still behind his
25  back.

102

1   Q.      All right.  And they took him
2   to an ambulance?
3   A.      Yes.
4   Q.      Did they have oxygen on him?
5   A.      Yes.
6   Q.      Did they use a bag to try to
7   resuscitate him, do you know?
8   A.      I think so.
9   Q.      They put him in the ambulance.
10  And did you get in the ambulance with
11  Troy?
12  A.      No.
13  Q.      Did any family member get into
14  it with him?
15  A.      No.
16  Q.      All right.  And they took him
17  to Punxsutawney Hospital?
18  A.      Yes.
19  Q.      Did you stay at the house for
20  any period of time?  You knew he was
21  going to Punxsy?
22  A.      Yes.
23  Q.      Did you stay at the house for
24  any period of time or did you guys
25  just get in your cars and go to the

103

1   hospital too?

2   A.      Barbara and Tim got right in

3   their car and went, and I stayed

4   behind to get the children together.

5   Q.      Right.  During that period of

6   time, did the police say anything

7   further to you, state troopers?

8   A.      No.

9   Q.      Did the EMS personnel say

10  anything about the incident to you?

11  A.      No.

12  Q.      Did Tim say anything to you

13  about what happened?

14  A.      No, he just said that we're

15  going to go to the hospital.  I said,

16  all right, I'll get the kids together

17  and I'll meet you there.

18  Q.      And did Barbara say anything

19  about what she observed to you while

20  she was at the scene?

21  A.      No.

22  Q.      I'm going to go back to the

23  statement for a second.  Now, on 21,

24  you say Battestilli said to the older

25  cop are you okay, and the older cop

1  said, yeah, I'm okay, I hit my head.

2  You said, no, you didn't, it was

3  Troy's head that hit?

4  A.      Yes.

5  Q.      Do you recall saying that?

6  A.      Yes, I do.

7  Q.      Do you know what the trooper

8  said in response?

9  A.      No.

10  Q.      All right.  Twenty-two (22),

11  you said Troy kept his hands under

12  him and Battestilli said I'm going to

13  taser him.  He tried, but couldn't

14  because Troy had on two shirts.

15  Battestilli asked the other cop to

16  lift Troy's shirt, which he did.

17  Battestilli tasered Troy.  Troy

18  screamed out in pain.  Do you

19  remember that?

20  A.      Yes.

21  Q.      Battestilli said I'm going to

22  hit him again.  You said he held the

23  Taser against the --- Troy for what

24  seemed like 10 seconds, and then

25  again for 30.  I believe Troy was

105

1    tasered at least three times like

2    this.   Then Battestilli tasered Troy

3    on his neck.   Did you see that

4    happen?

5    A.      No, I didn't.

6    Q.      How do you know it happened?

7    A.      I thought he --- I don't know.

8    They just kept tasering him.

9    Q.      Then you said Troy had stopped

10   resisting.   Troy pulled his hands out

11   and he was cuffed?

12   A.      Yes.

13   Q.      Troy was facedown on the couch

14   the entire time he was being tasered?

15   A.      Yes.

16   Q.      Okay.  And Battestilli was on

17   top of him and Johnson then was the

18   one that got off and tasered him?

19   A.      I thought it was until I seen

20   this.  I mean, it's been 12 years.

21   Q.      Okay.  Troy was then pulled

22   off the couch and put on his back.

23   The older cop put his knee on Troy's

24   chest while Battestilli said he was

25   going to get shackles for Troy's leg.

106

1  Do you remember that happening?  If
2  you don't, that's fine.
3  A.      Yeah, now that I'm looking at
4  this, yeah, because I know he didn't
5  have the shackles on him when he came
6  in.
7  Q.      All right.  And then you said
8  I believe Troy was tasered again
9  after he was handcuffed because he
10  was moving his legs.  Do you recall
11  that happening?
12  A.      Yes.
13  Q.      Do you recall Troy moving his
14  legs around?
15  A.      Yes.
16  Q.      All right.  What do you recall
17  about that?
18              ATTORNEY HAKEN:
19              Objection.  It's pretty
20         vague.  What do you mean, what
21         do you recall about that?
22  BY ATTORNEY DONAHOE:
23  Q.      On 25 where you said I believe
24  Troy was tasered again after he was
25  handcuffed because he was moving his

107
1  legs, do you recall what fashion he
2  was moving his legs at that point
3  when he was handcuffed?
4  A.      No.  I mean, he wasn't kicking
5  or anything.  He was just wriggling
6  his legs.
7  Q.      And where did they taser Troy
8  on his body, if you recall?  If you
9  don't, that's fine.
10  A.      The last one I don't recall.
11  I thought it was his thigh to get him
12  to stop moving his legs.
13  Q.      All right.  Now, then 26 said
14  Tim said I don't think he's
15  breathing?
16  A.      Yes.
17  Q.      The older cop lifted Troy's
18  shirt and said yeah, he's breathing.
19  Tim responded no, he's not breathing.
20  I could tell too that Troy wasn't
21  breathing.  So you and Tim were in
22  the living room at this point?
23  A.      Yeah, I was standing in the
24  hallway area.
25  Q.      And the older cop, you mean

108

1   not Battestilli?

2   A.      Right.

3   Q.      All right.  And he lifted his

4   shirt?  All right.

5   A.      Yeah, he just lifted it to

6   show us his chest.

7   Q.      Then Battestilli returned and

8   the other cop, the older cop,

9   whispered to him this guy's not

10  breathing.  Battestilli did not help

11  Troy but put the shackles on Troy's

12  legs?

13  A.      Yes.

14  Q.      All right.  Tim said why do

15  you still have your knee on him?  The

16  cop said we don't want to take a

17  chance he's going to resist again.

18  Tim said he can't resist, he is

19  handcuffed and shackled?

20  A.      Yes.

21  Q.      And that was Johnson who had

22  his knee on him, not Battestilli?

23  A.      I believe so.  I don't

24  remember.

25  Q.      You said Battestilli then

1   walked casually out the back porch

2   and with the door open made a phone

3   call.  I heard him say where's the F-

4   ing ambulance, this guy's not

5   breathing, we need it here now.  That

6   was from the back porch?

7   A.      Yes.

8   Q.      Where were you?

9   A.      On the diagram there?

10  Q.      Yeah.

11  A.      The hallway coming from the

12  back porch, ---

13  Q.      Yes.

14  A.      --- that's where my laundry

15  room was.

16  Q.      Okay.

17  A.      And then I was standing right

18  there on the corner, right where your

19  pen is.

20  Q.      Right.  How far was that from

21  the back door?

22  A.      Not very far.  I mean, it was

23  like five steps.

24                ATTORNEY HAKEN:

25                Can I offer a very

110

1          brief break?  Will you
2          appreciate that or do you want
3          to just get through this?
4     A.      No, I just want to get through
5     this.
6                    ATTORNEY HAKEN:
7               All right.  I just
8          wanted to make sure that was
9          an option.
10    BY ATTORNEY DONAHOE:
11    Q.      Number 30 says Battestilli
12    returned and said the ambulance is on
13    its way.  While this was --- and 31
14    says while this all was going on, the
15    older cop had slid his knee up and
16    was now leaning on the left side of
17    Troy's neck.  They were on his neck
18    for what seemed like about ten
19    minutes.  They were on his chest for
20    about five with their knee.  The
21    older cop finally stood up and he and
22    Battestilli just stood there.  They
23    didn't say or do anything, and Barb
24    asked where's the ambulance.  And the
25    next one is when the paramedics

111

1   arrived, I thought they seemed

2   shocked at what they saw.  And what

3   caused you to make that observation?

4   A.     Because they asked why is he

5   still cuffed and shackled when he's

6   not even resisting, he's not moving?

7   Q.     They said ---?

8   A.     He's unconscious.

9   Q.     Okay.  Anything else?

10  A.     No, not that I remember.

11  Q.     All right.  Then next

12  paragraph, 34, the paramedics ask the

13  cops to remove the handcuffs.  The

14  cops refused.  Battestilli said he

15  resisted.  The paramedics said he's

16  unconscious, he can't resist.

17  Battestilli said I don't care?

18  A.     Yes.

19  Q.     All right.  During the entire

20  episode, Barb and Tim and I were in

21  the living room or standing at the

22  edge of the living room in the

23  doorway of the hall kitchen?

24  A.     Uh-huh (yes).

25  Q.     All right.  So that's what you

112

observed.  And then you didn't go to
the hospital until a little bit later
after you ---?

A.      I left maybe 15 minutes after
they did.

Q.      All right.  When you got to
the hospital, were the troopers
there?

A.      Yes.

Q.      Did you speak to them at all
then?

A.      No.

Q.      Did you overhear them say
anything about the incident?

A.      No.

Q.      Did you speak to the doctors?

A.      Yes, I did.

Q.      Did the doctors say anything
to you about what had happened to
Troy?

A.      I don't remember, no.

Q.      All right.  Did you overhear
Tim or Barb talk about the incident
while you were at the hospital?

A.      No.

113

1    Q.      Did you overhear the doctors

2    talk to Barb or Tim about the

3    incident?

4    A.      No.

5    Q.      Did you overhear the troopers

6    talk to Barb or Tim?

7    A.      No.

8    Q.      All right.  Did you overhear

9    any other state police personnel

10   while you were at the hospital?

11   A.      No.

12   Q.      All right.  Afterwards, did

13   any investigators from the police

14   contact you to get a statement from

15   you?

16   A.      Someone had come over in the

17   waiting room before we were allowed

18   in to see Troy.

19   Q.      All right.  Did you speak to

20   that person?

21   A.      No.

22   Q.      Did Tim?

23   A.      Yes, he did.

24   Q.      And did Barbara?

25   A.      She started to and Tim stopped

114

1    her.

2    Q.      All right.  Do you know why

3    Tim stopped her?

4    A.      Because he said we were going

5    to get a lawyer.

6    Q.      And did he have any further

7    discussion in that regard?

8    A.      No, he just said if you want

9    to speak to us when we have a lawyer,

10   you can speak to them.

11   Q.      And did anybody else in your

12   family cooperate with the police in

13   describing the incident until you

14   retained the lawyer?

15   A.      No.

16   Q.      Have you heard subsequent to

17   the evening when this happened

18   whether either of the troopers

19   involved had made any other

20   statements about this incident?

21   A.      Not to my knowledge, no.

22   Q.      Have you heard that anybody

23   else has any information about this

24   incident other than the folks who

25   were there and saw it?

115

1    A.       No.

2    Q.       Did anybody ever talk to

3    Troy's doctor after this occurred

4    about what happened?

5    A.       I don't know.

6    Q.       Subsequent to this, what

7    happened with Tim?  Do you recall

8    that he was initially arrested at

9    Walmart for pulling Mucinex off the

10   shelves?

11   A.       I don't know anything about

12   that.

13   Q.       All right.  Do you know what

14   happened to Tim with respect to his

15   death?

16   A.       I had heard from Barbara, yes.

17   Q.       What did Barbara tell you?

18   A.       He had a heart attack.

19   Q.       Did she say why?

20   A.       Because he wasn't taking his

21   insulin.  He was diabetic.

22   Q.       All right.  Anything further

23   about him having taken any drugs or

24   overdose of drugs?

25   A.       No.

116

1   Q.      Subsequent to this incident

2   occurring, did you ever talk to Tim

3   or Barbara about Troy's use of

4   Mucinex that day?

5   A.      No, not really.

6   Q.      Did the doctors ever talk to

7   you about the cause of Troy's death?

8   A.      They said it was suffocation.

9   Q.      All right.  And who told you

10  that?

11  A.      I don't even know the doctor's

12  --- it was a doctor in Pittsburgh.

13  Q.      All right.  Do you know if he

14  was the coroner?

15  A.      No.

16  Q.      All right.  Did you talk to

17  him on the phone?

18  A.      No, I talked to him in person.

19  Q.      Where were you when it

20  happened?

21  A.      At the hospital saying our

22  goodbyes.

23  Q.      All right.  That night?

24  OFF RECORD DISCUSSION

25  A.      At the hospital saying our

117

1    goodbyes.

2    BY ATTORNEY DONAHOE:

3    Q.      You mean that night or the

4    next day, the following day?

5    A.      It was a few days later.

6    Q.      A few days later.  And so you

7    spoke to a doctor in person there at

8    --- was it Presbyterian Hospital,

9    UPMC-Presbyterian?

10   A.      I don't remember the name.  I

11   thought it was Allegheny, but I'm not

12   sure.

13   Q.      Okay.  It might have been

14   Allegheny General.  I'm sorry.  I

15   think it was.  I apologize.  Tell me

16   the circumstances of this doctor

17   coming in and telling you that Troy

18   died of suffocation.

19   A.      I asked him.  I said there's

20   nothing you can do?  And he said he

21   had --- if he had lived through it,

22   he would have been a vegetable

23   because of the hitting of the head.

24   And they saw trauma to his neck area.

25   Q.      And was this in connection

118

1   with a request to remove life support

2   from Troy?

3   A.      I don't know.  I was just

4   sitting there asking the doctor, you

5   know, isn't there anything else you

6   can do.

7   Q.      Where were you sitting?

8   A.      We were in an off waiting

9   room.

10  Q.      Okay.  And this was like two

11  days after his initial admission to

12  Allegheny General?

13  A.      Something like that, yeah.

14  Q.      And a doctor came out.  Did

15  you understand what role this doctor

16  was playing in the care of Troy?

17  A.      I believe he was one of the

18  best doctors there.  He ran numerous

19  tests on him.

20  Q.      So he was the doctor who was

21  essentially in charge of Troy's care?

22  A.      I think so.

23  Q.      All right.  Do you recall

24  anything about his appearance or

25  look?

119

1    A.      He had dark hair.  That's

2    about it.  I don't remember.  Small

3    guy.

4    Q.      Did you recall his name?

5    A.      No.

6    Q.      Was he American?  Was he

7    foreign country origin?  Did he speak

8    with an accent?  Do you recall any of

9    that?

10   A.      I believe he was an American.

11   Q.      All right.  And when he came

12   out and introduced himself to you or

13   you talked to him, did he describe to

14   you or relate to you the purpose of

15   the conversation you had with him?

16   A.      He just wanted to let us know

17   everything he did for Troy to try

18   and, you know, save him.

19   Q.      What did he say that he had

20   done?

21   A.      I don't know.  He just rambled

22   all these medical terms.

23   Q.      And who was there also with

24   you?

25   A.      My son Joshua.  And I believe

120

1    Tim was there with us, too.  I can't

2    remember, though.

3    Q.      How about Barbara?  Was she

4    there?

5    A.      No, I think Barbara stayed

6    home that day.

7    Q.      Okay.  So had you been coming

8    in from Punxsutawney every day?

9    A.      No, we just came in that day

10   because the doctor said to come say

11   goodbye.

12   Q.      All right.  And Barbara did

13   not come with you?

14   A.      No, she was already there

15   before.

16   Q.      All right.  She was there

17   before.  Did Barbara relay to you

18   what the doctor said to her about the

19   cause of Troy's death?

20   A.      She said it's the same thing

21   the doctor did, brain hemorrhage and

22   suffocation.

23   Q.      Okay.  So the doctor said

24   brain hemorrhage and suffocation.

25   And the doctor said it was from

121

1   hitting his head on the table?

2   A.      Yeah.

3   Q.      All right.  When Troy hit his

4   head on the table, did it make him

5   unconscious?

6   A.      No, he was still alert.

7   Q.      Was he bleeding?

8   A.      No.

9   Q.      Did he have a mark on the top

10  of his forehead?

11  A.      Yes.

12  Q.      When that doctor talked to you

13  that day, did he mention the Taser as

14  a cause of the death?

15  A.      No, he didn't say anything.

16  Q.      Did he mention the ingestion

17  of Mucinex as a cause of death?

18  A.      No.

19  Q.      Did he mention Troy's heart

20  condition as a cause of death?

21  A.      No.

22  Q.      As far as this guy was

23  concerned who was the lead, I guess,

24  neurosurgeon or whatever in charge of

25  his care, the whole thing was due to

122

1   him hitting his head and suffocating?

2   A.      That's what he said to me.

3                   ATTORNEY DONAHOE:

4                   Okay.  All right.  I

5           don't think I have any other

6           questions.

7                   ATTORNEY CORRADO:

8                   I think we're okay,

9           too.

10                  ATTORNEY DONAHOE:

11                  Okay.

12                  VIDEOGRAPHER:

13                  This deposition has

14          concluded.

15              *  *  *  *  *  *  *

16      VIDEOTAPED DEPOSITION CONCLUDED AT

17                12:59 A.M.

18              *  *  *  *  *  *  *

19

20

21

22

23

24

25

```
                                                        123
1    COMMONWEALTH OF PENNSYLVANIA   )

2    COUNTY OF CLEARFIELD           )

3

4                     CERTIFICATE

5         I, Rhonda K. Thorpe, a Notary Public

6    in and for the Commonwealth of Pennsylvania, do

7    hereby certify:

8              That the witness whose testimony

9    appears in the foregoing deposition, was duly

10   sworn by me on said date and that the

11   transcribed deposition of said witness is a

12   true record of the testimony given by said

13   witness;

14             That the proceeding is herein recorded

15   fully and accurately;

16             That I am neither attorney nor counsel

17   for, nor related to any of the parties to the

18   action in which these depositions were taken,

19   and further that I am not a relative of any

20   attorney or counsel employed by the parties

21   hereto, or financially interested in this

22   action.

23

24

25
```

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
RHONDA K. THORPE, Notary Public
Clearfield, Clearfield County, PA
My Commission Expires July 11, 2017

Court Reporter

# EXHIBIT D-4

# Deposition of Steven Johnson

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

BARBARA J. WINGARD, *

individually and as *

Administratrix of *

the Estate of TROY *

ROBERT LEE *

HOOFTALLEN, *

    Plaintiff    * Case No.

    vs.          * 2:12-cv-01500

GUY A. BATTLESTILLI;* District Judge

STEVEN E. JOHNSON; * Cathy Bisson

PENNSYLVANIA STATE * JURY TRIAL

POLICE; COMMONWEALTH* DEMANDED

OF PA; TASER® *

INTERNATIONAL, INC.;*

    Defendants    *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

STEVEN JOHNSON

May 5, 2014

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

1              V I D E O T A P E D   D E P O S I T I O N

2                          O F

3      STEVEN JOHNSON, taken on behalf of

4      the Plaintiff herein, pursuant to the

5      Rules of Civil Procedure, taken

6      before me, the undersigned, Rhonda K.

7      Thorpe, a Court Reporter and Notary

8      Public in and for the Commonwealth of

9      Pennsylvania, at the offices of

10     Jefferson County Commissioners

11     Office, 155 Main Street, #202, Second

12     Floor, Brookville, Pennsylvania, on

13     Monday, May 5, 2014, beginning at

14     1:30 p.m.

15

16

17

18

19

20

21

22

23

24

25

3

1                    A   P   P   E   A   R   A   N   C   E   S

2

3      TAMARA  J.  HAKEN,  ESQUIRE

4      SUSAN  A.  CORRADO,  ESQUIRE

5      Boyle  Litigation

6      4660  Trindle  Road

7      Camp  Hill,  PA   17011

8           COUNSEL  FOR  PLAINTIFF

9

10     THOMAS  L.  DONAHOE,  ESQUIRE

11     Office  of  Attorney  General

12     6th  Floor,  Manor  Complex

13     564  Forbes  Avenue

14     Pittsburgh,  PA   15219

15          COUNSEL  FOR  DEFENDANTS

16

17

18

19

20

21

22

23

24

25

4

1                    I  N  D  E  X

2

3    DISCUSSION AMONG PARTIES      7 -   8

4    WITNESS: STEVEN JOHNSON

5    EXAMINATION

6        By Attorney Corrado       8 -  98

7    DISCUSSION AMONG PARTIES          99

8    CERTIFICATE                      100

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    E X H I B I T   P A G E

2

3                                              P A G E

4    N U M B E R      D E S C R I P T I O N          I D E N T I F I E D

5    O n e         L o g                              3 9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                         OBJECTION PAGE

2

3    ATTORNEY                                    PAGE

4                          NONE MADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
26

7

1               P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3               V I D E O G R A P H E R :

4                    My name is Sarah Dick.

5          I'm an employee of Boyle

6          Litigation which is located at

7          4650 Trindle Road, Suite 102,

8          Camp Hill, Pennsylvania,

9          17011.  This deposition is

10         being recorded on Monday, May

11         5th, 2014, at 1:30 p.m. in the

12         small conference room of the

13         Jefferson County Commissioners

14         Office located at 155 Main

15         Street, Brookville, PA, 15825.

16         This deposition is being

17         filmed in connection with the

18         case of Barbara Wingard, et

19         al., v. Pennsylvania State

20         Police, et al., U.S. District

21         Court for the Western District

22         of Pennsylvania, Docket Number

23         12-cv-01500.  The witness in

24         this deposition is Steven

25         Johnson.  This deposition is

8

1    being videotaped on behalf of

2    the Plaintiff.

3                COURT REPORTER:

4                You can raise your

5    right hand, please.

6    --------------------------------------

7  STEVEN JOHNSON, HAVING FIRST BEEN

8  DULY SWORN, TESTIFIED AS FOLLOWS:

9    --------------------------------------

10               ATTORNEY CORRADO:

11               This deposition is

12       being taken pursuant to the

13       federal rules of civil

14       procedure.

15  EXAMINATION

16  BY ATTORNEY CORRADO:

17  Q.     Trooper Johnson, could you

18  please state your full name and spell

19  your last name for the record?

20  A.     Steven Eric Johnson, and

21  that's Steven with a V.

22  J-O-H-N-S-O-N.

23  Q.     Thank you.

24  A.     Uh-huh (yes).

25  Q.     My name is Susan Corrado.  To

9

1    my right is Tamara Haken.

2    A.      Uh-huh (yes).

3    Q.      We're representing the

4    Plaintiffs in this action.  As you

5    know, we're here today to take your

6    deposition.  And I just want to go

7    over some deposition instructions

8    quickly if you don't mind.

9    A.      Okay.

10   Q.      You were placed under oath.

11   A.      Uh-huh (yes).

12   Q.      You're expected to answer

13   truthfully.  The court reporter's

14   going to take down everything that

15   you say so if you would provide your

16   responses verbally instead of, you

17   know, a shrug of the shoulders and

18   uh-huh ---

19   A.      Uh-huh (yes).

20   Q.      --- or a nodding of the head.

21   I'm going to ask for you to wait

22   until I'm finished with my question

23   before you give a response.

24   A.      Okay.

25   Q.      And in turn, I'll wait for you

10

1   to finish before I ask you another

2   question so the court reporter can

3   take down everything accurately.

4   A.      Okay.

5   Q.      My questions are not designed

6   to trick you.  I'm just here to get

7   the facts and to get your knowledge

8   regarding the case.  And while I

9   don't want you guessing at any

10  answers, if you have a reasonable

11  estimate or somewhat of a

12  recollection of something, I'd like

13  to know about that.

14          You're represented by Counsel

15  today.  If at any time during this

16  deposition you feel a need to have a

17  conference with your Counsel, please

18  let me know.  The only thing I ask is

19  that you please finish the question

20  that's pending before we break to

21  speak to your Counsel.

22  A.      Okay.

23  Q.      If I could just start with a

24  few background questions.  Trooper

25  Johnson, and we will keep this

11

1   confidential, could I have your

2   address please?

3   A.      Home address?

4   Q.      Yes, please.

5   A.      470 Madison Avenue,

6   Brookville, Pennsylvania.

7   Q.      And how long have you been

8   there?

9   A.      Seven years.

10  Q.      Okay.  And where did you live

11  prior to that?

12  A.      Still here in Brookville.

13  Q.      Okay.  And what is your age?

14  A.      Oh, goodness, 45.

15  Q.      Okay.  And are you still

16  currently employed by the

17  Pennsylvania State Police?

18  A.      Yes.

19  Q.      Okay.  And how long have you

20  been there?

21  A.      Currently, 12 and a half

22  years.

23  Q.      Okay.  And what is your

24  current rank?

25  A.      Trooper first class.

12

1   Q.      Trooper first class.  And when
2   did you attain trooper first class?
3   I understand prior to that it's
4   trooper and then it's trooper first
5   class?
6   A.      Correct, right.  October 1st.
7   Q.      Of this year?
8   A.      Last year.
9   Q.      Last year, okay.  And what
10  does that involve?  What is your
11  general duties as trooper first
12  class?
13  A.      Trooper first class is pretty
14  much the same as trooper.  The
15  difference is it just signifies that
16  you have 12 years of service in.
17  Generally you're more senior.  That
18  allows the younger troopers that have
19  questions or whatever, they can ---
20  you know, you're someone that they
21  can go to for help type of stuff.
22  Q.      Okay.  So that status is
23  attained through time of service?
24  A.      Yes, longevity, yes.
25  Q.      Okay.  And what did you do

13

1    prior to becoming a state trooper?

2    A.      I worked at a plant,

3    manufacturing plant.

4    Q.      Okay.  And what plant was

5    that?

6    A.      Beverage Air Corporation.

7    Q.      Okay.  And what did you do for

8    them?

9    A.      Multiple things.  I sheered

10   metal, bent metal, made parts,

11   assembled coolers.

12   Q.      Okay.  And how long were you

13   there?

14   A.      Oh, my goodness.  Since 1995,

15   so about six years.

16   Q.      Okay.  Have you ever been the

17   plaintiff or a defendant in a

18   lawsuit?

19   A.      No.

20   Q.      Okay.  Have you had any

21   allegations of excessive force made

22   against you?

23   A.      No.

24   Q.      Okay.  Have you ever had your

25   deposition taken before?

14

1    A.      No.

2    Q.      Okay.  Did you review any

3    information or documents in

4    preparation for today's deposition?

5    A.      Yes.

6    Q.      What did you review?

7    A.      The incident report.

8    Q.      Okay.

9    A.      And also the general

10   investigation report, the IED

11   investigation.

12   Q.      Okay.  And other than your

13   attorney, did you speak to anyone in

14   preparation for this deposition?

15   A.      No.

16   Q.      I want to begin by training,

17   your training, with the state police.

18   Tell me about that.  I understand the

19   facility's in Hershey, Pennsylvania;

20   is that correct?

21   A.      Yes.

22   Q.      Okay.  And how long of a time

23   period is that?

24   A.      Twenty-seven (27) weeks, I

25   believe, it is.

15

1    Q.       Twenty-seven (27) weeks, okay.
2    And can you just give me in a few
3    sentences generally what the training
4    entails?
5    A.       Physical fitness, study of
6    traffic, law, study of criminal law,
7    how to shoot, that type of stuff.
8    Q.       Okay.  And what type of
9    weapons are you trained on?
10   A.       Currently?
11   Q.       At the time and then
12   subsequent to that.
13   A.       Oh, my goodness.  What did we
14   have at the time?
15   Q.       I'm sure there's a handgun?
16   A.       There's a pistol, but we have
17   changed since then.
18   Q.       Right, right, right.
19   A.       I'm not sure if it was the ---
20   I believe it was the Glock 45 GAP was
21   the pistol we had at the time.
22   Q.       Uh-huh (yes).
23   A.       And we had an AR rifle.  I'm
24   trying to think of what the --- I
25   can't remember what the numbers were

16

1  for it.  And we also had a Remington

2  870 shotgun.

3  Q.      Okay.

4  A.      And I believe there was a

5  Remington 1187 shotgun we were

6  trained on.

7  Q.      All right.  And what about a

8  machine gun?

9  A.      No.

10  Q.      No MP5s?

11  A.      No.

12  Q.      Okay.  What about pepper

13  spray?

14  A.      Yes.

15  Q.      Okay.  And baton?

16  A.      May I clarify?  The pepper

17  spray is different now than it was at

18  the time.

19  Q.      You certainly can.

20  A.      Yeah.  It was different pepper

21  spray then.  Then it had -- it was

22  alcohol based.  Today we're now using

23  a water based.

24  Q.      Okay.  And what about a baton?

25  A.      Yes, an ASP baton.

17

1   Q.     Okay.  And that's the smaller

2   baton that you affix to your belt and

3   it will at the flick of a wrist

4   extend?

5   A.     Yes, in theory.  But by

6   regulations, we don't have to carry

7   it on our belt anymore.  It's allowed

8   to be carried in our bag so it's

9   readily accessible.

10   Q.     Okay.  When did that change?

11   A.     I don't know for sure.

12   Q.     Okay.  So the current law is

13   you do not need to carry it on your

14   belt ---

15   A.     Correct.

16   Q.     --- so long as it's in your

17   bag and nearby?

18   A.     Current regulation says that.

19   I don't know when it was changed.

20   Q.     Okay.  And what about the

21   Taser?

22   A.     I'm authorized to carry the

23   Taser.  I don't remember when we got

24   them.  That was after I left the

25   academy.

18

1    Q.      Okay.  And what about

2    handcuffs?  I'm assuming you had ---

3    A.      Yes.

4    Q.      --- training with handcuffs?

5    A.      Yes.

6    Q.      And what did they tell you

7    about handcuffs?  Should you handcuff

8    in front?  Should you handcuff in

9    back?  What situations call for front

10   versus back?

11   A.      Regulations state that we're

12   supposed to always handcuff in the

13   back.

14   Q.      Okay.  Is there any time a

15   situation would call for in the

16   front?

17   A.      There again, it's up to ---

18   regulations say one thing, but it is

19   up to the discretion of the trooper

20   that is applying them.  I mean, if

21   someone has, you know, bad shoulders

22   or something along those lines, they

23   may be cuffed in the front.  But

24   typically when we cuff in the front,

25   we use a waist belt that the

19

1   handcuffs are slipped through.

2   Q.      Okay.  Have you ever double-

3   cuffed anybody?

4   A.      Yes.

5   Q.      Okay.  In what circumstances

6   have you double-cuffed someone?

7   A.      Typically when their shoulders

8   are --- they may demonstrate are

9   huge, wide, and they can't actually

10  bring their arms back in behind.

11  Q.      Okay.  Tell me a little bit

12  about your use of force policy, what

13  you know about it.  We have not been

14  provided with a copy of it to our

15  knowledge so if you're able to recall

16  what the use of force policy says and

17  if you know the policy number?

18  A.      I don't know the exact number

19  but we currently use an array, which

20  is a circle.

21  Q.      Okay.

22  A.      And the trooper is in the

23  middle.

24  Q.      Uh-huh (yes).

25  A.      And all our tools that we're

20

1   provided with from --- let's see,

2   there's our gun, our ASP baton,

3   Taser, pepper spray, physical

4   presence, using words are situated

5   around.  And what we're allowed to do

6   is go from --- we're allowed to

7   choose any tool we see as necessary

8   at any time.  We don't have to

9   actually run from --- okay, we show

10  up, then we talk to the guy, then we

11  pull out our pepper spray.  That

12  didn't work.  Pull out our Taser.

13  That didn't work.  We're allowed to

14  go to any tool we need as we need.

15  Q.     Okay.  So what you just said

16  to me, there's no use this next, use

17  this next, use this next?

18  A.     Correct.

19  Q.     Okay.  I just want to talk a

20  little bit more about the Taser.  You

21  said it was introduced after your

22  initial basic training?

23  A.     Correct.

24  Q.     Can you give me an approximate

25  time?

                                                                21

1    A.      I don't remember.

2    Q.      Okay.  What did the training

3    entail?

4    A.      I believe it was a one-day

5    class we had to go to.  We had to

6    shoot certain amount of cartridges to

7    be certified.  They talked about, you

8    know, where to shoot it on a person,

9    when to use it, when not to use it.

10   Q.      Can you put a little bit more

11   meat on the bones, when to use it,

12   when not to use it?

13   A.      Typically if it's an elderly

14   person or someone in obviously bad

15   health, we shouldn't use it on them.

16   Q.      And why is that?

17   A.      If they're elderly, we don't

18   want them to fall and hurt

19   themselves.

20   Q.      Okay.

21   A.      If they obviously have some

22   sort of injury, like they're standing

23   there with a broken arm or a broken

24   leg, you don't want to taser them

25   because when you taser them, if your

22

1    MD probe load where the probes are

2    actually shot into the individual, it

3    locks up the muscle group and they

4    fall to the ground.  Also we were

5    trained that if you're standing on a

6    roof, you don't want to taser

7    somebody, you know.  Check out your

8    surroundings, you know, because you

9    don't want them to fall and hit

10   something, that type of stuff.

11   Q.     Okay.  Any instructions on

12   tasering people who are intoxicated

13   or on drugs?

14   A.     Nothing.  I mean, that all

15   falls into using your judgment type

16   of stuff.

17   Q.     Okay.  So there wasn't

18   anything specific that you recall

19   regarding tasering people on drugs or

20   intoxicated?

21   A.     No.

22   Q.     Okay.  What about the

23   psychological and emotional stress of

24   a Taser?  Was there any instruction

25   on that?

23

1    A.       Not that I recall.

2    Q.       Okay.  And what about the

3    model Taser that you carried?  Did

4    that ever change?  And if so, why?

5    A.       I don't believe so, no.

6    Q.       Okay.  And what about probe

7    versus drive stun?  I mean, are you

8    using them in certain situations?

9    OFF RECORD DISCUSSION

10   A.       Can you ask your question

11   again, please?

12   BY ATTORNEY CORRADO:

13   Q.       Sure.  When would you use

14   probe versus drive stun?

15   A.       Just to clarify, drive stun is

16   a pain compliance.  It's not actually

17   for locking the body up.  The Taser,

18   we deploy the probes when there's

19   some sort of threat and you're trying

20   to stop them.  The drive stun is if

21   they're not complying, then, you

22   know, like I said, it's pain

23   compliance.  You hit them with it.

24   You get them to comply via pain.

25   Q.       Okay.  And have you ever been

24

1    involved in an incident where a Taser

2    has caused injury or death?

3    A.      Like directly or indirectly

4    or ---?

5    Q.      Both.

6    A.      Not that I'm aware of.

7    Q.      Okay.  And where on parts of

8    the body did they say not to tase?

9    You had mentioned earlier that they

10   had instructed you on avoiding

11   certain parts of the body.

12   A.      Now, are we talking today's or

13   are we talking then because it's

14   changed?

15   Q.      Okay.  Could you start with

16   then and then move to today for me,

17   please?

18   A.      Okay.  The initial training,

19   we were told not to aim for the face

20   area or the groin area.

21   Q.      Okay.

22   A.      Typically you wanted center

23   mass.  And ideally would be a leg to

24   get the maximum coverage.

25                ATTORNEY DONAHOE:

25

1      Are you talking probe

2          mode?

3    A.      Probe mode.

4               ATTORNEY DONAHOE:

5               Yeah.

6    A.      In probe mode.

7    BY ATTORNEY CORRADO:

8    Q.      Okay.

9    A.      Yeah.  You want one probe

10   center mass and you'd want one in a

11   leg if possible because that ideally

12   locks up the most amount of muscles

13   to get the person to --- you know,

14   their muscles to stop so they go to

15   the ground.

16   Q.      Okay.

17   A.      Now, recently, and I'm not

18   sure when this was, this was within

19   the last couple of years after this

20   incident, they changed it where they

21   don't want a center mass anymore.

22   They want it more low, one probe

23   lower, sternum, and the other one in

24   the leg.

25   Q.      And what's the reason for the

26

1   change?

2   A.      As it was explained to us,

3   that possibly, possibly could cause

4   heart.  I don't know.  The department

5   says do it, I do it.

6   Q.      Okay.  And that was for the

7   probe.  Any difference in

8   instructions on drive stun?

9   A.      What we were explained drive

10  stun, it's anywhere.  I mean,

11  obviously you don't want to get them

12  in the face, anywhere sensitive like

13  that.

14  Q.      Okay.  So the change has been

15  for both probe and drive?

16  A.      No, no.  Never for drive stun.

17  It's always been for only the probe

18  mode only.

19  Q.      Okay.  Okay.  Okay.  I

20  misunderstood.  Thank you.  So you

21  said you have not been involved in

22  any other cases where a Taser has

23  caused injury or death.  Have you

24  heard of any other cases where a

25  Taser has caused injury or death?

27

1    A.      There was supposedly a case in

2    West Virginia where I believe it was

3    a male individual that was tasered

4    and after he had been sprayed with

5    pepper spray.  And the Taser ignited

6    the pepper spray because it was an

7    alcohol based.

8    Q.      Okay.  As part of your

9    training, did they ask you to

10   volunteer to be tased?

11   A.      Yes.

12   Q.      Okay.  Did everyone have to go

13   through that training?

14   A.      The tasing?

15   Q.      Yes.

16   A.      The tasing was optional.

17   Q.      It was optional?

18   A.      It was optional.

19   Q.      Okay.  Did you opt to be

20   tased?

21   A.      No.

22   Q.      Okay.  Has that policy since

23   changed?

24   A.      Yes.

25   Q.      Okay.  And how did that

28

1    change?

2    A.      They don't tase anybody now.

3    Q.      And why is that?

4    A.      We were told that there is a

5    slight percentage that Taser may

6    cause death.

7    Q.      Okay.  And when did that

8    change occur, if you know?

9    A.      In the past few years.  I'm

10   not sure the exact date.

11   Q.      Okay.

12                   ATTORNEY CORRADO:

13                   If we could get a copy

14           of that policy.

15                   ATTORNEY DONAHOE:

16                   The change?

17                   ATTORNEY CORRADO:

18                   Yes.

19                   ATTORNEY DONAHOE:

20                   I've never saw it, but

21           I can do it.

22                   ATTORNEY CORRADO:

23                   Okay.

24                   ATTORNEY DONAHOE:

25                   I mean, if they have

29

1              it, I'll do it.

2    A.        Yeah, there's a change.

3                   ATTORNEY DONAHOE:

4                   It's probably like a

5              circular letter or something,

6              but I don't have it.  I'll

7              look for it.  I'll ask these

8              guys to get it.

9                   ATTORNEY CORRADO:

10                  Okay.

11                  ATTORNEY DONAHOE:

12                  If you could send me an

13             e-mail, I will definitely ---.

14             Then off the record.

15   OFF VIDEO

16   OFF RECORD DISCUSSION

17   ON VIDEO

18   BY ATTORNEY CORRADO:

19   Q.        Any instructions regarding

20   tasering subjects while they are

21   cuffed?

22   A.        Try not to.

23   Q.        And why is that?

24   A.        It's all circumstance

25   depending.  I mean, if the person is

30

1   cuffed and they're running away from

2   you, you know, it's your discretion.

3   I mean, you got to understand, to

4   just throw out this question like

5   this, there's so many circumstances

6   that we run into.

7   Q.      Right.

8   A.      I mean, yeah, there may be a

9   case where it happens in the probe

10  mode.  You know, there's other cases

11  that it wouldn't happen.  I mean,

12  it's all depending upon

13  circumstances.

14  Q.      But you said try not to.  Did

15  somebody tell you to try not to do

16  that?  When you say ---?

17  A.      They never said --- I mean,

18  it's up to the trooper's discretion

19  and the circumstances you're in at

20  that time.

21  Q.      Okay.  Did anybody instruct

22  you to try not to?

23  A.      No, no one ever said.  I mean,

24  common sense would say if someone's

25  laying there on the ground, they're

31

1    handcuffed, there's no sense in going

2    and tasering them again.  You know,

3    in the deploy mode.  I mean, that's

4    common sense.  But no one

5    specifically said, you know, hey, you

6    know, you don't need to do that.

7    Q.      Okay.  But as a general rule,

8    that's something you try not to do?

9    A.      Me personally, yes.

10   Q.      Okay.  Have you ever heard of

11   the term positional asphyxia?

12   A.      Yes.

13   Q.      And how do you understand the

14   term?

15   A.      Well, it was explained to us

16   that there was a previous practice of

17   hogtying defendants, which was

18   handcuff behind their back.  Their

19   feet were tied together, and the

20   handcuffs were tied.

21   Q.      Uh-huh (yes).

22   A.      This way, they were laid in

23   the back of the patrol car on their

24   stomachs, and there was a study that

25   said that that caused positional

32

1    asphyxia where it was hard for them

2    to breathe, which caused the asphyxia

3    and they would die.  So we were

4    instructed not to do that, and at all

5    costs, not to --- if you can, keep

6    them off their stomach as much as

7    possible.

8    Q.      Okay.  And was this part of

9    your basic training or was this

10   something that happened subsequently?

11   A.      It's both actually.  It was

12   basic training and then also we have

13   mandatory in-service training once a

14   year every year.  And that was

15   included in that as well.

16   Q.      Okay.  And these classes or

17   seminars that you had about

18   positional asphyxia, did you learn

19   that drugs in a person's system can

20   increase the risk of positional

21   asphyxia?

22   A.      No.

23   Q.      Okay.  I think you mentioned

24   this already, but you learned that

25   placing a subject face down can

33

1   increase the risk of positional

2   asphyxia?

3   A.      Yes.

4   Q.      Okay.  Did you learn that

5   kneeling or placing weight on a

6   subject increases the risk of

7   positional asphyxia?

8   A.      Yes.

9   Q.      Did you learn that a natural

10  reaction to oxygen deficiency can

11  cause a person to struggle violently?

12  A.      No.

13  Q.      Did you learn that

14  unresponsiveness of a subject during

15  or after a struggle may indicate

16  cardiopulmonary arrest?

17  A.      No.

18  Q.      Did you learn as part of your

19  training that the risk of positional

20  asphyxia is increased when the

21  physical restraint includes behind

22  the back handcuffing combined with

23  placing the subject on their stomach?

24  In the stomach and behind the back

25  handcuffing.

34

1    A.        Increases it?

2    Q.        Yes, the combination of both.

3    A.        Not that it increases it.

4    There's the risk.

5    Q.        Okay.  Were you trained to

6    recognize breathing difficulties or

7    loss of consciousness?

8    A.        Yes.

9    Q.        And where did that training

10   come in?

11   A.        That was at the academy.  We

12   had standardized --- I'm sorry.  We

13   had first aid training and first

14   responder.

15   Q.        Okay.  And I'm assuming that

16   you had subsequent training, I don't

17   want to put words in your mouth,

18   regarding medical training?

19   A.        Not medical training, ---

20   Q.        Right, right.

21   A.        --- I mean, per se.  Not like

22   a doctor or anything.

23   Q.        Right.

24   A.        But we are certified first

25   responders.  We also have CPR, AED,

35

1  and first aid.

2  Q.      Okay.  And what is the

3  Pennsylvania State Police's policy on

4  providing medical care?

5  A.      For what?  I mean, ---.

6  Q.      For somebody who was in

7  distress.  I mean, are you obligated

8  to provide medical care to

9  somebody ---

10  A.      Yes.

11  Q.      --- in distress?

12  A.      Yes.

13  Q.      And what is that policy?  Does

14  it say anything specific, if you

15  know, other than it says that you

16  should provide medical care to

17  somebody in distress?

18  A.      We are to provide care.  I

19  mean, we're a first responder.  We're

20  to provide care.

21  Q.      Okay.  And do you know the

22  policy number?

23  A.      No.

24  Q.      Okay.

25                    ATTORNEY CORRADO:

36

1          If I could get a copy

2      of that?

3              ATTORNEY DONAHOE:

4              Yeah.  E-mail me.  That

5      would be great.

6              ATTORNEY CORRADO:

7              Okay.  All right.

8  BY ATTORNEY CORRADO:

9  Q.      Let's turn now to October

10  18th, 2010.

11  A.      Okay.

12  Q.      Could you tell me a little bit

13  about the start of the shift?  Is it

14  11:00 to 7:00?

15  A.      It was 11:00 to 7:00 shift.  I

16  was working with Trooper Guy

17  Battestilli.

18  Q.      Uh-huh (yes).

19  A.      He was driving.  We were in a

20  marked patrol car in full uniform.

21  Q.      Okay.  If I could just stop

22  you.  I'm sorry.  Is this your normal

23  shift?

24  A.      My normal shifts are three

25  daylight shifts followed by seven

37

1    midnight shifts.  And then I have

2    four days off.  So that is my normal

3    rotation.

4    Q.     Okay.

5    A.     So this was in my midnight

6    portion of my ten-day stretch.

7    Q.     Okay.  And you're in uniform?

8    A.     Yes.

9    Q.     Okay.  And tell me what's on

10   your belt.

11   A.     On my belt I had my duty

12   pistol, my magazines, my pepper

13   spray, my handcuffs, and my Taser.

14   Q.     Okay.  Did you have your

15   baton?

16   A.     It was in my bag.

17   Q.     Okay.  And your bag is in the

18   car?

19   A.     It was in the backseat.

20   Q.     In the backseat, okay.  And

21   what about your radio?  Do you carry

22   a radio?

23   A.     I had to carry a radio in my

24   bag, plus we have a car radio.

25   Q.     Okay.  Are you issued a cell

38

1    phone?

2    A.      No.

3    Q.      Okay.  Do you use your

4    personal cell phone on occasion for

5    work?

6    A.      Yes.

7    Q.      Okay.  And do you have your

8    cell phone on you?

9    A.      Yes.

10   Q.      Okay.  Did you do a spark test

11   for the Taser, your Taser, that day?

12   A.      Yes.

13   Q.      Okay.  And that's normal

14   course of business ---

15   A.      Yes.

16   Q.      --- when you get on duty?

17   A.      By regulation every day when

18   you start your shift, you're supposed

19   to do a spark test.

20   Q.      Okay.  What time does the call

21   come in, if you know?

22   A.      I don't know for sure.  I

23   mean, I can refer to my report if

24   that's fine.

25   Q.      That's okay.  I'm going to

39

1    show you ---.

2                    ATTORNEY CORRADO:

3                    I'm going to have the

4            court reporter mark this as

5            Johnson Exhibit One.

6                    (Johnson Exhibit One

7                    marked for

8                    identification.)

9                    ATTORNEY CORRADO:

10                   And, Counselor, I think

11           you've already seen this

12           before.

13                   ATTORNEY DONAHOE:

14                   Yeah, thanks.

15   BY ATTORNEY CORRADO:

16   Q.      Do you know what this document

17   is?

18   A.      I do.

19   Q.      What is it?

20   A.      It's a photocopy of our radio

21   log.

22   Q.      Okay.  And who maintains that?

23   A.      The PCO, which is the

24   communication officer.

25   Q.      Okay.  And how does that

40

1    communication officer gather that

2    information?

3    A.      Which information are you

4    talking?  Do you want me to go

5    through the blocks and I can explain

6    it or ---?

7    Q.      Just to move this along, that

8    first number, that CO1-103, that's an

9    incident number?

10   A.      Yes, ma'am.

11   Q.      Okay.  And the MHR stands for?

12   A.      That is just a brief --- it's

13   a mental health request, just a brief

14   description of what the incident is.

15   Q.      Okay.  And do you know what

16   would have been marked out here?

17   A.      I don't know what that is.  I

18   was wondering that myself, but I

19   don't know what that would be.

20   Q.      Okay.  It's a code one?

21   A.      Yes, ma'am.

22   Q.      Okay.

23   A.      The initials are the PCO's

24   initials, would be the initial block.

25   Q.      All right.  And the code one

41

1    means?

2    A.      Code one means that non-

3    emergency.  You got an incident and

4    you don't have to respond.  I mean,

5    it's not a high speed response.  It's

6    just, hey, there's something going

7    on, you need to go there.

8    Q.      Okay.  And what is the 2322?

9    A.      That would be the time it was

10   dispatched.

11   Q.      Okay.  And the 2337 is?

12   A.      The time that we went actually

13   on scene there.

14   Q.      So you get to the scene and

15   somebody calls in we've arrived?

16   A.      On scene, yes.

17   Q.      On scene, okay.  What do you

18   know about what's happening at this

19   point?

20   A.      What do you mean?

21   Q.      What do you know about why

22   you're responding?

23   A.      We were told that there was a

24   request for an ambulance, and we were

25   going there.  The person was possibly

42

1   combative, and we were going there to

2   assist EMS.

3   Q.      And that's all you knew?

4   A.      He had just possibly ingested

5   some pills.

6   Q.      Okay.

7   A.      And I mean, it was very

8   limited information.

9   Q.      Okay.  And who tells you that?

10  A.      That was given to us through

11  radio, PCO Thomas McGee.

12  Q.      Okay.  And is that the same

13  person maintaining this log?

14  A.      Yes.

15  Q.      Okay.  And that comes in over

16  the car radio?

17  A.      Yes.

18  Q.      Okay.  All right.  So 2337,

19  you arrive?

20  A.      Uh-huh (yes).

21  Q.      You exit the vehicle, and what

22  happens next?

23  A.      Not directly do we exit the

24  vehicle.

25  Q.      Okay.

43

1    A.        At 2337 when we pulled into

2    the driveway, we were met there by

3    Timmy Hooftallen, which we later

4    found out was the brother of Troy.

5    Q.        Okay.  So you're still in the

6    car at this point?

7    A.        We're still in the car, yes.

8    Q.        Okay.

9    A.        Actually, we're in the car at

10   the end of the driveway.  We see a

11   male standing there.  We weren't even

12   sure we were at the right location.

13   He said yes, we're --- you know,

14   we're the ones that called.

15   Q.        Okay.  What happens next?

16   A.        And I'm in the passenger's

17   seat.  Trooper Battestille is

18   driving, and he's talking to Trooper

19   Battestilli and he starts about how

20   he's --- he says he's in the house

21   tearing up the place, you know,

22   screaming and carrying on.

23   Q.        Uh-huh (yes).  Did he mention

24   anything about what he had taken?

25   A.        He said he had taken a box of

44

1   Mucinex.  And at that point, I asked

2   him --- because he was talking to

3   Trooper Battestilli.  I'm sitting on

4   the passenger side.

5   Q.      Uh-huh (yes).

6   A.      And I said, well, what kind of

7   Mucinex is it?  I said was it the

8   kind with the pseudoephedrine in it,

9   the kind that you have to get from

10  behind the counter or is it the kind

11  that you can just go and pull off the

12  counter?  And he said, well, it was

13  the kind from behind the counter.

14  Q.      And why did you want to know

15  that?

16  A.      Because pseudoephedrine is

17  what they make methamphetamine out of

18  and it's --- you know, it's a

19  controlled-type substance.

20  Q.      Were you concerned about his

21  level of agitation or that he was, in

22  fact, ingesting illegal drugs?

23  A.      I wanted to know what he had

24  taken.  And there is a difference.  I

25  mean, from my lay knowledge at the

45

time, I thought the type that was

with the pseudoephedrine would be

worse if he had been taking that for

himself than the other kind.  So

that's why I was inquiring.

Q.      Okay.  Did he mention anything

else regarding Troy's condition?

A.      I believe he mentioned that he

does this to get high.

Q.      Uh-huh (yes).

A.      And he's done this before and

at one point he even said something

about how a couple weeks ago he had

done this and he had gone to the

hospital.

Q.      Okay.  Did he mention about

any medical conditions Troy had?

A.      No.

Q.      Okay.  Where is EMS staged, if

you know?

A.      They are staged at --- I can't

remember the name of the church.  It

is a church that is very close

proximity.  It's probably 100 yards

farther south than where we are on

46

1  the same road.

2  Q.      And how did you learn that?

3  A.      That's what we were told via

4  radio that they were going to be

5  staging there.

6  Q.      Okay.  Okay.  So Timmy comes

7  to the car.  You have a conversation

8  with Timmy.  And then what happens

9  next?

10 A.      I just had the brief

11 conversation with him.

12 Q.      Right.

13 A.      There is a female walking up

14 the driveway.

15 Q.      Uh-huh (yes).

16 A.      Trooper Battestilli asks who

17 is that, and he says, oh, that's

18 Troy's wife.  We didn't know any

19 different at the time.  She

20 approaches the car.  He's out of

21 control.  He's screaming and carrying

22 on in the house, he being Troy.  He's

23 waking my girls.  My girls are up and

24 he won't calm down.  You need to

25 hurry up and get in there.

47

1    Q.      Okay.  And what happens next?

2    A.      They step off to the side.  We

3    actually roll the patrol car up.  I

4    don't know exactly how far, maybe 50

5    or 60 feet to get closer to the

6    house, exit the patrol car, and

7    follow them into the residence

8    through the back door.

9    Q.      Okay.  And what do you see?

10   A.      We are following Timmy in.  He

11   goes into the first room which is the

12   kitchen on the left and says that ---

13   he kind of points around the corner

14   and says, hey, they're around,

15   they're in there, which is the living

16   room.  So we take the little

17   entranceway to the end.  It's a T.

18   We go to the left and we walk into

19   the living room.

20   Q.      And what do you see?

21   A.      When we enter the living room,

22   the --- Troy's sitting there on the

23   left end of the couch sitting next to

24   what we later discover was his mother

25   sitting in the middle.

48

1   Q.      Okay.  And where is ---

2   Timmy's in the kitchen at this point?

3   A.      Yes.

4   Q.      Can he see from the kitchen

5   what's happening in the living room?

6   A.      Yes.

7   Q.      Okay.  And where is Ms. Hall?

8   A.      I believe she was standing

9   next to Tim.

10  Q.      Okay.  And is there anything

11  in front of the couch where Troy and

12  his mother are sitting?

13  A.      There is a coffee table.  You

14  know, a table of some sort there, low

15  table.

16  Q.      If you had to estimate, how

17  large would you say the coffee table

18  is?

19  A.      Oh, my goodness.  Three feet

20  by two feet maybe, three feet by 18

21  inches wide.  All I knew was they

22  were both sitting behind it.  Maybe

23  four feet.

24  Q.      Okay.  And what happens next?

25  A.      We walked in and Trooper

49

1  Battestilli is standing on my right

2  and I'm standing on the left.  It was

3  his incident.  He does the talking.

4  I'm just there.

5  Q.      And why is that?  Why is it

6  considered his incident?

7  A.      There's an understanding that

8  we had that on midnights, since

9  there's two people in one car, we

10  traded what was called majors and

11  minors.

12  Q.      Uh-huh (yes).

13  A.      And major incidents would be

14  either an incident report or a crash

15  would be considered a major.  A minor

16  would be an assignment report, and it

17  could be anything from a C officer or

18  other, assist mental health,

19  anything.  And all it is is just

20  based on the reporting.

21  Q.      Okay.  So I'm sorry.  This was

22  considered then a ---

23  A.      Minor.

24  Q.      --- minor report, and that's

25  why he was assigned to take the lead?

50

1  A.     He was up on this one, yes,

2  ma'am.

3  Q.     Okay.  All right.  So he goes

4  ahead and introduces himself?

5  A.     He walks across the room,

6  sticks out his hand and says Trooper

7  Battestilli.  And Troy stands up,

8  shakes his hand and then goes and

9  sits back down.

10 Q.     Okay.  And did you understand

11 that this was a mental health

12 complaint?  You knew?

13 A.     Not at this point, no.  I

14 mean, all we had known at this point,

15 that he was tearing up the place and

16 probably --- and possibly had

17 ingested and overdosed on some sort

18 of medication.

19 Q.     Okay.  And that would not be a

20 mental health complaint to you or

21 incident to you?

22 A.     It depends.  I mean, if he was

23 trying to harm himself by

24 intentionally --- he was trying to

25 kill himself, it would be more mental

51

1    health.  If he was doing it just

2    because he took a whole bunch of

3    pills and OD'd, then no, it would be

4    an assist EMS.

5    Q.      Okay.  Referring back to the

6    mobile unit log, ---

7    A.      Uh-huh (yes).

8    Q.      --- it is titled by somebody

9    an MHR assist?

10   A.      Uh-huh (yes).

11   Q.      Is that done at the time or is

12   that done later, to your knowledge?

13   A.      I don't know when he did it.

14   Q.      Okay.  So the call did not

15   come in like that to you?

16   A.      No.

17   Q.      Okay.  I'm sorry.  Go ahead.

18   He introduces himself, Trooper

19   Battestilli introduces himself.

20   A.      And Trooper Battestilli then

21   steps back towards me.  I'm

22   positioned in front of a loveseat,

23   which would be at a 90-degree angle

24   toward where Troy is sitting with my

25   back to the kitchen with the open

52

1    window, with, I believe, Tim --- is

2    her name, the girlfriend, and Tim are

3    standing like right here on me.

4    Q.        Okay.

5    A.        And they start --- I'm trying

6    to remember, trying to remember

7    exactly how it was.  Troy, at one

8    point, starts talking about how he's

9    the baddest mother fucker around and

10   he can kick anybody's ass.

11           And he, at one point, spins

12   his baseball cap around, stands up,

13   and there's a 20-ounce --- I believe

14   it was an Orange Crush bottle, and it

15   had about yeah much in the bottom.

16   He stands up and he just starts

17   ripping on it like this like he was

18   trying to tear it in half.  And his

19   mother says no, no, no, don't do

20   that, you know, that will cause a

21   mess.  And Trooper Battestilli says

22   oh, no, don't.  Yeah, we don't want a

23   mess.  So he sits back down, puts the

24   bottle down.  And then he mentions

25   --- he being Troy mentions something

53

1  about, you know, I found the meaning

2  of life.  And Trooper Battestilli

3  said oh, well, enlighten us, what is

4  it?  And Timmy starts laughing from

5  the kitchen.  And then at that point

6  Troy stands up and he walks around,

7  which would be to his left, around

8  the end of the cocktail table or

9  coffee table, in front of the TV, and

10  he's like I want to go outside.

11  Q.     Can I stop you?

12  A.     Uh-huh (yes).

13  Q.     Sorry.  Getting back to the

14  meaning of life, explain in a little

15  bit more detail the conversation

16  between Trooper Battestilli and Troy

17  for me.  Does Troy say this in a

18  joking way or is he serious?

19  A.     He just says I found the

20  meaning of life, and he sounds

21  serious.

22  Q.     Okay.  So Troy sounded

23  serious?

24  A.     Uh-huh (yes).

25  Q.     Does Trooper Battestilli

54

1   respond to him in a joking way?

2   A.      It was please, tell us.  You

3   know, he was like if you found the

4   meaning of life, we'd all like to

5   know.  You know, it was like, hey,

6   we'd all like to know what the

7   meaning of life is.  You know, he

8   wasn't necessarily joking.  It was

9   just if you're so enlightened, please

10  let us all know.

11  Q.      Did he snicker or laugh when

12  he said that?

13  A.      No.

14  Q.      Okay.  And you said Timmy

15  laughed?

16  A.      Yes.

17  Q.      Okay.  And then what happens

18  next?  You said he comes around to

19  the left of the coffee table?

20  A.      He gets up and comes around

21  the left end and he approaches

22  Trooper Battestilli, puts his arm out

23  like this and says hey, I want to

24  talk --- let's go outside.  And puts

25  his arm on what would be Trooper

55

1  Battestilli's right arm, and then he
2  puts his right arm on my left arm
3  because we're standing looking at
4  each other.
5  Q.     Uh-huh (yes).
6  A.     And like he's trying to crowd
7  us to get us to go outside, and grabs
8  our arm to kind of, you know, do a
9  little of these to get us to go
10 outside. And at that point, Trooper
11 Battestilli said no, no, no, we don't
12 need to go outside. We can stay in
13 here and talk.
14 Q.     And if you know, why did
15 Trooper Battestilli not want to go
16 outside and talk?
17 A.     I have no idea other --- I
18 mean, my thoughts are there's no
19 reason to go outside and talk.  I
20 mean, we're in here.  Everything's
21 fine.  Everything's relatively ---
22 it's calm.  You know, there's no
23 sense even going outside.
24 Q.     When he touches you, was it a
25 violent touch?

56

1    A.        No.

2    Q.        Okay.

3    A.        Well, hang on.  Could you

4    define what you say by violent?

5    Q.        Did you interpret it as

6    violent?

7    A.        He put his hand on me like he

8    was trying to get us to go out the

9    door.

10   Q.        Okay.  And Trooper Battestilli

11   said no, we don't need to ---

12   A.        Right.

13   Q.        --- go outside?  Then what

14   happens?

15   A.        At that point, I pivot back.

16   Trooper Battestilli pivots back, so

17   we're looking at each other.  And

18   Troy then turns and stares at me.

19   And my back is up against the

20   loveseat, which is up against the

21   wall.  I had nowhere to go, and he's

22   staring at me.  And I can see it was

23   like slow motion.  All of a sudden

24   you could see his shoulder dipping

25   and his right arm was coming around

57

1  and here it comes.  Comes up like

2  this.  And if he's throwing a punch,

3  I throw up my left arm and block it.

4  Q.      How long did the eye contact

5  last?

6  A.      Ten seconds maybe.

7  Q.      And who broke the eye contact?

8  A.      He did when he coiled down.

9  He kind of pulled his head this way

10  and as he was coming up.

11  Q.      Did you say anything during

12  those ten seconds to him?

13  A.      No.

14  Q.      Did Trooper Battestilli say

15  anything during those ten seconds to

16  him?

17  A.      No.

18  Q.      Okay.  So you block it with

19  your left arm, you said?

20  A.      Left arm, right in this ---

21  probably this location here.

22  Q.      Okay.  And then what happens?

23  A.      As he throws the punch and I

24  go to block his weight's coming

25  forward on me, so if I may

58

1    demonstrate.  As his arm comes past,

2    I take this arm and roll it around

3    like this in an effort to grab the

4    arm.  And he's pushing me down.  I

5    pull the arm in up under my armpit

6    like this so his arm is shooting

7    straight under my armpit this way.

8    And this is all happening as I'm

9    falling backwards with him on top of

10   me.  I take this arm, grab this arm

11   around and, for lack of a better

12   term, it's almost like he's doing a

13   Superman like this with his arms

14   underneath my armpit.  And at this

15   point, I'm in fear that he's trying

16   to grab one of my devices on my belt.

17   I have no idea.  I mean, the guy just

18   threw a punch at me.  I don't know if

19   he's going for my Taser.  Is he going

20   for anything?  So I grab and hold on.

21   But as we're going back and I'm

22   holding on, he falls on top of me.

23   My head goes up.  I fall into the

24   loveseat.  My head hits the upper

25   portion, upper back portion into the

59

1   wall like this, and he's laying fully

2   on top of me pushing his weight down

3   on top of me.

4   Q.     Does your head hit the top of

5   the loveseat or the wall or the bar

6   behind you?

7   A.     It does not hit the bar.  I

8   think it was the intersection of

9   where the loveseat and the wall is

10  because there was like --- I don't

11  know.  I was back ever so ---.  I

12  don't know if it was hard on the top.

13  My head hit something hard and it was

14  right at the intersection of where

15  the loveseat touches the wall.

16  Q.     And it was the back of your

17  head that hit?

18  A.     It was right at the back of my

19  head here.

20  Q.     The lower?

21  A.     The lower, like right in

22  through here.

23  Q.     Okay.  And where are the tools

24  on your belt?  Is your gun on your

25  right side?

60

1    A.      My gun is on this side.  My

2    magazines are here.

3    Q.      If you wouldn't mind not

4    saying this side.  Tell me left or

5    right.

6    A.      I'm sorry.

7              ATTORNEY DONAHOE:

8              Yeah, just use the

9         right.

10   A.      Okay.  Gun is on right side.

11   Magazines are front right side which

12   would be between my belt buckle and

13   my firearm.  On the other side I had

14   my Taser, which would be on the left

15   side front.

16   BY ATTORNEY CORRADO:

17   Q.      Uh-huh (yes).

18   A.      And then I believe at that

19   time I had pepper spray would be

20   behind it, and then my cuffs were

21   behind it.  Then I had a flashlight

22   loop in the back.

23   Q.      Okay.

24   A.      The Taser opens.  It's a

25   cross-draw Taser, so it opens to the

61

1    front.

2    Q.      Uh-huh (yes).

3    A.      So with him coming on top of

4    me, it's obvious you would pull

5    straight out rather than pull to the

6    back, if that makes sense.

7    Q.      Does your pistol have a

8    holster with a snap?

9    A.      Let me think here because,

10   like I said, we had switched weapons

11   and we have switched holsters.  What

12   did the old ones have?  The old

13   holster had a --- it was a double

14   retention system.  It had a snap that

15   went along the outside and around the

16   front, but also had an internal

17   device in it so if it came unsnapped,

18   you just couldn't pull it straight up

19   and out.

20   Q.      And that was the one you were

21   wearing ---?

22   A.      That was the one I was wearing

23   then, yes.

24   Q.      Okay.  And I'm assuming you're

25   right-handed?

62

1    A.      Yes.

2    Q.      Okay.  And you said your Taser

3    is on your ---

4    A.      Left side.

5    Q.      --- left side?

6    A.      Yes, correct.

7    Q.      And that's at a front cross

8    --- how did you describe that for me

9    earlier?

10   A.      It's a cross-draw.

11   Q.      Right, right.

12   A.      It's to use your strong hand

13   to pull it.  There is a button that

14   you activate.  You're supposed to

15   activate with your index finger.  You

16   lay your finger on it.  You push it,

17   and it just pulls straight out.

18   Q.      Okay.  And what type of

19   firearm were you carrying at the

20   time?

21   A.      It would have been a Glock.  I

22   can't remember the nomenclature.  I

23   believe it was a model 37, which is a

24   45 GAP.

25   Q.      There's no safety on a Glock.

63

1   Was there a safety feature on your

2   Glock?

3   A.      Glock's have --- it's all

4   internal.  There's no actual latch on

5   it for a safety.

6   Q.      Okay.  So there was no

7   traditional safety feature on your

8   Glock?

9   A.      There is what they call ---.

10  Q.      No latch?

11  A.      No latch.  They do call the

12  trigger a safety, which has a little,

13  like a horseshoe piece on it that if

14  you --- that you have to push that in

15  to make it fire.

16  Q.      Okay.

17  A.      I don't know.  I'm sorry.  You

18  have to see how a Glock is to

19  understand where there's a ---.  In

20  the trigger, there's a horseshoe that

21  sticks up this way, but it has to be

22  depressed before the trigger will

23  actually fire.

24  Q.      Okay.  So he's got his arms

25  straight out like Superman and

64

1  they're under your armpits?

2  A.     Yes, ma'am.

3  Q.     And you've now gone backwards

4  onto the couch?

5  A.     Yes.

6  Q.     What happens next?

7  A.     Well, I'm laying there.  I

8  can't see what's going on because his

9  chest is up over my face.  He's up

10  over me like this, and I hear a Taser

11  being deployed.

12  Q.     Where are your feet at this

13  time?

14  A.     They're on the floor.

15  Q.     And where are Troy's feet, if

16  you know?

17  A.     I don't know.

18  Q.     Okay.  You heard a Taser being

19  deployed?

20  A.     I heard a Taser being

21  deployed.  I felt Troy's body tighten

22  up which I was told that was the

23  effect of the Taser being deployed.

24  It was deployed in probe mode because

25  I heard the actual --- you actually

65

1   can hear the difference between a

2   drive stun and the deploy mode.  I

3   heard it deploy.  I felt his body

4   tighten up and I put my hands up and

5   I pushed myself out to my right side,

6   which would be his left side.

7   Q.      Okay.  Did you seek medical

8   treatment for your head?

9   A.      No.

10  Q.      Did you see Troy hit his head?

11  A.      No.

12  Q.      Did you hear Troy's head hit?

13  A.      No.

14  Q.      Okay.  So now you've pushed

15  him.  And what happens next?

16  A.      I didn't ---.

17  Q.      Well, you moved him ---?

18  A.      I didn't move him.  I just

19  slid out from underneath him.

20  Q.      Okay.  And then what happens

21  next?

22  A.      I take my left foot.  It goes

23  on the ground.  My right foot is on

24  the knee.  Trooper Battestilli's

25  like, hey, cuff him up.  I grab what

66

1    would be his left arm.  I pull my

2    handcuffs out, cuff his left arm.

3    Had a little bit of trouble getting

4    his right arm because his right arm

5    is, if I may, it's out like this.

6    Pulled his right arm back and then I

7    get it secure.

8    Q.       Are you putting any of your

9    body on him during the cuffing

10   process?

11   A.       No.

12   Q.       Does Trooper Battestilli have

13   any of his body on Troy during this

14   cuffing process?

15   A.       He's behind him.  I don't know

16   if any of his weight was on him or

17   not.

18   Q.       Are the probes still in the

19   back?

20   A.       Yes.

21   Q.       Okay.  And what happens next?

22   A.       Once his handcuffs were

23   secured, I pulled the probes out of

24   his back, out of Troy's back.  I

25   believe I put them on the counter

67

1   which would have been like right in

2   front of us.   Trooper Battestilli

3   popped the cartridge off the Taser.

4   I secured that in my left coat

5   pocket.

6   Q.       Okay.  And then what happens

7   next?

8   A.       And then Troy starts bucking

9   around, kicking, starts flailing

10  around on the couch.  And what I do

11  at that point is I take my left knee

12  off the couch, have both feet on the

13  ground, and I put my shoulder on his

14  back to try and keep him from kicking

15  around and put my shoulder like this,

16  wrap his shoulder, and I'm holding

17  him like this to keep him from

18  flailing around.

19  Q.       When you say flailing, what do

20  you mean?  Is this his upper body?

21  A.       His upper body's moving.  He's

22  kicking with his feet.

23  Q.       And he's facedown on the

24  couch?

25  A.       Yes.

68

1   Q.      So his feet are kicking

2   forward?

3   A.      They're kicking out behind,

4   like a --- almost like a donkey kick,

5   if that clarifies it, how they kick

6   out behind.

7   Q.      Did he kick anyone prior to

8   you restraining him?

9   A.      No.

10  Q.      Okay.  So tell me again if you

11  would what position you had him on

12  the couch after he started flailing?

13  A.      My right shoulder was on his

14  upper back.  This arm was holding his

15  --- which would be his right

16  shoulder, and I was holding him in

17  position like this.

18  Q.      Okay.  And where are your

19  knees at this point?

20  A.      My feet were on the ground,

21  and I believe my knees were on either

22  the sofa or the ground.  I didn't

23  have --- the loveseat, I'm sorry,

24  because the loveseat's low and I was

25  down like this.

69

1   Q.      Okay.  And so your knees are

2   not on him?

3   A.      No.

4   Q.      And where is Trooper

5   Battestilli at this time?

6   A.      He's behind me back here, at

7   the feet, the lower end.

8   Q.      Okay.  And what is he doing,

9   if you know?

10  A.      I hear what sounds like a

11  drive stun.  I'm more concentrated

12  with the upper part, the upper

13  portion, keeping control of him

14  there.  What he's actually doing, I

15  don't see him do anything.  I mean,

16  I'm not focusing on him.  I'm

17  focusing on Troy.

18  Q.      Okay.  Does he tell you that

19  he's going to drive stun?

20  A.      No.

21  Q.      Okay.  What is Troy saying at

22  this time?

23  A.      He doesn't say anything.

24  Q.      Okay.  And where is his face

25  at this time?

70

1    A.       It's on the loveseat.

2    Q.       Okay.  So you hear the drive

3    stun?

4    A.       Uh-huh (yes).

5    Q.       And then what happens?

6    A.       I believe Troy lets out a ---

7    like a little scream or something

8    like that.  He continues to kick.

9    And then he calms down for a few

10   seconds and Trooper Battestilli's

11   like I'm going to go get my shackles

12   out of the car.

13   Q.       So you only hear or have

14   knowledge of only one drive stun?

15   A.       The drive stun, yeah.  I mean,

16   the individual, I can't count how

17   many he does.  I don't know how many

18   he actually does.

19   Q.       Well, what does it sound like?

20   A.       It's a clacking noise.

21   Q.       Okay.  Does it make a clack

22   per ---?

23   A.       No, what it does is when you

24   activate the Taser, there's an

25   electric current that goes ---

71

1    there's two probes that stick out and

2    there's an electric current that goes

3    between the two and it's just like

4    clack, clack, clack, clack, clack,

5    clack, clack, clack, clack, clack,

6    clack.  It's a continuous.  As long

7    as it's --- as long as you have the

8    trigger pulled, it's a continuous

9    noise of the electricity clacking.

10   Q.      Okay.  So that drive stun you

11   hear, how long is that clack, if you

12   can estimate?

13   A.      I don't know.

14   Q.      Okay.  And you only hear one

15   before Trooper Battestilli says I'm

16   going to get my shackles?

17   A.      What do you mean?  One clack?

18   Q.      Yes.  Only one continuous

19   clack?

20   A.      It's hard to remember, I mean,

21   if it was one continuous or if there

22   were several short bursts.  I don't

23   know.

24   Q.      Okay.  Is there any discussion

25   regarding the location of Troy's

72

1  clothes or pulling up his shirt or

2  trying to get an accurate spot in

3  order to accurately drive stun him?

4  A.      There was no discussion

5  between --- you mean between me and

6  Trooper Battestilli?

7  Q.      Yes.

8  A.      No, we never had a discussion.

9  Q.      Okay.  So to your knowledge,

10  if I can recap, you hear the drive

11  stun deployed, but you don't know how

12  many drive stuns are administered?

13  A.      No, no.

14  Q.      Okay.  What you hear next

15  though is Trooper Battestilli saying

16  I'm going to get my shackles?

17  A.      Right.

18  Q.      Okay.  And is Troy compliant

19  at this point?

20  A.      Yes.

21  Q.      Okay.

22  A.      And at that point he says I'm

23  going to get my shackles and that was

24  to restrain his feet.

25  Q.      Uh-huh (yes).

73

1   A.      Trooper Battestilli asks Timmy

2   if he would come down and help hold

3   his feet while he goes out to the car

4   to get the shackles, and Timmy comes

5   around and grabs ahold of him in some

6   fashion.

7   Q.      And are you maintaining the

8   same position you had earlier?

9   A.      I'm still holding the same

10  position, yes.

11  Q.      Okay.  So you don't have any

12  --- you don't have your knees on him?

13  You have your upper body on his upper

14  body?

15  A.      Yes.

16  Q.      Okay.  And from what part of

17  his body to what part of his body do

18  you think your weight is being

19  applied to?  For example, is it the

20  waist to the neck?  Is it from his

21  lower buttocks to his neck?

22  A.      Probably from about here.  I

23  mean, I laid my arm across him like

24  this so he wouldn't be not a big

25  path, you know, from wherever, maybe

74

1  here up across my shoulder in this

2  fashion so it's almost like a

3  triangle.

4  Q.      Only because here the court

5  reporter won't be accurate when we

6  look back at the record, would you

7  say here is mid-back?

8  A.      It's easier to show than it is

9  to describe.  I mean, it would start

10  maybe mid-back to top of --- to the

11  top of his shoulder area and a

12  diagonal from mid-back ---.  It would

13  be mid-back left side to top of

14  shoulder right side.

15  Q.      Okay.

16  A.      And then draw like a triangle

17  across to the right shoulder --- to

18  the left shoulder.  So if you could

19  draw a triangle in that area.

20  Q.      Okay.  So Timmy is now holding

21  his feet?

22  A.      Uh-huh (yes).

23  Q.      And how long does it take

24  Trooper Battestilli to return with

25  the shackles?

75

1    A.      I don't know.  It seemed like

2    an eternity.

3    Q.      Okay.

4    A.      I mean, seriously.  I mean, I

5    don't know if it's off the record.

6    It seemed like an eternity.  I could

7    literally hear his footsteps in the

8    gravel as he was running to the

9    patrol car and on the way back.  I

10   couldn't give you an actual time

11   though.

12   Q.      Were you having difficulty

13   still maintaining Troy in a

14   compliant ---?

15   A.      No, he was fine at the point.

16   The situation is I'm a trooper here

17   by myself with someone who has been

18   combative.  So if Trooper

19   Battestilli's out of the house, I'm

20   here with him by myself.

21   Q.      Okay.  Does your pressure go

22   any --- above the shoulders at any

23   point?  Are you near his neck?

24   A.      No.

25   Q.      Okay.  So he returns.  And

76

1    then what happens?

2    A.       Timmy gets up and we move him

3    onto the floor on his stomach.  And

4    there was some --- Troy becomes

5    agitated a little bit again, starts

6    kicking and flailing again.  He's on

7    his stomach on the floor.  Trooper

8    Battestilli applies the shackles.

9    And then we roll him onto his back.

10   Q.       Okay.  Now, and what was the

11   purpose of placing him on his stomach

12   originally and then turning him over

13   onto his back?

14   A.       Well, originally he was on his

15   stomach --- to bring him on his

16   stomach.  On his stomach he's easier

17   for shackles because if he's on his

18   stomach while the handcuffs and/or

19   shackles are being applied, he can't

20   see what we're doing.

21   Q.       Uh-huh (yes).

22   A.       And that was one of the

23   techniques.  We don't want the person

24   who's being cuffed to know what we're

25   doing because if they have any

77

1   intentions of kicking at us, they can

2   see us.  So if they're facedown, then

3   it's easier to apply the shackles.

4   And then once the shackles are

5   applied, we flipped him on his back

6   for positional asphyxia, just lay him

7   out.

8   Q.      And what is ---?

9                   ATTORNEY DONAHOE:

10                  You mean to

11          prevent ---?

12  A.      Prevent, prevent positional

13  asphyxia, yes.  I'm sorry.

14                  ATTORNEY DONAHOE:

15                  I just wanted to make

16          sure.

17  BY ATTORNEY CORRADO:

18  Q.      And then what happens next?

19  A.      At that point he's laying

20  there.  And I'm in a squatted

21  position.  My feet on the ground and

22  I call it like a catcher's, baseball

23  catcher's position where my knees are

24  touching him.  I have one knee, it

25  would be my left knee, is touching

78

1    his upper right shoulder.  My right

2    knee would be touching the waist

3    area, if I may, which would be the

4    joint, right around the hip area.

5    And I'm in this position.  Just have

6    my legs just touching him in that

7    position because if he tries to get

8    up, I could apply pressure to hold

9    him down if need be, but we are

10   required to maintain contact with

11   anyone that is a prisoner at this

12   point, and he was a prisoner because

13   he had committed the aggravated

14   assault.

15   Q.    What is his condition at this

16   time?  Is he conscious?

17   A.    He is conscious, but he's just

18   --- he's laying there.  Eyes are

19   open.

20   Q.    Eyes are open.  Is he talking?

21   A.    No.

22   Q.    Has his color changed?

23   A.    No.

24   Q.    This is a department

25   requirement that you must maintain

79

1  contact with a prisoner?

2  A.    Yes.

3              ATTORNEY CORRADO:

4              And if I could get a

5       copy of that policy too?

6              ATTORNEY DONAHOE:

7              Uh-huh (yes).

8  BY ATTORNEY CORRADO:

9  Q.    Because he is shackled at this

10  point and he's handcuffed behind his

11  back?

12  A.    Yes, ma'am.

13  Q.    He would not have been able to

14  stand up?

15  A.    I can't answer that.  And the

16  reason I say that, because I have

17  seen people that are shackled and

18  handcuffed --- we actually had an

19  incident in Punxsy where a guy was

20  that way and he hopped straight to

21  his feet and started hobbling away.

22  Q.    All right.  So your left knee

23  is on your --- your left knee is on

24  his left shoulder?

25  A.    Right shoulder.

80

1    Q.      Right shoulder.

2    A.      Uh-huh (yes).

3    Q.      And you said your right knee

4    is now on his hip bone?

5    A.      Waist, hip bone.  Yes, right

6    at the junction where his hip would

7    be.

8    Q.      Okay.

9    A.      Sort of at the crease there.

10   Q.      Are the heels of your feet up?

11   A.      Yes.

12   Q.      Okay.  And where are your

13   hands at this point?

14   A.      They're sitting just like

15   this.  I actually had my elbows

16   resting.  I'm sitting like a

17   catcher's position.  My elbows are on

18   my thighs.

19   Q.      Okay.

20   A.      Right elbow, right thigh.

21   Left elbow, left thigh.

22   Q.      And your hands are on your

23   thighs as well?

24   A.      No, they're hanging out over,

25   you know, kind of like this.

81

1   Q.      Are they on Troy at all?

2   A.      No.

3   Q.      And where are the family

4   members at this point?

5   A.      I don't know where the mom's

6   at.  And I don't know where Kim's at.

7   Best I recall, I believe Tim is

8   standing, which would be behind me to

9   the right.

10  Q.      And is anyone talking at this

11  point?  Talking to you?

12  A.      Anybody being who?

13  Q.      Any of the family members?

14  A.      No.

15  Q.      Nobody engages in a discussion

16  with you or Trooper Battestilli?

17  A.      While this is going on,

18  Trooper Battestilli actually leaves

19  the residence to call to have --- I'm

20  not sure who he calls, whether he

21  calls our station or if he calls 911

22  directly, but he calls to have EMS

23  come because we feel it's safe enough

24  for them to come to the scene at this

25  point.

82

1    Q.       Did you and he have a

2    conversation about that?  Did he say

3    to you I'm going to leave at this

4    time?

5    A.       I think he said I'm going out

6    to call to have the EMS come up.

7    Q.       Did Troy show any signs of

8    distress at this point?

9    A.       No.

10   Q.       What is the purpose of going

11   outside to make the call?  Why can't

12   the call be made right at the scene?

13   A.       It technically was the scene.

14   I mean, when we call the station, we

15   typically go outside.

16   Q.       And what did he use to make

17   the call?

18   A.       I believe it was his personal

19   cell phone.

20   Q.       And why not a radio?

21   A.       Radios were in the car.

22   Q.       Okay.  How long is he ---?

23   A.       May I interject?

24   Q.       Yes.

25   A.       On the radio, at the time we

83

1    had gotten our new 800 radio system,

2    and it's not always dependable.  So

3    we were in the habit of not even

4    carrying them with us because there

5    was no guarantee it was going to even

6    work.

7    Q.    Okay.  So the 800 system that

8    you had at the time was unreliable?

9    A.    Still have.

10   Q.    Still have is unreliable.  And

11   the cell phone ensures that you'll

12   get through?

13   A.    Yes.

14   Q.    Okay.  Do you hear him make

15   the call?

16   A.    No.

17   Q.    How long is he gone?

18   A.    I don't know.  Several

19   seconds.  I don't know the exact

20   time.

21   Q.    Does anything happen while

22   he's gone?

23   A.    No.

24   Q.    Troy's condition does not

25   change?

84

1    A.        Does not change.

2    Q.        Trooper Battestilli comes back

3    into the home.  What happens?

4    A.        He's standing behind me on my

5    left, and I'm still in the same

6    position watching Troy.  And I'm

7    watching his face.  And all of a

8    sudden I see his eyes roll back in

9    his head.  I reach down at that point

10   with my left hand and I feel for a

11   pulse, which would be on the left

12   side of his neck, and I felt a pulse.

13   I could see his chest rising up and

14   down so he was still breathing.  So

15   he had a pulse and was breathing.  We

16   then moved Troy into what was called

17   the recovery position, which would

18   have been we rolled him on his right

19   side.

20   Q.        Did any family member indicate

21   to you that Troy was not breathing?

22   A.        No.

23   Q.        Okay.  After he's moved into

24   the recovery position, what happens

25   next?

85

1    A.      At that point, because his

2    eyes rolled back in his head, I

3    thought there could be some sort of

4    --- you know, more of a medical

5    emergency.  Then I personally walked

6    outside to see where EMS was.  And as

7    I'm walking out the back porch into

8    the driveway, EMS is already out of

9    their vehicle and walking towards the

10   back porch.  I tell them they need to

11   expedite to the house.

12   Q.      So you did not even complete

13   the call to the state police to

14   expedite, or you did?

15   A.      I never called at all.

16   Q.      You never called at all?

17   A.      I never called at all.  As I'm

18   walking out to see where EMS was,

19   because they were staged in very

20   close proximity and they should only

21   take a minute or two to get there, I

22   just walked out to see where they

23   were at, and they were already there

24   getting out of their vehicles.

25   Q.      Do you know if Trooper

86

1    Battestille made a telephone call?

2    A.      I don't know.

3    Q.      Okay.  Before you exited the

4    home, did you take Troy's pulse

5    again?

6    A.      No.

7    Q.      Did Trooper Battestille take

8    his pulse again?

9    A.      I don't know.

10   Q.      Were his cuffs moved at any

11   time prior to EMS arriving?

12   A.      No.

13   Q.      What did you tell the EMS

14   personnel upon their arrival?

15   A.      I believe I said that he

16   appears to be in trouble.  I said to

17   hurry up and get in the house.

18   Q.      Was there any mention of him

19   being tased?

20   A.      I did not specifically say it,

21   no.

22   Q.      Okay.  Who were the first

23   responders on the scene?  I

24   understand there's a fire department

25   response and then a paramedic

87

1  response?  And correct me if I'm

2  wrong.

3  A.      I believe it was the Big Run

4  Fire Department QRS was there.  And

5  it was an EMS unit, but I don't --- I

6  don't know.

7  Q.      Do they go into the home first

8  or do you go back in and they follow

9  you?

10  A.      I go in with them.  I don't

11  know specifically if it was EMS, me,

12  EMS or I was first, they were second.

13  I'm not sure exactly the order, but I

14  go in with them to show them where it

15  was at.

16  Q.      And what happens next?

17  A.      We go in and he is on his

18  side.  Troy is on his side still

19  cuffed.  I asked if they wanted me to

20  move the handcuffs to the front.

21  They said yes.  So at that point, I

22  uncuffed him from the back and moved

23  the handcuffs to the front.

24  Q.      So they did not ask you to do

25  that?

88

1   A.      I asked them if they wanted me

2   to do that, and they wanted me to

3   adjust the handcuffs.

4   Q.      And what was Troy's condition

5   at this time?

6   A.      I don't know.

7   Q.      Was he blue?

8   A.      No.  Not that I'm aware of.

9   Other than I handcuffed him --- and

10  after I handcuffed, I got up and

11  walked out.

12  Q.      Was he conscious?

13  A.      I don't know.

14  Q.      Did he appear conscious to

15  you?

16  A.      I was adjusting the cuffs and

17  I wasn't looking directly at his

18  face.

19  Q.      Were any of the family members

20  saying anything at this time?

21  A.      Not that I can recall.

22  Q.      Did Trooper Battestilli say

23  anything to you at this time?

24  A.      No.

25  Q.      Were there any other

89

1    conversations with Trooper

2    Battestilli about Troy's condition,

3    about whether he was breathing, about

4    the pulse?

5    A.      Between me and him?

6    Q.      Yes.

7    A.      No.

8    Q.      What about any of the family

9    members?

10   A.      No, not with me.

11   Q.      Okay.  How long of a time

12   period do you think it was before the

13   shackles go on and EMS arrives?

14   A.      A couple minutes.  I don't

15   know exactly.  I don't know.  There's

16   probably a log as to when they went

17   on scene there, but I don't know the

18   exact time.  It wasn't an extended

19   period.  Wouldn't have been more than

20   a couple minutes.

21   Q.      Did Troy do anything when you

22   uncuffed him and put his cuffs in the

23   front?

24   A.      No.

25   Q.      Were his hands limp and

90

1    unresponsive?

2    A.      They were no different than

3    anybody else that I've adjusted the

4    handcuffs on.  He complied by moving

5    them to the front.

6    Q.      Did you ask him to move them

7    to the front or did you move them to

8    the front for him?

9    A.      Well, what we did is he was on

10   his side.  We uncuffed.  We rolled

11   him onto his back.  Hands were off to

12   the side and I just hooked them onto

13   the front.

14   Q.      And you weren't able to tell

15   whether he was conscious or not at

16   that point?

17   A.      I didn't pay any attention to

18   whether he was or not.

19   Q.      What was the response of the

20   EMS?  What did they say about his

21   condition when they arrived, if

22   anything?

23   A.      I was not there for that.

24   After I uncuffed, I walked back

25   outside.

91

1    Q.      And where was Trooper

2    Battestilli?

3    A.      He was still inside.  I'm

4    sorry.  He was still inside.

5    Q.      Okay.  And how long was it

6    until EMS came out?

7    A.      I don't know.

8    Q.      Did you follow them to the

9    emergency room?

10   A.      Eventually we did.  While they

11   were inside, I went and had contacted

12   station to talk to --- get PCO McGee

13   to call our shift supervisor, which

14   happened to have been Sergeant

15   Metzger.  And I was talking to him on

16   the phone saying, hey, look, I was

17   assaulted and, you know, EMS is here

18   with the person.  We need to have a

19   crime person come out.  So I was

20   engaged in that conversation.  I

21   don't know what else was going on.

22   EMS left and Trooper Battestilli and

23   I were still sitting there.

24   Everybody had gone from the house,

25   and we were waiting to find out where

92

1    they wanted us to go, if they wanted

2    us to stay on scene, if they wanted

3    to follow up to the hospital.

4    Q.    So you made the call about the

5    assault.  Any mention of the fact

6    that Troy was in major, ---

7    A.    Yes, yes.

8    Q.    --- serious distress?

9    A.    Yes, yes.

10   Q.    Okay.  And what was said

11   during that conversation?

12   A.    I told Sergeant Metzger, I

13   said, look, we were at this

14   residence.  It was just a brief

15   synopsis of what happened.  He

16   assaulted me and he's in some sort of

17   distress.  He's having labored

18   breathing.  Unsure what his condition

19   is at this time, but we need to have

20   a crime person come out to

21   investigate.

22   Q.    And tell me about some of the

23   conversations you had that day with

24   Trooper Battestilli about what had

25   happened.  Did he tell you anything

93

1    more about Troy's condition when you

2    had left the residence?

3    A.      He had mentioned that ---.

4    Later he had mentioned to me that he

5    was --- he had talked to the mother

6    and that they had some sort of

7    discussion about how when he takes

8    all these Mucinex pills he gets

9    really labored breathing, but that

10   was something that was common with

11   him.

12   Q.      So that conversation did not

13   happen while you were present?

14   A.      No.

15   Q.      And you believe that

16   conversation happened when you

17   stepped outside to call EMS or ---?

18   A.      That would have been the only

19   other time it could have happened.

20   Q.      Okay.  Let's get back to when

21   Troy's on the back shackled and

22   handcuffed.  He's got his hands

23   behind his back?

24   A.      Uh-huh (yes).

25   Q.      You've got two knees on him.

94

1    I mean, department regulations don't

2    focus on the type of --- they want

3    you to hold the prisoner but there's

4    no guidelines as to what type of

5    hold, is there?  One knee to --- have

6    knees on him, you don't need to.  You

7    could be simply holding his arm?

8    A.       Well, it's up to --- it's up

9    to the trooper's discretion.  I mean,

10   at this point I've had an individual

11   that threw a punch at me and has been

12   combative the whole time.  So I'm not

13   going to just sit there with, you

14   know, two fingers on him and say, you

15   know, okay, you know, you're going to

16   have more in contact just in case

17   because the potential was there that

18   he was high, then low, then high,

19   then low that he's going to go on a

20   high again, that he's going to jump

21   up and try to start flailing again.

22   So I had to be prepared that if this

23   was the case, you know, I had to

24   protect myself and protect him.

25   Q.       Okay.  So did you wind up

95

1  going to the emergency room?

2  A.      Yes.

3  Q.      And what happened there?

4  A.      We went to the ER and stood

5  by.  Sergeant Metzger arrived and

6  told us just to wait.  I'm not sure

7  who called the officer of the day,

8  but he was notified, which was

9  Captain Scott Neil.  He showed up.

10 And he authorized ---.  In my

11 presence, he made a call.  I don't

12 know who he called, but he instructed

13 our crime corporal, which was

14 Corporal Chuck Dominick, to be called

15 out to do the investigation for the

16 aggravated assault.  And I believe he

17 called another regular crime trooper,

18 but I'm not sure who it was.

19 Q.      Okay.  What was the results of

20 the internal investigation that was

21 conducted here?

22 A.      I was cleared.

23 Q.      Okay.  And what was the

24 results of the aggravated assault

25 case?  What happens to a case like

96

1  this where somebody dies?

2  A.      I believe it was exceptionally

3  cleared.  I mean, I can refer to the

4  report but I believe it was

5  exceptionally cleared due to the

6  death of the actor.

7  Q.      Okay.  Just getting back a

8  little bit on this mental health, so

9  you didn't realize that this was a

10  mental health call until after the

11  fact?  You had mentioned earlier that

12  you didn't understand that this was a

13  mental health call.

14  A.      No.  What we were given was an

15  individual had ingested a lot of some

16  sort of drug and possibly had

17  overdosed and we were there initially

18  to assist EMS.

19  Q.      Okay.  And what are you

20  trained to do in situations like

21  this?  I mean, are you trying to ---

22  are you trained to calm the person

23  down?  What are you trained to do?

24  Your goal is to get this person into

25  the ambulance?

97

1    A.       Our goal is to get them to

2    help however we can.  Either talk

3    them into the ambulance, have a

4    family member drive them to the

5    hospital.  We've used all different

6    types of, you know, techniques.

7    Sometimes we have to take them, you

8    know.  They physically just flat out

9    don't want to go.  We've had to take

10   people before.  So our goal is to ---

11   if it is a ---.  We want to have the

12   least amount of impact and to get

13   them to go just as calmly and quietly

14   as possible.

15   Q.       Did Trooper Battestilli ask

16   any family member at any time to take

17   over or take him to the hospital?

18   A.       I don't recall, no.

19   Q.       Okay.  Do you also have a

20   military background?

21   A.       Yes.

22   Q.       Can you tell me about that?

23   A.       Four years in the Marine

24   Corps.

25   Q.       Okay.  And did you receive any

98

1    sort of medical training during that

2    time as well?

3    A.      Just your standard combat

4    training.

5    Q.      Okay.  And I'm assuming during

6    both your trooper and your military

7    background, you've had training in

8    defensive tactics?

9    A.      Yes.

10   Q.      Okay.  Did you use any of

11   those defensive tactics that day on

12   Mr. Hooftallen?

13   A.      Like that I was trained?

14   Q.      Yes.

15   A.      I blocked his punch, and then

16   I tried to restrict his movement by

17   grabbing his arms.

18   Q.      Okay.

19                    ATTORNEY CORRADO:

20                    Can we just take a

21           quick break and see if we have

22           any further questions?

23                    ATTORNEY DONAHOE:

24                    Sure.

25   OFF VIDEO

99

1    SHORT BREAK TAKEN

2    ON VIDEO

3                    VIDEOGRAPHER:

4                    This deposition has

5           resumed.

6                    ATTORNEY CORRADO:

7                    Trooper Johnson, we

8           don't have any further

9           questions for you at this

10          time.  Thank you.

11   A.     You're welcome.

12                   ATTORNEY DONAHOE:

13                   We don't have any

14          further questions and we'll

15          read the transcript.  I'll

16          explain that to Trooper

17          Johnson.

18                * * * * * * * *

19    DEPOSITION CONCLUDED AT 2:49 P.M.

20                * * * * * * * *

21

22

23

24

25

Sargent's Court Reporting Service, Inc.
(814) 536-8908

Case 2:12-cv-01500-CB   Document 64-1   Filed 10/10/14   Page 547 of 684

100

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF CLEARFIELD          )

3

4                   CERTIFICATE

5        I, Rhonda K. Thorpe, a Notary Public

6   in and for the Commonwealth of Pennsylvania, do

7   hereby certify:

8            That the witness whose testimony

9   appears in the foregoing deposition, was duly

10  sworn by me on said date and that the

11  transcribed deposition of said witness is a

12  true record of the testimony given by said

13  witness;

14           That the proceeding is herein recorded

15  fully and accurately;

16           That I am neither attorney nor counsel

17  for, nor related to any of the parties to the

18  action in which these depositions were taken,

19  and further that I am not a relative of any

20  attorney or counsel employed by the parties

21  hereto, or financially interested in this

22  action.

23

COMMONWEALTH OF PENNSYLVANIA
24  NOTARIAL SEAL
    RHONDA K. THORPE, Notary Public
    Clearfield, Clearfield County, PA          Court Reporter
25  My Commission Expires July 11, 2017

Sargent's Court Reporting Service, Inc.
(814) 536-8908

# EXHIBIT D-5

# Deposition of
# Guy Battestelli

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

BARBARA J. WINGARD, *

individually and as *

Administratrix of *

the Estate of TROY *

ROBERT LEE *

HOOFTALLEN, *

    Plaintiff    * Case No.

    vs.    * 2:12-cv-01500

GUY A. BATTLESTILLI;* District Judge

STEVEN E. JOHNSON; * Cathy Bisson

PENNSYLVANIA STATE * JURY TRIAL

POLICE; COMMONWEALTH* DEMANDED

OF PA; TASER® *

INTERNATIONAL, INC.;*

    Defendants    *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

GUY BATTESTILLI

May 5, 2014

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

```
 1              V I D E O T A P E D   D E P O S I T I O N

 2                             O F

 3    GUY BATTESTILLI, taken on behalf of

 4    the Plaintiff herein, pursuant to the

 5    Rules of Civil Procedure, taken

 6    before me, the undersigned, Rhonda K.

 7    Thorpe, a Court Reporter and Notary

 8    Public in and for the Commonwealth of

 9    Pennsylvania, at the offices of

10    Jefferson County Commissioners

11    Office, 155 Main Street, #202, Second

12    Floor, Brookville, Pennsylvania, on

13    Monday, May 5, 2014, beginning at

14    9:26 a.m.

15

16

17

18

19

20

21

22

23

24

25
```

3

1            A  P  P  E  A  R  A  N  C  E  S

2

3   TAMARA  J.  HAKEN,  ESQUIRE

4   SUSAN  A.  CORRADO,  ESQUIRE

5   Boyle  Litigation

6   4660  Trindle  Road

7   Suite  102

8   Camp  Hill,  PA   17011

9        COUNSEL  FOR  PLAINTIFF

10

11  THOMAS  L.  DONAHOE,  ESQUIRE

12  Office  of  Attorney  General

13  Sixth  Floor,  Manor  Complex

14  564  Forbes  Avenue

15  Pittsburgh,  PA   15219

16        COUNSEL  FOR  DEFENDANTS

17

18

19

20

21

22

23

24

25

4

1                    I   N   D   E   X

2

3    DISCUSSION AMONG PARTIES           7  -  8

4    WITNESS: GUY BATTESTILLI

5    EXAMINATION

6        By Attorney Corrado           8  -  101

7    EXAMINATION

8        By Attorney Donahoe         101  -  107

9    RE-EXAMINATION

10       By Attorney Corrado         108  -  115

11   DISCUSSION AMONG PARTIES        115  -  116

12   CERTIFICATE                             117

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    E X H I B I T   P A G E

2

3                                          P A G E

4    N U M B E R      D E S C R I P T I O N          I D E N T I F I E D

5    O n e        L o g                              4 6

6

1                          O B J E C T I O N   P A G E

2

3     A T T O R N E Y                                    P A G E

4     Donahoe                                            115

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3              V I D E O G R A P H E R :

4              My name is Sarah Dick.

5         I'm an employee of Boyle

6         Litigation, which is located

7         at 4660 Trindle Road, Suite

8         102, Camp Hill, Pennsylvania,

9         17011.  This deposition is

10        being recorded on Monday, May

11        5th, 2014 at 9:26 a.m. in the

12        small conference room of the

13        Jefferson County Commissioners

14        Office, located at 155 Main

15        Street, Brookville, PA, 15825

16             This deposition is

17        being filmed in connection to

18        the case of Barbara Wingard,

19        et al., the Pennsylvania State

20        Police, et al.  U.S. District

21        Court for the Western District

22        of Pennsylvania, Docket Number

23        12-cv-01500.  The witness in

24        this deposition is Guy

25        Battestilli.  This deposition

Sargent's Court Reporting Service, Inc.
(814) 536-8908

8

1          is being videotaped on behalf

2          of the Plaintiff.

3                    ATTORNEY CORRADO:

4               This deposition is

5          taken pursuant to the Federal

6          Rules of Civil Procedure.

7          Sir, could you please state

8          your full name?  I'm sorry.

9                    COURT REPORTER:

10              Would you raise your

11         right hand, please?

12  - - - - - - - - - - - - - - - - - - - - - - - - -

13  GUY BATTESTILLI, HAVING FIRST BEEN

14  DULY SWORN, TESTIFIED AS FOLLOWS:

15  - - - - - - - - - - - - - - - - - - - - - - - - -

16                    ATTORNEY CORRADO:

17              This deposition is

18         being taken pursuant to the

19         Federal Rules of Civil

20         Procedure.

21  EXAMINATION

22  BY ATTORNEY CORRADO:

23  Q.       Sir, could you please state

24  your full name and spell your last

25  name for the record?

9

1    A.        Guy Anthony Battestilli,

2    B-A-T-T-E-S-T-I-L-L-I.

3    Q.        Mr. Battestilli, my name is

4    Susan Corrado.  To my right is Tamara

5    Haken.  We represent the Plaintiffs

6    in a lawsuit against you which is

7    currently pending in the United

8    States District Court for the Western

9    District of Pennsylvania.  We're here

10   today to take your deposition.  Have

11   you had your deposition taken before?

12   A.        Yes.

13   Q.        How many years ago was that?

14   A.        Fifteen (15).

15   Q.        Okay.  We'll go into that a

16   little bit further later, and you've

17   been probably given these

18   instructions before at the last time

19   you had your deposition taken, but I

20   do want to go over them again

21   quickly.  You were placed under oath.

22   You are expected to answer

23   truthfully.  The court reporter is

24   going to take down everything that we

25   say.  Therefore, I ask that you give

10

1    all your answers out loud orally so

2    the court reporter can take it down.

3    She can't take down nods of the head,

4    shrugs of the shoulders, or uh-huh.

5    So those sorts of things we would ask

6    you to refrain from and please try to

7    answer in words.

8            I will also ask that you wait

9    until I'm done asking my questions

10   before you give a response.

11   Likewise, I will wait until you are

12   done responding before I ask another

13   question.  Again, it's so the court

14   reporter can take everything down.

15   If we are talking over each other, it

16   makes it difficult for her to get

17   everything down accurately.

18           My questions are not designed

19   to trick you.  We are here to find

20   out your knowledge of the facts.  And

21   while we don't want you guessing at

22   any answers, if you have a reasonable

23   estimate or somewhat of a

24   recollection of something, you can

25   tell us that.

11

1          You're represented here by
2     Counsel.  If at any time during this
3     deposition you feel the need to have
4     a conference with your Counsel
5     outside of my hearing, that is
6     acceptable and we will allow you to
7     do that.  The only thing I ask though
8     is that you'll answer any question
9     that is pending before you have that
10    conference.  Okay?
11    A.       Yes.
12    Q.       And if at any time you need to
13    take a break, please let me know.
14    I'd like to start with a few
15    background questions.  What is your
16    address?
17    A.       342 Pine Street, Punxsutawney,
18    Pennsylvania.
19    Q.       And how long have you lived
20    there?
21    A.       Twenty-six (26) years.
22    Q.       And what is your ---?
23                   ATTORNEY DONAHOE:
24                   Let me put on the
25              record.  Whenever I have state

12

1          troopers who are witnesses,

2          with respect to the personal

3          address of law enforcement

4          individuals, the request is

5          that be made confidentially so

6          that generally speaking

7          they're exposed to people that

8          could pose a threat to them if

9          they knew where they lived.

10         So that's the request that the

11         personal address remain

12         confidential.

13                   ATTORNEY CORRADO:

14              That is not a problem.

15    BY ATTORNEY CORRADO:

16    Q.     And, sir, what is your age?

17    A.     Forty-nine (49).

18    Q.     And what is your current

19    occupation?

20    A.     I'm retired from the state

21    police.

22    Q.     And when did you retire?

23    A.     April 2013.

24    Q.     Okay.  And why did you retire?

25    Was it a forced retirement?

13

1    A.      No, I had my 25 years in.

2    Q.      Okay.  So you're allowed to

3    retire after how many years?  Twenty

4    (20), 25?

5    A.        Twenty (20) or 25.  I had 22

6    years and 3 years I bought military

7    time would be my 25.

8    Q.      Okay.  So if we could start

9    then, so state police was your last

10   employment then prior to your

11   retirement.  Could you tell me when

12   you began with the state police?

13   A.      May of 1990.

14   Q.      May of 1990.  Okay.  And tell

15   me a little bit about what you had

16   done prior to that.

17   A.      I was a borough police officer

18   for the Borough of Punxsutawney.  And

19   prior to that, I worked as a

20   part-time correctional officer at the

21   Indiana County Jail.  I was a

22   security guard for Pinkerton

23   Security.  And prior to that I was in

24   the U.S. Army as a military

25   policeman.

14

1  Q.     Okay.  When you were a Borough

2  of Punxsutawney police officer, how

3  long was that for?

4  A.     Three years.

5  Q.     Three years.  Okay.  And can

6  you tell me a little bit about your

7  training with the state police?

8  A.     Well, I attended the State

9  Police Academy in Hershey,

10  Pennsylvania from May until October

11  of 1990.  And went to additional

12  training, update training, you know,

13  throughout the years.

14  Q.     Okay.  And we'll go into that

15  in a little bit more detail later.

16  Have you ever been a plaintiff or a

17  defendant in a lawsuit?

18  A.     Yes.

19  Q.     Can you tell me a little bit

20  about ---?  One occasion, more than

21  one occasion?

22  A.     Just one occasion.

23  Q.     Can you tell me about that

24  case?

25  A.     I had an individual.  I was

15

1    attempting a traffic stop late at

2    night.  The individual refused to

3    stop, and I used the pit maneuver on

4    her vehicle, and it subsequently

5    overturned and she was not injured in

6    the case, but they filed suit and she

7    was awarded damages.

8    Q.     Okay.  And do you know the

9    amount of the damages she was

10   awarded?

11   A.     I think $250,000.

12   Q.     Okay.  And was there an

13   internal investigation in connection

14   with that matter?

15   A.     Yes.

16   Q.     Okay.  And what were the

17   results of the internal

18   investigation?

19   A.     They said I was not acting

20   properly at that time and I got two

21   days off, I believe.

22   Q.     Two days off?

23   A.     Yeah.

24   Q.     Okay.  And so what happens

25   when you get two days off?  Is your

16

1    pay docked for those two days?

2    A.      Yes.  Yes.

3    Q.      Okay.  And it becomes a record

4    in your file, I'm assuming?

5    A.      Yes.

6    Q.      Okay.  And that was the only

7    punishment was the two days off?

8    A.      Yes.

9    Q.      Okay.  So there was no other

10   instances that you have been a

11   plaintiff or defendant in a lawsuit?

12   A.      No.

13   Q.      Okay.  And was that the

14   occasion where you were deposed

15   previously?

16   A.      No.  Actually there was

17   another --- it was a traffic accident

18   we investigated.  An individual had

19   died as a result of the traffic

20   accident and it was a civil suit

21   between the business that owned the

22   vehicle and the driver of the

23   vehicle.  The passenger was injured,

24   severely injured in that accident.

25   Q.      Okay.  So you were not named

17

1  as a party in that suit?

2  A.      No, I wasn't.

3  Q.      You were acting as a witness

4  in that case?

5  A.      Yes.

6  Q.      Okay.  Did you give any

7  deposition in connection with the

8  case you mentioned earlier where you

9  got two days off?

10 A.      No.

11 Q.      Okay.  Did you review any

12 information or documents in

13 preparation for today's deposition?

14 A.      Yes.

15 Q.      What did you review?

16 A.      My statement from the initial

17 report and also the Internal Affairs

18 report, my statement I made at that

19 point.

20 Q.      Okay.  Anything else?

21 A.      No.

22 Q.      Other than your attorney, did

23 you speak to anybody in preparation

24 for today's deposition?

25 A.      No.

18

1    Q.      Okay.  You had mentioned
2    earlier that you had gone through
3    some training with the state police
4    back in Hershey, Pennsylvania.  I'm
5    assuming --- you said from May to
6    October of 1990?
7    A.      Yes.
8    Q.      Okay.  Let's talk about that
9    training and what was involved.  I'm
10   assuming you were trained on --- even
11   though it sounds like you had
12   training previously as a borough
13   police officer on various weapons,
14   can you specifically tell me about
15   some of the training that they taught
16   you?  You had, I'm assuming, a
17   pistol?
18   A.      Yes.
19   Q.      Okay.  Did you carry a block
20   or --- what kind of weapon were you
21   issued?
22   A.      Initially a revolver.
23   Q.      A revolver.
24   A.      A regular revolver, yeah.
25   Q.      Okay.  And that changed at

19

1   some point.  But during your

2   training, you were trained on a

3   revolver?

4   A.     Yes.

5   Q.     Okay.  What other weapons?

6   Shotgun, machine gun?

7   A.     Shotgun.  We had mace

8   training, I believe, at that time.

9   Unarmed self-defense.

10  Q.     Okay.  What about a baton?

11  A.     I think we had just a riot

12  baton was the only thing we had at

13  that point.

14  Q.     Okay.  A riot baton?

15  A.     Yes.

16  Q.     Is that one of the long ones

17  ---

18  A.     The longer one.

19  Q.     --- that don't expand?

20  A.     Yes.

21  Q.     Okay.  And was that something

22  you were issued then?

23  A.     Yes.

24  Q.     Okay.  And you carried on you?

25  A.     We didn't carry that usually.

20

1    That was just part of the riot gear

2    if we had an incident we had to go to

3    as far as a riot.  We would take

4    that.  They gave you a helmet and the

5    riot baton.

6    Q.      Okay.  And you said mace.  And

7    what about handcuffs?

8    A.      We had handcuffing, yeah.

9    Q.      Okay.  Can you tell me a

10   little bit about the training with

11   the handcuffs?  Were you trained to

12   cuff people in the front, cuff people

13   in the back?  Which way were you

14   trained and were there different ---

15   were there different ways that you

16   were to use handcuffs depending on a

17   situation?

18   A.      Basically you're to handcuff a

19   person behind their back.

20   Q.      Okay.

21   A.      Primarily, yes.  We use them

22   occasionally on the front if they're

23   not --- if somebody's not violent or

24   not confrontational.  I don't know

25   how else to explain that.

21

1  Q.     Okay.  If I could just recap,

2  usually you would cuff somebody in

3  the back.  You could occasionally

4  cuff somebody in the front if they

5  were not confrontational or

6  non-violent?

7  A.     Right.

8  Q.     Okay.  Did you mention you

9  said shotgun, machine gun?

10  A.     I didn't say machine gun, but

11  shotgun, yeah.

12  Q.     Okay.  Not MP5 training?

13  A.     No.

14  Q.     No, okay.  And you said mace.

15  And what about the Taser at the time?

16  A.     We didn't have a Taser at that

17  point.

18  Q.     Okay.  At what point did you

19  --- was the Taser introduced?

20            ATTORNEY DONAHOE:

21            You mean for him or ---

22            ATTORNEY CORRADO:

23            Yes.

24            ATTORNEY DONAHOE:

25            --- in general in the

22

1          world?

2    A.        Well, I don't even know.    I

3    don't know.    Early 2005, '04,

4    somewhere in that range.

5    BY ATTORNEY CORRADO:

6    Q.        Somewhere in that range?

7    A.        Probably.   I'm not exactly

8    sure.

9    Q.        Okay.  And what about

10   shackles.   Was there any training

11   with the shackles or was that

12   something that was not covered in the

13   training?

14   A.        Mostly just handcuffing.   I

15   don't recall having special training

16   on the shackles.

17   Q.        Okay. And what type of ---

18   you said you were taught in --- did

19   you say defensive tactics or ---?

20   A.        Yeah, unarmed self-defense.

21   Q.        Okay.  For lack of a better

22   word, what type of moves were you

23   trained in?  I mean, what were some

24   of the techniques, the physical

25   techniques, that you were trained on?

23

1    I mean, was it karate or take-down?

2    I mean, you know, were there certain

3    moves that you were taught in order

4    to facilitate an arrest or when

5    unarmed ---?

6    A.      You have a lot of cumalongs,

7    goose-neck cumalong, different

8    pressure points.  It's so long ago.

9    It's hard to remember exactly what

10   all was back in there.  A lot of

11   cumalongs and pressure points, those

12   type of things.

13   Q.      Okay.  Were you given some

14   sort of training policy or was there

15   a written policy regarding use of

16   force with the Pennsylvania State

17   Police?

18   A.      Yes.

19   Q.      And what is that?  I mean, is

20   there a written ---?  I'll start with

21   this.  Is there a written policy?

22   A.      Yes.

23   Q.      Okay.  And what is that

24   called?

25   A.      Use of force continuum.

24

1   Q.      Okay.  And what does that say,

2   to your knowledge?

3   A.      It was just showing that there

4   was different levels of force to use

5   starting with verbal up through

6   physical and up through deadly force.

7   Q.      Okay.  Tell me where your

8   different tools --- you've got a

9   toolbox; right?  For lack of a better

10  word; right?  You have a toolbox.

11  You have hand-to-hand sort of moves

12  like you talked about.  You've got

13  handcuffs.  You've got shackles.  You

14  have your mace.  You have your

15  pistol.  You have your Taser at some

16  point.  Where do all these things

17  fall on your ---?

18              ATTORNEY DONAHOE:

19              Let me ask for one

20         thing.

21              ATTORNEY CORRADO:

22              Uh-huh (yes).

23              ATTORNEY DONAHOE:

24              We had sent you the use

25         of force wheel, but I don't

25

1          have it.  Are you going to

2          show it to him?

3                    ATTORNEY CORRADO:

4                    We did not get that.

5                    ATTORNEY DONAHOE:

6                    Okay.  All right.  And

7          it's online and all that

8          stuff.  I just don't have it

9          right here.  And I didn't know

10         if you were going to show it

11         to him or not.  But that's

12         okay.  He'll probably remember

13         without looking at it.

14                   ATTORNEY CORRADO:

15                   Okay.  Yeah, we were

16         not provided with that.

17                   ATTORNEY DONAHOE:

18                   We usually send it out

19         in the packet in all of these

20         cases.

21                   ATTORNEY CORRADO:

22                   You know, I don't think

23         we got it.

24                   ATTORNEY DONAHOE:

25                   Okay.  I'll send it to

26

1          you.  It's online somewhere

2          too on their line.

3                    ATTORNEY CORRADO:

4                    Okay.

5                    ATTORNEY DONAHOE:

6                    I think it's on your

7          guys website, isn't it?  Okay.

8          He's retired.

9     A.     I don't care anymore.  I don't

10   want to see it anymore.

11                   ATTORNEY DONAHOE:

12                   Well, it's out there.

13         I apologize for not sending it

14         to you.

15                   ATTORNEY CORRADO:

16                   No, that's okay.

17                   ATTORNEY DONAHOE:

18                   I thought for sure I

19         did.

20                   ATTORNEY CORRADO:

21                   Okay.

22   BY ATTORNEY CORRADO:

23   Q.     So if you could, to your best

24   recollection, go through the policy

25   as you understood it in terms of

27

1    where all these tools in your toolbox

2    fall into the policy?

3    A.      Well, you use whatever force

4    is necessary to overcome the force

5    that's being used against you.

6    Q.      Okay.

7    A.      There's not where I have to

8    use one before the other or that

9    depends.  Each circumstance is

10   different.

11   Q.      Okay.

12   A.      I mean, if it's strike with

13   deadly force, you'd use deadly force.

14   There's nothing in the requirement

15   that, you know, use less force.

16   Q.      Okay.  So they don't say, for

17   example, the Taser can only be used

18   in certain circumstances?  Does it

19   specifically address the use of the

20   Taser?

21   A.      I don't recall anywhere that's

22   --- anything specific saying you

23   can't use it in certain

24   circumstances.

25   Q.      Okay.  So speaking of the

28

1  Taser, you said it was introduced in

2  2004, 2005?

3  A.      That's a rough guess.  I'm not

4  even, you know, --- I can't say

5  exactly.  I don't recall when we

6  actually got started on that.

7  Q.      That's okay.  But at some

8  point when something new is

9  introduced, right, a new tool in your

10 toolbox ---

11 A.      Right.

12 Q.      --- you have some sort of

13 training on it?

14 A.      Yes.

15 Q.      Can you tell me about that

16 training?

17 A.      They went through the

18 description as far as how it works,

19 gave you the basic functions, what

20 the requirements are as far as

21 testing it.  Before every shift

22 you're supposed to test it and make

23 sure it's properly working.

24 Q.      Is that like a spark test?

25 A.      A spark test, yes.

29

1    Q.      Okay.

2    A.      And we went through firing

3    sequence.  We fired it twice, live

4    fire into a target.

5    Q.      Did you have to be subjected

6    to a Taser test as part of your

7    training?

8    A.      No.  We had people that

9    volunteered to do it.  I wasn't one

10   of those.  I didn't feel a need to do

11   it.  But there were people in our

12   class that did take hits from the

13   Taser.

14   Q.      Okay.  Could you tell me a

15   little bit about the probe versus the

16   dry stun?

17   A.      Well, obviously with the

18   probe, you're going to be further

19   away from the individual.  It's going

20   to be safer for you than using a dry

21   stun at the EO.  If you get a proper

22   spread and good contact with both the

23   probes, it's going to incapacitate

24   the person as far as them being

25   physically unable to do anything.  A

30

1    dry stun is just a pain compliance.

2    It would be similar if I used a

3    pressure point or something else on

4    them.  It's not going to prevent them

5    from being able to react or continue

6    the action that they're in.

7    Q.     Okay.  So to dry stun, you

8    need to get almost on the skin?

9    A.     Or contact with the body,

10   yeah.

11   Q.     Contact with the body.  Okay.

12   Can you only do the probe once on the

13   gun?

14   A.     As long as the probes are

15   engaged you can reactivate.  It's

16   going to cycle for five seconds

17   automatically if you let the trigger

18   off.  You leave the trigger on, it

19   will stay on until you let it go, or

20   you can reactivate it if you leave

21   the prongs in.

22   Q.     Okay.  What were some of the

23   risks of the Taser that you learned

24   during training?

25   A.     I mean, basically to watch,

31

1    not shoot somebody --- try not to

2    shoot somebody in the face, the head

3    where a probe can go in an eye.  They

4    do penetrate pretty well.

5    Q.     Okay.  And why not the head?

6    For the penetration purpose or ---?

7    A.     Well, just the eyes.  Your

8    throat and eyes and things like that.

9    You want it in the center of the

10   body.

11   Q.     Okay.  What other dangers

12   regarding the Taser were you trained

13   on?

14   A.     Boy, I don't recall any

15   specific on that.

16   Q.     Okay.  Did they talk about the

17   psychological or emotional stress of

18   a Taser?

19   A.     I don't recall anything about

20   the stress on that.

21   Q.     Okay.  Did they talk to you at

22   all about the dangers of the Taser or

23   did Taser at any time come in and

24   discuss with you the dangers of the

25   use of a Taser?

32

1  A.      We had known it was --- you

2  know, some individuals had died after

3  being tasered, but not if it was, you

4  know, still considered a nonlethal

5  use of force.

6  Q.      Okay.  And what were the

7  causes of the death?

8              ATTORNEY DONAHOE:

9              Well, you know, you're

10         probably asking an expert

11         question.

12             ATTORNEY CORRADO:

13             Right.

14             ATTORNEY DONAHOE:

15             I think you guys have

16         already dropped the case

17         because they don't cause it,

18         but that's okay.

19             ATTORNEY CORRADO:

20             You know, at least

21         trying to get his knowledge of

22         what ---.

23             ATTORNEY DONAHOE:

24             All right.  What did

25         they tell you was the cause of

33

1          these people dying, if they

2          did?

3     A.      I don't even recall that.  I

4     think they said something about not

5     using it on somebody with a

6     pacemaker.  It would cause

7     interference with that.  But beyond

8     that, I don't know of anything else.

9     BY ATTORNEY CORRADO:

10    Q.      Okay.  Have you heard of the

11    Taser causing injury or death in

12    other cases?  I mean, other than your

13    training, what have you heard through

14    discussions with other people, with

15    reading the newspaper, with just

16    learning generally through injuries

17    or death that have occurred from the

18    use of the Taser?

19    A.      Nothing specific.  Like I

20    said, there was a small percentage of

21    the population that had died after

22    Taser had employed.  I think that was

23    part of the thing why they didn't

24    want us to go through the incident

25    ourselves when we went through our

34

1   training practice.  You know, it

2   wasn't mandatory to do that because

3   there is --- if you have an unknown

4   heart condition or something like

5   that, you know, they just didn't want

6   to take the risk with that type of

7   thing either.

8   Q.     So that's why it wasn't

9   mandatory and they were asking for

10  volunteers?

11                 ATTORNEY DONAHOE:

12                 If you know.

13  BY ATTORNEY CORRADO:

14  Q.     If you know.

15  A.     Yeah, I don't know if that's

16  why they did it.  I'm not sure they

17  still even will let you take a Taser

18  if you were requested.  I'm not sure

19  if it's --- you know, it wasn't

20  mandatory for it.

21  Q.     Okay.  And have you learned

22  that since then that they don't make

23  anyone take the Taser?

24  A.     I don't know.

25  Q.     You don't know.  So that did

35

1    not change during your tenure with

2    the state police?

3    A.      No.

4    Q.      Okay.  What was the policy of

5    the state police regarding tasing

6    people while they were cuffed, if

7    they had one?

8    A.      I don't think there's anything

9    really about that.

10   Q.      The state police never

11   addressed the use of a Taser while a

12   suspect had been handcuffed?

13   A.      Not as far as I know.

14   Q.      Okay.  Are you familiar with

15   the term positional asphyxia?

16   A.      Yes.

17   Q.      Okay.  What do you understand

18   that to mean?

19   A.      Basically if we have someone

20   in a handcuffed position and they're

21   laying on their abdomen, that they

22   could possibly lose --- be unable to

23   breathe just from the weight of their

24   own body on --- compressing on the

25   chest.

36

1    Q.      Okay.  And did you learn about

2    that as part of your training?

3    A.      Yes.

4    Q.      And what did you learn?  First

5    of all, was this during your basic

6    training or was this in training

7    subsequent to your basic training?

8    A.      I think that was subsequent.

9    Q.      Okay.  Can you tell me what

10   you learned during that training?

11   A.      Well, they just didn't want

12   you to ---.  Once a person is secured

13   to try to roll them on their back or

14   on their side so they're not laying

15   flat down on top of them.  And make

16   sure you don't put weight on somebody

17   while they're in that position.

18   Q.      Okay.  And who was this

19   training given by?

20   A.      We do our update training by

21   the training academy.  There's

22   regional offices in Franklin and

23   Greensburg.  When we do our update

24   training, that's usually where that

25   type of training was done.

37

1  Q.     Okay.  And was that on one

2  occasion or more than one occasion,

3  if you recall?

4  A.     We had the update training

5  every year in use of force and use of

6  the Taser was annual.

7  Q.     So when you say that was

8  annual, every year you would have

9  updated training on the use of the

10  Taser?

11  A.     Yes.

12  Q.     Okay.  And did anything change

13  over time?  I mean, what was the

14  purpose of updating the Taser

15  training?

16  A.     So you're familiar with your

17  weapon.  We did handcuffing every

18  year, baton strikes.  Same thing.

19  Just so you're proficient and don't

20  forget from the last year how to use

21  everything.

22  Q.     Okay.  And this positional

23  asphyxia training, was that on one

24  occasion or more than one occasion?

25  A.     That wasn't all the time.  I

38

1    had it before but I don't recall how

2    often it was.

3    Q.       Okay.  As part of your

4    training, did they ever speak about

5    drugs in a person's system could

6    increase the risk of positional

7    asphyxia?

8    A.       Not to my recollection.

9    Q.       Okay.  Did you ever learn or

10   were taught that --- I think you

11   already said this, that kneeling or

12   placing weight on a subject increases

13   the risk of positional asphyxia?

14   A.       Yes.

15   Q.       Did they talk about where on

16   the body or was it any part of the

17   body would --- could increase the

18   risk?

19   A.       I would think the

20   chest/abdomen area.

21   Q.       Chest/abdomen area?

22   A.       Yeah.

23   Q.       Okay.  And what about the

24   back?

25   A.       Well, if you're laying on the

39

1    front, I mean, obviously on the back.

2    Q.      Okay.

3    A.        In those areas, yeah.

4    Q.      Okay.  Did they discuss that

5    natural reaction to oxygen deficiency

6    is to cause a person to struggle more

7    violently so when somebody might not

8    be getting enough oxygen, they might

9    struggle more and that could be a

10   sign of positional asphyxia?

11   A.      I don't recall.

12   Q.      Okay.  Did you ever learn that

13   the unresponsiveness of a subject

14   could indicate positional asphyxia?

15   A.      No.

16   Q.      Okay.  Did you learn as part

17   of your training that positional

18   asphyxia is increased when physical

19   restraint includes behind the back

20   handcuffing combined with placing the

21   subject in a stomach-down position?

22   A.      Could you repeat that?

23   Q.      Sure.  Did you learn that the

24   risk of positional asphyxia is

25   increased when a subject is

40

1    handcuffed behind the back and the

2    subject is placed down on their

3    stomach?

4    A.      Yeah, that's what I said.  The

5    sooner we take them over a recovery

6    position and put them on their back

7    at that point, yeah.

8    Q.      Okay.  And I just want to

9    touch back on the Taser briefly.  Did

10   your model Taser ever change over

11   time?  I mean, from when you were

12   first introduced in 2004, 2005?

13   A.      I think it was the same one.

14   Q.      Okay.  And do you recall the

15   model Taser that you used?

16   A.      No idea.

17   Q.      Okay.  Was part of your

18   training --- did they teach you how

19   to recognize breathing difficulties

20   or loss of consciousness?

21   A.      Oh, yeah.  We had medical

22   training.  Yeah.

23   Q.      Okay.  And what did that

24   entail, your medical training?

25   A.      Oh, basic CPR, first aid, that

41

1    type of ---.

2    Q.      Okay.  And was that renewed

3    yearly or how often would you get

4    that type of training?

5    A.      It was yearly.  Then I think

6    they changed it later on.  We did CPR

7    alternating.  We did first aid one

8    year and CPR the next.  I think it

9    was every two-year cycle, I think it

10   was.

11   Q.      Okay.  So you were certified

12   to give CPR?

13   A.      Yes.

14   Q.      Okay.  And what is the state

15   police policy on giving CPR?  I mean,

16   if you have a subject that's going

17   into cardiac arrest or stopping

18   breathing, I mean, what's the policy

19   regarding treating that subject?

20   A.      Well, if they don't have a

21   pulse or they're not breathing, you

22   would perform CPR on them.

23   Q.      Okay.  And is that mandated?

24   Is that ---?

25                ATTORNEY DONAHOE:

42

1          You mean do they have
2       to even if an ambulance is
3       outside?
4              ATTORNEY CORRADO:
5              Yes.
6  A.     We have to give appropriate
7  care, yeah.
8  BY ATTORNEY CORRADO:
9  Q.     And is there a name of that
10 policy?  I mean, do you know what
11 that written policy is called?
12 A.     No.
13             ATTORNEY DONAHOE:
14             I mean, there's
15          policies out there.  They
16          usually have numbers, not
17          names.
18             ATTORNEY CORRADO:
19             Okay.
20 BY ATTORNEY CORRADO:
21 Q.     You wouldn't happen to know
22 the number of that policy, do you?
23 A.     No.
24 Q.     Okay.  Okay.  Let's turn now
25 to October 18th, 2010.  What shift

43

1   were you working?

2   A.      11:00 p.m. to 7:00 a.m.

3   Q.      Okay.  And you were with

4   Trooper Johnson?

5   A.      Yes.

6   Q.      Okay.  Was he somebody you

7   normally worked with?

8   A.      Yes.

9   Q.      Okay.  And how long had you

10  been working with him?

11  A.      Four or five years.

12  Q.      Okay.  And your title at the

13  time was?

14  A.      Trooper first class.

15  Q.      Trooper first class.  Okay.

16  Can you tell me a little bit about

17  --- was that the same title you held

18  when you first came into the state

19  police?

20  A.      No.  Well, trooper.  Then

21  trooper first class after you have

22  like 12 years.

23  Q.      Okay.

24  A.      You became trooper first

25  class.

44

1    Q.      Okay.  And then where do you

2    go from there?  Trooper second class

3    and I don't know.

4    A.      No, that's all.  That's just

5    the basic, you know, unless you get

6    promoted to a corporal or work up the

7    ranks that way.

8    Q.      Okay.  So you were trooper

9    first class at the time.  And what

10   was, if you know, Trooper Johnson's

11   rank at the time?

12   A.      Trooper.

13   Q.      Trooper, okay.  So were you

14   considered the senior ---

15   A.      Yeah.

16   Q.      --- trooper on the scene?

17   A.      Yes.

18   Q.      Okay.  So tell me a little bit

19   about the shift.  It's an 11:00 to

20   7:00.  Is that a shift you normally

21   would work?

22   A.      Yes.

23   Q.      Okay.  And a call comes in.

24   And you said that you had done the

25   spark test earlier ---

45

1    A.        Yes.

2    Q.        --- that day?  That was part

3    of your training, so you did your

4    spark test on your Taser.  I assume

5    you were in uniform?

6    A.        Yes.

7    Q.        Okay.  What's on your tool

8    belt at this point?

9    A.        My pistol, handcuffs, baton,

10   the Taser.  I think that's all.

11   Q.        Okay.  Pepper spray?

12   A.        Pepper spray, yes.

13   Q.        Okay.  And the baton you have,

14   is it the small kind that flips out?

15   A.        Yes, the ASP baton.

16   Q.        Okay.  Okay.  And did you have

17   your --- do you have a hat?  You had

18   full uniform and a hat?

19   A.        I don't think I had my hat on

20   riding in a car.

21   Q.        Okay.  So the call comes in.

22   What time do you think that this was?

23                      ATTORNEY DONAHOE:

24                      To where?  You mean to

25            911 or to him because ---?

46

1          ATTORNEY CORRADO:

2              To him.

3          ATTORNEY DONAHOE:

4              Okay.  When did you, is

5       the question, receive the

6       call?

7    A.     It was a little after 11:00.

8    I can look at my report but ---.

9          ATTORNEY CORRADO:

10             Could you mark this?

11             (Battestilli Deposition

12             One marked for

13             identification.)

14   A.     I don't have a time on here.

15   It's shortly after 11:00.  It was

16   early in the shift.

17   BY ATTORNEY CORRADO:

18   Q.     Mr. Battestilli, I'm going to

19   show you what's been --- Counsel's

20   showing you what's been marked

21   Exhibit One.

22   A.     Okay.

23   Q.     Do you know what this is?

24   A.     Yeah, our communications memo.

25   That's the way they keep track of our

47

1   activities during our shift.

2   Q.      Okay.

3   A.      The PCOs would keep this log.

4   Q.      Is this something that you

5   maintain or is it something that the

6   office maintains?

7   A.      Our dispatcher.

8   Q.      The dispatcher?

9   A.      Our PCO, communications

10  officer, would start this log when we

11  start our shift.

12  Q.      Okay.

13  A.      And any activities he assigned

14  us to on that shift would be logged

15  on it, or things we'd call on would

16  log on this paper.

17  Q.      Okay.  Could you walk me

18  through this briefly?  It's a little

19  bit unclear to me.  Under patrol

20  zones, you have a CO-1 number.  That

21  first one, is this the call that

22  comes in regarding the incident in

23  question?

24  A.      Yes.

25  Q.      Okay.  Can you tell me what

48

1   that code means, if you know?

2   A.      That's just a report number.

3   Q.      That's a report number?

4   A.      Yes.

5   Q.      Okay.

6   A.      That would be the incident

7   report this was done under.

8   Q.      Okay.  So the numbers, itself,

9   don't mean anything?  It's just the

10  incident number?

11  A.      Yeah.

12  Q.      Okay.  Moving to your right,

13  you have a code one, two, and three.

14  What does that code one mean that was

15  marked?

16  A.      The dispatcher would normally

17  assign a priority as far as your

18  response, one being the minor.  Two

19  would be a more expedited response,

20  and three would be a full emergency

21  response.

22  Q.      Okay.

23  A.      It would be a shooting or

24  something like that, active shooter

25  would be a three.

49

1    Q.      Okay.

2    A.      So you're going to respond

3    with lights and siren.

4    Q.      Okay.

5    A.      Two would be expedite.  You

6    might use your lights, might not, but

7    just depending what your

8    circumstances are, you know.

9    Q.      Okay.  And the time, 2322, is

10   that the time it gets to you or is

11   that the time ---?

12   A.      That's the time he assigned it

13   to us.

14   Q.      Okay.  All right.  So the call

15   comes in to you through the mobile,

16   the radio dispatcher?

17   A.      Yes.

18   Q.      Okay.  And the 2337 number,

19   ---?

20   A.      That would have been when we

21   arrived at the scene.

22   Q.      Okay.  All right.  And then

23   the in-service number, does that mean

24   that you've left the scene and you're

25   available for another call?

50

1    A.      Yes.

2    Q.      Okay.  Thank you for that.

3    Okay.  So tell me what happened.

4    You're in your vehicle.  I don't want

5    to put words in your mouth.  You're

6    in your vehicle when the call comes

7    in?

8    A.      Yes.

9    Q.      Okay.  And tell me what you

10   hear.

11   A.      Dispatcher told us that we had

12   to assist for a mental health case.

13   Gave us the location.  Advised us

14   that he had --- I think he had talked

15   to his brother.  The individual was

16   threatening violence, was a fighter.

17   You know, there could be problems

18   with him there.

19   Q.      Okay.  So do you go right to

20   the scene?

21   A.      Yes.

22   Q.      Okay.  And what happens when

23   you get there?

24   A.      We pulled in, I guess, an

25   access road.  It would be in front of

51

the residence.  And we pulled up and
were contacted by Timmy Hooftallen,
the decedent's brother.

Q.      Go ahead.

A.      And he basically said that his
brother had taken a bunch of pills, a
bunch of Mucinex, and he was violent
and tearing up things, tearing up the
place is what his words were.

Q.      Uh-huh (yes).

A.      We needed to come in there.
Ms. Hall then came out also and
reiterated basically the same thing.
He's violent and threatening and we
needed to do something.

Q.      Okay.  Did someone ask whether
or not it had been prescription
Mucinex or not?

A.      I don't think at that point,
no.

Q.      Okay.  Did anyone mention
whether or not Mr. Hooftallen had
tried to kill himself earlier?  Not
that night, but previously?

A.      I don't recall there right in

52

1  the initial contact.  I don't

2  believe.

3  Q.      Okay.  Anything else that you

4  recall being told by the decedent's

5  brother Timmy or Ms. Hall?

6  A.      Let me refer to my notes to

7  refresh my memory, make sure.  Okay.

8  He did say that he attempted to

9  commit suicide prior to that at the

10 initial contact.  No, that was about

11 all at that point then.  It was very

12 short.  They started walking away

13 from the car even while I was still

14 wanting to question them further.

15 And they started heading back to the

16 residence.

17 Q.      How many minutes did it take

18 you to get there?

19 A.      Well, it was 14 minutes, 15

20 minutes.

21 Q.      Okay.  And can you describe

22 the home for me?

23 A.      Like a doublewide trailer

24 style.

25 Q.      Okay.  And where was EMS at

53

1   this time, if you know?

2   A.      We were told they were staging

3   --- there's a little church about a

4   quarter-mile up the road from where

5   we were at.

6   Q.      Okay.  And who told you that?

7   A.      Our dispatcher.

8   Q.      Okay.  And you were told that

9   on the way over there?

10  A.      Yes.

11  Q.      Okay.  And on your tool belt,

12  do you also have a radio?

13  A.      Well, we have portable radios,

14  yeah.  I don't usually have it on my

15  belt.

16  Q.      Okay.  Do you have a cell

17  phone?

18  A.      Yes.

19  Q.      Okay.  And does that cell

20  phone have any --- it doesn't have

21  any radio capabilities?

22  A.      No.

23  Q.      Just Pennsylvania State

24  Police?

25  A.      Just my personal --- no, it's

54

1  my personal cell phone.

2  Q.      It's your personal cell phone.

3  Okay.  So your portable radio was in

4  the car?

5  A.      Yes.

6  Q.      Okay.  And would that be

7  something you would normally do is

8  leave your radio in the car?

9  A.      It depends.  I mean, I don't

10  have --- I have a belt holster for

11  it.  So it's just another thing

12  that's in the way, you know.

13  Q.      Okay.  So you understand that

14  EMS is staged, you said, a

15  quarter-mile down the road?

16  A.      Yes.

17  Q.      Okay.  So Hall and Timmy start

18  to walk back to the house.  You and

19  Trooper Johnson follow.  And what

20  happens?

21  A.      We enter the back door of the

22  house.  There's like a little

23  hallway.  We come up.  The kitchen

24  will be off to the left and then

25  straight ahead is the living room.

55

1   And we walked into the living room.

2   And Timmy kind of stayed back at the

3   doorway of the kitchen entrance.  And

4   Troy Hooftallen was sitting on a sofa

5   and his mother was sitting next to

6   him.

7   Q.      Okay.  Is the kitchen open to

8   the living room?

9   A.      There's an entrance on both

10  ends of the living room, and there's

11  an open area.  It's a sofa, a

12  loveseat, and there's an open area

13  there that look through into the

14  kitchen.

15  Q.      Okay.  So is there a coffee

16  table?

17  A.      Yes.

18  Q.      And where's the coffee table

19  in relation to where?

20  A.      It's right in front of Troy

21  and his mother.  It's parallel to the

22  couch that they're sitting on.

23  Q.      Okay.  And is there other

24  furniture in the room?

25  A.      There's a TV, I think, to my

56

1   right.  I'm not sure behind me if

2   there's anything back that way.

3   Q.      Okay.  And where are the

4   bedrooms, if you know?

5   A.      Never went back to that part

6   of the house, so I assume back the

7   hallway that --- near where we came

8   in at.

9   Q.      Okay.  And where's Ms. Hall at

10  this time?

11  A.      I believe she's standing in

12  the kitchen or in the back of the

13  living room, somewhere in that back

14  corner.

15  Q.      Okay.  Do you see anybody

16  else?

17  A.      No.

18  Q.      Okay.  So is Troy to the right

19  or to the left of his mother on the

20  couch?

21  A.      To the left.  He's to my right

22  and his mother's to the left.

23  Q.      He's to your right?

24  A.      Where I'm facing them, he's to

25  my right and she's to the left.

57

1  Q.      Okay.  So what happens next?

2  A.      I introduced myself.  I walked

3  over to the coffee table and told

4  them I'm Trooper Battestilli from the

5  state police, and I reached my hand

6  out to him.  He stood up and shook

7  hands with me and sat back down on

8  the couch and just proceeded to talk

9  to him about what's going on tonight.

10 Q.      Okay.  And what did you say to

11 him specifically?

12 A.      I just asked him what's going

13 on, you know.  He said he was

14 agitated.  He just said he wanted to

15 fight.  I'm the bad mother fucker

16 around and that type of thing.  I

17 just tried to engage him in

18 conversation just what's --- I said

19 you want to go to a hospital, and he

20 wouldn't respond to me as far as

21 answering questions like that.  And

22 he just kept going back to, you know,

23 how bad he is and he's going to

24 fight.  He wants to kick some ass

25 tonight.

58

1   Q.      Is he still seated on the

2   couch at this point?

3   A.      Yeah.

4   Q.      Okay.  And where's Trooper

5   Johnson at this point?

6   A.      Just to my left to the rear

7   behind me.

8   Q.      Okay.  So are you standing in

9   front of the coffee table or are you

10  in front of the coffee table?  Where

11  are you?

12  A.      I'm in the front of the coffee

13  table, about the center of the room

14  and then Steve's off to my left a

15  little behind me.

16  Q.      Okay.  And Troy is still

17  seated at this point and the mother

18  is still there?

19  A.      Yes.

20  Q.      Okay.  So what happens next?

21  A.      We just continued that way.

22  He at one point had said that, oh, I

23  figured out the meaning of life.  I

24  said, boy, I'd like to know that too.

25  Why don't you tell me what it is.  He

59

1   obviously didn't respond to that.
2   And he just kept repeating it, you
3   know.  He wanted to fight.  He was
4   going to kick some ass, you know, how
5   bad he is.  At one point he was
6   sitting on the couch.  He stood up.
7   He had a bottle of, I think orange
8   Crush pop, a plastic bottle in front
9   of him.  He stood up, grabbed it, and
10  just crushed it with both hands but
11  he wanted to rip it in half.  And his
12  girlfriend and his mother both yell
13  at him to knock it off, that you're
14  going to make a mess.  And he sat
15  back down, put the bottle down.
16  Q.     Okay.
17  A.     Through this, you know, every
18  once in a while he'd open it and take
19  a sip and put it back on the table.
20  Q.     Did the meaning of life
21  conversation happen before or after
22  the pop?
23  A.     I don't recall.  Let me refer
24  to my report.  I think it was after
25  the bottle of pop.

60

1  Q.      Okay.  Does Troy get up after

2  the meaning of life conversation?

3  A.      Yes.

4  Q.      Do you recall?  Okay.  Did you

5  snicker when he mentioned the meaning

6  of life?

7  A.      First of all, I said, hear, I

8  said, --- I kind of laughed and said,

9  well, I'd like to know what the

10 meaning of life is too.

11 Q.      Okay.  Is it at that point

12 that he gets up and stands up from a

13 seated position?

14 A.      I don't think it was directly

15 at that point.

16 Q.      Okay.

17 A.      It was a little later.  He

18 still kept --- I asked him about

19 going to the hospital and trying to

20 get him to talk and he wouldn't.

21 They're worried.  Your parents are

22 worried about you.  And after a

23 minute, a couple other minutes is

24 when he finally got up again and

25 approached us.

61

1    Q.      Okay.   Did anybody else
2    comment about this meaning of life
3    comment that he made?
4    A.      No, no one else really said
5    anything.   It was just me and Troy
6    talking.
7    Q.      Okay.  So what happens next?
8    He gets up and then what happens?
9    A.      He has a ball cap there.   He
10   put his ball cap and came walking
11   over to us and he grabbed my left arm
12   and Steve's right arm because he was
13   facing both of us and started to
14   forcibly push and said let's go
15   outside.
16   Q.      Okay.
17   A.      And I told him no, we're not
18   going outside, we can talk here and
19   everything's okay.
20   Q.      Why would you not let him go
21   outside?
22   A.      Because I have no idea what
23   he's going to do at that point.   If I
24   can keep him in the same location
25   here and where we have things under

62

1  control on him.

2  Q.      Okay.

3  A.      I don't want him running off

4  through the woods where we have to

5  take off, you know.  He's kind of

6  controlled where he's at.

7  Q.      So that was the fear if he

8  went outside was that he would run

9  off?

10  A.      Well, that and I don't know

11  what's outside, if he has weapons

12  outside or, I mean, it's dark outside

13  and you can't see as well.  We have a

14  smaller area where we can keep him

15  confined to.  It's better to keep him

16  in that one location.

17  Q.      Okay.  So what happens next?

18  A.      Well, I told him no, and you

19  know, held my ground, wouldn't move

20  backwards.  He let go of us and he

21  ---.  Steve was off to the left here

22  at this point and he's in between us.

23  He kind of put his arms down and he

24  turned and faced toward Trooper

25  Johnson and just stared at him.  And

63

1  he did that for a second.  You could

2  see him.  He made a fist and he wound

3  back and you could see the punch

4  coming.  He threw a roundhouse punch

5  at Steve, which Steve was able to

6  block.  And then they both --- I went

7  to him and grabbed him.  We all went

8  onto the couch.

9  Q.       Okay.  I just want to back up

10  for a minute.  Did he tell you why he

11  wanted to go outside?

12  A.       He said he wanted to talk.

13  Q.       Okay.  And how long did this

14  eye contact last?

15                ATTORNEY DONAHOE:

16                You mean the eye

17        contact between the assailant

18        and Trooper Johnson?

19                ATTORNEY CORRADO:

20                Yes.

21                ATTORNEY DONAHOE:

22                Okay.  If you can ---.

23  A.       Not real long.  I mean, ten

24  seconds, something where he wasn't

25  ---.

64

1  BY ATTORNEY CORRADO:

2  Q.      Okay.  And who broke the eye

3  contact, if you know?

4                  ATTORNEY DONAHOE:

5                  If it was broken.

6  A.      I don't even know if it was

7  broken, yeah.  I really couldn't say

8  at that point.  You could see Troy

9  tense up and he started winding up.

10 BY ATTORNEY CORRADO:

11 Q.      Okay.  So to your knowledge,

12 Johnson did not break eye contact?

13 A.      I don't know.

14 Q.      Okay.  He didn't look away or

15 make some other move that could be

16 ---?  He didn't back up?

17 A.      No, he just stood there and

18 was watching him.

19 Q.      Okay.  So tell me a little bit

20 more about this punch.  You said it

21 was a roundhouse or I don't want to

22 put words in your mouth.

23 A.      Yeah, it was a little haymaker

24 of a type.  Yeah, it was just a real

25 --- he wound back and you could see

65

1   the arm coming all the way around

2   just full extended.

3   Q.      Okay.

4                   ATTORNEY DONAHOE:

5                   You should probably say

6        which arm.

7   BY ATTORNEY CORRADO:

8   Q.      Yes.

9   A.      Right arm, yeah.  Yeah, right

10   arm.

11   Q.      So it's his right arm.  And

12   you said he blocked the punch.  Does

13   he use his left arm to block it or

14   ---?

15   A.      I really couldn't say for

16   sure.  I mean, it was just --- it all

17   went into a heap at that point when

18   the punch came around.

19   Q.      Okay.  Did he make contact

20   though or he --- when you say he

21   blocked it, he actually made contact

22   with Trooper Johnson?

23   A.      Yeah.  I couldn't say exactly

24   how.  The punch came and then we all

25   end up --- Steve ended up grabbing

66

1    him so I'm not sure where.  You know,

2    it was all just a blur at that point.

3    Q.      Okay.

4    A.      It all fell together.

5    Q.      And where is his mother at

6    this point?  Tell me where the mother

7    is at this point.

8    A.      As far as I know, still on the

9    couch.

10   Q.      Okay.  And where are Ms. Hall

11   and Timmy?  Are they still where they

12   had been originally?

13   A.      To the best of my knowledge,

14   yes.

15   Q.      Okay.  So tell me how the fall

16   happens.  Now, you said everybody is

17   sort of now grabbing each other?

18                   ATTORNEY DONAHOE:

19                   I don't think he said

20          that.

21   BY ATTORNEY CORRADO:

22   Q.      I'm sorry.  Tell me again what

23   happens.

24   A.      Well, the punch went around,

25   they were together.

67

1    Q.       Right.

2    A.       And they fell backwards.  I

3    was coming over to grab ahold of Troy

4    and we all kind of fell onto a pile

5    on the loveseat.

6    Q.       So is this different from the

7    couch that he had been sitting on

8    originally?

9    A.       Yes.  This is perpendicular to

10   the --- you know, the left wall where

11   the overhang to the window is to the

12   left side of the room.

13   Q.       Okay.  And what are you trying

14   to accomplish by ---?  You're trying

15   to grab Troy from behind?

16   A.       Yeah.

17   Q.       Okay.  And do you lose your

18   balance and then you all go onto the

19   couch or is Trooper Johnson pulling

20   him onto the couch?

21   A.       They all just tumbled onto the

22   couch.  I mean, I'm behind them so I

23   can't really grab anything at that

24   point.

25   Q.       Okay.  So what is the position

68

1    of Trooper Johnson now on the couch?

2    A.      He would be on his back like

3    dangling over the left arm of the

4    couch with Troy directly on top of

5    him.

6                    ATTORNEY DONAHOE:

7                    When you say couch, you

8            mean the loveseat?

9    A.      The loveseat, yes.

10   BY ATTORNEY CORRADO:

11   Q.      Loveseat, okay.  And does

12   anybody get hurt in the fall?

13   A.      I don't know at that point if

14   anything's hurt.  I think Steve later

15   said that he had hit his head and

16   shoulders, whatever, on the wall

17   there.

18   Q.      Okay.  You didn't know at that

19   point that he had hit his head?

20   A.      No.

21   Q.      Okay.  And what about Troy?

22   Does Troy hit his head on his way

23   down?

24   A.      I don't know.  They were both

25   up towards that wall there at the

69

1   upper end of the couch.

2   Q.      Okay.  Is there an arm on the

3   wall or --- I'm sorry.  Is there an

4   arm on the side of the couch?

5               ATTORNEY DONAHOE:

6               Again, couch or

7        loveseat?

8   BY ATTORNEY CORRADO:

9   Q.      Or loveseat, sorry.

10  A.      Loveseat.  Loveseat, yeah.

11  Yes.

12  Q.      Can you describe the loveseat

13  a little bit to me?

14  A.      The standard loveseat.  It has

15  two arms and a back and ---.

16  Q.      Okay.

17  A.      Yeah.

18  Q.      Is it one of those big cushy

19  ---

20  A.      No, I don't think it's ---.

21  Q.      --- loveseats?

22  A.      No, it's not the overstuffed.

23  Q.      Okay.

24  A.      I don't think there's any

25  pillows there either that I recall.

70

1    Q.      No pillows.  Okay.  All right.

2    So he's on his back on the loveseat

3    and Troy is over him?

4    A.      Yes.

5    Q.      And where are you?

6    A.      I'm behind Troy, you know,

7    knocking on his buttocks.

8    Q.      Okay.  And where is Trooper

9    Johnson's feet at this point?

10   A.      On the floor, I believe.

11   Q.      On the floor.

12   A.      Yeah.

13   Q.      And where is Troy's feet?

14   A.      Also on the floor.

15   Q.      Okay.  And your feet are on

16   the floor?

17   A.      Yes.

18   Q.      And you have your knees, you

19   said ---?

20   A.      In his buttocks, lower back

21   area.

22   Q.      Okay.  And both knees?

23   A.      I don't recall exactly.  I

24   think I was.

25   Q.      Okay.  And is Trooper Johnson

71

1   saying anything to you at this time?

2   A.      No, I think we're both just

3   yelling at Troy to quit fighting and

4   I don't recall Steve saying anything

5   to me.

6   Q.      Okay.  And what happens next?

7   A.      Well, I didn't have any real

8   way of grabbing anybody's arms or

9   Troy's arms are underneath their

10  bodies.  So I took my Taser out and

11  leaned back as far as I could to get

12  the spread on the probes and fired a

13  Taser into Troy.  And while that was

14  activated, Steve was able to slide

15  out from under him and start

16  handcuffing him.

17  Q.      Okay.  And so Trooper Johnson

18  slides out completely from underneath

19  him?

20  A.      Yes.

21  Q.      And he handcuffs both the left

22  and the right handcuff?

23  A.      Yes.

24  Q.      And where are you at this

25  time?

72

1   A.      Still holding the Taser and

2   still kneeling on the buttocks of Mr.

3   Hooftallen holding the Taser.

4   Q.      Okay.  And then what happens

5   next?

6   A.      Well, Trooper Johnson pulled

7   the probes of Troy and I just took

8   the cartridge off of the Taser and I

9   started trying the holster, to

10  reholster the Taser.  While I was

11  doing that, I couldn't get it to

12  snap.  I didn't put the new cartridge

13  --- the bottom Taser has a second

14  cartridge put in so it wouldn't fit

15  snug and I couldn't snap it on there,

16  but I was trying with one hand and

17  holding onto Troy with the other.

18  And then he started getting real

19  violent, started kicking and

20  thrashing.  So then I ended up taking

21  the Taser back out and then do a dry

22  stun.

23  Q.      Okay.  So where's Trooper

24  Johnson now?  He's out from

25  underneath him.  Is he standing now?

73

1   A.      Yeah, he's right alongside me.

2   We're both behind Troy and holding

3   onto him.

4   Q.      Okay.  So you're both behind

5   Troy.  Where are Trooper Johnson's

6   hands on Troy at this point, or body?

7   A.      I'm not sure if he's holding

8   his arm.  I'm not exactly sure where

9   his hands were at that point.

10  Q.      Okay.  But he's completely

11  handcuffed at this point?

12  A.      Yes.

13  Q.      Okay.  And you still have your

14  knee on --- your knees on his lower

15  back, buttocks area?

16  A.      Yeah.

17  Q.      And you were not able to fully

18  snap your Taser in your holster?

19  A.      Right.

20  Q.      And you then administer a dry

21  stun?

22  A.      Yeah.  I did a dry stun

23  because he was kicking and thrashing

24  very violently.  And I did a dry stun

25  on his leg and didn't get any

74

1    response from him at that point.  And

2    I reinitiated and his shirt had

3    pulled up, so I did a dry stun in his

4    back.  And he rolled away from me and

5    kind of yelled a little bit at that

6    point.  So I think it disengaged and

7    I reengaged it because when he rolled

8    away, it disengaged the Taser.  And

9    then at that point I turned it off

10   and reholstered the Taser.

11   Q.      Okay.  So at this point before

12   you administered that second dry

13   stun, Mr. Hooftallen is face down on

14   the couch.  His knees are on the

15   ground or his knees were ---?

16   A.      No.  I don't think his knees

17   are --- his knees are like off the

18   edge of the couch, off the loveseat

19   there.

20   Q.      Okay.  And he's facing forward

21   onto the couch?

22   A.      Yeah, he's kind of diagonal.

23   His head's up by the left armrest.

24   Q.      Okay.

25   A.      That area.

75

1    Q.      Can you tell me exactly what
2    he's doing, I mean, with his body?  I
3    mean, he is handcuffed from behind.
4    A.      He's just kicking and
5    thrashing.  I mean, we had to hang
6    onto him to keep him from moving from
7    where he was at.  He just was very
8    violent with thrashing, kicking his
9    legs.
10   Q.      But he's face down though.  So
11   can you explain to me how he's
12   kicking?
13   A.      Well, just the whole body's
14   just --- he's bouncing and just
15   kicking and bucking violently.
16   Q.      Is he saying anything?
17   A.      Not that I recall.
18   Q.      Did you ask his mother to say
19   anything to him at this point?
20   A.      No.
21   Q.      And he doesn't have any
22   weapons on him and he's cuffed from
23   behind.  Is the fear that you're
24   going to be kicked?
25   A.      Well, yeah.  He's still out of

76

1    control.  He's still ---.

2    Q.      And what are you trying to

3    accomplish at this point?  For him to

4    stop kicking and thrashing?

5    A.      Yeah, for him to calm down and

6    ---

7    Q.      Okay.

8    A.      --- stop, you know, fighting

9    with us.

10   Q.      Okay.  So I cut you off.  You

11   said you administered the dry stun to

12   the right leg?

13   A.      Yeah.

14   Q.      You don't see any response

15   from him?

16   A.      No.

17   Q.      Does he scream?

18   A.      Nothing.  There's no response

19   there at all.

20   Q.      Okay.  Then you see, you said,

21   his shirt go up?

22   A.      Yeah, his shirt lifted up and

23   you could see the bare skin.

24   Q.      Okay.

25   A.      Or his lower right back.

77

1   Q.    And then what?

2   A.    Then I put the --- did a dry

3   stun at that point.  And then that's

4   when he yelled, kind of rolled

5   forwards on the couch trying to roll

6   away from the pain obviously.

7   Q.    So he rolls which way?

8   A.    It would be to his right

9   towards the couch.  Toward the back

10   of the loveseat.  I mean toward the

11   back of the loveseat, away.

12   Q.    Okay.  Do you guys step back

13   at all as he's kicking and thrashing?

14   A.    No, we're trying to hold him,

15   hold him down.

16   Q.    Okay.  And what happens after

17   the second dry stun?

18   A.    Well, he kind of calmed down a

19   little bit, and I put the Taser away,

20   got it snapped.  And then he started

21   kicking with his legs.  And I was

22   holding --- I got down and held both

23   legs down up against the couch and

24   kind of pinned him there.  And I told

25   Steve I needed to --- I'll get my

78

1    shackles.  I always had a pair of

2    shackles I kept in my patrol bag.

3    And Timmy at this point was standing

4    just to my right, and I said can you

5    help hold his legs?  And he jumped

6    down and grabbed onto his legs and

7    then I ran out to the car to bring my

8    shackles in.

9    Q.      Okay.  So how is Timmy

10   positioned now?  Is Timmy just

11   kneeling down?

12   A.      Yeah, kneeling or crouched

13   down right there with both hands on

14   his --- on Timmy's legs.

15   Q.      Okay.

16                   ATTORNEY DONAHOE:

17                   On Troy's legs?

18   A.      On Troy's legs, sorry.  Yeah.

19   BY ATTORNEY CORRADO:

20   Q.      And where is Trooper Johnson

21   at this point?

22   A.      Still holding his upper body.

23   Q.      Okay.  And holding him how?

24   A.      I think his hands on him.  I'm

25   not sure.  Like I said, I don't

79

1    recall how exactly his hands were at

2    that point.

3    Q.       Okay.  Just his --- you know,

4    the palms of his hands or is he using

5    his arms?  Is he using his knees?

6                    ATTORNEY DONAHOE:

7                    Well, he already said

8            he didn't recall how his hands

9            were on him, but if you want

10           to take another crack at

11           recalling?

12   A.       I mean, he's basically sitting

13   like I am and we're crouched down

14   leaning over top of him holding him.

15   I mean, he wasn't laying on him or

16   --- I mean, he's just --- I don't

17   know what part of the body, his

18   shoulder or arms or where he actually

19   has his hands positioned or how

20   they're positioned because I'm

21   worried about watching his legs and

22   not getting kicked.

23   BY ATTORNEY CORRADO:

24   Q.       Do you know on what part of

25   Troy --- I mean, do you see him, his

80

1   hands on any part of Troy at this

2   point?  Where on Troy?

3   A.      Well, like I say, he's holding

4   the upper body so I'm not sure what

5   exact position his hands are on at

6   that point.

7   Q.      Okay, okay.  And Troy's still

8   face down on the couch?

9   A.      Yeah, he's still diagonal,

10  diagonal across the couch.

11  Q.      Okay.  So then you leave to go

12  get your shackles?

13  A.      Yes.

14  Q.      And then what happens?

15  A.      I came back in and put one of

16  the shackles on and he was --- he

17  kicked his legs and his legs kicked

18  apart and I had to pull them together

19  to get the other shackle on because

20  he had his legs spread out far enough

21  where I couldn't get the shackle on.

22  Got the second shackles on.  And then

23  we rolled him onto the floor on his

24  back.

25  Q.      And why did you do that?

81

1  A.      Just to get him off --- to

2  secure him on the floor.  I mean,

3  he's diagonal across a couch so, I

4  mean, he's on the floor.  He's less

5  of a danger or a threat to kick

6  anybody when he is on the couch.

7  Q.      Okay.

8  A.      Even with the shackles on,

9  he's still a threat at that point if

10 he's up off the ground.

11 Q.      Okay.  So when you bring him

12 onto the floor, he's on his back?

13 A.      Yes.

14 Q.      And he's shackled.  Is he

15 saying anything at this point?

16 A.      No.

17 Q.      How does he look to you?

18 A.      He's just laying there at this

19 point.

20 Q.      Okay.  Is the family member

21 saying anything to you at this point?

22 A.      No.

23 Q.      Okay.  So he does not appear

24 in distress at all at this point to

25 you?

82

1    A.      No.

2    Q.      Is he conscious?

3    A.      He appeared to be, yeah.

4    Q.      Were his eyes open?

5    A.      I don't recall for sure

6    whether they were or not.

7    Q.      Okay.  So you're not sure if

8    his eyes were open or closed at this

9    point?

10   A.      I thought they were open.  I'm

11   not 100 percent sure on that.

12   Q.      Okay.  What happens next?

13   A.      I went out and called our

14   dispatcher, told him to get the

15   ambulance, paramedics, up to the

16   scene.  Then I walked back into the

17   house and Timmy started talking to

18   me.  I walked back to where Troy's

19   feet were at because Timmy was

20   standing there at the point where he

21   had stood up from where he was

22   holding him on the couch.  And he

23   told me that --- started apologizing

24   for his brother's behavior.  He said

25   I'm sorry.  And I basically told him,

83

1    well, I knew it was coming, just the

2    state that he was in.  You know, I

3    had my back to Troy at that point.

4    And then Timmy said something about

5    is he still breathing.  And I turned

6    around and Trooper Johnson went down

7    and checked his pulse.  And we rolled

8    him onto the recovery position on the

9    side.

10   Q.     All right.  I just want to

11   stop you for a minute there.  How

12   long do you think you were gone

13   getting the shackles?

14   A.     Probably less than a minute.

15   Q.     Okay.  When you leave, you

16   said Troy is on his back on the

17   floor.  What position is Trooper

18   Johnson?

19   A.     No, he was still ---.  When I

20   went to get shackles, he was still on

21   the couch.

22   Q.     I'm sorry.  After the shackles

23   are put on him, he's on the floor on

24   his back?

25   A.     Yes.

84

1    Q.      And you go outside to make the

2    call?

3    A.      Right.

4    Q.      What position is Trooper

5    Johnson in at this time?

6    A.      I think he's crouched down by

7    the head.

8    Q.      Okay.  And where is he holding

9    Mr. Hooftallen?

10   A.      I couldn't say exactly what

11   position he was in right there.  He

12   was crouched down over him by his

13   head area, but I'm not sure.

14   Q.      Okay.  So you're not sure if

15   he had any --- if he was placing any

16   pressure on Mr. Hooftallen at this

17   time?

18   A.      No, I couldn't say for sure.

19   Q.      Okay.  But he was down by his

20   head area?

21   A.      Yeah.

22   Q.      Okay.  When you come back in

23   from calling the state police, how

24   long were you gone?

25   A.      Not very long.  I just ---.

85

1          ATTORNEY DONAHOE:

2               You mean when he called

3     the dispatch ---

4          ATTORNEY CORRADO:

5               Yes.

6          ATTORNEY DONAHOE:

7               --- to tell the EMS to

8     come?

9          ATTORNEY CORRADO:

10              Yes.

11         ATTORNEY DONAHOE:

12              Okay.

13    A.     Yeah, not very long.  Maybe 30

14    seconds or a minute.

15    BY ATTORNEY CORRADO:

16    Q.     Okay.  And what exactly did

17    you tell them?

18    A.     Just to get the ambulance,

19    tell them to call the ambulance, get

20    them up here.

21    Q.     Okay.  And when you come back

22    in, is Trooper Johnson still by his

23    head area?

24    A.     I believe.  I don't recall if

25    he was still crouched down or if he

86

1    was standing at that point.

2    Q.      Okay.

3    A.      He was still in that same

4    general vicinity toward Troy's head.

5    Q.      Okay.  And I'm sorry.  Where's

6    Timmy at this time?

7    A.      Still down at the --- between

8    the sofa and the couch, the loveseat

9    and the sofa.

10   Q.      Okay.  And Troy's not saying

11   anything at this point?

12   A.      No.

13   Q.      Are his eyes closed or open?

14   A.      I don't know at this point.

15   Q.      Okay.  So I'm sorry.  Go on.

16   What happens next?  You're waiting

17   for the ambulance to arrive.

18   A.      Yeah.  And I was talking to

19   Timmy.  Timmy was apologizing for his

20   brother's behavior.

21   Q.      Right.

22   A.      Then Timmy says is he still

23   breathing.  I turned back and Trooper

24   Johnson went down and checked his

25   pulse and checked his breathing.

87

1   Then we rolled him onto his side,

2   onto his right side.

3   Q.      When he checked his pulse and

4   his breathing, what were the results

5   of that?

6   A.      He said he still had a pulse.

7   Q.      He still had a pulse?

8   A.      Yeah.

9   Q.      Did it appear to you that he

10  was in distress?

11  A.      Not at that point, it didn't

12  seem like.

13  Q.      What led Timmy to believe, if

14  you know, that his brother was no

15  longer breathing?

16  A.      I don't know.  My back was to

17  Troy.  I was facing Timmy, talking to

18  him and then he said that.  I don't

19  know what triggered ---.

20  Q.      Okay.  Did Mr. Hooftallen make

21  any gurgling noises or gasping

22  breaths?

23  A.      Not at that point.  We rolled

24  him onto his recovery position and I

25  crouched down next to him and then I

88

1    told Steve, go back out.  Go call the

2    ambulance and get it expedited up

3    here.  At that point, he was making

4    gasping breaths.  It was almost like

5    a sleep apnea-type.  He would stop

6    breathing for a second and then he'd

7    take a loud gasp for air, but he

8    continued doing that.

9    Q.       Okay.  So Timmy says is he

10   breathing.  Trooper Johnson checks

11   his pulse, says he has a pulse.  Did

12   you see any other signs of distress?

13   Eyes rolling back in the head?  Was

14   he turning blue, because you do roll

15   him into a recovery position?

16   A.       Yeah.  I didn't see --- I

17   don't recall his eyes.  Can I refer

18   to my report here a second to see how

19   ---?  I don't think I had ---.  Yeah,

20   I don't recall anything about the

21   eyes.

22   Q.       Okay.  So now he's on his

23   side, and then what happens?

24   A.       Well, Steve went up to call

25   the ambulance to get them to hurry

89

1    up.  I stayed down by his head and

2    kept him in the side position.  And

3    he was doing the gasping breaths.  I

4    had asked his mother if there was ---

5    if he had any kind of sleep apnea or

6    any kind of condition like that, and

7    she said that, well, he has trouble

8    breathing when he's taking these

9    pills.

10   Q.     Okay.  Did you uncuff him?

11   A.     No.

12   Q.     Why not?

13   A.     I don't know his status yet.

14   He's in a recovery position.  There's

15   no point at that point.  I mean, why

16   unsecure him at that point?

17   Q.     Okay.  When does he go

18   unconscious?

19   A.     The paramedics came in and the

20   first paramedic reached down, felt

21   for his breath, and said he had

22   shallow breathing.  And we uncuffed

23   him from the back and moved the

24   handcuffs to the front so that ---.

25   Q.     Did they ask you to do that?

A.    No, I don't think they did.  I
think we just did it so that he'd be
in position where they could work on
him, get him on a gurney more
comfortably that way.  And then when
the paramedics got down then he said
about he lost his --- no pulse, no
breathing and they initiated CPR.

Q.    Did you observe Troy to be
blue at any time?

A.    No.

Q.    How was the family reacting at
this time?

A.    I don't think they said
anything.  They were just all
standing kind of watching everything.

Q.    How many minutes elapsed, if
you recall, between the time you
placed him in the recovery position
until the ambulance arrives?

A.    Not very long.  Probably less
than a minute because they were not
even a quarter-mile up the road from
where they were staging at.

Q.    And who arrives first?  I

91

1    think there was --- were there two

2    units staged?

3    A.       Well, there was paramedics

4    from the medic unit and then there

5    was also --- Big Run Fire Company had

6    sent out a response team also, and

7    they were altogether there.  And they

8    all came.  The paramedics came in

9    first from the ambulance crew and

10   then the fire company came in, all

11   basically the same time.

12   Q.       Okay.  And who was the first

13   to, if you recall, treat him on the

14   scene?  Do you know these responders?

15   Do you know their names?

16   A.       I don't know their names, no.

17   Q.       Okay.  Can you describe the

18   first responder, the person who was

19   checking his vital signs?

20   A.       It was a male probably in his

21   40s, maybe 50s.  And a female, I

22   think, with him.

23   Q.       Okay.  What did you tell the

24   EMS when you --- when they arrived,

25   if anything, or the first responders?

92

1    A.     I don't know if I said

2    anything at that point because it was

3    just ---.  I mean, they came in, we

4    changed the handcuffs and rolled him

5    over, and they lost the pulse and

6    breathing so it all went kind of nuts

7    at that point with everybody trying

8    to get CPR started and ---.

9    Q.     Did you tell them that he had

10   been tased?

11   A.     I don't recall if I did or

12   not.

13   Q.     Okay.  So what happens next?

14   They administer CPR?

15   A.     Yeah, they started CPR and we

16   assist them to get him transported

17   out, get him out on the gurney and

18   then out of the house into the medic

19   unit.

20   Q.     Okay.  So you moved his cuffs

21   from the front --- from the back to

22   the front prior to the first

23   responders arriving?

24   A.     No, when they came in, we

25   switched it over.

93

1   Q.      Okay.  And then what happens?
2   What's next?
3   A.      They continued CPR, put him in
4   a medic unit and took him to the
5   hospital.  And I had called our
6   dispatcher and advised him to have a
7   Punxsy Borough Police meet the
8   ambulance at the emergency room so
9   they could remove the handcuffs for
10  treatment up there.
11  Q.      Okay.  Where do you go after
12  this?
13  A.      We went to the emergency room.
14  Q.      And what did you do there?
15  A.      Not much there.  Just waited
16  as they were working on him for quite
17  a while until they transferred him to
18  --- I don't know where he went to,
19  Pittsburgh.
20  Q.      And then just going back to
21  the Taser and the handcuffs, have you
22  ever tased somebody in handcuffs
23  before?
24  A.      No.
25  Q.      Okay.  And have you ever tased

94

1   anybody before?

2   A.      Yes.

3   Q.      How many times would you say?

4   A.      I know once for sure and I'm

5   not sure if I did anybody else

6   besides that.  I tried at somebody

7   and missed, but this was two

8   occasions I recall.

9   Q.      So this would be the second

10  time you've tased somebody?

11  A.      Yeah, I think it was the

12  second time.

13  Q.      Okay.  Any department training

14  on how many times somebody should be

15  tased?  Do they give you any

16  instructions on, you know, once, more

17  than once?

18  A.      It all depends on the

19  circumstances, until the force is

20  overcome and the person's secured.

21  Q.      Okay.  Did you ever have any

22  training regarding how to deal with

23  somebody on these mental health

24  calls?  I mean, are they to be

25  treated differently than a normal

95

1    call?

2                    ATTORNEY DONAHOE:

3                    Are you saying is this

4             a mental health call, and is

5             there such a thing because you

6             have to lay a foundation for

7             that question.

8                    ATTORNEY CORRADO:

9                    Right.  I thought he

10            did earlier when he said that

11            he got a call that this was a

12            mental health call.

13   A.       I believe I said that, yeah.

14                   ATTORNEY DONAHOE:

15                   Okay.

16   BY ATTORNEY CORRADO:

17   Q.       Is there specific training on

18   how to deal with mental health calls?

19   A.       Well, I mean, nothing

20   specific.  I mean, your best judgment

21   on a case.  I mean, you want to try

22   to keep things as calm as possible

23   and, you know, try to ---.  You know,

24   I'm just there as an assistant to the

25   ambulance crew basically at that

96

1  point, so there's nothing as far as

2  me as the law enforcement just other

3  than keeping everybody safe and try

4  to get the individual the care he

5  needs.

6  Q.      Okay.  Was there an internal

7  investigation as a result of this

8  case?

9  A.      Yes.

10  Q.      And tell me about that.  You

11  provided an interview?  I'm assuming

12  you were interviewed?

13  A.      Yes.

14  Q.      Okay.  And you provided a

15  written statement?

16  A.      Yes.

17  Q.      Okay.  Can you tell me what

18  the results of the internal

19  investigation were?

20  A.      There was nothing.  Our

21  conduct was proper and there was

22  nothing in violation of any

23  department regulations.

24                  ATTORNEY CORRADO:

25                  Okay.  I think we're

97

1          going to take --- can we take

2          a quick break and just go

3          through my notes quickly to

4          see if I have any more

5          questions?

6    OFF VIDEO

7    SHORT BREAK TAKEN

8    ON VIDEO

9    BY ATTORNEY CORRADO:

10   Q.      Mr. Battestilli, you had

11   mentioned earlier that Timmy said

12   something to you.  He apologized, and

13   you responded that you had expected

14   this.  What did you mean by that?

15   A.      Just as agitated --- I mean,

16   as agitated as he was, he kept saying

17   he wanted to fight, he was going to

18   fight and we couldn't really talk him

19   down out of it.  He just wouldn't

20   respond, you know, to my comments to

21   him other than just kept repeating

22   the same thing over and over again.

23   So you're kind of waiting for

24   something like that where they're

25   going to explode at some point, you

98

1  know, because he wasn't calming down.

2  Q.      Did you call for backup at any

3  time?

4  A.      No.  We're the only car out so

5  there's --- it's me and Steve.

6  That's it.

7  Q.      Okay.  I just want to go back

8  to about that this was a mental

9  health call.  What percentage of

10  calls would you say, if you could

11  give me an estimate, are mental

12  health calls that you respond to over

13  the years or on a yearly basis?

14  A.      Oh, I have no idea.

15  Q.      Would you say half?

16  A.      No.

17  Q.      Less than half?

18  A.      Not that much, but they're

19  frequent.  I mean, you might not do

20  one for a month or two months and you

21  might get one weekend where you get

22  three or four.  I mean, it just ---.

23  Q.      And what sort of training do

24  they give you at all regarding mental

25  health calls?

99

1    A.      Well, I don't recall anything
2    specific related to that.  I mean,
3    we're mostly there just to assist the
4    ambulance service.  That's their
5    incident.  We're only called if
6    there's a problem or if they feel it
7    could be a violent individual just to
8    help keep them safe.
9    Q.      So you did not get any
10   training with the state police.  Did
11   you get any training in your prior
12   employment with either the Borough of
13   Punxsutawney or you had mentioned you
14   had been a corrections officer or in
15   the military at all?  Any mental
16   health training?
17   A.      We had people come in from
18   different agencies talking about
19   mental health, you know, cases and
20   things, but as far as actually
21   dealing with the people there, it's
22   your judgment basically on, you know,
23   try to keep them calm and keep them,
24   you know, --- build a rapport with
25   them, just stuff like that.

100

1   Q.      Okay.  And what about medical
2   training?  You had mentioned earlier
3   that with the state police, you had
4   been CPR certified.  Any training
5   regarding medical training with the
6   Borough of Punxsutawney or as a
7   corrections officer or with the
8   military?
9   A.      Well, the military in basic
10  training and also I attended Indiana
11  University of Pennsylvania Police
12  Academy there.  And you get basic
13  first-aid as first responder
14  training.
15  Q.      Okay.  And so when you say
16  first-aid, is that all first
17  responder training includes or is
18  that also the CPR and ---?
19  A.      All together.  It's the CPR,
20  you know, bleeding wounds, things
21  like that, you know, medical
22  emergencies.
23  Q.      Okay.  Did you know Mr.
24  Hooftallen had taken --- had anyone
25  told you he had had Crohn's disease?

101

1   A.      No.

2   Q.      You were not aware of that at

3   the time of the call?

4   A.      No.

5   Q.      Okay.  And you did not use

6   your baton at all during this

7   incident?

8   A.      No.

9   Q.      You did not use your pepper

10  spray at all during this incident?

11  A.      No.

12                  ATTORNEY CORRADO:

13                  I don't think I have

14          any further questions.  Thank

15          you for your time.

16  A.      Sure.

17  EXAMINATION

18  BY ATTORNEY DONAHOE:

19  Q.      Trooper, I just want to go

20  over a couple questions to, in my

21  mind, at least clarify one or two

22  items.  First of all, when you were

23  dispatched to this residence, had you

24  ever been there before?

25  A.      No.

102

1   Q.      Were you dispatched by a
2   Pennsylvania State Police
3   communications officer?
4   A.      Yes.
5   Q.      Did they receive the call from
6   911 and then dispatch you?
7   A.      Yes.
8   Q.      Does 911 dispatch the EMS
9   service?
10  A.      Yes.
11  Q.      All right.  Were you aware
12  that EMS was standing by when you
13  went to the scene?
14  A.      Yes.
15  Q.      All right.  You arrived.  And
16  would you describe Mr. Hooftallen,
17  Troy, who later died as being at some
18  point combative?
19  A.      Yes.
20  Q.      In that he was combative, does
21  that demeanor occur only in mental
22  health calls or can you --- can you
23  encounter combative persons when
24  there is no indication that it's a
25  mental health call?

                                                    103

1    A.        Well, yes.

2    Q.        All right.  Have you had some

3    years of experience dealing with

4    mental health calls?

5    A.        Yes.

6    Q.        All right.  Did you try to

7    calm the situation?

8    A.        Yes.

9    Q.        When you respond to a mental

10   health call, is there generally an

11   understanding that you do not want to

12   antagonize the person who's the

13   subject and you want to develop a

14   rapport with them?

15   A.        Yeah, I want them to basically

16   voluntarily go with the ambulance

17   crew for treatment.

18   Q.        Did you try to talk to Troy to

19   develop a rapport with him?

20   A.        Yes.

21   Q.        All right.  Did you know while

22   you were on the way to this call that

23   his brother had advised the dispatch

24   that he was not only large, six foot,

25   four, and I think over 200 pounds,

104

1   and according to his brother, he was
2   an expert in Kung Fu or Tae Kwan Do?
3   Were you aware of that?
4   A.      Yes.
5   Q.      When he was kicking you, were
6   you able to determine whether or not
7   these were kicks by someone who had
8   been trained as a martial arts
9   expert?
10  A.      No.
11                  ATTORNEY CORRADO:
12                  I don't recall any
13          testimony regarding that he
14          was kicked.
15                  ATTORNEY DONAHOE:
16                  Oh, kicking actually.
17  BY ATTORNEY CORRADO:
18  Q.      I don't know that you were
19  kicked either.  Did any of the kicks
20  land on you?
21  A.      No.  More a thrashing type
22  thing.  It wasn't an actual kick.
23  Q.      Sorry.  I'll withdraw that
24  point.  With respect to the Exhibit
25  Battestilli Number One, everybody has

105

1  a copy so I'm going to give that back

2  to Counsel and work from the copy

3  that I have that's not marked.  But

4  it's the same as Battestilli Number

5  One.

6  A.      Okay.

7              ATTORNEY CORRADO:

8              Okay.

9  BY ATTORNEY CORRADO:

10 Q.      I just don't understand a few

11 of the entries there.  This is called

12 a mobile unit log, radio dispatcher

13 log.  So is this kept by your PCO

14 officer?

15 A.      Yes.

16 Q.      All right.  And he's an

17 employee of the Pennsylvania State

18 Police?

19 A.      Yes.

20 Q.      This particular log is

21 particular to your patrol unit;

22 correct?

23 A.      Yes.

24 Q.      And your unit is ten?

25 A.      Right.

106

1   Q.      Who is driving, you or Steve?

2   A.      I was.

3   Q.      The initial MHR assist has a

4   time of 2322 across from it.  It's

5   CO1-1038588?

6   A.      Right.

7   Q.      The 2322, is that the time

8   that the dispatcher at the state

9   police radioed you to respond to this

10  location?

11  A.      Yes.

12  Q.      Is the out of service 2337 the

13  time when you arrived at the --- at

14  the residence?

15  A.      Yes.

16  Q.      The line two lines down has a

17  ditto mark, so they're referencing

18  CO1-1038589, Punxsy Emergency Room.

19  The out of service is 1219 a.m.  Is

20  that the time when you and Trooper

21  Johnson arrived at the Punxsy

22  emergency room?

23  A.      Yes.

24  Q.      Do you know how far of a drive

25  it is from the home where you had

107

1   encountered Mr. Hooftallen to the

2   Punxsy Emergency Room?

3   A.      It would be about seven or

4   eight miles.

5   Q.      Okay.  And you don't know the

6   time that it took you to drive there?

7   A.      No.

8   Q.      Okay.  Were you advised what

9   drugs Troy ingested that day?

10  A.      Just I was told the Mucinex DS

11  or DM, whatever.

12  Q.      And you were asked before but

13  I forget your answer.  Were you

14  advised whether it was prescription

15  or over-the-counter?

16  A.      No.

17  Q.      Were you advised whether this

18  was taken to get high?

19  A.      That was my understanding.

20  Q.      Okay.  Any other drugs that he

21  had taken that you were aware of that

22  day?

23  A.      No.

24                  ATTORNEY DONAHOE:

25                  I think that's all I

108

1          want, the questions I have.

2          Go ahead.

3                    ATTORNEY CORRADO:

4                    I just have one or two

5          follow-up questions.

6    RE-EXAMINATION

7    BY ATTORNEY CORRADO:

8    Q.        Referring back to Exhibit One,

9    ---

10   A.        Yes.

11   Q.        --- the first line says

12   1038588.  You have mentioned that was

13   an incident number?

14   A.        Yes.

15   Q.        Then below is 589.  This is

16   the same incident or ---?

17   A.        Yeah.  What they would have

18   done on here, the time's kind of odd

19   on this side.  The first number would

20   be our initial incident which would

21   be an assignment report only for the

22   mental health assistance.

23   Q.        Okay.

24   A.        I believe the second number,

25   I'd have to look at the reports,

                                                                    109

1    probably the incident he made of the

2    assault.    And I told him Trooper

3    Johnson had been assaulted by the

4    subject and he had been tasered.    So

5    he would have cut a different number

6    for that, an incident report for the

7    assault on both of us.

8    Q.       Okay.

9    A.       So that's that number.    And

10   then because normally they don't put

11   you in service until the completion

12   of the whole incident so I don't know

13   why he --- the numbers are in the

14   beginning.    He'd either leave it

15   blank where he has 207207.    It would

16   be just at the end or he'd have a

17   final in-service when you're done

18   with that whole incident.    So I mean,

19   it's a little odd that way.    I don't

20   know why they have it that way.

21   Q.       So do you provide them with

22   these time in and time out of

23   service?

24   A.       We call the radio.    We tell

25   them we've arrived.    They'll put the

110

1  in-service or he'll do the assigned

2  time when he assigned you the

3  incident.  And when we call the radio

4  and say we've arrived at the scene,

5  that will be our first out-of-service

6  time.

7  Q.     Right.

8  A.     And then when we're finished

9  with the incident, then he'll back

10  the back in service that we're

11  available for a call at that point.

12  Q.     But to put in the 2345 and the

13  2346, was that something then that

14  would be put in later?  How would he

15  know to put in 2345?

16  A.     That was probably when he cut

17  the other number for the assault and

18  put an assigned time for that.

19  Q.     And what are these blacked-out

20  numbers, if you know?  Is that an

21  address?

22  A.     I don't know.  I don't know

23  what was in there.

24  Q.     And the MHR assist, is that

25  mental health response?  Does MHR

111

1  stand for mental health response?

2  A.      The sheet they use to assign

3  stuff is MHR, mental health

4  retardation would be the code.

5  Q.      Okay.

6  A.      So it's MHR.

7  Q.      You had mentioned earlier that

8  you did not bring your radio in

9  because it was just one more thing

10  that you would have to carry.  Would

11  you normally bring your radio for a

12  mental health response?

13  A.      I don't normally carry my

14  portable radio unless I'm going to go

15  out in the woods or out away from any

16  communications.  So I just said I

17  don't like wearing mine on my belt.

18  Some guys have the holster on there

19  you can wear on your belt, but with

20  all the other stuff we have on, it's

21  uncomfortable to wear all night, so I

22  have it in a bag.  It's available for

23  me.  If I'm going to be away from the

24  car for any distance, then I'll take

25  the portable radio.

112

1    Q.      So you used your personal cell
2    phone in order to call the ambulance?
3    A.      Yes.  Well, to call our
4    dispatcher, yeah.
5    Q.      To call your dispatcher.  And
6    why did you exit or did Trooper
7    Johnson exit the home in order to
8    make the call to call for the
9    ambulance?  He did not make the call
10   at the scene?
11   A.      Yeah, I don't know if he left
12   the scene.  I don't recall if I went
13   out just the front.  When I made the
14   initial call, I think I went toward
15   the back door.  I don't think I went
16   outside, just in the hallway there
17   and told them what was going on.  And
18   I don't know where Steve --- if he
19   went out of the house or if he just
20   went back the hallway, too.  I'm not
21   sure.
22   Q.      Okay.  And is that the only
23   way to contact EMS?  Could you have
24   used your radio?
25   A.      No, we don't have radio

113

1   communication with the paramedics.

2   Q.      Okay.  So you would have used

3   your radio to contact ---

4   A.      Our dispatcher.

5   Q.      --- the dispatcher who would

6   then call ---?

7   A.      911 center and have them send

8   the ambulance.

9   Q.      Okay.  And why isn't the

10  ambulance at the home?

11  A.      They want to keep a safe

12  distance away if they're not sure

13  what's ---.  You know, when they get

14  a call like that, the person's

15  threatening violence, they don't know

16  if there's weapons involved or what's

17  the possibility there.  So they'll

18  find a location that's safe to get

19  away from the residence until we

20  arrive and secure the scene and we

21  tell them it's safe, that they can

22  bring the ambulance down.

23  Q.      Okay.  Would you agree that

24  seconds count many times in medical

25  emergencies?

114

1          ATTORNEY DONAHOE:

2               You know, let me just

3      say that's probably just a

4      doctor question.  So you're

5      asking him for an expert

6      opinion about such a general

7      thing?

8          ATTORNEY CORRADO:

9               Although he has

10     testified that he does have

11     medical training.

12         ATTORNEY DONAHOE:

13              But, I mean, seconds

14     count in what?  A heart

15     attack, baby dropped out of a

16     car?  I mean, what are you

17     talking about?  Crushed chest?

18     I mean, every medical

19     emergency presents a different

20     medical profile.  So seconds

21     count in a stroke as far as I

22     know, but I'm not a doctor.  I

23     don't think he is either.

24 BY ATTORNEY CORRADO:

25 Q.     Would it be fair to say that

115

1  seconds can count in a medical

2  emergency?

3                    ATTORNEY DONAHOE:

4                    Again, you know, put my

5            objection on the record.  You

6            can go ahead and try to answer

7            it.

8  A.        Yeah, depending.  Most mental

9  health incidents, I've never had one

10 where anybody had any serious

11 complications.  We called the

12 ambulance.  They're usually there

13 within a minute or two because

14 they're close enough in their staging

15 area.

16 BY ATTORNEY CORRADO:

17 Q.        Okay.  But you do know that

18 Timmy Hooftallen did call for medical

19 emergency?

20 A.        Yes.

21                   ATTORNEY CORRADO:

22                   Okay.  I think that's

23            all the questions we have.

24            Thank you so much.

25                   ATTORNEY DONAHOE:

116

1          That's all I have.

2     Thanks, Trooper.

3               VIDEOGRAPHER:

4          This deposition has

5     concluded.

6  OFF VIDEO

7               ATTORNEY DONAHOE:

8          Generally speaking, the

9     court reporter will tell you

10    that the transcript will be

11    prepared, and I will send you

12    a copy.  You can take a look

13    at it to see if there are any

14    typos.  If we don't send you

15    anything back in 30 days, it's

16    finalized; correct?

17  OFF RECORD DISCUSSION

18               ATTORNEY DONAHOE:

19          We won't waive.

20        *  *  *  *  *  *  *

21    VIDEOTAPED DEPOSITION CONCLUDED

22          AT 11:09 A.M.

23        *  *  *  *  *  *  *

24

25

117

1    COMMONWEALTH OF PENNSYLVANIA   )

2    COUNTY OF CLEARFIELD           )

3

4                      CERTIFICATE

5         I, Rhonda K. Thorpe, a Notary Public

6    in and for the Commonwealth of Pennsylvania, do

7    hereby certify:

8              That the witness whose testimony

9    appears in the foregoing deposition, was duly

10   sworn by me on said date and that the

11   transcribed deposition of said witness is a

12   true record of the testimony given by said

13   witness;

14             That the proceeding is herein recorded

15   fully and accurately;

16             That I am neither attorney nor counsel

17   for, nor related to any of the parties to the

18   action in which these depositions were taken,

19   and further that I am not a relative of any

20   attorney or counsel employed by the parties

21   hereto, or financially interested in this

22   action.

23

24   COMMONWEALTH OF PENNSYLVANIA
     NOTARIAL SEAL
     RHONDA K. THORPE, Notary Public         *Rhonda K. Thorpe*
     Clearfield, Clearfield County, PA       _____
25   My Commission Expires July 11, 2017      **Court Reporter**

# EXHIBIT D-6

# Transcript of 911 Call from Timothy Hooftallen to Franklin 911

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

| | | |
|---|---|---|
| INCIDENT NO.: | C01-1038589   Tim Hooftallen | DATE OF INTERVIEW: 12/03/10 |
| TRANSCRIBED BY: | A. Susan Buchheit (Clerk Typist 3) | PAGE 1 OF 6 |
| PROOFED BY: | Ruth A. Defelice TAM | |

LEGEND:

| | | | | |
|---|---|---|---|---|
| TH | Tim Hooftallen | | D1 | First 911 Dispatcher |
| D2 | Second 911 Dispatcher | | | |

D1   911 what's your emergency?

TH   Yeah, I need a ambulance or someone from the cops to come up here and pick up my brother. He's going crazy.

D1   Where is this at?

TH   Uh, 421 Seitz Lane Punxsutawney,

D1   421 what lane?

TH   Uh, Seitz, uh, it's Charles Seitz' farm

D1   S i g h t s?

TH   S i e r S i e r S e i t z (someone talking in the background) What address is this then?

D1   What's your name?

TH   (someone in background "27 Charlie Hill Lane") 27 Charlie Hill Lane is the address.

D1   27 Charlie Hill Lane?

TH   Yep

D1   Ok and what's, uh, 421 Seitz Lane? What's that?

TH   That's the address that we're at? It's a, it's like

D1   That's the address where you're at?

TH   Yeah, where he's at.

D1   That's where he's at?

TH   Yep, uh, and me, yeah

D1   Ok, and you're calling from 27 Charlie Hill Lane?

TH   Yep

D1   And he's at the 427 Seitz.  What's your name?

TH   Right, Tim

D1   Last name Tim?

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

INCIDENT NO.:    C01-1038589   Tim Hooftallen      DATE OF INTERVIEW: 12/03/10

TRANSCRIBED BY:   A. Susan Buchheit (Clerk Typist 3)     PAGE 2 OF 6

PROOFED BY:    Ruth A. Defelice TAM

| | |
|---|---|
| TH | Hooftallen |
| D1 | Can you tell that, spell that? |
| TH | H o o f t a l l e n and he's gonna be violent. |
| D1 | Is he acting violent right now? |
| TH | Yea |
| D1 | How old is he? |
| TH | Uh, 36 |
| D1 | 36? |
| TH | (someone talking in background "Alright, nobody wants them.") |
| D1 | Ok, what township's that in? Do you know? |
| TH | Um, Punxsutawney, er, uh, e, Gaskill. |
| D1 | It's in |
| TH | It's on Route 36, |
| D | Ok. And he's having just some psychological issues today? |
| TH | Oh yeah! Big time! |
| D1 | Ok, stay online with my partner, he's gonna ask you a few more questions for you. Ok? |
| TH | Are they on their way? |
| D2 | Yeah, uh, yeah we're gonna send the police, we're gonna send, uh, an ambulance standby till the State Police get there. Ok, sir? |
| TH | Yep |
| D2 | Ok, uh, does he have any weapons? |
| TH | He tried, uh, to kill himself about a month and a half ago. |
| D2 | Ok, right now does he have any weapons with him? Are there any weapons in the house? |
| TH | No, no weapons. |
| D | Ok, uh, and you're not there at this time? |
| TH | Yeah, I'm right here. I'm in the kitchen; he's in the living room. |
| D2 | Ok, so what address are you at right now? |
| TH | Uh, 23 Charlie Hill Lane |

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

INCIDENT NO.:  C01-1038589   Tim Hooftallen       DATE OF INTERVIEW: 12/03/10

TRANSCRIBED BY:  A. Susan Buchheit (Clerk Typist 3)   PAGE 3 OF 6

PROOFED BY:  Ruth A. Defelice TAM

D2   Ok, so

TH   Er 27, 27 Charlie Hill Lane

D2   Ok, so you're all at 27 Charlie Hill Lane?

TH   Yep.

D2   (Luke, they're all at 27 Charlie Hill Lane.)  Ok, what's the 427 Seitz Street then (someone in background saying Seitz Lane) Seitz Lane?

TH   That's, that's the, that's where all the post, mail boxes are.

D2   Ok, but he's at, he's with you right now at 23 Charlie Hill Lane?

TH   Yea

D2   Ok, he's, he's at that Charlie Hill Lane address.

TH   Yes

D2   Ok, sir, now, where's he at right now? (someone at 911 center in background - "Gaskill Township")

TH   On the couch.

D2   Ok, uh, ok, he is just being violent or is he threatening to hurt himself or anybody else?

TH   Uh, he doesn't plan on goin anywhere.

D2   Ok, but is, has he threatened any to hurt anybody?

TH   Nnn, well, he hasn't threatened anybody.

D2   Ok, has he, uh, threatened to hurt himself?

TH   Yea, he's, he's taken, has taken somethin. (sounds like might be crying)

D2   Ok, he's, he has taken somethin?

TH   Yea, some pills (sound of someone talking in background)

D2   Ok, so he is actively trying to kill himself?

TH   Well, he's not trying to kill himself he's just (someone yelling in background) trying to get high and

D2   Yeah, a

TH   gets all messed up.

D2   Ok

TH   Can you hear him?

ATTACHMENT: 2
PAGE 27 OF 54

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

INCIDENT NO.:    C01-1038589  Tim Hooftallen       DATE OF INTERVIEW: 12/03/10

TRANSCRIBED BY:   A. Susan Buchheit (Clerk Typist 3)    PAGE 4 OF 6

PROOFED BY:     Ruth A. Defelice TAM

D2    Yeah, I, I can hear him

(sound of someone hollering in background).

D2    Uh, do you think this is an overdose?

TH    Um, it could be. I don't know how much he took.

D2    Ok, sir. Alrighty, uh,

(more loud talking in background "it's coming down")

D2    ok, is he completely alert and awake?

TH    Yeah

D2    Ok.

TH    He's poundin his fist right now. (A women's voice saying "Enough!")

D2    Ok

TH    He's ready to fight.

D2    Ok, sir. Is he breathing normally?

TH    You gotta get someone here quick!

D2    Ok, can, can you get everybody out of the house if you have to?

(Loud talking in background. "The kids are trying to sleep.")

TH    Well, the kids are sleepin.

D2    Well, I, I understand that sir, but we don't want him hurtin anybody especially the kids. Ok?

TH    He aint gonna hurt the kids, he's, he's just, he's just beatin up on himself.

D2    Ok. Alright sir, uh

TH    And I, I can't get him out of the house, I already tried.

D2    Ok, sir, my partner is sending the help, like I said, they're gonna be sending the State Police. The ambulance will be staging until the State Police can take care of him.

TH    Yea

D2    And subdue him or do whatever they need to do to get him to calm down. So the ambulance will be standing by, uh, just up the street. Uh, keep an eye on him.

TH    Ok

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

INCIDENT NO.:    C01-1038589   Tim Hooftallen         DATE OF INTERVIEW: 12/03/10

TRANSCRIBED BY:   A. Susan Buchheit (Clerk Typist 3)     PAGE 5 OF 6

PROOFED BY:     Ruth A. Defelice TAM

D2    Ok, like I say, I mean, just, just watch him I've, you don't have to get physical with him

       unless you have to defend yourself or anything like that. Ok?

(Person making loud roar like noises in the background)

TH    Right

D2    Ok, uh, do you want me to hang up or do you want to stay on the line?

TH    Um, it don't matter. (Someone in the background saying "Ma, leave that on!")

D2    ??

TH    (Someone in background asking "Who are you on the phone with?) If, if you want tell, tell

       whoever's comin that the, I have the headlights on, on my jeep,

D2    Ok

TH    the porch lights on.

D2    Ok

TH    And (Someone asking in background "Who are you talking to?") – (TH - ??? I'm on, I'm,

       I'm on the phone with my ???.) (Person in background "Who are you, who are you on the

       phone with?")

D2    Ok, alright, we do have, we do have the State Police in route at this time. Ok?

TH    Ok

D2    Ok, do you want to stay on the line? Do you want me to stay on the line or do you, do you

       feel comfortable?

TH    Yeah, just in case, just in case something happens, yeah.

D2    Ok, sir.  Ok, how, how big is this guy?

TH    Uh, he's, uh 6'4" and he can,

D2    He's 6'4"?

TH    yeah, he can fight. He went to, uh, karate and kung fu and all that shit, so. So, uh,

D2    Ok, your address, just to verify it one more time – it's 27 Charlie Hill Lane

TH    Yeah

D2    Yeah, 27, ok, sir

TH    But, I'm at, I'm at house, uh, it seems like a apartment complex

D2    Um hum

# PENNSYLVANIA STATE POLICE
## TRANSCRIPTION

INCIDENT NO.:    C01-1038589   Tim Hooftallen       DATE OF INTERVIEW: 12/03/10

TRANSCRIBED BY:   A. Susan Buchheit (Clerk Typist 3)     PAGE 6 OF 6

PROOFED BY:    Ruth A. Defelice TAM

| | |
|---|---|
| TH | I mean there's like a whole bunch of, uh, he, he rents out to us. There's a whole bunch of houses on this property, it's like a farm house. |
| D2 | Ok, but your jeep's sitting out in front of the house they need to report to right? |
| TH | Yep, my jeep's sittin out front of the house, |
| D2 | Right |
| TH | um, my headlights are on, uh, they ride up, uh, 36, Route 36, um, I'm standin right in front of my jeep, and they'll be able to see me. |

(Someone from 911 center "27 Charlie Hill Lane")

| | |
|---|---|
| TH | But, uh, and just so you know, that, heee, thhhh, to let them know that he is a, he is one hell of a fuckin scrapper and |
| D2 | Ok |
| TH | he doesn't plan on goin anywhere. |
| D2 | Ok, sir, alright |
| TH | But he has, there's no weapons or anything. |
| D2 | Ok, sir. Alrighty, uh, I'm gonna go ahead and disconnect, uh, you can call 911 back, ok if, if anything should change, you call us back here at 911 ok? And that way we can let the State Police know. |
| TH | Ok |
| D2 | Alrighty |
| TH | Alright, thank you. |
| D2 | Ok |
| TH | Bye |
| D2 | Bye, bye |

# EXHIBIT D-7

# Toxicology Report for Troy Hooftallen

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
## FORENSIC LABORATORY DIVISION

*1-28-11*

### TOXICOLOGY SECTION REPORT

**Laboratory Case No** 10LAB09753  **Report # 1**      **Pathology Case No:** 10COR06862      **Date:** January 27, 2011

**Deceased Name: Troy Hooftallen**

**Autopsy Prosector:** Todd Luckasevic      **Blood Drawn By:** J. Pietrzak      **Date of Autopsy** 10/21/2010

## Specimen(s) Submitted:

**By:  M .GLOWACKI**                          **Received By:**  Erin Mullen

**Date Submitted:** 10/21/2010                **Time:**  8:55 am

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 4 | 1 | 0-10 mL Yellow top tube evidence classified as CORE Urine | 12 mL |
| 5 | 1 | 0-10 mL Lavender top tube evidence classified as CORE Blood | 6 mL |
| 6 | 1 | 0-10 mL Lavender top tube evidence classified as CORE Blood | 6 mL |
| 7 | 1 | 0-10 mL Red top tube evidence classified as CORE Blood | 10 mL |
| 8 | 1 | 0-10 mL Red top tube evidence classified as CORE Blood | 9 mL |
| 9 | 1 | 0-10 mL Gray top tube evidence classified as CORE Blood | 6 mL |
| 10 | 1 | 0-10 mL Gray top tube evidence classified as CORE Blood | 6 mL |
| 15 | 1 | 0-10 mL Gray top tube evidence classified as CORE Blood | 6 mL |

**By:  Jacob Pietrzak**                          **Received By:**  Lona A. Daley

**Date Submitted:** 10/21/2010                **Time:**  2:24 pm

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 24 | 1 | 0-10 mL Green with yellow ring tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; 0400 |
| 28 | 1 | 0-10 mL Blue top tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; 0400 |
| 30 | 1 | 0-10 mL Gray top tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; 0400 |
| 31 | 1 | 0-10 mL Lavender top tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; 0400 |
| 33 | 1 | 0-10 mL Plastic tube evidence classified as Hospital Urine | 3 mL; 10/19/2010; 0417 |

**By:  Curtis Williams**                          **Received By:**  Erin Mullen

**Date Submitted:** 10/25/2010                **Time:**  12:52 pm

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 38 | 1 | 0-10 mL Lavender top tube evidence classified as Hospital Blood | 3 mL; 10/19/2010; 0400 |

## Laboratory Findings:

**4 - CORE Urine**

    **GC Headspace**

        Alcohol                          Not Detected

    **GC/MS**

        Dextromethorphan                          POS

**5 - CORE Blood**

    **GC Headspace**

        Whole Blood Alcohol                          Not Detected

BOYLELIT000273

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
# FORENSIC LABORATORY DIVISION

TOXICOLOGY SECTION REPORT

**Laboratory Case No** 10LAB09753  **Report # 1**     **Pathology Case No:** 10COR06862          **Date:** January 27, 2011

## Deceased Name: Troy  Hooftallen

| Autopsy Prosector: Todd Luckasevic | Blood Drawn By: J. Pietrzak | Date of Autopsy  10/21/2010 |
|---|---|---|

**5 - CORE Blood**

   **ELISA**

| | |
|---|---|
| Benzodiazepines | Not Detected |
| Cocaine metabolite | Not Detected |
| Opiates | Not Detected |
| Oxycodone | Not Detected |
| Fentanyl | Not Detected |

**6 - CORE Blood**

   **GC/MS**

| | |
|---|---|
| Dextromethorphan | POS |

**7 - CORE Blood**

   **Colorimetry**

| | |
|---|---|
| Salicylates | Not Detected |

**9 - CORE Blood**

   **GC**

| | |
|---|---|
| Dextromethorphan | 211 ng/mL |

**10 - CORE Blood**

   **HPLC**

| | |
|---|---|
| Sertraline | Not Detected |
| Norsertraline | Not Detected |

**15 - CORE Blood**

   **GC**

| | |
|---|---|
| Dextromethorphan | POS |
| Methamphetamine | Not Detected |
| Amphetamine | Not Detected |

**24 - Hospital Blood**

   **ELISA**

| | |
|---|---|
| Benzodiazepines | Not Detected |
| Cocaine metabolite | Not Detected |
| Opiates | Not Detected |
| Oxycodone | Not Detected |
| Fentanyl | Not Detected |

BOYLELIT000274

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER
# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
## FORENSIC LABORATORY DIVISION
TOXICOLOGY SECTION REPORT

Laboratory Case No 10LAB09753  Report # 1       Pathology Case No: 10COR06862          Date:  January 27, 2011

**Deceased Name: Troy  Hooftallen**

**Autopsy Prosector:** Todd Luckasevic        **Blood Drawn By:** J. Pietrzak        **Date of Autopsy**  10/21/2010

## 28 - Hospital Blood
### GC Headspace

| | |
|---|---|
| Whole Blood Alcohol | Not Detected |

### HPLC

| | |
|---|---|
| Sertraline | Not Detected |
| Norsertraline | Not Detected |

## 30 - Hospital Blood
### GC

| | |
|---|---|
| Dextromethorphan | 849 ng/mL |

## 31 - Hospital Blood
### GC

| | |
|---|---|
| Dextromethorphan | POS |
| Methamphetamine | Not Detected |
| Amphetamine | Not Detected |

## 33 - Hospital Urine
### GC Headspace

| | |
|---|---|
| Alcohol | Not Detected |

### ELISA

| | |
|---|---|
| Barbiturates | Not Detected |
| Methadone | Not Detected |
| Propoxyphene | Not Detected |
| Methamphetamine | Not Detected |
| Amphetamine | Not Detected |
| Carisoprodol | Not Detected |

### GC

| | |
|---|---|
| Dextromethorphan | POS |
| Methamphetamine | Not Detected |
| Amphetamine | Not Detected |

### GC/MS

| | |
|---|---|
| Dextromethorphan | POS |

## 38 - Hospital Blood

BOYLELIT000275

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER
# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
## FORENSIC LABORATORY DIVISION
TOXICOLOGY SECTION REPORT

Laboratory Case No 10LAB09753  Report # 1     Pathology Case No:10COR06862      Date: January 27, 2011

**Deceased Name: Troy  Hooftallen**

Autopsy Prosector: Todd Luckasevic     Blood Drawn By: J. Pietrzak     Date of Autopsy  10/21/2010

**38 - Hospital Blood**

 **ELISA**

| | |
|---|---|
| Benzodiazepines | Not Detected |
| Cocaine metabolite | Not Detected |
| Opiates | Not Detected |
| Oxycodone | Not Detected |
| Fentanyl | Not Detected |
| Barbiturates | Not Detected |
| Methadone | Not Detected |
| Propoxyphene | Not Detected |
| Methamphetamine | Not Detected |
| Amphetamine | * See comment below |
| Carisoprodol | Not Detected |

\* Result indicates that further testing is required. Refer to quantitation above for final result.

GC/MS screen may reveal presence of drugs not reported. Only those results confirmed and/or quantified are reported.

Katrina M. Lindauer
Scientist

**BOYLELIT000276**

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
# FORENSIC LABORATORY DIVISION

*2.14-11*

**Laboratory Case No:** 10LAB09753  **Report # 2**      **Pathology Case No:** 10COR06862      **Date:** February 14, 2011

**Deceased Name: Troy  Hooftallen**

**Autopsy Prosector:** Todd Luckasevic        **Blood Drawn By:** J. Pietrzak        **Date of Autopsy:** 10/21/2010

## Specimen(s) Submitted·

**By:  Jacob Pietrzak**                                            A. Daley

**Date Submitted:** 10/21/2010

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 24 | 1 | 0-10 mL Green with ye Hospital Blood | L; 10/19/2010; 0400 |
| 25 | 1 | 0-10 mL Green with yel Hospital Blood | ; 10/19/2010; 1145 |
| 26 | 1 | 0-10 mL Green with yel Hospital Blood | ; 10/19/2010; 1010 |
| 27 | 1 | 0-10 mL Green with yell Hospital Blood | ; 10/19/2010; 0400 |
| 28 | 1 | 0-10 mL Blue top tube e | ; 10/19/2010; 0400 |
| 29 | 1 | 0-10 mL Lavender top tt Blood | ; 10/19/2010; 1010 |
| 30 | 1 | 0-10 mL Gray top tube e | ; 10/19/2010; 0400 |
| 31 | 1 | 0-10 mL Lavender top tu Blood | 2 mL; 10/19/2010; 0400 |
| 32 | 1 | 0-10 mL Blue top tube evidence classified as Hospital Blood | 4 mL; 10/19/2010; 1345 |
| 33 | 1 | 0-10 mL Plastic tube evidence classified as Hospital Urine | 3 mL; 10/19/2010; 0417 |
| 34 | 1 | 0-10 mL Plastic tube evidence classified as Hospital Urine | 6 mL; 10/19/2010; 0815 |

*(handwritten annotations over center of form:)*
Robo t.pny
therapeutic Dextro
1.8 ng/ml
1-8 ng/ml
tox: 506 - 1200
lethal: 3300 - 9200

*(Avapro irbesartan advertisement text partially visible:)* As soon as pregnancy is detected, discontinue AVAPRO. Please see Indications and Important Safety Information on cube and accompanying full Prescribing Information, including boxed WARNING regarding use in Pregnancy.

**By:  Brittany Harmon**                              **Received By:**  Lona A. Daley

**Date Submitted:** 10/22/2010                     **Time:**  8:25 am

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 36 | 1 | 0-10 mL Green top tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; no time |
| 37 | 1 | 0-10 mL Green top tube evidence classified as Hospital Blood | 2 mL; 10/19/2010; no time |

**By:  Curtis Williams**                              **Received By:**  Erin Mullen

**Date Submitted:** 10/25/2010                     **Time:**  12:52 pm

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 38 | 1 | 0-10 mL Lavender top tube evidence classified as Hospital Blood | 3 mL; 10/19/2010; 0400 |

## Laboratory Findings:

**38 - Hospital Blood**

Guaifenesin                          * Refer to report from NMS

BOYLELIT000277

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
## FORENSIC LABORATORY DIVISION

Laboratory Case No: 10LAB09753  Report # 2        Pathology Case No: 10COR06862        **Date:** February 14, 2011

**Deceased Name: Troy Hooftallen**

**Autopsy Prosector:** Todd Luckasevic        **Blood Drawn By:** J. Pietrzak        **Date of Autopsy:** 10/21/2010

*Jennifer Janssen*

Jennifer K. Janssen
Assistant Chief Toxicologist

Report Page 2 of 2

**BOYLELIT000278**

 **NMS** **LABS**

**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**   02/07/2011 23:01

| | |
|---|---|
| **Patient Name** | HOOFTALLEN, TROY |
| **Patient ID** | 10LAB09753 |
| **Chain** | 11258642 |
| **Age** | Not Given |
| **Gender** | Male |
| **Workorder** | 11030662 |

**Page 1 of 2**

To:  **10020**
Allegheny Coroner's Forensic Division Labs.
Attn: Robert Huston
1520 Penn Ave
Pittsburgh, PA  15222

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Guaifenesin | 12 | mcg/mL | Hospital Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 2185B | Guaifenesin, Blood |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Lavender Vial | 2.2 mL | Not Given | Hospital Blood | |

All sample volumes/weights are approximations.
Specimens received on 02/05/2011.

v.7

**BOYLELIT000279**

 **NMS** LABS

CONFIDENTIAL

| Workorder | 11030662 |
| Chain | 11258642 |
| Patient ID | 10LAB09753 |

**Page 2 of 2**

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Guaifenesin | 12 | mcg/mL | 0.40 | 001 - Hospital Blood | HPLC |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

**Reference Comments:**

1. Guaifenesin (Glyceryl Guaiacolate) - Hospital Blood:

    Guaifenesin is extensively used as an expectorant and is available in numerous over-the-counter medications. It is usually in combination with decongestants, antihistamines and antitussives. Guaifenesin is also a metabolite of Methocarbamol, a skeletal muscle relaxant.

    Following a single 600 mg oral dose, peak blood concentrations averaged 1.4 mcg/mL at 15 minutes post-dose. The half-life of guaifenesin in blood is 60 minutes.

Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

**Analysis Summary and Reporting Limits:**

Acode 2185B - Guaifenesin, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography (HPLC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Guaifenesin | 0.40 mcg/mL | | |

v.7

**BOYLELIT000280**

# EXHIBIT D-8

# Jefferson County 911 Incident Report

Report Date:  10/25/2010 10:16:45

Report Period
YTD

# JEFFERSON COUNTY, PA - 9-1-1

## Incident Report

### For Incident Number 1010000697

| Incident# | Incident Type | Disp Type | Date & Time of Call | Queue Date & Time | Complete Date & Time | Originating Dispatcher | Completing |
|---|---|---|---|---|---|---|---|
| 1010000697 | Psychiatric Emergency BLS | 3000 | 10/18/2010 23:19:50 | 10/18/2010 23:20:01 | 10/19/2010 01:14:25 | LMCCRACKEN | LMCCRACKEN |

| ESN | EMS Box | Beat | Box | Priority | Call Origination | Originating Incident # | Ending Disposition | Originating CAD ID | Completing CAD ID |
|---|---|---|---|---|---|---|---|---|---|
| 50 | 20 | 50 | 1705 | 0 | 911 Call | 1010000697 | Call Complete | 0 | 2 |

| Reporting Party | | | | Incident Location | | | | |
|---|---|---|---|---|---|---|---|---|
| **First Name** TIM | **Last Name** HOOFTALLEN | **Phone Number** 814-249-1287 | **DOB** 1/1/9999 | **Cross Left** | **Cross Right** | **Latitude** -78.878723144531 3 | **Longitude** 40.9249458312988 | |
| **Location** | | **Community** | **ST** PA | **Location** 27 | CHARLEY HILL   LN | **Community** GASKILL | **ST** PA | |

**Reporting Party Notes**

=====Required Agencys=====
X PSP Punxsutawney
=====Required Agencys=====
X PSP Punxsutawney
=====Required Agencys=====
X PSP Punxsutawney

**TDD Info**

**Comments**

36 Y/O MALE PT  LMCCRACKEN 10/18/2010 23:26:52
CALLER ADVISED PT WILL BECOME COMBATIVE LMCCRACKEN 10/18/2010 23:27:04
CALLED PSP PUNXSY PCO MCGEE GAVE HIM THE INFO AND LOCATION AND CALLER INFO HE ADVISED HE WILL CALL HIM AND ASK IF WE WERE GOING TO
DISCONNECT WITH THE CALLER AND THEN HUNG UP BEFORE I COULD GET AN ETA  LMCCRACKEN 10/18/2010 23:31:38
Comments added by: TVERNE terminal: 3
EMD    25-A-1    NON-SUICIDAL AND ALERT   DID TAKE PILLS UNK. HOW MANY   IS BEING VIOLENT TO HIMSELF. WILL FIGHT WITH PERSONAL WHO SHOWS UP, HAS
MARSHALL ART TRAINING. 10-18-2010 23:31:49
RESCUE PUMPER 17 IS AT THE STAGGING POINT LMCCRACKEN 10/18/2010 23:37:56

CALLED PSP PUNXY SPOKE TO PCO MCGEE ADVISED HIM OF THE ABOVE INFO. TVERNE 10-18-2010 23:40:37
MEDIC 53 IS AT STAGGING LMCCRACKEN 10/18/2010 23:41:56
PER PCO MCGEE SEND EMS IN LMCCRACKEN 10/18/2010 23:52:47
PSP PUNXY CALLED ADVISED PT. MAY HAVE STOPPED BREATHING TVERNE 10-18-2010 23:54:42

| Unit name | Incident# | Report No. | Date/Time | Status | Start Mi | End Mi | Term ID | User ID | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Station17 | 1010000697 | | 10/18/2010 23:23:59 | DS | | | 2 | LMCCRACKEN | |
| Amb50 | 1010000697 | | 10/18/2010 23:23:59 | DS | | | 2 | LMCCRACKEN | |
| PSPPunxsy4 | 1010000697 | | 10/18/2010 23:24:00 | DS | | | 2 | LMCCRACKEN | |
| Amb50 | 1010000697 | | 10/18/2010 23:25:44 | EK | | | 2 | LMCCRACKEN | |
| Dep17 | 1010000697 | | 10/18/2010 23:28:32 | DS | | | 2 | LMCCRACKEN | |

ATTACHMENT:
PAGE __26__ OF __27__

Case 2:12-cv-01500-CB   Document 64-1   Filed 10/10/14   Page 684 of 684

# JEFFERSON COUNTY, PA - 9-1-1
## Incident Report
### For Incident Number 1010000697

| | | | | | |
|---|---|---|---|---|---|
| Dep17 | 1010000697 | 10/18/2010 23:28:34 | ER | 2 | LMCCRACKEN |
| Station17 | 1010000697 | 10/18/2010 23:28:35 | EK | 2 | LMCCRACKEN |
| PSPPunxsy4 | 1010000697 | 10/18/2010 23:28:37 | EK | 2 | LMCCRACKEN |
| Medic53 | 1010000697 | 10/18/2010 23:29:36 | DS | 2 | LMCCRACKEN |
| Medic53 | 1010000697 | 10/18/2010 23:29:38 | ER | 2 | LMCCRACKEN |
| Amb50 | 1010000697 | 10/18/2010 23:29:39 | AV | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/18/2010 23:30:17 | DS | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/18/2010 23:30:18 | ER | 2 | LMCCRACKEN |
| Station17 | 1010000697 | 10/18/2010 23:30:20 | AV | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/18/2010 23:38:21 | AC | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/18/2010 23:38:23 | AC | 3 | TVERNE |
| ResPump17 | 1010000697 | 10/18/2010 23:38:32 | DS | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/18/2010 23:38:33 | ER | 2 | LMCCRACKEN |
| Medic53 | 1010000697 | 10/18/2010 23:53:18 | OS | 2 | LMCCRACKEN |
| ResPump17 | 1010000697 | 10/19/2010 00:10:33 | AV | 2 | LMCCRACKEN |
| Dep17 | 1010000697 | 10/19/2010 00:10:34 | AV | 2 | LMCCRACKEN |
| Medic53 | 1010000697 | 10/19/2010 00:13:27 | EH | 2 | LMCCRACKEN |
| PSPPunxsy4 | 1010000697 | 10/19/2010 01:14:25 | AV | 2 | LMCCRACKEN |
| Medic53 | 1010000697 | 10/19/2010 01:14:26 | AV | 2 | LMCCRACKEN |

ATTACHMENT:
PAGE 22 OF 54