# Exhibit 2

**R. PAUL McCAULEY, Ph.D., FACFE**
*Criminologist*
4620 Lucerne Road
Indiana, Pennsylvania 15701

Telephone:
724-349-9676
Fax:
724-349-6477

June 13, 2014

Dennis E. Boyle, Esquire
Boyle Litigation
4660 Trindle Road, Suite 102
Camp Hill, PA 17011

> Re:   Barbara J. Wingard et al. v. John Doe 1, et al.   In
> the United States District Court for the Western
> District of Pennsylvania
> Civil Action No.:  2:12-cv-01500 Judge Cathy Bisson

Dear Mr. Boyle:

Please accept this letter as my report for the above-referenced case.  I reserve the right to amend/supplement this report should additional information become available.

## I.    QUALIFICATIONS

I am Professor Emeritus of Criminology and former Chairperson of the Department of Criminology, Indiana University of Pennsylvania (IUP).  The University is a comprehensive, doctoral degree granting institution with an approximate enrollment of 15,000 students.  The Department of Criminology offers bachelors, masters, and doctorate degrees and has about 1,000 criminology majors.  I taught and conducted research at all academic/degree levels.

I am a former Pennsylvania municipal police officer and in that capacity I engaged in the arrest, handcuffing, transportation and processing of individuals.  For more than twenty-five of my 30 plus year career, I have been a state certified police instructor in Pennsylvania, Kentucky, and Florida.  In my academic duties, as well as in my police training duties, I taught the policies and procedures of police operations.  Also, I have written or published more than 80 professional papers, books, chapters, and technical reports, many of which address the issues concerning police administration, operations, and policies.

For almost ten years I was a member of the faculty of the Southern Police Institute, School of Police Administration, University of Louisville.  In that position I lectured to more

than 1,500 police commanders from across the United States, including command officers of the Pennsylvania State Police, in the area of police operational policy formulation, which included police use of force.  More than 300 of these student officers have become police chiefs.  Also, I have received numerous letters and commendations from police executives for my work and contributions to their agencies.

In 1987, I was a Fulbright Scholar, Australia, lecturing to university faculties of law, justice studies, business, and police commanders, and security directors.  My lecture area was the relationship/interaction between public police and private security in the prevention of crime.

I hold the designation Fellow American College of Forensic Examiners and have been qualified as a police expert in state and federal courts in more than 30 states, including United States District Courts of Pennsylvania (three Districts).  In 1984, I was one of two finalists interviewed for the position of Commissioner of the Pennsylvania State Police.  The Pennsylvania State House of Representatives issued a formal citation recognizing my career and contributions to law enforcement.

Additional information is provided in my curriculum vitae, which is enclosed.

## II.   INTRODUCTION

I was retained by Boyle Litigation, to review the case material and render a professional opinion regarding the police operations and conduct at approximately 11:30 p.m. on Monday, October 18, 2010 involving the above-referenced parties.  My $3,500.00 retainer/minimum to which I bill at an hourly rate of $350.00 was paid in advance of my rendering any analysis or opinion and payment was not contingent upon my rendering a favorable opinion.

## III. METHODOLOGY

My examination and analysis of this matter are based on generally accepted qualitative methodologies commonly used in the social sciences.  These techniques include comparative analysis, ethnography/description, content analysis, and case study in assessing compliance with and deviations from accepted police operational and managerial practices.

This report is being offered as an expert forensic report for the purpose of this litigation.  It is based on the best practices of police/law enforcement management and operations and the information provided in the above-listed materials.

## IV.  MATERIALS REVIEWED

In the preparation of this report I have reviewed the following materials, which are commonly examined in my profession and discipline in rendering professional/expert opinions:

1. Complaint in this matter;
2. Amended Complaint in this matter;
3. Motion to Dismiss;
4. Brief of Co-Defendant's Commonwealth of Pennsylvania and Pennsylvania State Police in Support of Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6);
5. Brief in Opposition to Defendants' Commonwealth of Pennsylvania and Pennsylvania State Police Motion to Dismiss;
6. Report and Recommendation;
7. Medical Records from Alleghany General Hospital;
8. Medical Records from Jefferson County EMS;
9. Medical Records from Martin Chambers, M.D.;
10. Medical Records from Punxsutawney Area Hospital;
11. Allegheny County Medical Examiner's Autopsy Report, along with a CD containing all of the photos taken at the autopsy;
12. Expert report and documents from Cyril Wecht, a forensic pathologist;
13. Deposition transcript of Barbara Jean Wyngard;
14. Defendant Taser International Inc.'s Answers to Plaintiff's Interrogatories, Supplemental Disclosure Statement, and Second Supplemental Disclosure;
15. Defendant Pennsylvania State Police's Response to Plaintiff's Interrogatories;
16. Discovery responses and documents provided by the Plaintiff, which includes Affidavits of Kim Hall, Tim Hooftallen, and Barbara Wyngard;
17. Initial Disclosures of Plaintiff Pursuant to Rule 26(a) of the Federal Rules of Civil Procedure;
18. Defendant Johnson's Response to Plaintiff's

Interrogatories;
19. Defendant Johnson's Response to Plaintiff's First Set
    of Interrogatories Directed to Commonwealth Defendants;
20. Defendant Battestilli's Response to Plaintiff's
    Interrogatories;
21. Plaintiffs' Objections and Answers to Defendant Taser
    International Inc.'s First Set of Interrogatories to
    Plaintiffs;
22. Plaintiffs' Objections and Answers to Defendant Taser
    International Inc.'s First Request for Production of
    Documents to Plaintiff;
23. Plaintiffs' Objections and Answers to Defendant Taser
    International Inc.'s Second Request for Production of
    Documents to Plaintiff;
24. Plaintiffs' Objections and Answers to Defendant Taser
    International Inc.'s Third Request for Production of
    Documents to Plaintiff;
25. FR 9-1 ELECTRONIC CONTROL DEVICES (ECD), 9/23/2009;
26. FR 7-3 USE OF FORCE, 9/23/09;
27. FR 7-2 PRISONER SECURITY AND TRANSPORTATION, 9/8/2010;
28. AR 5-7 FIRST AID, EMERGENCY RESPONSE, CPR AND AED
    PROGRAMS, 12/11/2009.

## V.   SUMMARY OF FACTS

**The plaintiff's civil complaint** states that Troy Hooftallen was
having a reaction to his medication and at 11:20 p.m. a family
member called 911 for an ambulance.  Two Pennsylvania State
Police (PSP) Troopers (Tpr.) Battestilli and Johnson were
dispatched and arrived at the residence before the ambulance.
The troopers were advised that Mr. Hooftallen was "kind of
messed up," was not violent but did not want to go to the
hospital and he attempted suicide a few weeks earlier.

The troopers found Mr. Hooftallen sitting on a sofa smoking a
cigarette.  The troopers teased and taunted Mr. Hooftallen until
he took a swing at one of the troopers who responded by
physically pressing his face into the sofa cushions.  Trp.
Battestilli Tasered (probe mode) Mr. Hooftallen in the upper
back for 7 seconds and subsequently energized the Taser (drive
stun mode) three times for 4 seconds, 6 seconds and 5 seconds
for a total Taser exposure of 22 seconds.  In addition, one or
both of the troopers put a knee on Mr. Hooftallen's neck,
throat, and in the middle of his back between his shoulder
blades and pressed on his back at which time Mr. Hooftallen said

"Ok, ok, I's done – I'm done."  At this point Mr. Hooftallen was handcuffed.  However, while and/or after being handcuffed a trooper continued to kneel of his throat/neck and back.  After being handcuffed but before being leg shackled Trp. Battestilli Tasered (drive stun mode) at least three more times.  Trp. Johnson was present and took no action.  At this point Mr. Hooftallen became still and quiet and was dragged to the middle of the floor where he remained handcuffed and shackled and on his stomach and a trooper placed a knee on Mr. Hooftallen's neck and throat and the other knee of his back.  A trooper acknowledged Mr. Hooftallen was unconscious and also summoned an ambulance.  The troopers did not attempt CPR but discovered he was in respiratory and cardiac arrest and again requested an ambulance which arrived approximately 10 minutes later.  At the request of medical personnel the troopers removed the handcuffs and shackles and CPR was initiated and the patient/Mr. Hooftallen was transported to the hospital.  On October 19, 2010, at 5:47 p.m., Mr. Hooftallen was pronounced dead.

**Kimberly Hall** states in her sworn affidavit she is a friend of the decedent.  When the two troopers arrived at the house they had a dialog/verbal exchange with Mr. Hooftallem.  The troopers did not seem to be interested in trying to calm down Mr. Hooftallen and Trp. Battestilli had a major attitude and seemed like he wanted to kick Troy's ass.  At some point Mr. Hooftallen took a swing at the troopers but no contact was made.  The troopers tackled him and pushed his face down on the couch while his knees were on the floor and his hands under him.  The troopers were saying "don't resist."  Mr. Hooftallen's hands were under his body and Trp. Battestilli tried to Taser him but he could not because Mr. Hooftallen was wearing two shirts.  The other trooper lifted the shirts and Trp. Battestilli Tasered him and he screamed.  The trooper then held the Taser against Mr. Hooftallen at least three more times.  Mr. Hooftallen was on the couch during the Taserings and then put his hands behind his back and was handcuffed.

The troopers pulled him off of the couch and onto the floor on his back.  While handcuffed on the floor Ms. Hall believes he was Tasered again for moving his legs.  The older trooper put his knee of Mr. Hooftallen's chest while Trp. Battestilli went for shackles.  It was determined that Mr. Hooftallen was not breathing and they shacked him, and did not help him.  Troopers requested an ambulance and when paramedics asked the troopers to remove the handcuffs and shackles they complied.

**Tim Hooftallen,** (died February 1, 2013) decedent's brother states in his sworn affidavit that he called 911 and told the operator his brother was 6'4", took too many medications and was "messed up," knew Kung Fu, and probably would not go willingly. The 911 operator told him an ambulance and police were on the way. When the tropoers arrived he told them his brother was "messed up" on Mucinex for Crohn's disease and he was not violent but did not want to go anywhere. Mr. Hooftallen and the trooper(s) had a verbal exchange the trooper(s) had sarcastic voice, cocky tone, really cocky. Tim Hooftallen thought the way the cops were talking to Mr. Hooftallen and provoking him, it started to make Mr. Hooftallen mad. Mr. Hooftallen told them to get out of his M---F---ing house and took a swing at, but missed, the troopers. The troopers tackled Mr. Hooftallen and took him down onto the couch.

A trooper pulled his Taser but it would not work because Mr. Hooftallen had on two shirts. The other trooper pulled up the shirts and he was Tasered, and while he was being Tasered he was handcuffed. The trooper with the Taser had his knee on Mr. Hooftallen's neck. The trooper who handcuffed Mr. Hooftallen pulled out the Taser wires and Mr. Hooftallen screamed. At some point Mr. Hooftallen said "Ok, Ok, I'm done."

When Mr. Hooftallen rolled off of the couch and handcuffed, a trooper put his knee and weight on Mr. Hooftallen's neck for 4 or 5 minutes. When the other trooper returned he was shackled and then determined not to have a pulse. Troopers called for an ambulance and during the 10 minutes until the ambulance arrived the troopers did nothing but watch-wait.

**Barbara J. Wingard** states in her sworn affidavit, she is the decedent's mother and when she went into the room she noticed two troopers standing there. When the troopers and Mr. Hooftallen were talking the younger trooper laughed at one of the comments and later asked him "what's next" at which time he took a swing at the troopers and the troopers responded by tackling him onto a couch with a trooper putting his knee on Mr. Hooftallen's neck, drawing his Taser and tried 3 or 4 times but it did not work through her son's clothing. The other trooper pulled up the shirts and he was Tasered on his bare back. Again a trooper put his knee on her son's neck-throat area as his head was turned. The troopers and Mr. Hooftallen struggled on the couch during which a trooper Tasered him with a "prong stun gun"

on his neck, pulled his arms out from under him, handcuffed him
behind his back, and he fell/slid onto the floor.  While
handcuffed and on the floor a trooper put one knee on his neck-
throat area and the other knee in the middle of her son's back.
It appeared the trooper put all of his weight on her son.  Her
son·said "Ok, Ok, I'm done-I'm done" but the trooper who had him
pinned did not get off.  While the one trooper had her son
pinned down, the other trooper went to get leg braces [shackles]
and upon his return Mr. Hooftallen moved his legs and was
Tasered again on the right waist area with the "probe stun gun."
After the leg braces were put on him the troopers dragged him to
the middle of the floor, prone, and handcuffed, a trooper put
his left knee on her son's neck and throat area and his other
knee in the middle of her son's back-shoulder blades.

The troopers discovered Mr. Hooftallen was not breathing and
called for an ambulance.  Approximately 10 minutes later the
ambulance arrived and the troopers removed Mr. Hooftallen's
handcuffs as the medics requested.  The medics started CPR and
transported him to a hospital in Punxsutawney, Pennsylvania and
he was later transferred to Allegheny General Hospital in
Pittsburgh, Pennsylvania.

**Barbara Jean Wingard** testified at deposition and her testimony
regarding the incident on October 18, 2010 was generally·
consistent with her civil complaint in this matter and her
affidavit.  Additional issues beyond the actual incident were
addressed during her deposition including information that her
son, Tim Hooftallen, a witness to the instant matter, has since
died of natural causes.  Mrs. Wingard confirmed that the
decedent, her son, Mr. Troy Hooftallen attempted suicide
September 2, 2010 and it was related to his relationship-
fighting with Kim Hall.

When the two troopers (Battestilli was the younger trooper and
Johnson was an older trooper) arrived Mr. Hooftallen was calm.
The young trooper's words, tone of voice was not regular,
aggravating, sarcastic, arrogant questions, trying to start
something and the trooper laughed.  Troy was standing and picked
up a plastic bottle and acting angry and aggressively twisted it
while talking with the troopers.  He put the bottle down, walked
toward and touched the trooper to ask him to go outside.  He
then put his arm back and slowly swung with a closed fist as if
he was going to hit the trooper (the sarcastic one) with a
roundhouse punch and both troopers tackled him with Mr.

Hooftallen being on the bottom.  His knees were on the floor and his face was pressed against the couch back cushion and his arms down on the seat cushion.  He did not fight back but he repeatedly put his hands under his stomach while on the couch-he did not want to be cuffed and he resisted.  Things happened so fast.  The younger trooper pulled his stun gun and never warned or said anything to Mr. Hooftallen and at some point the trooper said "stop resisting."  The trooper put the stun gun on her son's shirt(s) at the stomach-rib cage but nothing happened.  The young trooper told the older trooper to pull her son's shirt(s) and then he was Tasered with the barbs.

She confirmed at various times after Mr. Hooftallen was Tasered and on the floor, the younger trooper (Battestilli) variably placed a knee(s) and all of his weight on Mr. Hooftallen's neck/side of neck, throat, middle of back and Tasered on the leg/thigh, neck and back or side with electricity (not barbs-drive stun).  After the first Tasering Mr. Hooftallen said "I give, I give", or "I'm done I'm done" and slid/fell off the couch, a trooper removed the darts, and he was handcuffed but still struggling at which time the trooper Tasered him two times (drive stun).  A trooper (Johnson) went out to get the leg shackles.  After Trp. Johnson placed the leg shackles on Mr. Hooftallen, who was then pulled to the middle of the room, on his stomach and the trooper still had his knee into his throat and back.  Trp. Battestilli told her he was holding Mr. Hooftallen down because when he comes around he will be resisting again.  After Mr. Hooftallen was leg shackled another Taser drive stun discharge may have happened, but she does not recall.

At some point the troopers determined Mr. Hooftallen did not have a pulse and he was not breathing.  The troopers made a telephone call regarding the ambulance and they stood waiting for the ambulance.  Mr. Hooftallen was still.  The ambulance arrived and the paramedics asked the troopers to remove the handcuffs, which they did and the paramedics started CPR.  The handcuffs were not reapplied front or rear.  At some point Mr. Hooftallen was transported by ambulance to the Punxsutawney Area Hospital.  Trp Johnson was more in the background and left Trp Battestilli do everything.

**Pennsylvania State Police General Investigation Report** states in part, the decedent's brother Timmy Hooftallen called 911 and said his brother "was going crazy" and having "psychological

problems," acting violently to himself, was 6'4' tall, knew karate and kung fu, and was "one hell of a scraper," he would not want to go anywhere, and Mr. Hooftallen had no weapon.  The 911 dispatcher told him "the police would subdue Mr. Hooftallen in order to calm him down before the ambulance could take him (staging).

When Trps. Battestilli and Johnson arrived at the residence they were not sure of the exact nature of the call but they were advised that Mr. Hooftallen had taken a lot of pills/Mucinex DM and was tearing the place up.  Also, he tried to commit suicide a few weeks earlier by taking a lot of pills.

When the troopers entered the residence Mr. Hooftallen was sitting on a couch/locve seat next to his mother.  Trp. Battestilli identified himself, extended his hand, and shook hands with Mr. Hooftallen.  When the troopers asked Mr. Hooftallen what was going on he said he was the "baddest mother fucker around and could kick anybody's ass," he said he found the meaning of life, he stood up from the couch, walked around a coffee table and positioned himself in front of Trp. Battestilli who told him to relax and to calm down.  Mr. Hooftallen then grabbed both troopers by the arms and and started to push them out the door, then let go of them and he faced and stared at Trp. Johnson for several seconds.  Mr. Hooftallen coiled back his right arm as he prepared to hit Trp. Johnson and then threw a punch at the trooper who was able to block it.  While trying to restrain Mr. Hooftallen the two troopers and Mr. Hooftallen fell onto a love seat, with Trp. Johnson hitting his head on the wall.

While trying to help hold Mr. Hooftaller down by putting pressure on Mr. Hooftallen's lower back, he leaned back to get as much probe spread as he could, drew and fired his Taser at 23:45:45 at Mr. Hooftallen with the probes striking him in the upper right back area.  The Taser was activated for seven seconds and Trp Johnson was able to place a handcuff on Mr. Hooftallen's left wrist.  Mr. Hooftallen resisted but Trp. Johnson was able to secure the right wrist, as well.  After both handcuffs were secured the Taser probes were removed and Trp. Johnson collected the spent Taser cartridge.  At this point Mr. Hooftallen began to resist again—jerking, thrashing, and kicking, and Trp. Battestilli responded with a Taser drive stun to Mr. Hooftallen's right leg at 23:47:12 for four seconds which had no effect.  Seeing that Mr. Hooftallen's shirt was pulled up

Trp. Battestilli drive stunned this exposed area, (right side above the waistline) at 23:47:19 for five seconds and at 23:47;26 for six seconds.

Trp. Johnson was able to restrain Mr. Hooftallen's chest area. Trp. Johnson said he was holding Mr. Hooftallen down by the upper back area and shoulder blades and he had some weight on him, but his (Trp. Johnson's) feet and knees were on the ground. He put no pressure on Mr. Hooftallen's throat or neck.  Trp. Battestilli put his weight and pressure on Mr. Hooftaller's lower back and buttocks area, not near his neck or throat.  Trp. Johnson is 6'1' 210 pounds and Trp. Battestilli is 6'2" and 210 pounds

Timmy Hooftallen held Mr. Hooftallen's feet while Trp. Battestilli went outside and retrieved the leg shackles.  Mr. Hooftallen was resisting, kicking and moving but Trp. Battestilli was able to apply the shackles.  Trp. Battestilli radioed for the ambulance that was on standby and a supervisor. At this time the troopers noticed Mr. Hooftallen's eyes rolled back into his head and breathing problems.  Trp. Johnson detected a pulse with shallow breathing and Mr. Hooftallen was rolled onto his right side in a recovery position.   EMS arrived and Trp. Johnson removed the handcuffs from behind to the front and CPR was being performed by EMS.  He was transported to Punxsutawney at approximately 00:04 hours, October 19, 2011.

Trp. Battestilli Tasered Mr. Hooftallen four times in the following sequence; probes discharged at 23:45:45 in his back and approximately two minutes later three drive stun discharges-one to his leg and two to his waist-back area.

The 911 Incident reports, "Non-suicidal and alert, did take pills unk how many, is being violent to himself, will fight with any personal who shows up, has marshall art training."

**Cyril H. Wecht, M.D., J.D.** reported, November 15, 2012 that Mr. Hooftallen,

> died due to asphyxia from chest compression that occurred during the physical restraint applied by the state troopers.

> The TASER applications may not have played a direct role in the unfortunate death of this relatively healthy young

adult.   However, the multiple taserings would have contributed to the physiological and emotional stress that Mr. Hooftellen was experiencing as a result of the physical restraint and chest compression produced by the State Troopers.

## **Additional Information**

Telephone transcript from Tim Hooftallen to 911 Dispatcher (paraphrased)
- He [Mr. Hooftallen] is acting violent and is having "Big Time" psychological issues
- He is violent
- He is trying to hurt himself-took something
- He is not trying to kill himself
- He has not threatened anyone
- He has no weapons

Jefferson County EMS, PXY, states in part;
- Call dispatched as "scene not safe"
- Informed by trooper, the Taser was deployed once with probes and 3 times direct contact

The Post-Mortem report states in part;
- Mr. Hooftallen was 6'2" tall and weighed 189 pounds at time of autopsy.
- Taser was deployed 4 times (22 seconds total)
- Arms and legs restrained (shackles and cuffed)
- Multiple contusions and abrasions of the upper and lower extremities
- Forced into a prone position
- Officers positioned on decedent's upper back/neck and thigh regions
- Contusions of the upper and lower back and the right posterior upper thigh
- Became unconscious and pulseless during the struggle

Note:  I have accepted the medical evidence in this matter without question and I shall offer no medical opinions in this matter.

## VI.   ANALYSIS AND DISCUSSION

Although it is not my role to decide issues of credibility, generally accepted social science technique requires that I comment on apparent inconsistencies, assertions of interested witnesses which are contrary to logic or other facts.  Further, while I do not resolve credibility issues, I have offered opinions based upon alternate, legitimate, factual disputes. Ultimately, it will be for a jury to determine what facts to apply.  My duty is simply to provide my professional opinions, some of which are dependent upon alternate versions of disputed factual scenarios.

The Court, in its **REPORT AND RECOMMENDATION**, stated in part;

> Here, the Defendant State Troopers were aware that
> Hooftallen was mentally impaired, anxious, reacting to
> medication for his Crohn's Disease, but unarmed and seated
> on a couch talking to his mother.

EMS Dispatch as "Scene Not Safe"
Pennsylvania State Police (PSP) it was proper for EMS to be dispatched to a staging area close to the scene and wait there until the troopers have rendered the scene safe/clear for EMS to enter.  In non-criminal, no weapon involved, medical response situations police support EMS and provide an initial security service for EMS personnel.  The police response to the Hooftallen residence was not a crime call/law enforcement call but a medical support or service call.

Use of Force

The legal standard for use of force analysis is the Supreme Court decision in Graham v. Connor, which stated in part:

> The calculus of reasonableness must embody allowance for
> the fact that police officers are often forced to make
> split-second judgments in circumstances that are tense,
> uncertain, and rapidly evolving - about the amount of force
> that is necessary in a particular situation.

Graham v. Connor provides the general framework for assessing whether a particular use of force is legal under the Fourth Amendment.  This, like most general standards found in Fourth Amendment precedent, operates through a balancing test.

The legal basis for the use of force by law enforcement officers is found in the Pennsylvania Crimes Code.   The Crimes Code states:

> §508.   Use of Force in Law Enforcement.
>      (a) Peace officer's use of force in making arrest.
> (1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a **lawful arrest** because of resistance or threatened resistance to the arrest. [Emphasis added]
>
> He is justified in the use of any force which he believes to be necessary to affect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest.   However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes *both* that:
> (i) such force is necessary to prevent the arrest from being defeated by resistance or escape; and
> (ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

Troopers are to be trained in the use of force.   This training must be consistent with police department policies and procedures, which in turn must be consistent with established statutory and constitutional laws.   To assist officers to understand the levels of force that may be used under varying degrees of resistance by a suspect, some version of a use of force continuum is commonly used in police training.   The "Confrontational Force Continuum" (Ronald Traenkle, Copyright, July 2004) consists of seven steps and is presented here as an example, as follows:

> Law enforcement officers are permitted to use the degree of force that is reasonably necessary to accomplish their lawful objectives, and to overcome any unlawful resistance.

Step I.  Officer Presence
The officer assumes control of the situation or suspect
through his announced and/or uniformed presence.

Step II.  Verbal Command
Presence has failed; the officer now begins verbal
persuasion/dialog and if needed command/warning mode to
take control of the incident.

Step III.  Open Hand
Where practical, the officer places hands on the suspect
and advises him that he is under arrest.  All resistance
beyond this point is unlawful and must be countered by the
officer.  This step often leads to a wrestling match,
grabbing and pushing.

Step IV.  Pain Compliance
This is where officers may employ pressure point control or
oleoresin capsicum (OC).  Officers may utilize OC at Step
III whenever an accelerated reaction using higher force is
appropriate.  The potential for weapons, considerable size
difference, multiple suspects, combative behavior, the
influence of alcohol, controlled substances or other drugs
could justify this greater force.

Step V.  Mechanical Compliance
The usual methods of mechanical compliance includes
wristlocks, arm bar or other "come along" techniques.
These employ counter joint pressures and leverage.  They
may be applied utilizing handcuffs or the police baton.

Step VI.  Impact
It is only when mechanical control methods are ineffective
or inappropriate that the force applied escalates to the
use of impact weapons.  When practical, blows should
initially be directed to the soft tissue areas such as the
back of the legs or buttocks prior to a strike at a joint
or bone.  This is the intermediate step between hand-
applied force and the ultimate force of firearms.

Step VII.  Deadly Force
This ultimate step is appropriate only to protect yourself
or another from death or serious injury, or to apprehend a
forcible felon when you have exhausted all other reasonable

means of apprehension and the suspect presents an imminent
risk to the community if not immediately apprehended.
Where practical, a verbal warning must be given.

Taser

(Note: TASER™ is a registered trademark of TASER International
and is one of several manufactures of Conducted Energy Weapon
(C.E.W.) further described as an Electro-Muscular Disruptor
(E.M.D.) and Electronic Control Weapon (ECW).  For the purpose
of this report I shall use the term TASER since it is the device
used by the Pennsylvania State Police.

The Taser is a use of force option that is generally accepted as
an intermediate, less-than-lethal weapon/use of force that may
be used by police consistent with law and accepted police
practices.  The use of force, the Taser and compression shall be
analyzed and discussed independently and collectively in this
report.

From the witnesses' affidavit testimony it appears the Taser
deployment sequence was three or four activations in drive stun
mode which were ineffective through Mr. Hooftallen's two shirts.
Then a trooper pulled up Mr. Hooftallen's multiple shirts and
the Taser probes were fired into his back which was effective.
Additional, Taser activations in drive stun mode were applied at
least to his neck and waist.  This sequence is not supported by
the documented Taser record.

Note: I shall not evaluate the body of Taser related research
but I shall address relevant information, police policies,
procedures, and training.

The PSP FR 7-3 USE OF FORCE, 9/23/09, states in part:

   3.02 DEFINITIONS

         I.    Totality of Circumstances:  All the facts and
               circumstances of a particular incident including,
               but not limited to, the severity of the crime at
               issue, whether the suspect poses an immediate
               threat to the safety of officers or others, and
               whether the suspect is actively resisting arrest
               or attempting to evade arrest by flight.  Other
               factors that should be considered include, but

not limited to:
3.    Subject's level of resistance, psychological
intimidation, verbal non-compliance,
passive resistance, active resistance,
active aggression, and aggravated active
aggression (deadly force).

## 3.10. RENDERING MEDICAL AID

After employing any force, including lethal or less
than lethal, members and enforcement officers shall
look for evidence of injury and render appropriate
medical aid **and** request further medical assistance,
when necessary, for the suspect and any other injured
individuals, as soon as it is safe to do so.
[Emphasis added]

The PSP FR 9-1 ELECTRONIC CONTROL DEVICES (ECD), 9/23/09 states,
in part:

1.02 POLICY      Members shall be guided by FR 7-3, Use of
Force regarding the justification for
deployment of the ECD.

## 1.03 DEFINITIONS

D.    Electronic Control Device (ECD):  A less lethal
weapon, as described in FR 7-3, which uses
propelled wires or directed contact to conduct
energy through a subject, thereby affecting the
sensory and motor functions of the nervous
system.

## 1.06 MEDICAL CONSIDERATIONS

In addition to the requirements in FR 7-3 for
rendering first aid, the following protocols shall be
followed for use of the ECD.

B.    Arrangements shall be made to have the following
subjects, who have been exposed to the ECD,
transported to a medical facility for
examination and/or removal of probes;
7.    Subjects who have been exposed more than
three times in an incident.

8. Subjects, who have had more than one ECD effectively used against him or her in a given incident.

9. Subjects, who have been exposed to a continuous energy cycle of 15 seconds or more, by either probe deployment or in a drive stun in a given incident. [The 15 second exposure and other known Taser/ECW research based factors were assembled and published in 2011 by the Police Executive Research Forum (PERF)].

The Police Executive Research Forum (PERF) and the Community Oriented Policing Services (COPS) United States Department of Justice, *2011 Electronic Control Weapons (ECW) Guidelines,* March 2011 state, in part:

Drive Stun:  Avoid use as a pain-compliance tactic
The most commonly used ECWs can be used in two modes: probe and drive stun.  Many police managers and officers erroneously believe that applications of drive stun are as effective as applications with probes, but that is not correct.  The drive stun mode can be used to complete the circuit in the event that one of the probes is ineffective or becomes dislodged.  The drive stun mode can also be used in close quarters for the purpose of protecting the officer or creating a safe distance between the officer and subject.  Absent these circumstances, using the ECW in drive stun mode is of questionable value.  The primary function of the drive stun mode, when not used to complete the circuit, is to gain subject compliance through the administration of pain.  **Using the ECW to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject.**  For these reasons, agencies should carefully consider policy and training regarding when and how personnel use the drive stun mode, and should discourage its use as a pain compliance tactic.  Drive stun has an applicable but limited purpose that should be taught, explained, and monitored during ECW training and field use. [Emphasis in the original]

13. Personnel should be trained to use an ECW for one
standard cycle (five seconds) and then evaluate the
situation to determine if subsequent cycles are
necessary.  Training protocols should emphasize that
multiple applications or continuous cycling of an ECW
resulting in an exposure longer than 15 seconds
(whether continuous or cumulative) may increase the
risk of serious injury or death and should be avoided.

16. Agencies' policy and training should discourage
the use of the drive stun mode as a pain
compliance technique.  The drive stun mode should
be used only to supplement the probe mode to
complete the incapacitation circuit, or as a
countermeasure to gain separation between officers
and the subject so that officers can consider
another force option.

22. A warning should be given to a subject prior to
activating the ECW unless doing so would place any
person at risk.  Warnings may be in the form
of verbalization, display, laser painting, arcing, or
a combination of these tactics.

*Note:   PERF is the research-policy organization
for the major police departments (500
officers or more) in the United States.

Clearly, the PSP and the police community generally are keenly
aware of the need to consider the totality of the circumstances
when using force and the risks posed by the use of the Taser.  I
shall address the totality of the circumstances surrounding the
State Police troopers' use of force encounter with Mr.
Hooftallen.

## Police Dispatch, Approach, and Initial Contact

From the information known to Trps. Battestrilli and Johnson at
arrival at the scene and before making face-to-face contact with
Mr. Hooftallen, they knew or should have known he was an
Emotionally Disturbed Persons (EDP) and they had to manage this
incident appropriately and consistent with accepted police
practices.  The troopers were the scene managers, not the
Hooftallens.  More specifically, the assigned officer or senior
officer should have been the officer in charge (OIC) and the

responsible incident manager.

Emotionally Disturbed Person (EDP) is a term of art in law
enforcement that is used to describe persons suffering from a
wide variety of human behaviors that would indicate the person
is suffering from mental illness or other emotional or life
crisis, of which the nature and extent may or may not be known
to the officer.   Police encounters with persons exhibiting
bizarre and even dangerous behavior commonly are initially
reported/dispatched as suicidal person, man with a knife,
hostage/barricaded person, domestic violence, intoxicated or
drugged person, or as a combination of two or more of these
descriptors, as examples.  Upon arrival the responding police
officers often are unable, and are not expected to identify/
diagnose the specific "mental" issues.  It is for this reason
that responding officers should be trained to effectively manage
the situation, at least until specially trained officers, if
available, can be summoned.  Nevertheless, the common threads of
police intervention of EDP situations include calm, avoid
escalating the stress-tension, do not rush, use time to
advantage, effectively communicate, and do not create or
increase the tensions and dangers of the situation.

In the instant matter Mr. Hooftallen did not have a firearm or a
knife, was not barricaded, and was not actively harming himself,
but he was known to be an EDP in crisis in his home.  The
following information should demonstrate the police dynamics in
such a situation.

**Emotionally Disturbed Person (EDP):**  The following information
is taken in part from The International Association of Chiefs of
Police (IACP) Training Key #274 *Abnormal Behavior*:

> Handling a disturbed person is a complex task.
> The officer must be able to first recognize
> abnormal behavior that is potentially destructive
> and then intervene effectively.  The police
> officer must accomplish three objectives at the
> same time:  protect the public, safeguard his own
> well being, and treat the mentally or emotionally
> disturbed person as humanely as possible.
>
> For good reasons, control of so-called abnormal behavior is
> **not** usually the responsibility of police officers.  First
> and foremost, abnormal behavior is not necessarily illegal

behavior.

Successful intervention requires that the officer be able to recognize and evaluate the potential danger of abnormal behavior.

**Response**

At most times, mentally ill persons are not particularly dangerous; however, the police most frequently are in contact with disturbed persons when there is a potential for violence.  Certain specific measures for dealing with persons who act abnormally are therefore recommended.

- Emergency lights, sirens, a gathering crowd, and a threatening manner by the responding officers may trigger a violent reaction from the disturbed person.  The officer should use a calm, quiet, non-threatening approach and

    Assess the situation.  If the disturbed individual is not engaged in destructive behavior, **avoid physical contact.** [Emphasis added]

    *  Move slowly and do not excite the disturbed person....
    *  Whenever possible, more than one officer should be assigned to calls involving the emotionally disturbed....[Emphasis added]

    *  Talk to the disturbed person, if possible.... communicate that you care about him, and let him "ventilate" his feelings to you.  The presence of a familiar person who is not contributing to the disturbance usually has a quieting effect on the disturbed person's agitated behavior.

    *  Do not threaten a disturbed person.  Most disturbed individuals are already badly frightened because they do not understand their own feelings and are unsure how other people will treat them.

\* Aggressive behavior by a mentally disturbed person is the outcome of this fear. If the officer's actions create any additional stress, it may trigger violent behavior. The officer's weapon is of no use as a threat against a disturbed person. The person may react by attacking the officer and attempt to take his weapon. Also, persons emotionally disturbed may exert unusual physical strength and be indifferent to pain. The officer's reaction should be calm, understanding manner conveying that he is truly concerned and wants to help rather than to punish the disturbed person.

Restraining Disturbed Persons

Unfortunately, physical restraint is sometimes a necessity. Hesitancy and ambiguity of response can only increase the risk of injury to all involved when violence is directed toward you or others or the subject seems capable of inflicting serious harm on himself. In these cases use only as much force as is necessary. Continue to speak with the subject, treating him with respect and dignity. Do not be condescending or threatening in speech or manner. Do not strike the abnormal person.

Remember that most mentally ill persons are not violent and most of them are not dangerous. Excitement usually lasts only a short time and they will quiet down if properly handled and not threatened or further frightened.

Further, this kind of situation is not uncommon for police officers. Murphy states,

On any given shift, police officers can encounter persons exhibiting a wide variety of human behaviors. Many such behaviors are easily addressed. Others pose problems. Some of the most troublesome for officers to manage are those with mental disabilities. Much of the trouble is associated with officers' unfamiliarity with persons suffering from mental illnesses.... Murphy, Gerard.

Managing Persons with Mental Disabilities:  A Curriculum
Guide for Police Trainers; Police Executive Research Forum,
1985, p. i.

James J. Fyfe, [Former Professor and later Deputy Commissioner
NYPD], et al. state;

> Certainly, neither police officers nor other nonmedical
> personnel can be expected to identify the specific
> disorders suffered by people whose behavior is dangerous or
> bizarre....
>
> In response to this problem, training has been developed
> for police encounters with EDPs and generally encourages a
> patient, nonthreatening approach in which officers keep
> their distance and demonstrate that they seek to help
> (Murphy 1986).  Unfortunately, not all police have been
> adequately trained to deal with EDPs in this manner....
>
> Pointing a gun at a [rational] knife-wielding robber, using
> command voice to direct him or her to drop a knife and
> surrender, and advising the offender that there is no other
> viable option but surrender, for example, are likely to
> result in compliance and a bloodless arrest.  But, when
> police challenge knife-wielding EDPs in the same way—or
> worse, close in on them in attempts to disarm them—they are
> likely to precipitate attacks on themselves that can be
> halted only by resorting to deadly force.  In short, trying
> to intimidate an EDP into submission is no less likely to
> result in explosion than is lighting the fuse on a stick of
> dynamite.
>
> Shootings following hasty police attempts to intimidate
> EDPs are unnecessary because they are precipitated by
> inappropriate and needlessly volatile police action.  James
> J. Fyfe, et al. Police Administration, Fifth Edition.
> McGraw Hill, 1997, p. 453-454. (For a different perspective
> see, James J. Fyfe, Ph.D., *Policing the Emotionally
> Disturbed* J. American Academy of Psychiatry Law Vol. 28,
> No.3, 2000; P. 345-347).
>
> On occasion EDPs are even likely to regard police threats
> and commands—"Drop the knife!"—as challenges to physical
> action.  ... responding to such challenges almost
> invariably kills the EDP rather than the police.  But if

police are to conform to their primary responsibility for
protecting life, officers must be sophisticated enough to
avoid issuing such challenges unknowingly or otherwise
unnecessarily.  Instead, they should avoid threatening
behavior and must take as much time as necessary to take
dangerous EDPs into custody without precipitating needless
bloodshed; Fyfe p. 501.

The Police Executive Research Forum (the research organization
of the major city police chiefs) recommends "Do not rush the
person or crowd his personal space.  Any attempt to force an
issue may quickly backfire in the form of violence; (in Fyfe,
Box 15-3, p. 501.)

In the instant matter two troopers responded and it is disputed
that Trp. Battestilli identified himself and shook hands with
Mr. Hooftallen.  Accepting this as true, such an approach is an
appropriate first step to de-escalating the situation.  However,
if we accept Trp. Battestilli approached Mr. Hooftallen and was
sarcastic, aggressive in words, manner, tone of voice,
arrogantly questioning, trying to start something and laughed at
him, this is taunting and teasing and generally unacceptable
police conduct.  Further, such conduct is not de-escalating but
more likely than not to create increased dangers for officers
and for Mr. Hooftallen who committed no crime and was not being
arrested.  Knowing this call was a medical assist for an EDP and
considering the totality of circumstances, reasonably trained
and competent police officers would have used time and available
space initially to avoid creating an artificial split-second
decision to use force beyond "Step II Verbal Command:  the
officer now begins verbal persuasion/dialog and if needed
command/warning mode to take control of the incident."

Further, the troopers must use the available space and furniture
to their tactical and own safety advantage, while talking with
Mr. Hooftallen.  Additionally, the troopers must use their
persuasive and EDP relevant skills effectively.

General Police Conduct

Accepting that Trp. Battestilli and/or Trp. Johnson taunted Mr.
Hooftallen which did not deescalate but rather escalated the
tensions of this situation and created a split-second decision
to use physical force unnecessarily, such conduct is contrary to
accepted police practices.  It is unethical and unprofessional

police conduct for officers to taunt a person and specifically to agitate, not show concern/care for, or express a sincere willingness to help Mr. Hooftallen, an EDP, in a life crisis and possibly suicidal.

Such conduct is beyond discourteous and contrary to accepted police practices.  The International Association of Chiefs of Police, Training Key #295 *Police Conduct* states, in part;

> Discourtesy:  More citizen complaints involve accusations of officer discourtesy than any other single public grievance.

> However, because of the extreme degree of control over prisoners, there is the possibility of mistreatment other than by the use of excessive force, such as verbal harassment or denial of prisoner rights

It is generally accepted that an officer's verbal and/or physical misconduct can create or escalate a situation resulting in the use of a level of force that initially would not have been necessary.  Also, what the trooper did not say is important.  From the evidence, neither trooper asked Mr. Hooftallen, an EDP **how they can help him** or, for example, ask if they could all just sit and talk until the ambulance arrives—de-escalate and calm the situation.  This was a moment for the troopers to follow the police slogan "to protect and to serve" Mr. Hooftallen, but they did not.

## Police Conduct and Tactics

In the instant matter Mr. Hooftallen initially was sitting on a couch and was not a prisoner but merely a medically-based police-citizen contact.  Accepting the witnesses' testimonies, the troopers' language, manner, arrogance etc. quickly escalated this situation that resulted in a police-custodial death. Considering Mr. Hooftallen was a big man and may fight them, was not armed, and possessed no weapon the officers had the opportunity to use time and spatial distance to their advantage. Although the area of the room where Mr. Hooftallen and the troopers met was "small," the troopers had access to walls and furniture, for example, to provide protective cover/a barrier to separate them and from which to talk to Mr. Hooftallen and other family members present.  The failure to use other available tactical options created and/or escalated the tensions and

opportunities for violence.

When Mr. Hooftallen was standing, approached, and swung at Trp. Barrestilli, the trooper was correct to respond.  But rather than have both troopers physically tackle and Taser him, they had other options, including pushing him away and attempting to verbally regain control and retreat to deescalate and establish calm.  Also, from this tactical position Trp. Battestilli would have had time and position to warm Mr. Hooftallen that he would be Tasered if he did not cooperate.

Although the law does not require officers to retreat, this was not a crime-arrest situation but rather a man in crisis needing medical help.  Also, retreating to a position of safety and tactical advantage is smart, not a sign of cowardice, and advances the troopers' service role.  When police officers perceive their role as that of law enforcement and not service, we see officers making poor decisions, often with legal consequences for the officers.

Considering the totality of the circumstances and available tactic options, applying the troopers' 420 pounds combined weight variably to Mr. Hooftallen's chest, back, neck, and throat, while in a prone position, for a prolonged period of time was objectively unreasonable and unnecessay.

Considering the totality of the circumstances and available tactic options, applying the Taser (intermediate force) without giving Mr. Hooftallen an appropriate warning that he would be Tasered if he did not comply was objectively unreasonable.

Further, Tasering Mr. Hooftallen after he was handcuffed and in a prone position on the floor and not exhibiting overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion was unnecessary, unreasonable, and abusive.  The IACP Model Policy *Electronic Control Weapons*, states in part;

    C.  Deployment
        1.  As such, it is forbidden to use the device as follows:
            (b) On a handcuffed or secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion (2005)

Incident Time Factors

Approximately eight minutes elapsed from the time the two
Troopers (Battestilli and Johnson) arrived at the Hooftallen
residence at 23:37 until the Taser was first deployed at
23:45:45.  From the time the troopers arrived until they
actually came face-to-face with Mr. Troy Hooftallen is unknown.
However, accepting the troopers took time to speak with Tim
Hooftallen outside the residence and then walked into the
residence, the face-to-face time with Mr. Hooftallen was less
than eight minutes.  Also, I do not know if the Taser time
recorder/clock and the 911 dispatch and the PSP communications'
timers/clocks are synchronized.  This may account for some time
reporting differential.  Nevertheless it is abundantly clear the
troopers physically engaged with Mr. Hooftallen and time was not
used to their advantage. The Taser record indicates the
following Taser deployments/activations:

        2345.45 hours   7 second duration
        2347.12 hours   4 second duration
        2347.19 hours   5 second duration
        2347.28 hours   6 second duration
                       22 seconds

Positional and Compression Asphyxia, Handcuffing, and the Taser

I know of no standard that prohibits police officers from
putting weight on an actively resisting subject who is in a
prone position on the ground, in an attempt to control and
restrain (handcuff) the subject.  However, the amount of weight
necessary and how long it is applied is that amount that will
prevent a person in the prone position from moving away or
getting up.  The lawful objective is to quickly control not
crash the subject.

Compression asphyxia/positional asphyxia have been known in
professional law enforcement since the late 1980s.  Compression
means putting additional weight on a subject, ex. a police
officer putting his knee/weight on a prone subject's back.
Positional means where only the subject's own weight is involved
but the subject's position is at issue.  As early as 1993, the
International Association of Chiefs of Police Training Key #429
Custody Death Syndrome, states, (See attached)

- In addition, when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. **In order to facilitate the individual's breathing, he should be rolled onto his side or into a sitting position as soon as possible.** p. 52. [Emphasis added]

The National Law Enforcement Technology Center, United States Department of Justice, <u>Positional Asphyxia—Sudden Death.</u> 1995, in part, states,

Basic Physiology of a Struggle

* A suspect is restrained in a face-down position, and breathing may become labored.

* Weight is applied to the person's back—the more weight, the more severe the degree of compression.

* The individual experiences increased difficulty breathing.

* The natural reaction to oxygen deficiency occurs—the person struggles more violently.

* The officer applies more compression to subdue the individual.

Predisposing Factors to Positional Asphyxia

Certain factors may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position.

* Obesity.
* Alcohol and high drug use.
* An enlarged heart (renders an individual more susceptible to a cardiac arrhymia under conditions of low blood oxygen and stress).

The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly

when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position.

Advisory Guidelines for Care of Subdued Subjects

   Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying).

* Follow existing training and policy guidelines for situations involving physical restraint of subjects.

* **As soon as the suspect is handcuffed, get him off his stomach** [Emphasis added]

(Note:  The NYPD's Guidelines to Preventing Deaths in Custody are presented in the same documents and include,

   * **As soon as the subject is handcuffed *get him off his stomach*.  Turn him on side or place him in a seated position.**

   * **If he continues to struggle *do not sit on his back*. Hold his legs down or wrap his legs with a strap.**

   * **Do not lay the person on his stomach during transport to a station house or hospital.  Instead, place him in a seated position.)** [Emphasis added]

The IACP National Law Enforcement Policy Center, issued Model Policy:  <u>Transportation of Prisoners</u> in 1996.  The policy states,

   III.B.7. Officers are prohibited from transporting prisoners who are restrained in the prone position.

FR 7-2 PRISONER SECURITY AND TRANSPORTATION, 9/8/2010 states in part;

   2.04 C.3  Not transport prisoners in a prone position or "hog-tied" position to avoid chest compression, which may precipitate positional asphyxia or air hunger.  Members shall place prisoners in a seated position, or if necessary on their side.

Clearly, the police executive community has been aware of the dangers of persons simply being restrained in the prone position without compression.  It would be sufficiently clear to a reasonably trained and competent police officer and chief officer of police, the police policymaker, that compression would compound the risk of serious injury or death to a restrained suspect, specifically the plaintiff, in this case.

Also, Ross reports that, "Research shows that a sudden in-custody restraint death is a statistically rare event given the annual number of police contacts with citizens."  Ross further summarizes the studies; "Collectively, the studies conclude that the prone restraint position, in and of itself, nor the hog-tied restraint position, with or without weight force, contributed to abnormal pulmonary function, hypoxemia... sufficient to cause asphyxia" (Darrell L. Ross. <u>Science, Liability, Use of Force, and Restraint Asphyxia</u>.  Police One.com News; January 27, 2010).

As recently as April 21, 2014 Ross presented research findings to the International Law Enforcement Educators & Trainers Association. (ILEETA) which states in part,

> It is important to note that even when subjects were Tasered, even **when weight was applied to them** while they were down, and even when their legs were hobbled, there were no deaths and extremely few significant injuries.
>
> As a control measure, Ross asserts prone positioning is preferred for the safety of officers and subjects alike. He recommends **organized team tactics** for getting combative subjects to the ground, controlled and restrained as **quickly as possible,** this shortens the confrontation time span and allows the subject to promptly receive medical attention. [Emphasis added] PoliceOne.com News 04/21/2014

The phrase "When weight is applied" is too simplistic.  The amount of weight, the duration of application, and the location the weight is applied are significant factors that must be considered when addressing the issue of compression.  In the instant matter it was unreasonable for Trp. Battestilli and/or Trp. Johnson to use his (or their combined) full or significant body weight to compress Mr. Hooftallen's neck, throat and back for a prolonged period of time.  Again, Cyril H. Wecht, M.D., J.D. reported, November 15, 2012 that Mr. Hooftallen,

died due to asphyxia from chest compression that occurred
during the physical restraint applied by the state
troopers.

It is unclear which of the troopers was the OIC, if either.
Also, it is unclear if they were functioning as an organized
team capable of assessing Mr. Hooftallen's level of resistance
and the tactical and force options available to control an EDP,
considering the totality of the circumstances.  Such failures
create increased dangers for subjects being controlled and
restrained by police.

For purposes of discussion, if we accept, in the instant matter,
the troopers were justified to use weight/compression to control
Mr. Hooftallen while prone on the floor, their lawful objective
was to control and restrain/handcuff him as quickly and as
safely as possible.  Upon successfully handcuffing, Mr.
Hooftallen should have been rolled onto his side for recovery,
which Trp. Battestilli said was done.  This is in dispute and if
the officers failed to do this, such conduct was contrary to
accepted police practices.

Again, after Mr. Hooftallen was handcuffed the troopers were not
justified to apply the Taser while he was handcuffed on the
floor and not overtly assaultive.

<u>Neck and Throat Compressions</u>

Neck and throat compressions as described in this matter are
dangerous.  Generally, police policies and training include the
uses, prohibitions, and dangers of choke holds which are applied
by choking/compressing blood vessels and/or the windpipe.
Compression includes the officers using arms, hands, batons,
flashlights, feet/shoes, and knees as examples.

A choke hold/compression is not the same as a hand neck hold/
compression, or head lock/compression.

> Choke holds involve placing the forearm straight across
> the front of the individual's neck and using the free hand
> to grab the wrist and pull it back.  This technique is an
> extremely dangerous practice and is not recommended for
> use by police officers, except in those situations where
> other uses of force are not reasonably available.  The
> carotid neck restraint uses both the upper arm and the crux

of the forearm on either side of the individual's neck to apply pressure.  The goal is to compress the carotid arteries enough to cause unconsciousness, while applying minimal pressure to the airways.  The carotid neck restraint has been used for decades as a means of gaining compliance but must be employed only by officers who have been trained specifically in its proper application.  (International Association of Chiefs of Police (IACP) Training Key #671 *Excited Delirium Syndrome*, 2012, p. 3).

As early as 1993, the IACP recognized *Custodial Death Syndrome*, which addresses positional asphyxia and excited delirium, in its Training Key #429.  That Training Key states in part,

> ... the carotid restraint hold should be retained as a method of restraining individuals who are actively resisting arrest or who are assaultive.  However, when using the hold the task force recommends that
> - The hold not be used as a "control" hold but that it be employed with the intent of rendering the subject unconscious;
> - Full pressure not be applied more than 30 seconds;
> - If the individual is rendered unconscious within the 30 seconds, that pressure be reduced so the carotid arteries are not compressed but the neck remains immobilized;

Again, the prolonged (greater than 30 seconds) compression on the **side of Mr. Hooftallen's neck** (carotid) was unjustified, unreasonable, and excessive force.

The compression of Mr. Hooftallen's **throat** (windpipe) by placing a knee on the **front of the individual's neck** is an extremely dangerous practice and is not recommended for use by police officers, except in those situations where other uses of force are not reasonably available.  Here, the troopers had other options including the Taser and two officers-on-one subject, with possibly Tim Hooftallen helping to hold Mr. Hooftallen's legs, thus a three-on-one encounter.  If either a neck or throat compression was applied after Mr. Hooftallen was handcuffed, such force was unnecessary, unreasonable, abusive, and excessive force.

## Post Restraint First-Aid

The PSP Cadet training includes "the American Red Cross class in First Aid and CPR and requires a passing grade of at least 80 percent."<u>file:///C:/Users/Paul/Downloads/Cadet%20Training%202014</u> <u>0314%20</u>(1).pdf  Also, AR 5-7 FIRST AID, EMERGENCY RESPONSE, CPR AND AED PROGRAMS, 12/11/2009, governs the administration of related certifications.

When the two troopers realized Mr. Hooftallen was in pulmonary and/or cardiac distress they should have applied appropriate first-aid as/if trained **and** called for the staged ambulance.  AR 5-7 states, "members and enforcement officers shall look for evidence of injury and render appropriate medical aid **and** request further medical assistance, when necessary...."  The failure to reasonably respond and apply first-aid, as/if trained, was conduct contrary to accepted police field practices.

## Policy, Training, and Supervision

Formal policies and procedures are the foundation for training and state **what** is to be done and **why**.  It is the agency's policies and procedures on which an officer must be trained.  Training is the organizational process that allows the policymaker to translate policies to be practiced by the officers, consistent with the law and the policymaker's intentions.  Training is the organizational function/activity that informs the officers **how** to do what is expected.  Therefore, the failure to have adequate policies and procedures in place, or not to reasonably train officers in the established policies and procedures is inadequate training.

In the instant matter the involved troopers' misconduct, as addressed in this report, which included EDPs, the use of Tasers, body compression, and the responsibilities of the OIC/senior officer-supervisor indicates deficient policies, and/or training, and/or incident supervision, and/or the troopers' non-compliance to PSP policies and training, which may be insubordination.


## Police Code of Silence and Police Lying:  Organizational Integrity at Risk

When the evidence is disputed, as it is in this case, the issue of both witness and police truthfulness must be considered. Here, the officers' accounting of their actions and documented medical evidence are inconsistent suggesting the officers are being less than honest in the process.

For many years, criminologists, sociologists, political scientists, attorneys, judges, police, and others have known, documented, and reported police misconduct, including untruthfulness, false reporting, and perjury.  However, in recent years some segments of police/law enforcement have acknowledged the simple truth that some police do lie which lends support for the plaintiff's allegations.

As an example, Lisa A. Judge, Police Legal Advisor, Tucson, Arizona Police Department and the International Association of Chiefs of Police provide useful and disturbing insights which are presented in part, below.

———————————————

Judge, Lisa, A. *Disclosing Officer Untruthfulness to the Defense:  Is a Liars Squad Coming to Your Town*?  <u>The Police Chief</u>.  International Association of Chiefs of Police. November 2005, (pp. 10-11):

Supreme Court decisions create a rule that requires prosecutors to learn of and disclose to the defense information that could be used to discredit law enforcement witnesses in a case.

The reality is that prosecutors must rely on law enforcement agencies to inform them of a hidden witness credibility problem including, for example, evidence of an officer's prior untruthfulness in official matters.

Responding to this requirement, Attorney General Janet Reno in 1996 established the so-called Giglio policy, which required federal law enforcement agencies to inform federal prosecutors about potential impeachment information. Specifically, federal investigative agencies are required to report prior misconduct involving the officers in a case if that misconduct is "material to the defense" and would damage the credibility of an officer-witness.

Many state and local agencies have similarly begun to

disclose to prosecutors any conclusive information
regarding untruthfulness, bias, and crime committed by an
officer who is to be a material witness in a criminal
prosecution.

If the information involves untruthfulness, it is likely to
undermine the officer's ability to testify effectively.
Agencies have responded to this problem in different ways.
Some have adopted strict truthfulness policies and
terminated officers who violate them.  Other agencies have
simply placed officers with impeachment problems in
administrative assignments where there is no likelihood of
becoming a witness in a criminal case, essentially creating
so-called liars squads.

As this trend grows, agencies will be required to deal more
forcefully with officers who lie.

The serious crime of perjury by police officers had been known
and an issue for years.  Police officers' (anyone) lying under
oath is perjury and is usually a felony.  However, perjury
(committing a felony) by police officers, incorrectly has become
"accepted" in some segments of the police culture as necessary
to achieve police goals.

Lawrence Sherman (1978: 13) has noted that police failure
to observe due process requirements in arresting suspects
is an illegal practice, but such practices are usually
viewed as supportive of the formal police goal of police
organizations.

Similarly, when the law does not serve to advance the
organizational objective of the police, police are likely
to resort to deviant behavior to secure objectives.  Many
authors have noted that while the exclusionary rule was
constructed to prevent police abuses of citizens'
constitutional rights through the exclusion of evidence
illegally obtained by the police, its use has resulted in
an increase of police perjury. (Oaks, 1970; Burger, 1964).
In Kappeler, V. E., Sluder, R. D., & Alpert, G. P.
(1994).
*Forces of Deviance:  Understanding the Dark Side of
Policing.*  Prospect Heights, IL:  Waveland Press, Inc.,
p. 39.

Also see, Barker, Thomas, & Carter, David L. (1994).  *Police Deviance.* "*Police Lies and Perjury:  A Motivation-Based Taxonomy. Chapter 8 (with bibliography).*  (3rd. Ed.).  Cincinnati, OH:  Anderson Publishing, Inc.

Although police officers are expected to follow legal and ethical mandates, it is widely known often they do not meet those expectations.  False statements and reports by the officers to cover-up their actions are contrary to law, accepted police ethics, police standards of conduct, and accepted police policies and practices.  Furthermore, the police subculture can influence police officers in their roles as internal affairs investigators, supervisors, and commanders and influence to quality of internal investigations and the organization's accountability and integrity.  This wide-spread practice also impacts on the failure of police officers to intervene when they observe other officers engage in misconduct.

The police Code of Silence and police lying, including false and incomplete reports, are related, are real, and not confined to the PSP.  As recently as December 20, 2012, a United States District Court upheld the jury's finding in <u>Karolina Obrycka v. City of Chicago and Anthony Abbate, Jr.</u>  The jury found the Chicago Police Department had a code of silence and/or a widespread custom or practice of not adequately investigating and/or disciplining its officers.

<u>Internal Affairs Investigation (IAI)</u>

It is important to understand that a primary purpose of completed internal affairs investigations to identify problems and issues about written directives, policies, supervision, and training.  Completed internal investigations provide a foundation for feedback to the policy maker so appropriate corrective actions (enhanced policies, procedures, supervision, and training) can be developed, implemented, and evaluated.

The International Association of Chiefs of Police (IACP) Training Key #299 <u>The Disciplinary Process:  Internal Affairs Role</u>, Vol. XIII, (1980), p. 61 states,

> Perhaps the most exacting aspect of the police discipline process is the investigation of an allegation of misconduct....  The investigation must be seen by both the community and the police

as being impartial and diligent....

> Confidence and trust in police integrity can be instilled
> in the public only through objective investigations....  A
> stable, uniform, and totally unimpeachable system of
> investigating complaints against any of the department's
> employees reinforces proper police conduct as well as
> assures the public of effective and honest police services.

Just as police officers must consider the totality of the
circumstances when assessing the need to use force, police post
incident investigations also must consider and analyze the
totality of the circumstance.  The failure of the PSP to include
in its IAI of this matter, the issues of police response to an
EDP, taunting/conduct, the use and limitations body/neck/chest
compression, and the duty of the OIC as the incident manager
failed to identify critical information.  This failure did not
allow the PSP to assess the need for policy and training changes
or discipline.  The IAI was considered "exceptionally cleared
due to the death of the actor."

This administrative conduct resulted in a partial or incomplete
investigation which is contrary to accepted practices of
organization and officer accountability.  From the materials I
have reviewed, the PSP has fallen below the accepted practices
of police internal investigatory conduct.

Additionally, the actions and/or inactions of the involved
officers, as analyzed and discussed in this report, were
substantial contributing factors causing the harm suffered by
Troy Hooftallen and the plaintiffs.

## VII.  OPINIONS

Based on my review of the above-listed materials, my specialized
knowledge and combined experience of more than 40 years as a
police officer, police trainer, educator, policy researcher, and
forensic examiner and professional and academic qualifications
in criminology, criminal justice organizations, operations, and
procedures, I offer all opinions expressed above, within a
reasonable degree of professional certainty.

Sincerely,

*/s/ R. Paul McCauley*

R. Paul McCauley, Ph.D., FACFE

Attachment

Copy of Curriculum Vitae – R. Paul McCauley, Ph.D., FACFE
Summary of Expert Experience
List of cases in which testimony was given the last four years