# EXHIBIT

# Report of

# Cliff Jobe

Cliff Jobe Consulting, LLC.                                    Telephone 724-454-5044

204 Kennan Drive                                              OR1@cliffjobe.com

Greensburg, Pa. 15601

---

June 26, 2014

Thomas L. Donahoe, Jr., Esquire

Office of Attorney General

6th Floor, Manor Complex

564 Forbes Ave.

Pittsburgh, PA. 15219

Phone: 412 -565-3572

         RE:     <u>Barbara Wingard v. Guy Battestilli, et. al.,</u>

                   12-1500

Dear Mr. Donahoe,

       With regard to the aforementioned case you asked me to review certain materials and render opinions with regard to the official and dutiful response, operations and tactics, force options and procedures utilized and demonstrated by members of the Pennsylvania State Police, with regards to an encounter and custodial apprehension of a Troy Hooftallen, while dutifully conducting an investigation into ongoing and immediate actions by Hooftallen that were dangerous, unlawful, and created a substantial risk of serious injury and damage to persons and property in proximity to Troy Hooftallen during this incident occurring on October 18th, 2010.

       Please accept this letter as my report for the requested opinions on the matter.  I reserve the right to amend this report should any additional information become available at any time.

**Qualifications**

       I am a retired Pennsylvania State Police Officer with approximately 38 (thirty eight) years of service to the Commonwealth of Pennsylvania, and 4 (four) years of private practice as an expert witness in the "use of force" as it pertains to law enforcement related matters.

       The Pennsylvania State Police is the oldest and largest State Constabulary in the United States with a rich history of exemplary service to the Commonwealth, maintaining the peace and protection of the majority of geographical Pennsylvania.

       On July 31, 1993, the Pennsylvania State Police was accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA), thus becoming the largest internationally accredited law enforcement agency in the world.

1

Accreditation facilitates the creation, verification and maintenance of high quality policies and procedures, via voluntary compliance with a body of performance standards.

The Department has been instrumental for over 100 years in responding to and effectively managing any crisis or dangers that have confronted the citizens in unique as well as day to day operations of this great Commonwealth.

As a career Pennsylvania State Trooper I served in a variety of ranks and assignments giving me a realistic, professional and first hand perspective of legal, tactical and procedural issues that sworn police officers are tasked with while in the performance of carrying out their sworn duty to attempt to intervene for the protection of society from illegal, disrupting and dangerous circumstances.

For over twenty two years of my State Police Career I was and continue to be a Pennsylvania State Police and Pennsylvania Municipal Police Officer *certified instructor* and trainer for police and law enforcement officers and related professions.  I have trained thousands of Pennsylvania State Police and Municipal Police officers as well law enforcement agents, military personnel and corrections and probation officers from a variety of state, county and United States enforcement and Armed Forces agencies.

As a result of my professional experience and training I was designated as a Use of Force Expert by the Pennsylvania State Police for the Department from 1996 and up and until my mandatory retirement from the Department on April 16th, 2010.  I continue to be contracted by the Pennsylvania State Police and the Pennsylvania State Troopers Association to review and opine on Pennsylvania State Police related incidents where the "use of force" becomes a contested issue by parties involved.

Since July of 2010 I have been employed as a private consultant and expert witness, Cliff Jobe Consulting, LLC, for the purpose of rendering professional and expert opinions in matters involving the "use of force" as it pertains to law enforcement related encounters.


**Materials Reviewed**

In preparation of this report I have reviewed the following case- related materials.

1. Title 18, Pennsylvania Crimes Code, Sections 501, 505 and  508 of Chapter 5, 2009 Edition, Pennsylvania State Police Criminal Justice Handbook, published by Lexis Nexis.

2. Case Law including Graham v. Connor, 490 US page 386 (1989).

3. Pennsylvania State Police Field Regulations Section 7-3, Use of Force, 7-2, Prisoner Transportation, and 9-1, Electronic Control Devices, 9-2, Weapons, Qualifications and Proficiency Training, RE: Time of this incident.

4. Pennsylvania State Police Lesson Plans and Policies for Training Certification in the Use of TASER, EID Device, Model X-26 Deployment re: time of this incident.

5. Training Transcripts for Pennsylvania State Troopers Guy Battestilli and Steven Johnson (Officers involved in the incident).

6. IAD Histories for Pennsylvania State Troopers Guy Battestilli and Steven Johnson.

7. Service Records (Redacted) for Pennsylvania State Troopers Guy Battestilli and Steven Johnson.

2

8. Reports and Materials, provided by Attorney Thomas Donahoe, counsel for the defendants in this case, to include the following:

   a. Pennsylvania State Police Incident Report C01-1038589, date of incident 10/18/2010, including Initial and Supplemental reports.  Crime, Aggravated Assault.

   b. Pennsylvania State Police Fire Non-Traffic Death Investigation Report C01-1039203, date of incident 10/18/2010. Accidental Death of Troy Hooftallen.

   c. General Investigation Report for IAD-10-0738, Date of Report 05/19/2011.

   d. Allegheny County Medical Examiner Report Relative the Death of Troy Hooftallen, dated 10/21/2010.

   e. Death Certificate for Troy Hooftallen

   f. Troy Hooftallen Autopsy Report

   g. Troy Hooftallen Autopsy Photographs

   h. Plaintiff's response to request for Production with Medical, Hospital, Emergency Room and Ambulance.

   i. Deposition Transcripts including Sworn Statements of Barbara Wingard, Timothy Hooftallen and Kimberly Hall (Mother, Brother and Girlfriend of Troy Hooftallen (Deceased Subject of Investigation)).

   j. Medical History for Troy Hooftallen.

   k. Jefferson County 911 radio transcripts and audio recording for this incident.

   l. Audio recording and transcripts of IAD interviews Troopers Guy Battestilli and Steve Johnson relative to this incident.

   m. Draft Report of Dr. Cyril H. Wecht, M.D., J.D., retained by Plaintiffs' Counsel.

   n. Opinion of Dr. R. Paul McCauley, dated June 13, 2014

   o. Updated Information published by TASER International at www.taser.com

   p. Deposition of Trooper Guy Battestilli, dated May 5, 2014

   q. Deposition of Trooper Steven Johnson, dated May 5, 2014

   r. Deposition of Kimberly Hall, dated May 5, 2014

**SYNOPSIS:**

On October 18, 2010 Jefferson County 911 received an emergency call from Timothy Hooftallen requesting "emergency response" in the form of ambulance and police personnel to "come here and pick up my brother, he's going crazy". Timothy Hooftallen went on to describe the situation that his brother Troy Hooftallen

3

had psychological issues, had been suicidal a few weeks before, had now taken an overdose of pills, was trying to get "high, being violent, beating himself up, disrupting the children's sleep (in the house), pounding his fists, will not go with the emergency services people willingly, is 6' 4" tall and knows karate and kung fu and is "one hell of a fucking scrapper" and "you gotta get someone here quick".

911 dispatchers advised Timothy Hooftallen that the Pennsylvania State Police had been dispatched, were in route to the address provided by Tim Hooftallen and that an ambulance would be staging in the near vicinity until the State Police officers could render the situation under control for the EMT's to safely respond. Timothy Hooftallen acknowledged that "response scenario" and advised the 911 dispatcher to "let them (Police) know he's one hell of a fucking scrapper" (referring to Troy Hooftallen) and "he doesn't plan on going anywhere".

Troopers Guy Battestilli and Steven Johnson, responded to the location of the caller, and were met outside of the residence by caller Tim Hooftallen (brother) and Kimberly Hall (Girlfriend of Troy Hooftallen). Both of these individuals indicated that Troy Hooftallen was in the residence acting "out of control". They also told the responding Troopers that the "out of control" Troy Hooftallen had taken a whole box of Mucinex. Tim Hooftallen and Kim Hall further related that he (Troy) was "smashing up the place" and that Hall's daughters were in the house.

The Troopers were escorted into the residence by Tim Hooftallen and Kimberly Hall where they (Troopers) observed Troy Hooftallen and his mother Barbara Wingard seated on a couch in a living room area. As both Tim Hooftallen and Hall watched from the adjoining kitchen area, the Troopers, in full duty uniform, entered the living room and introduced themselves. Trooper Guy Battestilli approached Troy on the couch and offered a handshake introduction and asked Troy "what is going on". Troy Hooftallen initially shook Battestilli's hand and then proceeded to announce that he had taken a lot of pills and referred to himself as the "baddest mother fucker around" and could kick anybody's ass.

Troy Hooftallen, then in a display of bravado and aggression, stood up from the couch, picked up a partially filled plastic soda bottle and began to squeeze it in an attempt to break it, to the dismay of his family members present who shouted for him to stop and put it down.

Six feet four inches tall Troy Hooftallen then attempted physically and verbally to direct the Troopers outside of the residence by grabbing onto their respective arms with his hands.  As the Troopers dismissed the verbal and physical direction to go out of the residence Troy redirected his focus onto Trooper Johnson and engaged in a threatening stare at Johnson. Troy then took a "haymaker" style punch at Trooper Johnsons head. Trooper Johnson was able to block and duck the assault and engaged Troy encircling his arms, face to face, in an attempt to thwart additional aggressive actions. Both of the Troopers then engaged Troy Hooftallen and in the process of trying to restrain him fell onto a "love seat" style sofa. In the process of the control attempt Trooper Johnson struck his head off of an adjacent wall as Hooftallen fell on top of Johnson pinning him to the love seat sofa.  Trooper Battestilli attempting to gain the physical release of Trooper Johnson and control of Hooftallen's hands for handcuffing deployed his X-26 TASER, firing the probes into the upper right shoulder blade area of Hooftallen's back and conducted seven seconds of energy through the TASER which temporarily distracted Hooftallen from his own resisting and combative objective and allowed Trooper Johnson to be released from underneath Troy and subsequently gain control of one of his hands to apply a handcuff. After the second hand of Hooftallen was restrained behind Hooftallen's back the TASER probes were removed from his back.

Troy Hooftallen now handcuffed and still positioned on the love seat began "bucking" and "kicking" at the troopers in a violent manner in an attempt to resist restraint. Hooftallen defied the commands of the troopers as well as the requests from his family members including his mother to stop resisting the restraining efforts of the troopers.

As Hooftallen continued to buck and violently kick at the troopers Trooper Battestilli again deployed his X-26 TASER in a "drive stun" mode contacting the rear right upper leg area of Hooftallen with no results of control or

4

co-operation. He then deployed the TASER in a drive stun contact against the right back area of Hooftallen just above the waist line, to which Hooftallen responded verbally (yelled) but would not stop kicking.

Trooper Battestilli then proceeded to the State Police Patrol Unit for additional "leg restraints" while Trooper Johnson and Troy's brother Tim Hooftallen attempted to control the kicking and resisting of Troy by holding onto his upper body and legs.

Trooper Battestilli returned with the leg shackles and was able to apply the same to Troy's legs while he was still kicking.

Trooper Battestilli then returned to the patrol car to radio for the ambulance personnel to come to the scene, as Trooper Johnson maintained an in contact observation of Troy Hooftallen now on the living room floor and on his back.

As the Troopers waited for the arrival of the EMT's and ambulance, Troy Hooftallen seemed to fall into an unconscious state, with Trooper Johnson observing that Hooftallen's eyes rolled back. Trooper Johnson immediately checked for a pulse and determined that Hooftallen did have a pulse and breathing although his breathing was becoming labored. Troy Hooftallen was moved to a "recovery position" on the floor as Troopers assessed his condition.

As the Troopers questioned the family as to any health information that they could provide about Troy Trooper Johnson was preparing to place another cell phone call to ascertain the whereabouts of the "staged" ambulance when the EMT's arrived on scene from a short distance down (Estimated by report, 100 yards) the road from the location of this incident.

The EMT's began a protocol of assessment and CPR on Troy Hooftallen determining a pulse but no breathing.

Troy Hooftallen was immediately transported by ambulance to the Punxsutawney Hospital where he was initially treated and prepared for transfer to Allegheny General Hospital in Pittsburgh, PA.

Hooftallen was then transferred to Allegheny General by ambulance from Punxsutawney where he subsequently died in the late afternoon of October 19, 2010.

The cause of death was determined by the Allegheny County Medical Examiner as "accidental" and due to atherosclerotic cardiovascular disease.

It is my opinion that the actions of the Pennsylvania State Troopers Battestilli and Johnson were "objectively reasonable" and consistent with accepted law enforcement practices in light of all of the "facts and circumstances" including their training in the "law, defense and control tactics, rendering first aid" and the "use of force policies" of the Pennsylvania State Police in addition to information provided by Jefferson County 911 dispatch, the brother Tim Hooftallen and girlfriend Kimberly Hall, prior to actual contact with Troy Hooftallen as well as their personal observations of Troy Hooftallen during this incident.

**My Opinion and Basis**

5

1.      It is my opinion that the Pennsylvania State Troopers, Guy Battestilli and Steven Johnson who responded to the scene of this family member reported incident at 27 Charles Hill, Lane, Gaskill Township, Jefferson County, Pennsylvania,[1] were authorized by law and Department Policy to do so as part of their official duties.

> **OPINION NOTE: Both Troopers Battestilli and Johnson were on duty, assigned to Patrol Unit 10, working the 11pm to 7am shift for 10/19/2010.[2]**
>
> **Note: Shift actually begins on the night of 10/18/2010.**
>
> **Unit 10 was assigned to Incident C01-1038588 at 2322 hours for a MHR (Mental Health) assist.[3]**

2.      It is my opinion and observation that Jefferson County 911 provided complaint caller Timothy Hooftallen with an adequate and reasonable explanation that the EMT's and ambulance would be "staging" at a safe nearby location until the Pennsylvania State Police officers could arrive at the incident location and take control of any dangerous circumstances that might present a threat to responding EMTs. Timothy Hooftallen acknowledged that this protocol would be followed and said he understood while speaking with the 911 Dispatcher.[4]

> **Opinion Note: It is an accepted standard emergency response practice where there is perceived or identified danger to Emergency Medical Technicians and responders to allow law enforcement to arrive and gain control of the scene before EMTs will arrive on scene to render medical assistance and transport.**
>
> **Big Run Volunteer Fire Chief Scott Bowers (first responding EMT) stated in his interview with the State Police investigators that "they staged at the church as the call came in as the subject being violent". "They waited for PSP to give the all clear".[5]**

3.      It is my opinion that Timothy Hooftallen articulated specific details about his "out of control" brother Troy Hooftallen, age 36, that would warrant the EMTs precaution of "staging" nearby the incident scene and allowing the jurisdictional law enforcement (PA State Police in this jurisdiction) to dispatch and proceed ahead of the EMTs to insure a "safe" and "controlled" scene for Emergency Medical Personnel to arrive at.

    The following are a list of circumstances presented by Timothy Hooftallen that would have been indicators of extreme danger for responding emergency personnel including the Pennsylvania State Police Troopers.[6]

    a.      His brother was acting violent.

    b.      His brother was "going crazy".

_____

[1] Address supplied by Timothy Hooftallen to Jefferson Co. 911, Refer to Audio Recording Dated 10/18/2010, Time:23:16:09 (YHEDH!702264525).wav.

[2] Refer to PA. State Police Communications Memo, dated 10/19/2010 for Unit 10.

[3] Refer to Communications Memo dated 10/19/2010 for Unit 10.

[4] Refer to Jefferson County 911 Audio recording dated 10/18/2010, time of call, 23:16:09.

[5] Refer to Supplemental Report C01-1038589 (Non-Traffic Related Death Report), Interview of Chief Scott Bowers.

[6] Refer to Jefferson County 911 Audio recording dated 10/18/2010, time of call, 23:16:09.

c.      His brother was having psychological issues.

d.      His brother was trying to get "high" by overdosing on pills

e.      His brother had attempted suicide a couple of weeks prior to this call.

f.      His brother was beating himself up.

g.      His brother was scaring the family and the sleeping children. (Other people in the proximity of the danger).

h.      His brother was pounding his fists. (Pounding can be heard with loud voices in the background of the caller's voice).

i.      His brother was ready to fight.

j.      His brother was 6' 4" tall.

k.      His brother knew Karate and Kung fu (two martial arts fighting disciplines that incorporate hard striking and kicking techniques).

l.      His brother was "one hell of a fucking scrapper". (Indicating that he was proficient at inflicting damage to other persons in a fight).

m.      That his brother "did not plan on going anywhere" (Indicating that he would resist being removed from the premises under any circumstances including with law enforcement or EMTs).

**OPINION NOTE: Autopsy photographs show multiple lacerations on the backs and knuckles of Troy Hooftallen's hands which would be consistent with the articulated "pounding of his (Troy's) fists" that was stated by Tim Hooftallen and could be heard in the caller's background, in his call to 911 on the night of the incident.[7]**

4.      It is my opinion and observation that both Tim Hooftallen and Kimberly Hall (girlfriend of Troy Hooftallen) recognized the level of danger that Troy Hooftallen presented to others and himself as they met Troopers outside of the residence of the incident and described the need for the State Police to enter the residence and take control of Troy Hooftallen who by both of their descriptions was "out of control".[8]

a.      Tim Hooftallen related that his brother Troy had taken pills, a whole box of Mucinex DM.

b.      Tim Hooftallen related that Troy has done this before saying "he gets all hyped up and wants to fight everybody."

**OPINION NOTE: This is the second time that Tim Hooftallen has warned 1st responders that his brother is a "fighter".**

---

[7] Autopsy Photographs from the Allegheny County Medical Examiners Autopsy of Troy Hooftallen, 10/21/2010, Case # 10CORO6862.

[8] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589.

c.    Tim Hooftallen says his brother was in the hospital for attempted suicide a couple of weeks prior to his incident.[9]

d.    Tim Hooftallen relates to the troopers that his brother is 6'4" and "tough".

    **OPINION NOTE: Pennsylvania State Troopers are trained to consider the "Totality of Circumstances" in every "risk encounter", be it an unknown risk or a high risk. The Totality of Circumstances includes Officer- Subject factors e.g. age, sex, size of the suspect, skill level of the suspect, strength, endurance, hostility of the suspect, etc..[10]**

    **First responding Troopers are trained and understand from experience that in dealing with violators of the law there are only two types of "situations" from a preparatory perspective. There are "high risk" incidents or "unknown risk" incidents. Troopers are trained to understand that there are no "low risk" response or encounter situations.[11]**

e.    Kimberly Hall (identified to Troopers by Tim Hooftallen as Troy Hooftallen's wife), relates that Troy Hooftallen was (inside) yelling, screaming, scaring her girls, had taken Mucinex and was "out of control" and was urging the Troopers to hurry inside to get Troy help.[12] [13]

    NOTE: Hall overheard Tim Hooftallen tell the 911 dispatcher that Troy Hooftallen was skilled in Tae Kwan Do. She also knew that Troy Hooftallen had trained in "martial arts" before he and she got together (as a couple).[14]

5.    It is my opinion that when the Troopers first arrived inside the living room area that they properly identified themselves as "law enforcement" and authorized first responders. Trooper Battestilli offered a handshake introduction to Troy and attempted to ascertain what was happening with his condition by questioning.[15]

6.    It is my opinion that when Troy Hooftallen responded to the Troopers introduction in a hostile and threatening statement "I'm the baddest motherfucker around and can kick anybody's ass", the trooper's

---

[999] Documented by Hooftallen's medical records, Punxsutawney Hospital, September 2, 2010, Dr. Martin Chambers reporting. "Patients brother (Tim Hooftallen) did point out he (Troy) takes Mucinex DM in huge doses and becomes *nearly comatose* at times with ingestion of Mucinex." Overdose in suicide attempt.

[10] Pennsylvania State Police "Use of Force" Police, Field Regulation 7-3, dated 8/31/2009.

[11] The author was a Pennsylvania State Police Use of Force Instructor at the time of this incident and has first-hand knowledge of the State Police training materials and lesson at that time.

[12] Victim Statement of Trooper Steve Johnson,  Incident report # C01-1038589.

[13] Refer to Troopers Depositions, dated May 5, 2014, describes urgency depicted by Tim Hooftallen and Kimberly Hall to get Troy Hooftallen "under control".

[14] Refer to Kimberly Hall Deposition, May 5, 2014, Pages 64 -65.

[15] Victim Statement of Trooper Steve Johnson,  Incident report # C01-1038589.

level of "threat assessment" under the circumstances would have immediately been elevated to a tactically defensive position.[16]

**OPINION NOTE:  Troopers are trained to consider the "Totality of Circumstances" at the time of the incident including *Officer- Subject Factors*,(previously noted); *Special Circumstances*, including the subjects proximity to a weapon, special knowledge of the suspect (i.e. "fighting skills (karate and kung fu)); imminent danger, (including a warning from a person that they "could kick your ass"); alcohol or drug influence (i.e. "having taken a whole box of Mucinex" and being psychologically and physically impervious to reason, physical restraint or pain control) ; environmental factors (i.e. being in one's own residence with knowledge and access to weapons (conventional or improvised); resolution time (when a suspect may be escalating to a "high risk" potential); reaction time (of concern in close quarters confrontation where officers are within striking distance as well as other innocents (family members)); and consideration of other available options such as backup.[17]**

7.      It is my opinion that Troy Hooftallen, then escalated the level of danger to everyone in the residence by standing up from his seated position on the couch and closing the "reactionary gap"[18] established by Trooper Battestilli and Johnson, and grabbing onto the bodies of the officers in an attempt to force them outside of the residence and he announced that he wanted to go outside.[19]

> NOTE:    Kimberly Hall's Deposition of May 5, 2014 reveals the following information from her observation of Troy's response and action towards the Trooper's being at the residence:[20]
>
> a.      she believed that Troy Hooftallen "wasn't confused anymore". Page 77.
>
> b.      Hall states, "I knew he [Troy] knew what was going on". Page 78.
>
> c.      Hall relates that Troy put his hand on Trooper Battestilli's arm. Page 78.
>
> d.      Hall relates that Troy took a "swing" [assault punch] at the officers with his right hand. Page 83.

8.      It is my opinion that when Troy Hooftallen realized that he could not force the Troopers out physically he attempted to "assault" Trooper Johnson. Trooper Johnson reported that Troy Hooftallen then let go of the arms of the Troopers, faced Trooper Johnson with a 10-20 second stare, and then coiled his right hand, arm and side back to execute a "haymaker" style punch at Trooper Johnson.[21]

**OPINION NOTE: In addition, the "Totality of Circumstances" to be considered by trained Pennsylvania State Troopers includes the *Subjects Level of Resistance*,[22] including psychological intimidation (e.g. "I'm**

---

[16] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589.

[17] Pennsylvania State Police Field Regulation 7-3, "Use of Force" Policy, "Totality of Circumstances", Page 2.

[18] Reactionary gap is a distance established by trained Troopers to give them a reasonable time to "react" in self-defense or the defense of others when threatened.

[19] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589 and Witness affidavits of Wingard, Hall and Tim Hooftallen.

[20] Refer to Hall's Deposition, Page 77. NOTE: According to Hall, Troy must have known what he was doing.

[21] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589.

[22] Pennsylvania State Police Field Regulation 7-3, "Use of Force" Policy, "Totality of Circumstances", Page 2.

the baddest Mother Fucker around"); verbal noncompliance (e.g. "I can kick anybody's ass" Stated to questioning Law Enforcement 1st Responders); passive resistance (e.g. grabbing onto the arms of the Troopers and trying to physically direct them out of the residence), active resistance (e.g. Troy Hooftallen assuming a threatening stare[23] at Trooper Johnson); followed by active aggression (Troy Hooftallen takes a "haymaker" swing/punch at the head of Trooper Johnson)[24].

8.      It is my opinion that Trooper Johnson, after tactically avoiding the blow executed by Troy Hooftallen, then attempted to use "empty hand" control techniques by encircling the arms of his assailant allowing for Trooper Battestilli to move to a position behind Hooftallen to attempt to apply handcuffs to him, in order to restrain him from further attempts of assault with his hands.[25]

9.      It is my opinion that Trooper Johnson, Troy Hooftallen and Trooper Battestilli lost their footing in the struggle to control Hooftallen from further aggressive actions and fell together onto the "love seat" style sofa.

As Trooper Johnson fell he reportedly struck his head off of a proximal wall and was pinned underneath the struggling body of Troy Hooftallen who was now in a "superior tactical position" and in immediate proximity to attack Trooper Johnson's vital body areas as well as access his duty belt and police issued weapons including a firearm (pistol 40 Cal. S&W), an ASP Baton, OC Pepper Spray and an X-26 Taser (Electronic Immobilization Device).[26]

        OPINION NOTE: Pennsylvania State Troopers are trained to recognize that in every close encounter with a combative or resistive subject there are always weapons available and within reach of the suspect. Those weapons are the weapons of the Trooper and must be protected and retained during and hand to hand confrontation.[27]

10.     It is to my personal knowledge as a certified Police Tactical Instructor that "all of these circumstances" would create an immediate need to gain control of Hooftallen who had and was demonstrating an imminent threat of bodily injury to the Troopers as well as now resisting "seizure and arrest" for assaulting Trooper Johnson.

        OPINION NOTE: The affidavit of Barbara Wingard, (Mother of Troy Hooftallen), dated June 2, 2011, paragraph 7, states "I yelled to Troy to stop resisting and just let them cuff him."[28]

---

[23] Pennsylvania State Police Training on indicators of "high risk" situations include the "Thousand Yard Stare", a precursor look that a potential combatant suspect exhibits prior to attack.

[24] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589 and the sworn Affidavits of Barbara Wingard, dated June 2nd, 2011; Kimberly Hall, dated June 4th, 2011 and Timothy Hooftallen, Dated June 2nd, 2011, all acknowledge that Troy Hooftallen attempted to punch Trooper Johnson during this incident.

[25] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589. Victim Statement of Trooper Guy Battestilli, Incident report #C01-1838587.

[26] Victim Statement of Trooper Steve Johnson, Incident report # C01-1038589. Victim Statement of Trooper Guy Battestilli, Incident report #C01-1838587. Affidavit of Barbara Wingard, June 2, 2011.

[27] Pennsylvania State Police and Pennsylvania Municipal Police Officer Safety Lesson Plans include this training.

[28] Refer to Affidavit of Barbara Wingard, Dated June 2, 2011 sworn before Jeannette Ruth Bish, Notary Public, Punxsutawney Borough.

11.     It is my opinion that Trooper Battestilli's use of force in deploying his X-26 TASER was objectively reasonable with regard to lawful objects of the troopers in an attempt to gain "control" of a an escalating and immediately dangerous situation for everyone in the proximity of Troy Hooftallen including Hooftallen himself.

    a.     The X-26 Taser is an internationally accepted law enforcement tool, (less lethal weapon) designed to cause or bring about a number of tactical "control" objectives:[29]

        1. The immediate and temporary immobilization of a muscle group of the combative/resistive suspect, to allow/provide officers a window of opportunity to gain control of a physically capable or skillful suspect.

        2. The immediate and momentary distraction from the combative/resistive suspects intended or attempted unlawful or unreasonable objective, i.e. assaulting Trooper Johnson.

        3. The willful compliance of a resisting or combative suspect with "officer commands" or "officer objectives" induced by the irritating/painful sensation of the energy deployed from the TASER.

        **NOTE: Deposition of Kimberly Hall, dated May 5, 2014, indicates her observations of the TASER deployment on Troy Hooftallen:[30]**

        1.     Hall says the TASER was not effective because it wasn't going through his [Troy's] clothes. Page 90.

        2.     Hall relates, they tried Tasering him through his shirt, didn't work. Page 91.

        3.     Hall relates, that they pulled up his shirt and Tasered him two more times. Page 91.

        4.     Hall relates, the **last two** times it was going through but not the previous times of deployment. Page 92.

        5.     Hall related that she ***did not*** see Troy TASERED on the neck even though she stated that in her affidavit made prior to this deposition. Page 105.

**OPINION NOTE: It is my observation, according to Hall that Troy Hooftallen actually only "experienced" two "Drive Stun" modes of Deployment to his lower waist line area, because the other deployments, by her observation, did not go through because of his clothing. Hall's observations indicate that from an "effect" on Troy only the last two deployments of the (deployment at 2347.12 hrs. and 2347. 26 total of 11 seconds) were even felt by Troy.[31]**

**While Hall's observation of the amount of time of each deployment is exaggerated for any number of reasons her account is consistent with the accounts of both Trooper Johnson and Trooper Battestilli as to the locations and effectiveness of the actual EID deployments attempted on Hooftallen. The Download report gives the actual and accurate deployment time of each deployment attempted.**

---

[29] Refer to TASER International and Pennsylvania State Police Lessons Plans for the TASER X-26.

[30] Refer to Hall's Deposition, May 5, 2014.

[31] Refer to Download Report for TASER #X0-385580, issued to Battestilli and deployed the date of this incident.

b.      Troy Hooftallen escalated the situation from being an imminent medical and physical danger to himself and family, having intentionally overdosed on Mucinex DM[32], to being a "high risk" and immediate danger to the responding  Troopers who were assigned to respond and take control of the situation before Medical assistance would respond, i.e. the staging of the EMT's down that road.

**OPINON NOTE:  In a separate and subsequent investigation (4/15/11) Timothy Hooftallen told the Pennsylvania State Police that his brother Troy was a habitual abuser of Mucinex and that he (Hooftallen) had  actually been going to the store (where he was now arrested) where Troy obtained the Mucinex to personally (unlawfully) take the drug off of the store shelves to prevent his brother from obtaining it.[33]**

c.      The Troopers had already attempted verbal interaction to obtain the co-operation of Troy Hooftallen when he verbally and physically demonstrated aggressive and dangerous behavior towards the troopers.

d.      The Troopers initial response to Troy Hooftallen's <u>physical aggression</u> was to use empty hand techniques couple with verbal commands to stop the assault and resisting, to attempt to control the combative Hooftallen.

e.      Once Trooper Johnson's tactical position was compromised, as the assailant Hooftallen landed on top of him on the sofa and was in immediate and close proximity to Trooper Johnsons weapons Trooper Battestilli objectively determined the need to use the less lethal force of his Department issued X-26 TASER to attempt to immediately bring Hooftallen under control and free Trooper Johnson from his dangerous predicament.

**OPINION NOTE: Trooper Johnson was physically "pinned" under Troy Hooftallen but had also suffered a blow to his head against the wall as the suspect fell on top of him. Any *injury* to an officer that may distract or disable the officer from his ability to "tactically" and immediately function in self-defense or control mode is a "circumstance" that the Troopers are trained to take into consideration in the determining of "force options".[34]**

f.      Trooper Battestilli's initial discharge/deployment of his TASER was in the "Probe" (dart)  mode into the  upper right should blade area of Hooftallen's back.[35]

(1). The TASER probes are within two inches of each other indicating that very little muscle tissue would have been affected by the energy deployed for 7 seconds.[36] [37]

---

[32] Tim Hooftallen told 911 dispatcher that his brother "wasn't trying to kill himself" he was "just trying to get "high". Refer to Jefferson County 911 dispatch audio and transcript, PSP Non Traffic Death Report, C01-1039203. In a subsequent interview with Barbara Wingard, mother of the deceased, Wingard told state police that her son "takes too much Mucinex to get a buzz". Refer to supplemental Report C01-1038589, page .

[33] Refer to PA State Police Punxsutawney MVR (Mobile Video Recorder)Video of the Arrest of Timothy Hooftallen, for patrol unit C1-10, dated 04/15/11, referred to as item BDS3V00 in the materials reviewed.

[34] Refer to Pennsylvania State Police Field Regulation 7-3, Use of Force, Totality of Circumstances. Special Circumstances include: Injury or Exhaustion.

[35] Refer to the Attachment #2, Injury Diagram for Incident Report # C01-1039203. Taser Dart Punctures.

(2). The dart location on the back of the body of Hooftallen is consistent with the accepted deployment location as per TASER International and Pennsylvania State Police Instruction and Policy.[38]

(3). The medical examiners description and PSP Diagram of the "dart/probe" positioning describes the point of contact as being on upper right back area in the vicinity of the shoulder blade and approximately one (1) inch separating the darts.[39]

NOTE:    Refer to the attached Injury Diagram for dart/probe position.

**OPINION NOTE: It is my understanding and knowledge as a TASER X-26 certified instructor that the TASER energy deployed  at the time through the dart/probes would only be effecting a very small area of muscle mass just as the "drive stun" deployment only transmits the TASER energy signal to the immediate area of contact.**
**Additionally the area of contact is not near the heart but actually on the other side of the body. The discharge would have likely been at most a "distraction of irritating pain" in contrast to the expected temporary immobilization of a larger muscle group affected by wider probe deployment.[40]**

**The "narrow" band of tissue engaged by the dart deployment was because Trooper Battestilli was very close to Hooftallen at the instant of deployment of the probes, as he physically struggled to gain control of the subject who was on top of his partner Trooper Johnson.**

12.       It is my opinion that the continued resistance and active aggression of thrashing, bucking and kicking of handcuffed suspect Troy Hooftallen, as reported and described by Troopers Johnson and Battestilli in their Victim Statements, did require additional "objective oriented" force options to control Hooftallen in preventing him from further injuring himself, the troopers, family members and property.

**OPINION NOTE: Handcuffs are at best a temporary and partial restraining device designed to minimize the use of a suspects hands to further injure self, others or destroy evidence and property. Violent**

---

[36] Refer to Autopsy Report, TASER probes separated by "one inch", right posterior upper back.

[37] Refer to TASER Download for TASER # X00-385580, date of report 10/20/2010, download 0173.

[38] Refer to Attachments #1 and #2 for Targeting areas for TASER Deployment as Determined by TASER International and accepted by the Pennsylvania State Police for Training and Tactical Use of the TASER as a Less Lethal Force Option.

[39] Refer to Allegheny County Medical Examiner's report as well as the diagram of suspect injuries attached to the Non Traffic Death Report C01-1039203.

[40] TASER X-26 Instruction and **State Police Instruction Manual** for the use of the X-26 TASER, dated 2008, trains for the specific objectives and expectations of Probe Deployment and Drive Stun deployment of the X-26 TASER. Probes/dart, Deployed with wide spread (1 – 3 feet) designed for Neuro Muscular Incapacitation, while a Drive Stun Deploy is "generally pain compliance" oriented objective. NOTE: A close probe deployment as is noted in this incident (within one inch) functions like a "drive stun" deployment. Little if any NMI (Neuro Muscular Incapacitation).

13

handcuffed suspects, intent on resisting control efforts by police will still have the ability and opportunity to injure and destroy persons and property with their, head upper torso, legs and feet if not controlled by some form of restraint.

The United States Court System does not allow "prisoners" or arrested "suspects" to be transported through its jurisdiction without the use of restraining devices including handcuffs, waist chain and legs shackles and at least two transporting officers because the Court "fears" from experience, for the danger and damage that an unrestrained, uncontrolled prisoner can cause given a moment of opportunity without that control.[41]

The following is an account by Troopers Johnson and Battestilli for the controlling actions subsequent to the handcuffing.[42]

a.      Trooper Johnson articulated is his Victim/Witness account that once handcuffed Troy Hooftallen "started to resist again by kicking and jerking around".

b.      Trooper Johnson and Trooper Battestilli initially physically attempted to hold onto Troys upper and lower body to control him from his resisting efforts.

c.      Tim Hooftallen also recognizing the need to restrain his brother assisted Trooper Johnson in holding onto Troy's legs while Trooper Battestilli went to the patrol unit to obtain leg restraints.

d.      When Troy began resisting again during the application of the leg restraints he was moved from the "love seat" (couch) to the floor where Trooper Battestilli was able to apply the shackles.

e.      Once the restraints were applied Trooper Johnson rolled Troy Hooftallen onto his back so that he could continue to restrain the still resisting suspect and keep him from hurting himself.

OPINION NOTE: It is my observation that the plaintiffs' expert opinions of Dr. Cyril Wecht and Dr. R. Paul McCauley are at odds with each other with regard to Compression Asphyxia contributing to the Cardiac Arrest of Troy Hooftallen as indicated as cause of death by the Allegheny Medical Examiners Autopsy Report.

While Dr. Wecht opines that "compression asphyxia", "from chest compression that occurred during the physical restraint applied by the state troopers", placed an additional demand on a heart that was "at risk for the onset of myocardial ischemia"[43], Dr. Wecht was not on the scene and has no evidence articulated by the Troopers that any weight or compression was ever applied for a short or prolonged period of time to Troy Hooftallen.

In his report, Dr. McCauley opines that numerous scientific studies including as recently as April 21st of 2014, concluded that _neither_ the hog tie nor the prone position..._with or without weight force contributed_ to "abnormal pulmonary function", hypoxia... sufficient to cause asphyxia.[44]

---

[41] Refer to United States Marshall's Service Directives for Prisoner handling and transportation.

[42] Refer to Non-Traffic Death Report, Victim/Witness Statements of Troopers Johnson and Battestilli, C01-1038589.

[43] Refer to Dr. Cyril Wecht's Opinion, Page 6.

[44] Refer to Dr. R. Paul McCauley's Opinion, page 29 of 76.

OPINION NOTE: It is to my knowledge and understanding according to the research of Dr. Christine Hall, medical faculty member at the University of British Columbia and the University of Calgary, recognized internationally as an expert of excited delirium syndrome, and funded by the Canadian Police Research Center, determined that the "medical examiners original work (early 1980's) on the effects of positioning was shown to be "fraught with methodological errors," and that other more sophisticated studies disputed alleged adverse findings.

Dr. Hall's Study results reported in a publication Force Science News #196, published by the Force Science Institute, Ltd., points out that "prone positioning came to be regarded "without scientific evidence" as "particularly dangerous" to restrained suspects who are "under the influence of intoxicants such as alcohol and/or stimulants, experiencing mental distress, or in the agitated, incoherent state known as excited delirium," as well as those who have been Tasered. "When a cause of death cannot be found otherwise, positional asphyxia is often suggested to have [played] a role….," the researchers note.[45]

13.     It is to my knowledge[46] that Troopers Johnson and Battestilli, having undergone Basic State Police Cadet Training as well as annual required "Mandatory Update" training which included Use of Force and Arrest and Control procedures, would have been acutely aware of the "asphyxia associated concerns" attributed, "by some", to prolonged excessive pressure on any prone suspect.  It is also my opinion that aside from the periods of continued resistance or assaultive behavior on behalf of Troy Hooftallen the force options utilized by the troopers were compliance and control oriented, i.e. short TASER deployments to distract while applying handcuffs. Once the troopers had accomplished the "lawful objectives" of applying physical restraints to minimize Hooftallen's potential to cause injury and damage, the troopers basically maintained a position of contact to monitor the suspect's actions while waiting for the summoned ambulance and EMT's to arrive from their staged location.

OPINION NOTE: Trooper Johnson reported that once the shackles were applied to the still kicking, (resisting arrest) Hooftallen, he (Hooftallen) was rolled over into a position on his back by the troopers, as he was still resisting, and Johnson continued to restrain him to keep him from hurting himself.[47]

14.     It is my opinion that the troopers having been trained and American Red Cross Certified in First Aid and CPR, properly monitored Troy Hooftallen while waiting for EMT arrival and properly placed him in a "recovery position" when they observed that he had gone unconscious although he exhibited a pulse and shallow breathing.

OPINION NOTE: American Red Cross does not advocate giving CPR to a person who is still breathing and has a pulse regardless of how strong or weak either of the life functions are exhibited. The proper care for the "First responder" is to move the victim to a recovery position, barring any concern for spinal injury or other exigent circumstance, maintain an open airway and monitor the victim.

The troopers are also aware from training and experience that a violent "suspect" victim who is in custody also presents additional safety concerns if the suspect recovers or reverts or is feigning illness and reverts  to his previously exhibited violent and dangerous behavior.

It is my opinion and observation that these concerns of continued violence are the reasons for the EMT staging policy until "law enforcement" has secured the "dangerous victim".[48]

---

[4545] Force Science Institute, Ltd, publication, News # 196.

[46] Cliff Jobe was a Certified Use of Force and Control Tactics Instructor for the Pennsylvania State Police from 1988 until retirement from State Service in 2010.

[47] Trooper Johnson's "Victim/Witness report, dated 10/19/2010, page 3, Report #C01-1038589.

It is to my knowledge that the Pennsylvania State Police Training incorporated a publication from the National Law Enforcement Technology Center, dated June 5, 1995 titled Positional Asphyxia- Sudden Death. The purpose of this publication was to highlight that certain types of conditions including "drug and alcohol intoxication, and violent struggle extreme enough to "require" officers to employ some type of restraint technique may result in subjects being "more vulnerable" to subsequent respiratory muscle failure.

The purpose of this publication as it was presented to Pennsylvania State Police Trainees was to alert the officer's for the potential of an onset of respiratory difficulty or failure and to be prepared for the "need for immediate medical attention".

It is my opinion that the troopers, in this instance, not only immediately monitored the suspect for any type of stress related issues but had the EMT's on scene as "immediately as time and distance" coupled with the "protocol" of the ambulance and emergency medical response team would allow for. [49]

15.     It is my opinion that the documented bruises on the body of Troy Hooftallen are not indicative of any unauthorized or excessive force option utilized by the State Troopers. Troy Hooftallen was acting violently and banging himself around at the time that his brother Tim Hooftallen called 911 in the concern for his brother. Hooftallen was also handled by numerous other persons including EMT transporting personnel, hospital attendants at Punxsutawney as well as transporting EMT's to Allegheny General Hospital and hospital attending persons at that facility.

OPINION NOTE: Tim Hooftallen told the 911 Dispatcher "he ain't gonna hurt the kids he's just beating up on himself". [50]

16.     It is my opinion that Troy Hooftallen was a habitual drug abuser who utilized a variety of drugs for euphoric gratification with no regard for the negative social or economic effects it posed to him or his family members or responding emergency personnel.

a.      His mother Barbara Wingard told the State Police that Troy overdosed Mucinex to "get a buzz".

b.      His brother Tim Hooftallen told the Jefferson 911 dispatcher that Troy was trying to "get high".

c.      Family members told the EMT's responders including Chief Scott Bowers that Troy Hooftallen had smoked marijuana previously this date in addition to overdosing on the Mucinex DM.

d.      Tim Hooftallen reported to 911 Dispatchers and State Police that Troy had taken a whole box of Mucinex DM.

e.      The standard retail box of Mucinex DM contains 14 tablets. The adult dosage is one tablet every 12 hours.

---

[48] Refer to Audio recording and Transcript of Jefferson 911 dispatcher (D2) advising Tim Hooftallen that EMT's would not come to the residence until the State Police had secured the subject. "the ambulance will be staging until the State Police can take care of him and subdue him or do whatever they need to do to get him to calm down."

[49] Refer to the 911 Dispatch from Jefferson County 911. The Ambulance and EMT's were not to proceed until the Troopers got the situation under control and then the Ambulance would respond to the scene.

[50] Refer to Audio recording and Transcript of Jefferson 911 call from Tim Hooftallen.

f.      The Allegheny County Medical Examiner's report indicated under the heading GASTROINTESTINAL SYSTEM, that "there are no drug-like residues, capsules or pills in the stomach" of Troy Hooftallen.   The Allegheny County Medical Examiner's report does indicate that there were quantities of Dextromethorphan in both the blood and the urine of Troy Hooftallen.[51]

g.      Medical Records reported by attending physician Dr. Martin Chambers, Punxsutawney Area Hospital, History and Physical Examination of Troy R. Hooftallen, for a suicide Attempt on September 2, 2010, Under the  heading of **History of Present Illness**, states that "The patients brother (Timothy Hooftallen) did point out  that he (Troy Hooftallen) does take Mucinex DM in huge doses and **becomes nearly comatose at times** with ingestion of Mucinex DM."[52]

**OPINOIN NOTE: It is my observation that if Troy took a whole box of Mucinex DM (Fourteen Tablets) and none were found in his stomach contents but blood and urine were positive for the active ingredient Dextromethorphan then Troy Hooftallen had a dosage of "fourteen" times the prescribed adult dosage in his blood stream and affecting his body functions.**

**The Side effects of Dextromethorphan in Mucinex DM (a single dose can produce) as listed on the products Web Page are as follows: severe dizziness, anxiety, restless feeling, or nervousness; confusion, hallucinations; or _slow, shallow breathing._**

**Troy Hooftallen had fourteen times the amount of Dextromethorphan in his system at the time he was responded to by the State Police.**

**It is my opinion that if one adult dose of Mucinex DM can produce the above listed side effects including "shallow breathing" then it is probable that fourteen (14) times the amount can severely compromise the breathing capability of the ingesting party, in this case Troy Hooftallen.**

17.     It is my opinion that Troy Hooftallen, contrary to Dr. Wecht's opinion that Troy Hooftallen was a relatively healthy young adult, was a prime candidate for heart failure under any set of stressful circumstances because of his own unfortunate medical condition, his undiagnosed arteriosclerosis which was obviously exacerbated by his own selected life style.

a.      The Allegheny Medical Examiners report indicates that he had %70 blockage of a major artery to his heart and "acute intoxication" of both Dextromethorphan and Guaifenesin.

The pharmaceutical warning for Dextromethorphan is that an overdose can cause "slow or shallow breathing" among other agitating conditions to the body including blurred vision, confusion, difficulty in urination, drowsiness or dizziness, nausea or vomiting (severe), shakiness and unsteady walk, slowed breathing, unusual excitement, nervousness, restlessness, or irritability (severe).[53]

Tim Hooftallen related that his brother Troy took a whole box of Mucinex DM (14 x's the regular 12 hour dose).[54]

---

[51] Allegheny County Medical Examiners  Autopsy Report for Troy Hooftallen, dated October 21, 2010, Case No. 10COR06862.

[52] Punxsutawney Hospital Medical Records for Troy Hooftallen DOB 07/06/1974, Dictating Physician Dr. Martin Chambers, date of dictation, 09/02/2010.

[53] Refer to Web Page www.drug.com/sfx/dextromethorphan-side-effects.html.

[54] The box was collected and retained in evidence by the Pennsylvania State Police for this investigation.

17

b.      Punxsutawney Hospital Medical records from Dr. Martin Chambers indicated that he suffered from Crohn's disease, that he abused Mucinex DM to the point of being "comatose", that he smoked ½ a pack of cigarettes a day and smoked for many years (36 years old), and that he overdosed on other medications in attempted suicide prior to the date of this incident.

c.      Tim Hooftallen related to Dr. Martin Chambers relative to Troy's prior suicide attempt (two weeks prior to this incident, that Troy abused Mucinex DM on other prior occasions to the point of being "comatose".[55]

d.      Tim Hooftallen on State Police Mobile Video told the State Police that Troy repeatedly abused over the counter drugs (Mucinex DM) to the point that he [Tim] felt obligated to try to eradicate the drugs before his brother destroyed himself on the drugs.

e.      The family of Troy Hooftallen told EMT's at the scene of the incident that Troy had smoked marijuana earlier in the day.

**OPINION NOTE:** It would "not be reasonable" to believe that someone who regularly abused non-proprietary drugs would have just "incidentally" smoked marijuana for the first time this date.

**Marijuana also raises heart rate by 20-100 percent shortly after smoking; this effect can last up to 3 hours. In one study, it was estimated that marijuana users have a 4.8-fold increase in the risk of heart attack in the first hour after smoking the drug. This risk may be greater in older individuals or in those with cardiac vulnerabilities.[56]**

f.      Both Tim Hooftallen and Barbara Wingard indicated to investigators that Troy Hooftallen regularly/routinely abused drugs to "get high" or to "get a buzz".

**NOTE:   It is to my knowledge as a former Pennsylvania State Police Undercover Investigator for Illegal trafficking and abuse of "Controlled Substances", and as a former certified American Red Cross Advanced First Aid Instructor that "drug abusers" typically have weekend "body systems" and poor health, including "weakened and taxed major organs including the heart" and weekend immune systems as a result of the detrimental effects of these drugs on the body systems.**

g.      Kimberly Hall relates the following in her May 5, 2014 deposition about the daily routine and lifestyle of her live in boyfriend Troy Hooftallen:[57]

1.      No hobbies

2.      Gets up in the morning and goes to his mother's house to talk.

3.      Smokes half a pack of cigarettes each day.

4.      Sits around the house (while she works) playing video games.

5.      Has not played the only sport of interest (basketball) in over a year.

---

[55] Refer to Medical records for Troy Hooftallen.

[56] Refer to Web Page, www.drugabuse.gov/publications/drugfacts/marijuana.

[57] Hall Deposition, Page 47 and 48.

6.      Does not work.

7.      During the day "does nothing really".


CONCLUSION:

It is my opinion that the "totality of circumstances" encountered and recognized by Troopers Johnson and Battestilli including, dealing with the "unreasonable physical aggression of Troy Hooftallen, the "agitated irrational psychological mindset" of the self-intentionally drug overdosed Troy Hooftallen, the "uncontrolled physical environment" of the suspects place of encounter and "other family members", constituted a violent and dangerous scenario.[58]

It is my opinion that the Troopers acted in a professional and tactical demeanor in initially confronting and addressing Troy Hooftallen given the amount of discomforting "warning" information they had obtained from 911 Dispatch, Brother Tim Hooftallen and girlfriend Kimberly Hall, to include that Troy was violent, non-cooperative, a well-trained fighter and acting "irrationally" as a result of habitual self- induced drug abuse.

It is my opinion that when Troy Hooftallen assaulted the Troopers by laying hands on them and then subsequently attempting to "punch" Trooper Johnson that the troopers responded in a tactical manner utilizing "objectively reasonable" force options to attempt to bring Hooftallen under control as they would in dealing with any dangerous criminal attempt to assault anyone including themselves.

It is my opinion that once Troy Hooftallen was reasonably controlled by the State Police officers using authorized restraints, albeit that he was still resisting, the troopers called for the staged and alerted EMT personnel as was the protocol for this response and when they became immediately aware that Hooftallen may be in medical distress took further action to facilitate his comfort and recovery until the EMT's arrived momentarily.

It is my opinion that Troy Hooftallen's death was "accidental" as determined by the Allegheny County Medical Examiner and that Troy Hooftallens abusive and combination use of illegal (marijuana) and non-prescription drugs (Mucinex DM) contributed to his already undiagnosed, precarious health condition of atherosclerotic cardiovascular disease, culminating in his unfortunate demise on the date of the incident.

It is my opinion that the use of force options selected by the defendants (Pennsylvania State Troopers) in this incident, including uniformed officer presence, multiple officer presence, continuous verbal commands to surrender and comply with law enforcement and the deployment of less lethal temporary immobilization technology was "objectively reasonable" from the perspective of a reasonable, trained and experienced police office.

All of my opinions offered in this report are to a reasonable degree of professional certainty based on the facts related in the materials that I have been asked to review or that I have professional and personal knowledge of.

---

[58] *Graham v. Connor*, 490 U.S. 386 (1989), The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. Pp. 490 U. S. 396-397.

I reserve the right to amend or change any or all parts of my opinion should other documented and corroborated information be presented to me at a future time that would cause me to view this matter differently.

Respectfully Submitted:

Clifford W. Jobe, Jr.                    Date of Report:   June 26, 2010.

**Cliff Jobe Consulting, LLC**



| SP 7-0072A (4-94) | **INJURY DIAGRAM** | | INCIDENT NO. C01-1039203 |
| --- | --- | --- | --- |
| VICTIM | **Troy Robert Lee HOOFTALLEN** | | |

TASER DART PUNCTURES

BRUISE

ABRASIONS

ABRASIONS

ABRASIONS

TASER DRY STUN MARKS

BRUISING

| COMPLETED BY | Cpl. Charles C. DOMINICK | BADGE NO. 6311 | DATE 03/23/11 |
| --- | --- | --- | --- |
| SUPERVISOR'S REVIEW | C.I. SECTION CO. | | PAGE NO. |

Attachment 1, Preferred Target Zone Front.

21

# Preferred Target Zone Front
## (when possible)

Lower torso (blue zone)

- More effective
  - Split hemisphere
  - Larger Muscles
- Reduces risk of hitting sensitive body areas –
  Refer to current product warnings
- Increases dart-to-heart safety margin distances
- Do not intentionally target genitals



22

Attachment 2, Preferred
Target Zone Rear.

V17 – Tactical Consideration

# Preferred Target Zone Rear

- Below neck (blue zone)
  - Large muscles
  - Avoid head



23

